IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FUJIFILM SONOSITE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-309 (JPM) |
| | ) | |
| BUTTERFLY NETWORK, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF FUJIFILM SONOSITE'S OPENING CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Robert L. Maier
Jennifer C. Tempesta
Margaret M. Welsh
Pallavi Mathur
Eric J. Faragi
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY  10112
(212) 408-2500

April 18, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff FUJIFILM Sonosite, Inc.*

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................................ 1

II.     LEGAL STANDARD.................................................................................................... 1

III.    DISPUTED CLAIM TERMS........................................................................................ 3

        A.      The '157 Patent ................................................................................................. 3

                1.      "information of object" ......................................................................... 3

                2.      "image analysis unit" ............................................................................ 5

                3.      "normalization process"........................................................................ 8

                4.      "region setting unit" .............................................................................. 9

        B.      The '985 Patent............................................................................................... 10

                1.      "accessible by a hand of the user that is holding the portable ultrasound system".................................................................................. 11

                2.      "controls that can be selectively activated by a thumb of the user to select" ................................................................................................ 13

        C.      The '050 Patent............................................................................................... 14

                1.      "an ultrasound scanner support device, comprising"........................... 14

        D.      The '108 Patent............................................................................................... 16

                1.      "an ultrasound system application specific integrated circuit (US-ASIC)" ................................................................................................ 16

                2.      "one or more digital signal processor(s)" ............................................ 17

                3.      "input/output channels" ....................................................................... 19

        E.      The '822 Patent............................................................................................... 21

                1.      "determining a mask of pixels that correspond to the location of the interventional instrument" / "determine a mask of pixel coordinates that correspond to the location of the interventional instrument".................... 21

                2.      "blending pixels from the first frame and the second frame" / "combine a first set of pixels from the first frame and a second set of pixels from the second frame" ................................................................................. 23

                3.      "producing a graphic indication on the blended final ultrasound image" / "producing a graphic on the blended final ultrasound image" ................. 24

                4.      "processor".......................................................................................... 27

        F.      The '981 Patent............................................................................................... 29

                1.      "display of an impulse drive type"....................................................... 29

                2.      "one field period" ................................................................................ 30

                3.      "adjustment circuit" ............................................................................ 32

                4.      "control unit" ...................................................................................... 33

                5.      "image display period control circuit"................................................. 34

                6.      "second adjustment circuit" ................................................................ 35

IV.     CONCLUSION............................................................................................................ 35

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*3G Licensing, S.A. v. Blackberry Ltd.*,
   No. 17-82, 2018 WL 4375091 (D. Del. Sept. 13, 2018)............................................................27

*Allergan Sales, LLC v. Sandoz, Inc.*,
   935 F.3d 1370 (Fed. Cir. 2019)..................................................................................................2

*Apex Inc. v. Raritan Computer, Inc.*,
   325 F.3d 1364 (Fed. Cir. 2003)....................................................................................6, 32, 34

*Apple Inc. v. MPH Techs. Oy*,
   28 F.4th 254 (Fed. Cir. 2022) ..................................................................................................11

*Blackbird Tech LLC v. ELB Elecs., Inc.*,
   895 F.3d 1374 (Fed. Cir. 2018)................................................................................................23

*CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
   224 F.3d 1308 (Fed. Cir. 2000)................................................................................................23

*Canon, Inc. v. TCL Elecs. Holdings Ltd.*,
   No. 2:18-CV-546, 2020WL2098197 (E.D. Tex. May 1, 2020)...........................................6, 10

*Capella Photonics v. Fujitsu Network Communications Inc.*,
   Nos. 2:20-cv-00076, 2:20-cv-00077, 2021 WL 465430 (E.D. Tex. Feb. 9, 2021).................33

*Cequent Performance Prod., Inc. v. Hopkins Mfg. Corp.*,
   No. 13-CV-15293, 2017 WL 371230 (E.D. Mich. Jan. 26, 2017) ....................................32, 33

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
   868 F.2d 1251 (Fed. Cir. 1989)................................................................................................14

*Dyfan, LLC v. Target Corp.*,
   28 F.4th 1360 (Fed. Cir. 2022) ..................................................................................2, 3, 19

*Estech Sys. IP, LLC v. Mitel Networks, Inc.*,
   No. 221-CV-00473, 2023 WL 2695093 (E.D. Tex. Mar. 28, 2023) .......................................32

*FitnessAge Servs., Inc. v. Polar Electro, Inc.*,
   No. 2:1 l-CV-01444, 2014 WL 551335 (D. Nev. Feb. 10, 2014)............................................27

*GoDaddy.com, LLC v. RPost Commc'ns Ltd*,
   No. 14-CV-00126, 2016 WL 212676 (D. Ariz. Jan. 19, 2016) ..............................................27

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004)......................................................................................3

*Hewlett-Packard Co. v. EMC Corp.*,
   No. 02-04709 JF, 2004 WL 5651068 (N.D. Cal. June 23, 2004)...........................................20

*IControl Networks, Inc. v. Zonoff Inc.*,
   No. 14-1199-GMS, 2016 WL 1437892 (D. Del. Apr. 11, 2016)..........................................33

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)....................................................................................26

*Intel Corp. v. Broadcom Corp.*,
   172 F. Supp. 2d 515 (D. Del. 2001)................................................................................20

*Intel Corp. v. Qualcomm Inc.*,
   21 F.4th 801 (Fed. Cir. 2021) .......................................................................7, 12, 13, 14

*Intellicheck Mobilisa, Inc. v. Honeywell Int'l Inc.*,
   No. 16-0341-JLR, 2017 WL 6550700 (W.D. Wash. Dec. 21, 2017) .....................................32

*Jack Guttman, Inc. v. Kopykake Enterprises, Inc.*,
   302 F.3d 1352 (Fed. Cir. 2002)....................................................................................16

*Laryngeal Mask Co. v. Ambu*,
   618 F.3d 1367 (Fed. Cir. 2010)....................................................................................23

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004).................................................................................9, 23

*Masimo Corp. v. Philips Elecs. N. Am. Corp.*,
   No. 09-80, 2015 WL 7737308 (D. Del. Dec. 1, 2015) .......................................................28

*Maxell, Ltd. v. VIZIO, Inc.*,
   No. 21-6758, 2022 WL 2167619 (C.D. Cal. Mar. 9, 2022)..................................................33

*MTD Prod Inc. v. Iancu*,
   933 F.3d 1336 (Fed. Cir. 2019)...............................................................................6, 32

*Multilayer Stretch Cling Film Holdings, Inc. v. Inteplast Grp. Ltd.*,
   No. 2:12-CV-2107-WGY-DKV, 2013 WL 5972195 (W.D. Tenn. Nov. 8, 2013) (J. McCalla)
   ...................................................................................................................................16

*Neville v. Found. Constructors, Inc.*,
   972 F.3d 1350 (Fed. Cir. 2020)....................................................................................23

*Nobel Biocare Servs. AG v. Instradent USA, Inc.*,
   903 F.3d 1365 (Fed. Cir. 2018)....................................................................................24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008)..................................................................................11

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008)..................................................................................24

*Omega Eng'g, Inc, v. Raytek Corp.*,
   334 F.3d 1314 (Fed. Cir. 2003)..................................................................................26

*On Demand Mach. Corp. v.Ingram Indus., Inc.*,
   442 F.3d 1331 (Fed. Cir. 2006)..................................................................................14

*Optis Wireless Technology, LLC v. ZTE Corporation*,
   No. 2-15-CV-00300, 2016WL1599478 (E.D. Tex. April 20, 2016) ...........................6

*Panoptis Patent Management, LLC v. Blackberry Ltd.*,
   No. 2:16-CV-62, 2017WL497571 (E.D. Tex. Feb. 7, 2017).......................................6

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)...............................................................1, 2

*Polaris PowerLED Tech., LLC v. VIZIO, Inc.*,
   No. 18-0157, 2020 WL 1060363 (C.D. Cal. Jan. 21, 2020).....................................32

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
   383 F.3d 1303 (Fed. Cir. 2004).............................................................................14, 15

*Profectus Tech. LLC v. Huawei Techs. Co.*,
   823 F.3d 1375 (Fed. Cir. 2016)....................................................................................2

*Rowe v. Dror*,
   112 F.3d 473 (Fed. Cir. 1997)....................................................................................15

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
   948 F.3d 1342 (Fed. Cir. 2020)....................................................................................6

*Syncpoint Imaging, LLC v. Nintendo of Am. Inc.*,
   No. 2:15-cv-00247, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016) .................................27

*Techno View IP, Inc. v. Facebook Techs. LLC*,
   No. 17-386, 2018 WL 6427874 (D. Del. Dec. 7, 2018) ............................................27

*Teleflex v. Ficosa America Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002).....................................................1, 2, 7, 9, 17, 24

*Velocity Patent LLC v. FCA US LLC*,
   No. 13-CV-8419, 2018 WL 4214161 (N.D. Ill. Sept. 4, 2018)..................................27

*Velocity Patent LLC v. Mercedes-Benz USA, LLC,*
   No. 13-CV-8413, 2016 WL 5234110 (N.D. Ill. Sept. 21, 2016) ............................................27

*XR Commc'ns, LLC v. D-Link Sys., Inc.,*
   No. 817-CV-00596 2022 WL 2291747 (C.D. Cal. Apr. 18, 2022) ........................................20

**STATUTES**

35 U.S.C. § 112 (2011) ...................................................................................................... passim

## TABLE OF EXHIBITS

*Unless otherwise noted, all exhibits below are excerpts of the text cited therein.*

| Exhibit No. | Description |
|---|---|
| A | McGraw-Hill Dictionary of Scientific and Technical Terms (5th ed. 1994) |
| B | The American Heritage Dictionary of the English Language (4th ed. 2000) |
| C | The New Oxford American Dictionary (2001) |
| D | Random House Webster's College Dictionary (2001) |
| E | (Full text) Institution Decision in IPR2022-01577 |
| F | IEEE 100, The Authoritative Dictionary of IEEE Standards Terms (7th ed. 2000) |
| G | (Full text) Defendant's Final Claim Constructions |
| H | File History of U.S. Patent No. 8,128,050 (Examiner's Search Strategy and Results) |
| I | File History of U.S. Patent No. 7,169,108 |
| J | Douglas F. Elliott, Handbook of Digital Signal Processing (1987) |
| K | Microsoft Computer Dictionary (4th ed. 1999) |
| L | Phillip A. Laplante, Dictionary of Computer Science, Engineering, and Technology (2001) |
| M | Frank Hargrave, Hargrave's Communications Dictionary (2001) |
| N | (Full text) U.S. Patent No. 6,569,101 |
| O | File History of U.S. Patent No. 8,861,822 |
| P | Steven M. Kaplan, Wiley Electrical and Electronics Engineering Dictionary (2004) |
| Q | Keith Jack & Vladimir Tsatsulin, Dictionary of Video and Television Technology (2002) |
| R | Rudolf F. Graf, Modern Dictionary of Electronics (7th ed. 1999) |
| S | G. W. A. Dummer, Newnes Dictionary of Electronics (4th ed. 2002) |
| T | Steven M. Kaplan, Wiley Electrical and Electronics Engineering Dictionary (2004) |
| U | (Full text) U.S. Patent No. 8,147,408 |
| V | Simon Collin, Dictionary of Science and Technology (2003) |
| W | R. B. Fisher et al., Dictionary Of Computer Vision And Image Processing (2005) |
| X | Phillip A. Laplante, Comprehensive Dictionary of Electrical Engineering 194 (2d ed. 2005) |

## I.    INTRODUCTION

Plaintiff FUJIFILM Sonosite, Inc. ("Sonosite") hereby submits this opening claim construction brief addressing the disputed patent claim terms identified by the parties for six of the seven patents asserted in this case, all of which claim inventions directed to various aspects of point-of-care ultrasound ("POCUS") technologies—U.S. Patent Nos. 6,901,157 ("'157 Patent"), 9,538,985 ("'985 Patent"), 8,128,050 ("'050 Patent"), 7,169,108 ("'108 Patent"), 8,861,822 ("'822 Patent"), and 8,360,981 ("'981 Patent").[1]

The parties' disputes regarding the identified claim terms largely fall into two categories. *First*, Defendant Butterfly Network, Inc. ("Butterfly") seeks in many instances to incorporate into the claims additional, narrowing limitations that come from examples in the patent specifications—an approach that directly contradicts controlling Federal Circuit law. *Second*, Butterfly improperly seeks to apply 35 U.S.C. §112 ¶6 to claim terms, arguing that these terms qualify as "means-plus-function" terms—even though courts have repeatedly construed similar terms not as means-plus-function terms, but rather in accordance with their plain meanings. Ultimately, Butterfly's positions, which contradict the plain meaning of the claims, the intrinsic evidence, and Federal Circuit law, should be rejected.

## II.    LEGAL STANDARD

The Federal Circuit has repeatedly explained that, in construing patent claims, there is a "'heavy presumption' that the terms carry their ordinary and customary meanings." *Teleflex v. Ficosa America Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art ["POSITA"] in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d

---

[1] The parties have not identified for construction any claim terms in the seventh asserted patent, U.S. Patent No. 7,867,168.

1303, 1313 (Fed. Cir. 2005) (en banc).

"Claim construction must begin with the words of the claims themselves." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019). Next, a court should review the intrinsic evidence, which includes the patent's specification and prosecution history, to the extent relevant. *Phillips*, 415 F.3d at 1315, 1317. In addition to the intrinsic evidence, a court may also consider extrinsic evidence, such as dictionaries. *Id.* at 1317-1318. "But this evidence is not for the purpose of clarifying ambiguity in claim terminology, … but rather unfamiliarity of the court with the terminology of the art to which the patent is addressed." *Markman*, 52 F.3d 986. It is unnecessary to consider extrinsic evidence where "the intrinsic evidence fully determines the proper construction of the contested claim term." *Profectus Tech. LLC v. Huawei Techs. Co.*, 823 F.3d 1375, 1381 (Fed. Cir. 2016). And extrinsic evidence should not be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Phillips*, 415 F.3d at 1324.

Critically, while the specification may be referenced for context to resolve ambiguities in the plain language, the Federal Circuit has "cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification," referring to the importing of such limitations as "a 'cardinal sin' of claim construction." *See, e.g.*, *Teleflex*, 299 F.3d at 1324, 1328.

Moreover, claim terms in patents may be written as "means-plus-function" terms—and, if they are, then 35 U.S.C. §112 ¶6 applies. In those instances, "such claim[s] shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." 35 U.S.C. §112 ¶6 (2010). However, importantly, "[b]ecause invoking §112 ¶6 is typically a choice left to the claim drafter," there is a rebuttable presumption that a claim limitation is ***not*** subject to §112 ¶6 in the ***absence*** of the term "means." *Dyfan, LLC v. Target Corp.*, 28 F.4th

1360, 1365 (Fed. Cir. 2022). The essential inquiry is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.*

## III.    DISPUTED CLAIM TERMS

### A.    The '157 Patent

The '157 Patent relates to ultrasonic diagnostic apparatuses in which transmission/ reception and image processing conditions can be set through parameters for each body part to optimize the ultrasound image for display. '157 Patent at 1:14-23, 2:15-21. As the patent explains, in prior systems, these parameters were set manually each time an image was obtained and displayed, which was laborious. *Id.* at 1:24-34. The claimed ultrasonic diagnostic apparatus of the '157 Patent describes interconnected units that control, process, and analyze image data, and display the resulting images for a clinician. *See id.* Fig. 6, 4:8-26, 11:6-12.

#### 1.    "information of object"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
| --- | --- |
| Information that represents one body part to be scanned, such as a particular organ | Plain and ordinary meaning |

While there is ordinarily a heavy presumption in favor of plain meaning, here the phrase "information of object" is not a common phrase with an ordinary and customary meaning and, as such, construction based on the intrinsic evidence is required. *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence—the written description and the prosecution history—to obtain the meaning of that term"). Indeed, Butterfly's citations to extrinsic evidence of the individual words "information" and "object," rather than the claimed phrase "information of object," demonstrates that the claimed phrase lacks a customary meaning outside of the context

of the '157 Patent.[2]

The disputed term "information of object," when read in the context of the claims, specification, and the prosecution history of the '157 Patent, means "information that represents one body part to be scanned, such as a particular organ." As explained in the '157 Patent, "[t]he *__information of object represents__*, for example, *__one of the body parts__* *such as liver, heart* and so on of a human or a test phantom as the object to be inspected." *Id.* at 4:36-38.[3] Throughout the specification, the term "information of object" is repeatedly and consistently referred to as representing "one body part to be scanned, such as a particular organ." *See e.g.*, *id.* at 4:30-31 ("items of the information of object expressive of the body parts"), 4:34-36 ("preset for the *body parts* of the object, on the basis of *information of object* which is input to the information input unit 3"), 5:32-34 ("parameters corresponding to such *a body part* of the object to be inspected that is *expressed by the information of object* input to the information input unit 3"), 6:46-49 ("By way of example, the operator inputs *the information of object* for selecting '*liver*' as *the body part*"). Sonosite's construction of the term tracks the plain and ordinary meaning, when read in the

---

[2] While Butterfly relies on numerous citations to various dictionaries to define the words "information" and "object," Butterfly locates no dictionary or other reference that provides a plain and ordinary meaning for the claimed "information of object." *See, e.g.*, Ex. A (MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS 1013, 1373 (5th ed. 1994)) at BFLY_FUJI_0043095-96 (providing only a definition of "information" and "object" separately)); Ex. B (THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 899, 1211 (4th ed. 2000)); Ex. C (THE NEW OXFORD AMERICAN DICTIONARY 871, 1180 (2001)); Ex. D (RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 635, 848 (2001)). The extrinsic evidence provides definitions for other phrases that are commonly known in the art such as "information function of a partition" that have a particular meaning within the relevant art, but a definition of the disputed term is not present. *See* Ex. A at BFLY_FUJI_0043095 (no definition for the "information of object")).

[3] Unless otherwise noted, all emphases in this brief are added.

context of the claims, specification, and the prosecution history of the '157 Patent. [4]

### 2.    "image analysis unit"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not subject to 35 U.S.C. § 112, ¶ 6, but if further construction is necessary, "at least one processor programmed to analyze the image data by extracting certain frame data from among data being scanned" | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite.<br><br>For Claims 12 and 17, alternatively, "a processor programmed to analyze the image data by detecting peaks and calculating maximum values, minimum values, and average value of an intensity, by histogram analysis"<br><br>For Claim 23,  alternatively, "a processor programmed to analyze the image data of the desired region by detecting peaks and calculating maximum values, minimum values, and average value of an intensity, by histogram analysis" |

The term "image analysis unit" is not written in "means-plus-function form," and is not subject to § 112, ¶ 6. No further construction is necessary.

However, to the extent the Court concludes the term requires some further construction, Sonosite's proposed construction (shown above), is consistent with the claim language, as well as the specification of the '157 Patent. For example, the specification states the system can "***analyze the accumulated image data*** and calculate normalization parameters in the ***image analysis unit*** 65," and [t]he analysis in the ***image analysis unit*** 65 is made by ***extracting certain frame data from among data being scanned***." '157 Patent at 6:50-60.

Rather than track the plain meaning, Butterfly alleges that this term should be governed by 35 U.S.C. §112 ¶6 as a "means-plus-function" term. However, several courts have found similar "unit" language to be structural, and therefore not subject to §112 ¶6 – and the result here should

---

[4] The recent Institution Decision in IPR2022-01577 (Ex. E) issued on April 13, 2023, regarding the '157 Patent is not a final determination on claim construction, and not binding. Federal Circuit case law allows the P.T.A.B. to change its conclusion during the course of the proceeding. *See, e.g.*, *Hamilton Beach Brands, Inc. v. f'real Foods, LLC*, 908 F.3d 1328, 1338-39 (Fed. Cir. 2018).

be no different. *See, e.g.*, *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1353-54 (Fed. Cir. 2020) ("digital processing unit" was not means-plus function limitation and "clearly serves as a stand-in for a 'general purpose computer' or a 'central processing unit,' each of which would be understood as a reference to structure in this case"); *Optis Wireless Technology, LLC v. ZTE Corporation*, No. 2-15-CV-00300, 2016WL1599478, at *39 (E.D. Tex. April 20, 2016) ("Defendants failed [to] overcome presumption that 'receiving unit' is not governed by §112 ¶6 and failed to prove that 'receiving unit' renders any claim indefinite."); *Panoptis Patent Management, LLC v. Blackberry Ltd.,* No. 2:16-CV-62, 2017WL497571, at *3-8 (E.D. Tex. Feb. 7, 2017) (finding "determination unit", "reception unit", and "transmission unit" not governed by §112 ¶6 and construing to have plain meaning); *Canon, Inc. v. TCL Elecs. Holdings Ltd.*, No. 2:18-CV-546, 2020WL2098197, at *15 (E.D. Tex. May 1, 2020) (finding "control unit" to have sufficiently definite structure).

The term at issue here, and similar terms in the '157 Patent addressed below, follow this same "unit" structure. The "image analysis" modifier "imparts structural significance to the term," and, as such, the "image analysis unit" here is structural. *See, e.g., MTD Prod Inc. v. Iancu,* 933 F.3d 1336, 1342 (Fed. Cir. 2019) (citing *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364 (Fed. Cir. 2003) ("[T]he term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art.")). *See Canon*, 2020 WL 2098197 at *15. Further, the specification makes clear that the "image analysis unit" relates to a computer processor or unit that analyzes images—precisely as claimed in the plain language. '157 Patent at 6:50-60. Given this intrinsic evidence and the law, Butterfly cannot sufficiently rebut the presumption of non-applicability of §112 ¶6.

Butterfly's proposed alternative constructions are also improper, as they are overly narrow

and import limitations from the written description into the claims. *Teleflex*, 299 F.3d at 1324. Butterfly's proposed construction for claims 12 and 17, "a processor programmed to analyze the image data by detecting peaks and calculating maximum values, minimum values, and average value of an intensity, by histogram analysis," is based not on the description of the "image analysis unit," but rather on a specific function performed by the "image analysis unit." For example, the specification explains that "[t]he image analysis unit 65 detects peaks and calculates the normalization parameters, such as the maximum values, minimum values and average value of an intensity, by a histogram analysis." '157 Patent at 9:66-10:2. Butterfly incorporates this disclosure into the proposed construction but ignores entirely the modifier "***such as***," which signals that these are merely examples of ways to calculate the normalization parameters. Further, claims 12 and 17 already recite that the "image analysis unit" analyzes image data "thereby to calculate normalization parameters." The functionality imposed by Butterfly's proposed construction is already present in the claim, and to incorporate Butterfly's addition of this feature into the claim would render the other language superfluous—an approach the Federal Circuit has consistently rejected. *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

Finally, Butterfly's proposed construction for claim 23 suffers the same deficiencies, and also includes the phrase "desired region." Here again, Butterfly creates a redundancy as claim 23 already recites that the "image analysis unit" analyzes image data, "as to the desired region." Further, unlike claims 12 and 17, claim 23 does not require calculation of normalization parameters—and yet Butterfly seeks to add into the claim a specific example of normalization found in the specification ("detecting peaks and calculating maximum values, minimum values, and average value of an intensity, by histogram analysis"). Therefore, Butterfly's proposed

alternative constructions should be rejected.

### 3. "normalization process"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning, but if further construction is necessary, <br><br> "a process of performing a transformation on image data using parameters calculated based on at least peaks detected in the data" | "the process of performing a transformation of the image data by adjusting each intensity value so that a region between prescribed minimum and maximum intensity values becomes the full output range for the image data" |

The term "normalization process" requires no construction—as described throughout the specification, it is nothing more than a "process" for "normalizing" data—in the context of these claims, image data. Indeed, Butterfly's own extrinsic evidence provides that "normalization process" is a well understood term. *See, e.g.*, Ex. F (IEEE 100, THE AUTHORITATIVE DICTIONARY OF IEEE STANDARDS TERMS 744 (7th ed. 2000)) (defining "normalization" as "the process of decomposing and restructuring a complex data structure in order to reduce the structure to a simpler, more stable form"). No further construction is required, and the heavy presumption of plain meaning should prevail.

To the extent further construction is needed, Sonosite's proposed construction, "a process of performing a transformation on image data using parameters calculated based on at least peaks detected in the data" is consistent with plain meaning of "normalization," as described throughout the specification of the '157 Patent. Specifically, the "normalization parameters" are calculated by the image analysis unit, and in describing the normalization performed using the normalization parameters, the specification identifies that "image analysis unit 65 *detects peaks and calculates the normalization parameters*" and that "a linear *transformation* is made by way of example." *Id.* at 9:66-10:7. As the specification further describes: "[t]he *normalization* is done in such a way that image data obtained by the transmissions/receptions of ultrasonic waves is analyzed to

-8-

calculate *normalization parameters* in the image analysis unit 65 … whereupon a *linear normalization process* is executed in the image processing unit 66 on the basis of the *normalization parameters calculated* … ." '157 Patent at 9:48-55.  Thus, Sonosite's proposal – if construction is even necessary – draws directly from the patent and appropriately tracks the plain meaning of the claim language.

Butterfly's proposed construction is overly narrow and improperly imports into the claim limitations from a specific embodiment, which is inappropriate. *See, e.g., Teleflex*, 299 F.3d at 1324; *Liebel-Flarsheim Co. v. Medrad, Inc*., 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").

Moreover, the portion of the specification Butterfly appears to rely on for its proposed construction is only one example: "a linear transformation is *made by way of example* so that the region between the maximum value max1 and the minimum value min2 may become the full output range for the image data of the liver, and that the region between the maximum value max2 and the minimum value min2 may become the full output range for the image data of the heart." '157 Patent at 10:6-11. The specification clearly evidences that this is only one example from among others that can be used to perform a normalization of data, and Butterfly's construction ignores any other alternative normalization methods. Butterfly's construction should be rejected.

4.    "region setting unit"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, not subject to 35 U.S.C. § 112, ¶ 6 and not indefinite | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite. |

For the same reasons as expressed above with respect to the term "image analysis unit,"

*supra* IV.A.2., the term "region setting unit" does not qualify as a mean-plus-function term, and thus Butterfly's argument should again be rejected here.

As explained above, courts have repeatedly rejected attempts by accused infringers to construe similar "unit" terms as means-plus-function. And, much like the term above, and as can be seen in Figure 6, the "region setting unit 4" is simply a processing unit that allows "the operator [to set] a desired region of interest." '157 Patent at 12:14-16. In the patent specification, that unit is shown in the block diagram as being "connected to a system control unit 10, besides a parameter memory unit 2 … , and an information input unit 3." *Id.* at 11:6-9. It is clearly structural.

Similar to the term "image analysis unit" above, *supra* Part IV.A.2, the term follow this same structure. The "region setting" modifier "imparts structural significance to the term," and, as such, the "image analysis unit" here is structural. *See Canon*, 2020 WL 2098197 at *15. There is no evidence rebutting the presumption of non-applicability of §112 ¶6, and Butterfly's arguments should be rejected for the same reasons as detailed above.

### B.    The '985 Patent

The '985 Patent provides a portable ultrasound system allowing a clinician to operate advanced features of a graphical user interface ("GUI") on a touchscreen with only one hand holding the touchscreen device (a "base unit"), as illustrated in the figure below. '985 Patent at 2:57-3:5; Figs. 1B, 3C. This is valuable to the clinician because it is not always possible or convenient for the clinician to use both hands to operate the touchscreen, most importantly, while the clinician has one hand occupied holding the probe over the patient. *See id.* The invention provides for a "second control area" (marked in red below) containing controls that can be activated by the thumb of the user's hand while holding the touchscreen device:



Fig. 1B

Fig. 3C

*Id.* Figs. 1B, 3C (annotation added). Indeed, as shown above, the core of the invention, and as detailed in the claims, is a system that allows for one-handed operation of certain controls on the touchscreen device. The corresponding claim limitation at issue recites: "a second control area that is ***accessible by a hand of the user that is holding the portable ultrasound system***, wherein the second control area includes a plurality of ***controls that can be selectively activated by a thumb of the user to select*** an attribute of a selected graphical tool." *Id.* claim 1.

While Butterfly asserts plain and ordinary meaning for construction of these terms, the parties have a clear dispute as to what the plain and ordinary meaning actually is—and thus, an issue of interpretation that the Court must resolve in claim construction. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).

1.    **"accessible by a hand of the user that is holding the portable ultrasound system"**

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| "accessible by the user's hand that is holding the base unit" | Plain and ordinary meaning |

As an initial matter, Sonosite's proposed construction reflects the plain and ordinary meaning of the term, that is, "the meaning one of ordinary skill in the art would ascribe to a term when read in the context of the claim, specification, and prosecution history." *Apple Inc. v. MPH Techs. Oy*, 28 F.4th 254, 259 (Fed. Cir. 2022). Under the claim language itself, the claim term

concerning a second control area that is "accessible by a hand of the user that is holding the portable ultrasound system" plainly requires the second control area to be accessible *by the hand of the user holding the base unit*. The claim phrase recites a hand "holding *the* portable ultrasound system," and antecedent basis for that phrase traces back to the beginning of claim 1 including the preamble ("*a* portable ultrasound system"), which recites that the claimed "portable ultrasound system" comprises "a hand-held base unit," and all subsequent claim limitations then provide further descriptions that the control areas in question must be on that hand-held base unit:

> 1. A *portable ultrasound system*, comprising *a hand-held base unit*
> that includes:
>
>> a touchscreen display; and
>> a programmable processor configured to execute
>> instructions that cause the processor to produce a display
>> on the touchscreen display, including—
>>> a first control area . . . ,
>>> a second control area . . . , and
>>> an active image area . . . .

Therefore, "a hand holding the portable ultrasound system," read in the context of claim 1, must hold the "hand-held base unit." This is also supported by the specification's disclosure that a user would use the same hand to "*carry and operate* the base unit 110." '985 Patent 3:1-2. There is no other reasonable way to interpret the claim.

By contrast, Butterfly's position, which argues that the hand "should not be limited to only 'the user's hand that is holding the base unit,'" Ex. G (Defendant's Final Claim Constructions) at 20, contradicts the plain language and eviscerates the core invention allowing for one-handed operation. [5] Hence, Butterfly's construction should be rejected.

---

[5] This interpretation not only goes against the claim language and the intrinsic evidence that the claims are directed to one-handed operation, as explained above, but also improperly renders the claim limitation meaningless. *See Intel*, 21 F.4th at 810. If the "hand" here is not the one holding

> **2.** **"controls that can be selectively activated by a thumb of the user to select"**

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| "controls that a thumb of the user's hand holding the base unit can selectively activate to select" | Plain and ordinary meaning |

Similarly, Sonosite's proposed construction here confirms the plain and ordinary meaning of the term. The claim term here concern controls inside the "second control area." *(Id.* claim 1 (reciting "wherein the second control area *includes a plurality of controls*"). As explained above, the "second control area" is an area accessible to the hand holding the base unit. Therefore, when the claim language that immediately follows speaks of controls *in that second control area* capable of being "activated by a thumb of the user," the thumb, naturally, refers to the thumb of the same hand. No other interpretation makes sense. As illustrated above, when the user uses one hand to hold the base unit, the second control area accessible to that hand contains controls that would be operated by the thumb of that hand. *See* Figs. 1B, 3C (annotated) in *supra* Part III.B. To clarify, Sonosite's construction does not *preclude* selective activation of control by the other thumb; it merely requires that the controls can be selectively activated by the thumb of the hand holding the base unit, and is agnostic about the other thumb.

Butterfly's argument that the claim does not require the ability to provide one-handed operation— that "'a thumb of the user' should not be limited to only 'a thumb of the user of the hand holding the portable ultrasound system,'" Ex. G at 22, again renders the claimed invention and the limitation here effectively meaningless. *See Intel*, 21 F.4th at 810. The limitation here

---

the base unit, then it would be meaningless and superfluous to specify which hand it is. In fact, this whole claim limitation would be superfluous, because the second control area is in a "display on the touchscreen display," and a touchscreen is naturally designed to be operated by (hence accessible to) a hand of the user.

naturally flows from the immediately preceding claim language reciting that the second control area containing these controls accessible to the thumb should be accessible to the hand holding the base unit, as explained above. *Intel,* 21 F.4th at 810. Further, Butterfly's proposed interpretation ignores the core invention allowing one-handed operation, in light of the specification's disclosure, *e.g.*, in reference to Figure 1B ('985 Patent at 2:57-3:5), that the thumb controller is designed to enable the same hand to "carry *and* operate the base unit" as well as the thumb operations designed to facilitate such one-handed operation (*id.* at 4:27-41, 4:63-5:7). The Court should thus reject Butterfly's interpretation.

### C.    The '050 Patent

The '050 Patent relates to ultrasound scanner supports used to store and transport ultrasound devices and their cables without risk of damage. *See, e.g.,* '050 Patent, Title, Abstract, 1:40-42.

### 1.    "an ultrasound scanner support device, comprising"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
| --- | --- |
| Preamble is limiting | The preamble is not limiting |

The parties dispute whether the preamble of claim 1 of the '050 Patent—"[a]n ultrasound scanner support device, comprising"— is limiting. A preamble is limiting "if it is necessary to give life, meaning and vitality to the claim." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006). Whether a preamble is a claim limitation is "resolved only on review of the entirety of the patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257 (Fed. Cir. 1989).

The preamble here is limiting because its language represents an important characteristic of the claimed invention. *Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1310 (Fed. Cir.

2004). Indeed, the specification of the '050 Patent is replete with references to the invention as support devices for ultrasound scanners. The title of the patent itself is "ultrasound scanner support devices," and the abstract repeats that "[u]ltrasound scanner support devices and associated methods are disclosed herein." The specification also repeatedly describes the preferred embodiments as support devices for ultrasound scanners, and refers to the purpose and benefit of the invention as being solely focused on improvements for transport and storage of ultrasound devices. *See, e.g.*, '050 Patent at 1:40-48 ("there is a need for **support devices that can carry ultrasound scanners** for transport and/or storage without dam aging the communication lines"); 1:66-67 ("***The present technology is directed to support devices that can store and transport ultrasound scanners***."); 4:15-17 ("The **support device** 100 can be made from a lightweight, durable material that can **retain an ultrasound scanner assembly** during transport and/or storage."); 4:30-32 ("The **support device** 100 allows users to safely **store and/or transport ultrasound scanner assemblies** when they are not in use.").

Moreover, all the drawings depict an ultrasound support device, and the entire preamble "an ultrasound support device," is restated in each of the patent's 18 claims. Therefore, viewing the '050 Patent as a whole, the preamble language "an ultrasound support device" does not merely state a purpose or an intended use of the invention, but rather discloses a fundamental characteristic of the claimed invention. *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997).

Turning to the prosecution history, the patent examiner also recognized the preamble as a necessary and defining aspect of the invention. Indeed, during examination when searching for prior art, the examiner used key words containing both "ultra" (or "ultra sound") and "support" when searching for prior art. Ex. H (Examiner's Search Strategy and Results). Thus, the patent examiner clearly understood the claims to refer to ultrasound support devices and examined them

-15-

accordingly. *See Multilayer Stretch Cling Film Holdings, Inc. v. Inteplast Grp. Ltd.*, No. 2:12-CV-2107-WGY-DKV, 2013 WL 5972195 at \*16 (W.D. Tenn. Nov. 8, 2013) (finding support that the preamble is limiting after reviewing prosecution history). Therefore, the preamble of claim 1 of the '050 Patent is limiting.

### D.    The '108 Patent

The '108 Patent discloses an ultrasound system on an application specific integrated circuit, which combines numerous ultrasound system functions into an integrated chip. '108 Patent at 1:32-50.

### 1.    "an ultrasound system application specific integrated circuit (US-ASIC)"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| The language is limiting. | Preamble is limiting: |
| Plain and ordinary meaning, but if further construction is necessary, | "an ultrasound system on an application specific integrated circuit that inputs echo signals from a transducer and outputs video signals based on the echo signals" |
| "an ultrasound system on an application specific integrated circuit" | |

The parties agree that the language in question is limiting, but dispute the proper construction of that language. The claimed "ultrasound system application specific integrated circuit (US-ASIC)" should be given its plain and ordinary meaning. However, to the extent construction is necessary, the term should be construed as "an ultrasound system on an application specific integrated circuit," consistent with the plain meaning and specification. *See, e.g.,* '108 Patent at 3:41-42.  Indeed, there in the specification the patentee defined the term as follows: "***US-ASIC, an ultrasound system on an ASIC***.").  *Id.* "Where, as here, the patentee has clearly defined a claim term, that definition usually is dispositive." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1360 (Fed. Cir. 2002).

Butterfly's construction is improper because it attempts to read additional limitations into the claim from the preferred embodiments. For example, the limitation "[the ASIC] inputs echo signals from a transducer" is improper because nothing in the claim language or specification require this or otherwise preclude a configuration with additional components appearing between the transducer and the ASIC (for example, to pre-process data from the transducer). *See generally* '108 Patent. Similarly, the claims and specification do not preclude a configuration in which a transducer is integrated into and part of an ASIC, wherein the ASIC logically would not receive echo signals from the transducer.

Similarly, Butterfly's attempt to rewrite the claim to require that the ASIC "outputs video signals based on the echo signals" should be rejected. While Figure 5 appears to suggest that video data is formed inside the ASIC, the specification indicates no intent to be limited in that way. *See generally* '108 Patent. Butterfly's proposed construction attempts to read the description of a preferred embodiments into the claim, which is inappropriate. *See Teleflex*, 299 F.3d at 1324. The specification also expressly makes clear that the claimed invention is not confined to the specific details of the disclosed embodiments. '108 Patent at 4:45-49 ("Numerous alterations and modifications to the disclosure can be made without deviating from the true spirit of the present invention, which should be interpreted in light of the appended claims."). Therefore, Butterfly's overly narrow construction should be rejected.

### 2.    "one or more digital signal processor(s)"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, but if further construction is necessary, <br><br>"microprocessor specifically designed for processing digital signals" | "one or more special-purpose microprocessor(s) designed to manipulate digital signals in real time using mathematically intensive operations through the execution of program code" |

The disputed phrase should be given its plain and ordinary meaning because "digital signal

processors" were well known at the time of the invention and had an ordinary and customary meaning. *See* Ex. J (DOUGLAS F. ELLIOTT, HANDBOOK OF DIGITAL SIGNAL PROCESSING 941 (1987)). Indeed, the term "digital signal processor (DSP)" is self-defining, and requires nothing more than a processor that processes digital signals. *See id.* Nothing in the specification or file history evidences any narrower or more specific meaning. Thus, the term does not need construction; or, to the extent the Court finds construction appropriate, this term should be construed as a "microprocessor specifically designed for processing digital signals."

Butterfly's construction fails in several respects in seeking to rewrite the claim to introduce several new requirements: "***manipulate*** digital signals," "***in real time***," ***using mathematically intensive operations***," and "***through the execution of program code***."  None of these are required by the claims. First, regarding the use of "manipulate," Butterfly has identified a number of dictionary sources for this term, Ex. G at 9-11, but "manipulate" appears in the only one, Ex. V (SIMON COLLIN, DICTIONARY OF SCIENCE AND TECHNOLOGY 487 (2003)), and none of the other dictionary sources identified by Butterfly refer to "manipulate" — in fact, most of them consistently use the terms "process" or "processing" in their definitions, *e.g.*, Ex. W (R. B. FISHER ET AL., DICTIONARY OF COMPUTER VISION AND IMAGE PROCESSING 75 (2005)); Ex. X (PHILLIP A. LAPLANTE, COMPREHENSIVE DICTIONARY OF ELECTRICAL ENGINEERING 194 (2d ed. 2005)); Ex. Q (KEITH JACK & VLADIMIR TSATSULIN, DICTIONARY OF VIDEO AND TELEVISION TECHNOLOGY 95 (2002)); *see also* Ex. J at 941.

Second, there is no reason to require that the claims be limited to "in real time."  This is not an inherent feature of a digital signal processor, and, although digital signal processors "***often*** operate under real-time requirements," Ex. J at 941, there is no evidence that they are ***always*** required to do so.  Third, the phrase "mathematically intensive operations" improperly imparts yet

-18-

additional limitations, which only beg more questions (e.g. how "intensive" must the operations be in order to satisfy Butterfly's formulation?). Fourth and finally, it is improper to import Butterfly's requirement of "execution of program code" into the claim construction—there is simply no evidence that would require the claim to be rewritten with this requirement. Thus, Butterfly's construction, which improperly seeks to rewrite the plain language of the claims to require numerous additional limitations, should be rejected.

### 3.    "input/output channels"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning and not subject to § 112, ¶ 6, but if further construction is necessary, <br><br> "I/O ports for communication" | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite. <br><br> Alternatively, "for each peripheral component, a data path and associated circuitry for controlling the input of data from and the output of data to the peripheral component" |

The term "input/output channels" is not written in means-plus-function format, is not subject to § 112, ¶ 6, and should be given its plain and ordinary meaning. This term repeatedly appears in technical dictionaries from the time period of filing of the '108 Patent, thus evidencing that the term was both a widely used and well understood structure at the time. Ex. K (MICROSOFT COMPUTER DICTIONARY 236 (4th ed. 1999)); Ex. L (PHILLIP A. LAPLANTE, DICTIONARY OF COMPUTER SCIENCE, ENGINEERING, AND TECHNOLOGY 258 (2001) ("I/O channel")); Ex. M (FRANK HARGRAVE, HARGRAVE'S COMMUNICATIONS DICTIONARY 264 (2001)).

Indeed, "I/O channel" is a term well-known in the art, and these types of channels are clearly structural. *Dyfan*, 28 F.4th at 1366. For example, the I/O ports of the CW-ASIC are structural, hardware elements that may be connected to data inputs, memory, and power. '108 Patent at 3:27-32; *see also id.*, 3:2-4 ("The receive channels are applied to a multiplier where they are multiplied with a signal generated by a local oscillator generator."); Ex. N (U.S. Pat. No.

6,569,101 ("'101 Patent"))[6] at 7:36-41 ("The data port 256 may be a PCMCIA interface, a USB port or other information I/O line."). Further, courts, including in Delaware, have considered similar terms and found that they are not subject to §112 ¶6. *See e.g. Intel Corp. v. Broadcom Corp.*, 172 F. Supp. 2d 515, 548 (D. Del. 2001) ("I/O circuitry" is not a means-plus-function element); *XR Commc'ns, LLC v. D-Link Sys., Inc.*, No. 817CV00596 2022 WL 2291747, at *5 (C.D. Cal. Apr. 18, 2022) ("wireless input/output (I/O) unit" is not a means-plus-function element); *Hewlett-Packard Co. v. EMC Corp.*, No. C 02-04709 JF, 2004 WL 5651068, at *19 (N.D. Cal. June 23, 2004) ("I/O requests" is not a means-plus-function term).

Even if the term were subject to §112 ¶6, which it is not, the structure is not indefinite, as it is described throughout the specification. For example, the specification discloses "each channel is connected with a digital beam former, the plurality of channels are mixed down in quadrature to base band using a mixer and a local oscillator …; and a sub circuit which provides a digital serial control function to interface to a real time control bus providing per channel enable/disable of said mixer and said local oscillator generator … ." '108 Patent at 1:54-64; *see also id.* at 2:56-59 ("The T/R circuit is shown on the left. The individual receive channels of the transducer are either processed through a T/R circuit (as shown) or sent directly to the CW-ASIC 222 beam former."); 3:1-4 ("The incoming signal channels may be either analog or digital. The receive channels are applied to a multiplier where they are multiplied with a signal generated by a local oscillator generator."); Figs. 2-5. The I/O ports are further described in the related '101 Patent, the specification of which is incorporated by reference into, and thus makes up part of, the specification of the '108 Patent. *See* Ex. N ('101 Patent) at 7:34-37 ("The BE ASIC 250 is also

---

[6] The '101 Patent issued from U.S. Application Ser. No. 09/840,002 is incorporated by reference in its entirety to the '108 Patent. '108 Patent at 1:11-15.

coupled to a data port 256. The data port 256 may be a PCMCIA interface, a USB port or other information I/O line.").

Therefore, this is not a means-plus-function term, and should be given its plain meaning. However, to the extent construction is necessary, the term should be construed as "I/O ports for communication." Support for this construction is found in the patent specification, which sometimes refers to these types of components as "I/O ports." *See, e.g.,* '108 Patent, 3: 26-32 ("[T]he I/O ports of the CW-ASIC may more efficiently be coupled to data inputs, memory elements and power."); Ex. N ('101 Patent), claim 7 ("a serial I/O port for sending and receiving data to peripheral devices"). Butterfly's alternative construction is unfounded. For example, it imposes a requirement of "for each peripheral component"—a new requirement that appears nowhere in the claim. Further, Butterfly's proposal requires "a data path and associated circuitry for controlling"; while the specification mentions controlling for some channels, it does not require controlling circuity for each data path. '108 Patent at 1:51-67, 3:2-4, 3:27-32. Therefore, Butterfly's alternative construction, which again commits the "cardinal sin" of importing limitations into the claims from the specification, should be rejected, in favor of the plain and ordinary meaning of this term.

### E.     The '822 Patent

The '822 Patent is directed to ultrasound technology for providing an enhanced visual display of an interventional instrument, such as a needle, used during the operation of the ultrasound system. '822 Patent, Abstract, 5:43-55.

       1.     **"determining a mask of pixels that correspond to the location of the interventional instrument" / "determine a mask of pixel coordinates that correspond to the location of the interventional instrument"**

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, but if further construction is necessary, | "determining/determine a region in the second frame that includes the detected pixels |

| "determining a segmentation result including pixels corresponding to the interventional instrument" | corresponding to the interventional instrument and a number of pixels immediately surrounding the detected pixels" |
|---|---|

The phrases "determining a mask of pixels that correspond to the location of the interventional instrument" and "determine a mask of pixel coordinates that correspond to the location of the interventional instrument" should be given their plain and ordinary meaning. The patent does not provide any special definition for these phrases, and there is no good reason to depart from the strong presumption of plain and ordinary meaning. If a construction is necessary—which Sonosite does not believe is the case—the specification indicated that these phrases refer to a process of determining a segmentation result, the pixels corresponding to the interventional instrument (e.g., a needle).

Sonosite's proposed construction is consistent with the plain meaning and supported by the patent specification. '822 Patent at 9:39-47 ("operation of interventional instrument detection 512 of [the] embodiments provides a segmentation of the interventional instrument 130 and its immediate surrounding area, the result of which is mask 530. *The segmentation result, e.g., [the] mask*. . . .").

Butterfly's proposed construction actually contradicts the file history. Indeed, Butterfly's proposed construction improperly attempts to add back into the claims a limitation that was *removed during prosecution*. Specifically, in the Response to Office Action filed by Applicant, dated July 11, 2013, the Applicant amended the claims to remove the limitation "wherein the mask is defined by a region in the second frame that includes the detected pixels corresponding to the second object and a predetermined margin of *pixels immediately surrounding the detected pixels*." Ex. O ('822 Patent File History excerpts) at FFSS_BFLY_0001351 (Response to Final office action at 2). Although worded slightly differently, Butterfly's construction ("a region in the

-22-

second frame that includes the detected pixels corresponding to the interventional instrument and a number of ***pixels immediately surrounding the detected pixels***"), and the language deleted in that amendment are almost identical in substance. It would be improper to read a limitation into a claim where that limitation was expressly removed from the claim before allowance. *See, e,g., Laryngeal Mask Co. v. Ambu*, 618 F.3d 1367, 1373 (Fed. Cir. 2010); *Blackbird Tech LLC v. ELB Elecs., Inc.*, 895 F.3d 1374, 1378 (Fed. Cir. 2018) ("no skilled artisan would understand this claim to require a fastening mechanism . . . when that very limitation was expressly removed from the claim to secure patentability with the examiner's blessing and agreement."). Not only does this addition contradict the file history, it also improperly reads limitations from the specification into the claims. *See Liebel-Flarsheim*, 358 F.3d at 913.

Further, Butterfly's construction equates two different terms, but the Federal Circuit has made clear that different terms in a patent claim are presumed to have different meanings. *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."); *Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020) (use of different terms "requires that they connote different meanings").

Thus, Butterfly's construction should be rejected in favor of the plain meaning.

2.      **"blending pixels from the first frame and the second frame" / "combine a first set of pixels from the first frame and a second set of pixels from the second frame"**

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, but if further construction is necessary, "form an image by combining pixel values from first frame and pixel values from the second frame" | "form an image of pixels by, for each pixel, calculating a weighted average of the two corresponding pixel values from the first and second frames using assigned weights between 0 and 1" |

Butterfly's lengthy construction here is improper in multiple respects. Not only does it import limitations from a specification embodiment into the claims, but in fact, it does so while also narrowing the claim to exclude coverage of two other embodiments in the patent—against the Federal Circuit's "heavy presumption." *Teleflex*, 299 F.3d at 1324. Absent disclaimer, if claims reasonably can be construed to cover all embodiments, they should. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1277 (Fed. Cir. 2008); *see also Nobel Biocare Servs. AG v. Instradent USA, Inc.*, 903 F.3d 1365, 1381 (Fed. Cir. 2018), as amended (Sept. 20, 2018).

Here, Butterfly's construction comes directly from the specification's description regarding the first embodiment disclosed. '822 Patent 10:57-67. However, the specification also provides a second embodiment—covered which would be *excluded* by Butterfly's construction, 10:67-11:5 ("In another embodiment coefficient b can be a function of the location within the mask where coefficient b shall have higher values for locations in mask 530 closer to interventional instrument 130, and lower values for locations in mask 530 farther from the interventional instrument 530.") and yet a third embodiment which is likewise excluded. '822 Patent at 11:5-9 ("Alternatively, instead of applying a linear operation shown by equation (2), a non-linear operation can be used in a blending function of embodiments. In one example of such a case, $f(x_0, y_0)$ can be the maximum of values $f_1(x_0, y_0)$ and $f_2(x_0, y_0)$."). The latter two embodiments would be read out of the claims if Butterfly's construction were adopted, at least because the second embodiment does not include a set weight for each pixel, and the third embodiment does not have any weight at all, and is not linear. This construction cannot be correct.

### 3. "producing a graphic indication on the blended final ultrasound image" / "producing a graphic on the blended final ultrasound image"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, but if further construction is necessary, | "overlaying a graphic on the blended final ultrasound image, as distinguished from, e.g., |

| "process the image data so that the final ultrasound image includes a graphic indication" | providing a graphic before the blended final ultrasound image is formed" |
|---|---|

Butterfly's proposed construction here incorporates two significant changes to the claim language: (1) adding a limitation "as distinguished from, e.g., providing a graphic before the blended final ultrasound image is formed" and (2) replacing "producing" with "overlaying." Both changes are improper.

As to the first revision, Butterfly seeks to add a temporal requirement that the graphic must be "overlayed" on the final image *after* the complete final image is formed. There is no such requirement in the claim language, the specification, or the file history. In fact, during prosecution, this claim limitation was added to overcome a rejection based on U.S. Pat. App. No. 2005/008254 ("Ouchi"). Ex. O ('822 File History excerpts) at FFSS_BFLY_0001446-0001448 (Response to Non-final office action at 8-10). The system of Ouchi produced two types of images, an interim image, and a final image. *Id.* at FFSS_BFLY_0001408-0001409 (Non-final office action at 7-8). In rejecting the claims, the Examiner alleged that the interim image disclosed the claimed graphic indication. *Id.* at FFSS_BFLY_0001408 (Non-final office action at 7).

However, the Applicant noted that, while Ouchi included an interim graphic indication, no such graphic indication appeared once the final image was rendered to the user, and the Applicant amended the claims to reflect this distinction. *Id.* at FFSS_BFLY_0001446-0001448 (Response to Non-final office action at 8-10). In other words, the word "final" as added to the claim and as distinguished from the prior art refers to the requirement only that the final image displayed to the user must include the graphic indication—not that it may only be "overlaid" in a final step, as Butterfly contends. Of course, this makes sense in light of the '822 Patent's description of this invention, which allows an operator to know "that items of interest will only appear with high

quality visualization in certain portions," and reminds the operator that extra care should be used if the needle is outside the coverage area. '822 Patent, 11:47-55. It does not matter in any way how that graphic and boundary is added to the image—only that the clinician can see it while using the system. Accordingly, to the extent Butterfly argues that the prosecution history supports its position, Butterfly has misinterpreted it.

Moreover, this first added limitation is a negative limitation—seeking to exclude "providing a graphic before the blended final ultrasound image is formed" ("*as distinguished from*, e.g., providing a graphic before the blended final ultrasound image is formed"), and such negative limitations are highly disfavored in claim construction. *See Omega Eng'g, Inc, v. Raytek Corp.,* 334 F.3d 1314, 1323 (Fed. Cir. 2003) (To impose a negative limitation, there must be an "express intent to confer on the claim language the novel meaning imparted by this negative limitation."); *see also*, *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1120 (Fed. Cir. 2004) (refusing to impose a negative limitation because the claim did not present a "clear[] and unmistak[able]" disavowal). As to the second limitation Butterfly seeks to incorporate—replacing the claim term "producing" with "overlaying" —there is also no support for that rewrite of the claims. Moreover, the term "overlaying" is a term used by the specification to refer to an entirely *different* concept associated with another element of the claim, in particular, the mixing of two images, which corresponds to the "blending pixels" limitations in the patent. *Id.* at 11:56-63 ("to alert the clinician or other operator as to which portion of an object (e.g., the interventional instrument) is being *overlaid*"); Ex. O ('822 File History excerpts) at FFSS_BFLY_0001147 (as-filed application at 22, as-filed claim 17) ("wherein combining at least a portion of the first frame and at least a portion of the second frame to form the ultrasound image comprises *overlaying* at least a portion of *the second frame* onto *the first frame*"); *see also id.* (as-

-26-

filed claim 18) ("wherein combining . . . further comprises implementing a pixel blending technique to blend **the overlaid portion** of the **second frame into the first frame**"). Therefore, Butterfly's construction should be rejected.

### 4. "processor"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning and not subject to § 112, ¶6. | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite. |

For many of the reasons explained above, the term "processor" is not subject to 35 U.S.C. § 112 ¶ 6, and is not indefinite. "[F]or the most part, courts have ultimately concluded that 'processor' terms failed to invoke Section 112, paragraph 6." *Techno View IP, Inc. v. Facebook Techs.*, LLC, No. 17-386, 2018 WL 6427874, at *4 (D. Del. Dec. 7, 2018); *see also*, *e.g.*, *Syncpoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-cv-00247, 2016 WL 55118, at *19-21 (E.D. Tex. Jan. 5, 2016); *FitnessAge Servs., Inc. v. Polar Electro, Inc.*, No. 2:1 l-cv-01444, 2014 WL 551335, at *5 (D. Nev. Feb. 10, 2014); *3G Licensing, S.A. v. Blackberry Ltd.,* No. 17-82, 2018 WL 4375091 at *7 (D. Del. Sept. 13, 2018). In cases where "processor" terms were found to invoke § 112 ¶ 6, it was because that "processor failed to convey to the person of skill in the art **anything** about the internal components, structure, or specific operation of the processor." *Techno View IP, Inc*, 2018 WL 6427874, at *6; *See also e.g.*, *GoDaddy.com, LLC v. RPost Commc'ns Ltd*, No. CV-14-00126, 2016 WL 212676, at *56-57 (D. Ariz. Jan. 19, 2016); *Velocity Patent LLC v. Mercedes-Benz USA, LLC*, Case Nos. 13-cv-8413, 13-cv-8419, 13-cv-8418, 2016 WL 5234110 (N.D. Ill. Sept. 21, 2016); *Velocity Patent LLC v. FCA US LLC*, 2018 WL 4214161, at *8 & n.16 (N.D. Ill. Sept. 4, 2018).

Courts have recognized that "processor" describes "a class of known structures, unlike terms such as 'means,' 'device,' or 'element.'" *Techno View IP*, 2018 WL 6427874, at *5. "[I]n

many instances, the term 'processor' itself connotes sufficient structure." *Id.* at \*4. Courts examine whether the claim describes "how the processor performs the function, and whether a person of ordinary skill in the art could understand how the processor interacts with other components of the claims." *Id.* at \*5.

Here, the claim describes that the processor is configured to "detect pixels. . . determine a mask . . . combine [pixels] . . . and [produce] a graphic." '822 Patent, claim 6; *Masimo Corp. v. Philips Elecs. N. Am. Corp.*, No. 09-80, 2015 WL 7737308, at \*7-8 (D. Del. Dec. 1, 2015) (finding that a claim reciting "a processor configured to perform a method comprising . . . selecting one of the [values] based upon an analysis to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood" connoted sufficient structure to avoid means-plus-function treatment).

Further, the specification provides extensive disclosures regarding how the processor interacts with other components. *See*, *e.g.*, '822 Patent, 7:47-54 ("The angle of insertion provided by a selected interventional instrument guide may ***be provided automatically to a processor*** of system unit 110 using various sensor or other feedback techniques, such as those shown in [U.S. Pat. No. 8,147,408 (the "'408 Patent")][7] entitled 'Medical Device Guide Locator'"); 9:11-15 ("Interventional instrument detection 512 of embodiments, as may comprise ***a processor operating under control of an instruction set*** defining operation as described herein."); 10:29-38 ("***a same processor*** may operate under control of an instruction set defining operation of spatial compounding processing 511 and an instruction set defining operation of interventional instrument detection 512, if desired."); *see also* Ex. U ('408 Patent), Fig. 5, 8:50-62 ("Ultrasound imaging

---

[7] The '408 Patent (issued from U.S. patent application Ser. No. 11/216,735) is incorporated by reference in its entirety to the into the '822 Patent. '822 Patent at '7:51-54.

device . . . includes controller 531, such as may comprise a microcontroller, memory, and an instruction set providing operation as described herein"). Accordingly, the claimed "processor" should be given its plain meaning.

### F.    The '981 Patent

The '981 Patent discloses a novel ultrasonic diagnostic device that includes a display unit in which light emission of pixels is controlled to have "blanking" periods (that is, periods in which pixels do not emit light), and the proportion of blanking periods to light-emitting periods is adjusted according to a variety of parameters, such as frame rate, and/or part to be examined. This allows for, *inter alia*, reduction of negative artifacts in the display known as "afterimage," enabling improved display of moving images of rapidly moving tissues and organs in real time. *See, e.g.*, '981 Patent Figs. 4 & 5.

#### 1.    "display of an impulse drive type"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, but if further construction is necessary, "display in which pixels can emit light for less than a field period" | "display where each pixel emits light for an instant during a frame period, as distinguished from a hold type display where each pixel can be held on for more than an instant" |

The specification of the '981 Patent contains detailed descriptions of the claimed "display of an impulse drive type," and the term should be accorded its plain meaning as described throughout the patent, and consistent with the strong presumption in favor of plain meaning.

If further construction is required, then Sonosite's construction, "display in which pixels can emit light for less than a field period," fully captures the characteristics of such a display as described in the specification, as discussed above. Fig. 4 clearly shows that the "image display period" (i.e. when control signal is at high level and organic EL emits light) is a part of the one

field period.[8] Moreover, the ratio of the blanking period versus the image display period is adjustable, *id.* at 5:47-50, meaning that the image display period within a field period can be lengthened or shortened.

Butterfly's construction improperly seeks to include multiple limitations not required anywhere in the claims. For example, the word "instant" appears nowhere in the specification, and worse yet, inclusion of this term would add ambiguity regarding exactly how long an "instant" is. Moreover, regardless of how long an "instant" may be objectively, as explained above and shown in Figure 4, the '981 Patent describes light emission of pixels in an impulse drive display in reference to the field period, not an absolute length of time. Indeed, as shown in Figure 4, the image display period—that is, the light-emitting period—can take up a significant portion within a field period, and thus cannot properly be considered an "instant." Because Butterfly's proposed construction misinterprets the claim and contradicts the specification, it should be rejected.

### 2. "one field period"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning, but if further construction is necessary, "the period of time of one field of the display" | "the period of one frame in a non-interlace system or one of the plural fields in a frame in an interlace system" |

The term "one field period" is well understood in the art, as Butterfly's own extrinsic materials show. Multiple dictionaries produced by Butterfly consistently define a "field period" as "the time required to transmit one field" in a television system. Ex. P (STEVEN M. KAPLAN, WILEY ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY 282 (2004)); *see also* Ex. Q (KEITH JACK & VLADIMIR TSATSULIN, DICTIONARY OF VIDEO AND TELEVISION TECHNOLOGY 116 (2002))

---

[8] Although Figure 4 shows a label for the luminance state within "one frame period," the specification clarifies that the "one frame period" here either "is read as one field period" (for interlace systems) or is the same as "one field period" (for non-interlace systems). *Id.* at 5:67-6:3.

("The time required to transmit one TV field"); Ex. R (RUDOLF F. GRAF, MODERN DICTIONARY OF ELECTRONICS 282 (7th ed. 1999)) (same). Therefore, the meaning of "one field period" is known in the field, and requires no further construction.

To the extent the Court determines some further construction is appropriate, Sonosite's proposed construction, "the period of time of one field of the display," is fully consistent with the common understanding in the art based on the dictionary definitions, as applied outside the specific context of conventional television systems—here, one field period is in reference to the period of the image display. '981 Patent, Fig. 4; 5:63-6:3 (explaining that Figure 4 shows luminance "in one frame period *of image display*" but clarifying that "one frame period" in Figure 4 either should be read as "one field period" or is the same as one field period.)

Butterfly's construction adds no clarity to what is otherwise well known in the art as explained above, and is an unsupported attempt to narrow to the claims. Regarding the first part of Butterfly's construction ("the period of one frame" in a non-interlace system), the specification explains, "[i]n the non-interlace system, one frame period is equivalent to one field period." *Id.* at 6:2-3. Therefore, Butterfly's construction would require referencing the very term that Butterfly purports to construe ("one field period"), and thus Butterfly's construction is circular and ultimately no construction at all. The second part of Butterfly's construction, dealing with interlace systems, fares no better—it reads "[the period] of one of the plural fields in a frame," which still refers back to "the period of one field." Butterfly's reference to "plural fields in a frame" is superfluous because the fact that a frame may contain plural fields has no bearing on what the period of a single field, *i.e.*, "one field period" is. Therefore, in the end, Butterfly's construction does nothing more than introduce the extraneous phrase "frame" into the term that does not help construe the term, and should be rejected.

### 3.   "adjustment circuit"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning; not subject to 35 U.S.C. § 112, ¶ 6 | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite |

Butterfly argues that term is a "means-plus-function" term subject to 35 U.S.C. §112, ¶6. For many of the reasons repeated above with respect to similar terms for which Butterfly raises similar arguments, this argument should be rejected.

The Federal Circuit and district courts, including in this district, have consistently refused to recognize similar terms containing the word "circuit" as means-plus-function, and held that the word "circuit" connotes sufficient structure when coupled with appropriate identifiers (here, the "adjustment" in "adjustment circuit") or descriptions about operations of the circuit. *MTD Prod.*, 933 F.3d at 1342 (citing *Apex*, 325 F.3d at 1373 ("[T]he term 'circuit' with an appropriate identifier such as 'interface,' 'programming' and 'logic,' certainly identifies some structural meaning to one of ordinary skill in the art.")); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, Inc., No. 04-1371-LPS, 2016 WL 1171496, at *5 (D. Del. Mar. 24, 2016) ("soft start circuit" not a means-plus-function term ); *Estech Sys. IP, LLC v. Mitel Networks, Inc.*, No. 221-CV-00473, 2023 WL 2695093, at *14 (E.D. Tex. Mar. 28, 2023) (refusing to construe "circuitry for throttling data sent from the first network device" as a means-plus-function limitation); *Polaris PowerLED Tech., LLC v. VIZIO, Inc.*, Civ. No. 18-0157, 2020 WL 1060363, at *2 (C.D. Cal. Jan. 21, 2020) (refusing to construe "brightness control circuit" as a means-plus-function term); *Intellicheck Mobilisa, Inc. v. Honeywell Int'l Inc.*, No. C16-CV-0341JLR, 2017 WL 6550700, at *3–4 (W.D. Wash. Dec. 21, 2017) (refusing to construe  "first circuitry at said first location for receiving . . . and determining . . . " to be a means-plus-function term); *Cequent Performance Prod., Inc. v. Hopkins Mfg. Corp.*, No. 13-CV-15293, 2017 WL 371230, at *4 (E.D. Mich. Jan. 26, 2017) (refusing to construe "an

-32-

input circuit for generating a brake level signal . . ." to be a means-plus-function term).

The word "circuit" in "adjustment circuit," by itself, connotes structure. The word is also coupled with an appropriate identifier "adjustment," and the claims at issue clearly describe the operation of the circuit, that is, "adjusting a ratio of the blanking period to an image display period within one field period in said display." '981 Patent, claims 1, 9, and 11. Therefore, there is no evidence, rebutting the presumption of non-applicability of §112 ¶6.

In sum, the term "adjustment circuit" is not a means-plus-function term and is not subject to §112 ¶6. In any event, the specification discloses sufficient structure, and the term is not indefinite. *E.g.*, '981 Patent at 5:47-56.

### 4. "control unit"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning; not subject to 35 U.S.C. § 112, ¶ 6 | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite |

Similarly, Butterfly argues this term is a "means-plus-function" term subject to 35 U.S.C. §112, ¶6. As with the other terms above for which Butterfly takes the same position, courts have consistently declined to construe "control unit" as a means-plus-function term. *See, e.g., IControl Networks, Inc. v. Zonoff Inc.*, No. 14-1199-GMS, 2016 WL 1437892, at *1, *1 n.2 (D. Del. Apr. 11, 2016) (refusing to apply §112, ¶6 to "control unit for receiving signals from a variety of detection devices monitoring events pertaining to security" and rejecting argument that the term "control unit" is a means-plus-function term); *Maxell, Ltd. v. VIZIO, Inc.*, No. CV 21-6758, 2022 WL 2167619, at *17 (C.D. Cal. Mar. 9, 2022) (refusing to construe "control unit" as a means-plus-function term); *Capella Photonics v. Fujitsu Network Communications Inc.*, Case No. 2:20-cv-00076-JRG, No. 2:20-cv-00077, 2021 WL 465430, at *22-23 (E.D. Tex. Feb. 9, 2021) (same).

Furthermore, the term "control unit," when used in the field of electronics and computer

engineering, is a well-understood hardware structure. *See, e.g.,,* Ex. S (G. W. A. DUMMER, NEWNES DICTIONARY OF ELECTRONICS 70 (4th ed. 2002)) ("control unit: [Of a digital computer] that section which is responsible for interpreting and acting upon the input instructions and for applying signals to the arithmetic unit and other sections of the computer to enable it to carry out the allotted task."); Ex. T (STEVEN M. KAPLAN, WILEY ELECTRICAL AND ELECTRONICS ENGINEERING DICTIONARY 145 (2004)) (defining the term as "1. In a computer, circuitry that performs control functions such as sending control signals, interpreting program instructions, handling peripherals, or managing access to memory locations. 2. A unit which controls a given mechanism, piece of equipment, function, process, or system.")) The "control unit" here in the claims of the '981 Patent is consistent with these dictionary definitions. Accordingly, the term "control unit" is not a means-plus-function limitation because it is a hardware structure well known in the art. Hence, §112 ¶6 is not applicable. In any event, the specification discloses sufficient structure, and the term is not indefinite. *E.g.,* '981 Patent at 4:52-60.

### 5.    "image display period control circuit"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning; not subject to 35 U.S.C. § 112 | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite |

Butterfly argues that this term is a "means-plus-function" term subject to 35 U.S.C. §112, ¶6. Butterfly's argument is incorrect for the same reasons as discussed above (*supra* Part III.F.3).

Again, the word "circuit" by itself connotes structure. *E.g. Apex,* 325 F.3d at 1373. The word is also coupled with an appropriate identifier "image display period control," and the claim language describes the operation of the circuit: it would generate a "control signal to be activated in an image display period of each line" and the "second thin-film transistor electrically connects a drain of said third thin-film transistor to a current supply wire" according to that control signal.

-34-

'981 Patent claim 4. Therefore, there is no evidence rebutting the presumption of non-applicability of §112 ¶6.

Regardless, the specification discloses sufficient structure, and the term is not indefinite. *E.g.* '981 Patent at 5:50-59.

### 6.    "second adjustment circuit"

| Sonosite's Proposed Construction | Butterfly's Proposed Construction |
|---|---|
| Plain and ordinary meaning; not subject to 35 U.S.C. § 112 ¶ 6 | Governed by 35 U.S.C. § 112, ¶ 6; Claim language recites function; Corresponding Structure: Indefinite |

Butterfly argues that the term "second adjustment circuit" is a "means-plus-function" term subject to 35 U.S.C. §112, ¶6. Butterfly's argument is incorrect for the same reasons as discussed above with respect to the term "adjustment circuit" (*supra* Part III.F.3). For the same reasons, and the reasons addressed above regarding the other terms Butterfly argues to be means-plus-function terms, Butterfly's argument here should likewise be rejected.

## IV.    CONCLUSION

Sonosite respectfully requests that the Court adopt each of its proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Robert L. Maier
Jennifer C. Tempesta
Margaret M. Welsh
Pallavi Mathur
Eric J. Faragi
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY  10112
(212) 408-2500

February 18, 2023

Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff FUJIFILM Sonosite, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 18, 2023, upon the following in the manner indicated:

| | |
|---|---|
| Brian E. Farnan, Esquire<br>Michael J. Farnan, Esquire<br>FARNAN LLP<br>919 North Market Street, 12th Floor<br>Wilmington, DE  19801<br>*Attorneys for Defendant Butterfly Network, Inc.* | *VIA ELECTRONIC MAIL* |
| Steven D. Maslowski, Esquire<br>Jason Weil, Esquire<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>1735 Market Street, 12th Floor<br>Philadelphia, PA 19103<br>*Attorneys for Defendant Butterfly Network, Inc.* | *VIA ELECTRONIC MAIL* |
| Paul D. Tripodi II, Esquire<br>Clark Gordon, Esquire<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>4 Park Plaza, Suite 1900<br>Irvine, CA  92614<br>*Attorneys for Defendant Butterfly Network, Inc.* | *VIA ELECTRONIC MAIL* |
| C. Brandon Rash<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>2001 K Street, N.W.<br>Washington, D.C.  20006<br>*Attorneys for Defendant Butterfly Network, Inc.* | *VIA ELECTRONIC MAIL* |
| Brooks J. Kenyon<br>Megan R. Mahoney<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>Bank of America Tower, 44th Floor<br>New York, NY  10036-6745<br>*Attorneys for Defendant Butterfly Network, Inc.* | *VIA ELECTRONIC MAIL* |

/s/ *Jeremy A. Tigan*

Jeremy A. Tigan (#5239)