# EXHIBIT 1

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

Butterfly Network, Inc.,
Petitioner

v.

FUJIFILM Sonosite, Inc.,
Patent Owner

Patent No. 6,901,157
Filing Date: January 4, 2002
Issue Date: May 31, 2005

Ultrasonic Diagnostic Apparatus

IPR2022-01577

———————————

**PETITION FOR *INTER PARTES* REVIEW**

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................1

II.   MANDATORY NOTICES, FEES, & STANDING .......................................2
      A.    Real Parties-In-Interest...............................................................2
      B.    Related Matters............................................................................2
      C.    Lead & Backup Counsel ..............................................................2
      D.    Service Information......................................................................3
      E.    Certification of Grounds for Standing.........................................3
      F.    Fees...............................................................................................3

III.  STATEMENT OF PRECISE RELIEF REQUESTED ..................................3

IV.   U.S. PATENT 6,901,157 ("THE '157 PATENT")..................................4
      A.    Summary ......................................................................................4
      B.    Challenged Claims .......................................................................7
      C.    Prosecution History .....................................................................7

V.    LEVEL OF SKILL IN THE ART .............................................................7

VI.   CLAIM CONSTRUCTION .......................................................................8

VII.  PRIOR ART SUMMARY.........................................................................8
      A.    State of the Art.............................................................................8
      B.    HDI 3000 Manual.......................................................................11
      C.    Kinicki ........................................................................................13
      D.    Jackson .......................................................................................14
      E.    Short ...........................................................................................15
      F.    Clark ...........................................................................................15

VIII. GROUND 1: CLAIMS 1-4 AND 6-10 ARE ANTICIPATED BY THE
      HDI 3000 MANUAL...........................................................................16
      A.    Claim 1 .......................................................................................16
            1.    [1a] "An ultrasonic diagnostic apparatus comprising:"...........16
            2.    [1b] "an ultrasonic transmitting and receiving unit for
                  transmitting ultrasonic waves to an object to be inspected
                  and receiving echo waves reflected from the object;".............17
            3.    [1c] "an image processing unit for executing image
                  processing of image data, which is obtained on the basis
                  of the echo waves received by said ultrasonic
                  transmitting and receiving unit, by using image
                  processing condition parameters,".........................................18

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

4. [1d] "an information input unit to be employed for inputting information of object concerned with the object to be inspected;"...................................................................19

5. [1e] "a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object;"..............................................................................22

6. [1f] "a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to the image processing unit, and"...............................................................................25

7. [1g] "a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit."..................................................27

B. Claim 2 ...................................................................................29

   1. [2a] "An ultrasonic diagnostic apparatus according to claim 1, wherein: said parameter memory unit stores a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and" .............................................................29

   2. [2b] "said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object."....................30

C. Claim 3: "An ultrasonic diagnostic apparatus according to claim 1, wherein the image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data."........................................32

D. Claim 4: "An ultrasonic diagnostic apparatus according to claim 1, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in the image processing unit so as to output the three-dimensional image data to said display unit."..................................34

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

E.    Claim 6 ...................................................................................36
    1.    [6a] "An ultrasonic diagnostic apparatus comprising:"............36
    2.    [6b] "an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters,".........................36
    3.    [6c] "an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters,"............................................37
    4.    [6d] "an information input unit to be employed for inputting information of object concerned with the object to be inspected;".......................................................................37
    5.    [6e] "a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit and the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object;" ...................................................................................38
    6.    [6f] "a control unit for reading out at least either of the image processing condition parameters and the transmission/reception condition, parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to at least one of the image processing unit and said ultrasonic transmitting and receiving unit; and" ........39
    7.    [6g] "a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit."....................................................41
F.    Claim 7 ...................................................................................41
    1.    [7a] "An ultrasonic diagnostic apparatus according to claim 6, wherein: said parameter memory unit stores a plurality of image processing condition parameter sets and a plurality of transmission/reception condition

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

parameter sets in correspondence with one item of the information of object; and" ...................................................................41

2.   [7b] "said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object." ..........................................................42

G.   Claim 8: "An ultrasonic diagnostic apparatus according to claim 6, wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data." ...............................................43

H.   Claim 9: "An ultrasonic diagnostic apparatus according to claim 6, wherein ultrasonic transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focussing position, transmission power and reception sensitivity for the echo waves." ........................43

I.   Claim 10: "An ultrasonic diagnostic apparatus according to claim 6, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit." ....................................47

IX.   GROUND 2: CLAIMS 1-4 AND 6-10 ARE OBVIOUS OVER HDI 3000 MANUAL AND JACKSON ............................................................47

X.   GROUND 3: CLAIMS 1-3 AND 6-9 ARE ANTICIPATED BY KINICKI ....................................................................................................53
A.   Claim 1 ...........................................................................................53
1.   [1a] ......................................................................................53
2.   [1b] ......................................................................................53
3.   [1c] ......................................................................................54
4.   [1d] ......................................................................................55

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

5. [1e] ........................................................................................58
6. [1f].........................................................................................59
7. [1g] ........................................................................................60
B. Claim 2 ...................................................................................61
1. [2a] ........................................................................................61
2. [2b] ........................................................................................62
C. Claim 3 ...................................................................................63
D. Claim 6 ...................................................................................65
1. [6a] ........................................................................................65
2. [6b] ........................................................................................65
3. [6c] - [6d] ..............................................................................65
4. [6e] ........................................................................................66
5. [6f].........................................................................................66
6. [6g] ........................................................................................67
E. Claim 7 ...................................................................................68
1. [7a] ........................................................................................68
2. [7b] ........................................................................................68
F. Claim 8 ...................................................................................69
G. Claim 9 ...................................................................................69

XI. GROUND 4: CLAIMS 1-3 AND 6-9 ARE OBVIOUS OVER
KINICKI AND SHORT ....................................................................71
A. Claim 1 ...................................................................................71
B. Claim 2 ...................................................................................77
C. Claim 3 ...................................................................................78
D. Claim 6 ...................................................................................78
E. Claim 7 ...................................................................................81
F. Claim 8 ...................................................................................81
G. Claim 9 ...................................................................................81

XII. GROUNDS 5 AND 6: CLAIMS 4 AND 10 ARE OBVIOUS OVER
KINICKI, ALONE OR WITH SHORT, AND CLARK ..............................82
A. Claim 4 ...................................................................................82
B. Claim 10 ..................................................................................88

XIII. SECONDARY CONSIDERATIONS ..................................................88

XIV. DISCRETIONARY DENIAL IS NOT APPROPRIATE ............................89

XV. CONCLUSION...............................................................................90

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple Inc. v. MemoryWeb, LLC*,
  IPR2022-00032, Paper 12 (PTAB Jul. 8, 2022) ..................................................12

*Centripetal Networks, Inc. v. Cisco Sys.*,
  847 Fed. Appx. 869 (Fed. Cir. 2021) ...............................................................12

*DyStar Textilfarben GmbH v. C.H. Patrick Co.*,
  464 F.3d 1356 (Fed. Cir. 2006) ........................................................................75

*In re Epstein*,
  32 F.3d 1559 (Fed. Cir. 1994) .....................................................................52, 88

*In re Wiggins*,
  488 F.2d 538 (C.C.P.A. 1973) ..........................................................................88

*Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
  IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017)...............................................89

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007)..........................................................................................76

*Sotera Wireless, Inc. v. Masimo Corp.*,
  IPR2020-01019, Paper 12 (Dec. 1, 2020) .........................................................89

*Yeda Research & Dev. Co. v. Mylan Pharm., Inc.*,
  906 F.3d 1031 (Fed. Cir. 2018) ........................................................................16

**Statutes**

35 U.S.C. § 314(a) ...............................................................................................89

35 U.S.C. § 318(b) ...............................................................................................90

35 U.S.C. § 325(d) ...............................................................................................89

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

**Other Authorities**

Memorandum, *Interim Procedure for Discretionary Denials in AIA
Post-Grant Proceedings with Parallel District Court Litigation*
(USPTO Dir. June 21, 2022) ...........................................................................89

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 6,901,157 ("the '157 Patent") |
| 1002 | File History of U.S. Patent Application No. 10/035,256 (the "'256 application") |
| 1003 | HDI 3000 Ultrasound System Manual ("HDI 3000 Manual" or "Manual") (also attached as Appendix A to EX1010 and EX1011) |
| 1004 | U.S. Patent No. 5,997,478 ("Jackson") |
| 1005 | U.S. Patent No. 5,315,999 ("Kinicki") |
| 1006 | U.S. Patent No. 5,161,535 ("Short") |
| 1007 | U.S. Patent No. 6,174,285 ("Clark") |
| 1008 | Declaration of Dr. John Allison |
| 1009 | Curriculum Vitae of Dr. John Allison |
| 1010 | Declaration of Dr. Flemming Forsberg |
| 1011 | Declaration of David Rust |
| 1012 | American Institute of Ultrasound in Medicine, *Recommended Ultrasound Terminology*, 2nd Ed. (1997) |
| 1013 | Bushberg et al., *The Essential Physics of Medical Imaging*, Williams & Wilkins (1994) |
| 1014 | HDI 3000 Field Service Manual ("FSM") |
| 1015 | Counsel Declaration as to 35 U.S.C. §102(e) Status of Clark |
| 1016 | GE LOGIQ<sup>TM</sup> 400 Basic Users Manual |
| 1017 | HP SONOS 5500 / HP SONOS 4500 User's Guide |
| 1018 | Hedrick et al., *Ultrasound Physics and Instrumentation*, 3rd Ed. (1995) |
| 1019 | Wells et al., *Biomedical Ultrasonics* (1977) |
| 1020 | Forsberg et al., *Tissue-Specific US Contrast Agent for Evaluation of Hepatic and Splenic Parenchyma*, Radiology 210:1, 125-132 (1999) (also attached as Appendix B to EX1010) |

viii

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

| | |
|---|---|
| 1021 | Forsberg et al., *Gray Scale Second Harmonic Imaging of Acoustic Emission Signals Improves Detection of Liver Tumors in Rabbits*, 19 J. Ultrasound Med 557-563 (2000) (also attached as Appendix C to EX1010) |
| 1022 | Forsberg et al., *Breast Tumor Vascularity Identified by Contrast Enhanced Ultrasound and Pathology: Initial Results*, 38 Ultrasonics 105-109 (2000) (also attached as Appendix D to EX1010) |
| 1023 | Ramaswami et al., *Ultrasonic Plaque Character and Outcome After Lower Limb Angioplasty*, 29 J. Vasc. Surg. 110 (1999) |
| 1024 | Enderle et al., *Correlation of Imaging Techniques to Histopathology in Patients With Diabetic Foot Syndrome and Clinical Suspicion of Chronic Osteomyelitis*, 22(2) Diabetes Care 294 (Feb. 1999) |
| 1025 | Ebrahim et al., *Carotid Plaque, Intima Media Thickness, Cardiovascular Risk Factors, and Prevalent Cardiovascular Disease in Men and Women: The British Regional Heart Study*, 30(4) Stroke 841 (Apr. 1999) |
| 1026 | Daft et al., *Comprehensive Imager Simulation for Improved Acoustic Power Control*, 1999 IEEE Ultrasonics Symposium. Proceedings. International Symposium (Cat. No. 99CH37027), Vol. 2., 1571 |
| 1027 | *ATL Raises Stakes in Premium Ultrasound With HDI 3000 Release*, Diagnostic Imaging (Oct. 26, 1994), available at https://www.diagnosticimaging.com/view/atl-raises-stakes-premium-ultrasound-hdi-3000-release |
| 1028 | Dambrosio et al., *B-mode Color Sonographic Images in Obstetrics and Gynecology: Preliminary Report*, 6 Ultrasound Obstet. Gynecol. 208 (1995) |
| 1029 | File History of U.S. Patent Application No. 09/243,312 (the "'312 application") |
| 1030 | Leibovitz et al., *Assessment of Endometrial Receptivity for Gestation in Patients Undergoing* in vitro *Fertilization, Using Endometrial Thickness and the Endometrium-Myometrium Relative Echogenicity Coefficient*, 14 Ultrasound Obstet. Gynecol. 194 (1999) |
| 1031 | Morris et al., *High Resolution Ultrasound Assessment of the Carotid Artery: Its Relevance in Postmenopausal Women and the Effects of Tibolone on Carotid Artery Ultrastructure*, 2 Climacteric 13 (1999) |

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

| | |
|---|---|
| 1032 | Pickuth, *Essentials of Ultrasonography: A Practical Guide* (1995) |
| 1033 | Gudmundsson et al., *Factors Affecting Color Doppler Energy Ultrasound Recordings in an* in-vitro *Model*, 24(6) Ultrasound Med Biol. 899 (1998) |
| 1034 | Schroeder et al., *Noninvasive Determination of Endothelium-Mediated Vasodilation as a Screening Test for Coronary Artery Disease: Pilot Study to Assess the Predictive Value in Comparison With Angina Pectoris, Exercise Electrocardiography, and Myocardial Perfusion Imaging*, 138 Am. Heart J. 731 (Oct. 1999) |
| 1035 | Lewin et al., *Acoustic Output Levels and Ultrasound Output Display Standard*, Archives of Acoustics, Vol. 23, No. 2, 267 (1998) |
| 1036 | Barry et al., *Three-Dimensional Freehand Ultrasound: Image Reconstruction and Volume Analysis*, Ultrasound in Med. & Biol., Vol. 23, No. 8, 1209 (1997) |
| 1037 | ATL Ultrasound, Inc. Form 10-K for the Fiscal Year Ended December 31, 1997 |
| 1038 | Lim et al., *Three-Dimensional Power Doppler Imaging*, 40.3 J. Korean Radiological Soc., 519 (1999) |
| 1039 | Redline Comparison of the '312 Application and U.S. Patent No. 6,174,285 |

x

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## I.    INTRODUCTION

The '157 Patent generally claims an ultrasound system that stores known ultrasound parameters in memory as a "preset." According to the '157 Patent, users of previous systems had to input the parameters manually each time using the device. The '157 Patent's stated advance is presetting parameters by storing them in conventional memory in correspondence with an identifier that it calls "information of object." Users can then set the parameters by simply inputting the identifier. Presetting parameters in correspondence with an identifier, however, was not new.

Before 2001, ultrasound systems had to have preset functionality to be commercially viable. Instead of having to input dozens of parameters manually each time users wanted to diagnose a patient, they simply selected a "preset" associated with desired parameters for the body part to be examined. A POSA not only knew that ultrasound systems shipped with the claimed preset functionality, they expected it. The HDI 3000 Ultrasound System, for example, was well known in the 1990s. The HDI 3000 Manual was shipped and available with every system, and it disclosed the claimed preset functionality. Kinicki, a prior-art patent filed in 1993, also disclosed the claimed functionality. Before 2001, patents like Jackson, Short, and Clark were referring to the claimed preset functionality as old technology.

1

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## II.    MANDATORY NOTICES, FEES, & STANDING

### A.    Real Parties-In-Interest

Petitioner Butterfly Network, Inc. is the real party-in-interest.

### B.    Related Matters

Patent Owner asserted the '157 Patent, among others, against Petitioner in a pending litigation, *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, No. 1:22-cv-309 (D. Del.) ("the Litigation"). U.S. Patents 7,867,168 ("the '168 Patent") and 9,538,985 ("the '985 Patent") are also asserted in the Litigation. Petitioner has filed petitions for IPR of the '168 Patent (IPR2022-01575) and the '985 Patent (IPR2022-01576).

### C.    Lead & Backup Counsel

Petitioner provides the following designations of counsel:

| Lead Counsel | Backup Counsel |
|---|---|
| C. Brandon Rash<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Tel.: (202) 887-4380<br>Fax: (202) 887-4288<br>brandon.rash@akingump.com<br>USPTO Registration No. 59,121 | Ruben H. Munoz<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>1735 Market Street, 12th Floor<br>Philadelphia, PA 19103<br>Tel: (215) 965-1263<br>Fax: (215) 965-1210<br>rmunoz@akingump.com<br>USPTO Registration No. 66,998 |

2

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

### D.    Service Information

A Power of Attorney accompanies this Petition pursuant to 37 C.F.R. § 42.10(b). Please address all correspondence to:

AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006-1037

Petitioner consents to electronic service by email at:

AG-BFLY-FUJI-IPR@akingump.com

### E.    Certification of Grounds for Standing

Petitioner certifies that the '157 Patent is eligible for IPR and that Petitioner is not barred or estopped from challenging the claims.

### F.    Fees

Under 37 C.F.R. § 42.103(a), Petitioner authorizes the Office to charge the fee set forth in 37 C.F.R. § 42.15(a) to Deposit Account No. 50-2310, as well as any additional fees that might be due in connection with this Petition.

## III.    STATEMENT OF PRECISE RELIEF REQUESTED

Petitioner requests review and cancellation of claims 1-4 and 6-10 on the following grounds:

| Ground | Claims | Basis for Ground |
|---|---|---|
| 1 | 1-4, 6-10 | Anticipated by HDI 3000 Manual |
| 2 | 1-4, 6-10 | Obvious over HDI 3000 Manual and Jackson |
| 3 | 1-3, 6-9 | Anticipated by Kinicki |
| 4 | 1-3, 6-9 | Obvious over Kinicki and Short |
| 5 | 4, 10 | Obvious over Kinicki and Clark |

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

| Ground | Claims | Basis for Ground |
|--------|--------|------------------|
| 6 | 4, 10 | Obvious over Kinicki, Short, and Clark |

## IV.   U.S. PATENT 6,901,157 ("THE '157 PATENT")

### A.   Summary

The '157 Patent is directed to an ultrasonic diagnostic apparatus in which transmission/reception and image processing conditions can be set through parameters for each body part to optimize the image for display. EX1001, Abstract, 1:14-23, 2:15-21; EX1008, ¶¶38-44. According to the '157 Patent, these parameters were previously set manually each time an image was obtained and displayed, which was laborious. EX1001, 1:24-34. The '157 Patent states that its advance over the prior art is an apparatus that inputs of body part information ("information of object") to select "preset" parameters from memory, and displays an image obtained using the selected parameters. EX1001, Abstract, 2:15-59, 4:21-39 ("Parameters … are preset in correspondence with the body parts ….").

Figure 1 shows an ultrasonic diagnostic apparatus, controlled by system control unit 10. EX1001, 4:8-19.

4

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## FIG.1



EX1001, Fig. 1.

The ultrasound transmitting and receiving unit controls transmission/reception conditions, transmitting ultrasonic waves to an object to be inspected and receiving echo waves from the object. EX1001, 2:26-32, 4:11-19, 4:66-5:25, 6:13-31. Transmission/reception conditions include a center frequency, bandwidth, focussing position, transmission power, reception sensitivity, etc. of the waves or signals. EX1001, 1:14-20, 5:2-17, 7:13-32, 8:1-41. Detected waves are converted into digital image data and stored in image memory 64. EX1001, 5:23-25, 6:26-33, 7:32-34.

5

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Each frame of image data is subjected to image processing in image processing unit 66. EX1001, 5:26-27, 6:33-38, 7:34-40. Image processing conditions include a normalization process, nonlinear gradation control process, response control process, scale-up/down and interpolation processes, etc. EX1001, 5:27-30, 5:55-60, 6:51-7:2, 7:59-63, 8:42-9:3 (gradation control), 9:4-38 (response control), 9:39-10:33, 12:42-47, Figs. 2A-5. The '157 Patent also mentions "brightness and contrast." EX1001, 1:20-22.

Control unit 10 is connected to parameter memory unit 2 and information input unit 3. EX1001, 4:21-23, Fig. 1. One or more parameter sets for determining the transmission/reception and image processing conditions are "preset" (stored in parameter memory unit 2) in correspondence with body parts of an object by employing parameter setting unit 1. EX1001, 4:23-31, 6:39-47, 7:41-47. Ultrasonic transmission/reception and image processing are executed using the parameter set selected based on the "information of object" input to information input unit 3. EX1001, 4:31-37, 6:7-13, 7:6-12, 7:47-53. "Information of object" represents, for example, a body part, such as the liver, heart, etc. EX1001, 4:37-39, 6:47-50, 7:53-58, 10:33-67 (liver and blood vessel parameters).

Selecting a parameter set may be done in a two-step process. EX1001, 6:39-50, 7:41-58. For example, in step one, "the operator inputs the information of object for selecting 'liver' as the body part." EX1001, 7:53-58. And in step two, "the

6

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

operator … inputs information for selecting the image processing condition parameter set B, and information for selecting the transmission/reception condition parameter set Y." *Id.*

### B.    Challenged Claims

The challenged claims are claims 1-4 and 6-10. App'x A; EX1008, ¶¶45-55.

### C.    Prosecution History

The '157 Patent issued from U.S. Application 10/035,256 (EX1002), filed January 3, 2002, and claims foreign priority to Japanese Applications 2001-005994 and 2001-005995, both filed January 15, 2001.[1]

Nearly three years after filing, the Examiner issued a first-action allowance, stating as reason for allowance that the art of record fails to teach the claimed "parameter memory unit" in combination with the other claim elements. EX1002, 167, 187; EX1008, ¶¶56-57. As explained below, the prior art—including the HDI 3000 Manual, Jackson, and Kinicki—disclosed this combination.

## V.    LEVEL OF SKILL IN THE ART

A person of ordinary skill in the art ("POSA") on January 15, 2001, would have a degree in electrical engineering, biomedical engineering, or a related

---

[1] Petitioner assumes the '157 Patent is entitled to this earlier priority date for purposes of this Petition.

7

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

discipline, along with relevant experience (at least 2-3 years for a Ph.D., 3-5 years for a Master's, and 5+ years for a Bachelor's) researching or developing ultrasound systems or other medical imaging devices. EX1008, ¶¶21-26. The POSA would have general knowledge of ultrasound systems and related technologies as of January 15, 2001. *Id.*

## VI.    CLAIM CONSTRUCTION

Petitioner does not believe any terms require construction at this stage for the Board to find all challenged claims unpatentable. EX1008, ¶¶58-59.

## VII.    PRIOR ART SUMMARY

### A.    State of the Art

Ultrasound systems were around decades before 2001. EX1003, 17-146, 177-262; EX1004, 2:51-4:18; EX1005, 2:23-4:15; EX1016, 63-192; EX1017, 21-159; EX1008, ¶60. These systems commonly included an ultrasound probe, transmission/reception circuitry, image processing circuitry, processor-based control unit and associated memory, user interface, and display. *Id.* The probe (also called scanhead or scanner) included a transducer array that transmitted ultrasound waves and received echo waves. EX1003, 13, 171, 372-77; EX1005, 3:52-64; EX1014, 18-21; EX1016, 512, 527-35; EX1018, 31-32, 110-11, 215; EX1032, 5-7; EX1008, ¶61. Some or all of the remaining circuitry was included in the probe's enclosure or separate enclosure(s). *Id.*

8

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Before 2001, ultrasound systems included a transmission/reception unit, which comprised a transducer array and associated circuitry, and operated according to standard parameters. EX1013, 372, 386, 396, 402-03, 413-14; EX1008, ¶¶62-68. For example, the transmission circuitry had parameters for focus and transmission power (or "output"), and the receiving circuitry had parameters for reception sensitivity (e.g., gain). *Id.*; EX1012, 3, 91; EX1016, 54, 121, 124-26, 129, 131, 136, 145, 168, 261; EX1017, 37, 58, 76-81, 84, 88-90, 107-08, 112-14, 127, 130-34, 150-53; EX1018, 43, 46, 51-52, 58-62, 98-101, 115-17, 173, 254-55; EX1032, 8; EX1035, 278.

Digital image processing units in ultrasound systems were conventional before 2001. EX1008, ¶¶69-77. These units included circuitry for optimizing, for example, the brightness and contrast of displayed ultrasound images, and performed various operations on the image data, such as gradation control, response control, and persistence. *Id.*; EX1003, 239; EX1012, 65, 79; EX1013, 60-62, 113-14, 393; EX1016, 117, 130, 152, 155, 418; EX1017, 81, 84, 87-90, 109-10, 114, 153, 239; EX1018, 82-83, 174, 202-03, 218-26, 229; EX1028, 208, 214. Gradation control (or "postprocessing") used, for example, gray-scale maps (also called gray maps or post-processing maps, shown below) to display a shade of gray or brightness depending on the signal amplitude. EX1012, 65; EX1016, 130, 418; EX1018, 222; EX1008, ¶¶71-73.

9

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



EX1018, 222 (Fig. 10-20).

It was standard before 2001 for ultrasound systems to operate in one or more imaging modes. EX1032, 10; EX1008, ¶¶78-81. For example, 2D mode (or brightness mode or B-mode) rendered two-dimensional images in which tissue is depicted in variable points of brightness (also called monochromatic gradation or gray scale). EX1012, 10; EX1013, 392; EX1018, 74, 199; EX1032, 10-11. M-mode (or motion mode) showed movement of the tissue over time. EX1012, 55; EX1018, 190, 195; EX1032, 10. Color Doppler mode changed the echo waves into different colors to observe moving objects (also called polychromatic gradation or color scale). EX1018, 162-63. Each mode had associated parameters for transmitting ultrasound waves, receiving echo waves, and processing image data based on the

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

echo waves. EX1008, ¶82. Before 2001, ultrasound systems included known three-dimensional (3D) ultrasound imaging functionality. EX1003, 257-59; EX1016, 187-88, 200-07; EX1018, 115-22; EX1019, 248-52; EX1036, 1209-10; EX1008, ¶¶83-85.

Given the time, effort, and expertise required to manually set dozens of parameters, "preset" functionality was conventional before 2001. EX1008, ¶¶86-92. Preset functionality allowed users to set parameters from parameter sets stored in memory by simply selecting a preset associated with a body part. *Id.*; EX1003, 33-34, 41-43, 180-84, 195-96, 432; EX1032, 12. Major manufacturers of ultrasound systems—such as Acuson, ATL Ultrasound, GE, and HP—included presets, both pre-configured factory presets and user-defined presets, because such functionality was required for commercial viability by the late 1990s. *Id.*; EX1004 at 1:39-56, 3:58-4:4; EX1005, Abstract, 1:25-2:35, 5:29-50, 9:7-18; EX1006, 1:6-34; EX1016, 101, 111-13, 407-08, 415-47, 494-98; EX1017, 37-45, 76-135; EX1023, 111; EX1024, 295; EX1025, 842-43; EX1026, 1571; EX1027, 1-2; EX1028, 211; EX1030, 195; EX1031, 14; EX1033, 899-900; EX1034, 732-33; EX1037, 3.

## B.    HDI 3000 Manual

The HDI 3000 Manual (EX1003) is a "manual set," e.g., including at least the "Getting Started" and "Reference Manual" sections, which was shipped with each HDI 3000 Ultrasound System. EX1003, 13, 171. The Manual is a printed publication

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

that was disseminated and publicly accessible by no later than 1998, and is prior art under pre-AIA § 102(b). EX1003, 3, 153 ("Copyright ©1998"); EX1020-1022; EX1008, ¶¶93-95; EX1010, ¶¶1-21; EX1011, ¶¶1-18; *Centripetal Networks, Inc. v. Cisco Sys.*, 847 Fed. Appx. 869, 876-878 (Fed. Cir. 2021) (finding user manual qualified as a printed publication); *Apple Inc. v. MemoryWeb, LLC*, IPR2022-00032, Paper 12, at 11-14 (PTAB Jul. 8, 2022) (finding multiple HTML files to be a single reference).

The Manual disclosed an ultrasound system comprising a probe and associated circuitry that operated according to transmission/reception parameters, such as gain (reception sensitivity), focus (focussing position), and output (transmission power) (EX1003, 232-35), and a digital image processing unit that operated according to image processing parameters, such as gray maps (gradation) and persistence (EX1003, 226-30, 241), among many others. EX1008, ¶¶93-94.

The Manual disclosed that the HDI 3000 came with factory-installed "tissue specific presets" stored in memory that included "optimized" transmission/reception and image processing parameters to "reduce the need for control adjustments." EX1003, 33; EX1008, ¶95. Using a control panel, users selected a clinical option (e.g., abdomen) and then an associated tissue-specific preset (e.g., renal or aorta) from among multiple available presets. EX1003, 25-26, 33-34, 195-97. After selecting a preset, the system was automatically set up for operation based on the

12

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

parameters previously stored for that preset. *Id.* The Manual also described a procedure for users to save their "own presets" via a "Quick Save" key. *Id.*

### C.    Kinicki

Kinicki is U.S. Patent 5,315,999, issued May 31, 1994. It is prior art under pre-AIA § 102(b).

Kinicki disclosed an ultrasound imaging system for transmitting ultrasound waves, receiving echo waves, and processing the image data for display, all according to various parameters. EX1005, 1:14-45, 3:42-4:15, Fig. 1; EX1008, ¶¶96-97. To avoid the time-consuming process of manually adjusting these parameters (EX1005, 1:46-2:18), Kinicki disclosed "operating an ultrasound imaging system wherein sets of imaging parameter values [were] saved as preset modes" (EX1005, 3:25-41, 6:30-7:68, Figs. 4A-5). "When a user later selects one of the preset modes, the system automatically operates with the corresponding set of imaging parameter values." *Id.* "The system can store a plurality of preset modes for different exam types, for different image displays, for different patients and for different users," and "[e]ach of the preset modes can typically be selected with a single keystroke." *Id.*

Each preset mode includes "parameters that control transmission and reception of ultrasound energy, processing of received signals and image display." EX1005, 1:25-37. These parameters include image processing parameters such as

13

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

post-processing (gradation), edge enhance (response control), persistence, colorize, image width, and image position, and transmission/reception parameters such as focus (focussing position) and lateral gain control ("LGC") (reception sensitivity). EX1005, 4:16-36, 6:4-29, Figs. 2, 3B.

### D.    Jackson

Jackson is U.S. Patent 5,997,478, issued December 8, 1999. It is prior art under pre-AIA § 102(b).

Jackson disclosed an ultrasound imaging system comprising an ultrasound image acquisition, processing, and display system. EX1004, 2:49-3:20, Figs. 1-2; EX1008, ¶¶98-99. Jackson sought to go beyond traditional systems of the time that "use[d] pre-stored parameter-setting packages based on an intended clinical application (e.g., obstetrics, peripheral vascular, cardiology)." EX1004, 1:39-46, 2:49-3:29. "The difficulty with this approach is that the operator typically refines the recalled parameters to best visualize the structures of interest on each patient." EX1004, 1:44-46. Jackson disclosed storing for later recall "the exact parameters that were used"—including "depth," "transmit power," "gain" (reception sensitivity), and "postprocessing" (gradation), among others—and "an ultrasound image along with the parameters." EX1004, 3:46-54; EX1004, 1:21-56, 4:30-5:47, 7:3-49, Figs. 4-5. This was desirable because earlier "parameter-setting packages [were] insufficient for conducting precise, controlled serial studies on a set of

14

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

patients or for reproducing the imaging parameters that were used to acquire a specific image on a specific patient at some previous point in time." *Id.*

### E.   Short

Short is U.S. Patent 5,161,535, issued November 10, 1992. It is prior art under pre-AIA § 102(b).

Short disclosed an ultrasound system comprising a probe for imaging a patient, a display for displaying the ultrasound image, and a control panel providing a user interface. EX1006, 3:16-22, 8:46-9:2, Figs. 1, 9; EX1008, ¶¶100-02. Short was cited by Kinicki as an exemplary "ultrasound imaging system" with a similar control panel. EX1005, 2:18-20. Short disclosed providing "instant access" to various "control sets specific to each of the different system modes." EX1006, Abstract, 3:16-39, 4:7-5:50, 8:52-63, Figs. 2-8. Each control set includes "rotatable controls" for transmission/reception conditions, such as "transmit power" (transmission power) and "gain" (reception sensitivity), and image processing conditions, such as "postprocessing" and "color map" (gradation). *Id.* When a user selects a mode, "the ultrasound system responds accordingly" and displays the corresponding set of parameters. EX1006, Abstract, 1:66-2:8, 3:23-4:6.

### F.   Clark

Clark is U.S. Patent 6,174,285, filed February 2, 1999, and issued January 16, 2001. It is prior art under pre-AIA § 102(e). EX1015, ¶¶1-5; EX1029, 1-36; EX1039.

15

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Clark, which cites Kinicki as an ultrasound system having "preset imaging modes and parameters" (EX1007, 1:28-35), disclosed an ultrasound system that constructs three-dimensional ("3D") images using preset anatomical views and 2D image data acquired by a transducer unit (EX1007, 2:66-4:65, claims 15-19, Figs. 3-5). EX1008, ¶¶103-04.

## VIII. GROUND 1: CLAIMS 1-4 AND 6-10 ARE ANTICIPATED BY THE HDI 3000 MANUAL

Anticipation under Ground 1 is based solely on the HDI 3000 Manual. In fact, the Reference Manual section alone disclosed each limitation of claims 1-4 and 6-10, as arranged in the claims. EX1008, ¶105. Petitioner's expert provides corroborating evidence regarding the disclosures of the Manual. EX1008, ¶¶105-191. As he explains, his opinions would remain the same even without such corroborating evidence. *Id.*; *Yeda Research & Dev. Co. v. Mylan Pharm., Inc.*, 906 F.3d 1031, 1041 (Fed. Cir. 2018) ("non-prior art evidence of what was known … 'can be relied on for … how [a POSA] would have understood a prior art disclosure'").

### A.    Claim 1

#### 1.    [1a] "An ultrasonic diagnostic apparatus comprising:"

To the extent the preamble is limiting, the Manual disclosed a diagnostic ultrasound apparatus (e.g., HDI 3000) that acquires, processes, and displays ultrasound data. EX1003, 19, 221 (describing "cross-sectional representation of

16

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

anatomical structures" based on "image processing techniques"); EX1014, 6-7;

*supra* § VII.B; EX1008, ¶¶106-08.

> ### 2.    [1b] "an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object;"

The Manual disclosed the HDI 3000 includes an ultrasonic transmitting and

receiving unit comprising a scanhead or probe. EX1003, 13, 18-19, 25-26, 171, 541

("Array"), 549-50 ("Array"), 553 ("Array"); EX1014, 64, 80-88, 745-76; EX1008,

¶¶109-12.



Figure 2–2.  Connection Receptacles

EX1003, 19, 267. The scanhead transmits ultrasound waves to an object to be

inspected and receives echo waves reflected from the object. EX1003, 552-53 ("one

[transducer element] transmits the sound wave, the other receives the echo"). The

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Manual disclosed the HDI 3000 includes, for example, transmitting circuitry to control focussing position (focus) and transmission power (output), and receiving circuitry to control reception sensitivity (e.g., gain). *Infra* §§ VIII.E.2, VIII.H.

### 3. [1c] "an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters,"

The Manual disclosed the HDI 3000 includes an image processing unit for executing image processing of image data, including "*Image Processing*"[2] and various image processing condition parameters, such as gray maps, color maps, and persistence. EX1003, 226-27 (gray/color maps), 241 (persistence), 433 ("*Image Processing*" list); EX1014, 63, 89-94; EX1008, ¶¶113-18. In 2D mode, for example, the HDI 3000 uses "multiple *image processing* techniques" to optimize the image for display. EX1003, 221; *supra* § VII.A.

The image data is obtained from the echo waves received by the transmitting and receiving unit. EX1014, 89-92; EX1008, ¶¶115-16. Image processing conditions related to gray-scale and color-scale, for example, are set according to the "*echo* amplitude." EX1003, 55, 184 ("gray scale graphically represents the gray level or *echo* amplitude"), 226-30, 539-40.

---

[2] All emphases added unless stated otherwise.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

The HDI 3000 processes the image data by using image processing condition parameters, such as gray maps, color maps, and persistence. EX1003, 226-27, 241, 533, 540, 547; EX1014, 90-94; *infra* § VIII.C; EX1008, ¶¶117-18. Gray maps (a type of gradation control) are a "video depiction of the gray scale that is displayed on the system monitor," and "gray scale" is the "scale used to assign shades of gray to different signal amplitudes." *Id.* Color maps use "color scale" and "depicts the mapping of flow velocities to color." *Id.* Persistence is a "frame averaging function" that "eliminate[s] image speckle present in the 2D display." *Id.*

### 4. [1d] "an information input unit to be employed for inputting information of object concerned with the object to be inspected;"

The Manual disclosed the HDI 3000 includes an information input unit (e.g., control panel and on-screen menus) employed for inputting information of object (e.g., "clinical options") concerned with the object to be inspected. EX1003, 39-40, 180-86 ("Control Module" and user-selectable options for performing scan), 195-96; EX1008, ¶¶119-20. Figure 4-1 shows the "control panel," i.e., "primary user interface module." EX1003, 541.

19

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



**Figure 4-1.    Control Panel**

EX1003, 39, 180 (Fig. 2-3, same), 187-92 (keyboard).

From the control panel, users access the "Scanhead Display," which includes

a list of "[c]linical options" and "[t]issue specific presets" stored in the system in

correspondence with body parts. EX1003, 25, 195-96, 585.

20

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



**Figure 2-7.  Scanhead Display**

EX1003, 25-26, 195-96. As shown above, users select from the list of clinical
options (e.g., Abdomen, OB, and Gyn/Fertility), each of which has associated tissue-
specific presets (e.g., General, Renal, Aorta, and Transplant), associated with body
parts for inspection. EX1003, 25-26 ("select a scanhead for image optimization" and
"the clinical option that you want"), 195.

> … On the Scanhead display, there is a list of *clinical*
> *options*. Additionally, the *clinical options* are associated
> with one or more *tissue specific presets* …. For example:
> within the small parts clinical option, the tissue specific
> presets are thyroid, testicle, breast, and superficial. If you

21

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

> select the small parts *clinical option*, these *tissue specific presets* will be displayed … for your selection. …
>
> You specify how the system will be set up for operation by selecting a *clinical option* and a *tissue specific preset*. The more specific you are about your use of the system, the more specific the system can be.

EX1003, 195, 432 (clinical options).

### 5.    [1e] "a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object;"

The Manual disclosed a parameter memory unit for storing image processing condition parameters (e.g., parameters associated with clinical options and tissue-specific presets) to be used in the image processing unit. EX1003, 196; EX1014, 78-85; EX1025, 842-43; EX1008, ¶¶121-30. The HDI 3000 came equipped with clinical options and presets, stored in memory. EX1003, 27, 33-35 ("optimized … tissue specific presets … set up … for specific tissue imaging and … intended to reduce the need for control adjustments"), 195-96.

The Manual also taught users how to create and save their own tissue-specific presets. EX1003, 33-34, 196.

> *You can also create your own tissue specific imaging presets. The Quick Save key provides this capability*. You create a preset name for your optimized preset (Figure 3-

22

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

> 2). ***Once you associate the scanhead with the current system settings by saving them, from this point on, that scanhead will be associated with an optimized preset***, and the preset name appears on the Scanhead display.

EX1003, 196. The Quick Save feature enables users to "quickly save the current system settings as a user-defined preset for the active scanhead and clinical option." EX1003, 190, 33-35, 217, 555 ("**Quick Save** … allows you to setup and then save a range of Tissue Specific preset setups for a specific application and scanhead.").

The Manual taught users how to save image processing condition parameters, e.g., gray maps (in **blue** below) and persistence (in **red** below), among others, using the Quick Save feature. EX1003, 197 (Fig. 3-2); EX1008, ¶¶124-28. The parameters and current system settings can be saved under a custom preset name. EX1003, 33-34, 196-97, 432. "Once you have saved a preset in this way, each time that you press the Scanhead key, the list of tissue specific presets for a scanhead type will include your custom preset." EX1003, 196.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 3–2.   Quick Save for Creating a Preset

EX1003, 197 (annotated), 33 ("use the Quick Save key to save a preset"; Fig. 3-5,

Quick Save screen for "Abdomen").

As shown below, the custom preset appears in the Scanhead Display, where

"[y]ou can now use this preset with the specific scanhead and clinical option."

EX1003, 34, 196-97.

24

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 3–6.   User-defined Optimized Preset

*Id.* The presets are stored in the "presets database." EX1003, 36-37, 216-18.

As explained, the image processing condition parameters associated with tissue-specific presets correspond to the selected information of object (e.g., clinical option). EX1014, 485-86; *supra* §§ VIII.A.3-4; EX1008, ¶¶128-30.

> **6.    [1f] "a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to the image processing unit, and"**

The Manual disclosed the HDI 3000 includes a control unit for reading out the image processing condition parameters so as to supply read-out parameters to the image processing unit. EX1003, 25-26, 195-96, 217-18, 434, 585; EX1014, 63, 76-79; EX1008, ¶¶131-35. Using the information input unit (e.g., control panel), the

25

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

user chooses the tissue-specific preset for a clinical option associated with a body part to be inspected. EX1003, 25-28 (setting up system "for image optimization," including selecting presets), 172, 195-96, 217-18, 434; *supra* §§ VIII.A.4-5. In response to a user selecting a clinical option and tissue-specific preset, "[t]he system initializes for the Tissue Specific Imaging parameters that are appropriate for the scanhead and the clinical option you have selected (Figure 2-8)." *Id.* To perform "initializing," the control unit reads the saved parameter settings from memory associated with the selected preset and supplies those parameters to the image processing unit. EX1003, 26, 40, 196, 221-23; EX1008, ¶¶132-35.



Figure 2-8.    Tissue Specific Scanhead Initialization

EX1003, 26 (annotated), 196.

26

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

As explained, the image processing condition parameters read out and supplied by the control unit "correspond to the information of object input by employing the information input unit, from said parameter memory unit." EX1003, 585; *supra* §§ VIII.A.4-5; EX1008, ¶133.

### 7.  [1g] "a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit."

The HDI 3000 includes a display unit (e.g., video monitor) for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. EX1003, 20 (Fig. 2-3), 223, 267, 441 ("color monitor"); EX1014, 46, 63-64, 92-95; EX1008, ¶¶136-39.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 5–5.    **Pulse/Channel A Receptacle**

EX1003, 267.

"After initialization, a 2D image appears on the screen." EX1003, 40, 221-23. In 2D mode, for example, the 2D display will show the image on the basis of the image data subjected to image processing in the image processing unit. *Id.* As explained, the image data will be processed according to image processing condition parameters, such as a gray map, color map, and persistence, and then displayed on the monitor. EX1003, 241 (e.g., persistence); *supra* §§ VIII.A.3-6.

28

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

### B.    Claim 2

1.    **[2a] "An ultrasonic diagnostic apparatus according to claim 1, wherein: said parameter memory unit stores a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and"**

The Manual disclosed the HDI 3000 includes a parameter memory unit for storing image processing condition parameter sets (e.g., tissue-specific presets) in correspondence with one item of the information of object (e.g., clinical option). EX1003, 25-26 (Fig. 2-7), 195-97 (Figs. 3-1, 3-2), 432; EX1008, ¶¶140-43. As explained, the parameter memory unit stores multiple parameter sets (e.g., "tissue specific presets"), including image processing parameters, corresponding to each clinical option. *Supra* § VIII.A.4-5; EX1003, 195 ("For example: within the small parts clinical option, the tissue specific presets are thyroid, testicle, breast, and superficial."). Figure 3-1 shows multiple parameter sets (e.g., General, Renal, Aorta, and Transplant) for the "Abdomen" clinical option. EX1003, 196.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 3–1.    Clinical Options and Tissue Specific Presets: Scanhead Display

EX1003, 196 (annotated).

> **2.    [2b] "said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object."**

As explained, the Manual disclosed the HDI 3000's information input unit

(e.g., control panel) allows users to input the information of object (e.g., clinical

option) and select an image processing condition parameter set (e.g., tissue-specific

preset) from among the plurality of image processing condition parameter sets

corresponding to the information of object. EX1003, 25-26 (Fig. 2-7), 35 (Fig. 3-7),

30

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

195-96 (Fig. 3-1); *supra* §§ VIII.A.4, VIII.B.1; EX1008, ¶144. Figures 2-7 and 3-7

show multiple tissue-specific presets corresponding to a clinical option. *Id.*



**Figure 2–7.   Scanhead Display**

EX1003, 25-26, 195-96. Users "[u]se the trackball to move the cursor to the clinical

option that you want" and "[p]ress the SELECT control," and then "[a]

corresponding list of tissue specific presets is displayed." *Id.* Next, users "select a

tissue specific preset (Figure 2-7)," and "[t]he system initializes for the Tissue

Specific Imaging parameters." *Id.*

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

     **C.**    **Claim 3: "An ultrasonic diagnostic apparatus according to claim 1, wherein the image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data."**

The Manual disclosed the image processing condition parameters used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process, and an interpolation process for the image data. EX1008, ¶¶145-49. As explained, the Manual disclosed parameters used in the image processing unit, such as gray maps, chroma maps, color maps, and persistence. *Supra* § VIII.A.3.

Gray maps, for example, include image processing condition parameters that prescribe a control of a gradation control process. EX1003, 547; *supra* §§ VII.A, VIII.A.3; EX1008, ¶¶147-49. Gray maps are a "video depiction of the gray scale that is displayed on the system monitor," and "Gray Scale" is a "scale used to assign shades of gray to different signal amplitudes." *Id.*; EX1014, 26, 94; EX1025, 842-43 There are eight different gray maps, which "have been selected to optimize the display of 2D data for the selected clinical option." EX1003, 226-27 (Fig. 4-4), 230.

32

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 4–3.   Gray Maps

EX1003, 226 (annotated). As explained, the Manual disclosed saving the selected

gray map parameters to a custom tissue-specific preset. *Supra* § VIII.A.5.

33

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 3–2.    Quick Save for Creating a Preset

EX1003, 197 (gray map "Map 3" among saved parameters) (annotated).

> **D.    Claim 4: "An ultrasonic diagnostic apparatus according to claim 1, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in the image processing unit so as to output the three-dimensional image data to said display unit."**

The Manual disclosed the HDI 3000 includes a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data that was subjected to the image processing in the image processing unit (*supra* §§ VIII.A.3-7) so as to output the three-dimensional image data to the display unit. EX1003, 60, 181, 221-28, 257-58, 433, 540; EX1014, 89-95; EX1008, ¶¶150-56. The "3D imaging display is derived from the acquisition of Cineloop review

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

images." EX1003, 257-58 ("several images acquired when you move the scanhead over an anatomical region are rendered by the system to create an apparent 3D image"), 60-63 (steps "to create a 3D image sequence" as requiring acquisition and processing of images in, e.g., 2D mode (step 1) before "rendering of the 3D image display" (step 8)); EX1008, ¶¶83-85.

Users can generate 3D imaging from the CINE/3D menu (Figure 4-30). EX1003, 258.



Figure 4–30.   3D Imaging

EX1003, 258. The acquired 2D images are stored in Cineloop memory. EX1003, 57-61, 259; EX1008, ¶¶152-53. From the CINE/3D menu, users select the "Create 3D" button, which causes the system to render a 3D image (Figure 4-20 below) based on the 2D images. EX1003, 62-63, 258-59; EX1038, 520-21; EX1008, ¶¶154-56.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 4-20.   Creating a 3D Image

EX1003, 62, 258.

### E.    Claim 6

#### 1.    [6a] "An ultrasonic diagnostic apparatus comprising:"

To the extent the preamble is limiting, the Manual disclosed it for the same

reasons as [1a]. *Supra* § VIII.A.1; EX1008, ¶¶157-58.

#### 2.    [6b] "an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters,"

Claim element [6b] is like [1b], except the transmitting and receiving unit also

transmits and receives waves "in accordance with ultrasonic transmission/reception

conditions  which  are  set  on  the  basis  of  transmission/reception  condition

36

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

parameters." As explained, the Manual disclosed the HDI 3000 includes an ultrasonic transmitting and receiving unit (e.g., scanhead and associated circuitry). *Supra* § VIII.A.2.

The Manual disclosed the transmitting and receiving unit operates in accordance with transmission/reception conditions, such as gain, depth, focus, and acoustic power output ("output"). EX1003, 232 (depth), 233 (gain and output), 235 (focus); EX1008, ¶¶159-60. These conditions are set on the basis of transmission/reception condition parameters. *Id.*; *infra* §§ VII.A, VIII.E.5, VIII.H.

> **3.   [6c] "an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters,"**

The Manual disclosed element [6c] for the same reasons as [1c]. *Supra* § VIII.A.3; EX1008, ¶161.

> **4.   [6d] "an information input unit to be employed for inputting information of object concerned with the object to be inspected;"**

The Manual disclosed element [6d] for the same reasons as [1d]. *Supra* § VIII.A.4; EX1008, ¶162.

37

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

> **5.      [6e] "a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit and the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object;"**

Claim element [6e] is like [1e], except the parameter memory unit also stores "the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object." As explained, the Manual disclosed a parameter memory unit for storing image processing condition parameters to be used in the image processing unit, in correspondence with the information of object. *Supra* § VIII.A.5.

The Manual further disclosed preset transmission/reception parameters (e.g., tissue-specific presets) stored for subsequent use associated with an information of object (e.g., clinical option). EX1003, 196; EX1008, ¶¶163-67. As explained, the HDI 3000 comes with factory presets "related to a clinical option." EX1003, 33-37, 195-96, 217-18, 661; *supra* §§ VIII.A.4-6. Additionally, users can create their own presets that "save the current setups and system control settings," including the transmission/reception parameters, for later use. *Id.*; EX1003, 190, 555. Figure 3-2, for example, disclosed saving transmission/reception parameters, e.g., dynamic range, depth, focus, and output, using the Quick Save feature. EX1003, 196-97; EX1014, 82-85, 745-46; EX1025, 842-43; *infra* § VIII.H; EX1008, ¶¶165-67.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 3–2.   Quick Save for Creating a Preset

EX1003, 197 (annotated).

6.   **[6f] "a control unit for reading out at least either of the image processing condition parameters and the transmission/reception condition, parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to at least one of the image processing unit and said ultrasonic transmitting and receiving unit; and"**

Claim element [6f] is like [1f], except the control unit may read out at least either of the image processing condition parameters or "the transmission/reception condition, parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to at least one of the image processing unit and said

39

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

ultrasonic transmitting and receiving unit." As explained, the Manual disclosed a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to the image processing unit. *Supra* § VIII.A.6.

The Manual also disclosed a control unit for reading out the transmission/reception condition parameters "so as to supply the read-out parameters to at least one of the image processing unit and said ultrasonic transmitting and receiving unit." EX1014, 63, 76-79; EX1008, ¶¶168-72. After a user selects a clinical option and tissue-specific preset, the control unit "initializes" the system with Tissue Specific Imaging parameters. EX1003, 26-27, 195-96. The initialization process (illustrated in Figure 2-8) shows that the control unit reads out transmission/reception condition parameters—such as gain, depth, focus, and output—from the parameter memory unit and then supplies those parameters to the transmitting and receiving unit (e.g., scanhead and associated transmission/reception circuitry). *Id.*

As explained, the image transmission/reception condition parameters read out and supplied by the control unit "correspond to the information of object input by employing the information input unit, from said parameter memory unit." *Supra* §§ VIII.E.4-5; EX1008, ¶170.

40

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

      **7.**    **[6g] "a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit."**

The Manual disclosed element [6g] for the same reasons as [1g]. *Supra* § VIII.A.7; EX1008, ¶173.

      **F.**    **Claim 7**

      **1.**    **[7a] "An ultrasonic diagnostic apparatus according to claim 6, wherein: said parameter memory unit stores a plurality of image processing condition parameter sets and a plurality of transmission/reception condition parameter sets in correspondence with one item of the information of object; and"**

Claim element [7a] is like [2a], except the parameter memory unit also stores "a plurality of transmission/reception condition parameter sets in correspondence with one item of the information of object." As explained, the Manual disclosed the HDI 3000 stores a plurality of tissue-specific presets, which each includes saved image processing condition parameters, for a given clinical option. EX1003, 25-26 (Fig. 2-7), 195-96 (Fig. 3-1); *supra* § VIII.B.1.

The Manual further disclosed the parameter memory unit stores a plurality of transmission/reception condition parameter sets (e.g., tissue-specific presets) in correspondence with one item of the information of object (e.g., selected clinical option). EX1008, ¶¶174-76. As explained, the parameter memory unit stores multiple tissue-specific presets—each including transmission/reception condition

41

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

parameters, e.g., gain, depth, focus, and output—for a given clinical option. EX1003, 33-34, 195-97 (Fig. 3-1); *supra* §§ VIII.A.4-5, VIII.B.1, VIII.E.5.

> **2.    [7b] "said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object."**

Claim element [7b] is like [2b], except that the information input unit is also employed for "selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object." As explained, the Manual disclosed the HDI 3000 includes a control panel that allows users to input an information of object (e.g., clinical option). EX1003, 25-26, 195-96; *supra* §§ VIII.A.4-5; VIII.B.2. Users can then use the control panel to select from among a plurality of tissue-specific presets that include predetermined image processing parameters for a given clinical option. *Id.* As further explained, sets of transmission/reception parameters can also be saved to the tissue-specific preset that is selectable from among a plurality of tissue-specific presets for a given clinical option. EX1003, 33-34, 196-97; *supra* §§ VIII.E.5, VIII.F.1; EX1008, ¶177.

42

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

    **G.**    **Claim 8: "An ultrasonic diagnostic apparatus according to claim 6, wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data."**

The Manual disclosed claim 8 for the same reasons as claim 3. *Supra* § VIII.C; EX1008, ¶¶178-79.

    **H.**    **Claim 9: "An ultrasonic diagnostic apparatus according to claim 6, wherein ultrasonic transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focussing position, transmission power and reception sensitivity for the echo waves."**

As explained, the Manual disclosed ultrasonic transmission/reception condition parameters to be used in the ultrasonic transmitting and receiving unit, including gain, dynamic range, depth, focus, and acoustic power output. EX1003, 232 (depth), 233 (gain and output), 235 (focus), 238 (dynamic range); *supra* §§ VIII.E.2-7. These parameters prescribe control of at least one of a reception sensitivity for the echo waves (e.g., gain), focussing position (e.g., focus), and transmission power (e.g., output). EX1008, ¶¶180-89.

As explained, the Manual disclosed gain as a transmission/reception condition parameter that prescribes a control of the reception sensitivity of the echo waves. *Supra* § VIII.E.2; EX1008, ¶¶182-83. The Manual described that 2D gain, color gain, and Doppler gain are associated with the amplification of the received echo

43

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

waves. EX1003, 233, 432. "The 2D GAIN control governs the amount of amplification applied to the received echoes." EX1003, 233; EX1003, 180, 432, 536 (2D GAIN—"a control that adjusts the overall gain applied to the 2D echoes"). Color gain "affects the mapping of variance" and "[a]djusts the receiver gain for the Color or Power imaging display." EX1003, 181, 233; EX1003, 41, 432; *supra* § VII.A. Doppler gain "[a]djusts the receiver gain for the Doppler image display," and it "controls amplification of the incoming Doppler signals." EX1003, 182, 233; EX1003, 432, 485, 543 ("DOP GAIN").

The Manual disclosed depth and focus as transmission/reception condition parameters, with focus prescribing a control of a focussing position. EX1014, 82-83; *supra* § VIII.E.2; EX1008, ¶¶184-86. Depth is the "number of centimeters into the body over which the system acquires and displays data." EX1003, 542. The DEPTH control "[s]elects the 2D imaging depth," which varies depending on the scanhead used. EX1003, 182, 232. As shown in orange in Figure 4-9, the "depth scale is marked off in centimeters and allows you to determine the depth of the echoes." *Id.*

44

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Figure 4–9.  Depth

EX1003, 232 (annotated).

Focus controls the "depth of the focal zones" (also known as focus position). EX1003, 546. "Each frequency and type of array scanhead has a set of transmit focal zones that are fixed at specific depths." EX1003, 235. As shown in Figures 4-9 (above, in **blue**) and 4-10 (below, in **blue**), the "triangular marker to the right of the depth scale is the focal zone." EX1003, 182 ("FOCUS"), 232-35.

45

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



**Figure 4–10. Focus and # Zones**

EX1003, 235, 43 (Fig. 4-5, same).

The Manual disclosed output as a transmission/reception condition parameter that prescribed a control of the transmission power. EX1014, 83, 101-03; EX1025, 842-43; *supra* § VIII.E.2; EX1008, ¶¶187-89. Output "determines the amount of ultrasound acoustic power produced by the transducer measured in watts per square centimeter." EX1003, 552. "When you adjust the OUTPUT control, you directly control the system acoustic power output." EX1003, 184 ("OUTPUT"), 233.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

I. **Claim 10: "An ultrasonic diagnostic apparatus according to claim 6, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit."**

The Manual disclosed claim 10 for the same reasons as claim 4. *Supra* § VIII.D; EX1008, ¶¶190-91.

## IX. GROUND 2: CLAIMS 1-4 AND 6-10 ARE OBVIOUS OVER HDI 3000 MANUAL AND JACKSON

As explained, the HDI 3000 Manual disclosed each element in claims 1-4 and 6-10, as arranged in the claims. *Supra* § VIII. If Patent Owner argues the Manual did not disclose one or more of the hardware *units* (as in claims 1 and 6), *the storing of parameters in memory* (as in elements [1e] and [6e]) or *specific parameters stored in memory* (as in claims 3, 8, and 9), such a combination would have been obvious to a POSA before 2001, based on the combined teachings of the Manual and Jackson. EX1008, ¶¶192-205.

A POSA would have understood before 2001 that the ultrasound system disclosed in the Manual was equipped with the hardware units recited in claims 1 and 6 of the '157 Patent as further disclosed in Jackson. EX1008, ¶193. Specifically, Jackson disclosed a transmitting and receiving unit, an image processing unit, an information input unit, a parameter memory unit, a control unit, and a display unit. EX1004, 3:54-57, claim 38 (disclosing "keyboard control" and "means … for

47

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

retrieving … ultrasound parameter" as part of an information input unit), Figs. 1-2

(below). Before 2001, these units were known to be basic components of ultrasound

systems, including those in the Manual and Jackson, and were necessary for the

preset functionality that was widely available in commercial systems of the time.

*Supra* § VII.A; EX1008, ¶193.



EX1004, Fig. 1 (annotated).

48

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



EX1004, Fig. 2 (annotated).

As for saving of parameters in memory, Jackson disclosed multiple transmission/reception and image processing condition parameters—including parameters that prescribe "a control" as in claims 3, 8, and 9—were well known and implemented in ultrasound systems before 2001. EX1008, ¶194. Therefore, it would have been obvious to a POSA to incorporate the memory unit and parameters disclosed by Jackson into the system disclosed in the Manual, so that the parameters could be used in the transmitting and receiving unit and the image processing unit in correspondence with the information of object as part of the HDI 3000's tissue-specific preset functionality. *Id.*; *supra* § VIII.

Jackson disclosed that parameters were stored in any number of "storage devices," including "for example, [in] a permanent hard drive or a transportable

49

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

medium, … a portable data device, a hard-wired network, or in an ultrasound system, preferably in a battery-backed memory or other medium where the parameters will not be lost when the system is powered down." EX1004, 5:66-6:6, 3:58-63; EX1008, ¶195.

Jackson disclosed a non-exhaustive list of transmission/reception and image processing condition parameters to be stored in memory. EX1004, 7:3-49 (listing numerous parameters and stating "[i]t is important to note that ultrasound imaging parameters can include parameters in addition to the ones listed"); EX1008, ¶¶196-200. Among image processing condition parameters, Jackson disclosed, for example, "postprocessing parameters." *Id.* Among transmission/reception parameters, Jackson disclosed, for example, "transmit power," "transmit focus locations," "display depth," and "gain settings." *Id.*

A POSA would have been motivated to store transmission/reception and image processing condition parameters, as Jackson disclosed, as part of the HDI 3000's tissue-specific presets. EX1008, ¶201. Like the Manual, Jackson disclosed "an ultrasound imaging system [that] facilitate[s] a ***reproducible ultrasound imaging environment by reducing the variability in ultrasound parameters***." EX1004, 2:10-17; *supra* § VIII. As explained, Jackson disclosed that, by the 1990s, the industry was exploring ways to store even more parameters to conduct more sophisticated studies on patients. *Supra* § VII.D; EX1008, ¶201.

50

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Indeed, Jackson disclosed and promoted storing even more parameters than those "typically stored." EX1004, 6:22-34. These additional parameters "include a user-controlled B-mode field of view parameter, a user-controlled region displaying color-Doppler information parameter, and a user-controlled depth-dependent gain compensation parameter," which "are commonly known as RES™ enhanced resolution imaging box or ZOOM region location, Color Pan box location, and a DGC or TGC position, respectively." *Id.*; EX1008, ¶202.

To improve the efficiency and diagnostic capability of the HDI 3000, a POSA would have been further motivated to incorporate **all** parameters disclosed in Jackson as part of the HDI 3000's tissue-specific presets. EX1008, ¶203. For example, a POSA would have been motivated to incorporate "postprocessing parameters" to be used in the image processing unit in correspondence with an information of object to prescribe a control of a gradation control process as recited in claims 3 and 8. *Id.*; EX1004, 7:3-49; *supra* §§ VIII.C, VIII.G. Postprocessing parameters were well known to be useful in achieving an optimal level of detail of displayed anatomical structures. EX1008, ¶203; *supra* § VII.A.

Similarly, a POSA would have been motivated to incorporate, for example, "transmit power," "transmit focus locations," "gain settings (master gain, localized depth and/or lateral gain compensation," and "display depth" parameters to be used in the ultrasonic transmitting and receiving unit. EX1004, 7:3-49; EX1008, ¶204.

51

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

For instance, "transmit power" was a well-known parameter used to prescribe a control of transmission power, and "transmit focus locations" was a well-known parameter used to prescribe a control of a focussing position, as recited in claim 9. *Id.*; *supra* §§ VII.A, VIII.H. All of these parameters were well known to be useful in achieving optimal image quality (e.g., penetration, uniformity, and contrast/spatial resolution). *Id.*; EX1008, ¶204.

In combining the Manual and Jackson, a POSA would have had a reasonable expectation of success as evidenced by commercially available devices with these features before 2001. *Supra* § VII.A; EX1008, ¶205. Before 2001, ultrasound systems were capable of storing hundreds of transmission/reception and image processing condition parameters in memory for preset functionality. EX1027, 2; EX1032, 12; EX1037, 3; *supra* §§ VII.A, VII.D. Also, the '157 Patent provides only a high-level functional description of known, generic hardware elements, and does not discuss any particular software programming in the control unit or memory to accomplish the claimed functions. EX1001, Fig. 1; EX1008, ¶205. This lack of description further supports a reasonable expectation of success. *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994).

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## X.   GROUND 3: CLAIMS 1-3 AND 6-9 ARE ANTICIPATED BY KINICKI

### A.   Claim 1

#### 1.   [1a]

To the extent the preamble is limiting, Kinicki disclosed it. EX1008, ¶¶206-07. Kinicki described an ultrasound system that generates and displays "desired ultrasound image[s]." EX1005, Abstract, 1:6-24, 2:23-34, 3:25-41. Kinicki explained "[u]ltrasound imaging [was] widely used in medical applications to noninvasively observe structures within the human body." *Id.*

#### 2.   [1b]

Kinicki disclosed an ultrasonic transmitting and receiving unit (e.g., image generating means, including a scanner and associated circuitry), which transmits ultrasonic waves to an object to be inspected and receives echo waves reflected from the object. EX1005, 2:23-34 ("image generating means for generating an ultrasound image"); EX1008, ¶208. The system includes an "image generator" and "scanner," which "performs ultrasound scanning of a specified region of a patient's body." EX1005, 3:44-45, claim 18, Fig. 1. The scanner includes an "ultrasound transducer" that "transmits ultrasound energy into a region being imaged and receives reflected ultrasound energy from various structures and organs within the patient's body." EX1005, 3:46-64; EX1005, 1:18-21, claim 18. The "array of transducer elements" transmits ultrasound beams and converts received energy to electrical signals

53

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

supplied to a receive beamformer. *Id.* Kinicki further disclosed its system includes transmitting and receiving circuitry to control, for example, focus and LGC. *Infra* §§ X.D.2, X.G.

### 3.   [1c]

Kinicki disclosed an image processing unit (e.g., image generating means, including an image generator, scan converter, and associated circuitry) for executing image processing of image data, which is obtained on the basis of the echo waves received by the transmitting and receiving unit. EX1005, 2:23-34, 4:4-7, Fig. 1; *supra* § VII.A; EX1008, ¶209. The "image generating means for generating an ultrasound image" includes "an image generator responsive to the scanner signal for generating an ultrasound image." EX1005, claim 18; EX1005, 2:23-34, 2:60-3:4, claim 1. Kinicki explained the "typical imaging system" included a processing unit to process image data, including "a number of imaging parameters that control … *processing of received signals and image display*." EX1005, 1:14-45. Kinicki explained "[d]ifferent organs and regions of the human body may require very different imaging parameters." EX1005, 1:28-31, claim 18.

The image generator processes the image data using image processing condition parameters. EX1008, ¶210. Kinicki disclosed the image generator generates an ultrasound image "in accordance with preselected imaging parameters." EX1005, 2:24-26 ("image generating means for generating an ultrasound image in

54

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

accordance with preselected imaging parameters"), 2:60-3:4, claims 1, 18. The

"imaging parameters" include various image processing condition parameters, such

as "POSTPROC" (post-processing), "PERSIST" (persistence), "EDGE

ENHANCE," "COLORIZE," "IMAGE WIDTH," and "IMAGE POSITION."

EX1005, 4:63-5:1, 6:8-13, Fig. 3B; *infra* § X.C.

As explained, the image data is obtained on the basis of the echo waves

received by the scanner. EX1005, claim 18; s*upra* § X.A.2, EX1008, ¶211.

### 4.    [1d]

Kinicki disclosed an information input unit (e.g., control panel 20). EX1005,

4:14-27, Fig. 1; EX1008, ¶212. Figure 2 illustrates an exemplary control panel.

EX1005, 3:14-15.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Fig. 2

EX1005, Fig. 2. Control panel 20 includes touch panels 38 and 40, which "display information about the system status and permit user selection of various functions and parameters." EX1005, 2:44-46 ("touch panel for parameter display and selection"), 4:16-36, claims 2, 18 ("touch panel for selection of a set of imaging parameter values"), Figs. 3A-3B.

The control panel is employed for inputting the information of object (e.g., exam type) concerned with the object to be inspected. EX1008, ¶213. Kinicki disclosed touch panel 38 provides for "user selection of various system functions, such as Preset." EX1005, 4:31-36, 5:32-46.

56

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Fig. 3A

EX1005, Fig. 3A. When a user selects PRESET, region 62 presents "display keys

for user selection of [an] exam type" relating to a region of a patient's body, e.g.,

"cardiac, vascular and obstetric exam types." EX1005, 3:44-51, 4:43-46, 5:38-41.

Region 64 presents "display keys for user selection of various preset modes within

the selected exam type." EX1005, 5:41-46.

Kinicki explained that ultrasound systems were widely used to observe

"structures within the human body, such as cardiac structures, the vascular system,

the fetus, the uterus, the abdominal organs and the eye." EX1005, 1:14-31; EX1008,

¶214. It was well known that "[d]ifferent organs and regions of the human body

require very different imaging parameters." *Id.* For example, the "Cardiac key" was

57

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

for "cardiac structures" (e.g., heart), "Vascular key" was for vascular structures (e.g., blood vessels), and "obstetrics" key was for obstetric-related structures (e.g., fetus and uterus). EX1005, 1:51-53, 4:43-46, 5:40-41.

### 5. [1e]

Kinicki disclosed a parameter memory unit (e.g., memory) for storing the image processing condition parameters used in the image processing unit. EX1008, ¶¶215-16. Kinicki disclosed "a *memory* for storing … imaging parameter values." EX1005, claim 18; EX1005, 2:49-53 ("imaging parameter values are determined by the stored values rather than the mechanical positions of the control devices"), 4:11-14, 5:61-67 ("When a preset mode is selected, that preset mode becomes the active mode of the system [and] [t]he corresponding set of imaging parameter values is read from *memory*."), 7:54-8:14, Figs. 4A ("SAVE PRESET"), 5 ("SAVE PRESET" and "SAVE CURRENT PARAMETER VALUES"); *supra* § X.A.4. In addition to "factory preset modes," Kinicki disclosed that users may define, save, and select "user presets" or "user preset modes." EX1005, 6:36-7:68, Figs. 3A ("RACHEL"), 4A-5.

Kinicki disclosed the image processing condition parameters (e.g., post-processing and persistence) are stored in correspondence with the information of object (e.g., exam type). EX1005, Fig. 3B; *supra* §§ X.A.3-4; EX1008, ¶217. The "system stores a plurality of sets of imaging parameter values, each set

58

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

corresponding to a preset mode," which is associated, for example, with an exam type to image specific anatomical structures. EX1005, Abstract ("system can store preset modes for different exam types"), 2:54-59, 3:35-41, 5:12-28 ("image width" as example of image processing "parameter value … determined by the value stored"), 5:55-61. Figure 2 shows the HP ADULT preset for the CARDIAC exam type including parameters for "POSTPROC B" (post-processing), "PERSIST 2" (persistence), "EDGE ENHANCE," "COLORIZE," "IMAGE WIDTH," and "IMAGE POSITION." EX1005, Fig. 2.

### 6.    [1f]

Kinicki disclosed a control unit (e.g., "control unit" or "system controller") that reads out the image processing condition parameters from the memory. EX1005, 4:10-12, claim 18; EX1008, ¶¶218-19. The control unit includes a processor that "automatically control[s] said storage means to access [the] imaging parameter values to control … [the] image generator in response to [the] stored set of imaging parameter values." EX1005, claim 18; EX1005, Abstract, 3:28-30, 5:58-67.

Kinicki disclosed the read-out image processing parameters correspond to the information of object input by using the information input unit. EX1008, ¶219. The control unit's processor is "responsive to subsequent user selection of said preset mode." EX1005, claim 18. "When one of the preset modes is selected, the system controller 16 automatically operates the system in accordance with the stored set of

59

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

imaging parameter values that corresponds to the selected preset mode." EX1005,

5:58-63; EX1005, Abstract, 3:28-30.

Kinicki disclosed the control unit supplies the read-out parameters to the

image processing unit. EX1008, ¶220. The control unit controls the image generator

during "generation of an ultrasound image." EX1005, claim 18. The control unit

accesses a "set of imaging parameter values" from memory. *Id.* The "stored set of

imaging parameter values is supplied to the touch panel" and "used to control the

operation of the system." EX1005, 2:51-53, 5:55-67. The system is "automatically

initialized to the stored set of imaging parameter values that correspond to the preset

mode." EX1005, 9:9-15. This allows users to begin the exam with "consistent and

repeatable settings." *Id.*

### 7.    [1g]

Kinicki disclosed a display unit (e.g., display screen 14) for displaying

images. EX1008, ¶221. Kinicki described "video display screen 14, which displays

an image of the desired region of the patient's body." EX1005, 4:7-10, Fig. 1.

Kinicki disclosed the displayed image is based on the image data subjected to

processing in the image processing unit. EX1008, ¶222. As explained, the image

generator processes received image data according to stored imaging parameters

corresponding to the selected preset to generate a desired ultrasound image. EX1005,

claim 18; *supra* §§ X.A.3-6. Imaging parameters are used and adjusted to "obtain a

60

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

desired image on the display screen 14." EX1005, 2:36-3:4; 6:40-43. For a "typical imaging system," the image data obtained by the system is "processed and formatted into a video image." EX1005, 1:22-24.

### B.    Claim 2

#### 1.    [2a]

Kinicki disclosed that the memory unit "stores a plurality of sets of imaging parameter values, each set corresponding to a preset mode." EX1005, 2:54-56; EX1005, 8:67-9:3, claim 5; *supra* § X.A.5; EX1008, ¶¶223-25. These "imaging parameters" include various image processing condition parameters. *Infra* § X.C.

As explained, Kinicki disclosed preset modes are stored in correspondence with an information of object (e.g., exam type). *Supra* § X.A.5. The "system can store a plurality of preset modes for different exam types." EX1005, 3:35-38; 5:40-44 ("various preset modes within the selected exam type"), 8:43-45 ("touch panel 38 can accommodate a total of 12 preset modes for each exam type").

61

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Fig. 3A

EX1005, Fig. 3A (annotated). Presets include "one or more factory preset modes, such as adult and pediatric," and "one or more user presets." EX1005, 5:51-55, 6:43-47. Figure 3A shows four parameter sets (e.g., preset modes in **red**) in correspondence with one item of the information of object (e.g., selected "CARDIAC" exam type in **blue**).

### 2.    [2b]

As explained, Kinicki disclosed employing the information input unit (e.g., control panel) for inputting the information of object (e.g., exam type). *Supra* § X.A.4; EX1008, ¶226.

62

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Kinicki also disclosed employing the control panel for selecting an image processing condition parameter set (e.g., preset mode) from among the plurality of image processing condition parameter sets (e.g., preset modes) corresponding to the information of object (e.g., exam type). EX1005, 5:55-67; s*upra* §§ X.A.4-6; EX1008, ¶227. Kinicki disclosed that users select the PRESET function on the touch panel, which includes "display keys for user selection of various preset modes within the selected exam type." EX1005, 5:41-44. "[A] preset mode is obtained with a single keystroke on the touch panel." EX1005, 9:7-9; EX1005, Abstract, 3:38-39, 6:18-20. Figure 3A, above, shows an example of four selectable presets (in **red**) that correspond to the selected exam type (in **blue**). EX1005, 6:57-61, 7:47-65 (user-defined preset parameter sets), Figs. 2, 3A; *supra* § X.B.1.

### C.    Claim 3

As explained, Kinicki disclosed image processing condition parameters used in the image processing unit. *Supra* § X.A.3. These parameters include gradation processing using gray-scale maps in 2D ("POSTPROC B"), persistence ("PERSIST 2"), response control processing ("EDGE ENHANCE"), gradation processing using Chroma maps in 2D ("COLORIZE"), temporal interpolation ("IMAGE WIDTH"), and spatial interpolation ("IMAGE POSITION"). EX1005, 4:63-5:15, 6:8-13, Figs. 2, 3B; EX1008, ¶228.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Fig. 3B

EX1005, Fig. 3B (annotated).

Kinicki disclosed parameters prescribing a control of, for example, a gradation control process (e.g., POSTPROC B) and a response control process (e.g., EDGE ENHANCE). EX1008, ¶229. POSTPROCs are image processing condition parameters used in the image processing unit to prescribe a gradation control process for controlling the image gray scale. *Id.*; EX1005, Fig. 3B; EX1012, 65; EX1017, 89; EX1018, 222; *supra* § VII.A. EDGE ENHANCE is an image processing condition parameter used in the image processing unit to make edges in an image more apparent and sharp. *Id.*; EX1012, 30; EX1017, 88, 95-96; EX1018, 229.

64

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

### D.    Claim 6

#### 1.    [6a]

To the extent the preamble is limiting, Kinicki disclosed it for the same reasons as [1a]. *Supra* § X.A.1; EX1008, ¶¶230-31.

#### 2.    [6b]

As explained, Kinicki disclosed an ultrasonic transmitting and receiving unit (e.g., image generating means, including a scanner and associated circuitry) for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object. *Supra* § X.A.2.

Kinicki further disclosed the transmitting and receiving unit is set in accordance with various ultrasonic transmission/reception condition "parameters that control transmission and reception of ultrasound energy." EX1005, 1:25-28, 2:64-3:4, 5:61-67; EX1008, ¶¶232-33. These transmission/reception parameters include, for example, focus (focussing position) and LGC (reception sensitivity). EX1005, 4:17-24, 9:9-13 Figs. 2, 3B; *infra* § X.G; EX1008, ¶¶249-50.

#### 3.    [6c] - [6d]

Kinicki disclosed elements [6c]-[6d] for the same reasons as [1c]-[1d], respectively. *Supra* § X.A.3-4; EX1008, ¶234.

65

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

### 4.    [6e]

As explained, Kinicki disclosed a memory unit for storing the image processing condition parameters to be used in the image processing unit in correspondence with the information of object (e.g., exam type). *Supra* § X.A.5.

Kinicki disclosed the memory unit also storing transmission/reception condition parameters, which correspond with the exam type, to be used in the transmitting and receiving unit (e.g., image generating means, including the scanner and associated circuitry). EX1008, ¶¶235-36. The memory unit stores a "set of imaging parameter values," which include "imaging parameter values to control [the] scanner." EX1005, claim 18. Parameters associated with focus and LGC, for example, control the operation of the scanner and associated circuitry. *Supra* § X.D.2; EX1008, ¶236. Kinicki disclosed the stored parameter values for the scanner and image generator corresponding to a "preset mode." EX1005, claim 18; EX1005, Abstract, 2:54-56, 5:5-28, 5:51-67, claim 18 ("said set of imaging parameter values defining a preset mode"). Each preset mode corresponds to a specific exam type. *Supra* § X.A.5.

### 5.    [6f]

As explained, Kinicki disclosed a control unit (e.g., control unit or system controller) for reading out at least the image processing condition parameters from the system's memory unit so as to supply the read-out parameters to the image

66

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

processing unit. *Supra* § X.A.6; EX1008, ¶237. As further explained, these parameters correspond to the information of object input (e.g., exam type) by employing the information input unit. *Id.*

Kinicki disclosed the control unit also reads out the transmission/reception condition parameters from the memory unit. EX1005, claim 18; *supra* §§ X.D.2, X.D.4; EX1008, ¶238. The control unit includes a processor that "automatically control[s] said storage means to access said set of imaging parameter values to control said scanner." *Id.* As explained, Kinicki disclosed exemplary parameters to control the scanner, such as parameters for focus and LGC. *Id.* Kinicki further disclosed the "corresponding set of imaging parameter values is read from memory in system controller." EX1005, 5:58-67.

As explained, Kinicki disclosed the read-out parameters correspond to the information of object input by employing the information input unit. *Supra* § X.A.6; EX1008, ¶239.

Kinicki also disclosed the control unit supplies the read-out parameters to the ultrasonic transmitting and receiving unit. EX1005, 2:51-53, 5:58-67, claim 18 ("control unit for controlling said scanner"); *supra* § X.A.6; EX1008, ¶240.

### 6.    [6g]

Kinicki disclosed element [6g] for the same reasons as [1g]. *Supra* § X.A.7; EX1008, ¶241.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

### E.    Claim 7

#### 1.    [7a]

As explained, Kinicki disclosed that the parameter memory unit stores a plurality of image processing condition parameter sets (e.g., preset modes including sets of image processing condition parameters) in correspondence with one item of the information of object (e.g., exam type). *Supra* § X.B.1.

Kinicki also disclosed the plurality of preset modes stored in the parameter memory unit also include transmission/reception condition parameters in correspondence with one item of the information of object (e.g., exam type). EX1008, ¶¶242-44. Kinicki described "*sets* of imaging parameter values … saved as preset modes." EX1005, Abstract. As explained, these preset modes include stored transmission/reception "parameter values to control [the] scanner." EX1005, claim 12; *supra* §§ X.D.2, X.D.4-5; EX1008, ¶244.

#### 2.    [7b]

As explained, Kinicki disclosed employing the information input unit (e.g., control panel) for inputting an information of object (e.g., exam type). *Supra* §§ X.A.4, X.B.2. Kinicki disclosed employing the control panel for selecting from among a plurality of preset modes, which include image processing condition parameters, corresponding to the exam type. *Supra* §§ X.A.3-6, X.B.2.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

As explained, each preset mode also includes transmission/reception condition parameters in correspondence with the exam type. *Supra* § X.E.1. Thus, Kinicki disclosed the information input unit is employed for selecting a transmission/reception condition parameter set from among the plurality of parameter sets corresponding to the information of object. EX1005, 6:40-61, 7:47-65; EX1008, ¶¶245-47.

### F.    Claim 8

Kinicki disclosed claim 8 for the same reasons as claim 3. *Supra* § X.C; EX1008, ¶248.

### G.    Claim 9

As explained, Kinicki disclosed transmission/reception condition parameters used in the ultrasonic transmitting and receiving unit. *Supra* § X.D.2; EX1008, ¶249. As shown in Figures 2 and 3B, the parameters include, for example, FOCUS and LGC. EX1005, 4:17-24, 5:5-15, Figs. 2, 3B; EX1008, ¶249.

69

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



Fig. 3B

EX1005, Fig. 3B (annotated).

Kinicki disclosed that these parameters prescribe a control of, for example, a focussing position (e.g., FOCUS) and reception sensitivity (e.g., LGC). EX1005, 4:17-24, Figs. 2, 3B; EX1008, ¶250. FOCUS prescribes a control of focussing position by controlling acoustic depth of the focal zones, and LGC prescribes a control of reception sensitivity by controlling amplification of received echo waves. *Id.*; EX1008, ¶¶62-64, 67-68.

70

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## XI.    GROUND 4: CLAIMS 1-3 AND 6-9 ARE OBVIOUS OVER KINICKI AND SHORT

### A.    Claim 1

Kinicki disclosed claim 1. *Supra* § X.A. If Patent Owner argues that Kinicki did not disclose "storing" and "using" image processing condition parameters as part of a preset, it would have been obvious to do so—using known methods to yield predictable results—based on the combined teachings of Kinicki and Short. EX1008, ¶¶251-60.

Like Kinicki, Short (which shares a common inventor and assignee) disclosed an ultrasound system with "Preset" functionality and numerous condition parameters. EX1006, Abstract, 1:6-65, 3:16-4:13; Figs. 2-6 (showing parameters), 7(a)-7(e) (same), 8 ("Preset"); s*upra* § VII.E, X.A; EX1008, ¶253. Kinicki cited Short favorably as an "ultrasound imaging system [with] an electroluminescent touch panel" enabling storage of parameter "values for later use." EX1005, 2:6-21. Kinicki contrasted Short's system with systems using "control knobs or switches where[] each parameter value is determined by the mechanical position," which could lead to "user confusion." *Id.*

71

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



EX1006, Fig. 8 (annotated).

Like Kinicki, Short disclosed storing and using image processing condition parameters, including postprocessing ("POST PROC"), color maps ("MAP"), and persistence ("PERSIST"), among others. EX1006, 4:22-37; 5:2-48, Figs. 2-7(e); *supra* §§ X.A.3-6, X.C EX1008, ¶254. Figures 2 and 3, below, show various postprocessing parameters in POST PROC menu item 44, where 45 indicates the postprocessing selection by letter, e.g., postprocessing maps A and B. EX1006, 4:33-37, 5:18-21 ("POST PROC is set to B in the 2D and A in the M mode."). Figures 4(a) and 4(b) show color map parameters in MAP menu item 46, e.g., "MAP C." EX1006, 5:44-46. Figures 2, 4(a), and 4(b) show various persistence parameters in PERSIST menu item 30, e.g., persistence modes Ø and 2. EX1006, 4:22-32.

72

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



EX1006, Fig. 2 (annotated).



EX1006, Fig. 3 (annotated).

73

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



EX1006, Fig. 4(a) (annotated).



EX1006, Fig. 4(b) (annotated).

Based on the combined teachings of Kinicki and Short, it would have been

obvious to store and use all parameters (e.g., additional postprocessing maps, color

74

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

maps, and persistence parameters), as further disclosed by Short, in Kinicki's system

to achieve claim 1. EX1008, ¶255. Kinicki taught and suggested such a combination.

*Id.* Kinicki emphasized the efficiency and ease of using systems with presets over

traditional systems, which required manual adjustment "each time the instrument

[was] used to obtain a different image." EX1005, 1:39-45. Kinicki identified

significant drawbacks of manual adjustment, including being "time consuming,"

"difficult," and requiring "a high degree of user skill." EX1005, 1:41-58. Kinicki

explained, "to obtain consistent and reliable results, the imaging system should have

the same parameter settings for each test of the same type." EX1005, 1:60-63. Thus,

before 2001, a POSA would have been motivated to maximize the number of

parameters stored in preset modes. EX1008, ¶255. A POSA would have understood

that, as the number of parameters not stored under a preset increases, the time, effort,

and expertise required to set non-stored parameters also increases. *Id.*

Accordingly, to the extent Patent Owner argues the parameters recited in the

challenged claims are not disclosed by Kinicki, including as stored under presets in

memory, a POSA would have been motivated to include at least Short's parameters,

which were well known and routinely used by clinicians since at least the early

1990s. *Supra* §§ VII.A; VIII.A.3, IX; EX1008, ¶¶256-57; *DyStar Textilfarben*

*GmbH v. C.H. Patrick Co.,* 464 F.3d 1356, 1368 (Fed. Cir. 2006) ("motivation to

75

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

combine exists" when the "combination of references results in a product" that is "more desirable, for example because it is … faster" or "more efficient").

Kinicki provided the precise type of "teaching, suggestion, or motivation" that "would have led [a POSA]" to combine Kinicki's teachings with Short's to achieve an ultrasound system having presets for numerous parameters disclosed in the two references—using known methods to yield predictable results. MPEP § 2141.III; *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007); *supra* § VII.A; EX1008, ¶¶255-59. A POSA would have been particularly motivated to include Short's parameters in Kinicki's system because Kinicki expressly cited Short for its "medical ultrasound imaging system" and similar panel. EX1005, 2:18-20; EX1008, ¶256. A POSA would have also been motivated to include additional parameters in Kinicki's system for improved analysis of anatomical structures and diagnostic capability. EX1005, 5:16-28, 9:11-18; EX1008, ¶258.

A POSA would have had a reasonable expectation of success including these parameters in Kinicki's system to achieve claim 1 because they had been successfully implemented in commercial products before 2001. EX1003, 226-29, EX1016, 130, 418; EX1017, 78-90, 106-14; *supra* § VII.A; EX1008, ¶258. Before 2001, the use of preset parameters was a well-established technique in the ultrasound imaging field, and they were a necessity among clinicians because, as Kinicki explained, "[t]he ability to begin every exam with consistent and repeatable settings

76

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

can reduce the time to perform the exam" and improve "imag[e] performance."

EX1005, 1:46-50, 9:13-18; EX1008, ¶260. Managed healthcare in the United States

before 2001 exerted downward pressure on ultrasound reimbursements, and there

was a greater emphasis on increasing patient throughput, reducing costs, and

improving outcomes. EX1008, ¶260. Hardware and software components used in

ultrasound systems of the time would have made the inclusion of Short's parameters,

for example, technically feasible and routine. *Id.* Before 2001, it was standard for

ultrasound systems to store hundreds of parameters in memory as part of presets to

enable faster exams, better quality, and more accuracy. *Id.*; EX1003, 33-34; EX1016,

407-47; EX1017, 37-45; EX1023, 111; EX1024, 295; EX1025, 842-43; EX1026,

1571; EX1027, 2; EX1028, 211; EX1030, 195; EX1031, 14; EX1032, 12; EX1033,

899-900; EX1034, 732-33; EX1037, 3. Before 2001, major manufacturers included

parameter presets as part of their ultrasound systems because such functionality was

required for commercial viability. *Supra* § VII.A; EX1008, ¶260.

### B.    Claim 2

Kinicki disclosed claim 2. *Supra* § X.B. If Patent Owner argues otherwise,

claim 2 would have been obvious based on the combined teachings of Kinicki and

Short for the reasons explained above. *Supra* § XI.A; EX1008, ¶261.

77

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

### C.    Claim 3

Kinicki disclosed claim 3. *Supra* § X.C. If Patent Owner argues otherwise, claim 3 would have been obvious based on the combined teachings of Kinicki and Short for the reasons explained above. *Supra* § XI.A; EX1008, ¶262.

Like Kinicki, Short disclosed image processing condition parameters, including postprocessing (POST PROC) and color maps (MAP). *Supra* § XI.A; EX1008, ¶263. Postprocessing and color map parameters each prescribe a control of a gradation control process. EX1018, 173-75, 222; *supra* §§ VII.A; X.C; EX1008, ¶¶71-73, 263.

A POSA would have been motivated to include Short's image processing condition parameters—e.g., postprocessing and color maps—in Kinicki to achieve claim 3, and it would have been obvious, for the same reasons explained for claim 1. *Supra* § XI.A; EX1008, ¶264. A POSA would have had a reasonable expectation of success including these parameters for the same reasons explained for claim 1, e.g., because they had been successfully implemented in commercial products before 2001. *Supra* §§ VII.A, XI.A; EX1008, ¶265.

### D.    Claim 6

Kinicki disclosed claim 6. *Supra* § X.D. If Patent Owner argues that Kinicki did not disclose setting transmission/reception conditions on the basis of "transmission/reception condition parameters" and "storing" them as part of a preset,

78

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

it would have been obvious based on the combined teachings of Kinicki and Short.

*Supra* § XI.A; EX1008, ¶¶266-70.

Like Kinicki, Short disclosed transmission/reception condition parameters, including POWER and GAIN. EX1006, 4:19-21, 4:65-5:15, 5:33-65, 6:18-21, Figs. 2-7(e); EX1008, ¶267. Short disclosed that POWER "controls the ultrasound system transmit power," and GAIN "controls color flow gain" or "Doppler gain." *Id.*; *supra* §§ VII.A, VIII.H; EX1008, ¶¶65-68.



EX1006, Fig. 2 (annotated).

79

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157



EX1006, Fig. 4(a) (annotated).

A POSA would have been motivated to include all transmission/reception condition parameters—e.g., power and gain—and store them as part of presets to achieve claim 6, and it would have been obvious, for the same reasons explained for claim 1. *Supra* § XI.A; EX1008, ¶268. A POSA would have been particularly motivated to include gain parameters in Kinicki's system as part of presets for improved analysis of anatomical structures and diagnostic capability, and power parameters for the same reasons and to ***ensure safety*** of the subject being examined. *Id.*; EX1016, 261; EX1018, 254; EX1026, 1571; EX1035, 273-78.

A POSA would have had a reasonable expectation of success adding these parameters for the same reasons explained for claim 1, e.g., because they had been

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

successfully implemented in commercial products before 2001. *Supra* §§ VII.A, XI.A; EX1003, 233; EX1005, 1:46-50, 9:13-18; EX1016, 53-54, 124-26, 145; EX1017, 76-93, 106-15, 125-34, 150-53; EX1008, ¶¶269-70.

### E.    Claim 7

Kinicki disclosed claim 7. *Supra* § X.E. If Patent Owner argues otherwise, claim 7 would have been obvious based on the combined teachings of Kinicki and Short for the reasons explained above. *Supra* §§ XI.A-D; EX1008, ¶271.

### F.    Claim 8

Claim 8 was disclosed by Kinicki and would have been obvious based on the combined teachings of Kinicki and Short for the same reasons as claim 3. *Supra* § XI.C; EX1008, ¶272.

### G.    Claim 9

Kinicki disclosed claim 9. *Supra* § X.G. If Patent Owner argues otherwise, claim 9 would have been obvious based on the combined teachings of Kinicki and Short for the reasons explained above. *Supra* §§ XI.A-D; EX1008, ¶¶273-76.

Like Kinicki, Short disclosed transmission/reception condition parameters, including POWER and GAIN. *Supra* § XI.D; EX1006, 4:19-21, 4:65-5:65, 6:18-21, Figs. 2-7(e); EX1008, ¶274. Power parameters prescribe a control of a transmission power, and gain parameters prescribe a control of a reception sensitivity of echo waves. *Id.*; *supra* §§ VII.A, VIII.H.

81

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

A POSA would have been motivated to include Short's transmission/reception condition parameters—e.g., power and gain—in Kinicki to achieve claim 9, and it would have been obvious, for the same reasons explained for claims 1 and 6 (e.g., ***ensuring safety***). *Supra* §§ VII.A, XI.A, XI.D; EX1008, ¶¶275-76. A POSA would have had a reasonable expectation of success including these parameters for the reasons explained for claims 1 and 6, e.g., because they had been successfully implemented in commercial products before 2001. *Id.*

## XII.   GROUNDS 5 AND 6: CLAIMS 4 AND 10 ARE OBVIOUS OVER KINICKI, ALONE OR WITH SHORT, AND CLARK

### A.    Claim 4

Kinicki, alone or with Short, disclosed and rendered obvious claim 1, on which claim 4 depends. *Supra* §§ X.A, XI.A. Claim 4 would have been obvious—using known techniques to yield predictable results—based on the combined teachings of Kinicki, alone (Ground 5) or with Short (Ground 6), in view of Clark. EX1008, ¶¶277-89. Indeed, Clark suggested such a combination when it favorably cited Kinicki as disclosing an ultrasound system and "highly useful" provision of "standard views for 2-D ultrasound imaging" and "preset imaging modes." EX1007, 1:13-36; EX1008, ¶¶277-78.

The Kinicki and Kinicki-Short systems disclosed an ultrasonic diagnostic apparatus including an image processing unit, with a scan converter, and display

82

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

unit. *Supra* §§ X.A.3, XI.A. Similarly, Clark disclosed an ultrasound system including a "scan converter" for processing image data for display. EX1007, 3:7-20, Fig. 3; EX1008, ¶¶70, 278.

Clark disclosed a three-dimensional image construction unit, much like the unit in the '157 Patent. EX1008, ¶279. While the '157 Patent only briefly discusses this unit (EX1001, 5:50-54, 14:44-54, Fig. 1 ("3D IMAGE CONSTRUCTION UNIT")), it states the unit uses "a plurality of two-dimensional frame data (surface data)" obtained from "detection signals after the lapse of a predetermined time period" and "accumulated in the image memory 64." EX1001, 14:44-54. The '157 Patent states that "three-dimensional data is constructed in the 3D image construction unit 67 on the basis of the accumulated data." *Id.* Clark disclosed a similar three-dimensional image construction unit (e.g., scan converter 26 and video rendering unit 46) that constructs three-dimensional images using a plurality of two-dimensional frame data accumulated in memory (e.g., 3-D image memory 30). EX1007, 2:66-3:35, 4:9-20, Fig. 3; EX1008, ¶279.

Clark disclosed a three-dimensional construction unit (e.g., scan converter 26 or 3-D memory 30 and video rendering unit 46) for constructing three-dimensional image data on the basis of the image data subjected to the image processing in the image processing unit. EX1008, ¶¶280-83. Figure 3, below, shows that Clark's

83

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

system includes transducer 12, which emits "ultrasound pulses along beam path 14."

EX1007, 2:65-3:12.



FIG.3

EX1007, Fig. 3 (annotated). Beam 14 is "scannable through plane 16" in the

directions shown by arrows 17. EX1007, 2:67-3:20. Plane 16 is "slewed in the

directions shown by arrows 18" to enable a full 3D region scan. *Id.* Received signals

are passed to receiver 24, which "feeds the signals to scan converter 26" (in **blue**).

*Id.* Scan converter 26 converts the "echo signal values" to "rectangular coordinate

image values." *Id.* The resulting image data is subsequently constructed into 3D data

using one of two independent three-dimensional construction unit embodiments in

Clark. *Id.*; EX1008, ¶280. In the first embodiment, the image data is further

processed and 3D rendered by scan converter 26 using 3-D image pre-set procedure

84

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

38, after which it is outputted directly to image store 28 and then video display 32. EX1007, 3:21-64, 4:32-46, Fig. 4; EX1008, ¶281. In the second embodiment, the image data from scan converter 26 is supplied to a three-dimensional construction unit (in **red**), where it is "stored" in 3-D memory 30, supplied to "video rendering unit 46 to construct the desired image," and "thereafter displayed by video display 32." EX1007, 3:17-25, 4:12-17, 4:51-62, Figs. 3, 5; EX1008, ¶¶282-83.

Based on the combined teachings of Kinicki, alone or with Short, and Clark, it would have been obvious to modify the Kinicki and Kinicki-Short systems to include Clark's three-dimensional construction unit to achieve claim 4. EX1008, ¶284. It would have been obvious to modify scan converter 12 in the Kinicki and Kinicki-Short systems to include an image buffer, 3-D image pre-set procedure, and 3D processing and rendering functionality, as in Clark's first embodiment. *Id.*; EX1005, 2:23-24, Fig. 1; EX1007, 3:12-14, Fig. 3. Additionally, it would have been obvious to include a 3-D memory and video rendering unit, as in Clark's second embodiment, between scan converter 12 and display 14 in the Kinicki and Kinicki-Short systems, which is where it is located in Clark. *Id.* A POSA would have known that an ultrasound system must process the image data before constructing a 3D image because, otherwise, valuable diagnostic image quality would be lost in the displayed image. EX1008, ¶284.

85

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

It would also have been obvious to combine Clark's known technique with the Kinicki and Kinicki-Short systems because Clark expressly taught and suggested such a combination, explaining that such systems were known devices ready for improvement. EX1007, 1:13-50 (citing Kinicki "for further discussion re: preset imaging modes and parameters"); EX1008, ¶¶285-86. Clark cited Kinicki favorably as disclosing "standard views for 2-D ultrasound imaging which remove much of the operator and view variability and speed up image acquisition and review." *Id.* Clark emphasized that "[n]otwithstanding the obvious usefulness of 2-D imaging, such systems provide only a limited number of views of many organs." *Id.* Thus, before 2001, a POSA would have been motivated to maximize the number of views available to clinicians to include 3D imaging, because it would have enhanced their ability to examine, measure, and diagnose anatomies (e.g., heart) with better precision, detail, and quality. *Id.*; EX1007, Abstract, 2:19-23; EX1036, 1209. And Clark described such 3D imaging techniques that enabled more ways to view different organs. *Id.* Clark taught that 3D views were advantageous because they provided diagnostic views that were otherwise "not available" or "cannot be readily obtained from standard ultrasound transducer imaging positions." *Id.*

It would have been further obvious to combine the known technique from Clark with the Kinicki and Kinicki-Short systems to yield predictable results. EX1008, ¶287. A POSA would have known how to configure the Kinicki and

86

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

Kinicki-Short systems to render 3D images based on 2D image data because, as Clark explained, "[r]ecently, 3-D ultrasound systems have been introduced which acquire data for many different views from a single placement of a transducer on the patient. In such case, the view may be a 2-D slice, a 3-D rendering or another view derived from the data." EX1007, 1:39-50. Clark's technique would have yielded no more than a predictable outcome—3D renderings based on a series of 2D scans—which a POSA would have expected to achieve with this common ultrasound functionality. *Id.*; EX1008, ¶287.

A POSA also would have had a reasonable expectation of success in modifying the Kinicki and Kinicki-Short systems to include a 3D construction unit, as Clark disclosed, because 3D imaging was conventional and routine before 2001. *Supra* § VII.A; EX1008, ¶288. Basic ultrasound system components would have made including Clark's unit, for example, technically feasible and routine. *Id.* The use of 2D ultrasound scans to render 3D images was known since at least the 1970s, and it was common in the industry for systems to have 3D capabilities by the late 1990s, enabling better quality and more accurate diagnoses. EX1003, 258-59; EX1016, 187-88; EX1019, 248-52; EX1036, 1209; EX1008, ¶288. Before 2001, major manufacturers included 3D capabilities in their systems because it was highly desirable and beneficial for clinical applications (e.g., cardiography). *Id.*

87

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

The '157 Patent further supports a reasonable expectation of success because it provides only a high-level, cursory description of the 3D construction unit configuration. EX1001, 5:50-54, 14:50-53; EX1008, ¶289. The '157 Patent illustrates the "3D image construction unit" as a black box in Figure 1, and does not describe any specific structure for the unit or suggest how a POSA would even begin to design or implement any specific circuitry for doing so. *Id.* When a patent provides no details on implementation, it is fair to conclude that they are within the skill of a POSA. *Epstein*, 32 F.3d at 1568.

### B.    Claim 10

The combined teachings of Kinicki, alone or with Short, and Clark would have rendered obvious claim 10 for the same reasons as claim 4. *Supra* § XII.A; EX1008, ¶290.

## XIII.  SECONDARY CONSIDERATIONS

Petitioner is unaware of any secondary considerations that weigh against institution. EX1008, ¶¶291-93. No secondary considerations were asserted or relied on during prosecution, and Patent Owner has not asserted any in the Litigation. *Id.* Petitioner should not be required to predict which evidence, if any, Patent Owner may argue. Grounds 1 and 3 are anticipation, to which secondary considerations are not relevant. *In re Wiggins*, 488 F.2d 538, 543 (C.C.P.A. 1973).

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## XIV.  DISCRETIONARY DENIAL IS NOT APPROPRIATE

There is no basis to deny institution under 35 U.S.C. §§ 325(d) or 314(a). The '157 Patent has not been challenged previously, and this Petition does not rely on prior art or arguments presented during prosecution; therefore, there is no basis to deny institution under Section 325(d). *Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 15-19 (PTAB Sept. 6, 2017) (precedential as to § II.B.4.i.). The prior art references relied on herein were not considered by or before the Examiner.

The Petition should not be denied under Section 314(a) because Petitioner stipulates it will not pursue in the Litigation any ground raised or that could have been reasonably raised before the PTAB in this IPR if this Petition is instituted. *See Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 18-19 (Dec. 1, 2020) (precedential as to § II.A); Memorandum, *Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation*, at 3 (USPTO Dir. June 21, 2022) ("Consistent with *Sotera Wireless, Inc.*, the PTAB will not discretionarily deny institution in view of parallel district court litigation where a petitioner presents a stipulation not to pursue in a parallel proceeding the same grounds or any grounds that could have reasonably been raised before the PTAB.").

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## XV.  CONCLUSION

Petitioner respectfully requests the challenged claims be cancelled as

unpatentable pursuant to 35 U.S.C. § 318(b).

Respectfully submitted,

Date: October 11, 2022                   By: */C. Brandon Rash/*
                                         C. Brandon Rash
                                         USPTO Registration No. 59,121

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

**CERTIFICATION UNDER 37 CFR § 42.24(d)**

Under the provisions of 37 CFR § 42.24(d), the undersigned hereby certifies

that the word count for the foregoing Petition for *Inter Partes* Review totals 13,945

which is less than the 14,000 allowed under 37 CFR § 42.24(a)(i).

Respectfully submitted,

Date: October 11, 2022

By: */C. Brandon Rash/*
C. Brandon Rash
USPTO Registration No. 59,121

Counsel for Petitioner
Butterfly Network, Inc.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Petition for *Inter Partes* Review and a copy of the supporting exhibits 1001 through 1039 were served on counsel of record on October 11, 2022, by filing this document through the Patent Trial and Appeal Case Tracking System, as well as delivering a copy via Priority Mail Express to the counsel of record for the Patent Owner at the following address:

Sughrue, Mion, Zinn, Macpeak & Seas, PLLC
2100 Pennsylvania Avenue N.W.
Washington, DC 20037-3213
UNITED STATES

Respectfully submitted,

Date: October 11, 2022

By: /*C. Brandon Rash*/
C. Brandon Rash
USPTO Registration No. 59,121

Counsel for Petitioner
Butterfly Network, Inc.

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

## APPENDIX A: CLAIM LISTING

| Claim | Claim Language |
|-------|----------------|
| 1 | An ultrasonic diagnostic apparatus comprising:<br><br>an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object;<br><br>an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters;<br><br>an information input unit to be employed for inputting information of object concerned with the object to be inspected;<br><br>a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object;<br><br>a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to the image processing unit; and<br><br>a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. |
| 2 | An ultrasonic diagnostic apparatus according to claim 1, wherein:<br><br>said parameter memory unit stores a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and<br><br>said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object. |

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

| Claim | Claim Language |
|---|---|
| 3 | An ultrasonic diagnostic apparatus according to claim 1, wherein the image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. |
| 4 | An ultrasonic diagnostic apparatus according to claim 1, further comprising:<br><br>a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in the image processing unit so as to output the three-dimensional image data to said display unit. |
| 6 | An ultrasonic diagnostic apparatus comprising:<br><br>an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters;<br><br>an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters;<br><br>an information input unit to be employed for inputting information of object concerned with the object to be inspected;<br><br>a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit and the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object;<br><br>a control unit for reading out at least either of the image processing condition parameters and the transmission/reception condition, parameters, which correspond to the information of object input by |

2

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

| Claim | Claim Language |
|---|---|
| | employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to at least one of the image processing unit and said ultrasonic transmitting and receiving unit; and<br><br>a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. |
| 7 | An ultrasonic diagnostic apparatus according to claim 6, wherein:<br><br>said parameter memory unit stores a plurality of image processing condition parameter sets and a plurality of transmission/reception condition parameter sets in correspondence with one item of the information of object; and<br><br>said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object. |
| 8 | An ultrasonic diagnostic apparatus according to claim 6, wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. |
| 9 | An ultrasonic diagnostic apparatus according to claim 6, wherein ultrasonic transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focussing position, transmission power and reception sensitivity for the echo waves. |
| 10 | An ultrasonic diagnostic apparatus according to claim 6, further comprising: |

3

Petition for *Inter Partes* Review
of U.S. Patent 6,901,157

| Claim | Claim Language |
|---|---|
|  | a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit. |

4

# EXHIBIT 2

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Butterfly Network, Inc.,
Petitioner

v.

FUJIFILM Sonosite, Inc.,
Patent Owner

Patent No. 9,538,985
Filing Date: April 18, 2014
Issue Date: January 10, 2017

Hand-Held Medical Imaging System With Improved User Interface for Deploying
On-Screen Graphical Tools and Associated Apparatuses and Methods

IPR2022-01576

_____

**PETITION FOR *INTER PARTES* REVIEW**

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................1

II.     MANDATORY NOTICES, FEES, & STANDING ........................................2
        A.    Real Parties-In-Interest.................................................................2
        B.    Related Matters.............................................................................2
        C.    Lead & Backup Counsel ................................................................2
        D.    Service Information........................................................................2
        E.    Certification of Grounds for Standing...........................................3
        F.    Fees................................................................................................3

III.    STATEMENT OF PRECISE RELIEF REQUESTED ...................................3

IV.     U.S. PATENT 9,538,985 ("THE '985 PATENT")...................................4
        A.    Summary .......................................................................................4
        B.    Challenged Claims ......................................................................13
        C.    Prosecution History ....................................................................13

V.      LEVEL OF SKILL IN THE ART .............................................................14

VI.     CLAIM CONSTRUCTION ......................................................................15

VII.    PRIOR ART SUMMARY........................................................................15
        A.    State of the Art............................................................................15
        B.    Petruzzelli....................................................................................17
        C.    Grunwald......................................................................................21
        D.    Pelissier.......................................................................................24
        E.    Hyun ............................................................................................28

VIII.   GROUNDS 1 AND 2: CLAIM 1 IS ANTICIPATED AND
        RENDERED OBVIOUS BY PETRUZZELLI .............................................31
        A.    Claim 1 ........................................................................................31
              1.    [1a] "A portable ultrasound system, comprising a hand-
                    held base unit that includes: a touchscreen display; and".........31
              2.    [1b] "a programmable processor configured to execute
                    instructions that cause the processor to produce a display
                    on the touchscreen display, including—" ..................................33
              3.    [1c] "a first control area having a number of graphical
                    tools that can each be selectively activated by a user," ............34
              4.    [1d] "a second control area that is accessible by a hand of
                    the user that is holding the portable ultrasound system,
                    wherein the second control area includes a plurality of
                    controls that can be selectively activated by a thumb of

i

the user to select an attribute of a selected graphical tool,
and” ............................................................................................42

    a.    Ground 1 – Anticipation ................................................42

    b.    Ground 2 – Obviousness................................................47

5.    [1e] “an active image area in which an image of a patient
obtained from an ultrasound scan is displayed and at
which the selected one of the graphical tools can be
overlaid onto the image with the user-selected tool
attribute.”...................................................................................51

IX.    GROUND 3: CLAIM 1 IS OBVIOUS OVER PETRUZZELLI AND
PELISSIER ..............................................................................................53

A.    Claim 1 ..............................................................................................53

    1.    [1a] ..........................................................................................54

    2.    [1b] ..........................................................................................55

    3.    [1c]-[1e] ..................................................................................56

X.    GROUNDS 4 AND 5: CLAIMS 1-3 ARE ANTICIPATED AND
RENDERED OBVIOUS BY GRUNWALD................................................62

A.    Claim 1 ..............................................................................................62

    1.    [1a] “A portable ultrasound system, comprising a hand-
held base unit that includes: a touchscreen display; and”.........62

    2.    [1b] “a programmable processor configured to execute
instructions that cause the processor to produce a display
on the touchscreen display, including—” ................................64

    3.    [1c] “a first control area having a number of graphical
tools that can each be selectively activated by a user,” ............65

    4.    [1d] “a second control area that is accessible by a hand of
the user that is holding the portable ultrasound system,
wherein the second control area includes a plurality of
controls that can be selectively activated by a thumb of
the user to select an attribute of a selected graphical tool,
and” ............................................................................................70

        a.    Ground 4 - Anticipation................................................70

        b.    Ground 5 - Obviousness ...............................................77

    5.    [1e] “an active image area in which an image of a patient
obtained from an ultrasound scan is displayed and at
which the selected one of the graphical tools can be
overlaid onto the image with the user-selected tool
attribute.”...................................................................................80

ii

B.    Claim 2: "The portable ultrasound system of claim 1 wherein: one of the graphical tools that can be selected is a pictograph; and the second control area includes a control to select an attribute indicative of a region of the human anatomy." ..................82

C.    Claim 3 ...................................................................................83

    1.    [3a] "The portable ultrasound system of claim 1 wherein the processor is configured to execute instructions to: display a selected graphical tool at a first location in the first control area or the second control area;" ..........................83

    2.    [3b] "detect movement of a user's finger from a first location to a second location in the active image area; and" ......................................................................84

        a.    Ground 4 - Anticipation..................................84

        b.    Ground 5 - Obviousness ................................85

    3.    [3c] "overlay the selected one of the graphical tools at a second location in the active image area in response to the detected movement." ..........................................87

XI.   GROUND 6: CLAIMS 1-3 ARE OBVIOUS OVER GRUNWALD AND HYUN ...............................................................................88

A.    Claim 1 ...................................................................................88

    1.    [1a] .............................................................................88

    2.    [1b] ............................................................................89

    3.    [1c]-[1e] ....................................................................90

B.    Claim 2 ...................................................................................96

C.    Claim 3 ...................................................................................96

    1.    [3a] .............................................................................96

    2.    [3b] ............................................................................96

    3.    [3c] .............................................................................98

XII.  SECONDARY CONSIDERATIONS ............................................98

XIII. DISCRETIONARY DENIAL IS NOT APPROPRIATE ...............98

XIV.  CONCLUSION.............................................................................99

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
  IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017).................................................98

*In re Epstein*,
  32 F.3d 1559 (Fed. Cir. 1994) ...................................................................*passim*

*In re Wiggins*,
  488 F.2d 538 (C.C.P.A. 1973) .........................................................................98

*Sotera Wireless, Inc. v. Masimo Corp.*,
  IPR2020-01019, Paper 12 (Dec. 1, 2020) ..........................................................99

**Statutes**

35 U.S.C. § 314(a) .......................................................................................98, 99

35 U.S.C. § 318(b) .............................................................................................99

35 U.S.C. § 325(d) .............................................................................................98

**Other Authorities**

Memorandum, *Interim Procedure for Discretionary Denials in AIA
  Post-Grant Proceedings with Parallel District Court Litigation*
  (USPTO Dir. June 21, 2022) ............................................................................99

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## EXHIBITS

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 9,538,985 ("the '985 Patent") |
| 1002 | File History of U.S. Patent Application No. 14/256,744 ("the '744 application") |
| 1003 | U.S. Patent Application Pub. No. 2013/0324850 ("Petruzzelli") |
| 1004 | U.S. Patent Application Pub. No. 2006/0116578 ("Grunwald") |
| 1005 | U.S. Patent Application Pub. No. 2009/0198132 ("Pelissier") |
| 1006 | U.S. Patent Application Pub. No. 2010/0145195 ("Hyun") |
| 1007 | Declaration of Dr. Omid Kia |
| 1008 | Curriculum Vitae of Dr. Omid Kia |
| 1009 | U.S. Patent Application Pub. No. 2014/0098049 ("Koch") |
| 1010 | U.S. Patent Application Pub. No. 2009/0043195 ("Poland") |
| 1011 | U.S. Patent Application No. 14/256,759 |
| 1012 | U.S. Patent Application No. 10/697,148 |
| 1013 | U.S. Patent Application No. 10/081,542 |
| 1014 | U.S. Patent Application No. 09/860,209 |
| 1015 | U.S. Patent Application No. 09/378,175 |
| 1016 | U.S. Patent Application No. 09/872,541 |
| 1017 | U.S. Patent Application No. 10/039,910 |
| 1018 | U.S. Patent Application No. 29/147,576 |
| 1019 | U.S. Patent Application No. 29/147,660 |
| 1020 | U.S. Patent Application No. 29/148,421 |
| 1021 | U.S. Patent Application No. 29/148,532 |
| 1022 | U.S. Patent Application No. 29/149,730 |
| 1023 | Webpage: Apple Inc., *Apple Reinvents the Phone with iPhone*, Apple Newsroom Press Release (Jan. 9, 2007), https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/. |

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

| 1024 | Webpage: Apple Inc., *Cocoa Fundamental Guide*, Apple Developer (Sep. 18, 2013), https://developer.apple.com/library/archive/documentation/Cocoa/Conceptual/CocoaFundamentals/Introduction/Introduction.html#//apple_ref/doc/uid/TP40002974-CH1-SW1. |
|---|---|
| 1025 | Webpage: Apple Inc., *Apple Announces iPad Air—Dramatically Thinner, Lighter & More Powerful iPad*, Apple Newsroom Press Release (Oct. 22, 2013), https://www.apple.com/newsroom/2007/01/09Apple-Reinvents-the-Phone-with-iPhone/. |
| 1026 | Webpage: Apple Inc., *iPad Air Tech Specs* (archived by the WayBack Machine), (Oct. 1, 2013), https://web.archive.org/web/20131031112001/https://www.apple.com/ipad-air/specs/. |

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## I.   INTRODUCTION

The '985 Patent generally claims an ultrasound system with conventional hardware—any generic touchscreen and processor—and software instructions for producing a graphical user interface ("GUI") with two control areas and an ultrasound image area. The first control area has "graphical tools" to overlay on the ultrasound image, such as a "marker" tool to overlay text. The second control area includes controls for selecting an "attribute" of the graphical tool, such as particular text. The claims do not limit the size or location of the areas on the screen, except that the controls in the second control area are "selectively activated by a thumb of the user."

In other words, the claims cover nearly any ultrasound touchscreen GUI with one area anywhere on the display for selecting conventional graphical tools and another area anywhere on the display with controls for selecting any attribute of the selected graphical tool. There was nothing novel about annotating an ultrasound image using a touchscreen at the time of the '985 Patent, in 2014. Indeed, Petruzzelli and Grunwald each disclosed the claimed tools and areas on a portable ultrasound touchscreen display. And these references, in addition to Pelissier and Hyun, disclosed that hand-held ultrasound systems with a thumb-controlled touchscreen to implement the claimed interface were well known before 2014.

1

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## II.    MANDATORY NOTICES, FEES, & STANDING

### A.    Real Parties-In-Interest

Petitioner Butterfly Network, Inc. is the real party-in-interest.

### B.    Related Matters

Patent Owner asserted the '985 Patent, among others, against Petitioner in a pending litigation, *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, No. 1:22-cv-309 (D. Del.) ("the Litigation"). U.S. Patent No. 7,867,168 ("the '168 Patent") is also asserted in the Litigation. Petitioner has filed a petition for IPR of the '168 Patent (IPR2022-01575).

### C.    Lead & Backup Counsel

Petitioner provides the following designations of counsel:

| Lead Counsel | Backup Counsel |
|---|---|
| C. Brandon Rash<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>2001 K Street, N.W.<br>Washington, D.C. 20006<br>Tel: (202) 887-4380<br>Fax: (202) 887-4288<br>brandon.rash@akingump.com<br>USPTO Registration No. 59,121 | Clark Gordon<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>4 Park Plaza, Suite 1900<br>Irvine, CA 92614<br>Tel: (949) 885-4216<br>Fax: (949) 885-4101<br>cgordon@akingump.com<br>USPTO Registration No. 74,706 |

### D.    Service Information

A Power of Attorney accompanies this Petition pursuant to 37 C.F.R. § 42.10(b). Please address all correspondence to:

2

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

> AKIN GUMP STRAUSS HAUER & FELD LLP
> 2001 K Street, N.W.
> Washington, D.C. 20006-1037

Petitioner consents to electronic service by email at:

AG-BFLY-FUJI-IPR@akingump.com

### E.      Certification of Grounds for Standing

Petitioner certifies that the '985 Patent is eligible for IPR and that Petitioner

is not barred or estopped from challenging the claims.

### F.      Fees

Under 37 C.F.R. § 42.103(a), Petitioner authorizes the Office to charge the fee

set forth in 37 C.F.R. § 42.15(a) to Deposit Account No. 50-2310, as well as any

additional fees that might be due in connection with this Petition.

### III.      STATEMENT OF PRECISE RELIEF REQUESTED

Petitioner requests review and cancellation of claims 1-3 on the following

grounds:

| Ground | Claims | Basis for Ground |
|--------|--------|------------------|
| 1 | 1 | Anticipated by Petruzzelli |
| 2 | 1 | Obvious over Petruzzelli |
| 3 | 1 | Obvious over Petruzzelli and Pelissier |
| 4 | 1-3 | Anticipated by Grunwald |
| 5 | 1-3 | Obvious over Grunwald |
| 6 | 1-3 | Obvious over Grunwald and Hyun |

3

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## IV.  U.S. PATENT 9,538,985 ("THE '985 PATENT")

### A.  Summary

The '985 Patent is directed to a hand-held, portable ultrasound system. EX1001, 1:9-13. Prior art systems included a base unit that "can fold open to a display and a keypad, and a user can connect an ultrasound transducer wand to the base unit to acquire and view ultrasound images on the display." EX1001, 1:16-25. The '985 Patent replaces the display and keypad with a touchscreen for an "enhanced user interface." EX1001, Abstract; EX1007, ¶31.

Figure 1A illustrates system 100 comprising transducer device or wand 102 coupled to a hand-held base unit 110. EX1001, 2:11-23, 2:57-3:2.



**Fig. 1A**

EX1001, Fig. 1A. Base unit 110 includes a programmable processor and touchscreen display 114 that senses skin, stylus, or pressure contact. EX1001, 2:38-56, 3:10-43, Fig. 2. Figure 1B illustrates a user carrying system 100, using one hand to operate

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

wand 102 and the other to operate tablet-style base unit 110. EX1001, 2:57-3:9;

EX1007, ¶32.



**Fig. 1B**

EX1001, Fig. 1B.

Figures 3A-3G show graphical user interface ("GUI") 350 on touchscreen 114

in various display states. EX1001, 3:55-57. In Figure 3A, GUI 350 includes active

image area 352, in which an ultrasound image is displayed, and three control areas

355*a-c*. EX1001, 3:57-63.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



**Fig. 3A**

EX1001, Fig. 3A. The control areas can be expanded from a retracted state, as shown in Figure 3A, such that they overlay portions of active image area 352. EX1001, 3:63-4:10; EX1007, ¶33.

In Figure 3B, the user has expanded control area $355c$, which includes touch-selectable features, or soft buttons, corresponding to graphical tools that the user can overlay or implement on the image in active image area 352. EX1001, 4:11-17.

6

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



**Fig. 3B**

EX1001, Fig. 3B. "[G]raphical tools can identify, label, measure, or otherwise help

a user evaluate an ultrasound image." EX1001, 4:17-19. The buttons can be selected

to overlay a graphical marker ("MARKER"); pictograph ("PICTO"); an instrument

that measures a distance between two points on the ultrasound image ("CALIPER");

and a window that may be moved to various locations on the active image to zoom

or pan the image ("WINDOW"). EX1001, 4:19-26; EX1007, ¶34.

In Figure 3C, the user has selected the "PICTO" button, in response to which

the processor opens first control area 355*a*. EX1001, 4:27-30.

7

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



*Fig. 3C*

EX1001, Fig. 3C. Soft button controls 358*a* on thumbwheel 357 enable the user to select a tool attribute or property associated with the selected "PICTO" tool, each corresponding to a graphical icon representing an anatomical region. EX1001, 4:30-57. Upon selecting a tool property, the user can position (e.g., slide or drag) the pictograph on active image area 352 (as shown by arrow D). EX1001, 4:58-5:7; EX1007, ¶35.

The '985 Patent also states that the touch-selectable controls can include controls described, for example, in co-pending U.S. Patent Application 14/256,759. EX1001, 4:47-53; EX1011; EX1007, ¶36.

In Figure 3D, the user has selected the "Organs" button, which presents touch-selectable icons representing a bodily organ. EX1001, 5:8-27.

8

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



**Fig. 3D**

EX1001, Fig. 3D; EX1007, ¶37.

In Figure 3E, the user has selected the "MARKER" button, which opens second display area 355*b* to display textual markers 351 and arrow marker 354 that a user can drag onto the image (as shown by arrow H). EX1001, 5:28-44.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



Fig. 3E

EX1001, Fig. 3E. The "Text" icon allows the user to annotate text onto the image

via, for example, a pop-up graphical keyboard (not shown). EX1001, 5:38-40;

EX1007, ¶38.

In Figure 3F, the user has selected the "WINDOW" button, which presents

window 361 on active image area 352 and track pad 359 in first control area 355a.

EX1001, 5:45-64.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



## Fig. 3F

EX1001, Fig. 3F. Using "swiping" or "pinching" motions, track pad 359 may be

used to move window 361 and zoom on the image (Figure 3F), or to place arrow

marker 354 (Figure 3E) on the image. EX1001, 5:50-64; EX1007, ¶39.

In Figure 3G, the user has selected the "CALIPER" button, which overlays

caliper tool 368 on active image area 352 to measure the distance between endpoints

363, 365. EX1001, 5:65-6:20.

11

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



**Fig. 3G**

EX1001, Fig. 3G. As the user moves endpoints 363, 365 on active image area 352

using handle 366 or track pad 359, the measurement changes. EX1001, 6:2-20,

6:47-49; EX1007, ¶40.

Figure 4 is a flow diagram illustrating routine 470 for providing the graphical

tools with user-selectable attributes or properties. EX1001, 6:21-38.

12

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



*Fig. 4*

EX1001, Fig. 4. If a user operates a tool or selects a property, routine 470 displays

or modifies the display of the tool. EX1001, 6:39-7:5; EX1007, ¶41.

### B.    Challenged Claims

The challenged claims are claims 1-3. App'x A (claim listing); EX1007, ¶¶42-

45.

### C.    Prosecution History

The '985 Patent issued from U.S. Patent Application 14/256,744 ("the '744

application"), filed April 18, 2014. EX1007, ¶46.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

The Examiner rejected claims as anticipated by U.S. Patent Application Pub. 2014/0098049 ("Koch," EX1009) or obvious over Koch and in view of U.S. Patent Application Pub. 2009/0043195 ("Poland," EX1010). EX1002, 78-81. Applicants argued that "[n]othing in Koch teaches a control area having 'a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool,' and a separate active image area in which 'one of the graphical tools can be overlaid onto the image with the user-selected tool attribute,' as required by claim 1." EX1002, 96. The Examiner then allowed the claims without remark. EX1002, 111; EX1007, ¶47.

As explained below, the prior art—including Petruzzelli and Grunwald—disclosed a GUI with thumb-selectable attributes of a selected graphical tool, which can be overlaid on a separate active image area with the selected attribute. EX1007, ¶48.

## V.    LEVEL OF SKILL IN THE ART

A person of ordinary skill in the art ("POSA") at the time of April 18, 2014, would have a degree in electrical engineering, computer science, or a related discipline, along with relevant experience (at least 1-2 years for a Ph.D., 2-3 years for a Master's, and 3+ years for a Bachelor's) researching or developing graphical user interfaces (GUIs) for ultrasound systems or other medical imaging devices.

14

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1007, ¶¶14-19. The person would have general knowledge of GUIs for ultrasound systems or other medical imaging devices as of April 18, 2014. *Id*.

## VI.    CLAIM CONSTRUCTION

Petitioner does not believe any terms require construction at this stage for the Board to find all challenged claims unpatentable. EX1007, ¶¶49-50.

## VII.    PRIOR ART SUMMARY

### A.    State of the Art

Touchscreen displays in portable ultrasound systems were known long before the '985 Patent. EX1003, Abstract, ¶¶25-28, 33, 87-89, Figs. 1, 21; EX1004, ¶¶5, 16, 73, 214-21, Fig. 1; EX1005, ¶25, Fig. 1; EX1006, Abstract, ¶¶7, 20; EX1007, ¶¶51-54. Producing a display on the touchscreen display using a programmable processor in portable ultrasound systems was also known before 2014. EX1003, ¶¶27, 87, 91; EX1006, ¶26; EX1007, ¶51. Before 2014, advances in display technology requiring dedicated processing elements had led to small form factors used for mobile applications requiring touchscreen capability. EX1003, ¶¶1, 2, 27 (iPad), 87; EX1004, ¶¶69, 216 ("PDA"); EX1007, ¶51. By that time, touchscreen functionality was commonplace in medical imaging devices with improved graphical user interfaces. *Id*. By the time that the first iPhone was released in 2007—years before the application for the '985 Patent was filed—touchscreens and their corresponding interfaces were ubiquitous, and were being integrated in all manner of end-user devices. EX1003, Abstract, ¶¶25-28, 33, 87-89, Figs. 1, 21; EX1004,

15

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

¶¶5, 16, 73, 214-21, Fig. 1; EX1005, ¶25, Fig. 1; EX1006, Abstract, ¶¶7, 20; EX1007, ¶51.

Further, before 2014, there were known portable ultrasound systems whereby a user could hold a scanner in one hand, and a touchscreen display in the other hand. EX1006, Abstract, ¶7, 21, 32-34, Figs. 7-9; EX1007, ¶52. In general, these systems enabled the user to view the object or area being scanned in real time via a GUI displayed on the touchscreen. EX1006, Abstract, ¶¶7, 21, 32-34, Figs. 7-9; EX1007, ¶52. Such systems further enabled the user to adjust scanning parameters while scanning the patient in real time. EX1006, ¶34; EX1007, ¶52. As a practical matter, given that one hand of user is occupied holding the scanner during a live scan, GUIs for such ultrasound touchscreen systems had been configured such that the graphical tools of the GUI were accessible via the thumb of the hand holding the touchscreen—much in the same way that many other touchscreen smart devices had been designed to enable one-hand operation of the device's GUI. EX1006, ¶¶32-34, Figs. 7-9; EX1007, ¶52.

Additionally, before 2014, portable ultrasound systems—just as with non-portable systems—allowed users to take captures (i.e., "screenshots") of the area being imaged. EX1003, ¶¶42-46, Fig. 3 ("image capture buttons" including "freeze" and "save image"); EX1007, ¶53. In such systems, after an image capture is taken, the user may wish to manipulate that image by, for example, overlying an instrument

16

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

such as a caliper. EX1003, ¶¶42-46, Fig. 3 ("caliper"); EX1007, ¶53. When actively

manipulating or modifying a captured (or frozen) image, the hand of the user that is

holding the scanner is free to operate the GUI along with the hand of the user holding

the device. EX1003, ¶62, Fig. 5 ("user 202"); EX1007, ¶53. Thus, by 2014, GUIs

for ultrasound systems had been designed such that when manipulating an image

capture, a user was free to utilize the thumbs and/or fingers of both hands holding

the portable ultrasound system to operate the GUI displayed on the touchscreen.

EX1005, ¶¶33, 43-49, Fig. 5B; EX1007, ¶53.

Finally, before 2014, it was also known that touchscreen displays could

include various instruments that could be overlaid or implemented on ultrasound

images to identify, label, measure, or otherwise help the user evaluate the image.

EX1003, ¶¶41-44, 50-52, 62-63, Figs. 2, 5-6; EX1007, ¶54. A POSA would have

known that writing the software instructions to implement these standard

instruments on a generic touchscreen display would have been routine. EX1003,

¶¶32, 49, 92-94; EX1006, ¶34; EX1007, ¶54.

### B.    Petruzzelli

Petruzzelli is U.S. Patent Application Pub. 2013/0324850, published

December 5, 2013. It is prior art under post-AIA § 102(a)(1). EX1007, ¶¶55-58.

Petruzzelli disclosed a touchscreen interface for a handheld portable

ultrasound system that could be implemented on any tablet computing device, e.g.,

17

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

an iPad. EX1003, ¶¶1 ("ultrasound imaging system that utilizes a touch screen interface"), 2 ("enabling a user to interact with a medical imaging system using a touch screen display"), 27 ("an iPad or other suitable tablet computing device"), 87 ("an iPad or other suitable tablet computing device"); EX1007, ¶56.

Figure 21 illustrates a computer system for implementing the interface (e.g., an iPad), including touchscreen interface 2108, programmable processor 2102, and computer-readable storage medium 2110 for storing instructions to implement the interface. EX1003, ¶¶23, 87-91; EX1007, ¶56.



EX1003, Fig. 21. Petruzzelli acknowledged that the hardware and "computer programming tools and techniques" were "already available" for implementing the interface by 2013. EX1003, ¶91.

18

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

Figures 1-3 and 5-9 illustrate an exemplary touchscreen interface, in various

states, for an ultrasound imaging system. EX1003, ¶¶3-11, 27; EX1007, ¶57. Figure

1 shows that the interface includes three areas, a first control area (top-level function

menu or menus 122), second control area (sub-level function menus 124), and active

image area (primary imaging area 102). EX1003, ¶¶26, 39-45.



**Figure 1**

19

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1003, Fig. 1 (annotated). Menu 122 includes buttons for accessing tools that can identify, label, measure, or otherwise help a user evaluate the ultrasound image, which are activated by a user touching the button. EX1003, ¶¶39-42. Petruzzelli's graphical tools include, for example, measurements and annotations that can be overlaid onto the ultrasound image in imaging area 102. EX1003, ¶¶41-42, 44.

When a user selects one of the tools, sub-level function menus 124 presents corresponding controls along the bottom edge of the display, which can be selectively activated by a thumb of the user to select attributes of the selected tool. EX1003, ¶¶42-45; EX1007, ¶58. By activating a tool in menu 122 and corresponding controls in menus 124, the user can select from among text, image, and measurement tools, and overlay the selected tool onto the image—for example, a measurement instrument with a user-selected type and location (EX1003, ¶¶44, 64-69, Figs. 7-9) and an annotation with a user-selected comment, arrow or other marker and location (EX1003, ¶¶50-52, 62-63, Figs. 2, 5-6). Further, Petruzzelli provides for certain sets of graphical tools available to a user when working with "previously captured images" (e.g., text, image, and measurement tools). EX1003, ¶¶41, 44; EX1003, ¶¶33, 39. Petruzzelli also provides for certain other tools available to a user when working with the live image scan feed (e.g., "capture buttons", "print" and "save" buttons). EX1003, ¶46; EX1003, ¶¶33, 39.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

### C.    Grunwald

Grunwald is U.S. Patent Application Pub. 2006/0116578, published June 1, 2006. It is prior art under post-AIA § 102(a)(1). EX1007, ¶¶59-66.

Grunwald disclosed a hand-held, portable ultrasound system. EX1004, ¶¶5, 16; EX1007, ¶60. Grunwald recognized that prior-art systems, in some cases, were cumbersome to operate. EX1004, ¶13. Grunwald sought to allow for quick and efficient interaction through a touchscreen with active on-screen elements (e.g., soft buttons, tabs, and icons). EX1004, ¶¶13, 16.

Figures 1 and 2 show the processor-based ultrasound system and contents of its memory, including GUI 208. EX1004, ¶¶71-76; EX1007, ¶61.



FIG. 1                    FIG. 2

EX1004, Figs. 1-2. Figures 3-18 show various modes of the system, such as imaging (Figures 7-13), measurement (Figure 14), and annotation (Figure 15). EX1004, ¶¶32-47, Figs. 3-18.

21

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

Figure 20 illustrates an embodiment of ultrasound system 100, including ultrasound imaging unit 2004 and display and control unit 2006, each held in one hand. EX1004, ¶¶214-15; EX1007, ¶62.



FIG. 20

EX1004, Fig. 20. Display and control unit 2006 includes touchscreen 2020 displaying GUI 208, which has different views and includes windows that a user may rearrange "in any fashion desired." EX1004, ¶¶214, 216, 225. To accommodate use with one hand, GUI 208 is designed for operation using a touchscreen for "direct selection" of active on-screen elements. EX1004, Abstract, ¶¶15, 216, 226, 256. Unit 2006 may include, for example, "a Personal Digital Assistant (PDA)." EX1004, ¶¶216-17.

Figures 23-34 show views of GUI 208. EX1004, ¶¶52-67, Figs. 23-34. For example, Figure 23 shows three customizable areas, a first control area (tabbed panel

22

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

2306), second control area (sub-panel 2308), and active image area (image area 2302). EX1004, ¶¶248 ("tabs can be added or configured"), 279 ("specialized for any type of user"), 283 ("type and position of the information displayed on the screen, e.g., menu items, measurement results, etc. can be customized"); EX1007, ¶63.



FIG. 23

EX1004, Fig. 23 (annotated). Tabbed panel 2306 includes tabs for accessing tools that can identify, label, measure, or otherwise help a user evaluate the ultrasound image, which are activated by a user touching the tab. EX1004, ¶¶248, 256. Grunwald's graphical tools include, for example, text (e.g., patient information),

23

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

annotations, measurements, and other tools that can be overlaid onto the ultrasound image in image area 2302. EX1004, ¶¶249-57.

When a user selects one of the tools, sub-panel 2308 presents corresponding controls along the left side of the display, which can be activated by a thumb of the user to select attributes of the selected tool. EX1004, ¶¶16, 248; EX1007, ¶¶64-65. By activating a tool in panel 2306 and corresponding controls in sub-panel 2308, the user can select from among text, image (e.g., body markers), and measurement tools, and then overlay the selected tool onto the image—overlaying, for example, patient information with user-selected data (EX1004, ¶¶248-50, Figs. 23-24), a region of interest (ROI) outline with a user-selected position, size, and scale (EX1004, ¶¶260-66, Figs. 25-26B), a measurement instrument with a user-selected type and position (EX1004, ¶¶284-85, Fig. 31B), and an annotation with a user-selected body marker (EX1004, ¶¶292-93, Fig. 34).

Grunwald further identifies a number of applications and states that "[a]ll of the aforementioned applications are commonly assigned and are incorporated herein by reference." EX1004, ¶¶1-3; EX1012-22; EX1007, ¶66.

### D.    Pelissier

Pelissier is U.S. Patent Application Pub. 2009/0198132, published August 6, 2009. It is prior art under post-AIA § 102(a)(1). EX1007, ¶¶67-70.

24

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

Pelissier disclosed a hand-held, portable ultrasound system comprising a hand-held base unit (e.g., hand-held ultrasound unit 10), which "may be used in either hand." EX1005, ¶¶25, 50-51, Fig. 7; EX1007, ¶68.



FIG.1

EX1005, Fig. 1. Unit 10 includes touch-sensitive display 14, which displays ultrasound images (e.g., image 27) and "images representing controls with which an operator can interact to control the operation" of the unit. EX1005, ¶25.



FIG.5B

25

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1005, Fig. 5B, ¶¶25-33. Further, unit 10 "may switch between modes in which the controls are positioned for convenient left- or right-handed operation and/or modes in which the controls are positioned for convenient one- or two-handed operation." EX1005, Abstract, ¶33.

Further, Pelissier disclosed that touch-sensitive display 14 can display an ultrasound image 27 and "images representing controls with which an operator can interact to control the operation" of hand-held ultrasound unit 10. EX1005, ¶25; EX1007, ¶69. Pelissier recognized that the different protocols for performing ultrasonography required the user hold the unit in different ways. EX1005, ¶24; EX1005, ¶¶25-49. When performing cardiac scanning, for example, "it is typical to hold the transducer in the operator's left hand," whereas "[o]ther types of scanning may be performed with the transducer held in the operator's right hand." EX1005, ¶24. As such, Pelissier disclosed a GUI that "may switch between modes in which the controls are positioned for convenient left- or right-handed operation and/or modes in which the controls are positioned for convenient one- or two-handed operation." EX1005, Abstract, ¶¶24, 33.

26

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



EX1005, Figs. 5A-5B; EX1005, Abstract, ¶¶24, 33. Pelissier further disclosed that in the one-handed operation mode, such as that disclosed in Figure 5B, "user controls are located where they can be reached with the thumb or fingers of the same hand that the operator is using to grasp apparatus 10." EX1005, ¶33, Fig. 5B.

Pelissier additionally disclosed that the control area of touch-sensitive display 14 can include graphical tools and controls to select attributes of those tools, such as a measure tool that utilizes touch pad 28, which "is outside of ultrasound image 27." EX1005, ¶¶35-37; EX1007, ¶70.



27

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1005, Fig. 6. Pelissier also disclosed that, using touch pad 28, a user can "indicate a specific position, or positions, on an ultrasound image being displayed." EX1005, ¶¶35, 38-43. Using the measure tool, for example, "[d]istances between different points on an ultrasound image may be measured by specifying the two points and automatically computing the distance between the two points." *Id.*

### E.    Hyun

Hyun is U.S. Patent Application Pub. 2010/0145195, published June 10, 2010. It is prior art under post-AIA § 102(a)(1). EX1007, ¶¶71-74.

Hyun disclosed a hand-held portable ultrasound system comprising a hand-held base unit (e.g., body 110), which is coupled to an ultrasound probe through wired or wireless communication. EX1006, Abstract, ¶¶7, 20; EX1007, ¶72. Body 110 has a "size, weight and shape suitable for allowing a user to easily hold by using a single hand." EX1006, ¶21; EX1006, ¶7, Figs. 6A-8. Body 110 includes a touchscreen display (e.g., touchscreen 120). EX1006, ¶¶20-21, Figs. 2, 5-13.

28

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



EX1006, Figs. 7-8; EX1006, ¶¶29-33.

Hyun disclosed that touchscreen 120 displays both ultrasound images and "a preset touch screen menu for graphic user interface." EX1006, ¶27; EX1007, ¶73. Figure 5 illustrates that touchscreen 120 may include first display region 121 for displaying an ultrasound image and second display regions 122 for displaying the "preset touch screen menu." EX1006, ¶¶27-28, 33.



29

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1006, Fig. 5. Hyun teaches that the user interface may include menus and sub-

menus that may be thumb-activated by touching the items or "soft buttons" in the

menu, as illustrated, for example, in Figure 9. EX1006, ¶¶34-36.



FIG. 9

EX1006, Fig. 9.

Hyun also disclosed standard touchscreen operations. EX1007, ¶74. For

example, Hyun disclosed user input through various events "while the finger …

touches the touch panel," such as a "tap," "circular drag," "up and down drag," and

"left and right drag" events, as illustrated in Figures 6A-6C. EX1006, ¶28.



FIG. 6A      FIG. 6B

30

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 6C

EX1006, Figs. 6A-6C. Hyun also disclosed touchscreen operations for selecting ultrasound modes and parameters and manipulating graphical tools, such as overlaying and adjusting a region of interest outline or measurement tool using the drag events. EX1006, ¶¶38 ("region of interest"), 41 ("measuring a size of the target object"), Fig. 12.

## VIII. GROUNDS 1 AND 2: CLAIM 1 IS ANTICIPATED AND RENDERED OBVIOUS BY PETRUZZELLI

### A. Claim 1

#### 1. [1a] "A portable ultrasound system, comprising a hand-held base unit that includes: a touchscreen display; and"

Petruzzelli disclosed a portable ultrasound system comprising a hand-held base unit (e.g., "an iPad or other suitable tablet computing device") that includes a touchscreen display (e.g., touch screen panel interface 2108). EX1003, Abstract, ¶¶25-28, 33, 87-89, Figs. 1, 21; EX1007, ¶¶55-58, 75-76. Petruzzelli explained that "interface 100 may be displayed on a touch screen panel that may be capable of detecting the presence and location of a touch (e.g., by a finger, hand, stylus, and/or the like) within the display area." EX1003, ¶27. Further, "the touch screen panel may

31

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

be part of a discrete computing system incorporating a touch screen panel (e.g., an iPad or other suitable tablet computing device)." EX1003, ¶27. The illustration below depicts interface 100, which Dr. Kia has overlaid to demonstrate how it would have appeared operating on an iPad, as Petruzzelli disclosed. EX1003, ¶¶27, 87; EX1025-26; EX1007, ¶¶75-76.



EX1007, ¶76. The above figure depicts interface 100 from Figure 1 of Petruzzelli on an iPad that was commercially available in 2013. *Id.*

32

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

> **2.  [1b] "a programmable processor configured to execute instructions that cause the processor to produce a display on the touchscreen display, including—"**

Petruzzelli disclosed that the system includes a programmable processor (e.g., processor 2102, in **red**), which is communicatively coupled to the touchscreen display (e.g., touchscreen panel interface 2108, in **blue**) via data bus 2112. EX1003, ¶¶87-89; EX1007, ¶¶55-58, 77-80.



EX1003, Fig. 21 (annotated); EX1007, ¶77. Processor 2102 "may include one or more general purpose processors, application specific processors, microcontrollers, digital signal processors, FPGAs, or any other customizable or programmable processing device." EX1003, ¶90.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

Further, processor 2102 is "configured to execute computer-readable instructions stored on the non-transitory computer-readable storage medium 2110" to implement the functionality and interfaces in Petruzzelli, including Figures 1-20, and produce a display (e.g., interface 100) on the touchscreen panel. EX1003, ¶¶90-94; EX1007, ¶78.

Petruzzelli recognized that the hardware, including computers, ultrasound imaging systems, and touch screen panels, and "computer programming tools and techniques" were "already available" before 2013. EX1003, ¶91; EX1007, ¶¶79-80. Petruzzelli disclosed that the interface 100 may be any suitable touchscreen tablet computing device, such as an iPad. EX1003, ¶¶27, 87; EX1007, ¶80.

### 3. [1c] "a first control area having a number of graphical tools that can each be selectively activated by a user,"

Petruzzelli disclosed that interface 100 includes a first control area (e.g., top-level function menu 122). EX1003, ¶39; EX1007, ¶¶55-58, 81-88.

34

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



**Figure 1**

EX1003, Fig. 1 (annotated); EX1007, ¶81. Menu 122 has a number of graphical tools, which the '985 Patent describes as tools that a user can "position or overlay" or "implement on" the ultrasound image and that can "identify, label, measure, or otherwise help a user evaluate an ultrasound image." EX1001, 4:2-19. The graphical tools in menu 122, such as "Annotate" (EX1003, ¶¶50-54, 62, Figs. 2, 5) and

35

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

"Measure" (EX1003, ¶¶43-44, 64-69, Figs. 7-9), can be selectively activated by the

user "touching" the corresponding button. EX1003, ¶¶39-42.

Petruzzelli disclosed that "[t]he top-level function menus 122 may provide

one or more menu buttons defining one or more top-level functions a user may utilize

to interact with and/or control the ultrasound imaging system." EX1003, ¶39;

EX1007, ¶82. Further, the top-level function menus 122 "may include a patient

information menu button, an examination type menu button, a measure menu button,

an annotate menu button, a review menu button, and/or menu buttons corresponding

to any other type of top-level functions a user may wish to utilize." EX1003, ¶39.

Figure 2 illustrates interface 100 where a user has selected the "Annotate" tool

in top-level functions menu 122 and "Arrow" button in sub-level function menus

124, which allows the user to overlay a cursor or arrow on the displayed ultrasound

image. EX1003, ¶¶50-54; EX1007, ¶¶83-84.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



Figure 2

EX1003, Fig. 2 (annotated); EX1007, ¶¶83-84.

Figure 5 illustrates interface 100 where a user has selected the "Annotate" tool and "Comment" button, which allows the user to select and overlay graphical text (e.g., "Biopsy") on the ultrasound image, using touchpad 104 and set button 106 or touching on the graphical text (i.e., a drag-and-drop). EX1003, ¶¶51, 62; EX1007, ¶85.

37

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



Figure 5

EX1003, Fig. 5 (annotated), ¶¶51, 62; EX1007, ¶85. A menu (e.g., "a touch screen

keyboard") may be displayed that allows the user to enter a comment or annotation.

EX1003, ¶¶51, 54.

Figure 7 illustrates interface 100 where a user has selected the "Measure" tool,

which allows the user to overlay a region of interest outline on the ultrasound image.

EX1003, ¶¶64-65; EX1007, ¶86. Petruzzelli disclosed that "a region of interest 700

38

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

may be an area that the user 202 wishes to view in higher magnification, an area that

the user 202 wishes to measure, an area that the user 202 wishes to annotate for later

study in detail, and/or any other desired interest." EX1003, ¶64.



Figure 7

EX1003, Fig. 7 (annotated); EX1007, ¶86.

Figure 8 illustrates a view of interface 100 where a user has selected the

"Measure" tool and "Linear" button, which allows the user to overlay a caliper to

39

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

measure the linear distance (e.g., "E") between two marker points (e.g., "C" and

"D") on the ultrasound image. EX1003, ¶¶43-44, 66-67; EX1007, ¶87.



Figure 8

EX1003, Fig. 8 (annotated); EX1007, ¶87.

Figure 9 illustrates interface 100 where a user has selected the "Measure" tool

and the "Trace" button, which allows the user to overlay a multi-segment trace on

40

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

the ultrasound image that can be used, for example, in measurement, zooming, and

annotation operations. EX1003, ¶¶43-44, 68-69; EX1007, ¶88.



Figure 9

EX1003, Fig. 9 (annotated); EX1007, ¶88.

41

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

4. **[1d] "a second control area that is accessible by a hand of the user that is holding the portable ultrasound system, wherein the second control area includes a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool, and"**

a. **Ground 1 – Anticipation**

Petruzzelli disclosed that interface 100 includes a second control area (e.g., sub-level function menus 124) that is accessible by a hand of the user that is holding the portable ultrasound system. EX1003, ¶¶42-43; EX1007, ¶¶55-58, 89-93.



Figure 1

42

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1003, Fig. 1 (annotated); EX1007, ¶89. Sub-level function menus 124 "relate to one or more sub-level functions associated with a selected top-level function menu 122." EX1003, ¶42. Like the '985 Patent, Petruzzelli disclosed a portable ultrasound system that includes a base unit (e.g., iPad) and a probe, with the user using one hand to hold the base unit and the other hand to hold the probe. *Compare* EX1003, ¶¶27 ("touch screen panel (e.g., an iPad or other suitable tablet computing device) configured to operate with the ultrasound imaging system"), 33 ("probe being used with the ultrasound system") *with* EX1001, 2:65-3:2, Fig. 1B. Because sub-level function menus 124 is accessible by both the hand of the user holding the base unit (e.g., iPad) and the hand of the user holding the probe, sub-level function menus 124 is "accessible by a hand of the user that is holding the portable ultrasound system." EX1007, ¶89.

Petruzzelli further disclosed that the controls in sub-level function menus 124 "can be selectively activated by a thumb of the user," because interface 100 may be implemented on a touchscreen tablet (e.g., iPad), and sub-level function menus 124 is positioned at the bottom edge of the tablet. EX1003, ¶¶27-28; EX1007, ¶90. Petruzzelli disclosed a tablet-style device similar to the tablet in Figure 1B of the '985 Patent, which illustrates a user holding a tablet-style device in the left hand and a probe in the right hand. EX1001, Fig. 1B. Petruzzelli illustrates controls (e.g., various buttons and touchpad 104 in sub-level function menus 124) either being

43

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

operated by a thumb or in close proximity to a thumb that can operate the control. EX1003, Figs. 2, 4, 7-9; EX1007, ¶91.

Indeed, Petruzzelli disclosed a smaller tablet than the '985 Patent relative to the hand holding the tablet, which makes it easier for the user to selectively activate the controls using the thumb of the hand holding Petruzzelli's tablet. *Compare* EX1003, Figs. 2, 4, 7-9, *with* EX1001, Figs. 1B, 3C. Because the user can selectively activate the controls in Petruzzelli's second control area (e.g., sub-level function menus 124) using the thumb of the user's hand holding the base unit (e.g., iPad) or the thumb of the user's hand holding the probe, the controls "can be selectively activated by a thumb of the user." EX1003, ¶64, Fig. 7 (depicting the user's thumb operating touchpad 104); EX1007, ¶91.

Petruzzelli disclosed that when a user selects a graphical tool (e.g., "Annotate" or "Measure"), sub-level function menus 124 displays a plurality of controls that can be selectively activated to select an attribute—e.g., "visual or graphical appearance" (EX1001, 4:34-37)—of the selected graphical tool. EX1003, ¶¶30, 42-43; *supra* § VIII.A.3; EX1007, ¶92. For example, when a user selects the "Annotate" tool, sub-level function menus 124 displays controls to select attributes (e.g., type, appearance, and position) of the "Annotate" tool. EX1003, ¶¶29, 50-54, 62, Figs. 2, 5. As illustrated in Figures 2 and 5, these controls include, for example, "Comment,"

44

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

"Arrow," "Edit," and "Set" buttons and touchpad 104, which may be selectively

activated by a thumb. *Id.*



Figure 2

EX1003, Fig. 2 (annotated); EX1003, Fig. 5; EX1007, ¶92. Using a thumb, the user

may, for example, select the "Comment" or "Arrow" button—which are positioned

near the left edge of the display—to select the type of annotation, operate touchpad

104 to position the annotation, and select "Set" button 106 to place the annotation

45

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

on the ultrasound image. EX1003, ¶¶29, 50-52, 62. The "Edit" button allows a user

to edit the comment or annotation. EX1003, ¶54.

When a user selects the "Measure" tool, sub-level function menus 124

displays controls to select attributes (e.g., type and position) of the "Measure" tool.

EX1003, ¶¶29, 43-44, 64-69, Figs. 7-9; EX1007, ¶93. As illustrated in Figures 7-9,

these controls include, for example, "Edit," "Linear," "Trace," and "Set" buttons and

touchpad 104, which may be selectively activated by a thumb. *Id.*



Figure 7

46

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1003, Fig. 7 (annotated); EX1003, Figs. 8-9; EX1007, ¶93. Touchpad 104 in

Petruzzelli is like track pad 359 in the '985 Patent, using the same swiping, pinching,

and spreading gestures. *Compare* EX1003, ¶67, Fig. 7, *with* EX1001, 5:45-64,

Fig. 3F. Using a thumb, the user may, for example, select the "Linear" or "Trace"

button to overlay a caliper to measure distance (linear) or area (trace), use the

touchpad 104 to position measurement marker points, and touch the set button 106

to place the marker points. EX1003, ¶¶44, 67-68, Figs. 8-9. The "Edit" button allows

the user to reposition those marker points overlaid on the image. EX1003, ¶44.

### b. Ground 2 – Obviousness

If Patent Owner argues that Petruzzelli did not disclose "a second control area

that is accessible by a hand of the user that is holding the portable ultrasound

system," where the second control area includes controls that can be "selectively

activated by a thumb of the user," such a combination would have been obvious

based on Petruzzelli alone. EX1007, ¶¶94-101. As explained, Petruzzelli disclosed

each of these elements, including "a second control area" (e.g., sub-level function

menus 124) that can be implemented on an iPad, which would be both accessible by

a hand of the user that is holding the iPad (or the hand holding the ultrasound probe)

and include controls that "can be activated by a thumb of the user." *Supra*

§ VIII.A.4.a. It would have been obvious—using known methods to yield

predictable results—to size the tablet and arrange sub-level function menus 124 such

47

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

that it is accessible by "a hand of the user that is holding the portable ultrasound system" and includes controls that "can be selectively activated by a thumb of the user" to select an attribute of the selected graphical tool. EX1007, ¶94.

A POSITA would have understood that software GUI's were particularly easy to modify and change. *Supra* § VII.A; EX1007, ¶95. This is because software GUIs, unlike certain hardware applications, were very flexible in their design. *Id.* A POSA would have understood that when designing a software GUI, a primary focus was always on ease of use for the end user. *Id*. Thus, it would have been obvious to a POSA to implement the GUI of Petruzzelli such that sub-level function menus 124 were accessible by a hand of the user that is holding the portable ultrasound system. *Id*. Indeed, in practice, it would have been clear to a GUI engineer that the GUI would be easiest to use if sub-level function menus 124 could be accessed by the same hand that's holding the touchscreen display. *Id.* Further, elements of GUI design were commonly based on top-level/sub-level (*i.e.*, context-based selection) as in Petruzzelli, which is intended to promote ease of use. *Id.* A POSA would have had access to and known about such GUI design factors, and would have employed such menu selection configurations based on typical and conventional user needs for an ultrasound GUI. *Id.*

Petruzzelli also disclosed that "a number of variations can be made to the architecture, relationships, and functions presented in connection with FIG. 1."

48

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1003, ¶49; EX1007, ¶¶96-97. Petruzzelli further provided that "interface 100 layouts, architectures, and functionalities may be arranged and/or configured in any suitable manner." EX1003, ¶49. Petruzzelli disclosed, for example, that interface 100 allowed a user to "touch the system configuration indicator and be presented with a sub-menu allowing the user to modify the configuration of the ultrasound system." EX1003, ¶32.

A POSA would have understood that customizing and modifying an ultrasound GUI, such as interface 100, was standard practice. EX1007, ¶98. Indeed, Petruzzelli recognized the myriad of applications in which ultrasound systems were used, e.g., "during an abdominal examination, a kidney examination, an early obstetrical examination, a late obstetrical examination, a gynecological examination, a thyroid examination, a breast examination, a testicular examination, an adult or pediatric cardiac examination, an upper or lower extremity arterial or venous vascular examination, [and/or] a carotid vascular examination." EX1003, ¶26. As such, Petruzzelli disclosed that the touchscreen panel would be "customized" for a given ultrasound imaging system. EX1003, ¶27.

Further, a POSA would have had access to all of the known and prevalent workflows in ultrasound machines, as has also been described in Petruzzelli. EX1003, ¶¶ 39-43; *supra* § VII.A; EX1007, ¶99. The concepts of using context-dependent and menu-driven graphical interfaces for live scans and post-capture

49

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

processing as disclosed in Petruzzelli, for example, would have enabled a POSA to create multiple control areas with multiple selections responsive to user interactions. *Id.* A POSA would have understood that such interactions would be configured for a thumb-driven interface to enable the ultrasound technician to hold the ultrasound probe in their other hand. *Id.* Indeed, a POSA would have known that an ultrasound technician utilizes one hand to manipulate probe location and target specific body parts during live scans, which leaves the other hand (and corresponding thumb) to hold and operate the portable ultrasound system. *Id.*

In addition to the express teachings and motivations in Petruzzelli, a POSA would have been motivated to configure the base unit and interface to achieve the claimed second control area—e.g., by moving the controls to the left side of the display—to provide the advantage of allowing the user to manipulate the controls while holding and operating the system. *Supra* § VII.A; EX1007, ¶100. A POSA would have known that convenience and ease of use during operation of the ultrasound system was the primary motivation in designing GUIs for ultrasound systems. *Id*. Configuring the system to allow thumb-control would have allowed for quicker and more efficient diagnosis because the user can annotate the image and perform measurements in real-time while diagnosing the patient. *Id*.

A POSA would have had a reasonable expectation of success in customizing GUI interface 100 to achieve the claimed second control area for the further reason

50

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

that programming a GUI to implement known graphical tools was routine before

2014. EX1003, ¶¶27, 42-43; *supra* § VII.A; EX1007, ¶¶99, 101. The '985 Patent

does not allege overcoming any purported problems in programming GUIs, or

provide any guidance on how a software programmer would program the claimed

GUI. EX1007, ¶101. The lack of explanation on GUI software programming in the

'985 Patent further supports a reasonable expectation of success. *In re Epstein*, 32

F.3d 1559, 1568 (Fed. Cir. 1994).

> **5.    [1e] "an active image area in which an image of a patient obtained from an ultrasound scan is displayed and at which the selected one of the graphical tools can be overlaid onto the image with the user-selected tool attribute."**

Petruzzelli disclosed that interface 100 includes a separate active image area

(e.g., imaging area 102), in which "still or moving captured ultrasound images 204

may be displayed." EX1003, ¶¶26, 28, 36-47, 56-57; EX1007, ¶¶55-58, 102-03.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



**Figure 1**

EX1003, Fig. 1 (annotated); EX1007, ¶102.

As explained, the "Annotate" and "Measure" graphical tools described above can be overlaid onto the ultrasound image in the active image area with the user-selected tool attributes (e.g., size, shape, text, image, and position) described above. *Supra* §§ VIII.A.3-4; EX1007, ¶103. For example, as illustrated in Figures 2, 5, and 7-9, the "Annotate" tool overlays text or an image with user-selected attributes (e.g.,

52

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

text, image, and position), and the "Measure" tool overlays a caliper with user-selected attributes (e.g., size, shape, and position). *Id.*

## IX.    GROUND 3: CLAIM 1 IS OBVIOUS OVER PETRUZZELLI AND PELISSIER

### A.    Claim 1

As explained, Petruzzelli anticipates and renders obvious claim 1. *Supra* § VIII.A. If Patent Owner argues that Petruzzelli did not disclose or render obvious the "user"-related elements of claim 1, these elements would have been obvious based on the combined teachings of Petruzzelli and Pelissier. EX1007, ¶¶55-58, 67-70, 104-16. Specifically, it would have been obvious—using known methods to yield predictable results—to implement a GUI, as Petruzzelli disclosed, on a hand-held, touchscreen tablet that can be easily held and operated using one hand, as Pelissier disclosed, such that the first control area (e.g., top-level function menu 122) includes multiple graphical tools that "can each be selectively activated by a user," and the second control area (e.g., sub-level function menus 124) is "accessible by a hand of the user that is holding the portable ultrasound system" and includes "a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool." EX1007, ¶104.

53

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

### 1.    [1a]

Like Petruzzelli, Pelissier disclosed a portable ultrasound system comprising a hand-held base unit (e.g., hand-held ultrasound unit 10), which "may be used in either hand." EX1005, ¶¶25, 50-51, Fig. 7; *supra* § VIII.A.1; EX1007, ¶¶67-70, 105.



FIG.1

EX1005, Fig. 1. Unit 10 includes touch-sensitive display 14, which displays ultrasound images (e.g., image 27) and "images representing controls with which an operator can interact to control the operation" of the unit. EX1005, ¶25.



FIG.5A

54

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1005, Fig. 5A. Further, unit 10 "may switch between modes in which the controls are positioned for convenient left- or right-handed operation and/or modes in which the controls are positioned for convenient one- or two-handed operation." EX1005, Abstract, ¶33.

### 2.    [1b]

Like Petruzzelli, Pelissier disclosed that hand-held ultrasound unit 10 comprises a programmable processor (e.g., data processor 40) configured to execute instructions (e.g., software 42) that cause the processor to produce a display (e.g., image 27 and controls) on the touchscreen display (e.g., touch-sensitive display 14). EX1005, ¶¶50-53; *supra* § VIII.A.2; EX1007, ¶¶106-08.



FIG. 7

EX1005, Fig. 7 (annotated); EX1007, ¶106. Pelissier disclosed that data processor 40 "may comprise, for example, a microprocessor, microcontroller, digital

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

signal processor or the like," and "is connected to generate an image 27 on display 14 and is also connected to receive inputs from display 14." EX1005, ¶50; EX1007, ¶¶106-07.

As explained, Petruzzelli similarly disclosed that processor 2102 "may include one or more general purpose processors, application specific processors, microcontrollers, digital signal processors, FPGAs, or any other customizable or programmable processing device" to produce a display via touchscreen panel interface 2108. EX1003, ¶¶90-94; *supra* § VIII.A.2; EX1007, ¶108.

### 3.    [1c]-[1e]

As explained, Petruzzelli disclosed and rendered obvious instructions (e.g., interface 100) that cause the processor to produce a display that includes limitations [1c]-[1e]. *Supra* §§ VIII.A.3-5; EX1007, ¶109. Petruzzelli further disclosed that interface 100 can be a touchscreen panel implemented on "an iPad or other suitable tablet computing device." EX1003, ¶27; *supra* §§ VIII.A.1-2. When interface 100 of Petruzzelli is implemented on an iPad, for example, the user can use either the thumb of the hand holding the iPad or the thumb of the user's other hand to select a graphical tool displayed in the first control area (e.g., top-level function menu 122) and selectively activate controls in the second control area (e.g., sub-level function menus 124) to select an attribute of the selected tool. *Supra* §§ VIII.A.3-4. If Patent Owner argues that any of the "user"-related elements of limitations [1c]-[1e] were

56

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

not disclosed or rendered obvious, it would have been obvious to implement GUI

software with the claimed first control area, second control area, and active image

area, as Petruzzelli disclosed (*supra* §§ VIII.A.3-5), on a touchscreen device that can

be held and operated using one-hand, one-thumb operation, as Pelissier disclosed

(*supra* §§ IX.A.1-2), to achieve limitations [1c]-[1e]. EX1007, ¶¶109-16.

In the Petruzzelli-Pelissier system, the first control area (e.g., top-level

function menu 122) includes the multiple graphical tools disclosed in Petruzzelli that

can each be selectively activated by a user touching the corresponding button on the

display; and the second control area (e.g., sub-level function menus 124) includes

the controls disclosed in Petruzzelli that "can be selectively activated by a thumb of

the user" to select an attribute of a selected graphical tool by the user touching the

controls on the display using a thumb. EX1007, ¶110.

Pelissier disclosed that touch-sensitive display 14 can display an ultrasound

image 27 and "images representing controls with which an operator can interact to

control the operation" of hand-held ultrasound unit 10. EX1005, ¶25; EX1007, ¶111.

Pelissier recognized that the various different protocols for performing

ultrasonography required the user to hold the hand-held unit in a variety of different

ways. EX1005, ¶24. When performing cardiac scanning, for example, "it is typical

to hold the transducer in the operator's left hand," whereas "[o]ther types of scanning

may be performed with the transducer held in the operator's right hand." EX1005,

57

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

¶24. As such, Pelissier disclosed a GUI that "may switch between modes in which the controls are positioned for convenient left- or right-handed operation and/or modes in which the controls are positioned for convenient one- or two-handed operation." EX1005, Abstract, ¶¶24, 33.



FIG.5A                    FIG.5B

EX1005, Figs. 5A-5B. Pelissier further disclosed that in the one-handed operation mode, such as in Figure 5B, "user controls are located where they can be reached with the thumb or fingers of the same hand that the operator is using to grasp apparatus 10." EX1005, ¶33, Fig. 5B.

Further, like Petruzzelli, Pelissier disclosed that the control area of touch-sensitive display 14 can include graphical tools and controls to select attributes of those tools, such as a measure tool that utilizes touch pad 28, which "is outside of ultrasound image 27." EX1005, ¶¶35-37; EX1007, ¶¶112-13.

58

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 6

EX1005, Fig. 6. Pelissier disclosed that, using touch pad 28, a user can "indicate a specific position, or positions, on an ultrasound image being displayed on display 14." EX1005, ¶35. Using this measure tool, "[d]istances between different points on an ultrasound image may be measured by specifying the two points and automatically computing the distance between the two points." EX1005, ¶37. Pelissier further explained:

> The operator can move a cursor 29 over image 27 by sliding a finger back and forth, or up and down on virtual touch pad 28. Device 10 detects motions of the operator's finger and adjusts the position of the current cursor 29 on display 14 in response thereto.

EX1005, ¶¶35-37, Fig. 6.

Based on these teachings, it would have been obvious to implement Petruzzelli's GUI on Pelissier's hand-held ultrasound unit to achieve claim 1. *Supra* § VIII.A.4.b; EX1007, ¶114. Indeed, Petruzzelli and Pelissier suggested such a

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

combination, because Petruzzelli disclosed that its "touch screen panel may be part of a discrete computing system incorporating a touch screen panel (e.g., an iPad or other suitable tablet computing device) configured to operate with the ultrasound imaging system" (EX1004, ¶27) and Pelissier disclosed that its touchscreen displayed "controls are positioned for convenient left- or right-handed operation and/or modes in which the controls are positioned for convenient one- or two-handed operation" (EX1005, Abstract, ¶33). And well before 2014, hand-held, touchscreen tablet-type devices, such as those in Pelissier and Petruzzelli, were well known. *Supra* § VII.A; EX1007, ¶114. In the Petruzzelli-Pelissier system, a POSA would have either coupled a separate ultrasound probe to Pelissier's unit 10 via known techniques (such as wired or wireless), as disclosed in Petruzzelli (*supra* §§ VII.B, VIII.A.1), or integrated the ultrasound probe in the same enclosure as unit 10, as disclosed in Pelissier (*supra* §§ VII.D, IX.A.1), both of which would be covered by claim 1, which does not recite the location of the probe in the system. EX1007, ¶114.

In addition to the above express teachings in Petruzzelli and Pelissier, a POSA would have been further motivated to implement Petruzzelli's GUI on the hand-held ultrasound unit of Pelissier because both references disclosed the use of their systems in similar one-handed applications. EX1007, ¶115. For example, Pelissier disclosed that "for performing cardiac scanning it is typical to hold the transducer in the operator's left hand" (EX1005, ¶24) and, similarly, Petruzzelli disclosed that its GUI

60

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

was intended for use in "adult or pediatric cardiac examination," among other uses (EX1004, ¶26). In addition, Petruzzelli's interface provides more features for Pelissier's system, such as annotations, and Pelissier's single-unit system provides a more compact and portable system than Petruzzelli's two-unit system. EX1007, ¶115.



EX1007, ¶115 (modifying and combining Figures 4B and 5B from Pelissier).

Additionally, a POSA would have had a reasonable expectation of success in implementing Petruzzelli's GUI on Pelissier's touchscreen unit because programming a GUI on a touchscreen device would have been routine before 2014. *Supra* § VII.A; EX1007, ¶116. A POSA would have known that the claimed GUI could be run on any standard tablet-type device with a touchscreen display and a programmable, software-based processor, like in Petruzzelli and Pelissier. *Id*. The

61

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

'985 Patent further supports a reasonable expectation of success because it discloses

and claims only a generic touchscreen display and processor, and does not explain

how a POSA would program the claimed GUI in software. EX1001, 8:1-21;

EX1007, ¶116; *Epstein*, 32 F.3d at 1568.

## X.    GROUNDS 4 AND 5: CLAIMS 1-3 ARE ANTICIPATED AND RENDERED OBVIOUS BY GRUNWALD

### A.    Claim 1

#### 1.    [1a] "A portable ultrasound system, comprising a hand-held base unit that includes: a touchscreen display; and"

Grunwald disclosed a portable ultrasound system (e.g., ultrasound

system 100) comprising a hand-held base unit (e.g., display and control unit 2006),

which is coupled (via wired or wireless) to an imaging module (e.g., imaging module

2010) that collects and digitizes ultrasound data. EX1004, ¶¶5 ("handheld ultrasound

imaging device"), 16, 73, 214-21, Fig. 1; EX1007, ¶¶59-66, 117-21.



FIG. 20

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1004, Fig. 20. Figure 20 shows operation mode 2000 for system 2002, which is an embodiment of ultrasound system 100 (Figure 1). EX1004, ¶214. "One hand 2024 holds imaging module 2010 …, while the other hand 2022 holds the display and control unit 2006 by handle 2014." EX1004, ¶215. Grunwald explained that its system may be "advantageously applied" to a variety of "portable systems that may include a mobile telephone, a Personal Digital Assistant (PDA), and/or a portable computer." EX1004, ¶¶69, 216 ("PDA"); EX1007, ¶¶118-19.

Unit 2006 includes a touchscreen display (e.g., screen 2020) for displaying GUI 208. EX1004, Abstract, ¶¶15, 214; EX1007, ¶120. "[U]ser interactions … may be through buttons 2016 on handle 2014 and/***or*** touch sensitive controls areas on screen 2020." EX1004, ¶216 (emphasis added). The buttons and control elements on screen 2020, which is part of input system 104 or input/output system 114 (Figure 1), can be "activated" by a user touching the screen. EX1004, ¶¶74, 217 ("screen 2020 may contain a representation of the buttons 2016 or of other buttons and control elements, which can be activated by touching screen 2020"), 222 ("touch sensitive"), 256 ("user interface provides for random access to any of the active elements through a touchscreen").

As Grunwald explained, "GUI 208 is designed to be used by one-hand and one-thumb operation, and makes use of several intelligent (adaptive and context sensitive) active elements, e.g., windows, soft buttons, tabs, menus, toolbars, and/or

63

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

icons" (EX1004, ¶226), and provides a touchscreen for "direct selection" of

displayed active elements or objects (EX1004, Abstract, ¶15). EX1007, ¶121. "The

touch sensitive screens may be sensitive to heat and/or pressure" or "to a voltage or

current." EX1004, ¶74 ("input when the screens are pressed by a finger").

### 2. [1b] "a programmable processor configured to execute instructions that cause the processor to produce a display on the touchscreen display, including—"

Grunwald's display and control unit 2006 processes and displays information

from ultrasound imaging unit 2004. EX1004, ¶216; EX1007, ¶¶59-66, 122-23.

Unit 2006 includes a programmable processor (e.g., processor system 108)

configured to execute instructions that cause the processor to produce a display (e.g.,

GUI 208) on the touchscreen display (e.g., display 2020). EX1004, ¶71 ("processor

system 108").



FIG. 1          FIG. 2

EX1004, Figs. 1 (annotated), 2; EX1007, ¶ 122.

64

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

Grunwald further disclosed:

> Processor system 108 may include any one of, some of,
> any combination of, or all of multiple parallel processors,
> a single processor, a system of processors having one or
> more central processors and/or one or more specialized
> processors dedicated to specific tasks. Also, processor
> system 108 may include one or more Digital Signal
> Processors (DSPs) in addition to or in place of one or more
> Central Processing Units (CPUs) and/or may have one or
> more digital signal processing programs that run on one or
> more CPU.

EX1004, ¶72. Memory and processing units within unit 2006 are part of memory system 106 and processing system 108 (Figure 1), respectively. EX1004, ¶222. GUI 208 is stored in memory system 106. EX1004, ¶¶75-76, Fig. 2.

### 3. [1c] "a first control area having a number of graphical tools that can each be selectively activated by a user,"

Grunwald disclosed that GUI 208 includes a first control area (e.g., tabbed panel 2306 in control area 2304). EX1004, ¶248; EX1007, ¶¶59-66, 124-29.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 23

EX1004, Fig. 23 (annotated); EX1007, ¶124. This first control area can have a number of graphical tools, which the '985 Patent describes as instruments that a user can "position or overlay" or "implement on" an ultrasound image and that can "identify, label, measure, or otherwise help a user evaluate an image." EX1001, 4:2-7, 4:13-19. Grunwald's tabbed panel 2306 includes graphical tools that can be selectively activated by the user, such as imaging mode tab 2310, patient information tab 2312, and tools tab 2316 in Figure 23, which correspond to menu items 2220, 2312, and 2226 (Figure 22), respectively. EX1004, ¶248.

66

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

Figures 25-26B illustrate views where a user has selected imaging mode

tab 2310, which allows the user to position and size the outline of a region of interest

("ROI") overlaid on the displayed ultrasound image in various modes. EX1004,

¶¶138 (ROI mode 808), 140 (ROI mode 902), 177, 260 (ROI 2516 in Color Flow

mode), 262 (ROI 2618 in PW Doppler mode), 265 (line 2654 and ROI 2656 in CW

Doppler mode), Figs. 8-9; EX1007, ¶125.



FIG. 25

EX1004, Fig. 25 (annotated); EX1007, ¶125. The user may use the overlaid ROI

outline to, for example, zoom on the ROI. EX1004, ¶¶116, 158, 170.

Patient information tab 2312 allows the user to enter patient specific data (e.g.,

patient name), which is overlaid onto the ultrasound image, as illustrated, for

example, by the patient name and/or ID on the ultrasound image in the views of

Figures 23-26B. EX1004, ¶¶250, 271-77, Figs. 23-26B, 27-28; EX1007, ¶126.

67

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 34

EX1004, Fig. 34 (annotated); EX1007, ¶126.

Tools tab 2316 provides access to annotate mode 1304 and measure mode 1306. EX1004, ¶¶83, 249-50, Fig. 15; EX1007, ¶127. In annotate mode 1304, the user may place a text or image annotation on the image. EX1004, ¶¶156, 291 ("text can be moved anywhere on the image by dragging and dropping"). In measure mode 1306, the user may overlay different types of calipers on the image for performing measurements (e.g., distance) or different shapes (e.g., circles, ellipses, and squares) that a user can choose to define an area. EX1004, ¶¶190-92, Figs. 14-15. In Figure 34, the user has selected an annotation mode, which presents a list of body markers that a user can overlay on the ultrasound image, e.g., by "dragging and dropping" a marker onto the image. EX1004, ¶¶292-93.

68

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 34

EX1004, Fig. 34.

Grunwald disclosed that the type and position of the menu items displayed on the touchscreen, including the tabs in tabbed panel 2306, can be customized and included in a preset. EX1004, ¶283; EX1007, ¶128. Grunwald recognized that the presets will correspond to different types of users and allows "for individual customizing for all or some presets." EX1004, ¶246. Thus, a POSA would have understood that Grunwald disclosed configuring tabbed panel 2306 to include tabs for any of the graphical tools in Grunwald. EX1007, ¶¶59-66, 128. For example, tabbed panel 2306 in Figure 34, above, includes imaging mode, patient information, and tools tabs, like in Figure 23, but replaces the user defined preset tab 2314 shown in Figure 23 with an annotation mode tab (labeled with an "A"), which allows the

69

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

user to select text or images (e.g., body markers) that the user can overlay on the ultrasound image. EX1004, ¶¶290-93; Figs. 33-34.

Grunwald disclosed that each graphical tool in panel 2306 can be selectively activated by a user (e.g., directly selected using the touch screen). EX1007, ¶129. As explained, GUI 208 makes use of intelligent active elements or objects (e.g., soft buttons, tabs, and icons) and includes a touchscreen for "direct selection" of those objects. *Supra* § X.A.1; EX1004, Abstract ("active objects, for example tabs"; "touchscreen for direct selection of displayed active objects"), ¶¶15 (same), 256 ("user interface provides for random access to any of the active elements through a touchscreen").

4. **[1d] "a second control area that is accessible by a hand of the user that is holding the portable ultrasound system, wherein the second control area includes a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool, and"**

a. **Ground 4 - Anticipation**

Grunwald disclosed that GUI 208 includes a second control panel (e.g., sub-panel 2308) that is accessible by a hand of the user that is holding the portable ultrasound system. EX1004, ¶248; EX1007, ¶¶59-66, 130-36.

70

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 23

EX1004, Fig. 23 (annotated); EX1007, ¶130. Sub-panel 2308 is positioned along the

left edge of the display and accessible by a hand of the user holding the system, and

any controls in sub-panel 2308 can be selectively activated by a thumb of the user.

EX1004, Figs. 23, 25, 35; EX1007, ¶¶130-31. Grunwald explained, for example,

that "control unit 2006 may include a Personal Digital Assistant (PDA) or be capable

of performing many of or all of the functions associated with a PDA," and that

"screen 2020 on display and control unit 2006 may be touch sensitive." EX1004,

¶216. A PDA can be held in one hand of a user, with sub-panel 2308 being accessible

by the hand of the user holding the PDA (or the hand holding the probe). EX1004,

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

¶¶69, 216; EX1007, ¶131. Like the '985 Patent, Grunwald contemplates a portable ultrasound system that could be in the form factor of a mobile telephone or PDA and a probe, with the user using one hand to hold the base unit and the other hand to hold the probe. *Compare* EX1004, ¶¶69, 216, *with* EX1001, 2:65-3:2, Fig. 1B. Because sub-panel 2308 is accessible by both the hand of the user holding the base unit (e.g., PDA) and the hand of the user holding the probe (e.g. imaging unit 2004), user sub-panel 2308 is "accessible by a hand of the user that is holding the portable ultrasound system." EX1007, ¶131.

When the user selects one of the graphical tools in the first control area (tabbed panel 2306), the second control area (sub-panel 2008) displays a plurality of controls that can be selectively activated by a thumb of the user to select an attribute—e.g., "visual or graphical appearance" (EX1001, 4:34-37)—of the selected graphical tool. *Supra* § X.A.3; EX1007, ¶¶132-36.

For example, when a user selects imaging mode tab 2310, sub-panel 2008 displays controls (e.g., ROI Position and ROI size) to select attributes (e.g., position and size) of the selected ROI overlay tool. EX1004, ¶¶260-61.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 25

EX1004, Fig. 25 (annotated); EX1007, ¶133.

When a user selects patient information tab 2312, sub-panel 2008 displays

controls (e.g., New and Add) to select attributes (e.g., name and ID) of the selected

patient information overlay tool. EX1004, ¶¶271-77, Figs. 27-28.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 27

EX1004, Fig. 27 (annotated); EX1007, ¶134.

When a user selects tools tab 2316, sub-panel 2008 displays controls (e.g., Measure and Annotate) to select an attribute (e.g., a caliper for performing measurements, such as distance, or a shape for defining an area, such as an ellipse) to overlay on the ultrasound image. EX1004, ¶¶83, 189-92 (measure mode 1306, including set calipers mode 1402 and set area mode 1404), 284-85, Figs. 14-15.

74

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 31B

EX1004, Fig. 31B (annotated); EX1007, ¶135.

When the user selects the user-defined preset tab 2314 that has been defined

as an annotation tab, sub-panel 2008 displays controls (e.g., Text, Body Markers,

Indicators) to select from a variety of annotation attributes (e.g., text 3306, body

marker 3308, indicators 3310) to overlay on the ultrasound image. EX1004, ¶¶290-

93, Figs. 33-34.

75

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 33

EX1004, Fig. 33 (annotated); EX1007, ¶136.



FIG. 34

EX1004, Fig. 34 (annotated); EX1007, ¶136.

76

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

### b.    Ground 5 - Obviousness

If Patent Owner argues that Grunwald did not disclose this "second control area" limitation in combination with the claimed "first control area," such a combination would have been obvious based on Grunwald. EX1007, ¶¶137-42. As explained, Grunwald disclosed each of these limitations, including "a first control area" (tabbed panel 2306) and "a second control area" (sub-panel 2308). *Supra* §§ X.A.3-4.a. In addition to the express teachings in Grunwald, it would have been obvious—using known methods with predictable results—to combine a tabbed panel 2306 having graphical tools that can be selectively activated with a sub-panel 2308 that is accessible by a hand of the user and includes controls that can be selectively activated by a thumb of the user to select an attribute of the selected graphical tool. EX1004, ¶¶246, 282-83; EX1007, ¶137.

Grunwald disclosed that the application presets of GUI 208, which include the location of where menu items appear on the display, were fully customizable by a user to accommodate different user types and preferences. EX1004, ¶246; EX1007, ¶138. For example, Grunwald disclosed a setup menu 3110, which included a screen configuration icon 3112, as illustrated in Figure 31A. EX1004, ¶¶282-83.

77

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 31A

EX1004, Fig. 31A (annotated); EX1007, ¶138. Grunwald explained that "[s]creen configuration icon 3112 allows the user to configure the screen by changing its colors, locations of the control area and/or image area and/or otherwise retile the display." EX1003, ¶283. Grunwald further disclosed that "[t]he type and position of the information displayed on the screen, e.g. menu items, measurement results, etc., can be customized and included in a preset." EX1004, ¶283.

Thus, a POSA would have been motivated to combine a tabbed panel 2306 having graphical tools that can be selectively activated—including tabs for annotate, measure, ROI, and/or any of the other graphical tools that Grunwald disclosed— with a sub-panel 2308 that is accessible by a hand of the user and includes controls

78

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

to select an attribute of the selected graphical tool that can be selectively activated by a thumb of the user to facilitate quick and convenient one-handed operation of the GUI implemented on a mobile device. EX1004, ¶¶69, 216; EX1007, ¶139. Indeed, optimizing one-handed, one-thumb use of the handheld ultrasound device was a focus of Grunwald. EX1004, ¶¶16, 19-21, 23.

A POSA would have further understood that customizing and modifying an ultrasound GUI, such as GUI 208, based on the type of user was standard practice. EX1007, ¶¶140-41. Grunwald disclosed, for example, that "[c]ardiology, obstetrics, gynecology, and radiology menu items of application presets menu items 2254 correspond to different types of users." EX1004, ¶246. To accommodate these different users, Grunwald's system "allow[s] for individual customizing of all or some presets." EX1004, ¶246. Such customization to achieve the claimed areas provides the user with quick and convenient access to the tools (and associated controls for setting an attribute) most useful to that particular user. EX1007, ¶140.

A POSA would have had a reasonable expectation of success in customizing GUI 208 to achieve the claimed control areas because Grunwald provided a dedicated screen configuration setup option that allowed a user to change the "locations of the control area and/or image area and/or otherwise retile the display." EX1004, ¶283; EX1007, ¶142. Further, as explained above, even without a screen configuration setup, programming a GUI to implement known graphical tools would

79

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

have been routine before 2014. *Supra* §§ VII.A, VIII.A.4.b; EX1007, ¶142. The '985

Patent further supports a reasonable expectation of success because it does not allege

overcoming any purported problems in programming GUIs, or provide any guidance

on how a software programmer would program the claimed GUI. EX1007, ¶142;

*Epstein*, 32 F.3d at 1568.

### 5.   [1e] "an active image area in which an image of a patient obtained from an ultrasound scan is displayed and at which the selected one of the graphical tools can be overlaid onto the image with the user-selected tool attribute."

Grunwald disclosed that GUI 208 includes a separate active image area (e.g.,

image area 2302) in which an image of a patient obtained from an ultrasound scan

is displayed. EX1004, ¶¶248, 250, 254; EX1007, ¶¶59-66, 143.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 23

EX1004, Fig. 23 (annotated); EX1007, ¶143. As explained, any of the selected

graphical tools described above (e.g., ROI outline, patient information,

measurement, and annotation tools) can be overlaid onto the ultrasound image in the

active image area with the user-selected attributes (e.g., size, shape, text, image, and

position) described above. *Supra* §§ X.A.3-4. For example, like the '985 Patent,

Grunwald disclosed "dragging and dropping" a body marker selected from marker

options displayed in the second control area to anywhere on the ultrasound image.

EX1004, ¶293; EX1007, ¶143.

81

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 34                    Fig. 3D

*Compare* EX1004, Fig. 34, ¶292, *with* EX1001, Fig. 3D, 5:8-13.

> ### B.      Claim 2: "The portable ultrasound system of claim 1 wherein: one of the graphical tools that can be selected is a pictograph; and the second control area includes a control to select an attribute indicative of a region of the human anatomy."

As explained, Grunwald disclosed that one of the graphical tools that can be selected is a pictograph (e.g., annotation tool); and that the second control area includes a control (e.g., markers in annotation list 3402) to select an attribute indicative of a region of the human anatomy (e.g., body marker). *Supra* §§ X.A.3-4; EX1007, ¶¶59-66, 144-45. The '985 Patent describes a "pictograph" as a graphical icon representing, for example, "an anatomical location (e.g., a torso region, a head region, a left-arm region, etc.)." EX1001, 4:38-63. Similarly, Grunwald disclosed allowing the user to select from graphical icons representing anatomical locations (e.g., uterus, breast, and thyroid) located in the second control area (e.g., sub-panel 2308), which may be overlaid on the ultrasound image. EX1004, ¶¶292-93.

82

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



FIG. 34

EX1004, Fig. 34 (annotated); EX1007, ¶145. Grunwald further explained that

"[a]nnotation list 3402 can be used to select a body part marker, for example thyroid

marker 3418, which appears on the image"; "[b]ody markers can be static and/or,

animated graphical objects"; and "an animated body marker can be used to represent

more clearly what is the relative portion of the body being imaged by the ultrasound

transducer." EX1004, ¶293.

### C.    Claim 3

1.    **[3a] "The portable ultrasound system of claim 1 wherein the processor is configured to execute instructions to: display a selected graphical tool at a first location in the first control area or the second control area;"**

As explained, Grunwald disclosed that the processor is configured to execute

instructions to display a selected graphical tool (e.g., a body marker) at a first

83

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

location in the first control area or the second control area. *Supra* §§ X.A-B;

EX1007, ¶¶59-66, 146-47. For example, GUI 208 displays the selected graphical

tool with a user-selectable attribute at a location in sub-panel 2308 (e.g., an

annotation list displaying user-selectable body markers). EX1004, ¶¶69, 216, 246,

282-83, 292-93; *supra* §§ X.A-B.



FIG. 34

EX1004, Fig. 34 (annotated); EX1007, ¶147.

### 2.    [3b] "detect movement of a user's finger from a first location to a second location in the active image area; and"

#### a.    Ground 4 - Anticipation

Grunwald disclosed detecting movement of a user's finger from a first

location to a second location in the active image area. EX1007, ¶¶59-66, 148. As

explained, Grunwald disclosed a user moving a selected body marker from a first

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

location (e.g., from the annotation list displayed in the second control area or from anywhere on the ultrasound image) to a second location in the active image area (e.g., anywhere on the image the user decides) by "dragging and dropping" using a finger pressed against the touchscreen. *Supra* § X.A; EX1004, ¶¶15 ("touch screen for direct selection of displayed active objects"), 216 ("[U]ser interactions … may be through buttons 2016 on handle 1014 and/***or*** touch sensitive controls areas on screen 2020." (emphasis added)), 291 ("text can be moved anywhere on the image by dragging and dropping"; "list of icons representing various body parts that can be placed on the image"), 292 ("annotation list"), 293 ("body part marker can be moved by dragging and dropping"); EX1007, ¶148. Grunwald disclosed detecting the user's finger, including its movement, based on "heat and/or pressure" or based on "voltage or current." EX1004, ¶¶74, 269 ("moved by clicking and dragging using a … finger"); EX1007, ¶148.

### b.    Ground 5 - Obviousness

If Patent Owner argues that Grunwald did not disclose that the touchscreen display can "detect movement of a user's finger from a first location to a second location in the active image area," Petitioner disagrees for the reasons above and, regardless, including such instructions for the touchscreen in Grunwald's system would have been obvious based on Grunwald alone. EX1007, ¶¶149-52.

85

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

As discussed, for example, Grunwald provided that its system may be "advantageously applied" to systems such as a PDA. EX1004, ¶¶69, 216; *supra* § X.A.1; EX1007, ¶150. Moreover, Grunwald explained that that its display may be a touchscreen, and that "***user interactions*** … may be through buttons 2016 on handle 2014 and/***or*** touch sensitive controls areas on screen 2020." EX1004, ¶216 (emphasis added); EX1004, Abstract, ¶¶15, 214. Further, Grunwald disclosed that the "user interface provides for random access to any of the active elements through a touchscreen." EX1004, ¶¶256; EX1004, ¶¶74, 217 ("[S]creen 2020 may contain a representation of the buttons 2016 or of other buttons and control elements, which can be activated by touching screen 2020."), 222 ("touch sensitive").

It would have been obvious—using known methods with predictable results—to enable the "drag and drop" features of Grunwald's GUI by detecting the movement of a user's finger from a first location to a second location in the active image area on Grunwald's touchscreen display. EX1004, ¶¶172, 291-93; EX1007, ¶151. A POSA would have understood that the ability to drag and drop text and other graphical tools in Grunwald within the active image would have been valuable to a user operating the touchscreen display, particularly for Grunwald's PDA embodiment, because dragging and dropping graphical tools through detection of a finger moving on the screen allows the user to direct the placement of the tool directly on the screen—a familiar and convenient practice for users of touchscreen

86

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

devices before 2014, and potentially the only way to move images on the screen for

a PDA embodiment (as Grunwald disclosed) that lacks other non-touchscreen forms

of GUI control. EX1004, ¶¶216-17; EX1007, ¶151.

Further, a POSA would have had a reasonable expectation of success in

enabling the "detect[ion of] movement of a user's finger from a first location to a

second location in the active image area" for the further reason that dragging and

dropping graphical objects using a finger on a touchscreen was routine before 2014.

*Supra* § VII.A; EX1007, ¶152. Moreover, the '985 Patent does not allege

overcoming any purported problems in dragging and dropping within touchscreen

GUIs. *Id*.

### 3.    [3c] "overlay the selected one of the graphical tools at a second location in the active image area in response to the detected movement."

As explained, Grunwald disclosed that, in response the detected movement of

a user's finger (e.g., dragging and dropping using a finger), the GUI will overlay the

selected one of the graphical tools (e.g., selected body marker) at a second location

in the active image area (e.g., anywhere on the ultrasound image to which the user

dragged the selected marker). EX1004, ¶¶156 ("place any number of annotations

anywhere on the image"), 291 ("text can be moved anywhere on the image by

dragging and dropping"; "list of icons … that can be placed on the image"), 293

("select a body marker … which appears on the image"); *supra* §§ X.A-C.2;

EX1007, ¶153.

## XI.    GROUND 6: CLAIMS 1-3 ARE OBVIOUS OVER GRUNWALD AND HYUN

### A.    Claim 1

As explained, Grunwald disclosed and rendered obvious claim 1. *Supra*

§ X.A. If Patent Owner argues that Grunwald did not disclose or render obvious the

"user" related elements of claim 1, these elements would have been obvious based

on the combined teachings of Grunwald and Hyun. EX1007, ¶¶59-66, 71-74, 154-

62. Specifically, it would have been obvious—using known methods to yield

predictable results—to implement a GUI, as Grunwald disclosed, on a hand-held,

touchscreen tablet that can be easily held and operated using one hand, as Hyun

disclosed, such that the first control area (e.g., tabbed panel 2306) includes multiple

graphical tools that "can each be selectively activated by a user," and the second

control area (e.g., sub-panel 2308) is "accessible by a hand of the user that is holding

the portable ultrasound system" and includes "a plurality of controls that can be

selectively activated by a thumb of the user to select an attribute of a selected

graphical tool." *Id.*

#### 1.    [1a]

Like Grunwald, Hyun disclosed a portable ultrasound system comprising a

hand-held base unit (e.g., body 110), which is coupled to an ultrasound probe

88

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

through wired or wireless communication. EX1006, Abstract, ¶¶7, 20; *supra* § X.A.1; EX1007, ¶155. Body 110 has a "size, weight and shape suitable for allowing a user to easily hold by using a single hand." EX1006, ¶21; EX1006, ¶7, claims 1-4, Figs. 6A-8. Body 110 includes a touchscreen display (e.g., touchscreen 120). EX1006, ¶¶20-21, 29, 32, Figs. 2, 5-13.



EX1006, Figs. 7-8.

### 2.    [1b]

Like Grunwald, Hyun disclosed that body 110 comprises a programmable processor (e.g., control unit 116) configured to execute instructions that cause the processor to produce a display on touchscreen 120. EX1006, ¶¶26, 30-42, claims 1-4; *supra* § X.A.2; EX1007, ¶156.

89

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

FIG. 3



EX1006, Fig. 3 (annotated); EX1007, ¶156. Hyun disclosed that control unit 116

that is "operable to control the display of the touch screen according to user

instructions." EX1006, ¶26. As explained, Grunwald also disclosed that the control

unit may include one or more central and/or specialized processors configured to

execute instructions that cause the processor to produce a display on the touchscreen

display. *Supra* § X.A.2; EX1004, ¶72.

> **3.    [1c]-[1e]**

As explained, Grunwald disclosed and rendered obvious instructions (e.g.,

GUI 208) that cause the processor to produce a display that includes limitations [1c]-

[1e]. *Supra* §§ X.A.3-5; EX1007, ¶157. It would have been obvious to implement

GUI software with the claimed first control area, second control area, and active

image area, as Grunwald disclosed and rendered obvious (*supra* §§ X.A.3-5), on a

touchscreen tablet form factor that can be held and operated using one hand, as Hyun

90

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

disclosed (*supra* §§ XI.A.1-2), to achieve limitations [1c]-[1e]. EX1007, ¶¶59-66,

71-74, 157-162. In the Grunwald-Hyun system, the first control area (e.g., tabbed

panel 2306) includes the multiple graphical tools disclosed in Grunwald that can

each be selectively activated by a user touching the tabs on the display; and the

second control area (e.g., sub-panel 2308) includes the controls disclosed in

Grunwald that "can be selectively activated by a thumb of the user" to select an

attribute of a selected graphical tool by the user touching the controls on the display

using a thumb. EX1007, ¶157.

Hyun disclosed that touchscreen 120 displays both ultrasound images and "a

preset touch screen menu for graphic user interface." EX1006, ¶27; EX1007, ¶158.

Figure 5 illustrates that touchscreen 120 may include first display region 121 for

displaying an ultrasound image and second display regions 122 for displaying the

"preset touch screen menu." EX1006, ¶¶27-28, 33.

## FIG. 5



91

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

EX1006, Fig. 5, ¶27. Like Grunwald, Hyun teaches that the user interface may

include menus and sub-menus that may be thumb-activated by touching the items or

"soft buttons" in the menu, as illustrated, for example, in Figure 9. EX1006, ¶¶34-

36.



EX1006, Fig. 9.

Hyun also disclosed the standard touchscreen operations that would be used

to manipulate Grunwald's GUI 208 on a touchscreen display. EX1007, ¶159. For

example, Hyun disclosed user input through various events "while the finger …

touches the touch panel," such as a "tap," "circular drag," "up and down drag," and

"left and right drag" events, as illustrated in Figures 6A-6C. EX1006, ¶28.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



EX1006, Figs. 6A-6C. Hyun also disclosed touchscreen operations for selecting ultrasound modes and parameters and manipulating graphical tools like in Grunwald, such as overlaying and adjusting a region of interest outline or measurement tool using the drag events. EX1006, ¶¶38 ("region of interest"), 41 ("measuring a size of the target object"), Fig. 12; EX1007 ¶159.

Based on these teachings, it would have been obvious to implement Grunwald's GUI on Hyun's portable ultrasound system to achieve claim 1. *Supra* § X.A.4.b; EX1007, ¶¶160-62. The illustration below depicts GUI 208 from Grunwald as it would have been displayed on the tablet-style body 110 from Hyun. EX1004, Fig. 34; EX1006, Fig. 6B.

93

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985



EX1007, ¶160 (depicting GUI 208 illustrated in Figure 34 of Grunwald on body 110 illustrated in Figure 6B of Hyun). Indeed, Grunwald and Hyun both suggested such a combination, because Grunwald disclosed that its GUI may be "advantageously applied" to tablet-style portable systems, such a mobile telephone or PDA, and Hyun disclosed that its smaller, hand-held touchscreen tablet satisfied the "strong need" for an "easy to use" portable ultrasound system that a user can "easily hold by using a single hand." EX1004, ¶¶69 ("present invention may be advantageously applied to a variety of systems such as portable systems that may include a mobile telephone, a Personal Digital Assistant (PDA), and/or a portable computer"), 216 ("PDA"); EX1006, Abstract, ¶¶6-7, 21, 24, 27. And before 2014, hand-held, touchscreen tablets like in Hyun, such as the Apple iPad, were well known. *Supra* § VII.A; EX1007, ¶160.

94

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

In addition to the above express teachings in Grunwald and Hyun, a POSA would have been further motivated to implement Grunwald's GUI on a tablet-type device of Hyun because, as Grunwald recognized, for ultrasound systems in particular, "cumbersome are those user interfaces requiring two hands to operate or transport resulting in encumbrance of using the system for real-time examinations." EX1004, ¶13; EX1007, ¶161. In comparison to the two-part display and control unit embodiment in Grunwald with handle and monitor module, for example, touchscreen tablets like in Hyun were more familiar; offered a larger screen size combined with smaller overall size of the device; and provided improved ergonomics, convenience, ease of use, and portability for users. *Supra* § VII.A; EX1007, ¶161. A POSA would have been particularly motivated to use Hyun's touchscreen tablet to implement Grunwald's GUI for the touchscreen-only implementation that Grunwald disclosed (e.g., PDA), where a handle with physical buttons was not needed. EX1004, ¶216 ("[U]ser interactions … may be through buttons 2016 on handle 2014 and/**_or_** touch sensitive controls areas on screen 2020.") (emphasis added); EX1004, Abstract, ¶¶15, 214; EX1007, ¶161.

Further, a POSA would have had a reasonable expectation of success in implementing Grunwald's GUI on Hyun's touchscreen tablet because programming a GUI on touchscreen device would have been routine before 2014. *Supra* §§ VII.A, IX.A.3; EX1007, ¶162. A POSA would have expected that the claimed GUI could

95

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

be run on any conventional tablet-type device with a touchscreen display and a programmable processor, like in Grunwald and Huyn. *Supra* § VII.A; EX1007, ¶162. The '985 Patent further supports a reasonable expectation of success because it discloses and claims only a generic touchscreen display and processor, and does not explain how a POSA would program the claimed GUI in software. EX1001, 8:1-21; EX1007, ¶162; *Epstein*, 32 F.3d at 1568.

### B.    Claim 2

As explained, Grunwald disclosed each limitation of claim 2. *Supra* § X.B. EX1007, ¶163.

### C.    Claim 3

#### 1.    [3a]

As explained, Grunwald disclosed limitation [3a]. *Supra* § X.C.1. EX1007, ¶¶164-65.

#### 2.    [3b]

As explained, Grunwald disclosed and rendered obvious limitation [3b]. *Supra* § X.C.2. EX1007, ¶166.

If Patent Owner argues that Grunwald did not disclose or render obvious limitation [3b], the combined teachings of Grunwald and Hyun would have rendered this limitation obvious. EX1007, ¶¶167-69. As explained, Grunwald and Hyun both disclosed the conventional "drag and drop" touchscreen functionality for operating the claimed GUI, including the detection of movement of a user's finger from a first

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

location to a second location in the active image area. *Supra* §§ X.C.2, XI.A.3; EX1007, ¶167.

In addition to the express teachings in Grunwald and Hyun, a POSA would have been further motivated to configure the Grunwald-Hyun system to detect movement of a user's finger from a first location to a second location in the active image area because such functionality was necessary for implementing the advantageous, familiar, and convenient "drag-and-drop" functionality using a finger described in Grunwald and Hyun. *Supra* §§ X.C.2, XI.A.3; EX1007, ¶168. For example, Hyun disclosed that such functionality (e.g., "drag events … while the finger … touches on the touch panel") was already built into its touchscreen display, including in the active image area. EX1006, ¶¶28, 38, Figs. 6A-6C, 12.

A POSA would have had a reasonable expectation of success in implementing the ability to detect movement of a user's finger from a first location to a second location in the active image area for the same reasons above. *Supra* §§ X.C.2.b, XI.A.3; EX1007, ¶169. As explained, the claimed system only requires a generic touchscreen display and processor; the software programming required to implement the claimed detection would have been routine; and the '985 Patent itself lacks any explanation of how the claimed detection would have been programmed in software. *Id.*; *Epstein*, 32 F.3d at 1568.

97

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

### 3.     [3c]

As explained, Grunwald disclosed limitation [3c]. *Supra* § X.C.3; EX1007, ¶170.

If Patent Owner argues that Grunwald did not disclose the claimed "in response to the detected movement," it would have been obvious for the reasons above. *Supra* § XI.C.2; EX1007, ¶171. As explained, claim 3 is directed to conventional "drag-and-drop" functionality on a touchscreen display, which Grunwald and Hyun each disclosed. *Supra* §§ X.C, XI.C.2; EX1007, ¶171.

## XII.   SECONDARY CONSIDERATIONS

Petitioner is unaware of any secondary considerations that weigh against institution. EX1007, ¶¶172-74. No secondary considerations were asserted or relied on during prosecution, and Patent Owner has not asserted any in the Litigation. *Id*. Petitioner should not be required to predict which evidence, if any, Patent Owner may argue. Grounds 1 and 4 are anticipation, to which secondary considerations are not relevant. *In re Wiggins*, 488 F.2d 538, 543 (C.C.P.A. 1973).

## XIII.  DISCRETIONARY DENIAL IS NOT APPROPRIATE

There is no basis to deny institution under 35 U.S.C. §§ 325(d) or 314(a). The '985 Patent has not been challenged previously, and this Petition does not rely on prior art or arguments presented during prosecution; therefore, there is no basis to deny institution under Section 325(d). *Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 at 15-19 (PTAB Sept. 6, 2017) (precedential as

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

to § II.B.4.i.). The prior art references relied on herein were not considered by or before the Examiner.

The Petition should not be denied under Section 314(a) because Petitioner stipulates it will not pursue in district court litigation (*supra* § II.B) any ground raised or that could have been reasonably raised before the PTAB in this IPR if this Petition is instituted. *See Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12 at 18-19 (Dec. 1, 2020) (precedential as to § II.A); Memorandum, *Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation*, at 3 (USPTO Dir. June 21, 2022) ("Consistent with *Sotera Wireless, Inc.*, the PTAB will not discretionarily deny institution in view of parallel district court litigation where a petitioner presents a stipulation not to pursue in a parallel proceeding the same grounds or any grounds that could have reasonably been raised before the PTAB.").

## XIV. CONCLUSION

Petitioner respectfully requests the challenged claims be cancelled as unpatentable pursuant to 35 U.S.C. § 318(b).

Respectfully submitted,

Date: October 7, 2022

By: */C. Brandon Rash/*
C. Brandon Rash
USPTO Registration No. 59,121

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## CERTIFICATION UNDER 37 CFR § 42.24(d)

Under the provisions of 37 CFR § 42.24(d), the undersigned hereby certifies

that the word count for the foregoing Petition for *Inter Partes* Review totals 13,891

which is less than the 14,000 allowed under 37 CFR § 42.24(a)(i).

Respectfully submitted,

Date: October 7, 2022

By: /*C. Brandon Rash*/
C. Brandon Rash
USPTO Registration No. 59,121

Counsel for Petitioner
Butterfly Network, Inc.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Petition for *Inter Partes* Review and a copy of the supporting exhibits 1001 through 1026 were served on counsel of record on October 7, 2022, by filing this document through the End-to-End System, as well as delivering a copy via Priority Mail Express to the counsel of record for the Patent Owner at the following address:

159211 - WOMBLE BOND DICKINSON (US) LLP/FUJIFILM SONOSITE
ATTN: IP DOCKETING
P.O. Box 570489
ATLANTA, GA 30357-0037
UNITED STATES

Respectfully submitted,

Date: October 7, 2022

By: */C. Brandon Rash/*
C. Brandon Rash
USPTO Registration No. 59,121

Counsel for Petitioner
Butterfly Network, Inc.

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

## APPENDIX A: CLAIM LISTING

| Claim | Claim Language |
|---|---|
| 1 | A portable ultrasound system, comprising a hand-held base unit that includes:<br><br>a touchscreen display; and<br><br>a programmable processor configured to execute instructions that cause the processor to produce a display on the touchscreen display, including—<br><br>a first control area having a number of graphical tools that can each be selectively activated by a user,<br><br>a second control area that is accessible by a hand of the user that is holding the portable ultrasound system, wherein the second control area includes a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool, and<br><br>an active image area in which an image of a patient obtained from an ultrasound scan is displayed and at which the selected one of the graphical tools can be overlaid onto the image with the user-selected tool attribute. |
| 2 | The portable ultrasound system of claim 1 wherein:<br><br>one of the graphical tools that can be selected is a pictograph; and<br><br>the second control area includes a control to select an attribute indicative of a region of the human anatomy. |

1

Petition for *Inter Partes* Review
of U.S. Patent 9,538,985

| Claim | Claim Language |
|-------|----------------|
| 3 | The portable ultrasound system of claim 1 wherein the processor is configured to execute instructions to:<br><br>display a selected graphical tool at a first location in the first control area or the second control area;<br><br>detect movement of a user's finger from a first location to a second location in the active image area; and<br><br>overlay the selected one of the graphical tools at a second location in the active image area in response to the detected movement. |

2

# EXHIBIT 3

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Butterfly Network, Inc.,
Petitioner

v.

FUJIFILM Sonosite, Inc.,
Patent Owner

Patent No. 7,867,168
Filing Date: November 14, 2006
Issue Date: January 11, 2011

Ultrasonic Transducer Having Distributed Weight Properties

IPR2022-01575

_____

**PETITION FOR *INTER PARTES* REVIEW**

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................................1

II.     MANDATORY NOTICES, FEES, & STANDING ......................................2
        A.      Real Parties-In-Interest...............................................................2
        B.      Related Matters............................................................................2
        C.      Lead & Backup Counsel ..............................................................2
        D.      Service Information......................................................................2
        E.      Certification of Grounds for Standing.........................................3
        F.      Fees..............................................................................................3

III.    STATEMENT OF PRECISE RELIEF REQUESTED ..................................3

IV.     U.S. PATENT 7,867,168 ("THE '168 PATENT")......................................4
        A.      Summary ......................................................................................4
        B.      Challenged Claims .......................................................................7
        C.      Prosecution History .....................................................................7
                1.      U.S. Application 10/925,114...........................................8
                2.      U.S. Application 11/599,120 ..........................................8

V.      LEVEL OF SKILL IN THE ART ..............................................................9

VI.     CLAIM CONSTRUCTION ......................................................................10

VII.    PRIOR ART SUMMARY.........................................................................10
        A.      State of the Art...........................................................................10
                1.      Portable Ultrasound Systems ........................................10
                2.      Digital Interface ............................................................11
                3.      Battery Power Sources..................................................13
        B.      Halmann .....................................................................................14
        C.      Barnes.........................................................................................16
        D.      Honda .........................................................................................17
        E.      Walston .......................................................................................19
        F.      Smith...........................................................................................21

VIII.   GROUNDS 1 AND 2: CLAIMS 1-6, 12-13, AND 15 ARE
        ANTICIPATED AND RENDERED OBVIOUS BY HALMANN...............23
        A.      Claim 1 .......................................................................................23
                1.      [1a] "A system comprising: an ultrasound transducer
                        assembly including an ultrasound transducer array and
                        signal processing circuitry coupled to said transducer
                        array operable to process analog signals from said

i

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

transducer array and provide digital information there from;" ........................................................................................23

2.  [1b] "a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly; and" ......................25

3.  [1c] "a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between;" .............27

4.  [1d] "wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit." ...................................................30

    a.  Ground 1 – Anticipation ...................................................30

    b.  Ground 2 – Obviousness.................................................32

B.  Claim 2: "The system of claim 1, wherein said distribution of said battery source is configured at least in part to result in a desired total weight of said ultrasound transducer assembly, wherein said desired total minimum weight is configured to counterbalance torque forces felt by a user of said transducer assembly." ............................................................................35

C.  Claim 3: "The system of claim 1, wherein an amount of said processing circuitry included in said ultrasound transducer assembly is configured at least in part to result in a desired total weight of said ultrasound transducer assembly." ................................36

D.  Claim 4: "The system of claim 1, wherein said processing circuitry comprises a digital beam former coupled to said transducer array."...............................................................37

E.  Claim 5: "The system of claim 4, wherein said processing circuitry comprises a digital signal processor coupled to said digital beam former.".............................................................38

F.  Claim 6: "The system of claim 1, wherein said digital cable is configured to convey power from said main processing unit to said ultrasound transducer assembly for charging a battery therein." .................................................................................40

G.  Claim 12 ...................................................................................42

1.  [12a] "A method comprising: providing an ultrasound transducer assembly having a transducer array and signal processing circuitry coupled to said transducer array;"...........42

ii

2. [12b] "providing a main processing unit having signal processing circuitry in communication with said signal processing circuitry of said ultrasound transducer assembly via digital data communication" ...............................42

3. [12c] "wherein said ultrasound transducer assembly is connected to said main processing unit with a digital data cable configured to carry said digital information there between; and" ...................................................................43

4. [12d] "distributing battery capacity between said ultrasound transducer assembly and said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit." ...................................................................43

H. Claim 13: "The method of claim 12, further comprising: distributing signal processing circuitry between said signal processing circuitry of said ultrasound transducer assembly and said signal processing circuitry of said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit." .......44

I. Claim 15: "The method of claim 12 wherein said desired total distribution of weight is configured to provide sufficient weight to said transducer assembly to counterbalance torque forces felt by a user of said transducer assembly." ...........................44

IX. GROUND 3: CLAIMS 1-6, 12-13, AND 15 ARE OBVIOUS OVER HALMANN AND HONDA ........................................................................44

A. Claim 1 .....................................................................................44

B. Claim 2 .....................................................................................46

C. Claim 3 .....................................................................................47

D. Claim 4 .....................................................................................47

E. Claim 5 .....................................................................................47

F. Claim 6 .....................................................................................47

G. Claim 12 ...................................................................................48

H. Claim 13 ...................................................................................48

I. Claim 15 ...................................................................................48

X. GROUNDS 4 AND 5: CLAIMS 2-3, 5, 12-13, AND 15 ARE OBVIOUS OVER HALMANN, ALONE OR WITH HONDA, AND WALSTON ................................................................................................48

A. Claim 2 .....................................................................................48

B. Claim 3 .....................................................................................51

iii

C.    Claim 5 ....................................................................................53
D.    Claim 12 ..................................................................................54
E.    Claim 13 ..................................................................................55
F.    Claim 15 ..................................................................................55

XI.    GROUNDS 6 AND 7: CLAIM 6 IS OBVIOUS OVER HALMANN, ALONE OR WITH HONDA, AND SMITH .................................................55

XII.    GROUNDS 8 AND 9: CLAIMS 1-6, 12-13, AND 15 ARE ANTICIPATED AND/OR RENDERED OBVIOUS BY BARNES ............59
A.    Claim 1 ....................................................................................59
    1.    [1a] ...............................................................................59
    2.    [1b] ...............................................................................61
    3.    [1c] ...............................................................................63
    4.    [1d] ...............................................................................66
        a.    Ground 8 – Anticipation ...............................................66
        b.    Ground 9 – Obviousness ...............................................68
B.    Claim 2 ....................................................................................69
C.    Claim 3 ....................................................................................70
D.    Claim 4 ....................................................................................70
E.    Claim 5 ....................................................................................70
F.    Claim 6 ....................................................................................72
G.    Claim 12 ..................................................................................73
    1.    [12a] .............................................................................73
    2.    [12b] .............................................................................73
    3.    [12c] .............................................................................73
    4.    [12d] .............................................................................74
H.    Claim 13 ..................................................................................74
I.    Claim 15 ..................................................................................74

XIII.    GROUND 10: CLAIMS 2-3, 5, 12-13, AND 15 ARE OBVIOUS OVER BARNES AND WALSTON .................................................................74
A.    Claim 2 ....................................................................................75
B.    Claim 3 ....................................................................................76
C.    Claim 5 ....................................................................................76
D.    Claim 12 ..................................................................................77
E.    Claim 13 ..................................................................................77
F.    Claim 15 ..................................................................................77

XIV.    GROUND 11: CLAIM 6 IS OBVIOUS OVER BARNES AND SMITH ..........................................................................................77

XV.    SECONDARY CONSIDERATIONS ............................................................78

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

XVI.  DISCRETIONARY DENIAL IS NOT APPROPRIATE ..............................79

XVII. CONCLUSION........................................................................................80

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bristol-Myers Squibb Co. v. Ben Venue Labs., Inc.*,
    246 F.3d 1368 (Fed. Cir. 2001) ....................................................................35, 41

*Gen. Plastic Indus. Co. v. Canon Kabushiki Kaisha*,
    IPR2016-01357, Paper 19 (PTAB Sept. 6, 2017).................................................79

*Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*,
    814 F. App'x 592 (Fed. Cir. 2020) ......................................................................32

*In re Epstein*,
    32 F.3d 1559 (Fed. Cir. 1994) ....................................................................*passim*

*In re Wiggins*,
    488 F.2d 538 (C.C.P.A. 1973) .............................................................................78

*Kennemetal, Inc. v. Ingersoll Cutting Tool Co.*,
    780 F.3d 1376 (Fed. Cir. 2015) .....................................................................31, 32

*Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*,
    336 F.3d 1373 (Fed. Cir. 2003) .....................................................................43, 44

*PEAG d/b/a JLab Audio v. VARTA Microbattery GmbH*,
    IPR2020-01213, Paper 9 (PTAB Jan. 6, 2021) ...................................................79

*Sotera Wireless, Inc. v. Masimo Corp.*,
    IPR2020-01019, Paper 12 (Dec. 1, 2020) ...........................................................79

*Teva Pharms. USA, Inc. v. Sandoz Inc.*,
    906 F.3d 1013 (Fed. Cir. 2018) .............................................................35, 41, 72

**Statutes**

35 U.S.C. § 314(a) ...................................................................................................79

35 U.S.C. § 318(b) ...................................................................................................80

35 U.S.C. § 325(d) ...................................................................................................79

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

**Other Authorities**

Memorandum, *Interim Procedure for Discretionary Denials in AIA
    Post-Grant Proceedings with Parallel District Court Ligitgation*
    (USPTO Dir. June 21, 2022) ............................................................................79

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

**EXHIBITS**

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 7,867,168 ("the '168 Patent") |
| 1002 | File History of U.S. Patent Application No. 11/599,120 ("the '120 application") |
| 1003 | U.S. Patent Application Pub. No. 2003/0097071 ("Halmann") |
| 1004 | U.S. Patent Application Pub. No. 2003/0013966 ("Barnes") |
| 1005 | Certified English Translation of Japanese Unexamined Patent Application Pub. No. JP 2003-33350A ("Honda") (also attached as Appendix A to EX1056) |
| 1006 | U.S. Patent Application Pub. No. 2003/0139671 ("Walston") |
| 1007 | U.S. Patent Application Pub. No. 2004/0179332 ("Smith") |
| 1008 | Declaration of Dr. Christopher Daft |
| 1009 | Curriculum Vitae of Dr. Christopher Daft |
| 1010 | File History of U.S. Patent Application No. 10/925,114 ("the '114 application") |
| 1011 | U.S. Patent No. 5,971,923 ("Finger") |
| 1012 | U.S. Patent No. 6,491,634 ("Leavitt") |
| 1013 | U.S. Patent No. 5,839,442 ("Chiang") |
| 1014 | U.S. Patent No. 6,530,887 ("Gilbert") |
| 1015 | U.S. Patent Application Pub. No. 2003/0139664 ("Hunt") |
| 1016 | Redline Comparison of the '114 Application and the '120 Application |
| 1017 | U.S. Patent No. 6,416,475 ("Hwang") |
| 1018 | U.S. Patent No. 5,640,960 ("Jones") |
| 1019 | U.S. Patent Application Pub. No. 2004/0225220 ("Rich") |
| 1020 | U.S. Patent Application No. 10/924,390 |
| 1021 | U.S. Patent Application No. 10/847,643 |
| 1022 | U.S. Patent Application No. 10/821,123 |
| 1023 | U.S. Patent Application No. 10/821,198 |
| 1024 | U.S. Patent No. 5,722,412 ("the '412 patent") |

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

| 1025 | U.S. Patent No. 6,471,651 ("the '651 patent") |
|---|---|
| 1026 | U.S. Patent No. 5,772,412 |
| 1027 | U.S. Patent Application No. 10/062,179 |
| 1028 | U.S. Patent Application No. 09/840,002 |
| 1029 | U.S. Patent Application No. 09/630,165 |
| 1030 | U.S. Patent No. 6,135,961 ("Pflugrath") |
| 1031 | U.S. Patent No. 5,817,024 ("Ogle") |
| 1032 | U.S. Patent No. 5,893,363 |
| 1033 | U.S. Provisional Application No. 60/349,949 |
| 1034 | U.S. Patent No. 6,312,381 ("Knell") |
| 1035 | U.S. Patent No. 5,957,846 |
| 1036 | U.S. Patent No. 6,251,073 |
| 1037 | U.S. Patent No. 5,817,024 |
| 1038 | U.S. Patent No. 6,383,139 |
| 1039 | U.S. Patent Application No. 10/184,461 |
| 1040 | U.S. Patent No. 5,579,768 |
| 1041 | U.S. Patent No. 6,398,733 |
| 1042 | U.S. Patent No. 6,980,419 ("Smith419") |
| 1043 | File History of U.S. Patent Application No. 10/099,474 |
| 1044 | U.S. Patent Application Pub. No. 2004/0078505 ("Yu") |
| 1045 | U.S. Patent Application Pub. No. 2006/0033474 ("Shum") |
| 1046 | U.S. Patent Application Pub. No. 2003/0158482 ("Poland") |
| 1047 | Universal Serial Bus Specification, Revision 2.0 (Apr. 27, 2000) ("USB 2.0") |
| 1048 | Universal Serial Bus Specification, Revision 1.1 (Sept. 23, 1998) ("USB 1.1") |
| 1049 | Juin-Jet Hwang et al., *Portable Ultrasound Device for Battlefield Trauma*, 1998 IEEE Ultrasonics Symposium (1998) ("Hwang1998") |
| 1050 | Curtis F. Holmes, *The Role of Lithium Batteries in Modern Health Care*, Journal of Power Sources 97-98 (2001) ("Holmes") |
| 1051 | David M. Spillman & Esther S. Takeuchi, *Lithium Ion Batteries in Medical Devices*, Fourteenth Annual Battery Conference on |

ix

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

|  | Applications and Advances. Proceedings of the Conference (1999) ("Spillman") |
|---|---|
| 1052 | Robert A. Powers, *Batteries for Low Power Electronics*, Proceedings of the IEEE, vol. 83, no. 4 (April 1995) |
| 1053 | Excerpt of David Linden & Thomas B. Reddy, *Handbook of Batteries* (3d ed. 2001) |
| 1054 | U.S. Patent No. 5,865,733 |
| 1055 | Pike et al., *The Prevalence of Musculoskeletal Disorders Among Diagnostic Medical Sonographers*, Journal of Diagnostic Medical Sonography, vol. 13, no. 5 (Sept./Oct. 1997) |
| 1056 | Declaration of Translator Michael Fletcher as to Japanese Unexamined Patent Application Pub. No. JP 2003-33350A |
| 1057 | Japanese Unexamined Patent Application Pub. No. JP 2003-33350A (also attached as Appendix B to EX1056) |
| 1058 | Counsel Declaration as to Submitted Redline Comparison |

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

## I.    INTRODUCTION

The '168 Patent generally claims a battery-powered ultrasound transducer assembly coupled to a battery-powered main processing unit via a digital cable. But such systems were known. Halmann disclosed it. Indeed, Patent Owner had disclosed and claimed it in Barnes—a prior-art U.S. patent publication.

The '168 Patent discloses a prior-art system in Figure 1, which includes a transducer and main processing unit coupled together via an analog cable. The purported invention of the '168 Patent is simply adding a generic battery to each device and moving known components from the processing unit to the transducer assembly—in the same functional configuration—so that the cable carries digital information instead of analog signals. This was not new.

There can be no dispute that:

- The '168 Patent describes and claims only standard components of an ultrasound system, as admitted in prior-art Figure 1.

- The '168 Patent describes and claims nothing novel about moving components—in the same configuration—from the processing unit to the transducer assembly so that the assembly provides digital information over any cable coupled between the devices.

- The '168 Patent describes and claims nothing novel about the transducer assembly and main processing unit each having a battery.

1

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

## II.    MANDATORY NOTICES, FEES, & STANDING

### A.    Real Parties-In-Interest

Petitioner Butterfly Network, Inc. is the real party-in-interest.

### B.    Related Matters

Patent Owner asserted the '168 Patent, among others, against Petitioner in a pending litigation, *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, No. 1:22-cv-309 (D. Del.) ("the Litigation").

### C.    Lead & Backup Counsel

Petitioner provides the following designations of counsel:

| Lead Counsel | Backup Counsel |
|---|---|
| C. Brandon Rash<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>2001 K Street N.W.<br>Washington, DC 20006<br>Tel.: (202) 887-4380<br>Fax: (202) 887-4288<br>brandon.rash@akingump.com<br>USPTO Registration No. 59,121 | Brooks J. Kenyon<br>AKIN GUMP STRAUSS HAUER & FELD LLP<br>One Bryant Park<br>44th Floor<br>New York, NY 10036-6745<br>Tel: (212) 872-8122<br>Fax: (212) 872-1002<br>bkenyon@akingump.com<br>USPTO Registration No. 74,239 |

### D.    Service Information

A Power of Attorney accompanies this Petition pursuant to 37 C.F.R. § 42.10(b). Please address all corresponding to:

AKIN GUMP STRAUSS HAUER & FELD LLP

Petitioner consents to electronic service by email at:

2

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

AG-BFLY-FUJI-IPR@akingump.com

### E.     Certification of Grounds for Standing

Petitioner certifies that the '168 Patent is eligible for IPR and that Petitioner

is not barred or estopped from challenging the claims.

### F.     Fees

Under 37 C.F.R. § 42.103(a), Petitioner authorizes the Office to charge the fee

set forth in 37 C.F.R. § 42.15(a) to Deposit Account No. 50-2310, as well as any

additional fees that might be due in connection with this Petition.

### III.   STATEMENT OF PRECISE RELIEF REQUESTED

Petitioner requests review and cancellation of claims 1-6, 12-13, and 15 on

the following grounds:

| Ground | Claims | Basis |
|---|---|---|
| 1 | 1-6, 12-13, 15 | Anticipated by Halmann |
| 2 | 1-6, 12-13, 15 | Obvious over Halmann |
| 3 | 1-6, 12-13, 15 | Obvious over Halmann and Honda |
| 4 | 2-3, 5, 12-13, 15 | Obvious over Halmann and Walston |
| 5 | 2-3, 5, 12-13, 15 | Obvious over Halmann, Honda, and Walston |
| 6 | 6 | Obvious over Halmann and Smith |
| 7 | 6 | Obvious over Halmann, Honda, and Smith |
| 8 | 1-4, 6, 12-13, 15 | Anticipated by Barnes |
| 9 | 1-6, 12-13, 15 | Obvious over Barnes |
| 10 | 2-3, 5, 12-13, 15 | Obvious over Barnes and Walston |
| 11 | 6 | Obvious over Barnes and Smith |

3

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

## IV.    U.S. PATENT 7,867,168 ("THE '168 PATENT")

### A.    Summary

The '168 Patent is directed to partitioning signal processing functionality and battery capacity between a transducer assembly and main processing unit. EX1001, Abstract, 2:18-32; EX1008, ¶¶39-45. Typical ultrasound devices had a transducer that passed analog signals across a large cable to a separate processing unit. EX1001, 1:32-63, 4:64-5:1. The '168 Patent sought to reduce the cost and size of the cable by partitioning the system so that the output of the assembly is digital data. EX1001, 1:47-2:56, 4:41-47. For better weight balance, the '168 Patent disposes a portion of the power source in the transducer assembly and another portion in the processing unit. EX1001, Abstract, 3:1-11.

Figure 1 shows a "typical" prior-art system, including transducer array 17 coupled to main processing unit 11 via analog cable 18. EX1001, 3:39-4:8.

4

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1001, Fig. 1. Unit 11 includes receiving and transmit channels 12-1T/1R and 12-NT/NR, digital beamformer (DBF) 12, digital signal processor (DSP) 13, back end processing 14, and display 15, all controlled by controller 16. EX1001, 3:50-65. Display 15 can be in housing 11 or "separate from both the main processing unit and from the transducer assembly." *Id.* The '168 Patent states that "operation of processing elements," mentioned above, are discussed in prior-art U.S. Patents 5,772,412 (EX1026)[1] and 6,471,651 (EX1025). EX1001, 1:32-36, 3:65-67.

---

[1] U.S. Patent 5,7**7**2,412 is unrelated. Applicants apparently intended to identify U.S. Patent 5,7**2**2,412 (EX1024). EX1025, 1:23-25.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Figure 2 shows an embodiment where a portion of the signal processing—transmit/receive circuitry 26 and DBF 23—is moved to the transducer assembly. EX1001, 4:9-47.



EX1001, Fig. 2. The interface between DBF 23 and DSP 13 is digital cable 25, which may comprise any digital interface (e.g., USB). EX1001, 4:35-5:7, 5:54-6:11. Replacing the analog cable with a digital cable results in a smaller cable. *Id.* Also, distributing processing functionality to the assembly provides a desired weight. EX1001, Abstract, 2:37-67, 4:48-5:30.

The '168 Patent states "[a] distributed power source configuration may be utilized … such that a portion of the power source is disposed in [the main processing unit] and another portion … is disposed in [the transducer assembly]." EX1001, 3:1-11, 4:48-5:53. Figure 2 illustrates battery 27-1 and battery 27-2. *Id.* The '168 Patent

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

states this embodiment may be utilized with or without passing power through

cable 25. *Id.* This distributed configuration "provide[s] a transducer assembly having

a desired weight." *Id.*

Figure 3 shows further moving DSP 13 to the transducer assembly and

replacing the cable with a wireless interface. EX1001, 6:29-44.



EX1001, Fig. 3.

The '168 Patent also identified co-pending applications. EX1001, 1:12-23;

EX1020-23.

### B.    Challenged Claims

The challenged claims are claims 1-6, 12-13, and 15. App'x A (claim listing).

### C.    Prosecution History

The '168 Patent issued from U.S. Application 11/599,120 ("the '120

application," EX1002), filed November 14, 2006, which is a continuation-in-part of

7

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

U.S. Application 10/925,114 ("the '114 application," EX1010), filed August 24, 2004, now abandoned. EX1008, ¶¶56-63.

### 1.    U.S. Application 10/925,114

Applicants filed the '114 application with claims directed to a transducer comprising a digital beamformer and digital signal processor coupled to a separate processor via a digital cable. EX1010 at 11-15. The Examiner made rejections based on U.S. Patents 5,971,923 ("Finger"), 6,491,634 ("Leavitt"), 5,839,442 ("Chiang"), and 6,530,887 ("Gilbert"), and U.S. Pub. 2003/0139664 ("Hunt") (EX1011-15) because they disclosed and rendered obvious the claims. EX1010 at 178-79, 203-06, 311-13, 365-71. Applicants abandoned the application. EX1010 at 378.

### 2.    U.S. Application 11/599,120

Applicants filed the '120 application as a continuation-in-part, adding another inventor and new disclosure regarding the batteries. *Compare* EX1002 at 4-22, *with* EX1010 at 4-19; EX1016 (redline comparison); EX1058 (counsel declaration). The challenged claims are not entitled to an earlier priority date based on the '114 application, but each asserted reference is prior art even based on the earlier date. EX1008, ¶¶64-67.

The Examiner objected to claims reciting that the assembly and processing unit "are each powered by a same battery power source," because "it is unclear how two separate batteries residing in two separate system components may be deemed

8

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

the 'same battery source.'" EX1002 at 196. Applicants disagreed without explanation, but deleted "same" to advance prosecution. EX1002 at 221, 224.

The Examiner rejected the claims as obvious based on U.S. Patents 6,416,475 ("Hwang") and 5,640,960 ("Jones"), and U.S. Pub. 2004/0225220 ("Rich") (EX1017-19), because Hwang disclosed all claim elements except distributing portions of the power source, which Jones taught. EX1002 at 197-201. Applicants amended the claims to further require a "digital data cable." EX1002 at 221.

The Examiner allowed the claims because the prior art "teaches that the power source is located in one or the other and necessary power is supplied to the other via the cable" and thus "fails to teach a system in which a cable connects a main processing unit to an ultrasound transducer assembly wherein portions of the necessary battery power is distributed between these two units." EX1002 at 234-35. As explained below, however, the prior art—including Halmann and Barnes— disclosed such a configuration.

## V.    LEVEL OF SKILL IN THE ART

A person of ordinary skill in the art ("POSA") at the time of November 14, 2006, would have a degree in electrical engineering, physics, or a related discipline, along with relevant experience (at least 2-3 years for a Ph.D., 3-5 years for a Master's, and 5+ years for a Bachelor's) researching or developing ultrasound systems or other medical imaging devices. EX1008, ¶¶19-26. A POSA would have

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

general knowledge of ultrasound systems and related technologies as of November 14, 2006. *Id.*

If the '168 Patent were entitled to an August 24, 2004 priority date, the POSA would have had the degrees, experience, and knowledge described above as of August 24, 2004, and the challenged claims would be unpatentable for the same reasons herein. *Id.*

## VI.    CLAIM CONSTRUCTION

Petitioner does not believe any terms require construction at this stage for the Board to find all challenged claims unpatentable. EX1008, ¶¶68-69.

## VII.   PRIOR ART SUMMARY

### A.    State of the Art

This section applies equally to the 2004 and 2006 filing dates. EX1008, ¶70.

#### 1.    Portable Ultrasound Systems

Portable ultrasound systems were in widespread use before 2004. EX1004, ¶¶6-7; EX1006, ¶3; EX1012 at 1:14-41; EX1015, ¶3; EX1037, 1:15-40; EX1017 at 1:42-56; EX1046, ¶3; EX1038, 1:46-62; EX1008, ¶71. With the ever-increasing density and advancement of digital electronics and power management, systems in the late 1990s began moving from large stationary systems to handheld size. *Id.* Although most ultrasound systems at the time were large and complex, the use of prior-art digital beamformers and digital signal processing expanded the capabilities of smaller, portable systems. *Id.*

10

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Portable systems came in single or multi-unit configurations. EX1037, 1:15-40; EX1008, ¶72. Standard hardware included digital beamformers to form image data from ultrasound echo waves, digital signal processors to process the image data, and central processing units to control the system. *Id.*; EX1015, ¶¶24, 35, Fig. 5; EX1017, 2:36-62, Fig. 1; EX1030 at 2:41-3:5, Fig. 1; EX1031 at 2:40-3:17, Fig. 1; EX1038 at 3:21-49, Fig. 1.

### 2.    Digital Interface

Before 2004, there were several standard digital interfaces for carrying digital information and power between two devices, including ultrasound systems, via a digital cable, including USB and IEEE 1394 (FireWire) interfaces. EX1003, ¶22; EX1004, ¶32; EX1007, ¶81; EX1011, 9:28-39; EX1014, 3:46-67, 11:16-34, 26:35-57, Figs. 3A, 7A; EX1015, ¶49; EX1034, 29:1-15; EX1042 at 11:51-56; EX1045, ¶¶1-6, 15-17; EX1047, ii, 1-11; EX1008, ¶73. Prior art, such as Halmann and Gilbert, disclosed using a standard digital cable (e.g., USB) to couple a transducer assembly to a main processing unit, and prior art, such as Smith, Knell, and Finger, disclosed incorporating USB and other "industry standard interfaces" into ultrasound systems. *Id.*

USB 1.0, 1.1., and 2.0 released in 1996, 1998, 2000, respectively. EX1008, ¶74. These USB standards specified techniques for implementing data and power interfaces, digital cables, and connectors. *Id.*; EX1047, 1-24, 85-89, 119; EX1048.

11

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

A POSA would have been familiar with these specifications, which were publicly

available before 2004. *Id.* For example, USB 2.0 described a cable for transferring

power and digital signals over a four-wire cable. *Id.*



**Figure 4-2.  USB Cable**

EX1047, 17-24, 85-89, 119; EX1048.

Prior art, such as Yu, also described a standard USB interface in rechargeable

battery-powered devices. EX1008, ¶75.



FIG. 1

12

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

EX1044, Fig. 1 (annotated). USB connector 11 (in **red**) has power (+5V, GND) and

data (D+, D-) pins. EX1044, Abstract, ¶¶4, 7, 12-13, claim 1; EX1045, ¶1-4.

### 3.    Battery Power Sources

Before 2004, it was also conventional to include batteries in a portable

ultrasound system. EX1003, ¶¶18, 23; EX1004, ¶¶13, 36, claim 39; EX1005, ¶¶1-

15, 24-26, claims 1-3, Fig. 1; EX1006, ¶¶18, 33-38, Fig. 1; EX1007, ¶¶111-13,

Fig. 11; EX1013, Abstract, 5:27-36; EX1014 at 3:46-67, 11:16-34, 26:35-57,

Figs. 3A, 7A; EX1015, ¶¶22, 46; EX1018 at 6:7-11; EX1046, ¶¶35-36, claims 1-2,

10, 12, Fig. 10; EX1049, 1663-64; EX1008, ¶¶76-77. In multi-unit systems, it was

known and within the skill of the art to include a battery in each unit. *Id.*; *infra*

§§ VII.B-F; EX1018 at 6:7-11, 7:12-46, 12:33-51, Figs. 1, 3. Batteries were included

to eliminate the need to have the system always connected to an AC power supply.

EX1008, ¶¶76-77. Batteries also offered new applications that require portability,

such as "diagnosing trauma in the combat battlefield" and "bringing quality medical

imaging to the bedside, areas of natural disaster, or remote areas." *Id.*; EX1049

at 1663-64; EX1005, ¶¶1-3. Battery-powered ultrasound systems allowed imaging

in practically any location, including places without power sources or with smaller

space. *Id.*

Small, rechargeable batteries with high energy density, such as lithium-ion

batteries, were known and widely available in varying capacities. EX1005, ¶14;

13

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

EX1015, ¶46; EX1049 at 1664; EX1050 at 739-40; EX1051 at 203-07; EX1052

at 687-91; EX1053 at 22.1-4; EX1008, ¶¶78-80.

### B.    Halmann

Halmann is U.S. Patent Application Pub. 2003/0097071, published May 22,

2003. It is prior art under pre-AIA § 102(b).

Halmann disclosed a portable ultrasound system using an off-the-shelf

personal digital assistant ("PDA") device coupled to a hand-held probe assembly

through a standard digital interface, such as a USB cable. EX1003, Abstract, ¶¶2, 8,

10, claim 13, Fig. 1B ("realistic illustration"); EX1008, ¶¶81-86.



EX1003, Fig. 1B (annotated). Halmann recognized traditional systems were often

large, expensive and lacked portability. EX1003, ¶¶3-4. Halmann saw the need for a

portable, inexpensive, and easy-to-use system that performs digital beamforming in

the probe assembly to increase flexibility. EX1003, ¶¶7, 38.

14

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

As illustrated in Figures 1 and 5, the system includes hand-held probe assembly 2 and PDA 120. EX1003, ¶¶11, 18; EX1008, ¶¶83-86.



FIG. 1

EX1003, Fig. 1; EX1003, Fig. 5. Probe assembly 2 includes transducer head 10 and beamforming module 40. EX1003, ¶18. Probe assembly 2 converts analog signals from transducer array 20 to digital signals using analog-to-digital converter (ADC) 80, and performs digital beamforming in ASIC 90. EX1003, ¶¶21, 27-29. Probe assembly 2 may include "external battery/power source 110" or an "internal battery." EX1003, ¶¶18, 23.

Probe assembly 2 and PDA 120 exchange digital information across interface 150, which may be wired (e.g., USB) or wireless (e.g., Bluetooth). EX1003, ¶22, Fig. 1. PDA 120 receives and processes digital information from probe

15

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

assembly 2, and displays an ultrasound image on display 125. EX1003, Abstract,

¶¶24, 31. PDA 120 includes an "internal battery" that provides power to the system.

EX1003, Abstract, ¶¶8, 18.

### C.    Barnes

Barnes is U.S. Patent Application Pub. 2003/0013966, published January 16,

2003. It is prior art under pre-AIA § 102(b). Barnes was assigned to Patent Owner

and incorporated the full disclosure of several related applications. EX1004, Title

Page, ¶1; EX1024; EX1027-32.

Barnes disclosed a portable ultrasound system including a first body (main

processing unit) having system electronics and battery power supply coupled to a

second body or "transducer assembly." EX1004, ¶¶13, 32, 36, claims 39, 42;

EX1008, ¶¶87-93. "The transducer assembly has a digital beam former, an A/D

circuit, a transducer array, [and battery] power supply." *Id*. The first and second

bodies each have a "transmit/receive element," which may be wired or wireless, to

carry digital information between the bodies. *Id.*

16

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1004, Fig. 20 (annotated). Figure 20 illustrates a digital cable coupled between the bodies. *Id.*; EX1043 at 203, 289, 298, 322; EX1008, ¶¶88-89.

### D.    Honda

Honda is Japanese Patent Application Pub. JP 2003-33350A, published February 4, 2003. EX1005; EX1056-57. It is prior art under pre-AIA § 102(b).

Honda disclosed portable ultrasound systems, including a transducer assembly (e.g., probe 20) coupled to an off-the-shelf, battery-powered PDA (e.g., PDA 10). EX1005, ¶¶6-8, 14-15, claims 1-3, Fig. 1; EX1008, ¶¶94-96.

17

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1005, Figs. 1, 5. Honda disclosed that, even in a system having a wired connection (e.g., cable 7 or interface 3), it is advantageous to include another battery (e.g., battery 5) for powering the transducer assembly "to avoid draining the battery of the PDA 10." EX1005, ¶¶6-8, 14, claims 2-3, 6. Honda saw the need for a portable system that allows ultrasonic imaging in "any location." EX1005, Abstract, ¶¶1, 3, 5-6, 10, 24, 26.

18

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1005, Figs. 2, 6.

### E.    Walston

Walston is U.S. Patent Application Pub. 2003/0139671, published July 24, 2003. It is prior art under pre-AIA § 102(b).

Walston disclosed a portable ultrasound system that includes a transducer assembly (e.g., transducer 14) coupled to a main processing unit (e.g., housing 18) via a wired (e.g., cable 22) or wireless connection. EX1006, ¶¶18-21, 34, 42, Figs. 1-8; EX1008, ¶¶97-101.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1006, Figs. 2, 7. Walston recognized that portable ultrasound systems existed but

saw a need to perform imaging in unregulated environments. EX1006, ¶¶1-5;

EX1034-38. Transducer 14 includes a transducer array and may also include

"additional electronics, such as preamplifiers and/or portions of the transmit and

beam forming circuitry" and a "battery." EX1006, ¶¶19-20, 42. Housing 18 includes

ultrasound circuitry 20, including for example "a digital signal processor" and

"general processor," and "battery 44." EX1006, ¶¶18, 33-38, 42, Fig. 1. Walston

further disclosed that "part or all of the ultrasound circuitry 20 is included within

transducer 14" or "distributed amongst" transducer 14, housing 18, and display 16.

EX1006, ¶38.

20

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Walston also incorporated three patent documents. EX1006, ¶¶1, 20, 35;

EX1033; EX1040-41.

### F.    Smith

Smith is U.S. Patent Application Pub. 2004/0179332, filed March 12, 2003,

and published September 16, 2004. It is prior art under pre-AIA § 102(b). Smith

issued as U.S. Patent 6,980,419 ("Smith419," EX1042), which is prior art under pre-

AIA § 102(e). Smith and Smith419 are materially identical, and the disclosures the

Petition relies on in Smith, including for Grounds 6-7 and 11, are also in Smith419.

EX1008, ¶103. If the '168 Patent is entitled to the 2004 priority date, claim 6 would

be unpatentable for the same reasons in Grounds 6-7 and 11 based on Smith419. *Id.*

Smith disclosed a portable assembly (e.g., portable ultrasound unit 12)

coupled to a transducer (e.g., transducer 16) and a main processing unit (e.g.,

docking cart 14). EX1007, ¶¶7-8, 46-48, 65-67, 73-83, 111-13; EX1008, ¶¶102-06.

Portable unit 12 includes signal processing circuitry, including an analog-to-digital

(A/D) converter and digital beam former, coupled to transducer 16, which processes

the analog signals from the transducer array to provide digital information to cart 14.

*Id.*

21

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



FIG. 11

EX1007, Fig. 11. Digital communications circuitry 110 and 112 convey digital information between unit 12 and cart 14 via connector 114 using any digital format (e.g., USB or FireWire). EX1007, ¶¶80-83.

Portable unit 12 includes power control circuitry 148 and battery 152, and cart 14 includes power control circuitry 144 and battery 146. EX1007, ¶¶111-13,

22

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Fig. 11. Power control circuitry 144 conveys power (e.g., from an AC supply or battery 146) to power control circuitry 148 via connector 150. *Id.* Power control circuitry 148 distributes power from cart 14 or battery 152 to components in unit 12. *Id*. Battery 152 powers components of unit 12, including circuitry for generating drive signals for and receiving reflected acoustic waves from the transducer array. EX1007, ¶¶48, 65-66, 72-79, 84, 111-13. "[T]he cart's internal battery 146 … may (if desired) be used to supplement or replace the power supplied by [] battery 152." EX1007, ¶¶111-13. Power control circuitry 144 and 148 may also be used to recharge battery 152 in unit 12. *Id.*

## VIII. GROUNDS 1 AND 2: CLAIMS 1-6, 12-13, AND 15 ARE ANTICIPATED AND RENDERED OBVIOUS BY HALMANN

### A. Claim 1

1. **[1a] "A system comprising: an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from;"**

Halmann disclosed a system comprising an ultrasound transducer assembly (e.g., probe assembly 2). EX1003, Abstract, ¶¶6-10, 18, claim 13 ("system for performing ultrasound imaging"); EX1008, ¶¶107-09.

23

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1003, Fig. 1B (annotated). Probe assembly 2 includes an ultrasound transducer

array (e.g., array 20) coupled to signal processing circuitry (e.g., multiplexer 30 and

circuitry in module 40). EX1003, ¶¶9, 18-21, 24, 27-29, claim 13 ("transducer head

attaching to said beamforming module to form a hand-held probe assembly").



24

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

EX1003, Fig. 1 (annotated); EX1003, Fig. 5 (same, except eliminating folder 50 and designing VCA and ADC to handle 16 channels); EX1008, ¶85. Processing circuitry (in **blue**) processes analog signals from the array (in **red**) (e.g., through multiplexer 30, transmit/receive switching module 35, folder module 50, and voltage controlled amplifier (VCA) 70) and converts them to digital information using an analog-to-digital converter ("ADC") (e.g., ADC 80). EX1003, ¶¶9, 19-21, 27-29, 36, claims 14 ("analog signals from … transducer elements"), 15 ("ADC"), 16. Halmann explained, "It is more desirable to perform beamforming in the digital domain by first converting ultrasound data from the analog domain to the digital domain." EX1003, ¶¶6, 8-9, 38. The ADC connects to a beamforming application-specific integrated circuit ("ASIC") (e.g., ASIC 90), which connects to an interface controller (e.g., USB controller 100). EX1003, ¶¶9, 21-22, 29, claim 16 ("interface controller"). USB controller 100 provides digital information to a PDA through a standard digital interface (e.g., interface 150). *Id.*

> **2.    [1b] "a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly; and"**

Halmann disclosed a main processing unit (e.g., PDA 120), which is an off-the-shelf PDA (e.g., a Palm Pilot running Windows applications) "modified to include ultrasound data processing and application software" and is separated from the transducer assembly (e.g., probe assembly 2) by a standard digital interface (e.g.,

25

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

a USB cable). EX1003, Abstract, ¶¶2, 8-10, 19, 22, claim 17 ("PDA includes

software to perform ultrasound data processing functions."); EX1008, ¶110.





EX1003, Fig. 1B (annotated). PDA 120 (in **red**) sends digital control signals to, and

receives digital information from, the assembly via interface 150 in the USB cable

(in **blue**). EX1003, ¶¶22, 24-25, claims 13, 16. PDA 120 processes the digital

information and displays ultrasound images. EX1003, ¶¶9, 24, 30-31, claims 17-18.

26

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1003, Fig. 1 (annotated); EX1003, Fig. 5 (same).

    **3.    [1c] "a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between;"**

Halmann disclosed a digital data cable (e.g., USB cable) for carrying digital information between the transducer assembly (e.g., probe assembly 2) and PDA, as shown in the "realistic illustration" of Figure 1B. EX1003, Abstract, ¶¶12, 21-22, claims 13, 16, 18-20; EX1008, ¶¶111-12.

27

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1003, Fig. 1B (annotated).

The '168 Patent uses the term "cable" to refer to a "USB … or other standard

or proprietary digital interface," and to distinguish such interfaces from "a wireless

interface." EX1001, 5:54-63. Similarly, Halmann disclosed a digital data cable (e.g.,

USB cable) as distinguished from a "wireless interface." EX1003, ¶22, Fig. 1B ("140

& 150"). Figures 1 and 5 illustrate digital interface 150 (in **blue**) connected to the

PDA and interface controller 100 (in **red**) in the assembly. EX1003, ¶¶21-22.

28

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



F/G. 1

EX1003, Fig. 1 (annotated); EX1003, Fig. 5 (same). Digital interface 150 is, for

example, a wired USB interface. EX1003, ¶22; EX1008, ¶112. The "realistic

illustration" in Figure 1B shows a digital cable for carrying digital information

(digital interface 150) between the transducer assembly and PDA. EX1003, ¶12;

*supra* § VII.A.2; EX1008, ¶¶73-75, 112.

If Patent Owner argues Halmann did not disclose a "cable," it would have

been obvious to use a USB cable as digital interface 150, according to known

methods to yield predictable results. EX1008, ¶¶73-75, 113-15. A POSA would have

known that such cables were inexpensive, lightweight, flexible, widely available,

and based on the well-known USB standard. *Id.*; *supra* § VII.A.2. And prior art

disclosed incorporating USB interfaces into ultrasound systems and using a standard

29

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

digital cable, including USB, to couple a transducer assembly to a main processing unit. *Id.*

A POSA would have had a reasonable expectation of success implementing a USB cable based on the known "industry standard" and the existing USB interface controllers in Halmann's assembly and PDA. *Supra* § VII.A.2; EX1004, ¶22, Figs. 1, 5; EX1008, ¶¶73-75, 114-15. The '168 Patent supports a reasonable expectation of success because it only mentions using well-known standards, or any "other standard or proprietary digital interface," for the digital cable. EX1001, 5:54-59.

> **4.    [1d] "wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit."**

> **a.    Ground 1 – Anticipation**

Halmann disclosed that its system is powered by a battery power source, wherein portions are distributed between the transducer assembly (e.g., probe assembly 2) and main processing unit (e.g., PDA 120). EX1003, Abstract, ¶¶8, 18, 23; EX1008, ¶¶116-19. The '168 Patent discloses a "distributed power source configuration," such that "a portion of the power source is disposed in [the] main processing unit and another portion is disposed in [the] transducer assembly." EX1001, 3:1-5, 5:11-33. For example, Figures 2 and 3 illustrate battery 27-1 in the main processing unit, and battery 27-2 in the assembly. EX1001, 5:19-25, Figs. 2, 3.

30

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Halmann disclosed a "distributed" configuration like in the '168 Patent. In Halmann, the PDA includes an internal battery to power the system. EX1003, Abstract, ¶¶8, 18, claims 22, 24. The battery in the PDA can provide power to the transducer assembly across battery power interface 140 (e.g., a USB cable). EX1003, ¶18, claim 22; EX1008, ¶117. Figures 1 and 5 illustrate an optional external battery power source (e.g., battery/power source 110) for the assembly. EX1003, ¶21, claim 23, Figs. 1, 5. This external battery may be integrated into module 40, becoming an "internal battery." EX1003, ¶¶23, 34, claim 25.

Accordingly, Halmann disclosed each limitation of claim 1, as arranged in the claim, because Halmann disclosed an embodiment that includes the claimed "digital data cable" in paragraph 22, and immediately follows in paragraph 23 that this *same* embodiment may include an external or internal battery for the transducer assembly in addition to the battery in the PDA. EX1003, ¶¶18-23; EX1008, ¶¶118-19. Halmann further illustrates a digital data cable and distributed power source in the *same* block diagram, as shown in Figures 1 and 5 and further in the "realistic illustration" of Figure 1B. EX1003, Figs. 1, 1B, 5.

Even if it were not an express embodiment, Halmann would still anticipate claim 1 because a POSA would "at once envisage" the claimed combination of a "digital data cable" and "distributed" battery power source. *See Kennemetal, Inc. v. Ingersoll Cutting Tool Co.*, 780 F.3d 1376, 1381-83 (Fed. Cir. 2015). Halmann

31

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

disclosed only two options for the digital interface—(1) wired (e.g., USB) or (2) wireless (e.g., Bluetooth) (EX1003, ¶22, claims 19-22)—and two options for the battery power source—(1) only in the PDA or (2) distributed between the transducer assembly and PDA (EX1003, ¶¶18-23, 34, claims 22-26). Thus, the number of combinations in Halmann is finite and small enough that the claimed combination would have been immediately apparent to a POSA. *Kennemetal*, 780 F.3d at 1381-83; EX1008, ¶119.

Indeed, the prior art in *Kennemetal* did not spell out the claimed combination and disclosed more possible combinations than Halmann, only one of which anticipated, and the Federal Circuit still affirmed anticipation. 780 F.3d at 1381-83; *see Hayward Indus., Inc. v. Pentair Water Pool & Spa, Inc.*, 814 F. App'x 592, 596-97 (Fed. Cir. 2020) ("A prior art reference … does not need to include an 'express discussion of the actual combination to anticipate,' but may instead teach that the disclosed elements may be combined such that [a POSA] could implement the combination."). Indeed, "prior art references should be considered for all that they teach, rather than being limited to a particular embodiment." 814 F. App'x at 596.

b.    **Ground 2 – Obviousness**

If Patent Owner argues Halmann did not disclose limitations [1c] and [1d] together, such a combination would have been obvious based on Halmann. EX1008, ¶¶120-28. As explained, Halmann disclosed each limitation of claim 1, including an

32

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

internal battery in the transducer assembly, an internal battery in the PDA, and a USB cable for conveying digital information between the two. *Supra* §§ VIII.A.1-4.a. In addition to these express teachings, it would have been a matter of common sense and common knowledge to include a battery in a transducer assembly coupled to a PDA via a USB cable, as Halmann and other prior art disclosed, using known methods to yield predictable results. EX1008, ¶120.

Battery-powered transducer assemblies were known. *Supra* §§ VII.A.1, VII.A.3, VIII.A.4.a; EX1008, ¶¶71-72, 121. It was also known that such assemblies increased portability and reduced the need for examination rooms equipped with power sources and larger space. *Id*.

Coupling a transducer assembly to a battery-powered PDA using a standard USB cable was also known. *Supra* §§ VII.A.2, VIII.A.3; EX1008, ¶¶73-75, 122. A POSA would have been motivated to distribute a portion of the battery power source to the assembly in such a system based on known advantages of (1) increasing the battery power source capacity in the system, which allows for longer use times between having to recharge or replace batteries; (2) reducing the drain on the PDA battery from the assembly's electronics; and (3) allowing a manufacturer to design a transducer assembly with a sufficient, reliable, and efficient power supply, without being limited by or dependent on the power capabilities of the main processing unit

33

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

(e.g., PDA) that a user may connect to the assembly. *Supra* §§ VII.A.3, VII.D, VII.F; EX1008, ¶¶76-80, 123-25.

A POSA would have had a reasonable expectation of success in configuring Halmann's wired assembly-PDA system to include a battery in the transducer assembly. EX1008, ¶¶126-28. Integrating a battery in portable medical devices, including transducer assemblies, was conventional, and the ways of doing so would be materially the same whether the interface was wired or wireless. *Supra* §§ VII.A.2-3, VIII.A.4.a; EX1008, ¶¶73-80, 126-27. The '168 Patent acknowledges doing so was within the skill of a POSA because it provides only a high-level functional reference to the power source configuration. EX1001, 3:1-11, 5:11-53, Fig. 2; EX1008, ¶128. The '168 Patent does not provide any specific structure, battery type, or power control system, or identify anything unpredictable for accomplishing a "distributed" power source—nor does it suggest how a POSA would design or implement any specific circuitry for doing so. *Id.* When a patent provides no details on implementation, it is fair to conclude they are within the skill of a POSA. *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994).

34

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

      **B.**      **Claim 2: "The system of claim 1, wherein said distribution of said battery source is configured at least in part to result in a desired total weight of said ultrasound transducer assembly, wherein said desired total minimum weight is configured to counterbalance torque forces felt by a user of said transducer assembly."**

Halmann disclosed and rendered obvious claim 2 for the same reasons as claim 1. *Supra* § VIII.A; EX1008, ¶¶129-33. As explained, Halmann disclosed and rendered obvious "said distribution of said battery source." *Supra* § VIII.A.4.

The remaining "desired" element is non-limiting because it does not "require any additional required structure or condition for the claims." *Teva Pharms. USA, Inc. v. Sandoz Inc.*, 906 F.3d 1013, 1023 (Fed. Cir. 2018). There is also nothing in the intrinsic record that suggests this element was central to patentability or used to meaningfully distinguish the prior art. *See Bristol-Myers Squibb Co. v. Ben Venue Lab'ys, Inc.*, 246 F.3d 1368, 1377 (Fed. Cir. 2001). The "desired" element is merely the intended result or purpose of the structure already recited in claim 1 that the manufacturer provides. EX1001, Abstract, 2:37-3:11, 4:51-5:30; EX1008, ¶131. The "desired … weight" results from the manufacturer distributing portions of the battery power source between the ultrasound transducer assembly and the main processing unit, as recited in claim 1. *Id.* And claim 2 says "to result in."

The '168 Patent confirms the "desired" element does not require any additional structure or otherwise limit the claim. EX1008, ¶¶132-33. It states that "a user may feel the effects of torque [that] may result from a cable … hanging down

35

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

next to the user's hand, with a lighter transducer having a larger cable" in reference to "large and heavy" analog cables. EX1001, 1:47-50, 4:1-8, 4:64-5:1. The '168 patent addresses these "effects of torque" by using a "digital" cable, making the cable lighter than an analog cable, and by distributing portions of the signal processing circuitry and battery power source to the transducer assembly, making the assembly heavier than one having only a transducer array. EX1001, 2:53-56, 4:35-40, claim 1. The '168 Patent describes no further structural detail to achieve a "desired … weight." EX1008, ¶133.

**C.    Claim 3: "The system of claim 1, wherein an amount of said processing circuitry included in said ultrasound transducer assembly is configured at least in part to result in a desired total weight of said ultrasound transducer assembly."**

Halmann disclosed and rendered obvious claim 3 for the same reasons as claims 1 and 2. *Supra* §§ VIII.A-B; EX1008, ¶¶134-35. As explained, Halmann disclosed "an amount of said processing circuitry included in said ultrasound transducer assembly," and the remaining "desired" element is non-limiting because it does not require any additional structure. *Id.* Like claim 2, claim 3 recites "to result in," and the "desired … weight" results from the manufacturer including an amount of the processing circuitry in the transducer assembly, as recited in claim 1. *Id.*; *supra* § VIII.A.1.

36

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

**D.**    **Claim 4: "The system of claim 1, wherein said processing circuitry comprises a digital beam former coupled to said transducer array."**

As explained, Halmann disclosed that the processing circuitry comprises a digital beamformer coupled to the transducer array. *Supra* § VIII.A.1; EX1008, ¶¶136-37. Figures 1 and 5 show a transducer assembly (e.g., probe assembly 2) comprising transducer array 20 coupled to module 40 via multiplexer 30, and module 40 comprising ADC 80, which converts analog signals to digital signals and outputs the digital signals to beamforming ASIC 90. *Supra* §§ VII.B, VIII.A.1; EX1003, ¶¶8 ("Digital beamforming is performed within the beamforming module by a beamforming ASIC."), 19-21, 28-29, claims 14-15.



EX1003, Fig. 1 (annotated); EX1003, Fig. 5 (same). Halmann explained:

37

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

> The beamforming ASIC 90 is a digital ASIC performing beamforming in the digital domain and providing beamforming flexibility. For example, the beamforming ASIC 90 may be digitally loaded with various beamforming coefficients and instructions from the PDA 120 to perform different types of digital beamforming.

EX1003, ¶29.

### E.    Claim 5: "The system of claim 4, wherein said processing circuitry comprises a digital signal processor coupled to said digital beam former."

Halmann disclosed that the processing circuitry in the transducer assembly (e.g., probe assembly 2) comprises a digital signal processor ("DSP") coupled to the digital beamformer. EX1008, ¶¶138-41. As explained, module 40 includes a digital beamformer. *Supra* §§ VIII.A.1, VIII.D. Halmann further disclosed that "module 40 may comprise custom hardware elements such as a small circuit board with digital signal processors." EX1003, ¶37.

A POSA would have understood the DSP in module 40 is coupled to the digital beamformer. EX1008, ¶140. Because a DSP processes digital signals, it is located in the digital portion of module 40, between ADC 80 and controller 100. EX1003, Figs. 1, 5. The only other component in the digital portion is beamforming ASIC 90. *Id.* Coupling the DSP to the beamforming ASIC is consistent with the purpose of a

38

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

DSP in this application—to process digital information from the beamforming ASIC before it is transmitted to the PDA. EX1003, ¶¶6, 9; EX1008, ¶141.

If Patent Owner argues Halmann did not disclose this limitation, it would have been obvious to couple a DSP to the digital beamformer in the transducer assembly—according to known methods to yield predictable results. EX1008, ¶¶142-45. A POSA would have been motivated to include a DSP in that assembly to provide additional, optimized, and efficient digital image and blood flow processing, irrespective of the main processing unit (e.g., PDA) that a user connects to the assembly and to meet the performance and features of cart-based systems. *Supra* § VII.A.1; EX1008, ¶¶71-72, 142. Including a DSP in the transducer assembly also had the known benefit of reducing the processing load of the main processing unit (e.g., PDA). *Supra* §§ VII.A.1, VII.D; EX1008, ¶¶71-72, 143.

A POSA would have had a reasonable expectation of success because these components were common and coupling a DSP to a digital beamformer was routine. *Supra* § VII.A.1; EX1008, ¶¶71-72, 144. The '168 Patent supports this because it discloses and claims a generic DSP (EX1001, 3:55-59, 6:29-37, Figs. 1-3) and explains nothing unpredictable about coupling a DSP to a digital beamformer or how a POSA would do so. EX1008, ¶145; *Epstein*, 32 F.3d at 1568. The '168 Patent also admits that it was "typical" to couple a DSP to a digital beamformer in the same

39

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

enclosure, as in prior-art Figure 1 and a referenced, prior-art patent. EX1001, 1:31-36, 3:50-67, Fig. 1; EX1025 at 4:27-47, Fig. 3; EX1008, ¶145.

> **F.      Claim 6: "The system of claim 1, wherein said digital cable is configured to convey power from said main processing unit to said ultrasound transducer assembly for charging a battery therein."**

Halmann disclosed and rendered obvious that the digital cable (e.g., USB cable) is configured to convey power from the processing unit (e.g., PDA 120) to the transducer assembly (e.g., probe assembly 2) "for charging a battery therein." *Supra* § VIII.A.3; EX1008, ¶¶146-50. Consistent with standard USB cables at the time, Halmann taught that its USB cable was configured to convey data via digital interface 150 <u>and</u> power via battery power interface 140, as shown in Figures 1, 1B, and 5. *Id.*



EX1003, Fig. 1B (annotated), ¶¶18, 22. The single USB cable (in **blue**) includes both digital interface 150 and power interface 140. *Id*. The stated purpose—"for charging a battery therein"—does not further structurally limit "said digital cable []

40

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

configured to convey power," or otherwise limit the claim. EX1008, ¶148; *see Teva Pharms.*, 906 F.3d at 1023. Claim 6 does not recite what in the processing unit is supplying the power being conveyed or for which battery in the assembly the digital cable is configured. Also, nothing in the intrinsic record suggests this element is central to patentability or was used to distinguish the prior art. *Bristol-Myers*, 246 F.3d at 1377. Rather, "charging a battery" is the intended purpose of the structure already recited in claim 6—"said digital cable [] configured to convey power." EX1008, ¶148. The Examiner objected to this claim (then claim 9) "for failing to provide further structural limitations," and the applicants amended the claim to recite only how the "digital cable is configured," i.e., "to convey power." EX1002 at 196, 221-22; EX1008, ¶¶60-61, 149. A POSA would have understood that the USB cable in Halmann is configured to transfer power via interface 140 for any purpose, including for charging a battery. *Supra* §§ VII.A.2-3; EX1008, ¶¶73-80, 150.

If Patent Owner argues Halmann did not disclose claim 6, because it requires additional circuitry "for charging a battery," it would have been obvious, according to known methods to yield predictable results. EX1008, ¶¶151-55. Halmann disclosed a *rechargeable* battery in the assembly and conveying power over standard interfaces, like USB. EX1003, ¶¶18, 34, claim 52, Figs. 1, 1B, 5. A POSA would have been motivated to configure the Halmann system to charge the battery in the transducer assembly using power conveyed over the USB cable because doing so

41

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

would have lowered the operating costs and size of the system, eliminated the need to carry extra charging equipment, and allowed longer operating times, reducing the possibility of the transducer assembly running out of power during a diagnostic procedure. *Supra* §§ VII.A.2-3, VII.F; EX1008, ¶¶73-80, 152-53.

A POSA would have had a reasonable expectation of success configuring the Halmann system to charge the battery in the transducer assembly using power conveyed over the USB cable, such as by including battery charging circuitry in the transducer assembly, because doing so was known and within the skill of a POSA. *Supra* §§ VII.A.2-3; EX1008, ¶¶73-80, 154. The '168 Patent provides only a cursory mention of battery charging, which further supports a reasonable expectation of success. EX1001, 5:33-53; EX1008, ¶155; *Epstein*, 32 F.3d at 1568.

## G. Claim 12

### 1. [12a] "A method comprising: providing an ultrasound transducer assembly having a transducer array and signal processing circuitry coupled to said transducer array;"

Halmann disclosed limitation [12a] for the same reasons as [1a]. *Supra* § VIII.A.1; EX1008, ¶¶156-57.

### 2. [12b] "providing a main processing unit having signal processing circuitry in communication with said signal processing circuitry of said ultrasound transducer assembly via digital data communication"

Halmann disclosed limitation [12b] for the same reasons as [1b]. *Supra* § VIII.A.2; EX1008, ¶158.

42

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

> **3.    [12c] "wherein said ultrasound transducer assembly is connected to said main processing unit with a digital data cable configured to carry said digital information there between; and"**

Halmann disclosed and rendered obvious limitation [12c] for the same reasons as [1c]. *Supra* § VIII.A.3; EX1008, ¶¶159-60.

> **4.    [12d] "distributing battery capacity between said ultrasound transducer assembly and said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit."**

Halmann disclosed and rendered obvious limitation [12d] for the same reasons as [1d] and claim 2. *Supra* §§ VIII.A.4, VIII.B; EX1008, ¶¶161-62. As explained, the "desired" element is non-limiting. *Id.*; *see Minton v. Nat'l Ass'n of Sec. Dealers, Inc.*, 336 F.3d 1373, 1381 (Fed. Cir. 2003) (finding language "in a method claim is not given weight when it simply expresses the intended result").

If Patent Owner argues Halmann did not disclose limitations [12c] and [12d] together, such a combination would have been obvious for the same reasons as [1d]. *Supra* § VIII.A.4.b; EX1008, ¶162.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

      **H.    Claim 13: "The method of claim 12, further comprising: distributing signal processing circuitry between said signal processing circuitry of said ultrasound transducer assembly and said signal processing circuitry of said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit."**

Halmann disclosed and rendered obvious claim 13 for the same reasons as claim 3. *Supra* § VIII.C; EX1008, ¶¶163-64. As explained, the "desired" element is non-limiting. *Id.*; *Minton*, 336 F.3d at 1381.

      **I.    Claim 15: "The method of claim 12 wherein said desired total distribution of weight is configured to provide sufficient weight to said transducer assembly to counterbalance torque forces felt by a user of said transducer assembly."**

Halmann disclosed and rendered obvious claim 15 for the same reasons as claim 2. *Supra* § VIII.B; EX1008, ¶¶165-66. As explained, the "desired" element is non-limiting. *Id.*; *Minton*, 336 F.3d at 1381.

**IX.    GROUND 3: CLAIMS 1-6, 12-13, AND 15 ARE OBVIOUS OVER HALMANN AND HONDA**

      **A.    Claim 1**

Halmann disclosed and rendered obvious claim 1. *Supra* § VIII.A. If Patent Owner argues Halmann did not disclose or render obvious limitations [1c] and [1d] together, such a combination would have been obvious—using known methods to yield predictable results—based on the combined teachings of Halmann and Honda. *Supra* §§ VIII.A.3-4; EX1008, ¶¶167-70.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Similar to Halmann, Honda disclosed portable ultrasound systems including a transducer assembly (e.g., probe 20) coupled to an off-the-shelf PDA (e.g., PDA 10) with an expansion module (e.g., module 102, 202, 302). EX1005, Abstract, ¶¶4-5, 13-17, 20-24, claims 1-2, Figs. 1-6; EX1008, ¶168. Probe 20 may be integrated into the same assembly as the expansion module (e.g., Figure 6). *Id.* Probe 20 and PDA 10 are coupled together by a wired connection (e.g., cable 7 or interface 3). EX1005, Abstract, ¶¶7-8, 13, 17-18, claims 4-5, Figs. 1-6. The system included a battery for PDA 10 (e.g., battery 16) and another battery for probe 20 (e.g., rechargeable battery 5). EX1005, ¶¶4-8, 14-19, 21-24, claim 3, Figs. 2, 4, 6. Figures 5 and 6, for example, show probe 20 in the same hand-held assembly as scanning controller 4 and rechargeable battery 5. EX1005, ¶¶20-24.



45

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

EX1005, Figs. 5-6. Rechargeable battery 5 for the probe is "a [small-sized] battery with high energy density … (for example, a lithium ion battery or a nickel cadmium battery)." EX1005, ¶14.

Honda described express motivations for providing another battery for probe 20, even though it is wired to PDA 10: "The reason why the battery 5 is provided separately from the battery of the PDA 10 is to avoid draining the battery of the PDA 10 due to transmission of ultrasonic waves that require a relatively high amount of power." *Supra* § VII.D; EX1008, ¶¶76-80, 169. Honda also disclosed doing so would enable ultrasound imaging in "any location." *Id.*

Accordingly, it would have been obvious based on the combined teachings of Halmann and Honda to configure Halmann's wired assembly-PDA system (with USB cable) to include a battery in Halmann's transducer assembly in addition to the battery in the PDA, to achieve claim 1, for the reasons explained above for Ground 2 (including both the motivations and reasonable expectation of success) in combination with the express teachings and motivations in Honda. *Supra* §§ VII.A.1, VII.A.3, VII.D, VIII.A.4.b; EX1008, ¶¶71-72, 76-80, 170.

### B. Claim 2

Claim 2 was disclosed and rendered obvious by Halmann and would have been obvious based on the combined teachings of Halmann and Honda for the same reasons above. *Supra* §§ VIII.B, IX.A; EX1008, ¶¶171-72.

46

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

### C.    Claim 3

Claim 3 was disclosed and rendered obvious by Halmann and would have been obvious based on the combined teachings of Halmann and Honda for the same reasons above. *Supra* §§ VIII.C, IX.A; EX1008, ¶¶173-74.

### D.    Claim 4

Claim 4 was disclosed and rendered obvious by Halmann and would have been obvious based on the combined teachings of Halmann and Honda for the same reasons above. *Supra* §§ VIII.D, IX.A; EX1008, ¶¶175-76.

### E.    Claim 5

Claim 5 was disclosed and rendered obvious by Halmann and would have been obvious based on the combined teachings of Halmann and Honda for the same reasons above. *Supra* §§ VIII.E, IX.A; EX1008, ¶¶177-79. As further motivation to couple a DSP to the digital beamformer, Honda disclosed moving functions from the PDA to the transducer assembly to reduce the processing load of the PDA. EX1005, ¶25; *supra* § VIII.E; EX1008, ¶179.

### F.    Claim 6

Claim 6 was disclosed and rendered obvious by Halmann and would have been obvious based on the combined teachings of Halmann and Honda for the same reasons above. *Supra* §§ VIII.F, IX.A; EX1008, ¶¶180-82. Like Halmann, Honda disclosed using a rechargeable battery in the transducer assembly. *Supra* § IX.A.

47

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

### G.    Claim 12

Halmann disclosed and rendered obvious claim 12. *Supra* § VIII.G. If Patent

Owner argues Halmann did not disclose or render obvious limitations [12c] and

[12d] together, such a combination would have been obvious based on the combined

teachings of Halmann and Honda for the same reasons as claims 1 and 2. *Supra*

§§ VIII.G, IX.A-B; EX1008, ¶183.

### H.    Claim 13

Claim 13 was disclosed and rendered obvious by Halmann and would have

been obvious based on the combined teachings of Halmann and Honda for the same

reasons as claim 3. *Supra* §§ VIII.H, IX.C, IX.G; EX1008, ¶¶184-85.

### I.    Claim 15

Claim 15 was disclosed and rendered obvious by Halmann and would have

been obvious based on the combined teachings of Halmann and Honda for the same

reasons as claim 2. *Supra* §§ VIII.I, IX.B, IX.G; EX1008, ¶¶186-87.

### X.    GROUNDS 4 AND 5: CLAIMS 2-3, 5, 12-13, AND 15 ARE OBVIOUS OVER HALMANN, ALONE OR WITH HONDA, AND WALSTON

### A.    Claim 2

Halmann, alone or with Honda, disclosed and rendered obvious claim 2.

*Supra* §§ VIII.B, IX.B. If Patent Owner argues the "desired" elements are not

disclosed or rendered obvious, these elements would have been obvious—using

known methods to yield predictable results—based on the combined teachings of

48

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Halmann, alone (Ground 4) or with Honda (Ground 5), in view of Walston. EX1008, ¶¶188-96.

Walston disclosed portable ultrasound systems similar to the Halmann and Halmann-Honda systems, including a portable, battery-powered transducer assembly (e.g., transducer 14) coupled to a portable, battery-powered main processing unit (e.g., housing 18). *Supra* § VII.E; EX1006, ¶¶18-19, 47-48; EX1008, ¶189. Walston disclosed the assembly and processing unit could be coupled via a wired or wireless connection. *Id.* Walston explained that an ultrasound system can be any desired size, shape, and weight. *Id.* The transducer assembly can be "sized to be small for portability" or "larger, such as being sized to be generally similar to the size of the housing 18 or larger," and "[t]he weight is also similar but may be less or more." *Id.* Also, "[t]he size of the transducer 14 may be increased to provide more balanced electronic weight distribution." *Id.* Similarly, Honda disclosed configuring the system, which includes a battery power source, to be "a size and weight that readily enables portability," even "in one hand," so that "diagnosing … at any location becomes possible." EX1005, ¶¶4-8, Fig. 6; EX1008, ¶190.

Based on the combined teachings, a POSA would have been motivated to configure the distribution of the battery source in the Halmann or Halmann-Honda system to result in a "desired total weight" of the transducer assembly and a "desired total minimum weight … to counterbalance torque forces felt by a user." EX1008,

49

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

¶¶191-94. Consistent with common knowledge and other prior art, Walston disclosed sizing the assembly and internal electronics, which includes the battery, to provide a "balanced electronic weight distribution." *Supra* § VII.A.3; EX1006, ¶47; EX1008, ¶¶76-80, 191. The size of the assembly can be the same size as the housing or larger, which would be substantially more than any "minimum weight" to "counterbalance torque forces felt by a user," particularly given the Halmann and Halmann-Honda systems include a lightweight USB cable. *Supra* § VII.A.2; EX1006, ¶19; EX1008, ¶¶73-75, 192. Walston confirmed it would have been common sense and common knowledge for any POSA designing a portable assembly to configure its size, shape, and weight to maximize functionality, ease of use, and comfort for the user, including to reduce the likelihood of any musculoskeletal injuries. EX1006, ¶¶18-19, 47-48; EX1055 at 219, 224-27; EX1008, ¶193. A POSA also would have also known that increasing the weight of the battery had the added benefit of increasing its capacity, for longer use before having to recharge or replace the battery. *Supra* §§ VII.A.3, VIII.A.4; EX1008, ¶¶71-72, 76-80, 194.

A POSA would have had a reasonable expectation of success in configuring the "distributed" power source to result in the claimed "desired" weight. *Supra* §§ VII.A.1, VII.A.3; EX1008, ¶¶71-72, 76-80, 195. Configuring the distribution of the battery source to result in the "desired" weight was known, and indeed necessary,

50

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

when designing portable ultrasound systems. *Id.* The '168 Patent acknowledges that doing so was within the skill of a POSA because it provides only a high-level functional reference—providing an example of "one third" capacity in the assembly and "two thirds" capacity in the processing unit and, stating that "other distribution ratios may be utilized." EX1001, 5:19-30; EX1008, ¶196. It also does not describe any specific structure or method, or identify anything unpredictable, for achieving the claimed "desired" weights, which further supports that the "desired" elements were within the skill of a POSA. *Id.*; *Epstein*, 32 F.3d at 1568.

## B.    Claim 3

Halmann, alone or with Honda, disclosed and rendered obvious claim 3. *Supra* §§ VIII.C, IX.C. If Patent Owner argues the "desired" element is not disclosed, this element would have been obvious—using known methods to yield predictable results—based on the combined teachings of Halmann, alone (Ground 4) or with Honda (Ground 5), in further view of Walston. EX1008, ¶¶197-201.

As explained, Walston disclosed portable ultrasound systems like the Halmann and Halmann-Honda systems and explained that the transducer assembly may be of any size, shape, and weight, including smaller for "portability" or larger for "more balanced electronic weight distribution." *Supra* § X.A. Walston's transducer includes a transducer array and may also include "additional electronics, such as preamplifiers and/or portions of the transmit and beam forming circuitry."

51

EX1006, ¶¶19-20. Walston further disclosed "ultrasound circuitry," such as a "beam former" and "digital signal processor," and explained that "part or all of the ultrasound circuitry" may be included in transducer 14, or "distributed amongst" transducer 14, housing 18, and display 16. EX1006, ¶¶37-38.

Based on the combined teachings, a POSA would have been motivated to configure "an amount of said processing circuitry included in said ultrasound transducer assembly" in the Halmann or Halmann-Honda system to result in "a desired total weight" of the assembly. *Supra* § X.A; EX1008, ¶199. As explained, Walston disclosed the "ultrasound electronics" may be "distributed amongst" the assembly and processing unit (EX1006, ¶¶37-38), and the assembly and internal electronics may be sized, smaller or larger, to provide for portability and "balanced electronic weight distribution" (EX1006, ¶47). *Supra* § X.A.

A POSA would have had a reasonable expectation of success in configuring an amount of the processing circuitry to result in the claimed "desired total weight" because distributing circuitry between a transducer assembly and processing unit, as Walston and other prior art disclosed, was known and routine. *Supra* §§ VII.A.1, X.A; EX1008, ¶¶71-72, 200. The '168 Patent further supports a reasonable expectation of success because it provides only a high-level functional reference to moving a portion of the known circuitry in the prior-art ultrasound system of Figure 1 into an assembly that includes the transducer array and connecting the

52

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

assembly and processing unit with a standard digital interface. EX1001, 3:50-59, 4:28-40, 6:29-37, Figs. 1-3; EX1008, ¶201. The '168 Patent does not provide any specific structure or method—nothing beyond functional, black-box diagrams—or identify anything unpredictable for achieving "an amount of said processing circuitry … to result in a desired total weight." Nor does it suggest how a POSA would move the known circuitry from the prior-art system to a transducer assembly. *Epstein*, 32 F.3d at 1568.

### C.    Claim 5

Halmann, alone or with Honda, disclosed and rendered obvious claim 5. *Supra* §§ VIII.E, IX.E. If Patent Owner argues otherwise, claim 5 would have been obvious based on the combined teachings of Halmann, alone (Ground 4) or with Honda (Ground 5), in further view of Walston. EX1008, ¶¶202-05.

Walston disclosed that "ultrasound circuitry 20" may include a "digital signal processor" ("DSP"), in addition to a "transmit beam former" and "receive beam former" (EX1006, ¶37), and that "part or all of the ultrasound circuitry 20 is included within the transducer 14" (EX1006, ¶38). A POSA would have understood that the DSP is coupled to the receive beamformer to process image data from the beamformer. *Supra* § VIII.E; EX1008, ¶203. As explained, Halmann, alone and with Honda, disclosed that the processing circuitry in the transducer assembly comprised a digital beamformer coupled to the transducer array. *Supra*

53

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

§§ VIII.D, IX.D. Accordingly, it would have been obvious to modify the Halmann

or Halmann-Honda transducer assembly—using known methods to yield predictable

results—to include a DSP coupled to the digital beamformer. EX1008, ¶¶202-05.

Halmann and Walston each disclosed integrating a DSP into the transducer

assembly for the purpose of achieving the desired size, weight, and feature balance

between the assembly and main processing unit. *Supra* §§ VIII.E, X.B. Coupling a

DSP to the digital beamformer in the Halmann or Halmann-Honda assembly would

have had the known benefit of additional, sufficient, and efficient image processing

capabilities for the system, irrespective of the PDA used in the system and to meet

the performance and features of conventional cart-based systems. *Supra* §§ VII.A.1,

VIII.E; EX1008, ¶¶71-72, 204. It also had the known benefit of reducing the

processing load of the PDA. *Id.*

A POSA would have had a reasonable expectation of success for the same

reasons above, including the reasons that these components were common and

coupling a DSP to a digital beamformer was routine. *Supra* §§ VII.A.1, VIII.E, IX.E;

EX1008, ¶¶71-72, 205.

### D.    Claim 12

Halmann, alone or with Honda, disclosed and rendered obvious claim 12.

*Supra* §§ VIII.G, IX.G. If Patent Owner argues the "desired" element is not disclosed

or rendered obvious, this element would have been obvious based on the combined

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

teachings of Halmann, alone (Ground 4) or with Honda (Ground 5), in further view

of Walston, for the same reasons as claims 1 and 2. *Supra* §§ VIII.A, IX.A-B, X.A;

EX1008, ¶206.

### E.    Claim 13

Halmann, alone or with Honda, disclosed and rendered obvious claim 13.

*Supra* §§ VIII.H, IX.H. If Patent Owner argues the "desired" element is not disclosed

or rendered obvious, this element would have been obvious based on the combined

teachings of Halmann, alone (Ground 4) or with Honda (Ground 5), in further view

of Walston, for the same reasons as claim 3. *Supra* § X.B; EX1008, ¶207.

### F.    Claim 15

Halmann, alone or with Honda, disclosed and rendered obvious claim 15.

*Supra* §§ VIII.I, IX.I. If Patent Owner argues the "desired" element is not disclosed

or rendered obvious, this element would have been obvious based on the combined

teachings of Halmann, alone (Ground 4) or with Honda (Ground 5), in further view

of Walston, for the same reasons as claim 2. *Supra* § X.A; EX1008, ¶208.

## XI.    GROUNDS 6 AND 7: CLAIM 6 IS OBVIOUS OVER HALMANN, ALONE OR WITH HONDA, AND SMITH

Halmann, alone or with Honda, disclosed and rendered obvious claim 6.

*Supra* §§ VIII.F, IX.F. As explained, the Halmann and Halmann-Honda systems

include a digital cable (e.g., USB cable) configured to convey power from the main

processing unit to the transducer assembly for any purpose required by the assembly.

55

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

*Supra* §§ VIII.F, IX.F. Claim 6 requires nothing more. *Id.*; EX1008, ¶209. If Patent Owner argues Halmann did not disclose or render obvious claim 6, because it requires additional circuitry "for charging a battery," it would have been obvious— using known methods to yield predictable results—based on the combined teachings of Halmann, alone (Ground 6) or with Honda (Ground 7), in further view of Smith. EX1008, ¶¶210-14.

Smith disclosed an ultrasound system including a portable assembly (e.g., portable ultrasound unit 12) coupled to a transducer (e.g. transducer 16) and a main processing unit (e.g., docking cart 14). *Supra* § VII.F; EX1008, ¶211. Unit 12 and cart 14 are connected via connectors that carry digital information (e.g., connector 114) and power (e.g., connector 150). *Id.* Figure 11 shows the system includes power control circuitry and a battery in each of unit 12 (e.g., circuitry 148 and battery 152, in **red**) and cart 14 (e.g., circuitry 144 and battery 146, in **blue**). *Id.*

56

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



FIG. 11

EX1007, Fig. 11 (annotated). Battery 152 in portable unit 12 powers components of

unit 12, including circuitry for generating drive signals for and receiving reflected

acoustic waves from transducer 16. *Supra* § VII.F; EX1008, ¶211. Battery 146 in

docking cart 14 is used to supplement the power supplied to portable unit 12 by

57

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

battery 152. *Id.* Power control circuitry 144 and 148 may also recharge battery 152 in portable unit 12. *Id.*

Based on the combined teachings, a POSA would have been motivated to configure the Halmann or Halmann-Honda system to charge the battery in the transducer assembly using power conveyed over the USB cable. EX1008, ¶212. Smith disclosed a system that conveys power from a battery in a main processing unit to charge a battery in a portable assembly that controls an ultrasound transducer. *Id.* Moreover, a POSA would have been motivated to charge the battery in the transducer assembly in the Halmann or Halmann-Honda system with power conveyed over the USB cable because doing so would have lowered the operating costs and size of the system, eliminated the need to carry extra charging equipment, and allowed longer operating times, reducing the possibility of the assembly running out of power during a diagnostic procedure. *Supra* §§ VII.A.2-3, VIII.F; EX1008, ¶¶73-80, 212.

A POSA would have had a reasonable expectation of success in configuring the Halmann or Halmann-Honda system to charge the battery using power conveyed over the digital cable, such as by including battery charging circuitry in the transducer assembly, because doing so was known and within the skill of a POSA. EX1008, ¶213. For example, charging a battery using power conveyed from another battery was known and within the skill of a POSA, as Smith disclosed. *Supra*

58

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

§ VIII.F. And other prior art disclosed battery charging circuitry for a USB device that controls charging of an internal battery and reasons for doing so, such as "trickle charging." *Supra* § VII.A.2; EX1044, Abstract, ¶¶4, 7, 12-13, claim 1; EX1045, ¶¶6, 15-17; EX1054 at 10:27-43; EX1008, ¶¶73-75, 213. A POSA also would have had access to USB specifications, which described the power capabilities of a USB cable. *Id.* The '168 Patent further supports a reasonable expectation of success for the reasons above. *Supra* § VIII.F; EX1008, ¶214; *Epstein*, 32 F.3d at 1568.

## XII.    GROUNDS 8 AND 9: CLAIMS 1-6, 12-13, AND 15 ARE ANTICIPATED AND/OR RENDERED OBVIOUS BY BARNES

### A.    Claim 1

#### 1.    [1a]

Barnes disclosed a system comprising an ultrasound transducer assembly (e.g., "second body") including an ultrasound transducer array (e.g., "transducer array") coupled to signal processing circuitry (e.g., "digital beam former, A/D converter circuit, … second transmit/receive element"). EX1004, ¶¶13, 36 ("transducer assembly has a digital beam former, an A/D circuit, a transducer array, a second power supply, a second transmit and receive element"), claim 39; EX1008, ¶¶215-17. Figure 20 illustrates the "headset" embodiment described in paragraphs 13 and 36, and recited in claim 39. *Id.*; EX1043 at 288, 298; EX1008, ¶89.

59

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1004, Fig. 20 (annotated). The circuitry processes analog signals from the array,

converting them to digital information using the "A/D converter circuit" and further

processing the digital information using the "digital beam former." EX1004, ¶¶13,

36, claim 39; EX1008, ¶216. The transducer assembly provides digital information

from the digital beamformer via a "transmit/receive element," which is a wired

connection. EX1004, ¶¶13, 32 ("digital information goes between the body and the

transducer assembly"), 36, claims 39, 42 ("system as described in claim 39, wherein

the first and second transmit/receive elements … are wires"); EX1043 at 679, 682.

Barnes further described the same processing circuitry, including a digital

beamformer coupled to a transducer array in a common enclosure in U.S. Patent

5,817,024 (EX1031), "the full disclosure[] of which" Barnes incorporated. EX1004,

60

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

¶1; EX1031, Abstract, 2:54-3:17, 4:59-6:67, 7:1-8:54 (describing front-end (FE) ASIC, including A/D converter (ADC) and digital beamformer), claim 1, Figs. 1, 5-7; EX1008, ¶217.



**FIG. 1**

EX1031, Fig. 1 (annotated). As shown in Figure 1 above, transducer array 10 (in **red**) is coupled via T/R ASIC 20 (in **green**) to an ADC and digital beamformer formed by the "DELAY" and "SUM" blocks (in **blue**) in front end (FE) ASIC 30. EX1031, 1:55-65, 2:54-65, 6:12-24, 7:13-41, claims 1-5, Figs. 1, 6-7, 10-12, 15; EX1008, ¶217.

### 2.    [1b]

Barnes disclosed a main processing unit (e.g., "first body"), which is separated from the transducer assembly (e.g., "second body") by a wired cable. EX1004, ¶¶13,

61

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

36, claims 39 ("first body having … a first transmit/receive element"; "second body

having … a second transmit/receive element"), 42; EX1008, ¶¶218-19.



EX1004, Fig. 20 (annotated). The first body receives the digital information over the

wired cable via a "transmit/receive element" and further processes the information

with "system electronics" for display. EX1004, ¶¶13, 36, claims 39 ("first body

having system electronics … performs the diagnostic operations through said system

electronics"; "first body [and] second body … are in communication with each other

through the first and second transmit/receive element[s]"), 42.

Barnes disclosed the "system electronics" were "common" and "detailed in

previously listed co-pending applications." EX1004, ¶8. Barnes also disclosed the

system electronics in the first body controls the digital beamformer in the second

62

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

body, performs diagnostic operations, and may include, for example, another digital

beamformer, an image processor, and one or more digital signal processors capable

of processing ultrasound scans. EX1004, ¶¶12-13, claims 45-47. Through

incorporation, Barnes further described system electronics as including, for example,

a back end (BE) ASIC (in **red** below), which performs "scan conversion" and

includes the "graphics [image] processor" and "the central processor for the

ultrasound system, a RISC (reduced instruction set controller) processor." EX1004,

¶1; EX1031, 3:18-53, Fig. 1.



EX1031, Fig. 1 (annotated).

### 3.    [1c]

Barnes disclosed a digital data cable, as illustrated in Figure 20, carrying

digital information between the transducer assembly (e.g., "second body") and main

63

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

processing unit (e.g., "first body"). EX1004, ¶¶13, 36, claims 39, 42

("transmit/receive elements … are wires"); EX1043 at 203 ("claim 42 … expressly

recites the first and second transmit/receive elements comprise wires (e.g., a cable

connection)"), 679, 682 (changing "wires" in claim 42 to "wired" due to

"typographical error"); EX1008, ¶220.



EX1004, Fig. 20 (annotated). Barnes used the term "wires" interchangeably with

"thin flexible cable," as shown in Figure 20 and consistent with a POSA's

understanding of Barnes' description of the wired embodiments. EX1004, ¶31;

EX1008, ¶220. During the prosecution of Barnes, Patent Owner confirmed that

"wires" in claim 42 covers "a cable connection." EX1043 at 203.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Also, in discussing wired embodiments that include a digital beamformer in the transducer assembly (second body), Barnes described advantages of replacing an "analog" cable with a "digital data" cable:

> The wire connecting the body and transducer assembly provides … a signal path for the body and transducer assembly to communicate using ***digital data***. In this manner the need for an ***analog cable***, having many data paths for analog signals, is eliminated, and spares additional weight. The signal from the transducer array returns through the digital beam former incorporated into the transducer assembly so ***only digital information goes between the body and the transducer assembly***.

EX1004, ¶32 (emphasis added). The wired connection between the first and second bodies is a digital data cable for the additional reason that it provides both "power to the transducer assembly" and "a signal path for the body and transducer assembly to communicate using digital data." *Id.*; EX1008, ¶220.

If Patent Owner argues Barnes did not disclose a "cable," it would have been obvious to use a digital data cable for the wired connection between the first and second bodies in Barnes, for the same reasons as Ground 2. *Supra* §§ VII.A.2, VIII.A.3; EX1008, ¶¶73-75, 221-23. A POSA would have known that cables were inexpensive, lightweight, flexible, widely available, and based on well-known standards, such as USB. *Id.* Prior art disclosed incorporating USB and other

65

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

"standard interfaces" into ultrasound systems and using a standard digital cable, such as USB, to couple a transducer assembly to a main processing unit. *Id.*

A POSA would have had a reasonable expectation of success implementing a cable based on known "industry standards," and the first and second bodies in Barnes already included digital interfaces (e.g., "transmit/receive elements") for a wired connection between them for the reasons above. *Supra* §§ VII.A.2, VIII.A.3; EX1008, ¶¶73-75, 222-23.

### 4.    [1d]

#### a.    Ground 8 – Anticipation

Barnes disclosed that its system is powered by a battery power source, wherein portions are distributed between the transducer assembly ("second power supply") and main processing unit ("first power supply"). EX1004, ¶¶13, 36, claim 39 ("first body having … first power supply"; "second body having … second power supply"); EX1008, ¶¶224-27. A POSA would have understood "power supply" in Barnes to disclose a "battery" because Barnes used "power supply" and "battery" interchangeably, as illustrated in Figure 20, and Barnes described the transducer assembly and main processing unit as portable enclosures that could be held or worn on the body without, for example, any adapter for connecting to external AC wall power. EX1004, Fig. 20; EX1008, ¶225.

66

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168



EX1004, Fig. 20 ("ELECTRONICS, BATTERY ON HIP BELT") (annotated). Other

figures also included the term "battery." EX1004, Figs. 8, 19. Barnes also used

"power supply" and "battery" interchangeably when referring to internal power

supplies in the incorporated patent documents. EX1004, ¶8; EX1031, 3:54-61

("rechargeable battery"; "battery voltage"), 4:21-22 ("battery housed inside the

unit"), Fig. 1 ("BATTERY MANAGEMENT"); EX1008, ¶225.

Moreover, Barnes disclosed that, in the wired embodiments, power may also

be conveyed across the digital cable from the main processing unit to the transducer

assembly. EX1004, ¶¶11 ("wire having a path for feeding power from the power

supply to the transducer assembly"), 32 ("wire connecting the body and transducer

assembly provides power to the transducer assembly"); EX1008, ¶226.

67

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Accordingly, Barnes disclosed each limitation of claim 1, as arranged in the claim, because Barnes disclosed an embodiment that includes the claimed "transducer assembly" and "main processing unit," each having an internal battery and being coupled together via a digital data cable configured to convey digital information between the assembly and processing unit. EX1004, ¶¶11, 13, 32, 36, claims 39, 42; EX1008, ¶227. Indeed, claim 42 in Barnes recites each limitation in claim 1 of the '168 Patent. *Compare* EX1004, claims 39, 42, *with* EX1001, claim 1; EX1008, ¶227 (comparing side-by-side).

### b.    Ground 9 – Obviousness

If Patent Owner argues Barnes did not disclose limitations [1c] and [1d] together, such a combination would have been obvious based on Barnes. EX1008, ¶¶228-32. As explained, Barnes disclosed each limitation of claim 1, including an internal battery in the transducer assembly, an internal battery in the main processing unit, and a cable for conveying digital information between the assembly and processing unit. *Supra* §§ XII.A.1-4.a. In addition to the express teachings in Barnes, it would have been a matter of common sense and common knowledge to include a battery in a transducer assembly that is coupled to a main processing unit via a digital cable, as Barnes and other prior art disclosed, and a POSA would have done so according to known methods to yield predictable results. EX1008, ¶228.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

Battery-powered transducer assemblies, and their increased portability and advantages, were known. *Supra* §§ VII.A.1, VII.A.3, XII.A.4.a; EX1008, ¶¶71-72, 76-80, 229. Coupling a transducer assembly to a battery-powered processing unit using a cable was also known. *Supra* §§ VII.A.2, XII.A.3; EX1008, ¶¶71-72, 76-78, 230. A POSA would have been motivated to distribute a portion of the battery power source to the assembly in such a system based on known advantages of (1) increasing the battery power source capacity in the system, which allows for longer use before having to recharge or replace the battery; (2) reducing drain on the processing unit's battery from the transducer assembly's electronics; and (3) allowing a manufacturer to design a transducer assembly with a sufficient, reliable, and efficient power supply for the transducer assembly, irrespective of the processing unit used in the system. *Supra* §§ VII.A.3, VII.D, VIII.A.4.b; EX1008, ¶¶76-80, 231.

A POSA would have had a reasonable expectation of success in modifying Barnes' wired system to include a battery in the transducer assembly for the same reasons in Ground 2, in addition to the express teachings in Barnes. *Supra* §§ VII.A.2-3, VIII.A.4.b, XII.A.4.a; EX1008, ¶¶73-80, 232.

## B.    Claim 2

Barnes disclosed and rendered obvious claim 2 for the same reasons as claim 1. *Supra* § XII.A; EX1008, ¶¶233-34. As explained, Barnes disclosed and

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

rendered obvious "said distribution of said battery source" (*supra* § XII.A.4), and the remaining "desired" element is non-limiting (*supra* § VIII.B).

### C.    Claim 3

Barnes disclosed and rendered obvious claim 3 for the same reasons as claims 1 and 2. *Supra* §§ XII.A-B; EX1008, ¶¶235-36. As explained, Barnes disclosed "an amount of said processing circuitry included in said ultrasound transducer assembly" (*supra* § XII.A.1), and the remaining "desired" element is non-limiting (*supra* § VIII.B).

### D.    Claim 4

As explained, Barnes disclosed that the processing circuitry comprises a digital beamformer coupled to the transducer array. *Supra* § XII.A.1; EX1008, ¶¶237-38. Barnes explained that "[t]he signal from the transducer array returns through the digital beam former incorporated into the transducer assembly so only digital information goes between the body and the transducer assembly." EX1004, ¶32; EX1008, ¶238.

### E.    Claim 5

Claim 5 would have been obvious based on the teachings of Barnes. EX1008, ¶¶239-44. As explained, Barnes disclosed an embodiment that meets, and rendered obvious, each limitation of claims 1 and 4, on which claim 5 depends. *Supra* §§ XII.A, XII.D. Barnes did not expressly disclose, for this particular embodiment, that the "processing circuitry comprises a digital signal processor coupled to said

70

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

digital beam former." Barnes instead disclosed that the "system electronics" in the main processing unit comprises at least one digital signal processor ("DSP"). EX1004, ¶¶13, 36, claims 39, 45 ("system electronics comprises … a first digital signal processor"), 46-47. It would have been obvious, however, to modify the Barnes system—using known methods to yield predictable results—to couple a DSP to the digital beamformer in the transducer assembly. EX1008, ¶¶240-44.

Barnes suggested integrating a DSP into the transducer assembly because it is "desirable … to compact the entire ultrasound system into a scanhead-sized unit," and "[t]he use of digital beamformers and digital signal processing has allowed the expansion of capabilities of [] smaller, more portable ultrasound systems." EX1004, ¶¶6-7; EX1008, ¶241. Indeed, through incorporation, Barnes disclosed a DSP can be coupled to a beamformer in a common enclosure. EX1031, 2:62-65, 3:10-17, 4:45-58. A POSA further would have been motivated to include a DSP in the transducer assembly to provide additional, optimized, and efficient digital image and blood flow processing, irrespective of the main processing unit used in the system, to meet the performance and features of conventional cart-based systems, and to reduce the processing load of the main processing unit. *Supra* §§ VII.A.1, VIII.E; EX1008, ¶¶71-72, 242.

71

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

A POSA would have had a reasonable expectation of success for the reasons above, including because these components were common and coupling a DSP to a digital beamformer was routine. *Supra* §§ VII.A.1, VIII.E, X.C; EX1008, ¶¶243-44.

### F.    Claim 6

Barnes disclosed and rendered obvious that the digital data cable is configured to convey power from the main processing unit (e.g., "first body") to the transducer assembly (e.g., "second body") "for charging a battery therein." *Supra* §§ XII.A.3-4; EX1008, ¶¶245-46. As explained, Barnes teaches that, in the wired embodiments, power may be conveyed across the cable from the processing unit to the assembly. *Supra* §§ XII.A.3-4.a; EX1004, ¶¶11, 32; EX1008, ¶246. As also explained, conveying power for the purpose of "charging a battery therein" does not further structurally limit the configuration of "said digital cable [] configured to convey power," or otherwise limit the claim. *Supra* § VIII.F; *Teva Pharms.*, 906 F.3d at 1023. A POSA would have understood the cable in Barnes is configured to transfer power for any purpose, including for charging a battery. *Supra* §§ VII.A.2-3, VIII.F, XII.A.3-4; EX1008, ¶¶73-80, 246.

If Patent Owner argues Barnes did not disclose claim 6, because it requires additional circuitry "for charging a battery," it would have been obvious, according to known methods to yield predictable results. EX1008, ¶¶247-48. Barnes disclosed recharging a battery in ultrasound systems. EX1004, claim 9 ("power supply can be

72

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

recharged"). A POSA would have been motivated to configure the Barnes system to charge the battery in the transducer assembly using power conveyed over the cable because doing so would have lowered operating costs and size of the system, eliminated the need to carry extra charging equipment, and allowed longer operating times, reducing the possibility of the assembly running out of power during a diagnostic procedure. *Supra* §§ VII.A.2-3, VIII.F, XI; EX1008, ¶¶73-80, 247.

A POSA would have had a reasonable expectation of success in configuring the Barnes system to charge the battery in the transducer assembly using power conveyed over the cable, such as by including battery charging circuitry in the assembly, because doing so was known and within the skill of a POSA for the reasons above. *Supra* §§ VII.A.2-3, VIII.F, XI; EX1008, ¶¶73-80, 248.

### G.    Claim 12

#### 1.    [12a]

Barnes disclosed limitation [12a] for the same reasons as [1a]. *Supra* § XII.A.1; EX1008, ¶¶249-50.

#### 2.    [12b]

Barnes disclosed limitation [12b] for the same reasons as [1b]. *Supra* § XII.A.2; EX1008, ¶251.

#### 3.    [12c]

Barnes disclosed and rendered obvious limitation [12c] for the same reasons as [1c]. *Supra* § XII.A.3; EX1008, ¶¶252-53.

73

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

### 4.    [12d]

Barnes disclosed and rendered obvious limitation [12d] for the same reasons as [1d] and claim 2. *Supra* §§ XII.A.4, XII.B; EX1008, ¶254.

If Patent Owner argues Barnes did not disclose limitations [12c] and [12d] together, such a combination would have been obvious for the same reasons as claim 1. *Supra* § XII.A.4.b; EX1008, ¶255.

### H.    Claim 13

Barnes disclosed and rendered obvious claim 13 for the same reasons as claim 3. *Supra* § XII.C; EX1008, ¶¶256-57.

### I.    Claim 15

Barnes disclosed and rendered obvious claim 15 for the same reasons as claim 2. *Supra* § XII.B; EX1008, ¶¶258-59.

## XIII. GROUND 10: CLAIMS 2-3, 5, 12-13, AND 15 ARE OBVIOUS OVER BARNES AND WALSTON

As explained in Grounds 8 and 9, Barnes disclosed and/or rendered obvious claims 2-3, 5, 12-13, and 15, among others. *Supra* § XII; EX1008, ¶260. If Patent Owner argues otherwise, these claims would have been obvious based on the combined teachings of Barnes and Walston for the same reasons above for Grounds 4 and 5. *Supra* §§ X.A-F; EX1008, ¶260. The Barnes system is substantially the same as the Halmann and Halmann-Honda systems—a portable, battery-powered transducer assembly coupled to a portable, battery-powered main

74

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

processing unit via a cable the conveys digital information between the assembly and processing unit. *Supra* §§ VIII.A, IX.A, XII.A; EX1008, ¶260. Thus, Barnes would have been modified to achieve these claims in substantially the same way as the Halmann and Halmann-Honda systems, and it would have been obvious to modify the Barnes system based on the teachings of Walston to achieve these claims—including both the motivations to combine and reasonable expectation of success—for the same reasons it would have been obvious to modify the Halmann and Halmann-Honda systems based on the teachings of Walston to achieve these claims. EX1008, ¶260.

### A.    Claim 2

Barnes disclosed and rendered obvious claim 2. *Supra* § XII.B. If Patent Owner argues the "desired" elements are not disclosed or rendered obvious, these elements would have been obvious based on the combined teachings of Barnes and Walston for the reasons above. *Supra* §§ X.A, XII.B; EX1008, ¶¶261-66. As explained, based on the teachings of Walston, a POSA would have been motivated to configure the distribution of the battery source in the Barnes system to result in the claimed "desired" weight, and would have had a reasonable expectation of success. *Supra* § X.A; EX1008, ¶¶262-66.

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

## B.    Claim 3

Barnes disclosed and rendered obvious claim 3. *Supra* § XII.C. If Patent Owner argues otherwise, claim 3 would have been obvious based on the combined teachings of Barnes and Walston for the reasons above. *Supra* §§ X.B, XII.C, XIII.A; EX1008, ¶¶267-70. As explained, based on teachings of Walston, a POSA would have been motivated to configure "an amount of said processing circuitry included in said ultrasound transducer assembly" in the Barnes system to result in a "desired total weight" of the assembly, and would have had a reasonable expectation of success. *Id.*

## C.    Claim 5

Barnes rendered obvious claim 5. *Supra* § XII.E. If Patent Owner argues otherwise, claim 5 would have been obvious based on the combined teachings of Barnes and Walston for the reasons above. *Supra* §§ X.C, XII.E; EX1008, ¶¶271-73. As explained, Barnes rendered obvious signal processing circuitry comprising a DSP and digital beam former in a common enclosure (*supra* § XII.E), and Walston disclosed a DSP coupled to a digital beam former in a transducer assembly (*supra* § X.C). EX1008, ¶272. As further explained, based on the combined teachings, a POSA would have been motivated to modify the Barnes transducer assembly—using known methods to yield predictable results—to include a DSP coupled to the digital

76

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

beamformer, and would have had a reasonable expectation of success. *Supra* §§ X.C, XII.E; EX1008, ¶¶272-73.

### D.    Claim 12

Barnes disclosed and rendered obvious claim 12. *Supra* § XII.G. If Patent Owner argues the "desired" element is not disclosed or rendered obvious, this element would have been obvious based on the combined teachings of Barnes and Walston, for the same reasons as claim 2. *Supra* § XIII.A; EX1008, ¶274.

### E.    Claim 13

Barnes disclosed and rendered obvious claim 13. *Supra* § XII.H. If Patent Owner argues the "desired" element is not disclosed or rendered obvious, this element would have been obvious based on the combined teachings of Barnes and Walston for the same reasons as claim 3. *Supra* § XIII.B; EX1008, ¶275.

### F.    Claim 15

Barnes disclosed and rendered obvious claim 15. *Supra* § XII.I. If Patent Owner argues the "desired" element is not disclosed or rendered obvious, this element would have been obvious based on the combined teachings of Barnes and Walston, for the same reasons as claim 2. *Supra* § XIII.A; EX1008, ¶276.

## XIV.  GROUND 11: CLAIM 6 IS OBVIOUS OVER BARNES AND SMITH

Barnes disclosed and rendered obvious claim 6. *Supra* § XII.F. As explained, the Barnes system includes a cable configured to convey power from the main processing unit to the transducer assembly for any purpose, including for charging a

77

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

battery. *Supra* § XII.F. Claim 6 requires nothing more. *Id*.; EX1008, ¶277. If Patent Owner argues Barnes did not disclose or render obvious claim 6, because it requires additional circuitry "for charging a battery," it would have been obvious based on the combined teachings of Barnes and Smith for the same reasons above. *Supra* § XI; EX1008, ¶278. As explained, Barnes disclosed recharging a battery in ultrasound systems (*supra* § XII.F), and Smith disclosed conveying power from a battery in a main processing unit to charge a battery in a portable assembly that controls an ultrasound transducer (*supra* § XI). EX1008, ¶279. Based on the combined teachings, a POSA would have been motivated to configure the Barnes system to charge the battery in the transducer assembly using power conveyed over the digital cable, and would have had a reasonable expectation of success in doing so, such as by including battery charging circuitry in the transducer assembly, for the same reasons above. *Supra* §§ VII.A.2-3, VIII.F, XI; EX1008, ¶73-80, 280-82.

## XV.    SECONDARY CONSIDERATIONS

Petitioner is unaware of any secondary considerations that weigh against institution. EX1008, ¶¶283-85. No secondary considerations were asserted or relied on during prosecution, and Patent Owner has not asserted any in the Litigation. *Id.* Petitioner should not be required to predict which evidence, if any, Patent Owner may argue. Grounds 1 and 8 are anticipation, to which secondary considerations are not relevant. *In re Wiggins*, 488 F.2d 538, 543 (C.C.P.A. 1973).

78

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

## XVI.  DISCRETIONARY DENIAL IS NOT APPROPRIATE

There is no basis to deny institution under 35 U.S.C. §§ 325(d) or 314(a). The

'168 Patent has not been challenged previously, and this Petition does not rely on

prior art or arguments presented during prosecution; therefore, there is no basis to

deny institution under Section 325(d). *Gen. Plastic Indus. Co. v. Canon Kabushiki*

*Kaisha*, IPR2016-01357, Paper 19 at 15-19 (PTAB Sept. 6, 2017) (precedential as

to § II.B.4.i.). Barnes, Honda, and Walston were not considered by the Examiner.

And although Halmann and Smith were cited in an IDS, they were not substantively

considered, much less in combination with the other asserted references. EX1002

at 144; *see PEAG d/b/a JLab Audio v. VARTA Microbattery GmbH*, IPR2020-01213,

Paper 9 at 7-11 (PTAB Jan. 6, 2021). Thus, the Examiner erred in a manner material

to patentability by allowing the application over Halmann and Smith despite the

relevance of these references to features in the Challenged Claims.

The Petition should not be denied under Section 314(a) because Petitioner

stipulates it will not pursue in district court litigation (*supra* § II.B) any ground raised

or that could have been reasonably raised before the PTAB in this IPR if this Petition

is instituted. *See Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019, Paper 12

at 18-19 (Dec. 1, 2020) (precedential as to § II.A); Memorandum, *Interim Procedure*

*for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District*

*Court Litigation*, at 3 (USPTO Dir. June 21, 2022) ("Consistent with *Sotera Wireless,*

79

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

*Inc.*, the PTAB will not discretionarily deny institution in view of parallel district court litigation where a petitioner presents a stipulation not to pursue in a parallel proceeding the same grounds or any grounds that could have reasonably been raised before the PTAB.").

## XVII. CONCLUSION

Petitioner respectfully requests the challenged claims be cancelled as unpatentable pursuant to 35 U.S.C. § 318(b).

Respectfully submitted,

Date: October 3, 2022

By: /C. Brandon Rash/
C. Brandon Rash
USPTO Registration No. 59,121

## CERTIFICATION UNDER 37 CFR § 42.24(d)

Under the provisions of 37 CFR § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Petition for *Inter Partes* Review totals 13,856 which is less than the 14,000 allowed under 37 CFR § 42.24(a)(i).

Respectfully submitted,

Date: October 3, 2022

By: /*C. Brandon Rash*/
C. Brandon Rash
USPTO Registration No. 59,121

Counsel for Petitioner
Butterfly Network, Inc.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing Petition for *Inter Partes* Review and a copy of the supporting exhibits 1001 through 1058 were served on counsel of record on October 3, 2022, by filing this document through the End-to-End System, as well as delivering a copy via Priority Mail Express to the counsel of record for the Patent Owner at the following address:

> 159211 - WOMBLE BOND DICKINSON (US) LLP/FUJIFILM SONOSITE
> ATTN: IP DOCKETING
> P.O. Box 570489
> ATLANTA, GA 30357-0037
> UNITED STATES

Respectfully submitted,

Date: October 3, 2022

By: */C. Brandon Rash/*
C. Brandon Rash
USPTO Registration No. 59,121

Counsel for Petitioner
Butterfly Network, Inc.

## APPENDIX A: CLAIM LISTING

| Claim | Claim Language |
|---|---|
| 1 | A system comprising:<br><br>an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from;<br><br>a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly; and<br><br>a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between;<br><br>wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit. |
| 2 | The system of claim 1, wherein said distribution of said battery source is configured at least in part to result in a desired total weight of said ultrasound transducer assembly, wherein said desired total minimum weight is configured to counterbalance torque forces felt by a user of said transducer assembly. |
| 3 | The system of claim 1, wherein an amount of said processing circuitry included in said ultrasound transducer assembly is configured at least in part to result in a desired total weight of said ultrasound transducer assembly. |
| 4 | The system of claim 1, wherein said processing circuitry comprises a digital beam former coupled to said transducer array. |
| 5 | The system of claim 4, wherein said processing circuitry comprises a digital signal processor coupled to said digital beam former. |

Petition for *Inter Partes* Review
of U.S. Patent 7,867,168

| Claim | Claim Language |
|---|---|
| 6 | The system of claim 1, wherein said digital cable is configured to convey power from said main processing unit to said ultrasound transducer assembly for charging a battery therein. |
| 12 | A method comprising: <br><br> providing an ultrasound transducer assembly having a transducer array and signal processing circuitry coupled to said transducer array; <br><br> providing a main processing unit having signal processing circuitry in communication with said signal processing circuitry of said ultrasound transducer assembly via digital data communication wherein said ultrasound transducer assembly is connected to said main processing unit with a digital data cable configured to carry said digital information there between; and <br><br> distributing battery capacity between said ultrasound transducer assembly and said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit. |
| 13 | The method of claim 12, further comprising: <br><br> distributing signal processing circuitry between said signal processing circuitry of said ultrasound transducer assembly and said signal processing circuitry of said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit. |
| 15 | The method of claim 12 wherein said desired total distribution of weight is configured to provide sufficient weight to said transducer assembly to counterbalance torque forces felt by a user of said transducer assembly. |

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

FUJIFILM SONOSITE, INC.

    Plaintiff,

v.

BUTTERFLY NETWORK, INC.

    Defendant.

Case No. 1:22-cv-00309-JPM

DEMAND FOR JURY TRIAL

## PLAINTIFF'S LPR 3.1 INITIAL INFRINGEMENT CONTENTIONS

Pursuant to the Court's Scheduling Order and the Local Patent Rules for the Western District of Tennessee ("LPRs"), Plaintiff FUJIFILM Sonosite, Inc. ("Plaintiff" or "Fujifilm") hereby provides its Initial Infringement Contentions under LPR 3.1 in the above-captioned case against Defendant Butterfly Network, Inc. ("Butterfly").

These disclosures and contentions are made with respect to asserted United States Patent Nos. 6,901,157 (the "'157 Patent"), 9,538,985 (the "'985 Patent"), 7,867,168 (the "'168 Patent"), 7,169,108 (the "'108 Patent"), 8,861,822 (the "'822 Patent"), 8,360,981 (the "'981 Patent"), and 8,128,050 (the "'050 Patent") (collectively the "Asserted Patents" or "patents-in-suit"), and solely for purposes of this action.

## I.    ASSERTED CLAIMS AND ACCUSED PRODUCTS (LPR 3.1(A), (B))

In these Initial Infringement Contentions, Fujifilm asserts Butterfly infringes at least Claims 1-4, 6-10, 12-15, 17-21, and 23-26 of the '157 Patent, Claims 1-3 of the '985 Patent, Claims 1-5, 12, 13, and 15 of the '168 Patent, Claims 1-4 of the '108 Patent, Claims 1-10 of the '822 Patent, Claims 1-5, 7-9, and 11 of the '981 Patent, and Claims 1, 5, 7, 9, 10, and 12 of the '050 Patent (collectively the "Asserted Claims"), pursuant to 35 U.S.C. § 271(a), (b) and/or (c) at least by making, using, selling, or offering to sell in the United States, without authority, the Accused

Products for at least the reasons identified in Fujifilm's First Amended Complaint.  (D.I. 21, filed on September 7, 2022).  Based on the facts alleged in Fujifilm's First Amended Complaint, D.I. 21, which is incorporated by reference herein, Fujifilm asserts that Butterfly infringes certain of the Asserted Claims by jointly/dividedly infringing, or being vicariously liable for infringement of, the Asserted Patents by directing and controlling its customers' infringing conduct related to the Accused Products.

The Accused Products include at least the following Butterfly devices and accessories and software for use therewith: Butterfly iQ; Butterfly iQ+; Butterfly's iQ+ Vet; Butterfly iQ— Ultrasound application; Butterfly Hard Case; and any other unidentified reasonably similar or complementary devices or products. For example, certain potentially infringing devices may have had insufficient publicly available information to permit Fujifilm to identify them as an Accused Product; or, certain future Butterfly product releases, or products in development, may operate similarly to these identified Accused Products.  To the extent such other products (or Butterfly's associated activities) infringe the Asserted Claims in substantially the same manner as set forth in the attached Exhibits A to G, Fujifilm asserts that Butterfly infringes the Asserted Claims in connection with those products (and associated activities) as well.

## II.    INFRINGEMENT CHARTS (LPR 3.1(C))

The attached exhibits describe, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim may be found in the Accused Products, as follows:

- Attached Exhibit A sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '157 Patent may be found in the Accused Products.

- Attached Exhibit B sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '985 Patent may be found in the Accused Products.

- Attached Exhibit C sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '168 Patent may be found in the Accused Products.

- Attached Exhibit D sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '108 Patent may be found in the Accused Products.

- Attached Exhibit E sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '822 Patent may be found in the Accused Products.

- Attached Exhibit F sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '981 Patent may be found in the Accused Products.

- Attached Exhibit G sets forth, in exemplary fashion and by way of illustration only, where each element of each Asserted Claim of the '050 Patent may be found in the Accused Products.

Importantly, the information provided in the attached charts is based solely on publicly available information. Fujifilm has not yet received any discovery from Butterfly in this case. As additional information is learned in discovery, Fujifilm reserves the right to add Asserted Claims, remove Asserted Claims, or otherwise to modify the analysis provided in these infringement contentions in light of that additional information.

3

## III.    INDIRECT INFRINGEMENT (LPR 3.1(D))

Butterfly is liable for inducing infringement of the Asserted Patents, with the exception of the'050 Patent, under 35 U.S.C. § 271(b) by having knowledge of the Asserted Patents and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, or otherwise being willfully blind to, direct infringement of the Asserted Patents, with specific intent, by its customers.

Butterfly's knowledge and its inducing infringement of the Asserted Patents, with the exception of the'050 Patent, are demonstrated by the facts alleged in Fujifilm's First Amended Complaint filed on September 7, 2022, D.I. 21, which is incorporated by reference herein in its entirety.

Butterfly is liable for contributory infringement of the Asserted Patents, with the exception of the'108 Patent and '050 Patent, under 35 U.S.C § 271(c) by having sold or offered to sell, and continuing to sell or offer for sale the Accused Products within the United States because the Accused Products constitute a material part of the invention embodied in each Asserted Patent, which Butterfly knows to be especially made and/or especially adapted for use in infringement of the Asserted Patents, and which is not a staple article or commodity of commerce suitable for substantial non-infringing use. Butterfly's knowledge and its contributory infringement of the Asserted Patents, with the exception of the'108 Patent and '050 Patent, are demonstrated by the facts alleged in Fujifilm's First Amended Complaint filed on September 7, 2022, incorporated by reference herein.  More specifically:

- Details regarding Butterfly's indirect infringement of the Asserted Claims of the '157 Patent are described in the First Amended Complaint, D.I. 21, at ¶¶ 56-82.

4

- Details regarding Butterfly's indirect infringement of the Asserted Claims of the '985 Patent are described in the First Amended Complaint, D.I. 21, at ¶¶ 83-111.

- Details regarding Butterfly's indirect infringement of the Asserted Claims of the '168 Patent are described in the First Amended Complaint, D.I. 21, at ¶¶ 112-138.

- Details regarding Butterfly's indirect infringement of the Asserted Claims of the '108 Patent are described in the First Amended Complaint, D.I. 21, at ¶¶ 139-156.

- Details regarding Butterfly's indirect infringement of the Asserted Claims of the '822 Patent are described in the First Amended Complaint, D.I. 21, at ¶¶ 157-188.

- Details regarding Butterfly's indirect infringement of the Asserted Claims of the '981 Patent are described in the First Amended Complaint, D.I. 21, at ¶¶ 189-216.

To the extent it is required to be shown, the direct infringements related to Butterfly's indirect infringement can be found in the attached Exhibits A, B, C, D, E, and F, and as further detailed in the Paragraphs of the First Amended Complaint, D.I. 21, referenced above.

## IV.    DOCTRINE OF EQUIVALENTS (LPR 3.1(E))

Fujifilm asserts that, under the proper construction of the Asserted Claims, each limitation is literally present in the Accused Products. To the extent any limitation is found not to be literally present, or to the extent Butterfly argues any limitation is not literally present in the Accused Products, Fujifilm asserts that such limitation is present under the doctrine of equivalents because there are insubstantial differences between the corresponding structure and features of the Accused Products and the elements of the Asserted Claims, and/or the relevant structures and features of the Accused Products perform substantially the same function in substantially the same way to yield substantially the same result as those claim elements. Additional details regarding Butterfly's infringement by the doctrine of equivalents can be found in the attached Exhibits A-G.

## V.    PRIORITY (LPR 3.1(F))

Fujifilm asserts that the Asserted Claims of the '157 Patent claim priority to both Japanese Patent Application Nos. JP2001-005994 and JP2001-005995, filed January 15, 2001, and are entitled to the filing date of both applications. Fujifilm asserts that the Asserted Claim of the '985 Patent claim priority to its filing date of April 18, 2014. Fujifilm asserts that the Asserted Claims of the '168 Patent claim priority to United States Patent Application No. 10/925,114, filed August 24, 2004, and are entitled to its filing date. Fujifilm asserts that the Asserted Claims of the '108 Patent claim priority to United States Provisional Patent Application No. 60/353,385, filed February 1, 2002, and are entitled to its filing date. Fujifilm asserts that the Asserted Claims of the '822 Patent claim priority to United States Provisional Patent Application No. 61/321,666, filed April 7, 2010, and are entitled to its filing date. Fujifilm asserts that the Asserted Claims of the '981 Patent claim priority to Japanese Patent Application No. JP2008-214137, filed August 22, 2008, and are entitled to its filing date. Fujifilm asserts that the Asserted Claims of the '050 Patent claim priority to its filing date of February 8, 2011.

## VI.    WILLFUL INFRINGEMENT (LPR 3.1(G))

At least for the reasons identified in Fujifilm's Amended Complaint (D.I. 21), Butterfly had knowledge or was willfully blind to the Asserted Patents prior to the filing of the original Complaint, and had knowledge or was willfully blind to the fact that its conduct constituted, induced, or contributed to infringement of the Asserted Patents prior to the filing of the original Complaint. Despite such knowledge, Butterfly has continued its infringing activities. Butterfly's infringement of the Asserted Patents is willful, entitling Plaintiff to enhanced damages pursuant to 35 U.S.C. § 284.

## VII.   RESERVATIONS

Fujifilm's investigation of the Accused Products and matters disclosed herein is ongoing. These initial contentions are made on information and belief, and are based solely upon publicly available information regarding the Accused Products reasonably available to Fujifilm at this time, following an inquiry that was reasonable under the circumstances.

To date, Butterfly has not produced any information (e.g., specifications, schematics, service manuals, product requirement documents, other technical documentations) regarding the structure or operation of the Accused Products, as well as its other products that potentially infringe the Asserted Claims, including any for which publicly available information was limited or not readily available. Fujifilm reserves the right to supplement, amend, or alter these initial contentions after Butterfly and/or third parties produce documents or things related to the Accused Products.

These initial contentions are also made based on Fujifilm's plain and ordinary meaning interpretation of the Asserted Claims. Fujifilm reserves the right to supplement, amend, or alter these initial contentions if, for example, Butterfly's or the Court's construction of the Asserted Claims differs from Fujifilm's current interpretation.

Fujifilm reserves the right to supplement, amend, or alter these disclosures consistent with the LPRs and Rule 26(e) of the Federal Rules of Civil Procedure, including to identify additional infringing products identified during discovery, to provide citations to additional evidence of the infringements, and to alter or amend the infringement analyses based on new facts learned during the courts of discovery or based on revised claim interpretations proffered by Butterfly or so ordered by the Court.

## VIII.   DOCUMENT PRODUCTION (LPR 3.2)

Fujifilm is producing concurrently herewith the documents required by LPR 3.2.  However, the production of documents produced concurrently herewith is not a concession that all such

documents are responsive to any particular requirement of LPR 3.2. Additionally, Fujifilm is producing herewith copies of the documents referenced in its Initial Infringement Contentions, attached Exhibits A-G.

Fujifilm reserves the right to supplement this production as the case progresses, including, but not limited to, producing or making additional documents available for inspection. Fujifilm's search for such documents continues.

Dated: October 26, 2022                    Respectfully submitted,

                                        /s/  Robert L. Maier
                                        Jeremy A. Tigan
                                        MORRIS, NICHOLS, ARSHT &
                                        TUNNELL LLP
                                        1201 North Market Street
                                        P.O. Box. 1347
                                        Wilmington, DE 19899-1347
                                        Phone: (302) 351-9106
                                        jtigan@morrisnichols.com

                                        OF COUNSEL:

                                        Robert L. Maier
                                        Jennifer C. Tempesta
                                        Eric J. Faragi
                                        BAKER BOTTS L.L.P.
                                        30 Rockefeller Plaza
                                        New York, NY 10112
                                        Telephone: (212) 408-2500
                                        Fax: (212) 408-2501
                                        robert.maier@bakerbotts.com
                                        jennifer.tempesta@bakerbotts.com
                                        eric.faragi@bakerbotts.com

                                        Attorneys for Plaintiff
                                        Fujifilm Sonosite, Inc.

8

**CERTIFICATE OF SERVICE**

I certify that on October 26, 2022 all counsel of record were served with a copy of this document via electronic mail.

*/s/  Robert L. Maier*

# EXHIBIT 4A

**EXHIBIT A**
**U.S. PATENT NO. 6,901,157 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1–4, 6–10, 12-15, 17-21, and 23-36 of U.S. Patent No. 6,901,157 (the "'157 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted Claims 1–4, 6–10, 12-15, 17-21, and 23-26 of the '157 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

Butterfly also infringes asserted Claims 1–4, 6–10, 12-15, 17-21, and 23-26 under 35 U.S.C. § 271(b) by having knowledge of the '157 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, infringement of the '157 Patent, with specific intent, by others.

In violation of 35 U.S.C. § 271(c), Butterfly has also contributed to and is continuing to contribute to infringement of asserted Claims 1–4, 6–10, 12-15, 17-21, and 23-26 by others (such as customers of Butterfly's POCUS devices) by making, selling and/or offering for sale within the United States and/or importing into the United States POCUS devices or components thereof, that are especially made and/or adapted for infringing asserted Claims 1–4, 6–10, 12-15, 17-21, and 23-26 and are not staple articles of commerce suitable for substantial non-infringing use.

The chart below explains how Butterfly's POCUS devices infringe the '157 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence FUJIFILM Sonosite may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent Butterfly argues that any claim element is not literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See, e.g., Graver Tank and Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

1

| Claim 1 | Butterfly's POCUS systems |
|---|---|
| An ultrasonic diagnostic apparatus comprising: | To the extent that the preamble is construed as a limitation, Butterfly's POCUS systems include an ultrasonic diagnostic apparatus.<br><br>For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |
| an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object; | Butterfly's POCUS systems include an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

<table>
<tr>
<td></td>
<td>Butterfly's POCUS systems use "ultrasound" for "imaging and measurement of anatomical structures and fluids of adult and pediatric patients."<br><br>Butterfly iQ/Butterfly iQ+ is indicated for use by trained healthcare professionals in environments where healthcare is provided to enable diagnostic ultrasound imaging and measurement of anatomical structures and fluids of adult and pediatric patients for the following clinical applications:<br><br>• Peripheral Vessel (including carotid, deep vein thrombosis and arterial studies)<br><br>• Procedural Guidance<br><br>• Small Organs (including thyroid, scrotum and breast)<br><br>• Cardiac<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 5 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).</td>
</tr>
<tr>
<td>an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters;</td>
<td>Butterfly's POCUS systems include an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals."  Butterfly's POCUS systems further include a compatible "personal electronic device[]" to run its "Butterfly iQ Application."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br><br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br><br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals</td>
</tr>
</table>

3

|  | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Butterfly's POCUS systems include a Butterfly iQ App that uses the ultrasound signals received from the probe to "enable the visualization and measurement of anatomical structures within the human body."<br><br>**Butterfly iQ App**<br>The primary function of the Butterfly iQ App is general-purpose diagnostic imaging, for use by qualified and trained health-care professionals to enable the visualization and measurement of anatomical structures within the human body.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 16 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Butterfly's POCUS system includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values."<br><br>**Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Butterfly's POCUS system includes image processing condition parameters, for example, parameters "optimized for visualizing needles inserted at a 30-45 degree angle." |
| --- | --- |

## 8. Using the Needle Viz (in-plane) Tool (Butterfly iQ+ only)

 **WARNING!**
When used alone, the Needle Viz (in-plane) tool will NOT enhance the visualization of needles inserted out-of-plane.

Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.

Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets.

When using Needle Viz (in-plane), you can:

- Flip the needle approach direction
- Adjust the depth and gain

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 31 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application performs image processing of ultrasound waves received from the probe), in substantially the same way (e.g., the Butterfly IQ application uses image processing parameters), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application receives and processes image data received from the ultrasonic transmitting and receiving unit). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| | |
|---|---|
| an information input unit to be employed for inputting information of object concerned with the object to be inspected; | Butterfly's POCUS systems include an information input unit to be employed for inputting information of object concerned with the object to be inspected.<br><br>For example, Butterfly's POCUS systems include a Butterfly iQ application, which has a series of "presets" that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and |

Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung." *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):



"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed.

<table>
<tr>
<td></td>
<td>

**Presets**

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application provides selectable presets), in substantially the same way (e.g., the presets relate to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application provides selectable presets corresponding to objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

</td>
</tr>
<tr>
<td>

a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object;

</td>
<td>

Butterfly's POCUS systems include a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object.

For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

</td>
</tr>
</table>

7

The Butterfly iQ App on the personal electronic device includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Android electronic devices require a memory to execute instructions. *See* https://www.intel.com/content/www/us/en/support/articles/000006179/education/intel-education-software.html (last accessed Oct. 17, 2022).

### Minimum System Requirements for Android* 4.2 and 4.4

This table lists the minimum system requirements for running the Intel® Education Resources Application using Android* 4.2, 4.4.2, or 4.4.4.

| Operating system | Android 4.2, Android 4.4.2, or Android 4.4.4 |
| --- | --- |
| Processor | Intel Atom® Processor Z2520 1.2 GHz, or faster processor |
| Storage | Between 850 MB and 1.2 GB, depending on the language version |
| RAM | Minimum of 512 MB, 2 GB is recommended |
| Hard Disk | • 2 GB of available hard-disk space for installation; extra free space is required during installation.<br>• You cannot install using a removable flash storage device. |
| Video | 1280 x 800 pixels or higher on a 10-inch device |
| Software | PDF viewer |
| Browser/Internet | • This application is designed to work offline.<br>• To download and launch Google Play* Store apps within the application, a high-speed Internet connection is recommended. |

Butterfly's POCUS systems also include different built-in "modes."  For example, the "M-mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] M-Mode."   *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Using M-Mode**

M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.

When using M-Mode, you can:

- Adjust the radial scan line by tapping and dragging the move point: ⊙
- Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen
- Adjust the **Depth** and **Gain**
- Perform time, distance, and heart rate measurements on the display

**Accessing M-Mode**

1. Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.
2. Select Actions on the bottom of the imaging screen.
3. Under Modes, select M-Mode.

9

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

10

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

| a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out | Butterfly's POCUS systems include a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to the image processing unit.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |
|---|---|

11

| | |
|---|---|
| parameters to the image processing unit; | **Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>The Butterfly iQ App on the personal electronic device includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." These parameter values are used to change how the "Butterfly iQ App . . . operates." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location. |
| and a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. | Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

12

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

The "Butterfly iQ App user interface" allows a user to "image freeze [and] image capture." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Overview of User Interface**

This section provides information about the imaging display presented in the Butterfly iQ App user interface.

The app user interface will always show information about the Mechanical Index (MI) and the Thermal Index (TI) at the top of the screen.

Depending on your Butterfly membership status and mobile app version, the toolbar at the bottom of the screen may vary.

The toolbar at the bottom of the screen can be used for preset selection, image freeze, image capture and mode/tool selection.

For example, when performing a study, Butterfly's POCUS device allows a user to view a "live image" on the personal electronic device.

13

**Performing a Study**

Once the probe is connected to your mobile device follow the prompts on the screen to begin a new study. It is not required to enter patient information to begin or complete a study.

From the main scan screen you can freeze an image ⊕, capture still images 🔲 and record clips ▣ using the toolbar at the bottom of the screen. The live image must be frozen in order to capture a still image.

Captures may be reviewed from the Capture Reel located in the top right corner of the screen 🔳 before the study is completed.

To conclude a patient encounter, click on the capture reel and follow the steps on screen to upload the study.

During scanning, you may swipe horizontally to adjust the gain and swipe vertically to adjust the depth. The Time Gain Compensation (TGC) control button is surfaced upon tapping the screen 🔳.

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS system outputs images from the image data onto a display unit.  For example, the POCUS system allows for "ultra clear lung imaging" using "ultrasound-on-chip," with the images output onto the personal electronic device.  *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):

14



| Claim 2 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 1, wherein: said parameter memory unit stores a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein: said parameter memory unit stores a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and  said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object.<br><br>*See supra* at Claim 1.<br><br>For example, Butterfly's POCUS systems include a plurality of "presets" in the personal electronic device running the Butterfly iQ Application that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung."   *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022): |

| sets corresponding to the information of object. |  |
| --- | --- |
| | "Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |
| | **Presets** |
| | Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location. |
| | Butterfly's POCUS system includes a plurality of image processing condition parameter sets corresponding to particular information of objects. For example, Butterfly's POCUS system includes a preset for "abdomen," which includes a parameter set that "uses harmonic frequencies in a curvilinear format to support the clinical assessment of structures the size and morphology of abdominal organs, such as the liver and kidney, to a depth of 25cm. It is also |

16

| | used for abdominal procedures, such as paracentesis or ECMO lines in the IVC." https://support.butterflynetwork.com/hc/en-us/articles/360027864632-Presets; (last accessed Oct. 14, 2022). Butterfly's POCUS system includes a second parameter set for the abdomen called "Abdomen Deep." *Id*. It "uses the fundamental low frequencies required to provide the depth of penetration necessary for abdominal assessments of up to 30cm. This curvilinear preset is typically reserved for technically challenging patients, such as high BMI or those with highly attenuating livers, as in hepatitis." *Id*.<br><br>As a further example that Butterfly's POCUS system includes a plurality of image processing condition parameter sets corresponding to particular information of objects, after selecting "lung" scanning, Butterfly's POCUS system provides a list of "lung actions," including "modes" and "protocols." *See* https://www.youtube.com/watch?v=ya-SGgzA8J0 (last accessed Oct. 14, 2022). |
| --- | --- |

17

 

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application stores imaging parameters), in substantially the same way (e.g., relating the imaging parameters to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application stores image parameters and selects the parameters based on an

| | object to be imaged from a set of objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
|---|---|
| **Claim 3** | |
| An ultrasonic diagnostic apparatus according to claim 1, wherein the image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein the image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data.<br><br>*See supra* at Claim 1.<br><br>For example, Butterfly's POCUS systems include at least a scale- up or scale-down process.  On the "lung" preset, the image is scaled to fit eight centimeters of image on the display unit.  On the "card" (for cardiac) preset, the image is scaled to fit 16 centimeters on the display unit.  *See* https://www.youtube.com/watch?v=0RVjAiAoH1c (last accessed Oct. 14, 2022): |

19



| Claim 4 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 1, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in the image processing unit so as to output the three-dimensional image data to said display unit.<br><br>*See supra* at Claim 1. |

| | |
|---|---|
| image data subjected to the image processing in the image processing unit so as to output the three-dimensional image data to said display unit. | For example, Butterfly's POCUS system can generate an "interactive 3D render of the bladder." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 39 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). This 3D render is made by using the "probe" to conduct "[a] 3D sweep of the bladder area." *Id.* The 3D render of the bladder is output to the display unit. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 40 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br> |
| **Claim 6** | |
| An ultrasonic diagnostic apparatus comprising: | To the extent that the preamble is construed as a limitation, Butterfly's POCUS systems include an ultrasonic diagnostic apparatus. |

| | |
|---|---|
| | For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals |
| an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters; | Butterfly's POCUS systems include an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>Butterfly's POCUS systems use "ultrasound" for "imaging and measurement of anatomical structures and fluids of adult and pediatric patients." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 5 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

22

| | Butterfly iQ/Butterfly iQ+ is indicated for use by trained healthcare professionals in environments where healthcare is provided to enable diagnostic ultrasound imaging and measurement of anatomical structures and fluids of adult and pediatric patients for the following clinical applications:<br><br>• Peripheral Vessel (including carotid, deep vein thrombosis and arterial studies)<br><br>• Procedural Guidance<br><br>• Small Organs (including thyroid, scrotum and breast)<br><br>• Cardiac<br><br>The transmission and reception of the ultrasonic waves is performed in accordance with transmission and reception parameters.  For example, the transmission and reception parameters of the Butterfly iQ B-Mode are presented below: |
|---|---|

23

**Table 14. Butterfly iQ B-Mode**

| | Index Label | | MI | TIS Scan | TIS Non-Scan $A_{aprt}\leq1$ cm² | TIS Non-Scan $A_{aprt}>1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| | Maximum Index Value | | 0.485 | 0.02 | - | - | - | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 4.40 | - | | - | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | - | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | - | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | - | (a) |
| | Dim of $A_{aprt}$ — X (cm) | (cm) | | 2.0 | - | - | - | (a) |
| | Dim of $A_{aprt}$ — Y (cm) | (cm) | | 1.3 | - | - | - | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | - | |
| | Focal Length — FLx (cm) | | | 10.0 | - | - | | |
| | Focal Length — FLy (cm) | | | INF | - | - | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen deep | | | ✓ | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

| | |
|---|---|
| an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters; | Butterfly's POCUS systems include an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals." Butterfly's POCUS systems further include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." *See* Butterfly iQ/Butterfly |

24

iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

Butterfly's POCUS systems include a Butterfly iQ App that uses the ultrasound signals received from the probe to "enable the visualization and measurement of anatomical structures within the human body." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 16 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Butterfly iQ App

The primary function of the Butterfly iQ App is general-purpose diagnostic imaging, for use by qualified and trained health-care professionals to enable the visualization and measurement of anatomical structures within the human body.

Butterfly's POCUS system includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS system includes image processing condition parameters, for example, parameters "optimized for visualizing needles inserted at a 30-45 degree angle." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System

25

<table>
<tr><td></td><td>User Manual at 31 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).



## 8. Using the Needle Viz (in-plane) Tool (Butterfly iQ+ only)

**WARNING!**
When used alone, the Needle Viz (in-plane) tool will NOT enhance the visualization of needles inserted out-of-plane.

Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.

Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets.

When using Needle Viz (in-plane), you can:

- Flip the needle approach direction
- Adjust the depth and gain

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application performs image processing of ultrasound waves received from the probe), in substantially the same way (e.g., the Butterfly IQ application uses image processing parameters), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application receives and processes image data received from the ultrasonic transmitting and receiving unit). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.</td></tr>
<tr><td>an information input unit to be employed for inputting information of object concerned with the object to be inspected;</td><td>Butterfly's POCUS systems include an information input unit to be employed for inputting information of object concerned with the object to be inspected.

For example, Butterfly's POCUS systems include a Butterfly iQ application, which has a series of "presets" that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and</td></tr>
</table>

Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung."  *See* https://www.butterflynetwork.com/iq; (last accessed February 8, 2022):



"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed.  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

27

| | |
|---|---|
| | **Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application provides selectable presets), in substantially the same way (e.g., the presets relate to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application provides selectable presets corresponding to objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit and the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object; | Butterfly's POCUS systems include a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit and the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object.<br><br>Butterfly's POCUS systems also include different built-in "modes." For example, the "M-mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] M-Mode." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

28

### Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

29

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

30

**Using M-Mode**

M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.

When using M-Mode, you can:

- Adjust the radial scan line by tapping and dragging the move point:
- Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen
- Adjust the **Depth** and **Gain**
- Perform time, distance, and heart rate measurements on the display

**Accessing M-Mode**

1. Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.
2. Select Actions on the bottom of the imaging screen.
3. Under Modes, select M-Mode.

The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit.  For example, Table 16 provides the list of parameters used in M-Mode, which correspond with the "FAST," "Abdomen Deep," and "Cardiac THI" presets:

31

**Table 16. Butterfly iQ B + M-mode**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt} \leq 1$ cm² | TIS Non-Scan $A_{aprt} > 1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | $d_{eq}(z_{sp})$ | (cm) | | | | | 2.1 | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of $A_{aprt}$ — X (cm) | | | 2.0 | - | - | 2.5 | (a) |
| | Dim of $A_{aprt}$ — Y (cm) | | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (µsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length — FLx (cm) | | | 10.0 | - | - | | |
| | Focal Length — FLy (cm) | | | INF | - | - | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | | | ✓ | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal

32

Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

Android electronic devices require a memory to execute instructions. *See* https://www.intel.com/content/www/us/en/support/articles/000006179/education/intel-education-software.html (last accessed Oct. 17, 2022).

### Minimum System Requirements for Android* 4.2 and 4.4

This table lists the minimum system requirements for running the Intel® Education Resources Application using Android* 4.2, 4.4.2, or 4.4.4.

| Operating system | Android 4.2, Android 4.4.2, or Android 4.4.4 |
|---|---|
| Processor | Intel Atom® Processor Z2520 1.2 GHz, or faster processor |
| Storage | Between 850 MB and 1.2 GB, depending on the language version |
| RAM | Minimum of 512 MB, 2 GB is recommended |
| Hard Disk | • 2 GB of available hard-disk space for installation; extra free space is required during installation.<br>• You cannot install using a removable flash storage device. |
| Video | 1280 x 800 pixels or higher on a 10-inch device |
| Software | PDF viewer |
| Browser/Internet | • This application is designed to work offline.<br>• To download and launch Google Play* Store apps within the application, a high-speed Internet connection is recommended. |

33

| | |
|---|---|
| a control unit for reading out at least either of the image processing condition parameters and the transmission/reception condition, parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to at least one of the image processing unit and said ultrasonic transmitting and receiving unit; and | Butterfly's POCUS systems include a control unit for reading out at least either of the image processing condition parameters and the transmission/reception condition, parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to at least one of the image processing unit and said ultrasonic transmitting and receiving unit.<br><br>Butterfly's POCUS systems include different built-in "modes." For example, the "M-mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] M-Mode." This communicates the M-Mode information to the ultrasonic transmitting and receiving unit. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Using M-Mode**<br><br>M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.<br><br>When using M-Mode, you can:<br><br>• Adjust the radial scan line by tapping and dragging the move point: ⊙<br>• Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen<br>• Adjust the **Depth** and **Gain**<br>• Perform time, distance, and heart rate measurements on the display<br><br>**Accessing M-Mode**<br><br>1. Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.<br>2. Select Actions on the bottom of the imaging screen.<br>3. Under Modes, select M-Mode.<br><br>The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. For example, Table 16 provides the list of parameters used in M-Mode, which correspond with the "FAST," "Abdomen Deep," and "Cardiac THI" presets: |

**Table 16. Butterfly iQ B + M-mode**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt} \leq 1$ cm² | TIS Non-Scan $A_{aprt} > 1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 2.1 | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | 2.0 | - | - | 2.5 | (a) |
| | | Y (cm) | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length | FLx (cm) | | 10.0 | - | - | | |
| | | FLy (cm) | | INF | - | - | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | ✓ | | | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

35

The Butterfly POCUS system includes a control unit that reads out image parameters to a ultrasonic transmitting and receiving unit. For example, on selecting M-Mode, the parameters associated with M-Mode are supplied to the ultrasonic transmitting and receiving unit:



https://www.youtube.com/watch?v=vb_aqumbldM (last accessed Oct. 14, 2022).

The M-Mode parameters described in Table 16, *supra*, are then communicated to the ultrasonic transmitting and receiving unit.

The Butterfly POCUS system also reads out image parameters to a image processing unit. For example, by "Adjust[ing] the M-line" on the cardiac preset, image processing condition parameters are communicated to the imaging processing unit:



https://www.youtube.com/watch?v=vb_aqumbldM (last accessed Oct. 14, 2022).

| a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. | Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

The "Butterfly iQ App user interface" allows a user to "image freeze [and] image capture." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Overview of User Interface**

This section provides information about the imaging display presented in the Butterfly iQ App user interface.

The app user interface will always show information about the Mechanical Index (MI) and the Thermal Index (TI) at the top of the screen.

Depending on your Butterfly membership status and mobile app version, the toolbar at the bottom of the screen may vary.

The toolbar at the bottom of the screen can be used for preset selection, image freeze, image capture and mode/tool selection.

For example, when performing a study, Butterfly's POCUS device allows a user to view a "live image" on the personal electronic device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

38

## Performing a Study

Once the probe is connected to your mobile device follow the prompts on the screen to begin a new study. It is not required to enter patient information to begin or complete a study.

From the main scan screen you can freeze an image ⊕, capture still images ▣ and record clips ▣ using the toolbar at the bottom of the screen. The live image must be frozen in order to capture a still image.

Captures may be reviewed from the Capture Reel located in the top right corner of the screen ▣ before the study is completed.

To conclude a patient encounter, click on the capture reel and follow the steps on screen to upload the study.

During scanning, you may swipe horizontally to adjust the gain and swipe vertically to adjust the depth. The Time Gain Compensation (TGC) control button is surfaced upon tapping the screen ▣.

Butterfly's POCUS system outputs images from the image data onto a display unit.  For example, the POCUS system allows for "ultra clear lung imaging" using "ultrasound-on-chip," with the images output onto the personal electronic device.  *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):



| Claim 7 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 6, wherein: said parameter memory unit stores a plurality of image processing condition parameter sets and a plurality of transmission/reception condition parameter sets in correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object. | Butterfly's POCUS systems include each of the elements of Claim 6, and additionally include wherein: said parameter memory unit stores a plurality of image processing condition parameter sets and a plurality of transmission/reception condition parameter sets in correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object.<br><br>*See supra* at Claim 6.<br><br>For example, Butterfly's POCUS systems include a plurality of "presets" in the personal electronic device running the Butterfly iQ Application that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung." *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022): |



"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS system includes a plurality of image processing condition parameter sets corresponding to particular information of objects.  For example, Butterfly's POCUS system includes a preset for "abdomen," which includes a parameter set that "uses harmonic frequencies in a curvilinear format to support the clinical assessment of structures the size and morphology of abdominal organs, such as the liver and kidney, to a depth of 25cm. It is also

| | used for abdominal procedures, such as paracentesis or ECMO lines in the IVC." https://support.butterflynetwork.com/hc/en-us/articles/360027864632-Presets; (last accessed Oct. 14, 2022). Butterfly's POCUS system includes a second parameter set for the abdomen called "Abdomen Deep." *Id*. It "uses the fundamental low frequencies required to provide the depth of penetration necessary for abdominal assessments of up to 30cm. This curvilinear preset is typically reserved for technically challenging patients, such as high BMI or those with highly attenuating livers, as in hepatitis." *Id*.<br><br>As a further example that Butterfly's POCUS system includes a plurality of image processing condition parameter sets corresponding to particular information of objects, after selecting for "lung" scanning, Butterfly's POCUS system provides a list of "lung actions," including "modes" and "protocols." *See* https://www.youtube.com/watch?v=ya-SGgzA8J0 (last accessed Oct. 14, 2022): |
|---|---|



Butterfly's POCUS systems include different "modes."  For example, the "M-mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] M-Mode."  This communicates the M-Mode information to the ultrasonic transmitting and receiving unit.  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

43

**Using M-Mode**

M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.

When using M-Mode, you can:

- Adjust the radial scan line by tapping and dragging the move point: ⊙
- Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen
- Adjust the **Depth** and **Gain**
- Perform time, distance, and heart rate measurements on the display

**Accessing M-Mode**

1. Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.
2. Select Actions on the bottom of the imaging screen.
3. Under Modes, select M-Mode.

The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. For example, Table 16 provides the list of parameters used in M-Mode, which correspond with the "FAST," "Abdomen Deep," and "Cardiac THI" presets:

44

**Table 16. Butterfly iQ B + M-mode**

| | Index Label | | MI | Scan | Non-Scan $A_{aprt} \leq 1$ cm² | Non-Scan $A_{aprt} > 1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| | Maximum Index Value | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 2.1 | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | 2.0 | - | - | 2.5 | (a) |
| | | Y (cm) | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length | FLx (cm) | | 10.0 | - | - | | |
| | | FLy (cm) | | INF | - | - | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | ✓ | | | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application stores image processing and transmission parameters), in substantially the same way (e.g., relating the image processing and transmission parameters to objects to be imaged by the probe), and

45

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application stores image processing and transmission parameters and selects the parameters based on an object to be imaged from a set of objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 8** | |
| An ultrasonic diagnostic apparatus according to claim 6, wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. | Butterfly's POCUS systems include each of the elements of Claim 6, and additionally include wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. *See supra* at Claim 6. For example, Butterfly's POCUS systems include at least a scale- up or scale-down process.  On the "lung" preset, the image is scaled to fit eight centimeters of image on the display unit.  On the "card" (for cardiac) preset, the image is scaled to fit 16 centimeters on the display unit. |



*See* https://www.youtube.com/watch?v=0RVjAiAoH1c (last accessed Oct. 14, 2022).

| **Claim 9** | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 6, wherein ultrasonic | Butterfly's POCUS systems include each of the elements of Claim 6, and additionally include wherein ultrasonic transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a |

| | |
|---|---|
| transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focusing position, transmission power and reception sensitivity for the echo waves. | control of at least one of a center frequency, a bandwidth, and a focusing position, transmission power and reception sensitivity for the echo waves.<br><br>*See supra* at Claim 6.<br><br>The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit, including at least one of a center frequency, a focusing position, and a transmission power. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

**Table 16. Butterfly iQ B + M-mode**

| | Index Label | | MI | TIS Scan | TIS Non-Scan $A_{aprt} \leq 1$ cm$^2$ | TIS Non-Scan $A_{aprt} > 1$ cm$^2$ | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| | Maximum Index Value | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | W$_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [W.3(z$_1$), I$_{TA.3}$(z$_1$)] | (mW) | | | | - | | |
| | z$_1$ | (cm) | | | | - | | |
| | z$_{bp}$ | (cm) | | | | - | | |
| | z$_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | d$_{eq}$(z$_{sp}$) | (cm) | | | | | 2.1 | |
| | f$_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of A$_{aprt}$ X (cm) | | | 2.0 | - | - | 2.5 | (a) |
| | Dim of A$_{aprt}$ Y (cm) | | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (µsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | p$_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | d$_{eq}$ @PII$_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length FLx (cm) | | | 10.0 | - | - | | |
| | Focal Length FLy (cm) | | | INF | - | - | | |
| | I$_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | ✓ | | | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

| **Claim 10** | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 6, further comprising: a three-dimensional image construction unit for | Butterfly's POCUS systems include each of the elements of Claim 6, and additionally include a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit. |

| | |
|---|---|
| constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit. | *See supra* at Claim 6.<br><br>For example, Butterfly's POCUS system can generate an "interactive 3D render of the bladder." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 39 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). This 3D render is made by using the "probe" to conduct "[a] 3D sweep of the bladder area." *Id*. The 3D render of the bladder is output to the display unit:<br><br><br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 40 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

50

| **Claim 12** | |
|---|---|
| An ultrasonic diagnostic apparatus comprising: | To the extent that the preamble is construed as a limitation, Butterfly's POCUS systems include an ultrasonic diagnostic apparatus.<br><br>For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |
| an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object; | Butterfly's POCUS systems include an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals |

51

| | |
|---|---|
| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Butterfly's POCUS systems use "ultrasound" for "imaging and measurement of anatomical structures and fluids of adult and pediatric patients."<br><br>Butterfly iQ/Butterfly iQ+ is indicated for use by trained healthcare professionals in environments where healthcare is provided to enable diagnostic ultrasound imaging and measurement of anatomical structures and fluids of adult and pediatric patients for the following clinical applications:<br><br>• Peripheral Vessel (including carotid, deep vein thrombosis and arterial studies)<br><br>• Procedural Guidance<br><br>• Small Organs (including thyroid, scrotum and breast)<br><br>• Cardiac<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 5 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |
| an image analysis unit for analyzing image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, thereby to calculate normalization parameters; | Butterfly's POCUS systems include an image analysis unit for analyzing image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, thereby to calculate normalization parameters.<br><br>For example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).<br><br>Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].<br><br>"[T]he deep learning model may thereby learn to determine, based on inputted ultrasound data, a set of coordinates corresponding to the ultrasound data." Id. at [0057]. |

| | |
|---|---|
| | "[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.<br><br>"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.<br><br>Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing. |
| an image processing unit for executing a normalization process of the image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, in accordance with a normalization rule by using the normalization parameters calculated by said image analysis unit, and for executing image processing of the image data by using image processing condition parameters; | Butterfly's POCUS systems include an image processing unit for executing a normalization process of the image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, in accordance with a normalization rule by using the normalization parameters calculated by said image analysis unit, and for executing image processing of the image data by using image processing condition parameters.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals." Butterfly's POCUS systems further include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>Butterfly's POCUS systems include a Butterfly iQ App that uses the ultrasound signals received from the probe to "enable the visualization and measurement of anatomical structures within the human body." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 16 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

53

**Butterfly iQ App**

The primary function of the Butterfly iQ App is general-purpose diagnostic imaging, for use by qualified and trained health-care professionals to enable the visualization and measurement of anatomical structures within the human body.

Butterfly's POCUS system includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS system includes image processing condition parameters, for example, parameters "optimized for visualizing needles inserted at a 30-45 degree angle." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 31 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

54

## 8. Using the Needle Viz (in-plane) Tool (Butterfly iQ+ only)

 **WARNING!**
When used alone, the Needle Viz (in-plane) tool will NOT enhance the visualization of needles inserted out-of-plane.

Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.

Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets.

When using Needle Viz (in-plane), you can:

- Flip the needle approach direction
- Adjust the depth and gain

As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].

"[T]he deep learning model may thereby learn to determine , based on inputted ultrasound data , a set of coordinates corresponding to the ultrasound data." Id. at [0057].

"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.

"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.

| | |
|---|---|
| | Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing. <br><br> Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application performs image processing and normalization of ultrasound waves received from the probe), in substantially the same way (e.g., the Butterfly IQ application uses image processing parameters and normalization parameters), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application receives, processes and analyzes image data received from the ultrasonic transmitting and receiving unit). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| an information input unit to be employed for inputting information of object concerned with the object to be inspected; | Butterfly's POCUS systems include an information input unit to be employed for inputting information of object concerned with the object to be inspected. <br><br> For example, Butterfly's POCUS systems include a Butterfly iQ application, which has a series of "presets" that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung." *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022): |



"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed.

| | |
|---|---|
| | **Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application provides selectable presets), in substantially the same way (e.g., the presets relate to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application provides selectable presets corresponding to objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| a memory unit for storing the normalization rules and the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object; | Butterfly's POCUS systems include a memory unit for storing the normalization rules and the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br><br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br><br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals |

The Butterfly iQ App on the personal electronic device includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Android electronic devices require a memory to execute instructions. *See* https://www.intel.com/content/www/us/en/support/articles/000006179/education/intel-education-software.html (last accessed Oct. 17, 2022).

### Minimum System Requirements for Android* 4.2 and 4.4

This table lists the minimum system requirements for running the Intel® Education Resources Application using Android* 4.2, 4.4.2, or 4.4.4.

| Operating system | Android 4.2, Android 4.4.2, or Android 4.4.4 |
|---|---|
| Processor | Intel Atom® Processor Z2520 1.2 GHz, or faster processor |
| Storage | Between 850 MB and 1.2 GB, depending on the language version |
| RAM | Minimum of 512 MB, 2 GB is recommended |
| Hard Disk | • 2 GB of available hard-disk space for installation; extra free space is required during installation.<br>• You cannot install using a removable flash storage device. |
| Video | 1280 x 800 pixels or higher on a 10-inch device |
| Software | PDF viewer |
| Browser/Internet | • This application is designed to work offline.<br>• To download and launch Google Play* Store apps within the application, a high-speed Internet connection is recommended. |

59

Butterfly's POCUS systems also include different built-in "modes."  For example, the "Color Doppler mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] Color Doppler." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Using Color Doppler Mode or Power Doppler Mode**

When using Color Doppler or Power Doppler, you can:

- Adjust the size and position of the ROI.
- Adjust the Gain and Depth.
- Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

60

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

61

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Table 15. Butterfly iQ B-Mode + Color**

| | Index Label | | MI | | TIS | | TIB | TIC |
|---|---|---|---|---|---|---|---|---|
| | | | | Scan | Non-Scan $A_{aprt}\leq1$ cm² | Non-Scan $A_{aprt}>1$ cm² | Non-Scan | |
| | Maximum Index Value | | 0.485 | - | - | 0.13 | 0.29 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | - | - | | 17.4 | (a) |
| | min of $[W_{.3}(z_1), I_{TA.3}(z_1)]$ | (mW) | | | | 0.74 | | |
| | $z_1$ | (cm) | | | | 7.8 | | |
| | $z_{bp}$ | (cm) | | | | 2.76 | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 7.1 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 1.84 | . |
| | $f_c$ | (MHz) | 2.19 | - | - | 2.49 | 2.49 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | - | - | 2.0 | 2.0 | (a) |
| | | Y (cm) | | - | - | 1.8 | 1.8 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $P_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 1.84 | |
| | Focal Length | FLx (cm) | | - | - | 10.0 | | |
| | | FLy (cm) | | - | - | 10.0 | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Bladder | | | | | | ✓ | ✓ |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto

| | |
|---|---|
| | Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].

"[T]he deep learning model may thereby learn to determine, based on inputted ultrasound data, a set of coordinates corresponding to the ultrasound data." Id. at [0057].

"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.

"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.

Butterfly's POCUS systems, on information and belief, store in memory one or more normalization functions with such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing. |
| a control unit for reading out the normalization rule and the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said memory unit so as to supply the read-out rule and parameters to the image processing unit; | Butterfly's POCUS systems include a control unit for reading out the normalization rule and the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from Said memory unit so as to supply the read-out rule and parameters to the image processing unit.

For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

The Butterfly iQ App on the personal electronic device includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." These parameter values are used to change how the "Butterfly iQ App . . . operates." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Presets**

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].

"[T]he deep learning model may thereby learn to determine , based on inputted ultrasound data , a set of coordinates corresponding to the ultrasound data." Id. at [0057].

65

| | |
|---|---|
| | "[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id. |
| | "[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id. |
| | Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing. |
| and a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. | Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. |

Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit.

For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

The "Butterfly iQ App user interface" allows a user to "image freeze [and] image capture." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Overview of User Interface

This section provides information about the imaging display presented in the Butterfly iQ App user interface.

The app user interface will always show information about the Mechanical Index (MI) and the Thermal Index (TI) at the top of the screen.

Depending on your Butterfly membership status and mobile app version, the toolbar at the bottom of the screen may vary.

The toolbar at the bottom of the screen can be used for preset selection, image freeze, image capture and mode/tool selection.

For example, when performing a study, Butterfly's POCUS device allows a user to view a "live image" on the personal electronic device.

## Performing a Study

Once the probe is connected to your mobile device follow the prompts on the screen to begin a new study. It is not required to enter patient information to begin or complete a study.

From the main scan screen you can freeze an image ⊕, capture still images and record clips using the toolbar at the bottom of the screen. The live image must be frozen in order to capture a still image.

Captures may be reviewed from the Capture Reel located in the top right corner of the screen before the study is completed.

To conclude a patient encounter, click on the capture reel and follow the steps on screen to upload the study.

During scanning, you may swipe horizontally to adjust the gain and swipe vertically to adjust the depth. The Time Gain Compensation (TGC) control button is surfaced upon tapping the screen.

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS system outputs images from the image data onto a display unit. *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):

67

| Claim 13 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 12, wherein: said memory unit stores a plurality of normalization rules and a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting a normalization rule from among the plurality of normalization rules corresponding to the information of object and selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object. | Butterfly's POCUS systems include each of the elements of Claim 12, and additionally include wherein: said memory unit stores a plurality of normalization rules and a plurality of image processing condition parameter sets in correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting a normalization rule from among the plurality of normalization rules corresponding to the information of object and selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object. *See supra* at Claim 12. For example, Butterfly's POCUS systems include a plurality of "presets" in the personal electronic device running the Butterfly iQ Application that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung." *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):  |

"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS system includes a plurality of image processing condition parameter sets corresponding to particular information of objects. For example, Butterfly's POCUS system includes a preset for "bladder," which includes a parameter set that "optimized for the contrast and detail required for bladder assessment. The Field of View (FOV) is expanded to 120 degrees to enable broader visualization of the bladder to a depth up to 20cm. This curvilinear preset includes the application of harmonic imaging for high resolution imaging. It provides the penetration necessary for visualization of the entire bladder, and the contrast resolution required to demonstrate the bladder wall with confidence." https://support.butterflynetwork.com/hc/en-us/articles/360027864632-Presets; (last accessed Oct. 14, 2022).

As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].

"[T]he deep learning model may thereby learn to determine, based on inputted ultrasound data, a set of coordinates corresponding to the ultrasound data." Id. at [0057].

"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.

<table>
<tr>
<td></td>
<td>"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.

Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application stores image processing and transmission parameters), in substantially the same way (e.g., relating the image processing, normalization rules, and transmission parameters to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application stores image processing and transmission parameters and selects the parameters based on an object to be imaged from a set of objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.</td>
</tr>
<tr>
<td colspan="2"><strong>Claim 14</strong></td>
</tr>
<tr>
<td>An ultrasonic diagnostic apparatus according to claim 12, wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data.</td>
<td>Butterfly's POCUS systems include each of the elements of Claim 12, and additionally include wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data.

*See supra* at Claim 12.

For example, Butterfly's POCUS systems include at least a gradation control process, a scale-up process, and a scale-down process. Butterfly's POCUS system includes a preset for "bladder," which includes a parameters that are "optimized for the contrast and detail required for bladder assessment. The Field of View (FOV) is expanded to 120 degrees to enable broader visualization of the bladder to a depth up to 20cm. This curvilinear preset includes the application of harmonic imaging for high resolution imaging. It provides the penetration necessary for visualization of the entire bladder, and the contrast resolution required to demonstrate the bladder wall with confidence." https://support.butterflynetwork.com/hc/en-us/articles/360027864632-Presets; (last accessed Oct. 14, 2022).</td>
</tr>
</table>

70

| Claim 15 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 12, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit. | Butterfly's POCUS systems include each of the elements of Claim 12, and additionally include a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit.<br><br>*See supra* at Claim 12.<br><br>For example, Butterfly's POCUS system can generate an "interactive 3D render of the bladder." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 39 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). This 3D render is made by using the "probe" to conduct "[a] 3D sweep of the bladder area." *Id*. The 3D render of the bladder is output to the display unit:<br><br> |

71

| | |
|---|---|
| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 40 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |
| **Claim 17** | |
| An ultrasonic diagnostic apparatus comprising: | To the extent that the preamble is construed as a limitation, Butterfly's POCUS systems include an ultrasonic diagnostic apparatus. <br><br> For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device." <br><br> **Overview** <br><br> Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components: <br><br> • Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device) <br> • The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device <br> • The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals <br><br> *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |
| an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters; | Butterfly's POCUS systems include an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object, in accordance with ultrasonic transmission/reception conditions which are set on the basis of transmission/reception condition parameters. <br><br> For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals." |

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS systems use "ultrasound" for "imaging and measurement of anatomical structures and fluids of adult and pediatric patients."

Butterfly iQ/Butterfly iQ+ is indicated for use by trained healthcare professionals in environments where healthcare is provided to enable diagnostic ultrasound imaging and measurement of anatomical structures and fluids of adult and pediatric patients for the following clinical applications:

- Peripheral Vessel (including carotid, deep vein thrombosis and arterial studies)
- Procedural Guidance
- Small Organs (including thyroid, scrotum and breast)
- Cardiac

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 5 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS systems also include different built-in "modes." For example, the "Color Doppler mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] Color Doppler." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

73

**Using Color Doppler Mode or Power Doppler Mode**

When using Color Doppler or Power Doppler, you can:

- Adjust the size and position of the ROI.
- Adjust the Gain and Depth.
- Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

The Color Doppler Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. Color Doppler Mode can be accessed by selecting your desired preset, such as "Bladder." Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

74

**Table 15. Butterfly iQ B-Mode + Color**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt} \leq 1$ cm² | TIS Non-Scan $A_{aprt} > 1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | - | - | 0.13 | 0.29 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | - | - | | 17.4 | (a) |
| | min of $[W_{.3}(z_1), I_{TA.3}(z_1)]$ | (mW) | | | | 0.74 | | |
| | $z_1$ | (cm) | | | | 7.8 | | |
| | $z_{bp}$ | (cm) | | | | 2.76 | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 7.1 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 1.84 | ˙ |
| | $f_c$ | (MHz) | 2.19 | - | - | 2.49 | 2.49 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | - | - | 2.0 | 2.0 | (a) |
| | | Y (cm) | | - | - | 1.8 | 1.8 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 1.84 | |
| | Focal Length | FLx (cm) | | - | - | 10.0 | | |
| | | FLy (cm) | | - | - | 10.0 | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Bladder | | | | | ✓ | ✓ | |

| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. |
|---|---|
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). |
| (a) | Intended use does not include cephalic so TIC is not computed. |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

| an image analysis unit for analyzing image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, | Butterfly's POCUS systems include an image analysis unit for analyzing image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, thereby to calculate normalization parameters.<br><br>For example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters |

| | |
|---|---|
| thereby to calculate normalization parameters; | of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).<br><br>Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].<br><br>"[T]he deep learning model may thereby learn to determine , based on inputted ultrasound data , a set of coordinates corresponding to the ultrasound data." Id. at [0057].<br><br>"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.<br><br>"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.<br><br>Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing. |
| an image processing unit for executing a normalization process of the image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, in accordance with a normalization rule by using the normalization parameters calculated by said image analysis unit, and for executing image processing of the image data by using image processing condition parameters; | Butterfly's POCUS systems include an image processing unit for executing a normalization process of the image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, in accordance with a normalization rule by using the normalization parameters calculated by said image analysis unit, and for executing image processing of the image data by using image processing condition parameters.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals."  Butterfly's POCUS systems further include a compatible "personal electronic device[]" to run its "Butterfly iQ Application."  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

76

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

Butterfly's POCUS systems include a Butterfly iQ App that uses the ultrasound signals received from the probe to "enable the visualization and measurement of anatomical structures within the human body." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 16 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Butterfly iQ App**

The primary function of the Butterfly iQ App is general-purpose diagnostic imaging, for use by qualified and trained health-care professionals to enable the visualization and measurement of anatomical structures within the human body.

Butterfly's POCUS system includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Presets**

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS system includes image processing condition parameters, for example, parameters "optimized for visualizing needles inserted at a 30-45 degree angle." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 31 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).



### 8. Using the Needle Viz (in-plane) Tool (Butterfly iQ+ only)

**WARNING!**
When used alone, the Needle Viz (in-plane) tool will NOT enhance the visualization of needles inserted out-of-plane.

Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.

Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets.

When using Needle Viz (in-plane), you can:

- Flip the needle approach direction
- Adjust the depth and gain

As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].

"[T]he deep learning model may thereby learn to determine, based on inputted ultrasound data, a set of coordinates corresponding to the ultrasound data." Id. at [0057].

"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.

"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.

| | |
|---|---|
| | Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application performs image processing and normalization of ultrasound waves received from the probe), in substantially the same way (e.g., the Butterfly IQ application uses image processing parameters and normalization parameters), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application receives, processes and analyzes image data received from the ultrasonic transmitting and receiving unit). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| an information input unit to be employed for inputting information of object concerned with the object to be inspected; | Butterfly's POCUS systems include an information input unit to be employed for inputting information of object concerned with the object to be inspected.<br><br>For example, Butterfly's POCUS systems include a Butterfly iQ application, which has a series of "presets" that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung." *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022): |



"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed.

| | |
|---|---|
| | **Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application provides selectable presets), in substantially the same way (e.g., the presets relate to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application provides selectable presets corresponding to objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| a memory unit for storing the normalization rules and the image processing condition parameters to be used in said image processing unit and the transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit, in correspondence with the information of object; | Butterfly's POCUS systems include a memory unit for storing the normalization rules and the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br><br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br><br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals |

The Butterfly iQ App on the personal electronic device includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

## Presets

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS systems also include different built-in "modes." For example, the "Color Doppler mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] Color Doppler." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

### Using Color Doppler Mode or Power Doppler Mode

When using Color Doppler or Power Doppler, you can:

• Adjust the size and position of the ROI.
• Adjust the Gain and Depth.
• Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

82

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

83

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

84

**Table 15. Butterfly iQ B-Mode + Color**

| | Index Label | | MI | TIS | | | TIB | TIC |
| | | | | Scan | Non-Scan | | Non-Scan | |
| | | | | | $A_{aprt} \leq 1$ cm$^2$ | $A_{aprt} > 1$ cm$^2$ | | |
|---|---|---|---|---|---|---|---|---|
| | Maximum Index Value | | 0.485 | - | - | 0.13 | 0.29 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | - | - | | 17.4 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | 0.74 | | |
| | $z_1$ | (cm) | | | | 7.8 | | |
| | $z_{bp}$ | (cm) | | | | 2.76 | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 7.1 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 1.84 | . |
| | $f_c$ | (MHz) | 2.19 | - | - | 2.49 | 2.49 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | - | - | 2.0 | 2.0 | (a) |
| | | Y (cm) | | - | - | 1.8 | 1.8 | (a) |
| Other Information | PD | (µsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $P_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 1.84 | |
| | Focal Length | FLx (cm) | | - | - | 10.0 | | |
| | | FLy (cm) | | - | - | 10.0 | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Bladder | | | | | ✓ | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

The Color Doppler Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. Color Doppler Mode can be accessed by selecting your desired preset, such as "Bladder."

85

| | |
|---|---|
| | Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).<br><br>Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].<br><br>"[T]he deep learning model may thereby learn to determine , based on inputted ultrasound data , a set of coordinates corresponding to the ultrasound data." Id. at [0057].<br><br>"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.<br><br>"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.<br><br>Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing.<br><br>Android electronic devices require a memory to execute instructions. *See* https://www.intel.com/content/www/us/en/support/articles/000006179/education/intel-education-software.html (last accessed Oct. 17, 2022). |

| | |
|---|---|
| | **Minimum System Requirements for Android\* 4.2 and 4.4**<br><br>This table lists the minimum system requirements for running the Intel® Education Resources Application using Android\* 4.2, 4.4.2, or 4.4.4.<br><br><table><tr><td>Operating system</td><td>Android 4.2, Android 4.4.2, or Android 4.4.4</td></tr><tr><td>Processor</td><td>Intel Atom® Processor Z2520 1.2 GHz, or faster processor</td></tr><tr><td>Storage</td><td>Between 850 MB and 1.2 GB, depending on the language version</td></tr><tr><td>RAM</td><td>Minimum of 512 MB, 2 GB is recommended</td></tr><tr><td>Hard Disk</td><td>• 2 GB of available hard-disk space for installation; extra free space is required during installation.<br>• You cannot install using a removable flash storage device.</td></tr><tr><td>Video</td><td>1280 x 800 pixels or higher on a 10-inch device</td></tr><tr><td>Software</td><td>PDF viewer</td></tr><tr><td>Browser/Internet</td><td>• This application is designed to work offline.<br>• To download and launch Google Play\* Store apps within the application, a high-speed Internet connection is recommended.</td></tr></table><br>Butterfly's POCUS systems, on information and belief, store in memory one or more normalization functions with such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing. |
| a control unit for reading out at least either of the normalization rule and the image processing condition parameters, which correspond to the information of object input by employing said information input unit, from said memory unit so as to supply at least either of the read-out rule and the read-out parameters to said image processing unit, and for reading out the transmission/reception condition parameters, which correspond to the information | Butterfly's POCUS systems include a control unit for reading out at least either of the normalization rule and the image processing condition parameters, which correspond to the information of object input by employing said information input unit, from said memory unit so as to supply at least either of the read-out rule and the read-out parameters to said image processing unit, and for reading out the transmission/reception condition parameters, which correspond to the information of object, from said memory unit so as to supply the read-out parameters to said ultrasonic transmitting and receiving unit.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

| | |
|---|---|
| of object, from said memory unit so as to supply the read-out parameters to said ultrasonic transmitting and receiving unit; | **Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>The Butterfly iQ App on the personal electronic device includes image processing condition parameters, for example, "presets," which are "predefined set[s] of imaging parameter values."  These parameter values are used to change how the "Butterfly iQ App . . . operates."  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).<br><br>Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].<br><br>"[T]he deep learning model may thereby learn to determine , based on inputted ultrasound data , a set of coordinates corresponding to the ultrasound data." Id. at [0057]. |

"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.

"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.

Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing.

Butterfly's POCUS systems also include different built-in "modes." For example, the "Color Doppler mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] Color Doppler." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

### Using Color Doppler Mode or Power Doppler Mode

When using Color Doppler or Power Doppler, you can:

- Adjust the size and position of the ROI.
- Adjust the Gain and Depth.
- Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

90

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | B | M | Power | PWD | Color Doppler | Combined (Specify) |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

91

**Table 15. Butterfly iQ B-Mode + Color**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt} \le 1$ cm² | TIS Non-Scan $A_{aprt} > 1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | - | - | 0.13 | 0.29 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | - | - | | 17.4 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | 0.74 | | |
| | $z_1$ | (cm) | | | | 7.8 | | |
| | $z_{bp}$ | (cm) | | | | 2.76 | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 7.1 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 1.84 | . |
| | $f_c$ | (MHz) | 2.19 | - | - | 2.49 | 2.49 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | - | - | 2.0 | 2.0 | (a) |
| | | Y (cm) | | - | - | 1.8 | 1.8 | (a) |
| Other Information | PD | (µsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $P_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 1.84 | |
| | Focal Length | FLx (cm) | | - | - | 10.0 | | |
| | | FLy (cm) | | - | - | 10.0 | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Bladder | | | | | ✓ | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

The Color Doppler Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. Color Doppler Mode can be accessed by selecting your desired preset, such as "Bladder."

Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

The Butterfly POCUS system includes a control unit that reads out image parameters to a ultrasonic transmitting and receiving unit. For example, on selecting Color Doppler Mode, the parameters associated with Color Doppler are

| | |
|---|---|
| | supplied to the ultrasonic transmitting and receiving unit. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>The Color Doppler Mode parameters are then communicated, on information and belief, to the ultrasonic transmitting and receiving unit.<br><br>The Butterfly POCUS system also reads out image parameters to a image processing unit.  For example, by "Color gain and depth controls are available during Doppler imaging" in Color Doppler Mode, image processing condition parameters are communicated to the imaging processing unit. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Using Color Doppler Mode or Power Doppler Mode**<br><br>When using Color Doppler or Power Doppler, you can:<br><br>• Adjust the size and position of the ROI.<br>• Adjust the Gain and Depth.<br>• Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen<br><br>The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.<br><br>Color gain and depth controls are available during Doppler imaging. |
| and a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. | Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit.<br><br>For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application."  The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

The "Butterfly iQ App user interface" allows a user to "image freeze [and] image capture." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Overview of User Interface**

This section provides information about the imaging display presented in the Butterfly iQ App user interface.

The app user interface will always show information about the Mechanical Index (MI) and the Thermal Index (TI) at the top of the screen.

Depending on your Butterfly membership status and mobile app version, the toolbar at the bottom of the screen may vary.

The toolbar at the bottom of the screen can be used for preset selection, image freeze, image capture and mode/tool selection.

For example, when performing a study, Butterfly's POCUS device allows a user to view a "live image" on the personal electronic device.

94

**Performing a Study**

Once the probe is connected to your mobile device follow the prompts on the screen to begin a new study. It is not required to enter patient information to begin or complete a study.

From the main scan screen you can freeze an image ⊕, capture still images ▣ and record clips ▣ using the toolbar at the bottom of the screen. The live image must be frozen in order to capture a still image.

Captures may be reviewed from the Capture Reel located in the top right corner of the screen ▣ before the study is completed.

To conclude a patient encounter, click on the capture reel and follow the steps on screen to upload the study.

During scanning, you may swipe horizontally to adjust the gain and swipe vertically to adjust the depth. The Time Gain Compensation (TGC) control button is surfaced upon tapping the screen ▣.

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS system outputs images from the image data onto a display unit. *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):

| **Claim 18** | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 17, wherein: said memory unit stores a plurality of normalization rules, a plurality of image processing condition parameter sets and a plurality of transmission/reception condition parameter sets in | Butterfly's POCUS systems include each of the elements of Claim 17, and additionally include wherein: said memory unit stores a plurality of normalization rules, a plurality of image processing condition parameter sets and a plurality of transmission/reception condition parameter sets in correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting that a normalization rule from among the plurality of normalization rules corresponding to the information of object and selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter |

| | |
|---|---|
| correspondence with one item of the information of object; and said information input unit is employed for inputting the information of object and for selecting that a normalization rule from among the plurality of normalization rules corresponding to the information of object and selecting an image processing condition parameter set from among the plurality of image processing condition parameter sets corresponding to the information of object and selecting a transmission/reception condition parameter set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object. | set from among the plurality of transmission/reception condition parameter sets corresponding to the information of object.. *See supra* at Claim 17. For example, Butterfly's POCUS systems include a plurality of "presets" in the personal electronic device running the Butterfly iQ Application that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung." *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):  "Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

**Presets**

Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.

Butterfly's POCUS system includes a plurality of image processing condition parameter sets corresponding to particular information of objects. For example, Butterfly's POCUS system includes a preset for "bladder," which includes a parameter set that "optimized for the contrast and detail required for bladder assessment. The Field of View (FOV) is expanded to 120 degrees to enable broader visualization of the bladder to a depth up to 20cm. This curvilinear preset includes the application of harmonic imaging for high resolution imaging. It provides the penetration necessary for visualization of the entire bladder, and the contrast resolution required to demonstrate the bladder wall with confidence." https://support.butterflynetwork.com/hc/en-us/articles/360027864632-Presets; (last accessed Oct. 14, 2022).

Butterfly's POCUS systems also include different built-in "modes." For example, the "Color Doppler mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] Color Doppler." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Using Color Doppler Mode or Power Doppler Mode**

When using Color Doppler or Power Doppler, you can:

- Adjust the size and position of the ROI.
- Adjust the Gain and Depth.
- Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

97

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
|---|---|---|---|---|---|---|---|
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

98

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

**Table 15. Butterfly iQ B-Mode + Color**

| | Index Label | | MI | TIS Scan | TIS Non-Scan $A_{aprt}{\le}1$ cm² | TIS Non-Scan $A_{aprt}{>}1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| | Maximum Index Value | | 0.485 | - | - | 0.13 | 0.29 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | - | - | | 17.4 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | 0.74 | | |
| | $z_1$ | (cm) | | | | 7.8 | | |
| | $z_{bp}$ | (cm) | | | | 2.76 | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 7.1 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 1.84 | . |
| | $f_c$ | (MHz) | 2.19 | - | - | 2.49 | 2.49 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | - | - | 2.0 | 2.0 | (a) |
| | | Y (cm) | | - | - | 1.8 | 1.8 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $P_r$ @$PII_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @$PII_{max}$ | (cm) | | | | | 1.84 | |
| | Focal Length | FLx (cm) | | - | - | 10.0 | | |
| | | FLy (cm) | | - | - | 10.0 | | |
| | $I_{PA.3}$ @$MI_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Bladder | | | | | ✓ | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

The Color Doppler Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. Color Doppler Mode can be accessed by selecting your desired preset, such as "Bladder."

Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

|  | As another example, Butterfly's POCUS systems include "deep neural network based artificial intelligence (AI) algorithm" for analyzing "2D ultrasound images" using analysis tools, *e.g.*, "Auto Bladder Volume tool", where the "parameters of the algorithm are optimized" by showing the algorithm "ultrasound images". *See* Butterfly iQ+ Auto Bladder Volume White Paper at 6-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).<br><br>Butterfly further describes POCUS systems that include "deep learning models" which calculate normalization parameters, e.g., "a set of coordinates", based on "ultrasound data". *See* US Pub. No. 20200046322 at [0056].<br><br>"[T]he deep learning model may thereby learn to determine , based on inputted ultrasound data , a set of coordinates corresponding to the ultrasound data." Id. at [0057].<br><br>"[T]he processing device may receive a selection of the subject's body type ( e.g., height, girth, male / female, etc. ), and the deep learning model may use information about the subject's body type when determining the set of coordinates to output for given ultrasound data." Id.<br><br>"[T]he body type information may be used by the deep learning model to normalize outputs of the deep learning to the model of the canonical body portion." Id.<br><br>Butterfly's POCUS systems, on information and belief, perform one or more normalization functions on such normalization parameters (e.g., coordinate data) as part of the machine learning techniques and processing.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application stores image processing and transmission parameters), in substantially the same way (e.g., relating the image processing, normalization rules, and transmission parameters to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application stores image processing and transmission parameters and selects the parameters based on an object to be imaged from a set of objects to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
|---|---|
| **Claim 19** |  |

| | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 17, wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. | Butterfly's POCUS systems include each of the elements of Claim 17, and additionally include wherein image processing condition parameters to be used in the image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data.<br><br>*See supra* at Claim 17.<br><br>For example, Butterfly's POCUS systems include at least a gradation control process, a scale-up process, and a scale-down process. Butterfly's POCUS system includes a preset for "bladder," which includes parameters that are "optimized for the contrast and detail required for bladder assessment. The Field of View (FOV) is expanded to 120 degrees to enable broader visualization of the bladder to a depth up to 20cm. This curvilinear preset includes the application of harmonic imaging for high resolution imaging. It provides the penetration necessary for visualization of the entire bladder, and the contrast resolution required to demonstrate the bladder wall with confidence." https://support.butterflynetwork.com/hc/en-us/articles/360027864632-Presets; (last accessed Oct. 14, 2022). |
| **Claim 20** | |
| An ultrasonic diagnostic apparatus according to claim 17, wherein ultrasonic transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focusing position, transmission power and reception sensitivity for the echo waves. | Butterfly's POCUS systems include each of the elements of Claim 17, and additionally include wherein ultrasonic transmission/reception condition parameters to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focusing position, transmission power and reception sensitivity for the echo waves.<br><br>*See supra* at Claim 17.<br><br>Butterfly's POCUS systems also include different built-in "modes." For example, the "Color Doppler mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] Color Doppler." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

**Using Color Doppler Mode or Power Doppler Mode**

When using Color Doppler or Power Doppler, you can:

- Adjust the size and position of the ROI.
- Adjust the Gain and Depth.
- Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

103

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

104

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

**Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:**

| Clinical Application | | B | M | Power | PWD | Color Doppler | Combined (Specify) |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | | | | | | |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode / B-Mode + Color Doppler / B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode / B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode / B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode / B-Mode + Color Doppler / B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode / B-Mode + Color Doppler / B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode / B-Mode + Color Doppler / B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

105

**Table 15. Butterfly iQ B-Mode + Color**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt}{\le}1$ cm² | TIS Non-Scan $A_{aprt}{>}1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | - | - | 0.13 | 0.29 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | - | - | | 17.4 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | 0.74 | | |
| | $z_1$ | (cm) | | | | 7.8 | | |
| | $z_{bp}$ | (cm) | | | | 2.76 | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 7.1 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 1.84 | . |
| | $f_c$ | (MHz) | 2.19 | - | - | 2.49 | 2.49 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | - | - | 2.0 | 2.0 | (a) |
| | | Y (cm) | | - | - | 1.8 | 1.8 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $P_r$ @$PII_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @$PII_{max}$ | (cm) | | | | | 1.84 | |
| | Focal Length | FLx (cm) | | - | - | 10.0 | | |
| | | FLy (cm) | | - | - | 10.0 | | |
| | $I_{PA.3}$ @$MI_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Bladder | | | | | ✓ | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

The Color Doppler Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. Color Doppler Mode can be accessed by selecting your desired preset, such as "Bladder."

Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

| Claim 21 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 17, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit. | Butterfly's POCUS systems include each of the elements of Claim 17, and additionally include a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit.<br><br>*See supra* at Claim 17.<br><br>For example, Butterfly's POCUS system can generate an "interactive 3D render of the bladder." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 39 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).  This 3D render is made by using the "probe" to conduct "[a] 3D sweep of the bladder area." *Id*.  The 3D render of the bladder is output to the display unit: |



*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 40 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

| Claim 23 | |
|---|---|
| An ultrasonic diagnostic apparatus comprising: | To the extent that the preamble is construed as a limitation, Butterfly's POCUS systems include an ultrasonic diagnostic apparatus.<br><br>For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |

| | |
|---|---|
| | **Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals |
| an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object; | Butterfly's POCUS systems include an ultrasonic transmitting and receiving unit for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object.<br><br>For example, Butterfly's POCUS systems are "hand-held general purpose diagnostic ultrasound imaging device[s]" that include a "Probe" that "generate[s] and receive[s] ultrasound signals."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Butterfly's POCUS systems use "ultrasound" for "imaging and measurement of anatomical structures and fluids of adult and pediatric patients." |

| | |
|---|---|
| | Butterfly iQ/Butterfly iQ+ is indicated for use by trained healthcare professionals in environments where healthcare is provided to enable diagnostic ultrasound imaging and measurement of anatomical structures and fluids of adult and pediatric patients for the following clinical applications:<br><br>• Peripheral Vessel (including carotid, deep vein thrombosis and arterial studies)<br><br>• Procedural Guidance<br><br>• Small Organs (including thyroid, scrotum and breast)<br><br>• Cardiac<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 5 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). |
| a region setting unit to be employed for setting a desired region within a displayed image; | Butterfly's POCUS systems include a region setting unit to be employed for setting a desired region within a displayed image.<br><br>For example, Butterfly's POCUS systems include a Butterfly iQ application, which has an "Auto Bladder Volume tool" that includes a "Guidance Feature" that "ensures the user is centered over the bladder to optimize accuracy" so the tool can "acquire a 3D sweep of the bladder region." |

## Guidance feature

The Auto Bladder Volume tool includes a guidance feature that ensures the user is centered over the bladder to optimize accuracy. As soon as the probe is placed in the midline over the symphysis, the bladder appears on the screen highlighted in blue, as shown in Figure 2. The bladder is highlighted in the image using the deep learning algorithm described below. In the center of the bladder a square appears as a guide. An in-plane vertical guideline also appears and the user should adjust the position of the probe until the guideline intersects the square to ensure optimal positioning. Once the bladder is centered, select **Calculate**.



Fig. 2

*See* Butterfly iQ+ Auto Bladder Volume White Paper at 5 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly's POCUS systems also include an "Educational View Guidance" tool that provides a "visual indication of the quality of the image while scanning" while using either the "Cardiac preset" or the "Lung preset."

**Accessing Educational View Guidance**

The Educational View Guidance tools can be accessed in the Cardiac or Lung Preset while scanning in B- Mode.

Tap Actions located at the bottom right corner of the screen. You have the option to select the following tools from the Educational View Guidance section:

- Cardiac preset: A4C (Apical 4 Chamber), PLAX (Parasternal Long Axis) and PSAX (Parasternal Short Axis).
- Lung preset: A-Lines/B-Lines.







113

| | |
|---|---|
| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 43-44 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application sets a desired region to be imaged), in substantially the same way (e.g., the user selects a desired region of an object to be imaged), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application sets the desired region in a displayed image). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| an image analysis unit for analyzing image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, as to the desired region set by employing said region setting unit; | Butterfly's POCUS systems include an image analysis unit for analyzing image data obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, as to the desired region set by employing said region setting unit.<br><br>For example, Butterfly's POCUS systems include an "Auto Bladder Volume tool" that includes performing a "3D sweep of the bladder region" where "a bladder volume is automatically calculated" |

# The Auto Bladder Volume tool

## Overview

The Auto Bladder Volume tool provides a non-invasive calculation of bladder volume using transabdominal ultrasound and can be accessed through the **Bladder** preset in the Butterfly app. The tool has the unique capability to acquire a 3D sweep of the bladder region in seconds, while you hold the probe steady. After the sweep, a bladder volume is automatically calculated and shown on screen. This tool can be used with the probe positioned either in transverse (axial) or longitudinal (sagittal) directions.



Fig. 2

The "Auto Bladder Volume tool" includes "artificial intelligence (AI) algorithm" that analyzes a "2D ultrasound image" and outputs a "contour of the bladder contained in the [2D ultrasound] image."

## Summary

In summary, the iQ+ with the Auto Bladder Volume tool works by automatically performing a 3D image sweep through the bladder (Figure 4). The images are then sent to an artificial intelligence algorithm that traces the walls of the bladder. These traces are combined to give a resulting volume measurement and a 3D image of the bladder for visualization. The 3D visualization provides assurance that the whole bladder was captured.



Fig. 4

| Guidance Feature | 3D image sweep | AI algorithm traces the walls of the bladder | Traces are combined | 3D volume rendering |

*See* Butterfly iQ+ Auto Bladder Volume White Paper at 5-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly's POCUS systems also include an "Educational View Guidance" tool that provides a "visual indication of the quality of the image while scanning" while using either the "Cardiac preset" or the "Lung preset."

117

**Accessing Educational View Guidance**

The Educational View Guidance tools can be accessed in the Cardiac or Lung Preset while scanning in B- Mode.

Tap Actions ⊞ located at the bottom right corner of the screen. You have the option to select the following tools from the Educational View Guidance section:

- Cardiac preset: A4C (Apical 4 Chamber), PLAX (Parasternal Long Axis) and PSAX (Parasternal Short Axis).
- Lung preset: A-Lines/B-Lines.



 

118

| | |
|---|---|
| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 43-44 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application analyzes image data obtained), in substantially the same way (e.g., the user selects a desired region of an object to be imaged based on the echo waves received), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application analyzes image data obtained based on the echo waves received and the desired region to be imaged). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| an information input unit to be employed for inputting at least one of information of object concerned with the object to be inspected and image processing rule information concerned with a rule of the image processing; | Butterfly's POCUS systems include an information input unit to be employed for inputting information of object concerned with the object to be inspected and image processing rule information concerned with a rule of the image processing.<br><br>For example, Butterfly's POCUS systems include a Butterfly iQ application, which has a series of "presets" that allow the input of information related to the object to be inspected, such as "Abdomen Deep," "Aorta and Gallbladder," "Bladder," "Cardiac," "Cardiac Deep," and "Lung."  *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022): |



"Presets" are "predefined set[s] of imaging parameter values" associated with a particular object to be imaged or study to be performed. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

The "Bladder" preset also includes an option to select an "Auto Bladder Volume tool" that provides a "3D sweep" of the object to be imaged.

120

**To use the Auto Bladder Volume tool:**

1. Select the Bladder preset.

2. Select the Actions button on the bottom of the screen.

3. Under Tools, select Volume.

4. Position the probe so that the bladder appears at its widest and is centered on the screen. A blue shape highlights when the Auto Bladder Volume tool detects a bladder. Use the vertical line down the center of the screen to help you center the bladder.

5. Select Calculate. A 3D sweep of the bladder is automatically acquired. Do not move the probe during the sweep.

6. After successfully capturing the bladder, a volume is displayed at the bottom of the screen. The cine above the volume result displays the images and estimated bladder used to calculate the volume.

7. Tap the 3D bar to visualize an interactive 3D render of the bladder. Note: the 3D render is not for diagnostic use.

*See* https://support.butterflynetwork.com/hc/en-us/articles/360042212671-Automatically-Estimate-Bladder-Volume (last accessed Oct. 13, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application provides selectable presets and processing rules), in substantially the same way (e.g., the presets relate to objects to be imaged by the probe), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application provides selectable presets and processing rules corresponding to objects to be imaged and processed). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| | |
|---|---|
| a parameter memory unit for storing parameters concerned | Butterfly's POCUS systems include a parameter memory unit for storing parameters concerned with at least either of transmission/reception conditions to be used in said ultrasonic transmitting and receiving unit and image processing |

| | |
|---|---|
| with at least either of transmission/reception conditions to be used in said ultrasonic transmitting and receiving unit and image processing conditions to be used in said image processing unit, in correspondence with at least one of the information of object and the image processing rule information; | conditions to be used in said image processing unit, in correspondence with at least one of the information of object and the image processing rule information.<br><br>Butterfly's POCUS systems also include different built-in "modes."  For example, the "M-mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] M-Mode."  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).<br><br>**Using M-Mode**<br><br>M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.<br><br>When using M-Mode, you can:<br><br>• Adjust the radial scan line by tapping and dragging the move point: <br>• Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen<br>• Adjust the **Depth** and **Gain**<br>• Perform time, distance, and heart rate measurements on the display<br><br>**Accessing M-Mode**<br><br>1.  Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.<br>2.  Select Actions on the bottom of the imaging screen.<br>3.  Under Modes, select M-Mode. |

122

**Table 13. Diagnostic Ultrasound Indications for Butterfly iQ/Butterfly iQ+**

Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
|---|---|---|---|---|---|---|---|
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| Ophthalmic | Ophthalmic | X | | X | | X | B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Fetal Imaging & Other | Fetal/Obstetric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Abdominal | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intraoperative (Specify) | | | | | | |
| | Intra-operative (Neuro) | | | | | | |
| | Laparoscopic | | | | | | |
| | Pediatric | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Small Organ (including scrotum, thyroid, breast) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Neonatal Cephalic | | | | | | |
| | Adult Cephalic | | | | | | |
| | Trans-rectal | | | | | | |
| | Trans-vaginal | | | | | | |
| | Trans-urethral | | | | | | |
| | Trans-esoph. (non-Card.) | | | | | | |
| | Musculoskeletal (Superficial) | X | X | X | | X | B-Mode + M-mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Intravascular | | | | | | |
| | Other (Musculoskeletal Conventional) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Gynecological) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

123

**Transducer: Butterfly iQ/Butterfly iQ+ Ultrasound System transducer**

Intended Use: Diagnostic ultrasound imaging or fluid flow analysis of the human body as follows:

| Clinical Application | | Mode of Operation | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| General (Track 1 Only) | Specific (Tracks 1 & 3) | B | M | Power | PWD | Color Doppler | Combined (Specify) |
| | Other (Urology) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| Cardiac | Cardiac Adult | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Cardiac Pediatric | X | X | | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler |
| | Intravascular (Cardiac) | | | | | | |
| | Trans-esoph. (Cardiac) | | | | | | |
| | Intra-cardiac | | | | | | |
| Peripheral Vessel | Peripheral vessel | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Carotid, deep vein thrombosis, arterial studies) | X | X | X | | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |
| | Other (Procedural Guidance) | X | X | X | X | X | B-Mode + M-Mode<br>B-Mode + Color Doppler<br>B-Mode + Power Doppler |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 64-65 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit. For example, Table 16 provides the list of parameters used in M-Mode, which correspond with the "FAST," "Abdomen Deep," and "Cardiac THI" presets:

124

**Table 16. Butterfly iQ B + M-mode**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt} \leq 1$ cm² | TIS Non-Scan $A_{aprt} > 1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 2.1 | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of $A_{aprt}$ X | (cm) | | 2.0 | - | - | 2.5 | (a) |
| | Dim of $A_{aprt}$ Y | (cm) | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (μsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @$PII_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @$PII_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length FLx | (cm) | | 10.0 | - | - | | |
| | Focal Length FLy | (cm) | | INF | - | - | | |
| | $I_{PA.3}$ @$MI_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | | ✓ | | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

Butterfly's POCUS systems also include a "B-mode". The "B-mode" includes the "Auto Bladder Volume tool" that "calculate[s] bladder volume while using the Bladder preset."

The Bladder Volume tool allows you to calculate bladder volume while using the Bladder preset in B-mode. The Butterfly iQ acquires a 3D sweep while you hold the probe steady. A volume estimate is then calculated from this 3D sweep.

*See* https://support.butterflynetwork.com/hc/en-us/articles/360042212671-Automatically-Estimate-Bladder-Volume (last accessed Oct. 13, 2022).

The "Auto Bladder Volume tool" includes an "artificial intelligence (AI) algorithm" that has "parameters" that are "optimized" based on the "ultrasound images."

research literature. The parameters of the algorithm are optimized using a learning procedure that involves "showing" the network several thousand ultrasound images, whose contours are traced manually by expert sonographers. The algorithm is then trained to be able to distinguish bladder from other structures and organs in the abdominal region and subsequently to imitate the contours of the expert sonographers.

*See* Butterfly iQ+ Auto Bladder Volume White Paper at 5-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

| | |
|---|---|
| | **Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>Android electronic devices require a memory to execute instructions. *See* https://www.intel.com/content/www/us/en/support/articles/000006179/education/intel-education-software.html (last accessed Oct. 17, 2022).<br><br>**Minimum System Requirements for Android\* 4.2 and 4.4**<br><br>This table lists the minimum system requirements for running the Intel® Education Resources Application using Android\* 4.2, 4.4.2, or 4.4.4.<br><br>**Operating system** — Android 4.2, Android 4.4.2, or Android 4.4.4<br>**Processor** — Intel Atom® Processor Z2520 1.2 GHz, or faster processor<br>**Storage** — Between 850 MB and 1.2 GB, depending on the language version<br>**RAM** — Minimum of 512 MB, 2 GB is recommended<br>**Hard Disk** — • 2 GB of available hard-disk space for installation; extra free space is required during installation. • You cannot install using a removable flash storage device.<br>**Video** — 1280 x 800 pixels or higher on a 10-inch device<br>**Software** — PDF viewer<br>**Browser/Internet** — • This application is designed to work offline. • To download and launch Google Play\* Store apps within the application, a high-speed Internet connection is recommended. |
| a control unit for controlling at least one of transmission/reception | Butterfly's POCUS systems include a control unit for controlling at least one of transmission/reception operation of said ultrasonic transmitting and receiving unit and image processing operation of said image processing unit, in |

127

| | |
|---|---|
| operation of said ultrasonic transmitting and receiving unit and image processing operation of said image processing unit, in accordance with analytical results in said image analysis unit and the parameters corresponding to at least one of the information of object and the image processing rule information input to said information input unit; and | accordance with analytical results in said image analysis unit and the parameters corresponding to at least one of the information of object and the image processing rule information input to said information input unit.<br><br>For example, Butterfly's POCUS systems include an "Auto Bladder Volume tool" that includes performing a "3D sweep of the bladder region" where "a bladder volume is automatically calculated"<br><br>**The Auto Bladder Volume tool**<br><br>**Overview**<br><br>The Auto Bladder Volume tool provides a non-invasive calculation of bladder volume using transabdominal ultrasound and can be accessed through the **Bladder** preset in the Butterfly app. The tool has the unique capability to acquire a 3D sweep of the bladder region in seconds, while you hold the probe steady. After the sweep, a bladder volume is automatically calculated and shown on screen. This tool can be used with the probe positioned either in transverse (axial) or longitudinal (sagittal) directions. |



Fig. 2

The "Auto Bladder Volume tool" includes "artificial intelligence (AI) algorithm" that analyzes a "2D ultrasound image" and outputs a "contour of the bladder contained in the [2D ultrasound] image."

## Summary

In summary, the iQ+ with the Auto Bladder Volume tool works by automatically performing a 3D image sweep through the bladder (Figure 4). The images are then sent to an artificial intelligence algorithm that traces the walls of the bladder. These traces are combined to give a resulting volume measurement and a 3D image of the bladder for visualization. The 3D visualization provides assurance that the whole bladder was captured.



Fig. 4

| Guidance Feature | 3D image sweep | AI algorithm traces the walls of the bladder | Traces are combined | 3D volume rendering |

The "artificial intelligence (AI) algorithm" includes "parameters" that are "optimized" based on the "ultrasound images."

130

*research literature. The parameters of the algorithm are opti-*

*mized using a learning procedure that involves "showing" the*

*network several thousand ultrasound images, whose contours*

*are traced manually by expert sonographers. The algorithm is*

*then trained to be able to distinguish bladder from other struc-*

*tures and organs in the abdominal region and subsequently to*

*imitate the contours of the expert sonographers.*

*See* Butterfly iQ+ Auto Bladder Volume White Paper at 5-7 (November 2021), https://www.butterflynetwork.com/resource/butterfly-iq-auto-bladder-volume (last accessed Oct. 13, 2022).

Butterfly's POCUS systems also include different built-in "modes."  For example, the "M-mode" can be selected in the iQ Application by "select[ing] actions on the bottom of the imaging screen" and then "[u]nder Modes, select[ing] M-Mode."  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

### Using M-Mode

M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.

When using M-Mode, you can:

- Adjust the radial scan line by tapping and dragging the move point:
- Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen
- Adjust the **Depth** and **Gain**
- Perform time, distance, and heart rate measurements on the display

**Accessing M-Mode**

1. Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.
2. Select Actions on the bottom of the imaging screen.
3. Under Modes, select M-Mode.

The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit.  For example, Table 16 provides the list of parameters used in M-Mode, which correspond with the "FAST," "Abdomen Deep," and "Cardiac THI" presets:

131

**Table 16. Butterfly iQ B + M-mode**

| Index Label | | | MI | TIS Scan | TIS Non-Scan $A_{aprt}\leq1$ cm² | TIS Non-Scan $A_{aprt}>1$ cm² | TIB Non-Scan | TIC |
|---|---|---|---|---|---|---|---|---|
| Maximum Index Value | | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | $d_{eq}(Z_{sp})$ | (cm) | | | | | 2.1 | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | 2.0 | - | - | 2.5 | (a) |
| | | Y (cm) | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (µsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @$PII_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @$PII_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length | FLx (cm) | | 10.0 | - | - | | |
| | | FLy (cm) | | INF | - | - | | |
| | $I_{PA.3}$ @$MI_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | | ✓ | | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

| a display unit for displaying an image on the basis of the image data subjected to the image processing in said image processing unit. | Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit. |
|---|---|

Butterfly's POCUS systems include a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit.

For example, Butterfly's POCUS systems include a compatible "personal electronic device[]" to run its "Butterfly iQ Application." The application must be "downloaded and installed" on the device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

The "Butterfly iQ App user interface" allows a user to "image freeze [and] image capture." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022).

## Overview of User Interface

This section provides information about the imaging display presented in the Butterfly iQ App user interface.

The app user interface will always show information about the Mechanical Index (MI) and the Thermal Index (TI) at the top of the screen.

Depending on your Butterfly membership status and mobile app version, the toolbar at the bottom of the screen may vary.

The toolbar at the bottom of the screen can be used for preset selection, image freeze, image capture and mode/tool selection.

For example, when performing a study, Butterfly's POCUS device allows a user to view a "live image" on the personal electronic device. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022):

**Performing a Study**

Once the probe is connected to your mobile device follow the prompts on the screen to begin a new study. It is not required to enter patient information to begin or complete a study.

From the main scan screen you can freeze an image ⊕, capture still images ☐ and record clips ☐ using the toolbar at the bottom of the screen. The live image must be frozen in order to capture a still image.

Captures may be reviewed from the Capture Reel located in the top right corner of the screen ☐ before the study is completed.

To conclude a patient encounter, click on the capture reel and follow the steps on screen to upload the study.

During scanning, you may swipe horizontally to adjust the gain and swipe vertically to adjust the depth. The Time Gain Compensation (TGC) control button is surfaced upon tapping the screen ☐.

Butterfly's POCUS system outputs images from the image data onto a display unit.  For example, the POCUS system allows for "ultra clear lung imaging" using "ultrasound-on-chip," with the images output onto the personal electronic device.  *See* https://www.butterflynetwork.com/iq; (last accessed Oct. 14, 2022):



134

| Claim 24 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 23, further comprising: a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit. | Butterfly's POCUS systems include each of the elements of Claim 23, and additionally include a three-dimensional image construction unit for constructing three-dimensional image data on the basis of the image data subjected to the image processing in said image processing unit so as to output the three-dimensional image data to said display unit.<br><br>*See supra* at Claim 23.<br><br>For example, Butterfly's POCUS system can generate an "interactive 3D render of the bladder." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 39 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022). This 3D render is made by using the "probe" to conduct "[a] 3D sweep of the bladder area." *Id*. The 3D render of the bladder is output to the display unit:<br><br> |

| | See Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 40 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |
|---|---|
| **Claim 25** | |
| An ultrasonic diagnostic apparatus according to claim 23, wherein the ultrasonic transmission/reception conditions to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focusing position, a transmission power and a reception sensitivity for the ultrasonic waves. | Butterfly's POCUS systems include each of the elements of Claim 23, and additionally includes wherein the ultrasonic transmission/reception conditions to be used in said ultrasonic transmitting and receiving unit prescribe a control of at least one of a center frequency, a bandwidth, and a focusing position, a transmission power and a reception sensitivity for the ultrasonic waves.<br><br>*See supra* at Claim 23.<br><br>The M-Mode is associated with a number of different transmission and reception parameters that are communicated to the ultrasonic transmitting and receiving unit, including at least one of a center frequency, a focusing position, and a transmission power. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 67 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 14, 2022): |

**Table 16. Butterfly iQ B + M-mode**

| | Index Label | | MI | TIS | | | TIB | TIC |
|---|---|---|---|---|---|---|---|---|
| | | | | Scan | Non-Scan | | Non-Scan | |
| | | | | | $A_{aprt} \leq 1$ cm$^2$ | $A_{aprt} > 1$ cm$^2$ | | |
| | Maximum Index Value | | 0.485 | 0.013 | - | - | 0.012 | (a) |
| Assoc Acoustic Parameter | Pr.3 | (MPa) | 0.718 | | | | | |
| | $W_o$ | (mW) | | 2.64 | - | | 0.63 | (a) |
| | min of [$W_{.3}(z_1)$, $I_{TA.3}(z_1)$] | (mW) | | | | - | | |
| | $z_1$ | (cm) | | | | - | | |
| | $z_{bp}$ | (cm) | | | | - | | |
| | $z_{sp}$ | (cm) | 5.83 | | | | 8.3 | |
| | $d_{eq}(z_{sp})$ | (cm) | | | | | 2.1 | |
| | $f_c$ | (MHz) | 2.19 | 2.41 | - | - | 1.56 | (a) |
| | Dim of $A_{aprt}$ | X (cm) | | 2.0 | - | - | 2.5 | (a) |
| | | Y (cm) | | 1.3 | - | - | 1.3 | (a) |
| Other Information | PD | (µsec) | 0.295 | | | | | |
| | PRF | (Hz) | 1066 | | | | | |
| | $p_r$ @PII$_{max}$ | (MPa) | 1.11 | | | | | |
| | $d_{eq}$ @PII$_{max}$ | (cm) | | | | | 2.1 | |
| | Focal Length | FLx (cm) | | 10.0 | - | - | | |
| | | FLy (cm) | | INF | - | - | | |
| | $I_{PA.3}$ @MI$_{max}$ | (W/cm2) | 54.6 | | | | | |
| Operating Control Conditions | Preset: FAST | | ✓ | | | | | |
| | Preset: Abdomen Deep | | | ✓ | | | | |
| | Preset: Cardiac THI | | | | | | ✓ | |
| Note 1: | Information need not be provided for any formulation of *TIS* not yielding the maximum value of *TIS* for that mode. | | | | | | | |
| Note 2: | Information need not be provided regarding *TIC* for any TRANSDUCER ASSEMBLY not intended for transcranial or neonatal cephalic uses. | | | | | | | |
| Note 3: | Information on MI and TI need not be provided if the equipment meets both the exemption clauses given in 51.2aa) and 51.2 dd). | | | | | | | |
| (a) | Intended use does not include cephalic so TIC is not computed. | | | | | | | |

| Claim 26 | |
|---|---|
| An ultrasonic diagnostic apparatus according to claim 23, wherein the image processing conditions to be used in said image processing | Butterfly's POCUS systems include each of the elements of Claim 23, and additionally includes wherein the image processing conditions to be used in said image processing unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. |

| | |
|---|---|
| unit prescribe a control of at least one of a gradation control process, a response control process, a scale-up process, a scale-down process and an interpolation process for the image data. | *See supra* at Claim 23.<br><br>For example, Butterfly's POCUS systems include at least a scale- up or scale-down process.  On the "lung" preset, the image is scaled to fit eight centimeters of image on the display unit.  On the "card" (for cardiac) preset, the image is scaled to fit 16 centimeters on the display unit.<br><br><br><br>*See* https://www.youtube.com/watch?v=0RVjAiAoH1c (last accessed Oct. 14, 2022). |

# EXHIBIT 4B

**EXHIBIT B**
**U.S. PATENT NO. 9,538,985 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC.*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1-3 of U.S. Patent No. 9,538,985 (the "'985 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted claims 1-3 of the '985 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

Butterfly also infringes asserted Claims 1-3 under 35 U.S.C. § 271(b) by having knowledge of the '985 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, infringement of the '985 Patent, with specific intent, by others.

In violation of 35 U.S.C. § 271(c), Butterfly has also contributed to and is continuing to contribute to infringement of asserted Claims 1-3 by others (such as customers of Butterfly's POCUS devices) by making, selling and/or offering for sale within the United States and/or importing into the United States POCUS devices or components thereof, that are especially made and/or adapted for infringing asserted Claims 1-3 and are not staple articles of commerce suitable for substantial non-infringing use.

The chart below explains how Butterfly's POCUS devices infringe the '985 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence FUJIFILM Sonosite may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent that Butterfly argues any claim element is not literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See*, *e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

1

| Claim 1 | Butterfly's POCUS systems |
|---|---|
| A portable ultrasound system, comprising a hand-held base unit that includes: | Butterfly's POCUS systems include a portable ultrasound system, comprising a hand-held base unit.<br><br><br><br>*See* Jonathan M. Rothberg, et al., *Ultrasound-on-chip platform for medical imaging, analysis, and collective intelligence*, 118 PNAS 1, Fig. 1A (2021), https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf (academic paper authored by Butterfly Network founder and employees and funded by Butterfly Network. The paper includes images and videos of the Butterfly iQ/iQ+ from the Butterfly website, but rather than referring to the Butterfly iQ/iQ+, the paper refers to "ultrasound-on-chip probe" or "UoC probe").<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals |

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).

The Butterfly iQ/Butterfly iQ+ probe is only for use with the Butterfly iQ App. Do not attempt to connect the probe to other ultrasound systems. Figure 1, "Probe Components" [17] shows the parts of the probe and describes its parts.

**Figure 1. Probe Components**



1.  Lens
2.  Midline Mark
3.  Orientation Mark
4.  Battery Indicator Lights
5.  Battery Indicator Button
6.  Probe/Cable Boundary
7.  Mobile Device Cable
8.  Charging Source

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 17 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022):

3

<table>
<tr>
<td></td>
<td>



*See* https://cloud.butterflynetwork.com/-/edu/l9JrTUW8QcCMHIYtoBXWQA?utm_source=edu_share_modal; (last accessed Oct. 17, 2022).

</td>
</tr>
<tr>
<td>a touchscreen display; and</td>
<td>

Butterfly's POCUS systems include a touchscreen display.

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022):

</td>
</tr>
</table>

4

Butterfly's POCUS system is manipulated by touching the screen, e.g.,:

## Using Color Doppler Mode or Power Doppler Mode

When using Color Doppler or Power Doppler, you can:

- Adjust the size and position of the ROI.
- Adjust the Gain and Depth.
- Adjust the Scale (also known as Pulse Repetition Frequency (PRF)) to optimize for high or low flow by touching the **High/Low** control at the bottom of the screen

The ROI is displayed on the image. To move the ROI, tap and drag the box. To adjust the angle and size, use the arrows provided.

Color gain and depth controls are available during Doppler imaging.

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 26 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).

## Using M-Mode

M-Mode display includes speed controls (Fast or Slow), the M-Mode line, B-Mode image, and a move point to move the M-Mode line.

When using M-Mode, you can:

- Adjust the radial scan line by tapping and dragging the move point: ⊙
- Adjust the sweep speed of the M-Mode display by touching the Fast/Slow control in the middle of the screen
- Adjust the **Depth** and **Gain**
- Perform time, distance, and heart rate measurements on the display

### Accessing M-Mode

1. Select your desired preset and identify the area you'd like to image. Note that imaging will begin on B-Mode.
2. Select Actions on the bottom of the imaging screen.
3. Under Modes, select M-Mode.

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).

### Performing an Area Measurement

1. Select the ⊙ symbol.
2. Touch and drag the caliper icons to scale and rotate the ellipse. A box with the ellipse's circumference and area (displayed in centimeters and square centimeters) is displayed in a box at the bottom of the image. You can drag this box to the desired location on the image.
3. To delete an ellipse, select the ellipse or the measurement value and tap the X next to the corresponding numeric measurement display. Select Delete Ellipse to confirm.

6

| | |
|---|---|
| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 29 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022). |
| a programmable processor configured to execute instructions that cause the processor to produce a display on the touchscreen display, including— | Butterfly's POCUS systems include a programmable processor configured to execute instructions that cause the processor to produce a display on the touchscreen display.<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).<br><br>Android electronic devices require a processor to execute instructions. *See* https://www.intel.com/content/www/us/en/support/articles/000006179/education/intel-education-software.html (last accessed Oct. 17, 2022). |

**Minimum System Requirements for Android* 4.2 and 4.4**

This table lists the minimum system requirements for running the Intel® Education Resources Application using Android* 4.2, 4.4.2, or 4.4.4.

| Operating system | Android 4.2, Android 4.4.2, or Android 4.4.4 |
|---|---|
| Processor | Intel Atom® Processor Z2520 1.2 GHz, or faster processor |
| Storage | Between 850 MB and 1.2 GB, depending on the language version |
| RAM | Minimum of 512 MB, 2 GB is recommended |
| Hard Disk | • 2 GB of available hard-disk space for installation; extra free space is required during installation.<br>• You cannot install using a removable flash storage device. |
| Video | 1280 x 800 pixels or higher on a 10-inch device |
| Software | PDF viewer |
| Browser/Internet | • This application is designed to work offline.<br>• To download and launch Google Play* Store apps within the application, a high-speed Internet connection is recommended. |

The processor produces a display on the touchscreen display through the Butterfly iQ App. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022):

## Overview of User Interface

This section provides information about the imaging display presented in the Butterfly iQ App user interface.

The app user interface will always show information about the Mechanical Index (MI) and the Thermal Index (TI) at the top of the screen.

Depending on your Butterfly membership status and mobile app version, the toolbar at the bottom of the screen may vary.

The toolbar at the bottom of the screen can be used for preset selection, image freeze, image capture and mode/tool selection.

8

| a first control area having a number of graphical tools that can each be selectively activated by a user, | Butterfly's POCUS systems include a first control area having a number of graphical tools that can each be selectively activated by a user. |
|---|---|

Butterfly's POCUS systems include a first control area having a number of graphical tools that can each be selectively activated by a user.

For example, as shown below, Butterfly's POCUS systems contain a first control area at the bottom of the touch screen that has a number of graphical tools that can be activated by a user.  *See,* https://www.youtube.com/watch?v=8m3D5XpdnkI (last accessed Oct. 17, 2022):



Butterfly's POCUS system also includes, as shown below, a first control area that has a number of graphical tools, such as "M-Mode" and "Lung Protocol", that can be activated by a user. *See* https://www.youtube.com/watch?v=ya-SGgzA8J0 (last accessed Oct. 17, 2022).



Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the

| | |
|---|---|
| | same function (e.g., the Butterfly IQ application has graphical tools), in substantially the same way (e.g selectively activated by the user), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application has graphical tools selectively activated by the user in a control area). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| a second control area that is accessible by a hand of the user that is holding the portable ultrasound system, wherein the second control area includes a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool, and | Butterfly's POCUS systems include a second control area that is accessible by a hand of the user that is holding the portable ultrasound system, wherein the second control area includes a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool.<br><br>For example, as shown below, Butterfly's POCUS system includes a second control area on the right side of the screen that includes a plurality of controls that can be activated by the thumb of a user to select an attribute of the graphical tool. *See*, https://www.youtube.com/watch?v=8m3D5XpdnkI (last accessed Oct. 17, 2022).<br><br><br><br>See also https://cloud.butterflynetwork.com/-/edu/kG7_gURySX-7yvmqPCTg9A?utm_source=edu_share_modal (last accessed Oct. 19, 2022). |

11



Butterfly's POCUS system also includes, as shown below, a second control area located on the bottom of the screen that includes a plurality of controls that can be activated by a thumb of the user to select an attribute, such as choosing a "lung zone", of a selected graphical tool, such as "Lung Protocol". *See* https://www.youtube.com/watch?v=ya-SGgzA8J0 (last accessed Oct. 17, 2022).

12



Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application has controls selectively activated to select an attribute of a selected graphical tool), in substantially the same way (e.g., accessible by a hand holding the POCUS system and selectively activated by the thumb of the user), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application has controls activated by the thumb of a user holding the POCUS system selecting an attribute of a selected graphical tool in a control area). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

13

| an active image area in which an image of a patient obtained from an ultrasound scan is displayed and at which the selected one of the graphical tools can be overlaid onto the image with the user-selected tool attribute. | Butterfly's POCUS systems include an active image area in which an image of a patient obtained from an ultrasound scan is displayed and at which the selected one of the graphical tools can be overlaid onto the image with the user-selected tool attribute.<br><br>For example, as shown below, Butterfly's POCUS system includes an active image area displaying an image of a patient obtained from an ultrasound scan overlaid with the selected one of the graphical tools with a user-selected tool attribute. *See*, https://www.youtube.com/watch?v=8m3D5XpdnkI (last accessed Oct. 17, 2022):<br><br><br><br>*See also* https://www.youtube.com/watch?v=ya-SGgzA8J0 (last accessed Oct. 17, 2022). |



| | Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application displays images), in substantially the same way (e.g., the selected graphical tool is is overlaid onto the displayed image), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application has images displayed with graphical tools overlaid onto the image). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
|---|---|
| **Claim 2** | |
| The portable ultrasound system of claim 1 wherein: one of the graphical tools that can be selected is a pictograph; and | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein one of the graphical tools that can be selected is a pictograph.<br><br>*See supra* at Claim 1.<br><br>**Performing an Area Measurement**<br><br>1. Select the ⊙ symbol.<br>2. Touch and drag the caliper icons to scale and rotate the ellipse. A box with the ellipse's circumference and area (displayed in centimeters and square centimeters) is displayed in a box at the bottom of the image. You can drag this box to the desired location on the image.<br>3. To delete an ellipse, select the ellipse or the measurement value and tap the X next to the corresponding numeric measurement display. Select Delete Ellipse to confirm.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 29 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022). |

| | |
|---|---|
| | **Using Lung Protocol**<br><br>With the Lung Protocol, you can easily label lung zones while scanning with the Lung and Pediatric Lung presets.<br><br>**Adding Labels via the Lung Protocol**<br><br>1. From the scan screen, select either the Lung or Pediatric Lung preset.<br><br>2. Open the Actions menu ▦ and press the Lung Protocol button ⏸ . The lung zone picker displaying 12 lung zones will appear on screen.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 30 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application tools can be a pictograph), in substantially the same way (e.g., the selected graphical tool is an icon), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application has one of the graphical tools can be selected is a pictograph). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| the second control area includes a control to select an attribute indicative of a region of the human anatomy. | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein the second control area includes a control to select an attribute indicative of a region of the human anatomy.<br><br>*See supra* at Claim 1.<br><br>For example, Butterfly's POCUS system also includes, as shown below, a second control area located on the bottom of the screen that includes a plurality of controls to select an attribute, such as choosing a "lung zone". *See* https://www.youtube.com/watch?v=ya-SGgzA8J0 (last accessed Oct. 17, 2022). |



Tap any lung zone.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application can select a region of the human anatomy), in substantially the same way (e.g., provides an outline of a part of the human anatomy), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application has a control to select an attribute indicative of a region of anatomy). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

18

| Claim 3 | |
|---|---|
| The portable ultrasound system of claim 1 wherein the processor is configured to execute instructions to: display a selected graphical tool at a first location in the first control area or the second control area; | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein the processor is configured to execute instructions to display a selected graphical tool at a first location in the first control area or the second control area.<br><br>*See supra* at Claim 1.<br><br>For example as shown below, Butterfly's POCUS system includes processor configured to execute instructions to display a selected graphical tool in a second control area on the right side of the screen that includes a plurality of controls that can be activated by the thumb of a user to select an attribute of the graphical tool. *See*, https://www.youtube.com/watch?v=8m3D5XpdnkI (last accessed Oct. 17, 2022):<br><br> |

| | Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application can display a selected graphical tool), in substantially the same way (e.g., provides the graphical tool at a first location), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application has a selected graphical tool displayed at a first location in a control area). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
|---|---|
| detect movement of a user's finger from a first location to a second location in the active image area; and | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein the processor is configured to execute instructions to detect movement of a user's finger from a first location to a second location in the active image area. <br><br> *See supra* at Claim 1. <br><br> For example, as shown below, Butterfly's POCUS system includes an active image area displaying an image of a patient obtained from an ultrasound scan overlaid with the selected one of the graphical tools with a user-selected tool attribute. *See*, https://www.youtube.com/watch?v=8m3D5XpdnkI (last accessed Oct. 17, 2022): |

20



**Performing an Area Measurement**

1.  Select the ⬭ symbol.

2.  Touch and drag the caliper icons to scale and rotate the ellipse. A box with the ellipse's circumference and area (displayed in centimeters and square centimeters) is displayed in a box at the bottom of the image. You can drag this box to the desired location on the image.

3.  To delete an ellipse, select the ellipse or the measurement value and tap the X next to the corresponding numeric measurement display. Select Delete Ellipse to confirm.

21

| | |
|---|---|
| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 29 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application can detect movement of a user's finger), in substantially the same way (e.g., track movement in a first location and a second location in an active image area), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application can detect the movement of a finger from a first location to a second location in the active image area). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| overlay the selected one of the graphical tools at a second location in the active image area in response to the detected movement. | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein the processor is configured to execute instructions to overlay the selected one of the graphical tools at a second location in the active image area in response to the detected movement.<br><br>*See supra* at Claim 1.<br><br>For example, as shown below, Butterfly's POCUS system includes an active image area displaying an image of a patient obtained from an ultrasound scan overlaid with the selected one of the graphical tools with a user-selected tool attribute. *See,* https://www.youtube.com/watch?v=8m3D5XpdnkI (last accessed Oct. 17, 2022): |

22



**Performing an Area Measurement**

1.  Select the ⊙ symbol.
2.  Touch and drag the caliper icons to scale and rotate the ellipse. A box with the ellipse's circumference and area (displayed in centimeters and square centimeters) is displayed in a box at the bottom of the image. You can drag this box to the desired location on the image.
3.  To delete an ellipse, select the ellipse or the measurement value and tap the X next to the corresponding numeric measurement display. Select Delete Ellipse to confirm.

23

| | *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 29 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Oct. 17, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the Butterfly IQ application can overlay graphical tools at a second location), in substantially the same way (e.g., in response to the detected movement of a finger in the active image area), and achieves substantially the same result as the claimed subject matter (e.g., the Butterfly IQ application can overlay the graphical tools at a second location in the active image area in response to the detected movement). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
|---|---|

# EXHIBIT 4C

**EXHIBIT C**
**U.S. PATENT NO. 7,867,168 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC.*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1-5, 12, 13, and 15 of U.S. Patent No. 7,867,168 (the "'168 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted Claims 1-5, 12, 13, and 15 of the '168 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

Butterfly also infringes asserted Claims 1-5, 12, 13, and 15 under 35 U.S.C. § 271(b) by having knowledge of the '168 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, infringement of the '168 Patent, with specific intent, by others.

In violation of 35 U.S.C. § 271(c), Butterfly has also contributed to and is continuing to contribute to infringement of asserted Claims 1-5, 12, 13, and 15 by others (such as customers of Butterfly's POCUS devices) by making, selling and/or offering for sale within the United States and/or importing into the United States POCUS devices or components thereof, that are especially made and/or adapted for infringing asserted Claims 1-5, 12, 13, and 15 and are not staple articles of commerce suitable for substantial non-infringing use.

The chart below explains how Butterfly's POCUS devices infringe the '168 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence FUJIFILM Sonosite may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent Butterfly argues that any claim element is not literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See*, *e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

1

| Claim 1 | Butterfly's POCUS systems |
| --- | --- |
| A system comprising: an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from; | Butterfly's POCUS systems include an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from.<br><br>For example, Butterfly's POCUS system contains an array of ultrasound transducers, with CMOS signal processing circuitry coupled to the array:<br><br><br><br>*See* Jonathan M. Rothberg, et al., *Ultrasound-on-chip platform for medical imaging, analysis, and collective intelligence*, 118 PNAS 1, Fig. 1A (2021), https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf (academic paper authored by Butterfly Network founder and employees and funded by Butterfly Network. The paper includes images and videos of the Butterfly iQ/iQ+ from the Butterfly website, but rather than referring to the Butterfly iQ/iQ+, the paper refers to "ultrasound-on-chip probe" or "UoC probe").<br><br>"By integrating the circuitry of a full ultrasound system onto a chip, we hope that UoC enables a transformation of health care worldwide---just as putting a camera on a semiconductor chip made photography accessible to anyone with a smartphone." *Id.* at 7. |

"An ultrasound-on-chip (UoC) is described in the following sections that outline the design, fabrication and integration of MEMS ultrasonic transducers directly in a CMOS process." *Id.* at 1.

"The mixed-signal (analog and digital) circuity provides full processing and control for a versatile UoC platform." *Id.* at 2.

"Fig. 1*B* shows wafer-level integration of the MEMS transducers onto CMOS circuits." *Id.* at 2.



*Id.*

"A 0.13- μm BCD ([bipolar]-CMOS-double-diffused metal-oxide-semiconductor) chip, seen in Fig. 1*C*, is designed on a 31- × 20-mm die with the active MEMs array spanning over the analog front-end circuitry and the digital processing circuitry on the elevational periphery." *Id.* at 2.

"Each half-module has a digital processor and services a 1 × 32 column, which consists of four analog front ends each servicing eight MEMS elements." *Id.*

"Fig. 2*A* shows the digital communications subsystem between the 2- × 32- element UPU modules." *Id.*

3

"The UoC receive architecture is designed modularly with replicated arrays of pitch-matched analog front ends (AFEs) and digital processing units as seen in Fig. 2*F*." *Id*. at 4.

"With the AFE at its highest gain, we measured the channel noise at the analog-to-digital converter (ADC) output to be 9.68 mV rms and the channel interference noise also at the ADC output to be 0.55 mV rms, which is 24 dB lower than the channel noise floor." *Id*. at 4.

The POCUS system contains a 10-bit SAR analog-to-digital converter which converts analog signals to digital signals, which are then output to the data offload for further processing by a main processing unit. *See fig. 1F*:



*Id*. at Fig. 1F.

"The 1,120 ADCs on-chip can produce 448 Gbps of digitized ultrasound data and the 280 digital processing blocks provide an aggregate of over 1 trillion fixed-point operations per second." *Id*. at 5.

"The digitized samples from every four ADCs are consumed by a digital processing block nominally operating at a 160-MHz system clock rate and are resynchronized to a parallel data bus with a multiplexing hub. Each channel is then heterodyned to a baseband, low-pass filtered, and down-sampled to facilitate decimation for a data bandwidth reduction in the succeeding processing." *Id*.

4

| | **Overview** |
|---|---|
| | Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf. |
| a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly; and | Butterfly's POCUS systems include a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly.<br><br>"A mobile device application provides a touch-screen user interface to select preset modes and parameters for imaging that are compiled and communicated in real-time via the USB connection.  The mobile device processors provide additional back-end processing and visualization capabilities to the ultrasound data stream.  Measurement and annotation tools help assess the ultrasound captures.  The mobile platform provides a means to categorize and share data in the cloud. Further 3D rendering is done on the mobile platform, in the cloud, or on a local computer."  Rothberg et al. at 5.<br><br>"A sequence compiler on the host (the mobile device) compiles high-level imaging mode parameters into UoC parameters and a sequence command executable to be run on a sequence processing unit (SPU) on the FPGA."  *Id*. at 5.<br><br>"Expanding upon the capabilities provided by connecting a mobile device, we have designed an acquisition assistance application to interactively guide an operator to place and orient the UoC probe to a specified target anatomy."  *Id*. at 6.<br><br>"By combining the versatile UoC probe with a mobile device having broad interconnectedness, the applications for it become field-upgradable and integrated to the cloud and artificial intelligence systems.  In order to open up the UoC platform for research and development of new applications, we are developing an API, SDK, and an applications repository to provide access to data aggregated in the cloud repository and to expose some of the hardware and processing interfaces. Understanding that the needs for ultrasound go beyond the probe hardware toward interconnectivity, our vision is to maintain a virtuous cycle framework . . . that enables UoC data collection and clinical research and development for applications improving performance and the potential for automated interpretation."  *Id*. at 7-8.<br><br>"The digital board contains an FPGA . . . which is responsible for initializing, programming, and controlling the UoC, as well as offloading ultrasound data from the UoC for further processing."  *Id*. at 8. |

5

<table>
<tr><td></td><td>

**Overview**

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the mobile device receives digital information from the ultrasound transducer assembly), in substantially the same way (e.g., the mobile device is separate from the ultrasound transducer assembly and in communication therewith), and achieves substantially the same result as the claimed subject matter (e.g., the mobile device receives and processes digital information from the ultrasound transducer assembly). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

</td></tr>
<tr><td>

a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between;

</td><td>

Butterfly's POCUS systems include a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between.

"The processed ultrasound data are then transmitted through the USB interface . . . to a mobile device for image display." Rothberg et al. at 8.

"The digital board and mechanical housing connect to a USB cable, which plugs into a mobile device for display." See Fig. 6:

</td></tr>
</table>

6



*Id*. at 8.

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf.

The Butterfly POCUS product has a "Mobile device cable."  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 17, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf:

7

The Butterfly iQ/Butterfly iQ+ probe is only for use with the Butterfly iQ App. Do not attempt to connect the probe to other ultrasound systems. Figure 1, "Probe Components" [17] shows the parts of the probe and describes its parts.

**Figure 1. Probe Components**



1. Lens
2. Midline Mark
3. Orientation Mark
4. Battery Indicator Lights
5. Battery Indicator Button
6. Probe/Cable Boundary
7. Mobile Device Cable
8. Charging Source

| wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit. | Butterfly's POCUS systems include wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit.<br><br>"The UoC probe contains the UoC board connected to both a main board and a power board with a battery." Rothberg et al. at 5.<br><br>"About 50% of the power is consumed by the UoC, while the signal processing in the FPGA demands another 30%. The remaining 20% is used by the power management units and miscellaneous components in the probe." *Id*. at 8.<br><br>Butterfly's POCUS system has a battery power source: |



*Id.* at 8.

Butterfly's POCUS system has a battery power source. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 22, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf:

**To charge the probe:**

1. Disconnect the probe from the mobile device. Imaging cannot be performed while charging.
2. Connect the charging cable to the charging pad and the USB end to the wall adapter.
3. Plug the wall adapter into a power outlet. The charger will light up to show that it is powered on.
4. Place the probe onto the charging pad so that the probe lies flat and wait for the probe's battery indicator lights to turn on.

When the probe battery is charging, the probe battery indicator lights indicate the current battery level. When the probe completes its charge, the probe's battery indicator lights turn off. For additional information on the status lights on your specific charger please visit support.butterflynetwork.com.

The Butterfly POCUS system connects to a variety of compatible mobile devices, each of which also includes distributed portions of a battery source. *See* https://support.butterflynetwork.com/hc/en-us/articles/360028326031-Devices-Compatible-With-Butterfly-iQ- (last accessed March 2, 2022).

| | |
|---|---|
| | Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., a battery power source powers the Butterfly POCUS system), in substantially the same way (e.g., portions of the Butterfly POCUS system's battery power source are distributed between the ultrasound transducer assembly and the main processing unit), and achieves substantially the same result as the claimed subject matter (e.g., the power source are distributed between the main processing unit and the transducer assembly). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 2** | |
| The system of claim 1, wherein said distribution of said battery source is configured at least in part to result in a desired total weight of said ultrasound transducer assembly, wherein said desired total minimum weight is configured to counterbalance torque forces felt by a user of said transducer assembly. | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein said distribution of said battery source is configured at least in part to result in a desired total weight of said ultrasound transducer assembly, wherein said desired total minimum weight is configured to counterbalance torque forces felt by a user of said transducer assembly.<br><br>*See supra* at Claim 1.<br><br>On information and belief, the power source of Butterfly's POCUS system is distributed between the ultrasound transducer assembly and the mobile phone, and the system is configured to result in a desired total weight. *See, e.g.,* https://www.whcbc.org/pulse/putting-an-ultrasound-in-every-doctors-pocket-a-conversation-with-butterfly-networks-david-silk/:<br><br>Where we're truly changing the game is the insights one can get from ultrasound. Because of size, weight, fragility, complexity to operate, ultrasounds are fundamentally underutilized as a tool for diagnostic and procedural support. For example, take a simple thing like putting in an IV. In most cases, it's not an<br><br>*See also* https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf:<br><br>The number of such cables is often practically limited to a few hundred due to size and weight constraints, requiring the device to have an undesirably low channel count (often about 128 and well under 1,000). Moreover, since imaging at different depths in |

| | https://support.butterflynetwork.com/hc/en-us/articles/360041783912-System-Specifications: |
|---|---|
| | |

| Item | Butterfly iQ Specifications | Butterfly iQ+ Specifications |
|---|---|---|
| Probe dimensions | 185 x 56 x 35 mm (7.2 x 2.2 x 1.4 in) | 163 x 56 x 35 mm (6.4 x 2.2 x 1.4 in.) |
| Probe weight | 313 grams (0.69 lbs) | 309 grams (.68 lbs) |
| Power | Battery (rechargeable) | Battery (rechargeable) |
| Battery life | 2 hours continuous scanning | 144 minutes continuous scanning (20% longer) |
| Display | Variable | Variable |
| Min/Max scan depth | 1cm min / 30cm max | 1cm min / 30cm max |
| Ultrasound chip | Integrated CMOS chip | Integrated CMOS chip |
| Transducers | 9000-element CMUT | 9000-element CMUT |
| Frequency range | 1–10 MHz | 1–10 MHz |
| Cable Length | Lightning: 1.25 meters (4.10 feet) USB-C: 2 meters (6.56 feet) | Lightning and USB-C: 1.5 meters (4.92 feet) |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim. However, to the extent this claim is not literally present in or performed by the accused instrumentality, the claim is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., the distribution of the battery source results in a desired total weight of the ultrasound transducer assembly), in substantially the same way (e.g., portions of the Butterfly POCUS system's battery power source are distributed between the ultrasound transducer assembly and the main processing unit), and achieves substantially the same result as the claimed subject matter (e.g., the desired total minimum weight counterbalances torque forces felt by a user of the transducer assembly). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| **Claim 3** | |
|---|---|

| The system of claim 1, wherein an amount of said processing circuitry included in said ultrasound transducer assembly is configured at least in part to result in a desired total weight of said ultrasound transducer assembly. | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein an amount of said processing circuitry included in said ultrasound transducer assembly is configured at least in part to result in a desired total weight of said ultrasound transducer assembly.<br><br>*See supra* at Claim 1.<br><br>On information and belief, Butterfly's POCUS system includes processing circuitry, and the system is configured to result in a desired total weight. *See, e.g.*, https://www.whcbc.org/pulse/putting-an-ultrasound-in-every-doctors-pocket-a-conversation-with-butterfly-networks-david-silk/:<br><br>**Silk:** Butterfly began by changing the way that ultrasound can be used by putting the core technology of ultrasound on a chip. Traditional ultrasound uses crystals, which are fragile, and require multiple different probes to place an ideal ultrasound wave into a different part of the body. Butterfly put those crystals onto a chip, creating an ultrasound device that is more durable, cost-effective, and flexible relative to traditional ultrasound machines. That's where the innovation at Butterfly began. Right now, we have 20+ presets, and<br><br>Where we're truly changing the game is the insights one can get from ultrasound. Because of size, weight, fragility, complexity to operate, ultrasounds are fundamentally underutilized as a tool for diagnostic and procedural support. For example, take a simple thing like putting in an IV. In most cases, it's not an<br><br>*See also* https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf:<br><br>The number of such cables is often practically limited to a few hundred due to size and weight constraints, requiring the device to have an undesirably low channel count (often about 128 and well under 1,000). Moreover, since imaging at different depths in<br><br>https://support.butterflynetwork.com/hc/en-us/articles/360041783912-System-Specifications: |

12

| Item | Butterfly iQ Specifications | Butterfly iQ+ Specifications |
|---|---|---|
| Probe dimensions | 185 x 56 x 35 mm (7.2 x 2.2 x 1.4 in) | 163 x 56 x 35 mm (6.4 x 2.2 x 1.4 in.) |
| Probe weight | 313 grams (0.69 lbs) | 309 grams (.68 lbs) |
| Power | Battery (rechargeable) | Battery (rechargeable) |
| Battery life | 2 hours continuous scanning | 144 minutes continuous scanning (20% longer) |
| Display | Variable | Variable |
| Min/Max scan depth | 1cm min / 30cm max | 1cm min / 30cm max |
| Ultrasound chip | Integrated CMOS chip | Integrated CMOS chip |
| Transducers | 9000–element CMUT | 9000–element CMUT |
| Frequency range | 1–10 MHz | 1–10 MHz |
| Cable Length | Lightning: 1.25 meters (4.10 feet) USB–C: 2 meters (6.56 feet) | Lightning and USB–C: 1.5 meters (4.92 feet) |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim. However, to the extent this claim is not literally present in or performed by the accused instrumentality, the claim is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., an amount of the processing circuitry included in the ultrasound transducer assembly results in a desired total weight of the ultrasound transducer assembly), in substantially the same way (e.g., an amount of the processing circuitry is included in the ultrasound transducer assembly), and achieves substantially the same result as the claimed subject matter (e.g., a desired total weight of the ultrasound transducer assembly). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| **Claim 4** | |
|---|---|
| The system of claim 1, wherein said processing circuitry comprises a digital | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein said processing circuitry comprises a digital beam former coupled to said transducer array. |

| beam former coupled to said transducer array. | *See supra* at Claim 1.<br><br>"A configurable elevational column summer adds the decimated data from the rows to beamform and further compress the data for storage and offload." Rothberg et al. at 5.<br><br>"The SPU coordinates a real-time timing sequencer to load UoC parameters, launch triggers, and offload and process ultrasound data. Additional processing is architecturally reconfigurable and includes beamforming, compounding, and synthetic aperture imaging capabilities." *Id.* at 5. |
|---|---|
| **Claim 5** | |
| The system of claim 4, wherein said processing circuitry comprises a digital signal processor coupled to said digital beam former. | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein said processing circuitry comprises a digital signal processor coupled to said digital beam former.<br><br>*See supra* at Claim 1.<br><br>Butterfly's POCUS system contains a digital signal processor:<br><br><br><br>Rothberg et al. at Fig. 1F. |

14

| | |
|---|---|
| | "The digitized samples from every four ADCs are consumed by a digital processing block nominally operating at a 160-MHZ system clock rate and are resynchronized to a parallel data bus with a multiplexing hub. Each channel is then heterodyned into baseband, low-pass filtered, and down-sampled to facilitate decimation for a data bandwidth reduction in the succeeding processing. The baseband operation is accomplished with a direct digital synthesizer where a local oscillator is configured to output two signals, 90 phase offset, which are multiplied with the channel to generate in-phase($I$) and quadrature ($Q$) components. The $I/Q$ complex data are then low-pass-filtered by configurable cascaded integrator-comb filters with down-sampling. A configurable elevational column summer adds the decimated data from the rows to beamform and further compress the data for storage and offload." *Id*. at 5.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim. However, to the extent this claim is not literally present in or performed by the accused instrumentality, the claim is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., digital signal processing), in substantially the same way (e.g., coupled to the digital beam former as part of the ultrasound transducer assembly), and achieves substantially the same result as the claimed subject matter (e.g., processing digital signals). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 12** | |
| A method comprising: providing an ultrasound transducer assembly having a transducer array and signal processing circuitry coupled to said transducer array; | Butterfly provides an ultrasound transducer assembly having a transducer array and signal processing circuitry coupled to said transducer array.<br><br>For example, Butterfly provides a POCUS system that contains an ultrasound transducer assembly having an array of ultrasound transducers, with CMOS signal processing circuitry coupled to the array: |



*See* Jonathan M. Rothberg, et al., *Ultrasound-on-chip platform for medical imaging, analysis, and collective intelligence*, 118 PNAS 1, Fig. 1A (2021), https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf (academic paper authored by Butterfly Network founder and employees and funded by Butterfly Network. The paper includes images and videos of the Butterfly iQ/iQ+ from the Butterfly website, but rather than referring to the Butterfly iQ/iQ+, the paper refers to "ultrasound-on-chip probe" or "UoC probe").

"By integrating the circuitry of a full ultrasound system onto a chip, we hope that UoC enables a transformation of health care worldwide---just as putting a camera on a semiconductor chip made photography accessible to anyone with a smartphone." *Id*. at 7.

"An ultrasound-on-chip (UoC) is described in the following sections that outline the design, fabrication and integration of MEMS ultrasonic transducers directly in a CMOS process." *Id*. at 1.

"The mixed-signal (analog and digital) circuitry provides full processing and control for a versatile UoC platform." *Id*. at 2.

"Fig. 1*B* shows wafer-level integration of the MEMS transducers onto CMOS circuits." *Id*. at 2.

16



*Id.*

"A 0.13- μm BCD ([bipolar]-CMOS-double-diffused metal-oxide-semiconductor) chip, seen in Fig. 1*C*, is designed on a 31- × 20-mm die with the active MEMs array spanning over the analog front-end circuitry and the digital processing circuitry on the elevational periphery." *Id.* at 2.

"Each half-module has a digital processor and services a 1 × 32 column, which consists of four analog front ends each servicing eight MEMS elements." *Id.*

17



## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf.

| | |
|---|---|
| providing a main processing unit having signal processing circuitry in communication with said signal processing circuitry of said ultrasound | Butterfly directs and controls the users of its products to provide a main processing unit having signal processing circuitry in communication with said signal processing circuitry of said ultrasound transducer assembly via digital data communication wherein said ultrasound transducer assembly is connected to said main processing unit with a digital data cable configured to carry said digital information there between, and Butterfly provides such digital data cable.<br><br>"A mobile device application provides a touch-screen user interface to select preset modes and parameters for imaging that are compiled and communicated in real-time via the USB connection. The mobile device processors provide additional back-end processing and visualization capabilities to the ultrasound data stream. Measurement and annotation tools help assess the |

18

| | |
|---|---|
| transducer assembly via digital data communication wherein said ultrasound transducer assembly is connected to said main processing unit with a digital data cable configured to carry said digital information there between; and | ultrasound captures.  The mobile platform provides a means to categorize and share data in the cloud. Further 3D rendering is done on the mobile platform, in the cloud, or on a local computer." Rothberg et al. at 5.<br><br>"A sequence compiler on the host (the mobile device) compiles high-level imaging mode parameters into UoC parameters and a sequence command executable to be run on a sequence processing unit (SPU) on the FPGA." *Id.* at 5.<br><br>"Expanding upon the capabilities provided by connecting a mobile device, we have designed an acquisition assistance application to interactively guide an operator to place and orient the UoC probe to a specified target anatomy." *Id.* at 6.<br><br>"By combining the versatile UoC probe with a mobile device having broad interconnectedness, the applications for it become field-upgradable and integrated to the cloud and artificial intelligence systems.  In order to open up the UoC platform for research and development of new applications, we are developing an API, SDK, and an applications repository to provide access to data aggregated in the cloud repository and to expose some of the hardware and processing interfaces. Understanding that the needs for ultrasound go beyond the probe hardware toward interconnectivity, our vision is to maintain a virtuous cycle framework . . . that enables UoC data collection and clinical research and development for applications improving performance and the potential for automated interpretation." *Id.* at 7-8.<br><br>"The digital board contains an FPGA . . . which is responsible for initializing, programming, and controlling the UoC, as well as offloading ultrasound data from the UoC for further processing." *Id.* at 8.<br><br>"The processed ultrasound data are then transmitted through the USB interface . . . to a mobile device for image display." Rothberg et al. at 8.<br><br>"The digital board and mechanical housing connect to a USB cable, which plugs into a mobile device for display." See Fig. 6: |



*Id.* at 8.

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf.

Butterfly provides a "Mobile device cable" for its POCUS products. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 17, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf:

The Butterfly iQ/Butterfly iQ+ probe is only for use with the Butterfly iQ App. Do not attempt to connect the probe to other ultrasound systems. Figure 1, "Probe Components" [17] shows the parts of the probe and describes its parts.

**Figure 1. Probe Components**



1. Lens
2. Midline Mark
3. Orientation Mark
4. Battery Indicator Lights
5. Battery Indicator Button
6. Probe/Cable Boundary
7. Mobile Device Cable
8. Charging Source

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., providing a main processing unit having signal processing circuitry in communication with the signal processing circuitry of the ultrasound transducer assembly via digital data communication), in substantially the same way (e.g., the ultrasound transducer assembly is connected to the main processing unit with a digital data cable configured to carry the digital information there between), and achieves substantially the same result as the claimed subject matter (e.g., the main processing unit communicates with the ultrasound transducer assembly via digital data communication wherein the ultrasound transducer assembly is connected to the main processing unit with a digital data cable). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| distributing battery capacity between said ultrasound transducer assembly and said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit. | Butterfly distributes battery capacity between said ultrasound transducer assembly and said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit. |
|---|---|

"The UoC probe contains the UoC board connected to both a main board and a power board with a battery." Rothberg et al. at 5.

"About 50% of the power is consumed by the UoC, while the signal processing in the FPGA demands another 30%. The remaining 20% is used by the power management units and miscellaneous components in the probe." *Id*. at 8.

Butterfly's POCUS system has a battery power source:



*Id*. at 8.

Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 22, https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf:

**To charge the probe:**

1. Disconnect the probe from the mobile device. Imaging cannot be performed while charging.

2. Connect the charging cable to the charging pad and the USB end to the wall adapter.

3. Plug the wall adapter into a power outlet. The charger will light up to show that it is powered on.

4. Place the probe onto the charging pad so that the probe lies flat and wait for the probe's battery indicator lights to turn on.

When the probe battery is charging, the probe battery indicator lights indicate the current battery level. When the probe completes its charge, the probe's battery indicator lights turn off. For additional information on the status lights on your specific charger please visit support.butterflynetwork.com.

The Butterfly POCUS system connects to a variety of compatible mobile devices, each of which also includes distributed portions of a battery source. *See* https://support.butterflynetwork.com/hc/en-us/articles/360028326031-Devices-Compatible-With-Butterfly-iQ-.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., a battery power source powers the Butterfly POCUS system), in substantially the same way (e.g., distributing battery capacity between the ultrasound transducer assembly and the main processing unit), and achieves substantially the same result as the claimed subject matter (e.g., to provide a desired distribution of weight between the ultrasound transducer assembly and the main processing unit). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| Claim 13 | |
|---|---|
| The method of claim 12, further comprising:<br><br>distributing signal processing circuitry between said signal processing circuitry of said ultrasound | Butterfly's POCUS systems include each of the elements of Claim 13, and additionally include distributing signal processing circuitry between said signal processing circuitry of said ultrasound transducer assembly and said signal processing circuitry of said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit.<br><br>*See supra* at Claim 12.<br><br>On information and belief, Butterfly's POCUS system distributes processing circuitry between the signal processing of the ultrasound transducer assembly and the processing circuitry of the mobile phone, and the system provides a desired distribution |

| | |
|---|---|
| transducer assembly and said signal processing circuitry of said main processing unit to provide a desired distribution of weight between said ultrasound transducer assembly and said main processing unit. | of weight between the ultrasound transducer assembly and the mobile phone. *See, e.g.*, https://www.whcbc.org/pulse/putting-an-ultrasound-in-every-doctors-pocket-a-conversation-with-butterfly-networks-david-silk/: <br><br> **Silk:** Butterfly began by changing the way that ultrasound can be used by putting the core technology of ultrasound on a chip. Traditional ultrasound uses crystals, which are fragile, and require multiple different probes to place an ideal ultrasound wave into a different part of the body. Butterfly put those crystals onto a chip, creating an ultrasound device that is more durable, cost-effective, and flexible relative to traditional ultrasound machines. That's where the innovation at Butterfly began. Right now, we have 20+ presets, and <br><br> Where we're truly changing the game is the insights one can get from ultrasound. Because of size, weight, fragility, complexity to operate, ultrasounds are fundamentally underutilized as a tool for diagnostic and procedural support. For example, take a simple thing like putting in an IV. In most cases, it's not an <br> *See also* https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf: <br><br> The number of such cables is often practically limited to a few hundred due to size and weight constraints, requiring the device to have an undesirably low channel count (often about 128 and well under 1,000). Moreover, since imaging at different depths in <br><br> https://support.butterflynetwork.com/hc/en-us/articles/360041783912-System-Specifications: |

24

| Item | Butterfly iQ Specifications | Butterfly iQ+ Specifications |
|---|---|---|
| Probe dimensions | 185 x 56 x 35 mm (7.2 x 2.2 x 1.4 in) | 163 x 56 x 35 mm (6.4 x 2.2 x 1.4 in.) |
| Probe weight | 313 grams (0.69 lbs) | 309 grams (.68 lbs) |
| Power | Battery (rechargeable) | Battery (rechargeable) |
| Battery life | 2 hours continuous scanning | 144 minutes continuous scanning (20% longer) |
| Display | Variable | Variable |
| Min/Max scan depth | 1cm min / 30cm max | 1cm min / 30cm max |
| Ultrasound chip | Integrated CMOS chip | Integrated CMOS chip |
| Transducers | 9000-element CMUT | 9000-element CMUT |
| Frequency range | 1–10 MHz | 1–10 MHz |
| Cable Length | Lightning: 1.25 meters (4.10 feet) USB-C: 2 meters (6.56 feet) | Lightning and USB-C: 1.5 meters (4.92 feet) |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim. However, to the extent this claim is not literally present in or performed by the accused instrumentality, the claim is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., a method further comprising distributing signal processing circuitry between the signal processing circuitry of the ultrasound transducer assembly and the signal processing circuitry of the main processing unit), in substantially the same way (e.g., distributing signal processing circuitry between the signal processing circuitry of the ultrasound transducer assembly and the signal processing circuitry of the main processing unit), and achieves substantially the same result as the claimed subject matter (e.g., to provide a desired distribution of weight between the ultrasound transducer assembly and the main processing unit). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| Claim 15 | |
|---|---|
| The method of claim 12 wherein said desired total distribution of weight | Butterfly's POCUS systems include each of the elements of Claim 12, and additionally include wherein said desired total distribution of weight is configured to provide sufficient weight to said transducer assembly to counterbalance torque forces felt by a user of said transducer assembly. |

25

| is configured to provide sufficient weight to said transducer assembly to counterbalance torque forces felt by a user of said transducer assembly. | *See supra* at Claim 12.<br><br>On information and belief, Butterfly's POCUS system distributes weight between the ultrasound transducer assembly and the mobile phone, and the system provides sufficient weight. *See, e.g.*, https://support.butterflynetwork.com/hc/en-us/articles/360041783912-System-Specifications: |
|---|---|

| Item | Butterfly iQ Specifications | Butterfly iQ+ Specifications |
|---|---|---|
| Probe dimensions | 185 x 56 x 35 mm (7.2 x 2.2 x 1.4 in) | 163 x 56 x 35 mm (6.4 x 2.2 x 1.4 in.) |
| Probe weight | 313 grams (0.69 lbs) | 309 grams (.68 lbs) |
| Power | Battery (rechargeable) | Battery (rechargeable) |
| Battery life | 2 hours continuous scanning | 144 minutes continuous scanning (20% longer) |
| Display | Variable | Variable |
| Min/Max scan depth | 1cm min / 30cm max | 1cm min / 30cm max |
| Ultrasound chip | Integrated CMOS chip | Integrated CMOS chip |
| Transducers | 9000-element CMUT | 9000-element CMUT |
| Frequency range | 1-10 MHz | 1-10 MHz |
| Cable Length | Lightning: 1.25 meters (4.10 feet)<br>USB-C: 2 meters (6.56 feet) | Lightning and USB-C: 1.5 meters (4.92 feet) |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim. However, to the extent this claim is not literally present in or performed by the accused instrumentality, the claim is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., distribute weight), in substantially the same way (e.g., desired total distribution of weight), and achieves substantially the same result as the claimed subject matter (e.g., to provide sufficient weight to the transducer assembly to counterbalance torque forces felt by a user of the transducer assembly). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

# EXHIBIT 4D

**EXHIBIT D**
**U.S. PATENT NO. 7,169,108 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC.*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1–4 of U.S. Patent No. 7,169,108 (the "'108 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted Claims 1–4 of the '108 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

Butterfly also infringes asserted Claims 1–4 under 35 U.S.C. § 271(b) by having knowledge of the '108 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, infringement of the '108 Patent, with specific intent, by others.

The chart below explains how Butterfly's POCUS devices infringe the '108 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence Fujifilm may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent that any claim element is found to not be literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See, e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

1

| Claim 1 | Butterfly's POCUS systems |
|---|---|
| An ultrasound system application specific integrated circuit (US-ASIC) | Butterfly's POCUS systems include an ultrasound system application specific integrated circuit (US-ASIC). "Butterfly iQ can scan the body **with a single chip** because it replaces traditional piezoelectric crystals with Butterfly Network's ultrasound-on-a-chip technology wherein 9,000 capacitive micromachined ultrasound transducers create and receive sound from 1 - 10 MHz." *See Butterfly Network Technology and Security White Paper*, 3, 5 (Apr. 10, 2020), https://manual.butterflynetwork.com/Butterfly-Network-Technology-and-Security-White-Paper-950-20009-00-rev+D-1.pdf (last accessed February 9, 2022) (emphasis added). "Butterfly's Ultrasound-on- a-Chip technology combines the capabilities of the typical three probes into a single ultra wide-band, 2D matrix array comprised of thousands of microelectromechanical systems (MEMS). **These sensors are directly overlaid on an integrated circuit encompassing the electronics of a high performance ultrasound system.** The acoustic bandwidth and processing power available from the MEMS and electronics fusion creates unprecedented diagnostic versatility, speeds, modes, and resolutions. Moving the ultrasound machine to a chip allows it to be produced at unprecedented scales, at prices and rates of improvements that obey Moore's law and will enable a series of future form factors." *See A window into the human body for less than $2,000 enabled by breakthrough Ultrasound-on- a-Chip technology.*, https://www.butterflynetwork.com/press-releases/first-ultrasound-on-a-chip-receives-broadest-fda-510-k-clearance (last accessed February 9, 2022) (emphasis added). *See also The future of ultrasound is here.*, https://www.butterflynetwork.com/iq (last accessed February 9, 2022): |

|  | "The MEMS transducer array is bonded to the CMOS die and bounded by a seal ring. Bond pads to CMOS I/O connections are along the periphery of the CMOS chip."<br><br>*See* Jonathan M. Rothberg, et al., *Ultrasound-on-chip platform for medical imaging, analysis, and collective intelligence*, 118 PNAS 1, 3 (2021), https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf (academic paper authored by Butterfly Network founder and employees and funded by Butterfly Network. The paper includes images and videos of the Butterfly iQ/iQ+ from the Butterfly website, but rather than referring to the Butterfly iQ/iQ+, the paper refers to "ultrasound-on-chip probe" or "UoC probe").<br><br>"Furthermore, **the system is designed with high-voltage-tolerant bypass capacitors on the ASIC** and the printed circuit board (PCB) as well as the power supply allow us to supply current across the 8,960-element array of pulsers without significant voltage droops, thus supporting extended waveforms, e.g. Doppler." Rothberg et al. at 3-4 (emphasis added). |

3

## System Specifications

2 years ago

Do not use the Butterfly iQ App on a mobile device that does not meet minimum requirements. Using the Butterfly iQ App on a mobile device that does not meet the minimum requirements may affect performance and image quality, possibly resulting in misdiagnosis.

Butterfly iQ works on many Apple and Android devices. For the latest list of compatible mobile devices please click here.

| Item | Butterfly iQ Specifications | Butterfly iQ+ Specifications |
|---|---|---|
| Probe dimensions | 185 x 56 x 35 mm (7.2 x 2.2 x 1.4 in) | 163 x 56 x 35 mm (6.4 x 2.2 x 1.4 in.) |
| Probe weight | 313 grams (0.69 lbs) | 309 grams (.68 lbs) |
| Power | Battery (rechargeable) | Battery (rechargeable) |
| Battery life | 2 hours continuous scanning | 144 minutes continuous scanning (20% longer) |
| Display | Variable | Variable |
| Min/Max scan depth | 1cm min / 30cm max | 1cm min / 30cm max |
| Ultrasound chip | Integrated CMOS chip | Integrated CMOS chip |
| Transducers | 9000-element CMUT | 9000-element CMUT |
| Frequency range | 1-10 MHz | 1-10 MHz |
| Cable Length | Lightning: 1.25 meters (4.10 feet) USB-C: 2 meters (6.56 feet) | Lightning and USB-C: 1.5 meters (4.92 feet) |

*See System Specifications*, https://support.butterflynetwork.com/hc/en-us/articles/360041783912-System-Specifications (last accessed October 11, 2022).

4



SystemPlus Consulting report at 34.

| having at least one beam former, | Butterfly's POCUS systems include a US-ASIC having at least one beamformer. |
| --- | --- |

5



*See* https://www.butterflynetwork.com/iq (last accessed February 8, 2022).



*See* https://www.butterflynetwork.com/iq (last accessed February 8, 2022).

*See* https://www.butterflynetwork.com/iq (last accessed February 8, 2022).

"One feature of **on-chip beamforming architectures** is that a 3D image may be formed in a separable manner where one direction of the image is beamformed and another orthogonal direction is subsequently beamformed. For example, 3D beamforming may be accomplished with two 2D beamforming stages, where none, one, or both of the 2D beamforming steps is performed on-chip." *See* US Patent No. 9,592,032 (filed Apr. 17, 2015 and published March 14, 2017; filed by and currently assigned to Butterfly) at 20:25-32 (emphasis added).

On information and belief, the beamformer generates different types of ultrasound wave beams.

7





Curved

*See* https://www.butterflynetwork.com/int/en-uk/iq (last accessed October 11, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., 1.75D array beamforming), in substantially the same way (e.g., forming ultrasound wave beams by adjusting phases of individual waves), and achieves substantially the same result (e.g., forming ultrasound wave beams) as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| a transducer controller, | Butterfly's POCUS systems include a US-ASIC having at least one transducer controller. |
| --- | --- |
| | "An ultrasound-on-chip (UoC) is described in the following sections that outline the design, fabrication and **integration of MEMS ultrasonic transducers directly in a CMOS process**." Rothberg et al. at 8 (emphasis added). |
| | "(A) The 8,960 MEMS elements are on a single **transducer-on-CMOS chip, each with control and processing circuitry for sending and receiving ultrasound signals** through the acoustic lens of a handheld probe. The integrated MEMS and CMOS structures on a single die can be seen in a scanning electron microscope (SEM) image. The MEMS transducer array is bonded to the CMOS die and bounded by a seal ring. Bond pads to CMOS I/O connections are along the periphery of the CMOS chip." Rothberg et al. at 3, Figure 1(A) (emphasis added): |

9



"FIG. 2 shows a schematic illustration of the arrangement of **individually-controllable modules of ultrasonic transducer elements in an array** used in accordance with some embodiments of the present disclosure." *See* US Patent No. 9,592,032 at 2:64-67 (emphasis added).

"In various embodiments, **each RX control circuit 106 may be associated with a single transducer**, a group of two or more transducers within a single transducer element, a single transducer element comprising a group of transducers, a group of two or more transducer elements within a module, a single module comprising two or more transducer elements, two or more modules in an array 102, **or an entire array 102 of transducers**." *Id.* at 9:27-34 (emphasis added).

"In the example shown in FIG. 1B, **there is a separate RX control circuit 106 for each transducer in the array(s) 102**, but there is only one instance of each of the **timing & control circuit 108** and the signal conditioning/processing circuit 110. Accordingly, in such an implementation, the timing & control circuit 108 may be responsible for synchronizing and coordinating the operation of **all RX control circuit 106 combinations on the die 112**, and the signal

10

conditioning/processing circuit 110 may be responsible for handling inputs from all of the RX control circuits 106 on the die 112. Alternatively, die 112 may include multiple timing & control circuits 108, with each of the timing & control circuits being responsible for synchronizing and coordinating the operation of a subset of RX control circuit combinations on the die." *Id.* at 9:35-49 (emphasis added).

*See id.* at FIG. 1B:



FIG. 1B

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. For example, the TX control circuit 104 of Butterfly's 032

11

| | |
|---|---|
| | Patent controls the transducer arrays in substantially the same way and achieves substantially the same result as the claimed subject matter. As another example, the control electronics integrated into a CMOS controls MEMS in substantially the same way and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| one or more digital signal processor(s), | Butterfly's POCUS systems include a US-ASIC having at least one digital signal processor.<br><br>"A 0.13-µm BCD (bipoloar-CMOS-double-diffused metal–oxide–semiconductor) chip, seen in Fig. 1C, is designed on a 31- × 20-mm die with the active MEMS array spanning over the analog front-end circuitry and the **digital processing circuitry** on the elevational periphery (27). Modularity of the design provides a reduction of the engineering complexity. A 2- × 32-element ultrasound processing unit (UPU) module is replicated 140 times across the top and bottom halves of the array. **Each half-module has a digital processor** and services a 1 × 32 column, which consists of four analog front ends each servicing eight MEMS elements. A modular communication protocol coupled with the modular physical design allows for scaling the array size with straightforward replication (28)." Rothberg et al. at 2 (emphasis added).<br><br>*See id.* at FIG. 1C:<br><br><br><br>"The UoC receive architecture is designed modularly with replicated arrays of pitch-matched analog front ends (AFEs) and **digital processing units** as seen in Fig. 2F." Rothberg et al. at 4 (emphasis added).<br><br>*See id.* at FIG. 2F: |



"The ultrasound device may be, for example, an ultrasound-on-chip. FIG. 1A includes receive circuitry 101, 102 . . . 10 n; memory address circuitry 110; and memory 121, 122 . . . 12 n. . . . . **The receive circuitry 10i may include, for example, . . . digital filtering, digital beamforming circuitry, digital quadrature demodulation (DQDM) circuitry, digital averaging circuitry, digital dechirp circuitry, digital time delay circuitry, digital phase shifter circuitry, digital summing circuitry, and/or digital multiplying circuitry.**" *See* US Patent App. Pub. No. 2021/0056041 (filed Aug. 21, 2021 and published Feb. 25, 2021; filed by and currently assigned to Butterfly) at [0040]-[0041] (emphasis added).

See Rothberg et al. at 2, Table 1. Comparison of this UoC to state-of-the-art ultrasound ASIC designs showing the presence of one or more on-chip DSPs:

13

**Table 1. Comparison of this UoC to state-of-the-art ultrasound ASIC designs**

| | This work | Ref. 15 | 16 | 17 | 18 | 19 | 20 | 21 |
|---|---|---|---|---|---|---|---|---|
| Process | 130 nm BCD+MEMS | 1.5 μm HV | 28 nm | 180 nm HV SOI | 180 nm | 180 nm | 180 nm BCD SOI | 350 nm CMUT-in-CMOS |
| Transducer | 2D CMUT | 2D CMUT | 2D CMUT | 2D PZT | 2D PZT | 2D PMUT | 2D CMUT | 2D CMUT |
| No. of TX/RX elements | 8,960/8,960 | 256/256 | 0/16 | 128/3072 | 0/144 | 36/36 | 256/256 | 0/960 |
| Operating frequency | 1–10 MHz | 5 MHz | 5 MHz | 5 MHz | 5 MHz | 5 MHz | 7 MHz | 5 MHz |
| Pitch-matched | ✔ (208 μm) | × | ✔ (250 μm) | ✔ (300 μm) | ✔ (150 μm) | ✔ (250 μm) | ✔ (220 μm) | ✔ (162 μm) |
| Multilevel pulsing | ✔ (7-level) | × | × | ✔ (3-level) | × | × | × | × |
| TX beamforming | ✔ (digital) | ✔ (digital) | × | ✔ (digital) | × | × | × | × |
| RX beamforming | ✔ (digital) | × | ✔ (digital) | ✔ (analog) | ✔ (analog) | ✔ (analog) | × | × |
| On-chip TGC | ✔ (0.2 dB/step) | × | ✔ (0.33 dB/step) | × | ✔ (6 dB/step) | ✔ (6 dB/step) | × | ✔ (4.3 dB/step) |
| On-chip ADC | ✔ (1,120 ch) | × | ✔ (16 ch) | × | ✔ (16 ch) | ✔ (36 ch) | × | × |
| On-chip DSP | ✔ | × | × | × | × | × | × | × |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| and a plurality of input/output channels for linking to at least one memory means, a power control system, a transducer and a user interface. | Butterfly's POCUS systems include a US-ASIC having a plurality of input/output connections linking to at least one memory means, power control system, transducer, and a user interface.<br><br>"Bond pads to **CMOS I/O connections are along the periphery of the CMOS chip**." at 3, Figure 1(A) (emphasis added): |
|---|---|



"Fig. 6 shows a breakdown of the UoC probe, where the **MEMS and CMOS integrated chip is situated at the head of the probe**. . . . The **UoC I/O pins are wire-bonded to a PCB interposer, which is plugged into the probe's digital and power boards**. The **digital board** contains an FPGA (Cyclone V; Intel Co.), which is **responsible for initializing, programming, and controlling the UoC**, as well as **offloading ultrasound data from the UoC for further processing**. The processed ultrasound data are then transmitted through the USB interface, a USB controlling chip (FX3; Cypress Semiconductor Corp.), **to the mobile device for image display**." Rothberg et al. at 8 (emphasis added).

*See id.* at FIG. 2F:





SystemPlus Consulting report at 34.

Butterfly's POCUS system comprises a user interface.  For example, Butterfly iQ/iQ+ probe comprises Battery Indicator Lights and Battery Indicator Button.



1. Lens

2. Midline Mark

3. Orientation Mark

4. Battery Indicator Lights

5. Battery Indicator Button

6. Probe/Cable Boundary

7. Mobile Device Cable

8. Charging Source

*See User Manual*, https://support.butterflynetwork.com/hc/en-us/articles/360040444871-Probe (last accessed October 12, 2022).

As shown in the figure below, Butterfly's POCUS system comprises a LTC2980 chip (annotated yellow), a 16-Channel PMBus Power System Manager.

18



Id. at 18; also see LTC2980 data sheet, https://www.analog.com/media/en/technical-documentation/data-sheets/ltc2980.pdf (last accessed October 12, 2022).

Butterfly's POCUS system comprises memory means. For example and without limitation, the system comprises SRAM as shown in figure below, which is one example of a memory means in the Butterfly system.



Id. at 62.



Id. at 67.

Alternatively or in addition to the above, Butterfly's POCUS system comprises, on information and belief, a buffer that connects a USB or lightning cable. This buffer is another example of the claimed at least one memory means.

Alternatively or in addition to the above, a portable device connected with the iQ or iQ+ probe comprises at least one memory means, a power control system, and a user interface. On information and belief, the ASIC chip comprises I/O channels for linking to the portable device via a lightning or USB type C cable.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because

| | any difference between such claim element and the accused instrumentality is insubstantial.  For example, the Butterfly system includes various channels or connections that link to at least one memory means, power systems, a transducer and, ultimately, a user interface, and these connections perform substantially these same functions, in the same way, to achieve the same result of providing power and data connections necessary to operate the system.  As another example, I/O channels further connects to a portable device (e.g., an iOS or Android device) via a lightning or USB type C cable to achieve the same result of connecting to the components through additional lightning or USB cables. |
|---|---|
| **Claim 2** | |
| The US-ASIC of claim 1, wherein said at least one beam former comprises: | Butterfly's POCUS systems include a US-ASIC having at least one beamformer. *See supra* at Claim 1. |
| a transmit beam former and a receive beam former. | The at least one beamformer included in the US-ASIC included in Butterfly's POCUS systems further comprises a transmit beamformer and a receive beamformer. See Rothberg et al. at 2, Table 1. Comparison of this UoC to state-of-the-art ultrasound ASIC designs: |

Table 1.    Comparison of this UoC to state-of-the-art ultrasound ASIC designs

| | This work |
|---|---|
| Process | 130 nm BCD+MEMS |
| Transducer | 2D CMUT |
| No. of TX/RX elements | 8,960/8,960 |
| Operating frequency | 1–10 MHz |
| Pitch-matched | ✔ (208 µm) |
| Multilevel pulsing | ✔ (7-level) |
| TX beamforming | ✔ (digital) |
| RX beamforming | ✔ (digital) |
| On-chip TGC | ✔ (0.2 dB/step) |
| On-chip ADC | ✔ (1,120 ch) |
| On-chip DSP | ✔ |

"The CMOS circuitry is designed to individually drive each MEMS element to transmit ultrasonic waves as well as to receive ultrasonic vibrations which are converted to electronic signals, amplified, and processed." Rothberg et al. at 2 (emphasis added).

See also Rothberg et al. at 4, Figs. 2E and 2F (showing Tx/Rx circuitry):





Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., 1.75D array beamforming), in substantially the same way (e.g., forming ultrasound wave beams by adjusting phases of individual waves), and achieves substantially the same result as the claimed subject matter (e.g., forming ultrasound wave beams). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| **Claim 3** | |
|---|---|
| The US-ASIC of claim 2, wherein said transmit beam former and said receive | The transmit beamformer and the receive beamformer included in the US-ASIC included in Butterfly's POCUS systems draw from a single master clock path for precise timing. |

25

| | |
|---|---|
| beam former draw from a single master clock path for precise timing. | *See supra* at Claim 2.<br><br>"The on-chip digital transmit circuitry (Fig. 2B) enables each of the 8,960 elements to be individually addressed **in transmit for full beam-forming capabilities** in azimuth and elevation, which allows the transducer to have a programmable focal depth. A total of 280 waveform generators can be programmed with arbitrary waveforms having seven levels where each element can have independent delays at 6.25-ns increments . . . . Encoders and decoders allow for **serialization at the system clock level for precise waveform delays**." Rothberg et al. at 3 (emphasis added).<br><br>"The ultrasound device receives the first and second ultrasound data **on a single clock cycle**." US Pat. App. Pub. No. 2021/0056041 at [0066].<br><br>"The I/O interface of each module is one input port, one output port, and one clock." Rothberg et al. at 2. *See also* Rothberg at 2A:<br><br><br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and |

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter (e.g., providing the synchronized or same clock signal to other components).  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 4** | |
| The US-ASIC of claim 1, further comprising: analog to digital and digital to analog converters. | Butterfly's POCUS systems include a US-ASIC having analog to digital and digital to analog converters.  *See supra* at Claim 1. |

27

*See* Rothberg et al. at 2, Table 1. Comparison of this UoC to state-of-the-art ultrasound ASIC designs:

**Table 1.    Comparison of this UoC to state-of-the-art ultrasound ASIC designs**

| | This work |
|---|---|
| Process | 130 nm BCD+MEMS |
| Transducer | 2D CMUT |
| No. of TX/RX elements | 8,960/8,960 |
| Operating frequency | 1–10 MHz |
| Pitch-matched | ✔ (208 µm) |
| Multilevel pulsing | ✔ (7-level) |
| TX beamforming | ✔ (digital) |
| RX beamforming | ✔ (digital) |
| On-chip TGC | ✔ (0.2 dB/step) |
| On-chip ADC | ✔ (1,120 ch) |
| On-chip DSP | ✔ |

"The digitized samples from every four ADCs are consumed by a digital processing block nominally operating at a 160-MHz system clock rate and are resynchronized to a parallel data bus with a multiplexing hub." Rothberg et al. at 5.

"**Data reduction circuit 132 as shown also includes analog to-digital converter (ADC) 512** configured to convert the analog signal (or alternatively a filtered, or otherwise processed version of the analog signal) to a digital representation. For example, ADC 512 may, for example, comprise a 10-bit, 20 Msps, 40 Msps, 50 Msps, 80 Msps ADC, or any other suitable ADC. Illustrative types of ADCs that may be used include, but are not limited to, a Successive approximation register (SAR) ADC, a

28

flash ADC, a pipeline ADC, a sigma-delta ADC, a multi-slop ADC, and a time-inter leaved ADC." *See* US Patent No. 9,592,032 at 14:21-31 (emphasis added).

The Butterfly ASIC also includes a direct digital synthesizer (DDS). *See* Rothberg at Fig. 2F:



The DDS described in Rothberg outputs a continuous time signal, and thus includes a DAC. *See* Fig. 2F (describing the signal as cos(ωt) and -sin(ωt).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. For example, Butterfly's systems comprise a down sampler,

|  | which samples received analog signals and output digital signals performs substantially the same function (e.g., analog to digital signal converting) in the same way achieves substantially the same result (e.g., converting analog signals to digital signals).  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |

30

# EXHIBIT 4E

**EXHIBIT E**
**U.S. PATENT NO. 8,861,822 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC.*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1–10 of U.S. Patent No. 8,861,822 (the "'822 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted Claims 1–10 of the '822 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

Butterfly also infringes asserted Claims 1–10 under 35 U.S.C. § 271(b) by having knowledge of the '822 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, infringement of the '822 Patent, with specific intent, by others.

In violation of 35 U.S.C. § 271(c), Butterfly has also contributed to and is continuing to contribute to infringement of asserted Claims 1–10 by others (such as customers of Butterfly's POCUS devices) by making, selling and/or offering for sale within the United States and/or importing into the United States POCUS devices or components thereof, that are especially made and/or adapted for infringing asserted Claims 1–10 and are not staple articles of commerce suitable for substantial non-infringing use.

The chart below explains how Butterfly's POCUS devices infringe the '822 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence FUJIFILM Sonosite may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent that any claim element is found to not be literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See, e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

1

**Claim 1**

| Claim 1 | Butterfly's POCUS operation process |
|---|---|
| 1. A method for operating an ultrasound machine to produce an ultrasound image including an image of an interventional instrument, comprising: | The Needle Viz imaging tool of Butterfly's POCUS systems enables producing an ultrasound image that includes an image of an interventional instrument (e.g., a needle).<br><br>Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.<br><br>*See Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022). |
| establishing a first ultrasound imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce a high quality image of | The Needle Viz imaging tool of Butterfly's POCUS systems enables users to establish a first ultrasound imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce a high quality image of tissue within a volume to be imaged.<br><br>For example, Needle Viz offers in-plane "presets" (i.e., a first ultrasound imaging signature) corresponding to body parts and tissues. Each preset corresponds to a predefined set of imaging parameter values. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).<br><br>**Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>Thus, selection of a certain preset establishes a first ultrasound imaging signature, which in turn corresponds to one or more imaging parameters to produce a high quality image of an instrument (e.g., a needle) within the volume to be imaged (i.e., the body part or tissue corresponding to the selected preset). *See Using the Needle Viz Tool,* |

| | |
|---|---|
| tissue within a volume to be imaged; | https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>For Pro, Pro Team, and Enterprise iQ and iQ+ users, Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets. For Pro and Pro Team iQ+ Vet users, Needle Viz (in-plane) is available in the Bladder, Musculoskeletal, Musculoskeletal Equine, Small Organ, and Vascular presets.<br><br>The predefined set of imaginging parameter values corresponding to each preset must include, for example, a speckle reduction parameter (i.e., a noise reduction parameter), to optimize visualization of the body part or tissue corresponding to the preset.<br><br>Further, Butterfly patent application publication US2019/0282208 discloses generation of first and second ultrasound images based on a broad range of "**classifications**" which are "configured to classify the inputted ultrasound image according to a **quality metric of the inputted ultrasound image**." [0007] (emphasis added). These classifications thus correspond to imaging parameters, and further, plausibly correspond to "transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bypass filter type and coefficients, compression curve and speckle reduction" imaging parameters.<br><br>*See also* "In some embodiments, the classification model is configured to **classify the inputted ultrasound image according to a quality** of the inputted ultrasound image. In some embodiments, the classification model is configured to classify the inputted ultrasound image according to **an anatomical view** shown in the inputted ultrasound image." US2019/0282208 at [0008].<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems generate presets, which performs the substantially the same function (e.g., establishing a first ultrasound imaging signature) in substantially the same way and achieves substantially the same result as the claimed subject matter. |
| establishing a second ultrasound imaging signature having one | The Needle Viz imaging tool of Butterfly's POCUS systems enables users to establish a second ultrasound imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging |

| | |
|---|---|
| or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce a high quality image of an instrument within the volume to be imaged; | steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce a high quality image of an instrument within the volume to be imaged.<br><br>Needle Viz additionally establishes a second ultrasound imaging signature having one or more imaging parameters. For example, the second ultrasound imaging signature may have an **imaging steering angle image parameter**. The second ultrasound imaging signature in this case would be established by, for example: 1) selecting the "direction of needle approach" ("From left" or "From right"); and/or 2) selecting the "angle of the needle approach" (40˚, 30˚, or 20˚). *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>When using Needle Viz (in-plane), you can:<br><br>• Adjust the needle approach direction and angle<br><br>• Adjust scan depth<br><br>• Customize needle gain<br><br>• Activate biplane imaging (iQ+ only) |

**To use the Needle Viz Tool:**

1. From the scan screen, select the preset you'd like to use Needle Viz in.

2. Select the Actions button on the bottom right corner of the screen.

3. Under the "Tools" heading, select Needle Viz (in-plane).

4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.

5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.

6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.

7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems generate parameters for Needle Viz Tool, which performs the substantially the same function (e.g., establishing a second ultrasound imaging signature) in substantially the same way and achieves substantially the same result as the claimed subject matter.

| | |
|---|---|
| generating a first frame using the image data resulting from application of the first ultrasound imaging signature; and | The Needle Viz imaging tool of Butterfly's POCUS systems generates a first frame using the image data resulting from application of the first ultrasound imaging signature.<br><br>Needle Viz establishes a "regular B-mode" (i.e., a first frame) based on the application of, for example, the selected preset (i.e., the first ultrasound imaging signature). *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022): |

Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.

For Pro, Pro Team, and Enterprise iQ and iQ+ users, Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets. For Pro and Pro Team iQ+ Vet users, Needle Viz (in-plane) is available in the Bladder, Musculoskeletal, Musculoskeletal Equine, Small Organ, and Vascular presets.

Users must activate the Needle Viz "from the actions menu in an eligible preset" corresponding to the body part to be examined as an initial step. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022):

**Using Needle Viz (in-plane)**

In order to start using Needle Viz (in-plane):

1. Activate Needle Viz (in-plane) from the actions menu in an eligible preset.
2. Adjust the position of the ROI using the flip button. The needle indicator demonstrates the optimal angle of the needle in each ROI position.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems generate images based on selected preset, which performs the substantially the same function (e.g., generating a first ultrasound imaging frame) in substantially the same way and achieves substantially the same result as the claimed subject matter.

| | |
|---|---|
| generating a second frame using the image data resulting from application of the second ultrasound imaging signature; | The Needle Viz imaging tool of Butterfly's POCUS systems generates a second frame using the image data resulting from application of the second ultrasound imaging signature.<br><br>Needle Viz overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle, which is a region of interest in which the needle may be visualized and is represented with a trapezoid (i.e., a second frame), on top a regular B-mode (i.e., a first frame) that is established according to a selected preset. |



Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems generate images when Needle Viz tool is activated, which performs the substantially the same function (e.g., generating a second ultrasound imaging frame) in substantially the same way and achieves substantially the same result as the claimed subject matter.

7

| | |
|---|---|
| detecting pixels in the second frame that correspond to the interventional instrument; | The Needle Viz imaging tool of Butterfly's POCUS systems detects pixels in the second frame that correspond to the interventional instrument (e.g., a needle).<br><br>Needle Viz appears to detect the pixels of an interventional instrument (e.g., a needle) that correspond to the "direction of needle approach" and the "angle of the needle approach". *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>**To use the Needle Viz Tool:**<br><br>1. From the scan screen, select the preset you'd like to use Needle Viz in.<br><br>2. Select the Actions button on the bottom right corner of the screen.<br><br>3. Under the "Tools" heading, select Needle Viz (in-plane).<br><br>4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.<br><br>5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.<br><br>6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.<br><br>7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.<br><br>*See also* Butterfly patent application publication US2019/0282208 at [0050]: "The binary mask image may indicate which pixels from the first ultrasound image were changed in order to produce the second ultrasound image. In particular, the binary mask image may be the same size (in pixels) as the first ultrasound image and the second ultrasound image." Though pixels specifically corresponding to an interventional instrument are not disclosed, this suggests a comparison of pixels function between the first and second ultrasound images. The "changed" pixels likely correspond to, and allow the detection of, an interventional instrument.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because |

|  | any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems generate visual indication of a Needle when Needle Viz Tool is activated, which performs substantially the same function of detecting pixels in the second frame in substantially the same way and achieves substantially the same result as the claimed subject matter. |

| automatically determining a mask of pixels that correspond to the location of the interventional instrument; | The Needle Viz imaging tool of Butterfly's POCUS systems automatically determines a mask of pixels that correspond to the location of the interventional instrument.<br><br>*See, e.g.,* Butterfly patent application publication US2019/0282208 at [0050]: "The binary mask image may indicate which pixels from the first ultrasound image were changed in order to produce the second ultrasound image. In particular, the binary mask image may be the same size (in pixels) as the first ultrasound image and the second ultrasound image." Though pixels specifically corresponding to an interventional instrument are not disclosed, this suggests that the Needle Viz automatically determines a mask of pixels corresponding to the location of an interventional instrument.<br><br>*See also* Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022):<br><br><br><br>*See also* Butterfly patent application publication US2019/0282208 at [0072] (emphasis added), which discloses using a mask: "$z_j = E_j(x_j)$, $j \in \{0,1\}$, $x \in S_j$. The generator G generates, based on $z_j$, a reconstructed image $G_j(z_j)$, a transformed image $G_{1-j}(z_j)$, and a **mask $G_m(z_j)$** . . . . Thus, the composite image $C_{1-j}(z_j)$ may be a blend of the reconstructed image $G_{1-j}(z_j)$ and the image $x_j$." [0072]. |

10

*See* https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed May 29, 2022)



Blue pixels indicate the mask corresponding to the interventional instrument

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

For example, the accused instrumentality performs the same function of determining a mask of pixels. The accused instrumentality does so in the same way because it changes the display of an area, within which each pixel corresponds to a part of an image of an interventional instrument. The accused instrumentality achieves substantially the same result of masking the pixels.

11

| | |
|---|---|
| blending pixels from the first frame and the second frame in a region that is inside the mask and using pixels from the first frame in a region that is outside the mask to form a blended final ultrasound image; and | The Needle Viz imaging tool of Butterfly's POCUS systems blends pixels from the first frame and the second frame in a region that is inside the mask and using pixels from the first frame in a region that is outside the mask to form a blended final ultrasound image.<br><br>Needle Viz overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle/region of interest in which the needle may be visualized (i.e., a second frame), on top a regular B-mode (i.e., a first frame) that is established according to a selected preset to generate a final ultrasound image.  This overlaying necessarily involves blending pixels from the first frame and the second frame in a region that is inside the mask and using pixels from the first frame in a region that is outside the mask to form a blended final ultrasound image.<br><br>Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.<br><br>*Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>*See also* Butterfly patent application publication US2019/0282208 at [0072] (emphasis added), which discloses a blending function: "z j =E j(x j), j∈{0,1}, x∈S j. The generator G generates, based on zj, a reconstructed image Gj(zj), a transformed image G1-j(zj), and a **mask Gm(zj)** . . . . Thus, the composite image C1-j(zj)may be a **blend of the reconstructed image G1-j(zj) and the image xj**."  [0072].<br><br>*See* https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed May 29, 2022). |



Blended pixels with underlying image

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

For example, the accused instrumentality performs the same function of determining a mask of pixels. The accused instrumentality does so in the same way because it changes the display of an area, within which each pixel corresponds to a part of an image of an interventional instrument. The accused instrumentality achieves substantially the same result of masking the pixels.

| producing a graphic indication on the blended final ultrasound image that indicates the boundaries of a coverage area in the blended final ultrasound image where one or more of the imaging parameters of the | The Needle Viz imaging tool of Butterfly's POCUS systems produces a graphic indication on the blended final ultrasound image that indicates the boundaries of a coverage area in the blended final ultrasound image where one or more of the imaging parameters of the second ultrasound imaging signature is selected to produce a high quality image of the interventional instrument.<br><br>Needle Viz highlights the area directly surrounding a needle in blue (i.e., produces a graphic indication on the blended final ultrasound image) once the Needle Viz has detected the presence of a needle based on the selection of one or more of the imaging parameters of the second ultrasound imaging signature (e.g., an imaging steering angle image parameter). |

13

| second ultrasound imaging signature is selected to produce a high quality image of the interventional instrument. | The second ultrasound imaging signature would be established by, for example: 1) selecting the "direction of needle approach" ("From left" or "From right"); and/or 2) selecting the "angle of the needle approach" (40˚, 30˚, or 20˚).  These selections enable the Needle Viz to detect and highlight the needle.<br><br>*Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>**To use the Needle Viz Tool:**<br><br>1. From the scan screen, select the preset you'd like to use Needle Viz in.<br>2. Select the Actions button on the bottom right corner of the screen.<br>3. Under the "Tools" heading, select Needle Viz (in-plane).<br>4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.<br>5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.<br>6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.<br>7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.<br><br>*See also* Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022): |



*See also* Butterfly patent application publication US2019/0282208 at [0064] (emphasis added): "**The mask outlines 608 may be outlines highlighting regions of the mask image 502 containing pixels having values that are above a certain threshold** (e.g., 0.75, 0.8, 0.85, 0.9, 0.95). To generate the mask outlines, edge detection techniques applied to the mask image 502 may be used."

*See* https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed May 29, 2022)

15



Square parallelogram indicating coverage area boundaries.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

For example, the accused instrumentality performs the same function of determining a mask of pixels.  The accused instrumentality does so in the same way because it changes the display of an area, within which each pixel corresponds to a part of an image of an interventional instrument.  The accused instrumentality achieves substantially the same result of masking the pixels.

| Claim 2 | |
|---|---|
| The method of claim 1, wherein the interventional instrument is selected from the group consisting of a | The Needle Viz imaging tool of Butterfly's POCUS systems includes the claimed process of claim 1, wherein the interventional instrument is selected from the group consisting of a needle, a catheter, a stent, and a percutaneous tool.<br><br>*See supra* at claim 1. |

| | |
|---|---|
| needle, a catheter, a stent, and a percutaneous tool. | Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30–45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button. |
| | *See Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022). |
| | Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., a needle), in substantially the same way, and achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 3** | |
| The method of claim 1, wherein the imaging steering angle of the first ultrasound imaging signature is selected to provide imaging of the tissue at a desired quality and | The Needle Viz imaging tool of Butterfly's POCUS systems includes the claimed process of claim 1, and further enables users to establish a first ultrasound imaging signature having an imaging steering angle imaging parameter, wherein the imaging steering angle is selected to provide imaging of the tissue at a desired quality. |
| | *See supra* claim 1. |
| | Needle Viz offers in-plane "presets" (i.e., a first ultrasound imaging signature) corresponding to body parts and tissues.  In order to optimize imaging of these body parts, the presets correspond to one or more imaging parameters to provide imaging of the tissue corresponding to the selected preset at a desired quality. |
| | *See Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022): |
| | For Pro, Pro Team, and Enterprise iQ and iQ+ users, Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets. For Pro and Pro Team iQ+ Vet users, Needle Viz (in-plane) is available in the Bladder, Musculoskeletal, Musculoskeletal Equine, Small Organ, and Vascular presets. |
| | Once a Needle Viz user activates Needle Viz through an eligible preset (i.e., a first ultrasound imaging signature), the user may view and adjust a region of interest (ROI).  *See* Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022). |
| | Users may "[a]djust the position of the ROI using the flip button."  In the Needle Viz display screen, a "needle indicator demonstrates the optimal angle of the needle in each ROI position." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System |

User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).



*See also* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022):

**Using Needle Viz (in-plane)**

In order to start using Needle Viz (in-plane):

1. Activate Needle Viz (in-plane) from the actions menu in an eligible preset.

2. Adjust the position of the ROI using the flip button. The needle indicator demonstrates the optimal angle of the needle in each ROI position.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and

18

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| the imaging steering angle of the second ultrasound imaging signature is selected to provide imaging of the interventional instrument at a desired quality. | The Needle Viz imaging tool of Butterfly's POCUS systems enables users to establish a second ultrasound imaging signature having an imaging steering angle imaging parameter, wherein the imaging steering angle is selected to provide imaging of the interventional instrument at a desired quality.<br><br>Needle Viz establishes a second ultrasound imaging signature having an imaging steering angle image parameter established by, for example: 1) selecting the "direction of needle approach" ("From left" or "From right"); and/or 2) selecting the "angle of the needle approach" (40°, 30°, or 20°).  *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>When using Needle Viz (in-plane), you can:<br><br>• Adjust the needle approach direction and angle<br>• Adjust scan depth<br>• Customize needle gain<br>• Activate biplane imaging (iQ+ only)<br><br>**To use the Needle Viz Tool:**<br><br>1. From the scan screen, select the preset you'd like to use Needle Viz in.<br>2. Select the Actions button on the bottom right corner of the screen.<br>3. Under the "Tools" heading, select Needle Viz (in-plane).<br>4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.<br>5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.<br>6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.<br>7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button. |

| | |
|---|---|
| | Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., angle of the needle approach), in substantially the same way, and achieves substantially the same result as the claimed subject matter (e.g., selecting the imaging steering angle). In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 4** | |
| The method of claim 3, wherein the imaging steering angle of the second ultrasound imaging signature is more acute than the imaging steering angle of the first ultrasound imaging signature. | The Needle Viz imaging tool of Butterfly's POCUS systems includes the claimed process of claim 3, wherein the imaging steering angle of the second ultrasound imaging signature being more acute than the imaging steering angle of the first ultrasound imaging signature.<br><br>*See supra* at claim 3.<br><br>The imaging steering angle of the second ultrasound imaging signature corresponds to either 40˚, 30˚, or 20˚. *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022).<br><br>On the other hand, the imaging steering angle of a "regular b-mode" image corresponding to the first ultrasound imaging signature is presumably 0. *See* Butterfly Network, *Ultrasound Education: Biplane Imaging™ with Butterfly iQ+* (Dec. 14, 2020), https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed Feb. 10, 2022): |



Needle Viz not activated.



Needle Viz activated (imaging steering angle of 30° displayed)

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 5** | |
| The method of claim 4, wherein the imaging steering angle of the first ultrasound imaging signature comprises a steering angle magnitude under plus or minus 20 degrees and wherein the imaging steering angle of the second ultrasound imaging signature comprises a steering angle magnitude greater than plus or minus 20 degrees. | The Needle Viz imaging tool of Butterfly's POCUS systems includes the claimed process of claim 4, wherein the imaging steering angle of the first ultrasound imaging signature comprises a steering angle magnitude under plus or minus 20 degrees and wherein the imaging steering angle of the second ultrasound imaging signature comprises a steering angle magnitude greater than plus or minus 20 degrees.<br><br>*See supra* at Claim 4.<br><br>The imaging steering angle of the second ultrasound imaging signature corresponds to either 40˚, 30˚, or 20˚.  *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022).<br><br>On the other hand, the imaging steering angle of a "regular b-mode" image corresponding to the first ultrasound imaging signature is presumably 0.  *See* Butterfly Network, *Ultrasound Education: Biplane Imaging™ with Butterfly iQ+* (Dec. 14, 2020), https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed Feb. 10, 2022): |





Needle Viz not activated.



Needle Viz activated (imaging steering angle of 30˚ displayed)

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of

| | |
|---|---|
| | equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's systems having steering angles corresponds to at least 40°, 30°, or 20°, which achieves the same result of having a steering angle magnitude greater than plus or minus 20 degrees as the claimed subject matter. |
| **Claim 6** | |
| 6. An imaging system comprising: | The POCUS system is an imaging system comprising a hand-held probe and a compatible device with a screen (e.g., Apple or Android personal electronic devices). For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device." **Overview** Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components: • Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device) • The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device • The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022). |



*See Handheld portable ultrasound machine*, https://store.butterflynetwork.com/us/en/product-flow/step-1 (last accessed October 11, 2022).

| an ultrasound imaging system configured to produce: | The Needle Viz imaging tool of Butterfly's POCUS systems is an ultrasound imaging system.<br><br>For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device." The system comprises a hand-held probe and a compatible device with a screen (e.g. Apple or Android personal electronic devices). |
|---|---|

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).

26



*See Handheld portable ultrasound machine*, https://store.butterflynetwork.com/us/en/product-flow/step-1 (last accessed October 11, 2022).

Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.

*See Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022).

27

Alternatively or in addition, a portable device (e.g., a cellphone) connected with Butterfly's iQ or iQ+ probe or running under Butterfly's mobile application is an ultrasound imaging system.

On information and believe, the portable device generates and displays to a user ultrasound images.



*See Handheld portable ultrasound machine*, https://store.butterflynetwork.com/us/en/product-flow/step-1 (last accessed October 11, 2022).

Butterfly instructs its users to download the Butterfly mobile application capable of generating and displaying ultrasound images to a user. .

## Download the App

Open the App Store or Google Play Store on your compatible mobile device, then search for Butterfly iQ.

If the app does not appear in the App Store or Google Play Store, it's possible that you are not using a compatible mobile device. Refer to our list of compatible devices to confirm.

Please note that the Butterfly iQ App may not be available the App or Google Play Store depending on your location. For a full list of countries where use is supported, please review Who Can Purchase Butterfly iQ.

## Begin Scanning

1. When you first plug in your probe, you'll see lines on a black screen.
2. Apply some approved gel to your probe head.
3. On the bottom left corner of the screen, select a Preset to scan in. The preset corresponds to the anatomy being scanned — for instance, if you want to scan the bladder, you'd select Bladder.
4. Apply the probe head to the portion of the anatomy to be scanned. You'll see an ultrasound image appear on your mobile device.
5. To learn more, visit our Education Portal for tutorials on using the iQ, or view customer stories on our YouTube page.

*See First Time Use*, https://support.butterflynetwork.com/hc/en-us/articles/360038322752-First-Time-Use (last accessed October 11, 2022).

Alternatively or in addition, Butterfly's iQ or iQ+ probe is an ultrasound imaging system.

## Overview

Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:

- Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)
- The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device
- The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals

29

<table>
<tr>
<td></td>
<td><em>See</em> Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.</td>
</tr>
<tr>
<td>a first frame from one or more subframes that are acquired with a first imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce an image of tissue within a volume to be imaged; and</td>
<td>Butterfly's ultrasound imaging system generates a first frame from one or more subframes that are acquired with a first imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce an image of tissue within a volume to be imaged.<br><br>For example, Butterfly's ultrasound imaging system offers in-plane "presets" (i.e., a first ultrasound imaging signature) corresponding to body parts and tissues. Each preset corresponds to a predefined set of imaging parameter values. <em>See</em> Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 19 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).<br><br>**Presets**<br><br>Presets are a predefined set of imaging parameter values. When selected, the Butterfly iQ App automatically operates in accordance with the corresponding set of imaging parameter values. Presets available correspond to the clinical applications details in Indications for Use [5]. Preset availability may also vary depending on probe, Butterfly membership status and geographic location.<br><br>Thus, selection of a certain preset establishes a first ultrasound imaging signature, which in turn corresponds to one or more imaging parameters to produce a high quality image of an instrument (e.g., a needle) within the volume to be imaged (i.e., the body part or tissue corresponding to the selected preset). <em>See Using the Needle Viz Tool</em>, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):</td>
</tr>
</table>

30

For Pro, Pro Team, and Enterprise iQ and iQ+ users, Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets. For Pro and Pro Team iQ+ Vet users, Needle Viz (in-plane) is available in the Bladder, Musculoskeletal, Musculoskeletal Equine, Small Organ, and Vascular presets.

The predefined set of imaginging parameter values corresponding to each preset must include, for example, a speckle reduction parameter (i.e., a noise reduction parameter), to optimize visualization of the body part or tissue corresponding to the preset.

Further, Butterfly patent application publication US2019/0282208 discloses generation of first and second ultrasound images based on a broad range of "**classifications**" which are "configured to classify the inputted ultrasound image according to a **quality metric of the inputted ultrasound image**."  [0007] (emphasis added).  These classifications thus correspond to imaging parameters, and further, plausibly correspond to "transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction" imaging parameters.

*See also* "In some embodiments, the classification model is configured to **classify the inputted ultrasound image according to a quality** of the inputted ultrasound image. In some embodiments, the classification model is configured to classify the inputted ultrasound image according to **an anatomical view** shown in the inputted ultrasound image." US2019/0282208 at [0008].

Needle Viz overlays a "regular B-mode" (i.e., a first frame) based on the application of, for example, the selected preset (i.e., the first ultrasound imaging signature).  *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):

> Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.
>
> For Pro, Pro Team, and Enterprise iQ and iQ+ users, Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets. For Pro and Pro Team iQ+ Vet users, Needle Viz (in-plane) is available in the Bladder, Musculoskeletal, Musculoskeletal Equine, Small Organ, and Vascular presets.

Users must activate the Needle Viz "from the actions menu in an eligible preset" corresponding to the body part to be examined as an initial step.  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022):

31

| | |
|---|---|
| | **Using Needle Viz (in-plane)**<br><br>In order to start using Needle Viz (in-plane):<br><br>1. Activate Needle Viz (in-plane) from the actions menu in an eligible preset.<br>2. Adjust the position of the ROI using the flip button. The needle indicator demonstrates the optimal angle of the needle in each ROI position.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.<br><br>For example, Butterfly's accused systems generate images based on selected preset, which performs the substantially the same function (e.g., generating a first ultrasound imaging frame) in substantially the same way and achieves substantially the same result as the claimed subject matter. |
| a second frame from one or more subframes that are acquired with a second imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature | Butterfly's ultrasound imaging system generates a second frame from one or more subframes that are acquired with a second imaging signature having one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce an image of an interventional instrument within the volume to be imaged.<br><br>Butterfly's ultrasound imaging system additionally establishes a second ultrasound imaging signature having one or more imaging parameters. For example, the second ultrasound imaging signature may have an **imaging steering angle image parameter**. The second ultrasound imaging signature in this case would be established by, for example: 1) selecting the "direction of needle approach" ("From left" or "From right"); and/or 2) selecting the "angle of the needle approach" (40˚, 30˚, or 20˚). *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022): |

| | |
|---|---|
| bandpass filter type and coefficients, compression curve and speckle reduction parameters selected to produce an image of an interventional instrument within the volume to be imaged; and | When using Needle Viz (in-plane), you can:<br><br>• Adjust the needle approach direction and angle<br><br>• Adjust scan depth<br><br>• Customize needle gain<br><br>• Activate biplane imaging (iQ+ only)<br><br>**To use the Needle Viz Tool:**<br><br>1. From the scan screen, select the preset you'd like to use Needle Viz in.<br>2. Select the Actions button on the bottom right corner of the screen.<br>3. Under the "Tools" heading, select Needle Viz (in-plane).<br>4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.<br>5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.<br>6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.<br>7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.<br><br>Butterfly's ultrasound imaging system generates a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle, which is a region of interest in which the needle may be visualized and is represented with a trapezoid (i.e., a second frame), on top a regular B-mode (i.e., a first frame) that is established according to a selected preset. |

33



A vein accessed by needle, prior to activating the Needle Viz tool.

Needle Viz tool is activated.

Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

For example, Butterfly's accused systems generate images when Needle Viz tool is activated, which performs the substantially the same function (e.g., generating a second ultrasound imaging frame) in substantially the same way and achieves substantially the same result as the claimed subject matter.

| | |
|---|---|
| a processor in the ultrasound system | Butterfly's ultrasound imaging system comprises at least one processor. |

| | |
|---|---|
| that is configured to— | "An ultrasound-on-chip (UoC) is described in the following sections that outline the design, fabrication and **integration of MEMS ultrasonic transducers directly in a CMOS process**." Rothberg et al. at 8 (emphasis added).<br><br>"(A) The 8,960 MEMS elements are on a single transducer-on-CMOS chip, each with control and processing circuitry for sending and receiving ultrasound signals through the acoustic lens of a handheld probe. The integrated MEMS and CMOS structures on a single die can be seen in a scanning electron microscope (SEM) image. The MEMS transducer array is bonded to the CMOS die and bounded by a seal ring. Bond pads to CMOS I/O connections are along the periphery of the CMOS chip." Rothberg et al. at 3, Figure 1(A) (emphasis added):<br><br><br><br>In addition, on information and belief, the display device comprises a processor.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and |

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| detect pixels in the second frame that correspond to the interventional instrument; | Butterfly's ultrasound imaging system detects pixels in the second frame that correspond to the interventional instrument (e.g., a needle).<br><br>Butterfly's ultrasound imaging system appears to detect the pixels of an interventional instrument (e.g., a needle) that correspond to the "direction of needle approach" and the "angle of the needle approach". *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>**To use the Needle Viz Tool:**<br><br>1. From the scan screen, select the preset you'd like to use Needle Viz in.<br>2. Select the Actions button on the bottom right corner of the screen.<br>3. Under the "Tools" heading, select Needle Viz (in-plane).<br>4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.<br>5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.<br>6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.<br>7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.<br><br>*See also* Butterfly patent application publication US2019/0282208 at [0050]: "The binary mask image may indicate which pixels from the first ultrasound image were changed in order to produce the second ultrasound image. In particular, the binary mask image may be the same size (in pixels) as the first ultrasound image and the second ultrasound image." Though pixels specifically corresponding to an interventional instrument are not disclosed, this suggests a comparison of pixels function between the first and second ultrasound images. The "changed" pixels likely correspond to, and allow the detection of, an interventional instrument.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and |

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| determine a mask of pixel coordinates that correspond to the location of the interventional instrument, wherein the mask is defined by a region in the second frame that includes the detected pixels corresponding to the interventional instrument and a number of pixels immediately surrounding the detected pixels; and | Butterfly's ultrasound imaging system determines a mask of pixel coordinates that correspond to the location of the interventional instrument, wherein the mask is defined by a region in the second frame that includes the detected pixels corresponding to the interventional instrument and a number of pixels immediately surrounding the detected pixels. *See, e.g.,* Butterfly patent application publication US2019/0282208 at [0050]: "The binary mask image may indicate which pixels from the first ultrasound image were changed in order to produce the second ultrasound image. In particular, the binary mask image may be the same size (in pixels) as the first ultrasound image and the second ultrasound image." Though pixels specifically corresponding to an interventional instrument are not disclosed, this suggests that the Needle Viz automatically determines a mask of pixels corresponding to the location of an interventional instrument. *See also* Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022):  |

*See also* Butterfly patent application publication US2019/0282208 at [0072] (emphasis added), which discloses using a mask: "$z_j = E_j(x_j)$, $j \in \{0,1\}$, $x \in S_j$. The generator G generates, based on $z_j$, a reconstructed image $G_j(z_j)$, a transformed image $G_{1-j}(z_j)$, and a **mask $G_m(z_j)$** . . . . Thus, the composite image $C_{1-j}(z_j)$ may be a blend of the reconstructed image $G_{1-j}(z_j)$ and the image $x_j$." [0072].

The mask is defined by a region in the second frame that includes the detected pixels corresponding to the interventional instrument and a number of pixels immediately surrounding the detected pixels.



Blue pixels indicate the mask corresponding to the interventional instrument.

*See* https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed May 29, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

38

| | |
|---|---|
| | For example, the accused instrumentality performs the same function of determining a mask of pixels. The accused instrumentality does so in the same way because it changes the display of an area, within which each pixel corresponds to a part of an image of an interventional instrument. The accused instrumentality achieves substantially the same result of masking the pixels. |
| combine a first set of pixels from the first frame and a second set of pixels from the second frame in an area corresponding to the mask and using pixels from the first frame in an area outside the mask to form a blended final ultrasound image comprising the tissue and the interventional instrument; and | Butterfly's ultrasound imaging system combines a first set of pixels from the first frame and a second set of pixels from the second frame in an area corresponding to the mask and using pixels from the first frame in an area outside the mask to form a blended final ultrasound image comprising the tissue and the interventional instrument.<br><br>Butterfly's ultrasound imaging system overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle/region of interest in which the needle may be visualized (i.e., a second frame), on top a regular B-mode (i.e., a first frame) that is established according to a selected preset to generate a final ultrasound image. This overlaying necessarily involves blending pixels from the first frame and the second frame in a region that is inside the mask and using pixels from the first frame in a region that is outside the mask to form a blended final ultrasound image.<br><br>Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.<br><br>*Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>*See also* Butterfly patent application publication US2019/0282208 at [0072] (emphasis added), which discloses a blending function: "z j =E j(x j), j∈{0,1}, x∈S j. The generator G generates, based on zj, a reconstructed image Gj(zj), a transformed image G1-j(zj), and a **mask Gm(zj)** . . . . Thus, the composite image C1-j(zj)may be a **blend of the reconstructed image G1-j(zj) and the image xj**." [0072].<br><br>*See* https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed May 29, 2022). |

39



Blended pixels with underlying image

| | |
|---|---|
| | Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.<br><br>For example, the accused instrumentality performs the same function of determining a mask of pixels.  The accused instrumentality does so in the same way because it changes the display of an area, within which each pixel corresponds to a part of an image of an interventional instrument.  The accused instrumentality achieves substantially the same result of masking the pixels. |
| producing a graphic on the blended final ultrasound image that indicates the boundaries of a coverage area in the blended final ultrasound image where one or more of the imaging parameters of the second ultrasound | Butterfly's ultrasound imaging system produces a graphic on the blended final ultrasound image that indicates the boundaries of a coverage area in the blended final ultrasound image where one or more of the imaging parameters of the second ultrasound imaging signature is selected to produce the image of the interventional instrument.<br><br>Butterfly's ultrasound imaging system highlights the area directly surrounding a needle in blue (i.e., produces a graphic on the blended final ultrasound image) once the Needle Viz has detected the presence of a needle based on the selection of one or more of the imaging parameters of the second ultrasound imaging signature (e.g., an imaging steering angle image parameter).<br><br>The second ultrasound imaging signature would be established by, for example: 1) selecting the "direction of needle approach" ("From left" or "From right"); and/or 2) selecting the "angle of the needle approach" (40˚, 30˚, or 20˚).  These selections enable the Needle Viz to detect and highlight the needle. |

| | |
|---|---|
| imaging signature is selected to produce the image of the interventional instrument. | *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>**To use the Needle Viz Tool:**<br><br>1. From the scan screen, select the preset you'd like to use Needle Viz in.<br>2. Select the Actions button on the bottom right corner of the screen.<br>3. Under the "Tools" heading, select Needle Viz (in-plane).<br>4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.<br>5. At the bottom of the screen, select 40°, 30°, or 20° to adjust the angle based on the angle of the needle approach.<br>6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.<br>7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.<br><br>*See also* Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022): |

41



*See also* Butterfly patent application publication US2019/0282208 at [0064] (emphasis added): "**The mask outlines 608 may be outlines highlighting regions of the mask image 502 containing pixels having values that are above a certain threshold** (e.g., 0.75, 0.8, 0.85, 0.9, 0.95). To generate the mask outlines, edge detection techniques applied to the mask image 502 may be used."

*See* https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed May 29, 2022)



Square parallelogram indicating coverage area boundaries.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

For example, the accused instrumentality performs the same function of determining a mask of pixels. The accused instrumentality does so in the same way because it changes the display of an area, within which each pixel corresponds to a part of an image of an interventional instrument. The accused instrumentality achieves substantially the same result of masking the pixels.

| **Claim 7** | |
|---|---|
| 7. The system of claim 6, wherein the interventional instrument is selected from the group consisting of a | Butterfly's POCUS system includes the claimed system of claim 6, *wherein the interventional instrument is selected from the group consisting of a needle, a catheter, a stent, and a percutaneous tool.* <br><br> *See supra* at claim 6. |

| needle, a catheter, a stent, and a percutaneous tool. | Needle Viz (in-plane) is a tool that overlays a B-mode image optimized for visualizing needles inserted at a 30-45 degree angle on top of regular B-mode. A region of interest in which the needle may be visualized is represented with a trapezoid, and the location of the region of interest (ROI) may be adjusted using the flip button.<br><br>*See Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., selecting a neelde), in substantially the same way, and achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 8** | |
| 8. The system of claim 6, wherein the imaging signal steering angle of at least one of the first and second imaging signature is determined during operation of the system. | Butterfly's POCUS system includes the claimed system of claim 6, wherein the imaging signal steering angle of at least one of the first and second imaging signature is determined during operation of the system.<br><br>*See supra* claim 6.<br><br>Butterfly's ultrasound imaging system offers in-plane "presets" (i.e., a first ultrasound imaging signature) corresponding to body parts and tissues.  In order to optimize imaging of these body parts, the presets correspond to one or more imaging parameters to provide imaging of the tissue corresponding to the selected preset at a desired quality.<br>*See Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):<br><br>For Pro, Pro Team, and Enterprise iQ and iQ+ users, Needle Viz (in-plane) is available in the Musculoskeletal, MSK-Soft Tissue, Nerve, and Vascular: Access presets. For Pro and Pro Team iQ+ Vet users, Needle Viz (in-plane) is available in the Bladder, Musculoskeletal, Musculoskeletal Equine, Small Organ, and Vascular presets.<br><br>Once a Needle Viz user activates Needle Viz through an eligible preset (i.e., a first ultrasound imaging signature), the user may view and adjust a region of interest (ROI).  *See* Butterfly Network, *Ultrasound Education: Needle Viz™ with Butterfly iQ+* (Oct. 6, 2020), https://www.youtube.com/watch?v=U-_NlIYZcZI (last accessed Feb. 9, 2022).<br><br>Users may "[a]djust the position of the ROI using the flip button."  In the Needle Viz display screen, a "needle indicator demonstrates the optimal angle of the needle in each ROI position." *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System |

User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).



*See also* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 32 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022):

**Using Needle Viz (in-plane)**

In order to start using Needle Viz (in-plane):

1. Activate Needle Viz (in-plane) from the actions menu in an eligible preset.

2. Adjust the position of the ROI using the flip button. The needle indicator demonstrates the optimal angle of the needle in each ROI position.

Needle Viz establishes a second ultrasound imaging signature having an imaging steering angle image parameter established by, for example: 1) selecting the "direction of needle approach" ("From left" or "From right"); and/or 2) selecting the "angle of the needle approach" (40˚, 30˚, or 20˚).  *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022):

When using Needle Viz (in-plane), you can:

- Adjust the needle approach direction and angle
- Adjust scan depth
- Customize needle gain
- Activate biplane imaging (iQ+ only)

**To use the Needle Viz Tool:**

1. From the scan screen, select the preset you'd like to use Needle Viz in.
2. Select the Actions button on the bottom right corner of the screen.
3. Under the "Tools" heading, select Needle Viz (in-plane).
4. At the bottom of the screen, select "From left" or "From right" to indicate the direction of needle approach.
5. At the bottom of the screen, select 40˚, 30˚, or 20˚ to adjust the angle based on the angle of the needle approach.
6. To adjust the gain of the needle, swipe right or left on the screen. If you need to adjust the gain of the image, exit Needle Viz, adjust the gain to your satisfaction, then reactivate Needle Viz.
7. For iQ users, to simultaneously use Biplane Imaging, activate Biplane from the actions menu. The reference plane will display the region-of-interest within which an in-plane needle will be highlighted. Additionally, if the needle crosses the orthogonal plane indicator, the position of the needle in the out-of-plane view will be projected upon the orthogonal plane. To adjust the position of the region-of-interest, tap the flip button.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., angle of the needle approach), in substantially the same way, and achieves substantially the same result as the claimed subject matter (e.g., selecting the

46

| | imaging steering angle).  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
|---|---|
| **Claim 9** | |
| 9. The system of claim 6, wherein the imaging steering angle of the second imaging signature is more acute than the imaging steering angle of the first imaging signature. | Butterfly's POCUS system includes the claimed system of claim 6, wherein the imaging steering angle of the second imaging signature is more acute than the imaging steering angle of the first imaging signature. *See supra* at claim 6. The imaging steering angle of the second ultrasound imaging signature corresponds to either 40˚, 30˚, or 20˚.  *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022). On the other hand, the imaging steering angle of a "regular b-mode" image corresponding to the first ultrasound imaging signature is presumably 0.  *See* Butterfly Network, *Ultrasound Education: Biplane Imaging™ with Butterfly iQ+* (Dec. 14, 2020), https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed Feb. 10, 2022): |




|  |  |
| --- | --- |
| Needle Viz not activated. | Needle Viz activated (imaging steering angle of 30˚ displayed) |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and

| | |
|---|---|
| | achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| **Claim 10** | |
| 10. The system of claim 9, wherein the imaging steering angle of the first imaging signature comprises a steering angle magnitude under plus or minus 20 degrees and wherein the imaging steering angle of the second imaging signature comprises a steering angle magnitude greater than plus or minus 20 degrees. | Butterfly's POCUS system includes the claimed system of claim 9, wherein the imaging steering angle of the first imaging signature comprises a steering angle magnitude under plus or minus 20 degrees and wherein the imaging steering angle of the second imaging signature comprises a steering angle magnitude greater than plus or minus 20 degrees. <br><br> *See supra* at Claim 9. <br><br> The imaging steering angle of the second ultrasound imaging signature corresponds to either 40˚, 30˚, or 20˚. *Using the Needle Viz Tool*, https://support.butterflynetwork.com/hc/en-us/articles/360050525991-Using-the-Needle-Viz-Tool (last accessed February 9, 2022). <br><br> On the other hand, the imaging steering angle of a "regular b-mode" image corresponding to the first ultrasound imaging signature is presumably 0.  *See* Butterfly Network, *Ultrasound Education: Biplane Imaging™ with Butterfly iQ+* (Dec. 14, 2020), https://www.youtube.com/watch?v=rBS3GaIrqqc (last accessed Feb. 10, 2022): |





|  |  |
|---|---|
| Needle Viz not activated. | Needle Viz activated (imaging steering angle of 30˚ displayed) |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of

| | equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.  For example, Butterfly's systems having steering angles corresponds to at least 40˚, 30˚, or 20˚, which achieves the same result of having a steering angle magnitude greater than plus or minus 20 degrees as the claimed subject matter. |

# EXHIBIT 4F

**EXHIBIT F**
**U.S. PATENT NO. 8,360,981 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC.*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1-5, 7-9, and 11 of U.S. Patent No. 8,360,981 (the "'981 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted Claims 1-5, 7-9, and 11 of the '981 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

Butterfly also infringes asserted Claims 1-5, 7-9, and 11 under 35 U.S.C. § 271(b) by having knowledge of the '981 Patent and knowingly causing or intending to cause, and continuing to knowingly cause or intend to cause, infringement of the '981 Patent, with specific intent, by others.

In violation of 35 U.S.C. § 271(c), Butterfly has also contributed to and is continuing to contribute to infringement of asserted Claims 1-5, 7-9, and 11 by others (such as customers of Butterfly's POCUS devices) by making, selling and/or offering for sale within the United States and/or importing into the United States POCUS devices or components thereof, that are especially made and/or adapted for infringing asserted Claims 1-5, 7-9, and 11 and are not staple articles of commerce suitable for substantial non-infringing use.

The chart below explains how Butterfly's POCUS devices infringe the '981 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence FUJIFILM Sonosite may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent that any claim element is found to not be literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See, e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

1

| Claim 1 | Butterfly's POCUS systems |
|---|---|
| An ultrasonic diagnostic apparatus comprising: | To the extent that the preamble is construed as a limitation, Butterfly's POCUS systems include an ultrasonic diagnostic apparatus.<br><br>For example, Butterfly's POCUS system "is a hand-held general purpose diagnostic ultrasound imaging device."<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022). |
| an ultrasonic probe including plural ultrasonic transducers for transmitting ultrasonic waves toward an object to be inspected according to drive signals and receiving ultrasonic echoes propagating from the object to output reception signals; | Butterfly's POCUS systems include an ultrasonic probe that includes plural ultrasonic transducers for transmitting ultrasonic waves toward an object to be inspected according to drive signals and receiving ultrasonic echoes propagating from the object to output reception signals.<br><br>"Butterfly iQ can scan the body with a single chip because it replaces traditional piezoelectric crystals with Butterfly Network's ultrasound-on-a-chip technology wherein **9,000 capacitive micromachined ultrasound transducers create and receive sound from 1 - 10 MHz.**" *See Butterfly Network Technology and Security White Paper* 3, 4 (Apr. 10, 2020), https://manual.butterflynetwork.com/Butterfly-Network-Technology-and-Security-White-Paper-950-20009-00-rev+D-1.pdf (last accessed February 9, 2022) (emphasis added).<br><br>"The **CMOS circuitry is designed to individually drive each MEMS element to transmit ultrasonic waves as well as to receive ultrasonic vibrations** which are converted to electronic signals, amplified, and processed." *See* Jonathan M. Rothberg, et al., *Ultrasound-on-chip platform for medical imaging, analysis, and collective intelligence*, 118 PNAS 1, 2 (2021), https://www.pnas.org/content/pnas/118/27/e2019339118.full.pdf (academic paper authored by Butterfly Network founder and employees and funded by Butterfly Network. The paper includes images and videos of the Butterfly iQ/iQ+ from the Butterfly website, but rather than referring to the Butterfly iQ/iQ+, the paper refers to "ultrasound-on-chip probe" or "UoC probe") (emphasis added). |

2

*See also* Rothberg et al. at 4, Figs. 2E and 2F (showing Tx/Rx circuitry):



3



*See* Rothberg et al. at 2, Table 1. Comparison of this UoC to state-of-the-art ultrasound ASIC designs:

Table 1. Comparison of this UoC to state-of-the-art ultrasound ASIC designs

| | This work |
|---|---|
| Process | 130 nm BCD+MEMS |
| Transducer | 2D CMUT |
| No. of TX/RX elements | 8,960/8,960 |
| Operating frequency | 1–10 MHz |
| Pitch-matched | ✔ (208 μm) |
| Multilevel pulsing | ✔ (7-level) |
| TX beamforming | ✔ (digital) |
| RX beamforming | ✔ (digital) |
| On-chip TGC | ✔ (0.2 dB/step) |
| On-chip ADC | ✔ (1,120 ch) |
| On-chip DSP | ✔ |

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, the accused instrumentality includes a plurality of Capacitive Micromachined Ultrasonic Transducers (CMUT), which are insubstantially different from what is claimed, and which performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention.

| an image generating unit for supplying the drive signals to said ultrasonic probe and processing the reception signals outputted from said ultrasonic probe to generate image | Butterfly's POCUS systems include an image generating unit for supplying drive signals to the Butterfly iQ or iQ+ probe and processing reception signals outputted from the Butterfly iQ or iQ+ probe to generate image signals representing ultrasonic images.<br><br>The Butterfly iQ/iQ+ mobile application (the "Butterfly App.") serves as an interface to a mobile device, which drives signals to and receives signals from the Butterfly iQ/iQ+ probe based on user input to the Butterfly App. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 24 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022): |

| | |
|---|---|
| signals representing ultrasonic images; | **Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022).<br><br>**Performing a Study**<br><br>Once the probe is connected to your mobile device follow the prompts on the screen to begin a new study. It is not required to enter patient information to begin or complete a study.<br><br>From the main scan screen you can freeze an image, capture still images and record clips using the toolbar at the bottom of the screen. The live image must be frozen in order to capture a still image.<br><br>Captures may be reviewed from the Capture Reel located in the top right corner of the screen before the study is completed.<br><br>To conclude a patient encounter, click on the capture reel and follow the steps on screen to upload the study.<br><br>During scanning, you may swipe horizontally to adjust the gain and swipe vertically to adjust the depth. The Time Gain Compensation (TGC) control button is surfaced upon tapping the screen.<br><br>The mobile device, through the Butterfly App, performs image processing on the received signals to generate ultrasonic images. *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 27 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022): |

 

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise a processor in a mobile device running Butterfly Mobile Application supplying drive signals to Butterfly iQ/iQ+ probe and processing the signals from the probe, which is insubstantially different from what is claimed, and which performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention.

| a display unit including a display of an impulse drive type, in which a blanking period within one field period is variable, for displaying the ultrasonic images based on the image signals generated by | Butterfly's POCUS systems include a display unit that includes a display of an impulse drive type, in which a blanking period within one field period is variable, for displaying ultrasonic images based on the image signals generated by the image generating unit.<br><br>The Butterfly iQ/iQ+ POCUS system includes mobile devices compatible with the Butterfly iQ/iQ+ probe having organic light-emitting diode ("OLED") displays, including active-matrix organic light-emitting diode VRR ("AMOLED") displays. A person having ordinary skill in the art would know that VRR OLED and AMOLED displays are of the impulse drive type and that a blanking period within one field period may be adjusted to change the luminance of a display.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022): |

7

| | |
|---|---|
| said image generating unit, and | **Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>At least the most recent iPhone (iPhone 13), the Samsung Galaxy S21 Ultra, and the Google Pixel 6 Pro use VRR OLED or AMOLED screens.<br>*See, e.g., iPhone 13 Pro and iPhone 13 Pro Max*, https://www.apple.com/iphone-13-pro/specs/ (last accessed Feb. 10, 2022); *What is AMOLED?*, https://www.samsung.com/global/galaxy/what-is/amoled/ (last accessed Feb. 10, 2022); *Google Pixel 3 / Pixel 3 XL*, https://www.oled-info.com/google-pixel-3 (last accessed Feb. 10, 2022). *See also Optimize for variable refresh rate displays*, https://developer.apple.com/videos/play/wwdc2021/10147/; Deepak Singh, *List of phones with true variable refresh rate displays in 2022*, SMARTPRIX (Jan 3, 2022), https://www.smartprix.com/bytes/phones-with-true-variable-refresh-rate-displays/.<br><br>"A mobile device application provides a touch-screen user interface to select preset modes and parameters for imaging that are compiled and communicated in real-time via the USB connection. **The mobile device processors provide additional back-end processing and visualization capabilities to the ultrasound data stream**." Rothberg et al. at 5 (emphasis added).<br><br>*See also* U.S. Patent No. 8,334,826 at 4:60-64 (filed July 21, 2009 by Samsung Display Co Ltd): "Since the blurring degree of the hole-type display device is in proportion to the time for the display device to maintain display, an impulse drive method for displaying the image for a predetermined time within one frame and displaying black for the rest of the time has been proposed."<br><br>"The frame interval (a frame time) is an interval in which the organic light emitting device displays the luminance according to the input data to display the images. An exemplary embodiment of the present invention is an impulse driven display mode such that a black interval (dark frame insertion) displaying a black color during a predetermined time of one frame exists. The remaining time except for the black interval among the frame interval is an emission interval (an emission time) in which the organic light emitting element OLED emits the light." *Id.* at 9:30-39.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function (e.g., having a driver chip in a mobile device running Butterfly Mobile Application), in substantially the same way, and achieves substantially the same result as the |

| | |
|---|---|
| | claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. |
| an adjustment circuit for adjusting a ratio of the blanking period to an image display period within one field period in said display; and | Butterfly's POCUS systems include a display unit that includes an adjustment circuit for adjusting a ratio of the blanking period to an image display period within one field period in said display.  It is known that a blanking period within one field period may be adjusted to change the luminance of a display.

The display unit of a VRR OLED or AMOLED mobile device must include an adjustment circuit for adjusting a ratio of the blanking period to an image display period within one field period in said display.  "A mobile device application provides a touch-screen user interface to select preset modes and parameters for imaging that are compiled and communicated in real-time via the USB connection. **The mobile device processors provide additional back-end processing and visualization capabilities to the ultrasound data stream**." Rothberg et al. at 5 (emphasis added).

On information and belief, OLED display systems in compatible smartphone devices comprise at least an AMOLED display driver and a display controller.  Such a circuit may be tasked to adjust the blanking period ratio, for example, to create a desired brightness of the display.

On information and belief, adjusting the blanking period ratio would necessasrily result a change of luminance of OLED displays. |

9



Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.

*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022).



*See* U.S. Patent No. 8,334,826 at Fig. 13.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused system comprise a driver chip in a mobile device running Butterfly's Mobile Application, which performs substantially the same function of adjusting the display impulse configuration in substantially the same way and achieves substantially the same result as the claimed subject matter.

| a control unit for controlling said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display | Butterfly's POCUS systems include a control unit for controlling the adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in the mobile device display unit according to at least one of a selected part to be examined and a frame rate of the image signals generated by the Butterfly Mobile Application.

Ultrasound imaging frame rates vary based on selection of certain preset modes within the iQ/iQ+ POCUS system. Therefore, the Butterfly iQ/iQ+ POCUS system must use a control unit for controlling the adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in in the mobile device display unit according to at least |
| --- | --- |

| | |
|---|---|
| according to at least one of a selected part to be examined and a frame rate of the image signals generated by said image generating unit. | one of a selected preset and a frame rate of the image signals generated by the Butterfly app.    *See Specs.*, https://www.butterflynetwork.com/specs (last accessed Feb, 10, 2022):<br><br>On information and belief, mobile devices compatible with the Butterfly iQ/iQ+ device comprise a processor that controls a display drive or chip to adjust brightness by adjusting the blanking ratio.<br><br>On information and belief, adjusting the blanking period ratio would necessarily result in a change of luminance of OLED displays.<br><br><br><br>Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.<br><br>*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022). |



U.S. Patent No. 8,334,826 at Fig. 13.

The Butterfly iQ/iQ+ POCUS system includes mobile devices compatible with the Butterfly iQ/iQ+ probe, which devices include at least the feature of allowing an end user to adjust brightness of its display.

Moreover, Butterfly instructs its customers to adjust brightness to a default level of 65%.

**Adjust brightness.**

- Make sure the brightness on your screen is set to the recommended setting of 65%.

**Add more ultrasound gel.**

- Make sure you are using enough approved ultrasound gel.

**Run a diagnostic test.**

- To determine if your probe is damaged, perform the Probe Diagnostic Test.

If you are still not satisfied with the image quality, please contact Butterfly Support and include examples of images that represent your feedback.

Do not delete and reinstall the Butterfly app. If this problem persists, please contact Butterfly Support with details describing your issue, including the email address you use to log in to the app. Ensure your message does not include any protected health information.

Not all presets and imaging modes are available everywhere. Check for the availability in your country.

*See Troubleshooting Image Quality*, https://support.butterflynetwork.com/hc/en-us/articles/360027980231-Troubleshooting-Imaging-Issues (last accessed October 14, 2022).

14

Butterfly software further provides features to allow an end user to adjust brightness of an ultrasound image (e.g., gain control). As shown in the screenshot of a video below, a user may adjust the brightness by swiping left or right.

*See Butterfly iQ - How To - Adjust Gain & Depth* https://www.youtube.com/watch?v=7DA0ok3gcDc (last accessed October 14, 2022).

15

*see also Adjusting Gain, Depth, and TGC*, https://support.butterflynetwork.com/hc/en-us/articles/360027739012-Adjusting-Gain-Depth-and-TGC

Butterfly software adjusts contrast ratio of the display based on the target of the examination, which affects the brightness of some pixels.  For example, contrast ratio may be set to high when Aorta/Gallbladder is being examined.

## Aorta & Gallbladder

Aorta/Gallbladder uses imaging parameters which allow high–contrast imaging for these specific abdominal structures. This is designed for optimal delineation of borders, and so is best applied in the investigations of AAA, CBD, gallbladder disease, cholelithiasis, and pericholecystic fluid—common investigations in primary care and the emergency room.

The contrast ratio is the ratio between maximum and minimum levels of brightness, the maximum brightness can be adjusted by adjusting blanking period ratio.

16



Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.

*See Flicker, the display affliction*, https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022).

Additionally, as shown in Figures below, Butterfly software requires adjusting frame rates based on the target to be examined. On information and belief, a change of refresh rate may require a commensurate change of blanking period ratio for proper operation and display.

**Cardiac**

Read more +

This preset has been designed with parameters best for imaging of the fast-moving dynamics of the heart. It employs a high frame rate, and applies a sector scan which allows reliable real-time echocardiographic interrogation. M-Mode and Color Doppler are both supported.

**OB/GYN**

Read more +

Obstetric imaging typically requires high definition details acquired at a frame rate adequate to capture (sometimes very!) mobile subjects. The Obstetric preset offers high frequency curvilinear imaging to provide high quality transabdominal imaging, and Fetal Heart Rate (FHR).

**FAST**

Read more +

The FAST preset has been developed with clinical partners with parameters optimized specifically for the focused assessment of standard cardiac and abdominal windows in trauma. It provides high frame rates for cardiac imaging, and yet maintains the resolution necessary to identify pathology such as free fluid in the abdomen.

**Vascular: Carotid**

Read more +

This preset is optimized with the contrast resolution, frame rates and vascular enhancement with Color Doppler necessary for interrogation of the carotid artery.

*See List of Human Presets (iQ/iQ+)*, https://support.butterflynetwork.com/hc/en-us/articles/360027864632-List-of-Human-Presets-iQ-iQ- (last accessed October 14, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise a processor in a mobile device running Butterfly's mobile application, which may instruct the driver chip to adjust blanking period ratio or other display parameters based on various criteria, including the display refreshing rate, to achieve desired display luminosity.

| Claim 2 | |
|---|---|
| 2. The ultrasonic diagnostic apparatus according to claim 1, wherein said control unit further controls | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein said control unit further controls said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display according to whether an ultrasonic image to be displayed in said display is a moving image or a still image. |

18

| | |
|---|---|
| said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display according to whether an ultrasonic image to be displayed in said display is a moving image or a still image. | *See supra* at claim 1.<br><br>## Overview<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>### Cardiac<br><br>The Cardiac preset operates with a high-frame-rate phased array, and uses fundamental frequencies to allow reliable real-time echocardiographic interrogation of cardiac anatomy. This preset penetrates to 25cm, and is used actively by many bedside specialty clinicians in a diverse array of clinical environments such as the ED, ICU, Cardiology office and for peri-operative assessment in the PACU for global heart health assessment. It can also be used for thoracic procedures, such as pericardiocentesis.<br><br>### FAST<br><br>The FAST preset has been optimized for performance of the FAST (Focused Assessment with Sonography in Trauma) examination, which assists the clinician to identify free intraperitoneal or pericardial fluid in blunt trauma patients. It is a cornerstone of point-of-care ultrasound in both Emergency Medicine and EMS. The preset penetrates to 25cm, and is a combination of technical characteristics that provide high frame rate for cardiac imaging (typically the subxiphoid view) yet high detail for interrogation of the deep pelvis and abdomen. |

**Vascular: Face**

The Vascular: Face preset has been designed to meet the high-contrast, high-resolution demands of imaging the small facial vessels with slow hemodynamic flow, to support ultrasound-guided facial cosmetic procedures. This linear preset offers optimized imaging from a minimum of 1cm to a maximum depth of 4cm, and has a low grey-scale appearance with an emphasis on ready identification of facial vascular anatomy. B-Mode, Color Doppler, Power Doppler, and the Midline Tool are enabled in this preset.

*See List of Human Presets*, https://support.butterflynetwork.com/hc/en-us/articles/360027864632-List-of-Human-Presets-iQ-iQ- (last accessed October 14, 2022).

At least the most recent iPhone (iPhone 13), the Samsung Galaxy S21 Ultra, and the Google Pixel 6 Pro use VRR OLED or AMOLED screens.
*See, e.g., iPhone 13 Pro and iPhone 13 Pro Max*, https://www.apple.com/iphone-13-pro/specs/ (last accessed Feb. 10, 2022); *What is AMOLED?*, https://www.samsung.com/global/galaxy/what-is/amoled/ (last accessed Feb. 10, 2022); *Google Pixel 3 / Pixel 3 XL*, https://www.oled-info.com/google-pixel-3 (last accessed Feb. 10, 2022). *See also Optimize for variable refresh rate displays*, https://developer.apple.com/videos/play/wwdc2021/10147/; Deepak Singh, *List of phones with true variable refresh rate displays in 2022*, SMARTPRIX (Jan 3, 2022), https://www.smartprix.com/bytes/phones-with-true-variable-refresh-rate-displays/.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, on information and belief, the mobile device running Butterfly's mobile application may adjust refresh rate based on various refresh rate techniques, which adjusts refresh rate based on the content to be displayed.

| | |
|---|---|
| **Claim 3** | |
| The ultrasonic diagnostic apparatus according to claim 1, | Butterfly's POCUS systems include each of the elements of Claim 1, and additionally include wherein said display unit includes an organic EL (electro luminescence) display. |

| wherein said display unit includes an organic EL (electro luminescence) display. | *See supra* at claim 1.<br><br>The Butterfly iQ/iQ+ POCUS system includes mobile devices compatible with the Butterfly iQ/iQ+ probe having organic light-emitting diode ("OLED") displays, including active-matrix organic light-emitting diode VRR ("AMOLED") displays.<br><br>*See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 14 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf (last accessed Feb. 8, 2022):<br><br>**Overview**<br><br>Butterfly iQ/Butterfly iQ+ is a hand-held general purpose diagnostic ultrasound imaging device. The system consists of three components:<br><br>• Compatible Apple® or Android personal electronic devices including phones and tablets (the mobile device)<br>• The Butterfly iQ Application (App), downloaded and installed on the compatible mobile device<br>• The Butterfly iQ/Butterfly iQ+ Probe that connects to the mobile device to generate and receive ultrasound signals<br><br>At least the most recent iPhone (iPhone 13), the Samsung Galaxy S21 Ultra, and the Google Pixel 6 Pro use OLED or AMOLED screens.<br>*See, e.g., iPhone 13 Pro and iPhone 13 Pro Max*, https://www.apple.com/iphone-13-pro/specs/ (last accessed Feb. 10, 2022); *What is AMOLED?*, https://www.samsung.com/global/galaxy/what-is-amoled/ (last accessed Feb. 10, 2022); *Google Pixel 3 / Pixel 3 XL*, https://www.oled-info.com/google-pixel-3 (last accessed Feb. 10, 2022).<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise AMOLED, which performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the difference between AMOLED and an OLED is insubstantial. |
| **Claim 4** | |
| 4. The ultrasonic diagnostic apparatus | Butterfly's POCUS systems include an ultrasonic diagnostic apparatus. |

| according to claim 3, wherein: | *See supra* at claims 1 and 3. |
|---|---|
| said display includes an image display period control circuit for generating a control signal to be activated in an image display period of each line, and an organic EL element, first to third thin-film transistors, and a holding capacity provided in each pixel; | Butterfly's POCUS systems include an image display period control circuit for generating a control signal to be activated in an image display period of each line, and an organic EL element, first to third thin-film transistors, and a holding capacity provided in each pixel.  FIG.3 *See* U.S. Patent No. 8,334,826, Fig. 3. "The signal lines include a plurality of scanning signal lines to transmit Scanning signals, a plurality of sensing lines to transmit sensing data signals SEN, and a plurality of data lines to transmit data signals Vdat." '826 Patent, 4:50-53. "That is, the Switch Se1 is maintained in the on state in the turn-on interval when measuring the threshold voltage Vith and the mobility L, the first scanning signal scan a and the third Scanning signal Em are applied with the high Voltage Voff, and the |

| | |
|---|---|
| | second scanning signal scan b and the fourth scanning signal scan care applied with the low Voltage Von." '826 Patent, 10:1-6.<br><br>"Next, the first scanning signal scan a is changed into the high voltage Voff in the emission interval of FIG. 8(B), and the third scanning signal Em is changed into the low Voltage Von Such that the current I emitted in the driving transistor Qd flows in the organic light emitting element OLED and thereby the light is emitted" '826 Patent, 10:41-46.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise scanlines signals, which perform substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. |
| said first thin-film transistor allows said holding capacity to hold an image signal supplied via a drain wire according to a gate voltage supplied via a gate wire; | Butterfly's POCUS systems include said first thin-film transistor allows said holding capacity to hold an image signal supplied via a drain wire according to a gate voltage supplied via a gate wire. |



FIG.3

*See* U.S. Patent No. 8,334,826, Fig. 3 (annotated).

"When the first Switching transistor QS1 is turned on, the data Voltage Vdat flows to the node N1 and is stored in the capacitor Cst, and the driving transistor Qd is turned on through the Voltage stored in the capacitor Cst Such that the current I flows." '826 Patent, 9:8-12.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise holding capacitors, which perform substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter.

24

| | |
|---|---|
| said second thin-film transistor electrically connects a drain of said third thin-film transistor to a current supply wire according to the control signal generated by said image display period control circuit; and | Butterfly's POCUS systems include that said second thin-film transistor electrically connects a drain of said third thin-film transistor to a current supply wire according to the control signal generated by said image display period control circuit.<br><br><br><br>*See* U.S. Patent No. 8,334,826, Fig. 2 (annotated).<br><br>"The signal lines include a plurality of scanning signal lines to transmit Scanning signals, a plurality of sensing lines to transmit sensing data signals SEN, and a plurality of data lines to transmit data signals Vdat. The Scanning signal lines G1-Gn are extended in approximately a row direction and are Substantially parallel to each other, and the sensing lines and the data lines are extended in approximately a column direction and are substantially parallel to each other." '826 Patent, 4:50-57.<br><br>"The first Switching transistor QS1 is operated in response to a first scanning signal scana, the second Switching transistor QS2 is operated in response to a second scanning signal scan b, the third Switching transistor QS3 is operated in response to a third |

| | |
|---|---|
| | Scanning signal Em, and the fourth Switching transistor QS4 is operated in response to a fourth Scanning signal scan c. The first switching transistor QS1 is connected between the data line D and the node N1, the second switching transistor Qs2 is connected between the sensing line Sand the node N2, the third switching transistor Qs3 is connected between the anode (i.e., node N3) of the organic light emitting element OLED and the node N2, and the fourth switching transistor QS4 is connected between the sensing line Sand the node N1." '826 Patent, 5:10-22.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise transistors connected to data signals, which perform substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. |
| said third thin-film transistor supplies a current from a source to said organic EL element according to the image signal held in said holding capacity when the drain is electrically connected to said current supply wire. | Butterfly's POCUS systems include that said third thin-film transistor supplies a current from a source to said organic EL element according to the image signal held in said holding capacity when the drain is electrically connected to said current supply wire. |



FIG.2

*See* U.S. Patent No. 8,334,826, Fig. 2 (annotated).

"The signal lines include a plurality of scanning signal lines to transmit Scanning signals, a plurality of sensing lines to transmit sensing data signals SEN, and a plurality of data lines to transmit data signals Vdat. The Scanning signal lines G1-Gn are extended in approximately a row direction and are Substantially parallel to each other, and the sensing lines and the data lines are extended in approximately a column direction and are substantially parallel to each other." '826 Patent, 4:50-57.

"The first Switching transistor QS1 is operated in response to a first scanning signal scana, the second Switching transistor QS2 is operated in response to a second scanning signal scan b, the third Switching transistor QS3 is operated in response to a third Scanning signal Em, and the fourth Switching transistor QS4 is operated in response to a fourth Scanning signal scan c. The first switching transistor QS1 is connected between the data line D and the node N1, the second switching transistor Qs2 is connected between the sensing line Sand the node N2, the third switching transistor Qs3 is connected between the anode (i.e.,

27

| | |
|---|---|
| | node N3) of the organic light emitting element OLED and the node N2, and the fourth switching transistor QS4 is connected between the sensing line Sand the node N1." '826 Patent, 5:10-22.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise transistors connected to data signals, which perform substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. |
| **Claim 5** | |
| 5. The ultrasonic diagnostic apparatus according to claim 4, wherein said display unit further includes a second adjustment circuit for changing a level of an image signal supplied to the drain wire according to the ratio of the blanking period to the image display period adjusted by said adjustment circuit. | Butterfly's POCUS systems include wherein said display unit further includes a second adjustment circuit for changing a level of an image signal supplied to the drain wire according to the ratio of the blanking period to the image display period adjusted by said adjustment circuit.<br><br>See supra claims 1 and 4. |



On information and belief, OLED display systems in compatible smartphone devices comprise at least an AMOLED display driver and a display controller. Such a circuit may be tasked to adjust the blanking period ratio, for example, to create a desired brightness of the display.

On information and belief, adjusting the blanking period ratio would necessarily result in a change of luminance of OLED displays.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused

29

| | |
|---|---|
| | systems comprise Vdata, which charges the holding capacitor to a level corresponding to an image signal, which performs the substantially same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. |
| **Claim 7** | |
| 7. The ultrasonic diagnostic apparatus according to claim 1, wherein said control unit controls said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display according to a selected part to be examined. | Butterfly's POCUS systems include wherein said control unit controls said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display according to a selected part to be examined.<br><br>Ultrasound imaging frame rates vary based on selection of certain preset modes within the iQ/iQ+ POCUS system. Therefore, the Butterfly iQ/iQ+ POCUS system must use a control unit for controlling the adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in in the mobile device display unit according to at least one of a selected preset and a frame rate of the image signals generated by the Butterfly app. *See Specs.*, https://www.butterflynetwork.com/specs (last accessed Feb, 10, 2022):<br><br>On information and belief, mobile devices compatible with the Butterfly iQ/iQ+ device comprise a processor that controls a display drive or chip to adjust brightness by adjusting the blanking ratio.<br><br>On information and belief, adjusting the blanking period ratio would necessarily result in a change of luminance of OLED displays. |

30



Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.

*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022).

31



U.S. Patent No. 8,334,826 at Fig. 13.

The Butterfly iQ/iQ+ POCUS system includes mobile devices compatible with the Butterfly iQ/iQ+ probe, which devices include at least the feature of allowing an end user to adjust brightness of its display.

Moreover, Butterfly instructs its customers to adjust brightness to a default level of 65%.

### Image quality is poor

- In the app, select your avatar at the bottom right corner of the toolbar to open your Profile. Select your Preferences to check whether you have "Remember Last Depth and Gain" toggled on. If you do, toggle it off.
- Navigate back to the imaging interface, switch to another preset for a few moments, and then return to the original preset. This will reset the imaging parameters.
- Make sure you are using the appropriate preset and the depth is appropriate for the anatomy being scanned.
- Make sure the brightness on your screen is set to the recommended setting of 65%.
- Make sure you are using enough approved ultrasound gel.
- To determine if your probe is damaged, perform the Probe Diagnostic Test.
- If you are still not satisfied with the image quality, please contact Butterfly Support and include examples of images that represent your feedback.

32

https://support.butterflynetwork.com/hc/en-us/articles/360027980231-Troubleshooting-Imaging-Issues.

Butterfly software further provides features to allow an end user to adjust brightness of an ultrasound image (e.g., gain control). As shown in the screenshot of a video below, a user may adjust the brightness by swiping left or right.

(Annotated) *See* https://www.youtube.com/watch?v=7DA0ok3gcDc;

33

|   |  |
|---|---|
|   | *see also Adjusting Gain, Depth, and TGC*, https://support.butterflynetwork.com/hc/en-us/articles/360027739012-Adjusting-Gain-Depth-and-TGC<br><br>Butterfly software adjusts contrast ratio of the display based on the target of the examination, which affects the brightness of some pixels. For example, contrast ratio may be set to high when Aorta/Gallbladder is being examined.<br><br>**Aorta & Gallbladder**<br><br>Aorta/Gallbladder uses imaging parameters which allow high–contrast imaging for these specific abdominal structures. This is designed for optimal delineation of borders, and so is best applied in the investigations of AAA, CBD, gallbladder disease, cholelithiasis, and pericholecystic fluid—common investigations in primary care and the emergency room.<br><br>The contrast ratio is the ratio between maximum and minimum levels of brightness, the maximum brightness can be adjusted by adjusting blanking period ratio. |

34



Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.

*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022).

Additionally, as shown in Figures below, Butterfly software requires adjusting frame rates based on the target to be examined. On information and belief, a change of refresh rate may require a commensurate change of blanking period ratio for proper operation and display.

**Cardiac**

Read more +

This preset has been designed with parameters best for imaging of the fast-moving dynamics of the heart. It employs a high frame rate, and applies a sector scan which allows reliable real-time echocardiographic interrogation. M-Mode and Color Doppler are both supported.

**FAST**

Read more +

The FAST preset has been developed with clinical partners with parameters optimized specifically for the focused assessment of standard cardiac and abdominal windows in trauma. It provides high frame rates for cardiac imaging, and yet maintains the resolution necessary to identify pathology such as free fluid in the abdomen.

**OB/GYN**

Read more +

Obstetric imaging typically requires high definition details acquired at a frame rate adequate to capture (sometimes very!) mobile subjects. The Obstetric preset offers high frequency curvilinear imaging to provide high quality transabdominal imaging, and Fetal Heart Rate (FHR).

**Vascular: Carotid**

Read more +

This preset is optimized with the contrast resolution, frame rates and vascular enhancement with Color Doppler necessary for interrogation of the carotid artery.

https://support.butterflynetwork.com/hc/en-us/articles/360027864632-List-of-Human-Presets-iQ-iQ-

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems comprise a processor in a mobile device running Butterfly's mobile application, which may instruct the driver chip to adjust blanking period ratio or other display parameters based on various criteria, including the display refreshing rate, to achieve desired display luminosity.

| Claim 8 | |
|---|---|
| 8. The ultrasonic diagnostic apparatus according to claim 1, wherein said control unit controls said adjustment circuit to adjust the ratio of the blanking period to the | Butterfly's POCUS systems include wherein said control unit controls said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display according to a frame rate of the image signals generated by said image generating unit.<br><br>Ultrasound imaging frame rates vary based on selection of certain preset modes within the iQ/iQ+ POCUS system. Therefore, the Butterfly iQ/iQ+ POCUS system must use a control unit for controlling the adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in in the mobile device display unit according to at least |

| image display period within one field period in said display according to a frame rate of the image signals generated by said image generating unit. | one of a selected preset and a frame rate of the image signals generated by the Butterfly app.    *See Specs.*, https://www.butterflynetwork.com/specs (last accessed Feb, 10, 2022): <br><br> On information and belief, mobile devices compatible with the Butterfly iQ/iQ+ device comprise a processor that controls a display drive or chip to adjust brightness by adjusting the blanking ratio. <br><br> On information and belief, adjusting the blanking period ratio would necessarily result in a change of luminance of OLED displays. <br><br>  <br> Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles. <br><br> *See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022). |



U.S. Patent No. 8,334,826 at Fig. 13.

The Butterfly iQ/iQ+ POCUS system includes mobile devices compatible with the Butterfly iQ/iQ+ probe, which devices include at least the feature of allowing an end user to adjust brightness of its display.

Moreover, Butterfly instructs its customers to adjust brightness to a default level of 65%.

## Image quality is poor

- In the app, select your avatar at the bottom right corner of the toolbar to open your Profile. Select your Preferences to check whether you have "Remember Last Depth and Gain" toggled on. If you do, toggle it off.
- Navigate back to the imaging interface, switch to another preset for a few moments, and then return to the original preset. This will reset the imaging parameters.
- Make sure you are using the appropriate preset and the depth is appropriate for the anatomy being scanned.
- Make sure the brightness on your screen is set to the recommended setting of 65%.
- Make sure you are using enough approved ultrasound gel.
- To determine if your probe is damaged, perform the Probe Diagnostic Test.
- If you are still not satisfied with the image quality, please contact Butterfly Support and include examples of images that represent your feedback.

https://support.butterflynetwork.com/hc/en-us/articles/360027980231-Troubleshooting-Imaging-Issues.

39

Butterfly software further provides features to allow an end user to adjust brightness of an ultrasound image (e.g., gain control). As shown in the screenshot of a video below, a user may adjust the brightness by swiping left or right.



(Annotated) *See* https://www.youtube.com/watch?v=7DA0ok3gcDc;

40

|  | *see also Adjusting Gain, Depth, and TGC*, https://support.butterflynetwork.com/hc/en-us/articles/360027739012-Adjusting-Gain-Depth-and-TGC<br><br>Butterfly software adjusts contrast ratio of the display based on the target of the examination, which affects the brightness of some pixels.  For example, contrast ratio may be set to high when Aorta/Gallbladder is being examined.<br><br>## Aorta & Gallbladder<br><br>Aorta/Gallbladder uses imaging parameters which allow high–contrast imaging for these specific abdominal structures. This is designed for optimal delineation of borders, and so is best applied in the investigations of AAA, CBD, gallbladder disease, cholelithiasis, and pericholecystic fluid—common investigations in primary care and the emergency room.<br><br>The contrast ratio is the ratio between maximum and minimum levels of brightness, the maximum brightness can be adjusted by adjusting blanking period ratio. |
|---|---|

41



Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.

*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022).

Additionally, as shown in Figures below, Butterfly software requires adjusting frame rates based on the target to be examined. On information and belief, a change of refresh rate may require a commensurate change of blanking period ratio for proper operation and display.

### Cardiac
Read more +

This preset has been designed with parameters best for imaging of the fast-moving dynamics of the heart. It employs a high frame rate, and applies a sector scan which allows reliable real-time echocardiographic interrogation. M–Mode and Color Doppler are both supported.

### OB/GYN
Read more +

Obstetric imaging typically requires high definition details acquired at a frame rate adequate to capture (sometimes very!) mobile subjects. The Obstetric preset offers high frequency curvilinear imaging to provide high quality transabdominal imaging, and Fetal Heart Rate (FHR).

FAST

Read more +

The FAST preset has been developed with clinical partners with parameters optimized specifically for the focused assessment of standard cardiac and abdominal windows  in trauma. It provides high frame rates for cardiac imaging, and yet maintains the resolution necessary to identify pathology such as free fluid in the abdomen.

Vascular: Carotid

Read more +

This preset is optimized with the contrast resolution, frame rates and vascular enhancement with Color Doppler necessary for interrogation of the carotid artery.

https://support.butterflynetwork.com/hc/en-us/articles/360027864632-List-of-Human-Presets-iQ-iQ-

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter.  In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.  For example, Butterfly's accused systems comprise a processor in a mobile device running Butterfly's mobile application, which may instruct the driver chip to adjust blanking period ratio or other display parameters based on various criteria, including the display refreshing rate, to achieve desired display luminosity.

| Claim 9 | |
|---|---|
| 9. The ultrasonic diagnostic apparatus according to claim 1, wherein said control unit determines whether or not said ultrasonic diagnostic apparatus has been set into an energy saving mode, and controlling said adjustment circuit to adjust the ratio of the blanking period to the image display period | Butterfly's POCUS systems include wherein said control unit determines whether or not said ultrasonic diagnostic apparatus has been set into an energy saving mode, and controlling said adjustment circuit to adjust the ratio of the blanking period to the image display period within one field period in said display according to a determination result.<br><br>For example, Butterfly's POCUS systems determine a power saving mode, in which brightness is decreased by 10%. As explained above, the brightness of a screen can be adjusted by changing blanking period of the display. |

| | |
|---|---|
| within one field period in said display according to a determination result. |  Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.<br><br>*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022). |

## Use a different Power saving mode

**Note:** You can only adjust the settings when Power saving is off.

Some power saving modes will make your phone's screen dim in order to save battery life. However, you can turn off Power saving if you prefer a brighter screen.

Navigate to and open **Settings**. Tap **Battery and device care**, and then tap **Battery**. Tap **Power saving**, and then choose your preferred settings. Finally, tap the **switch** at the top of the screen to turn on Power saving.

*See* https://www.samsung.com/us/support/answer/ANS00087643/ (last accessed October 14, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.

| Claim 11 | |
|---|---|
| 11. The ultrasonic diagnostic apparatus according to claim 1, wherein: | Butterfly's POCUS systems include an ultrasonic diagnostic apparatus. *See supra* claim 1. |

45

| | |
|---|---|
| said display unit further includes a brightness sensor for sensing brightness around said display; and | Butterfly's POCUS systems include a display unit that further includes a brightness sensor for sensing brightness around said display.<br><br>As explained above, Butterfly's POCUS systems may include a portable device such as an android or iOS device.  Such mobile device may comprise a display unit capable of adjusting brightness based on the available light level.<br><br>Most **Samsung** Phones and tablets have a sensor that will try to determine the available light level around the device and adapt the brightness of the screen accordingly. **Auto Brightness** is enabled by default, but there are a couple of ways to adjust and enable **Auto Brightness:**<br><br>**Please Note:**<br>• **Auto Brightness** is available in **limited mobiles**. Kindly check Mobile specification or Manual for details. Also can <u>Chat with Us</u> for further assistance.<br><br>• Screenshots were taken from for **Android OS Version 7.0 (Nougat).**<br><br>*See Galaxy Smartphones: Enable Auto Brightness*, https://www.samsung.com/in/support/mobile-devices/galaxy-smartphones-enable-auto-brightness/ (last accessed October 14, 2022). |

46



*See How to adjust brightness on Samsung Mobile Device*, https://www.samsung.com/sg/support/mobile-devices/how-to-adjust-brightness-on-samsung-mobile-device/ (last accessed October 14, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused

47

| | systems adjust brightness of a display based on lighting condition, which performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. |
|---|---|
| said adjustment circuit automatically adjusts the ratio of the blanking period to the image display period within one field period in the display according to a sensing result of said brightness sensor. | Butterfly's POCUS systems include a display unit that further includes adjustment circuit automatically adjusts the ratio of the blanking period to the image display period within one field period in the display according to a sensing result of said brightness sensor.<br><br>As explained above, Butterfly's POCUS systems may include a portable device such as an android or iOS device. Such mobile device may comprise a display unit capable of adjusting brightness based on the available light level.<br><br>Most **Samsung** Phones and tablets have a sensor that will try to determine the available light level around the device and adapt the brightness of the screen accordingly. **Auto Brightness** is enabled by default, but there are a couple of ways to adjust and enable **Auto Brightness**:<br><br>**Please Note:**<br><br>• Auto Brightness is available in **limited mobiles**. Kindly check Mobile specification or Manual for details. Also can **Chat with Us** for further assistance.<br><br>• Screenshots were taken from for **Android OS Version 7.0 (Nougat)**.<br><br>*See Galaxy Smartphones: Enable Auto Brightness*, https://www.samsung.com/in/support/mobile-devices/galaxy-smartphones-enable-auto-brightness/ (last accessed October 14, 2022). |

48



*See How to adjust brightness on Samsung Mobile Device*, https://www.samsung.com/sg/support/mobile-devices/how-to-adjust-brightness-on-samsung-mobile-device/ (last accessed October 14, 2022).



Perceived brightness levels for 25%, 50%, 75%, and 100% PWM duty cycles.

*See* https://www.dxomark.com/flicker-the-display-affliction/ (last accessed October 14, 2022).

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, Fujifilm asserts that Butterfly literally infringes this claim element. However, to the extent this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. For example, Butterfly's accused systems adjust brightness of a display based on lighting condition, which performs substantially the same function, in substantially the same way, and achieves substantially the same result as the claimed subject matter.

# EXHIBIT 4G

**EXHIBIT G**
**U.S. PATENT NO. 8,128,050 INFRINGEMENT CONTENTIONS**
*FUJIFILM SONOSITE, INC. V. BUTTERFLY NETWORK, INC.*

Butterfly Network, Inc. ("Butterfly") infringes at least Claims 1, 5, 7, 9, 10, and 12 of U.S. Patent No. 8,128,050 (the "'050 Patent").

To the extent Butterfly manufactures, uses, and sells point of care ultrasound ("POCUS") devices in the United States, Butterfly directly infringes asserted Claims 1, 5, 7, 9, 10, and 12 of the '050 Patent under 35 U.S.C. § 271(a), literally or under the doctrine of equivalents.

The chart below explains how Butterfly's POCUS devices infringe the '050 Patent and is based on evidence that is currently available to FUJIFILM Sonosite, Inc. ("FUJIFILM Sonosite"). Throughout this chart, FUJIFILM Sonosite cites to exemplary evidence. These citations are provided as illustrations to identify the accused functionality and should not be construed to limit the evidence FUJIFILM Sonosite may rely upon.

FUJIFILM Sonosite contends that each element of each asserted claim is literally met unless otherwise indicated. But to the extent Butterfly argues that any claim element is found to not be literally met with respect to Butterfly's POCUS devices, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and Butterfly's POCUS devices, and the element and Butterfly's POCUS devices perform substantially the same function, in substantially the same way, to achieve substantially the same result. *See*, *e.g.*, *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605 (1950).

| Claim 1 | Butterfly's POCUS systems |
|---|---|
| An ultrasound scanner support device, comprising: | To the extent that the preamble is construed as a limitation, Butterfly sells an ultrasound scanner support device.<br><br>For example, the Butterfly store explains that a buyer can "[c]arry and protect your Butterfly probe with our Butterfly Hard Case" and provides the following image of the hard case:<br><br><br><br>*See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/.<br><br> |

| | |
|---|---|
| | *See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/. |
| a body having a first surface and a second surface opposite the first surface; | Butterfly's POCUS systems include a body having a first surface and a second surface opposite the first surface.<br><br>Butterfly's hard case has a first and second surface, as shown below. The first surface is the "upper" surface, while the second surface is the surface of the blue plastic component contacting the black case. *See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/:<br><br> |
| a recess having an interior surface between the first and second surfaces and a sidewall extending from the first surface | Butterfly's hard case includes a recess having an interior surface between the first and second surfaces and a sidewall extending from the first surface to the interior surface.<br><br>Butterfly's hard case includes a recess between the first and second surfaces, as shown below. |

3

| to the interior surface; and | <br><br>*See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/.<br><br>*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.<br><br>Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent Butterfly |

| | |
|---|---|
| | argues this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial.  In particular, the accused instrumentality includes interior, first, and second surfaces that allow for storage of the probe and cable to prevent damage, which is insubstantially different from what is claimed, and which performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention. |
| a peripheral channel extending around a perimeter of the body and having a curve at each directional change, wherein each curve has a radius of at least approximately 0.25 inch. | Butterfly's hard case includes a peripheral channel extending around a perimeter of the body and having a curve at each directional change, wherein each curve has a radius of at least approximately 0.25 inch.<br><br><br><br>*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.<br><br><br>The probe is two inches wide.  *See* Butterfly iQ/Butterfly iQ+ Personal Ultrasound System User Manual at 58 (Nov. 3, 2020), https://manual.butterflynetwork.com/butterfly-iq-user-manual_rev-ae-en.pdf: |

5

## System Specifications

### Table 6. System Specifications

| Item | Butterfly iQ | Butterfly iQ+ |
|---|---|---|
| Probe dimensions | 185 x 56 x 35 mm (7.2 x 2.2 x 1.4 in.) | 163 x 56 x 35 mm (6.4 x 2.2 x 1.4 in.) |
| Probe weight | 313 grams (.69 lbs) | 309 grams (.68 lbs) |
| Power | Battery (rechargeable) | |
| Battery Life | ≥2 hours in B-Mode (typical new battery at 25°C). ≥2 hours refers to continuous scanning vs. traditional scanning patterns. | |
| Languages | The user interface and accompanying documentation is localized in English, Spanish, French, German, Italian, Polish, Portuguese, Dutch, Danish, Norwegian, Swedish, and Finnish. | |
| Display | Variable | |
| Min/Max scan depth | 1 cm min / 30 cm max | |
| Ultrasound chip | Integrated CMOS chip | |
| Transducers | ~9000-element CMUT | |
| Frequency Range | 1-10 MHz | |
| Operating system | • Apple devices require iOS 13.0 or newer. Not compatible with beta or unreleased versions.<br>• Google Pixel devices require Android version 10 or newer.<br>• OnePlus mobile devices require Android version 10 or newer.<br>• Samsung mobile devices require Android version 9 or newer. | |

The radius of the curve of the channel at each directional change is at least 0.25".  The width of the probe is 2.2".  A circle drawn along the curve of the channel has a diameter larger than the width of the probe.  The radius of the curve of the channel is thus greater than 1":

6



*See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/.

Based on its current understanding of the claim language and publicly available information pertaining to the accused instrumentality, FUJIFILM Sonosite asserts that Butterfly literally infringes this claim element. However, to the extent Butterfly argues this claim element is not literally present in or performed by the accused instrumentality, the claim element is satisfied under the doctrine of equivalents because the accused instrumentality performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed subject matter. In addition, the doctrine of equivalents is satisfied because any difference between such claim element and the accused instrumentality is insubstantial. In particular, the accused instrumentality includes a channel for storing the cable and having a radius of curvature within the claimed range and designed to prevent damage to the cable, which is insubstantially different from what is claimed, and which performs substantially the same function, in substantially the same way, to achieve substantially the same result as the claimed invention.

| **Claim 5** | |
| --- | --- |
| The ultrasound scanner support device of claim 1, | Butterfly's hard case includes the elements of Claim 1, and further comprises a shoulder protruding from the sidewall partially into the opening. |

7

| | |
|---|---|
| further comprising: a shoulder protruding from the sidewall partially into the opening. | *See supra* at Claim 1.  *See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/. |

8



*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.

| **Claim 7** | |
| --- | --- |
| The ultrasound scanner support device of claim 1, further comprising: a notch spaced between the peripheral channel and at least one of the first and second surfaces, the notch having a curved surface. | Butterfly's hard case includes the elements of Claim 1, and further comprises a notch spaced between the peripheral channel and at least one of the first and second surfaces, the notch having a curved surface.<br><br>*See supra* at Claim 1. |

9



First Surface

Peripheral Channel

Notch

*See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/.



*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.

| Claim 9 | |
|---|---|
| The ultrasound scanner support device of claim 1, further comprising: a flange extending beyond the perimeter of the body, the flange being configured to retain a cable within the peripheral channel. | Butterfly's hard case includes the elements of Claim 1, and further comprises a flange extending beyond the perimeter of the body, the flange being configured to retain a cable within the peripheral channel.<br><br>*See supra* at Claim 1. |

11



*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.

| **Claim 10** | |
| --- | --- |
| The ultrasound scanner support device of claim 1 wherein the interior surface is substantially solid and at least substantially parallel to the first surface of the body. | Butterfly's hard case includes the elements of Claim 1, wherein the interior surface is substantially solid and at least substantially parallel to the first surface of the body.<br><br>*See supra* at Claim 1. |

12



*See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/.

13



First Surface

Interior surface

*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.

| **Claim 12** | |
|---|---|
| The ultrasound scanner support device of claim 1, further comprising: an internal channel extending from the recess to a portion of the peripheral channel. | Butterfly's hard case includes the elements of Claim 1, and further comprises an internal channel extending from the recess to a portion of the peripheral channel.<br><br>*See supra* at Claim 1. |

14



*See* https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/.

*See* https://spwindustrial.com/butterfly-iq-portable-ultrasound-with-case/.

15

# EXHIBIT 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

FUJIFILM SONOSITE, INC.,

                    Plaintiff,

          v.

BUTTERFLY NETWORK, INC.

                    Defendant.

C.A. No. 22-309 (JPM)

### BUTTERFLY'S FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO FUJIFILM'S INTERROGATORY NOS. 3-5 AND 7-9

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant Butterfly Network, Inc. ("Butterfly"), by its attorneys, hereby provides supplemental objections and responses to Plaintiff FUJIFILM Sonosite, Inc.'s ("Fujifilm") Interrogatory Nos. 3-5 and 7-9 to Defendant (the "Interrogatories").

### PRELIMINARY STATEMENT

Butterfly's investigation, discovery, and analysis are ongoing, and Butterfly's responses to Interrogatory Nos. 3-5 and 7-9 are based on information and documents presently available to Butterfly after a reasonable inquiry. Butterfly reserves the right to modify, alter, amend, or supplement these objections and responses in the event further information and/or documents are disclosed or discovered. Butterfly also reserves the right to amend its responses herein after completion of the pleadings stage of this Action, which is ongoing, and depending on the resolution of any motions on the pleadings, including Butterfly's pending motion to dismiss the First Amended Complaint. In addition, Butterfly's responses, subject to Butterfly's objections, are given without prejudice to its rights to introduce as evidence at trial any subsequently discovered or

1

unintentionally omitted information. Butterfly's responses, subject to Butterfly's objections, are also based on Butterfly's interpretation and understanding of the Interrogatories. If Fujifilm subsequently asserts any interpretation of any Interrogatory that differs from Butterfly's understanding, Butterfly reserves the right to alter, amend, or supplement its objections and responses. Accordingly, these responses shall not be deemed to constitute admissions or representations that any statement or characterization is complete.

## GENERAL OBJECTIONS

Butterfly incorporates by reference the General Objections set forth in its October 20, 2022 Objections and Responses to Fujifilm's First Set of Interrogatories as if fully set forth herein.

## OBJECTIONS AND RESPONSES TO INTERROGATORIES

### INTERROGATORY NO. 3:

Separately for each Accused Product, describe in detail the operation of the ASIC that is used, as referred to, for instance, in the publication Ultrasound-on-chip platform for medical imaging, analysis, and collective intelligence, Rothberg *et al.* PNAS 2021(118), e2019339118, and include in your answer at least a description of (a) the design and function of each micromachined electromechanical system in the Accused Products; (b) the design and function of each system that controls power flow to each component of the ASIC; (c) the design and function of each information storage system on the ASIC; and (d) an identification of all related documents.

### RESPONSE TO INTERROGATORY NO. 3:

Butterfly objects to this Interrogatory as compound because it contains multiple discrete subparts. Butterfly objects to this Interrogatory to the extent it seeks Privileged Information. No Privileged Information will be produced or disclosed. Butterfly objects to this Interrogatory to the extent it seeks information and/or documents that are subject to confidentiality obligations or agreements with non-parties or that are not in Butterfly's possession, custody, or control. Butterfly objects to this Interrogatory as being vague, ambiguous, overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case by using the terms "operation," "the ASIC that is used, as referred to, for instance, in the [Rothberg]

2

publication," "design and function," "micromachined electromechanical system," "system that controls power flow to each component of the ASIC," "information storage system on the ASIC," and "all related documents." Butterfly further objects to this Interrogatory as being overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case to the extent it seeks information about products, systems, or features not accused or otherwise at issue in this case. Butterfly further objects to this Interrogatory as premature to the extent it calls for the disclosure of expert testimony and opinions and/or seeks a legal conclusion. Butterfly will disclose any legal and expert opinions, and the bases for such opinions, in accordance with the deadlines set forth in the Court's Scheduling Order.

Subject to and without waiving the foregoing general and specific objections, Butterfly responds as follows: Butterfly will identify documents, pursuant to Rule 33(d), from which Fuji may ascertain relevant information responsive to this Interrogatory, including documents sufficient to show the structure and operation of the accused features of Butterfly's Ultrasound-on-Chip in the Accused Products. Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

## BUTTERFLY'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3 (March 3, 2023):

Subject to and without waiving the foregoing general and specific objections, and in addition to the information provided in Butterfly's previous Response to this Interrogatory, Butterfly further responds as follows:

Butterfly incorporates by reference its Initial Non-Infringement Contentions and accompanying Exhibits A-G (served November 23, 2022).

3

Pursuant to Rule 33(d), Butterfly identifies the following documents that may contain information responsive to this Interrogatory:

> BFLY_FUJI_0000001 (Poseidon 2.0 User Manual); BFLY_FUJI_0000356 (Software Design Specification – Version 8); BFLY_FUJI_0000432 (Butterfly iQ/iQ+ User Manual – Revision AJ); BFLY_FUJI_0022310 (Poseidon 3.0 User Manual); BFLY_FUJI_0022835 (Butterfly iQ/iQ+ User Manual – Revision AY); BFLY_FUJI_0022930 (Butterfly iQ Vet/iQ+ Vet User Manual – Revision K); Butterfly's source code.

Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**INTERROGATORY NO. 4:**

For each Accused Product that Butterfly contends does not infringe the Asserted Claims of the Asserted Patents, describe in detail all bases for your non-infringement defense for the Asserted Patents and include in your answer: (a) an identification of the claim element(s) of the Asserted Patents allegedly not present in or practiced by the Accused Product, either literally or under the Doctrine of Equivalents, (b) an identification by Bates number of all documents Butterfly relies on to support such non-infringement defense, and (c) an identification of the three individuals from Butterfly who are most knowledgeable about the structure, function, and operation of the Accused Product supporting or relating to Butterfly's non-infringement defense.

**RESPONSE TO INTERROGATORY NO. 4:**

Butterfly objects to this Interrogatory as compound because it contains multiple discrete subparts. Butterfly objects to this Interrogatory to the extent it seeks Privileged Information. No Privileged Information will be produced or disclosed. Butterfly objects to this Interrogatory to the extent it seeks information and/or documents that are subject to confidentiality obligations or agreements with non-parties or that are not in Butterfly's possession, custody, or control. Butterfly objects to this Interrogatory as being vague, ambiguous, overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case by using the term "three individuals from Butterfly who are most knowledgeable about the structure, function, and operation of the Accused Product supporting or relating to Butterfly's non-

4

infringement defense." Butterfly objects to this Interrogatory as overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks information about patent claims not currently asserted by Fuji. Butterfly objects to this Interrogatory as premature to the extent it seeks information and/or documents required to be produced as part of Butterfly's Initial Non-infringement Contentions pursuant to the Court's Scheduling Order and W.D. Tenn. Local Patent Rules 3.3 and 3.4. Butterfly further objects to this Interrogatory as premature to the extent it calls for the disclosure of expert testimony and opinions and/or seeks a legal conclusion. Butterfly will produce its contentions, associated documents identified in the Local Rules of the Western District of Tennessee, any legal opinions, and any expert opinions, and the bases for such opinions, in accordance with the deadlines set forth in the Scheduling Order.

Subject to and without waiving the foregoing general and specific objections, Butterfly responds as follows: Butterfly identifies Tushar Parlikar as an individual who may have information regarding certain technical aspects of the Accused Products. Butterfly will provide its non-infringement contentions, and any expert report(s) in support thereof, in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order. Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**BUTTERFLY'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4 (March 3, 2023):**

Subject to and without waiving the foregoing general and specific objections, and in addition to the information provided in Butterfly's previous Response to this Interrogatory, Butterfly further responds as follows:

5

Butterfly does not infringe any valid claim of the Asserted Patents, for at least the reasons set forth in Butterfly's Initial Non-Infringement Contentions and accompanying Exhibits A-G (served November 23, 2022) and Butterfly's Initial Invalidity and Unenforceability Contentions and accompanying Exhibits A1-A6, B1-B3, C1-C3, D1-D2, E1-E2, F1-F3, G1-G3 (served January 6, 2023)—all incorporated herein by reference.

Pursuant to Rule 33(d), Butterfly also identifies the following documents that may contain information responsive to this Interrogatory:

> BFLY_FUJI_0000001 (Poseidon 2.0 User Manual); BFLY_FUJI_0000356 (Software Design Specification – Version 8); BFLY_FUJI_0000432 (Butterfly iQ/iQ+ User Manual – Revision AJ); BFLY_FUJI_0000547 (Hard Case Diagram); BFLY_FUJI_0000549 (Hard Case Diagram); BFLY_FUJI_0022310 (Poseidon 3.0 User Manual); BFLY_FUJI_0022835 (Butterfly iQ/iQ+ User Manual – Revision AY); BFLY_FUJI_0022930 (Butterfly iQ Vet/iQ+ Vet User Manual – Revision K).

Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**INTERROGATORY NO. 5:**

Identify every commercially acceptable, actual or potential, non-infringing alternative to any alleged invention(s) claimed in the Asserted Patents and the date each such alternative became available.

**RESPONSE TO INTERROGATORY NO. 5:**

Butterfly objects to this Interrogatory as compound because it contains multiple discrete subparts. Butterfly objects to this Interrogatory to the extent it seeks Privileged Information. No Privileged Information will be produced or disclosed. Butterfly objects to this Interrogatory to the extent it seeks information and/or documents that are subject to confidentiality obligations or agreements with non-parties or that are not in Butterfly's possession, custody, or control. Butterfly objects to this Interrogatory as being vague, ambiguous, overbroad, unduly burdensome, not

6

relevant to any party's claims or defenses, and not proportional to the needs of the case by using the terms "every commercially acceptable, actual or potential, non-infringing alternative," "any alleged invention(s) claimed," and "the date each such alternative became available." Butterfly further objects to this Interrogatory as premature to the extent it calls for the disclosure of expert testimony and opinions and/or seeks a legal conclusion. Butterfly will disclose any legal and expert opinions, and the bases for such opinions, in accordance with the deadlines set forth in the Scheduling Order. Butterfly further objects to this Interrogatory as premature because Fuji bears the burden of proving its entitlement to damages in this case, including by proving the absence of acceptable and available non-infringing alternatives, but Fuji has not identified any damages theories or served infringement contentions to which Butterfly can respond.

Subject to and without waiving the foregoing general and specific objections, and to the extent Butterfly understands Fuji's infringement contentions and damages allegations, Butterfly responds as follows: Existing ultrasound systems that are/were commercially available, publicly known, and/or described in patents and printed publications are acceptable non-infringing alternatives. Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**BUTTERFLY'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5 (March 3, 2023):**

Subject to and without waiving the foregoing general and specific objections, and in addition to the information provided in Butterfly's previous Response to this Interrogatory, Butterfly further responds as follows:

Butterfly incorporates by reference its Initial Invalidity and Unenforceability Contentions and accompanying Exhibits ("Butterfly Invalidity Exs.") A1-A6, B1-B3, C1-C3, D1-D2, E1-E2,

7

F1-F3, G1-G3 (served January 6, 2023). The systems described in the asserted prior art references are acceptable non-infringing alternatives.

The Accused Products

The Accused Products in this case—including the accused Butterfly iQ, iQ+, iQ+ Vet, iQ Application, and Hard Case—do not infringe any valid claim of the Asserted Patents, as set forth at least in Butterfly's Initial Non-Infringement Contentions and accompanying Exhibits A-G (served November 23, 2022), incorporated herein by reference, and therefore are acceptable and available non-infringing alternatives to the claimed technology. These products have been available on the market throughout the period of alleged infringement, and they would not have cost any additional money to develop or implement.

Additional Non-Infringing Designs/Alternatives

Additional non-infringing alternatives to the claimed technology include, for example, systems and methods further defined by Fujifilm's contentions in its Initial Validity and Enforceability Contentions seeking to distinguish asserted prior art references.

**For the '157 Patent**, Fujifilm has asserted that limitations [1c]-[1f], [6d]-[6f], [12c]-[12g], [17e]-[17g], and [23d]-[23h], and each limitation of claims 2, 3, 7, 8, 13, 14, 18, 19, and 26 are missing from each and every asserted prior art reference in Butterfly Invalidity Exhibits A1-A6. *See, e.g.*, Fujifilm's Initial Validity and Enforceability Contentions, Ex. A1 ("Fujifilm Validity Ex.") at 3-9, 11-15, 17-22, 25-29, 31-37. For each of the limitations that Fujifilm has asserted is "missing," any systems that incorporate the structure and/or functionality described in the asserted prior art references for such limitations are acceptable non-infringing alternatives.

**For the '985 Patent**, Fujifilm has asserted that limitations [1a], [1c], and [1d] and each limitation of claims 2 and 3 are missing from each and every asserted prior art reference in

8

Butterfly Invalidity Exhibits B1-B3. *See, e.g.*, Fujifilm Validity Ex. B1 at 2-6. For each of the limitations that Fujifilm has asserted is "missing," any systems that incorporate the structure and/or functionality described in the asserted prior art references for such limitations are acceptable non-infringing alternatives.

**For the '108 Paten**t, Fujifilm has asserted that each limitation of claims 1-4 is missing from each and every asserted prior art reference in Butterfly Invalidity Exhibit D2. *See, e.g.*, Fujifilm Validity Ex. D2 at 2-4. For each of the limitations that Fujifilm has asserted is "missing," any systems that incorporate the structure and/or functionality described in the asserted prior art references for such limitations are acceptable non-infringing alternatives.

**For the '822 Patent**, Fujifilm has asserted that limitations [1f]-[1i], limitations [6e]-[6i], and each limitation of claims 2-5 and 7-10 are missing from each and every asserted prior art reference in Butterfly Invalidity Exhibits E1 and E2. *See, e.g.*, Fujifilm Validity Ex. E1 at 4-10, 12-16. For each of the limitations that Fujifilm has asserted is "missing," any systems or methods that incorporate the structure and/or functionality described in the asserted prior art references for such limitations are acceptable non-infringing alternatives.

Additional acceptable non-infringing alternatives to the version of the Butterfly iQ Application on iOS and Android (the "iQ App") commercially available as of March 8, 2022 (i.e., the "accused version") (iQ App Version No. 2.11.0) further include, for example, a version of the iQ App implemented with an updated version of the Needle Viz™ Tool, released in or around October 2022 after the filing of Fujifilm's Complaint (D.I. 1) (iQ App Version No. 2.19.0). BFLY_FUJI_0022561 at 561; BFLY_FUJI_0022568 at 568; *see* Butterfly's source code.

**For the '981 Patent**, Fujifilm has asserted that limitations [1d]-[1e] and each limitation of claims 2-5, 7-9, and 11 are missing from each and every asserted prior art reference in Butterfly

Invalidity Exhibits F1-F3. *See, e.g.*, Fujifilm Validity Ex. F1 at 4-12. For each of the limitations that Fujifilm has asserted is "missing," any systems that incorporate the structure and/or functionality described in the asserted prior art references for such limitations are acceptable non-infringing alternatives.

**For the '050 Patent**, additional acceptable non-infringing alternatives to the accused Butterfly Hard Case (Model No. 900-20005-00) include the Butterfly soft case (Model No. 900-20023-00), released in or around July 2021, and the redesigned Butterfly hard case (Model No. 900-20047-00), released in or around November 2022. *See* BFLY_FUJI_0047420 at 420; *see also, e.g.*, https://store.butterflynetwork.com/us/en/product/butterfly-soft-case/ ("The Butterfly Soft Case is lightweight, durable and makes it easy to store and carry your Butterfly probe, charger, and mobile device."); https://store.butterflynetwork.com/us/en/product/butterfly-hard-case/ ("Under a durable shell, the redesigned Butterfly Hard Case secures your probe, charger, full bottle of gel, and mobile device. Neatly loop your cord around a custom cable wrap.").

Pursuant to Rule 33(d), Butterfly also identifies the following documents that may contain information responsive to this Interrogatory:

> FFSS_BFLY_0000001-FFSS_BFLY_0001802 (File Histories of the Asserted Patents); BFLY_FUJI_0000356 (Software Design Specification – Version 8); BFLY_FUJI_0000432 (Butterfly iQ/iQ+ User Manual – Revision AJ); BFLY_FUJI_0022548 (Butterfly Website – Using the Needle Viz Tool); BFLY_FUJI_0022561 (Butterfly Website – What's New iOS); BFLY_FUJI_0022568 (Butterfly Website – What's New Android); BFLY_FUJI_0022835 (Butterfly iQ/iQ+ User Manual – Revision AY); BFLY_FUJI_0022930 (Butterfly iQ Vet/iQ+ Vet User Manual – Revision K); BFLY_FUJI_0047420 ("redesigned" Butterfly hard case); Butterfly's source code.

Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

10

**INTERROGATORY NO. 7:**

Describe in detail all bases for each affirmative defense that Butterfly raises in this case, and identify all documents and circumstances relating to those affirmative defenses and all persons with knowledge of those affirmative defenses.

**RESPONSE TO INTERROGATORY NO. 7:**

Butterfly objects to this Interrogatory as compound because it contains multiple discrete subparts. Butterfly objects to this Interrogatory to the extent it seeks Privileged Information. No Privileged Information will be produced or disclosed. Butterfly objects to this Interrogatory to the extent it seeks information and/or documents that are subject to confidentiality obligations or agreements with non-parties or that are not in Butterfly's possession, custody, or control. Butterfly further objects to this Interrogatory as being overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it seeks "all documents and circumstances relating to" and "all persons with knowledge of" the substance of information sought. Butterfly further objects to this Interrogatory as being premature to the extent it seeks the disclosure of information about Butterfly's Answer before it is due. Butterfly objects to this Interrogatory as premature to the extent it seeks information and/or documents required to be produced as part of Butterfly's Initial Non-infringement Contentions or Invalidity and Unenforceability Contentions pursuant to the Court's Scheduling Order and W.D. Tenn. Local Patent Rules 3.3, 3.4, 3.5, and 3.6. Butterfly further objects to this Interrogatory as premature to the extent it calls for the disclosure of expert testimony and opinions and/or seeks a legal conclusion. Butterfly will produce its contentions, associated documents identified in the Local Rules of the Western District of Tennessee, any legal opinions, and any expert opinions, and the bases for such opinions, in accordance with the deadlines set forth in the Scheduling Order.

Subject to and without waiving the foregoing general and specific objections, Butterfly responds as follows: Butterfly will provide the bases for each affirmative defense that Butterfly

11

raises in this case and any expert report(s) in support thereof, in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order. Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**BUTTERFLY'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7 (March 3, 2023):**

Subject to and without waiving the foregoing general and specific objections, and in addition to the information provided in Butterfly's previous Response to this Interrogatory, Butterfly further responds as follows:

The pleadings stage of this Action is ongoing. Butterfly's affirmative defenses may depend on the resolution of any motions on the pleadings, including Butterfly's pending motion to dismiss the First Amended Complaint (D.I. 21). Butterfly incorporates by reference its Partial Motion to Dismiss Fujifilm's Complaint (D.I. 11-13); its Partial Motion to Dismiss Fujifilm's First Amended Complaint (D.I. 32-34, 47); its Initial Non-Infringement Contentions and accompanying Exhibits A-G (served November 23, 2022); and its Initial Invalidity and Unenforceability Contentions and accompanying Exhibits A1-A6, B1-B3, C1-C3, D1-D2, E1-E2, F1-F3, G1-G3 (served January 6, 2023).

Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**INTERROGATORY NO. 8:**

Describe in detail the operation of the current version of any software Butterfly provides to, or identifies for, any customer, including the operation of any algorithms, routines, methods, functions, or structures for identifying an interventional instrument using ultrasound data.

12

**RESPONSE TO INTERROGATORY NO. 8:**

Butterfly objects to this Interrogatory as compound because it contains multiple discrete subparts. Butterfly objects to this Interrogatory to the extent it seeks Privileged Information. No Privileged Information will be produced or disclosed. Butterfly objects to this Interrogatory to the extent it seeks information and/or documents that are subject to confidentiality obligations or agreements with non-parties or that are not in Butterfly's possession, custody, or control. Butterfly objects to this Interrogatory as being overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it is not limited to a relevant time period or location. Butterfly objects to this Interrogatory as being overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case to the extent it seeks description "in detail the operation of . . . any software . . . including the operation of any algorithms, routines, methods, functions, or structures for identifying an interventional instrument." Butterfly further objects to this Interrogatory as being vague, ambiguous, overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case by using the terms "operation"; "provides to, or identifies for"; "customer"; "any algorithms, routines, methods, functions, or structures"; and "interventional instrument." Butterfly further objects to this Interrogatory as being overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case to the extent it seeks information about products, systems, or features not accused or otherwise at issue in this case. Butterfly further objects to this Interrogatory as premature to the extent it calls for the disclosure of expert testimony and opinions and/or seeks a legal conclusion. Butterfly will disclose any legal and expert opinions, and the bases for such opinions, in accordance with the deadlines set forth in the Scheduling Order.

Subject to and without waiving the foregoing general and specific objections, Butterfly responds as follows: Butterfly will identify documents, pursuant to Rule 33(d), from which Fuji

13

may ascertain relevant information responsive to this Interrogatory, including documents sufficient to show the operation of the accused features of the Needle Viz tool identified in Exhibit L of the First Amended Complaint. Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**BUTTERFLY'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8 (March 3, 2023):**

Subject to and without waiving the foregoing general and specific objections, and in addition to the information provided in Butterfly's previous Response to this Interrogatory, Butterfly further responds as follows:

In or around October 2020, Butterfly released a version of the Butterfly iQ Application on iOS and Android (the "iQ App") implemented with the first version of the Needle Viz™ Tool for the Butterfly iQ+ Probe (iQ App Version No. 1.23.0). BFLY_FUJI_0023352 at 352. In or around December 2020, Butterfly released a version of the iQ App implemented with an updated version of the Needle Viz™ Tool (iQ App Version No. 1.26.0). BFLY_FUJI_0022561 at 564-65; BFLY_FUJI_0022568 at 572. In or around January 2021, Butterfly released a version of the iQ App implemented with an updated version of the Needle Viz™ Tool for the Butterfly iQ Probe (iQ App Version No. 1.27.0). BFLY_FUJI_0022561 at 564; BFLY_FUJI_0022568 at 572. In or around October 2021, Butterfly released a version of the iQ App implemented with an updated version of the Needle Viz™ Tool for the Butterfly iQ+ Vet Probe (iQ App Version No. 2.6.0). BFLY_FUJI_0023339 at 339. On or around March 2, 2022, Butterfly released the version of the iQ App commercially available as of March 8, 2022 (i.e., the "accused version") (iQ App Version No. 2.11.0). In or around October 2022, after the filing of Fujifilm's Complaint (D.I. 1), Butterfly

14

released a version of the iQ App implemented with an updated version of the Needle Viz™ Tool (iQ App Version No. 2.19.0). BFLY_FUJI_0022561 at 561; BFLY_FUJI_0022568 at 568.

The operation of the Needle Viz™ Tool is generally described in the User Manuals and "Using the Needle Viz Tool" webpage, accessible on Butterfly's website. *See, e.g.*, BFLY_FUJI_0000432 at 464-65; BFLY_FUJI_0022548 at 548.

The complete operation and function of the Needle Viz™ Tool, including any algorithms, routines, methods, functions, or structures (to the extent any exist), is shown in the source code for the Butterfly iQ Application—all commercially available versions of which Butterfly has made available for inspection since November 23, 2022. *See* Butterfly's Initial Non-Infringement Contentions (Nov. 23, 2022) at 6 ("Butterfly's source code for the accused features of the Accused Products is available for inspection pursuant to the terms of the Protective Order (D.I. 30)").

Pursuant to Rule 33(d), Butterfly also identifies the following documents that may contain information responsive to this Interrogatory:

> BFLY_FUJI_0000356 (Software Design Specification – Version 8);
> BFLY_FUJI_0000432 (Butterfly iQ/iQ+ User Manual – Revision AJ);
> BFLY_FUJI_0022548 (Butterfly Website – Using the Needle Viz Tool);
> BFLY_FUJI_0022561 (Butterfly Website – What's New iOS);
> BFLY_FUJI_0022568 (Butterfly Website – What's New Android);
> BFLY_FUJI_0022835 (Butterfly iQ/iQ+ User Manual – Revision AY);
> BFLY_FUJI_0022930 (Butterfly iQ Vet/iQ+ Vet User Manual – Revision K); BFLY_FUJI_0023339 (Butterfly iQ+ Vet Press Release); BFLY_FUJI_0023352 (Butterfly iQ+ Press Release); Butterfly's source code.

Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**INTERROGATORY NO. 9:**

To the extent, if any, the operation of any algorithms, routines, methods, functions, or structures for identifying an interventional instrument using ultrasound data for the current version

15

of any software identified in Interrogatory No. 7 differs in any material respect from previous versions, identify each materially different version and the differences between each respective version.

**RESPONSE TO INTERROGATORY NO. 9:**

Butterfly objects to this Interrogatory as compound because it contains multiple discrete subparts. Butterfly objects to this Interrogatory to the extent it seeks Privileged Information. No Privileged Information will be produced or disclosed. Butterfly objects to this Interrogatory to the extent it seeks information and/or documents that are subject to confidentiality obligations or agreements with non-parties or that are not in Butterfly's possession, custody, or control. Butterfly objects to this Interrogatory as being overbroad, unduly burdensome, and not proportional to the needs of the case to the extent it is not limited to a relevant time period. Butterfly objects to this Interrogatory as being overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case to the extent it seeks the identification of "each materially different version and the differences between each respective version." Butterfly objects to this Interrogatory as being vague, ambiguous, overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case by using the terms "operation"; "any algorithms, routines, methods, functions, or structures for identifying an interventional instrument"; "any material respect"; "materially different"; and "the differences between each respective version." Butterfly further objects to this Interrogatory as being overbroad, unduly burdensome, not relevant to any party's claims or defenses, and not proportional to the needs of the case to the extent it seeks information about products, systems, or features not accused or otherwise at issue in this case. Butterfly further objects to this Interrogatory as premature to the extent it calls for the disclosure of expert testimony and opinions and/or seeks a legal conclusion. Butterfly will disclose any legal and expert opinions, and the bases for such opinions, in accordance with the deadlines set forth in the Scheduling Order.

16

Subject to and without waiving the foregoing general and specific objections, Butterfly responds as follows: Butterfly will identify documents, pursuant to Rule 33(d), from which Fuji may ascertain relevant information responsive to this Interrogatory, including documents sufficient to show any previous versions of the accused features of the Needle Viz tool identified in Exhibit L of the First Amended Complaint that may be different in some respect material to the asserted claims of U.S. Patent No. 8,861,822. Butterfly continues to investigate the information sought by this Interrogatory and reserves the right to supplement its response, as appropriate, including in accordance with the Federal Rules of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

**BUTTERFLY'S FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9 (March 3, 2023):**

Subject to and without waiving the foregoing general and specific objections, and in addition to the information provided in Butterfly's previous Response to this Interrogatory, Butterfly further responds as follows:

Butterfly understands the cross reference in Interrogatory No. 9 ("software identified in Interrogatory No. 7") should be to Interrogatory No. 8, not Interrogatory No. 7.

Butterfly incorporates by reference its Responses to Interrogatory No. 8.

All commercially available versions of the Butterfly iQ Application have been available for inspection since November 23, 2022. *See* Butterfly's Initial Non-Infringement Contentions (Nov. 23, 2022) at 6 ("Butterfly's source code for the accused features of the Accused Products is available for inspection pursuant to the terms of the Protective Order (D.I. 30)").

Pursuant to Rule 33(d), Butterfly also identifies the following documents that may contain information responsive to this Interrogatory:

> BFLY_FUJI_0000356 (Software Design Specification – Version 8);
> BFLY_FUJI_0000432 (Butterfly iQ/iQ+ User Manual – Revision AJ);

17

BFLY_FUJI_0022548 (Butterfly Website – Using the Needle Viz Tool);
BFLY_FUJI_0022561 (Butterfly Website – What's New iOS);
BFLY_FUJI_0022568 (Butterfly Website – What's New Android);
BFLY_FUJI_0022835 (Butterfly iQ/iQ+ User Manual – Revision AY);
BFLY_FUJI_0022930 (Butterfly iQ Vet/iQ+ Vet User Manual – Revision
K); BFLY_FUJI_0023339 (Butterfly iQ+ Vet Press Release);
BFLY_FUJI_0023352 (Butterfly iQ+ Press Release); Butterfly's source
code.

Butterfly continues to investigate the information sought by this Interrogatory and reserves

the right to supplement its response, as appropriate, including in accordance with the Federal Rules

of Civil Procedure, Local Rules of the District of Delaware, and Scheduling Order.

18

Dated: March 3, 2023                                    Respectfully submitted,


Steven D. Maslowski                                    **FARNAN LLP**

Jason Weil

**AKIN GUMP STRAUSS HAUER & FELD LLP**    */s/ Brian E. Farnan*

1735 Market Street, 12th Floor                         Brian E. Farnan (Bar No. 4089)

Philadelphia, PA 19103                                 Michael J. Farnan (Bar No. 5165)

Tel.: (215) 965-1200                                   919 N. Market St., 12th Floor

smaslowski@akingump.com                                Wilmington, DE 19801

jweil@akingump.com                                     Tel: (302) 777-0300

                                                       Fax: (302) 777-0301

Paul D. Tripodi II                                     bfarnan@farnanlaw.com

Clark Gordon                                           mfarnan@farnanlaw.com

**AKIN GUMP STRAUSS HAUER & FELD LLP**

4 Park Plaza, Suite 1900                               *Counsel for Defendant*

Irvine, CA 92614                                       *Butterfly Network, Inc.*

Tel: (949) 885-4100

ptripodi@akingump.com

cgordon@akingump.com


C. Brandon Rash

**AKIN GUMP STRAUSS HAUER & FELD LLP**

2001 K Street, N.W.

Washington, D.C. 20006

Tel: (202) 887-4000

brandon.rash@akingump.com


Brooks J. Kenyon

Megan R. Mahoney

**AKIN GUMP STRAUSS HAUER & FELD LLP**

One Bryant Park

Bank of America Tower

New York, NY 10036

Tel: (212) 872-1000

bkenyon@akingump.com

mmahoney@akingump.com


19

<u>CERTIFICATE OF SERVICE</u>

I, Brian E. Farnan, hereby certify that on March 3, 2023, a copy of Butterfly's First

Supplemental Objections and Responses to Fujifilm's Interrogatory Nos. 3-5 and 7-9 was served

on the following via e-mail:

| | |
|---|---|
| Jeremy A. Tigan | Robert L. Maier |
| Morris, Nichols, Arsht & Tunnell LLP | Jennifer C. Tempesta |
| 1201 North Market Street | Margaret M. Welsh |
| P.O. Box 1347 | Pallavi Mathur |
| Wilmington, DE 19899 | Eric J. Faragi |
| jtigan@morrisnichols.com | BAKER BOTTS L.L.P. |
| | DLBBFFSSvButterfly@BakerBotts.com |
| *Attorneys for Plaintiff FUJIFILM Sonosite, Inc.* | |
| | *Attorneys for Plaintiff FUJIFILM Sonosite, Inc.* |

/s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)

# EXHIBIT 6

Trials@uspto.gov
571-272-7822

Paper 8
Date: April 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

―――――――――――――

BEFORE THE PATENT TRIAL AND APPEAL BOARD

―――――――――――――

BUTTERFLY NETWORK, INC.,
PETITIONER,

V.

FUJIFILM SONOSITE, INC.,
PATENT OWNER.

―――――――――――――

IPR2022-01577
Patent 6,901,157 B2

―――――――――――――

Before WILLIAM V. SAINDON, BARBARA A. BENOIT, and
FRANCES L. IPPOLITO, *Administrative Patent Judges*.

SAINDON, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2022-01577
Patent 6,901,157 B2

# I.  INTRODUCTION

## A.  *Background and Summary*

Butterfly Network, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–4 and 6–10 ("the challenged claims") of U.S. Patent 6,901,157 B2 (Ex. 1001, "the '157 patent"). FUJIFILM Sonosite, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.")

We have authority to determine whether to institute an *inter partes* review under 35 U.S.C. § 314(b) and 37 C.F.R. § 42.4(a) (2020).  The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted unless "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."

For the reasons provided below, we determine Petitioner has satisfied the threshold requirement set forth in 35 U.S.C. § 314(a).  Because Petitioner has demonstrated a reasonable likelihood that at least one claim of the '157 patent is unpatentable, we institute an *inter partes* review of all challenged claims based on all grounds raised in the Petition.  37 C.F.R. § 42.08(a).

Our findings of fact, conclusions of law, and reasoning discussed below are based on the evidentiary record developed thus far, and made for the sole purpose of determining whether the Petition meets the threshold for initiating review.  This decision to institute trial is not a final decision as to the patentability of any challenged claim or the construction of any claim limitation.  Any final decision will be based on the full record developed during trial.

2

IPR2022-01577
Patent 6,901,157 B2

### B.  Real Parties in Interest

Petitioner asserts that Butterfly Network, Inc. and BFLY Operations, Inc. are real parties in interest.  Paper 6, 1 (Petitioner's Updated Mandatory Notices).  Patent Owner asserts that it is its sole real party in interest.  Paper 3, 2 (Patent Owner's Mandatory Notices).

### C.  Related Matters

Patent Owner states that it has asserted the '157 patent against Petitioner in the Federal District Court of Delaware in *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, 1:22-cv-00309-JPM.  Paper 3, 2; *accord* Pet. 2.

### D.  Prior Art and Asserted Grounds

Petitioner's grounds rely on the following prior art references:

| Name | Reference | Exhibit(s) |
|---|---|---|
| Short | US Pat. 5,161,535, iss. Nov. 10, 1992 | 1006 |
| Kinicki | US Pat. 5,315,999, iss. May 31, 1994 | 1005 |
| Jackson | US Pat. 5,997,478, iss. Dec. 7, 1999 | 1004 |
| Clark | US Pat. 6,174,285 B1, iss. Jan. 16, 2001 | 1007 |
| HDI 3000 Manual | HDI 3000 Ultrasound System:  Getting Started (ATL Ultrasound, 1998) | 1003 |

Petitioner asserts that claims 1–4 and 6–10 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–4, 6–10 | 102 | HDI 3000 Manual |
| 1–4, 6–10 | 103 | HDI 3000 Manual, Jackson |

---

[1] The '157 patent was filed on January 4, 2002.  Ex. 1001, code (22).  We apply the versions of 35 U.S.C. §§ 102 and 103 that were in force before they were amended by the Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011).

3

IPR2022-01577
Patent 6,901,157 B2

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1–3, 6–9 | 102 | Kinicki |
| 1–3, 6–9 | 103 | Kinicki, Short |
| 4, 10 | 103 | Kinicki, Clark |
| 4, 10 | 103 | Kinicki, Short, Clark |

### E.   Overview of the '157 Patent

The '157 patent states that ultrasound image quality depends on a number of different conditions and settings such as frequency, bandwidth, power, etc.  Ex. 1001, 1:14–20.  Different settings are more appropriate for different body parts.  *Id.* at 1:22–23.  The '157 patents states that the problem is that each of the various parameters must be manually entered and adjusted each time, which is laborious.  *Id.* at 1:24–33.  The '157 patent states that prior art systems seek to overcome this problem by storing preset parameters based on the body part to be inspected.  *Id.* at 1:46–58.  The '157 patent, in turn, discloses that it operates by providing the user with an opportunity to recall preset parameters based on the body part to be inspected.  *Id.* at 2:49–59.

### F.   Challenged Claims

Claim 1 is reproduced below.

> 1.  An ultrasonic diagnostic apparatus comprising:
>
> an   ultrasonic   transmitting   and   receiving   unit   for transmitting ultrasonic waves to an object to be inspected and receiving echo waves reflected from the object;
>
> an image processing unit for executing image processing of image data, which is obtained on the basis of the echo waves received by said ultrasonic transmitting and receiving unit, by using image processing condition parameters,

IPR2022-01577
Patent 6,901,157 B2

an information input unit to be employed for inputting information of object concerned with the object to be inspected;

a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object;

a control unit for reading out the image processing condition parameters, which correspond to the information of object input by employing the information input unit, from said parameter memory unit so as to supply the read-out parameters to the image processing unit; and

a display unit for displaying an image on the basis of the image data subjected to the image processing in the image processing unit.

## II.  ANALYSIS

### A.  *Legal Standards Used in the Merits Analysis*

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."  *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

To establish anticipation, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim.  *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such

5

IPR2022-01577
Patent 6,901,157 B2

that the subject matter as a whole would have been obvious . . . to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

### B.  Level of Ordinary Skill in the Art

Petitioner asserts that a person of ordinary skill in the art:

> would have a degree in electrical engineering, biomedical engineering, or a related discipline, along with relevant experience (at least 2–3 years for a Ph.D., 3–5 years for a Master's, and 5+ years for a Bachelor's) researching or developing ultrasound systems or other medical imaging devices. EX1008, ¶¶21–26. The POSA would have general knowledge of ultrasound systems and related technologies as of January 15, 2001. *Id.*

Pet. 7–8.

Patent Owner applies Petitioner's definition for purposes of its Preliminary Response. Prelim. Resp. 5.

We adopt the parties' accepted definition for purposes of this Decision.

### C.  Claim Construction

Petitioner does not offer any claim constructions at this time. Pet. 8. Patent Owner asserts that "information of object," recited in independent claims 1 and 6, should be construed as "information that represents one body part to be scanned, such as a particular organ." Prelim. Resp. 6–8. Patent

6

IPR2022-01577
Patent 6,901,157 B2

Owner asserts that its construction is "consistent with the specification." *Id.* at 6.

We apply the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), following the standard articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc). 37 C.F.R. § 42.100(b). Under *Phillips*, claim terms are afforded "their ordinary and customary meaning." *Phillips*, 415 F.3d at 1312. "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. "[T]he specification is always highly relevant to the claim construction analysis . . . . [I]t is the single best guide to the meaning of a disputed term." *Id.* at 1315 (internal quotation omitted). "[T]he specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description." *Id.* (internal quotation omitted). But one must not take this too far. Our reviewing court "has repeatedly 'cautioned against limiting the claimed invention to preferred embodiments or specific examples in the specification.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1346–47 (Fed. Cir. 2015) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1328 (Fed. Cir. 2002)). Significantly, "it is the claims, not the written description, which define the scope of the patent right." *Id.* at 1346 (alterations and emphasis removed) (quoting *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998)).

In this case, Patent Owner's assertion that its proposed construction is "consistent with the specification" fails to articulate or apply the proper standard. For example, any interpretation whose scope is equal to or

7

IPR2022-01577
Patent 6,901,157 B2

narrower than a proper construction would logically be *consistent with* that proper construction. Thus, Patent Owner could only establish that its proposed interpretation is equal to or narrower in scope than the proper interpretation. Comparing the claims to prior art using a claim construction potentially narrower than what is claimed would not be a fruitful exercise because the claim could read on the prior art but not on the unduly narrow interpretation. *Cf. Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) (holding that a broad claim is anticipated by any narrow disclosure falling within the broad claim).

Patent Owner's assertion that its proposed construction is consistent with examples in the specification is also not persuasive, and no more persuasive than its prior implication that its proposed construction is not inconsistent with the specification. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843–44 (Fed. Cir. 2010) ("[A] claim is not limited to the embodiments described in the specification unless the patentee has demonstrated a clear intention to limit the claim's scope with words or expressions of manifest exclusion or restriction." (internal quotation omitted)). Similar to the situation in *i4i*, Patent Owner here has failed to explain how the claim is clearly limited to the examples in the specification.

Instead, we construe "information of object" to be an identification of the object to be studied in the ultrasound examination, based on its plain language in the context of the claimed ultrasound device. We are not apprised of any language, on this record, in the '157 patent or prosecution history that otherwise constrains what types of "object" would be inspected by the claimed device. For example, there is no indication that the machine is less capable than other ultrasound machines in a way that limits its use to

8

IPR2022-01577
Patent 6,901,157 B2

examinations of certain things in a body such as a liver or a heart, but not simpler things in a body such as blood vessels or more complex things such as a fetus. Accordingly, we see no reason to constrain "object" to something other than those things in a body that a person of ordinary skill in the art would investigate during an ultrasound examination.

It does not appear necessary at this time to specifically construe any other claim terms. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### D. Asserted Anticipation in View of the HDI 3000 Manual

Petitioner asserts that claims 1–4 and 6–10 are anticipated by the HDI 3000 Manual (or, "Manual"). Pet. 16–47. We focus our analysis on claim 1, which requires an ultrasound machine that inputs "information of object" to be inspected by the machine to look up parameters in a memory storage corresponding to the chosen object.

Petitioner explains that the HDI 3000 Manual discloses an ultrasound system that utilized a variety of parameters (e.g., gain, focus, output) to create a digital image. *Id.* at 12. According to Petitioner, the Manual describes several tissue specific presets to optimize those parameters to reduce the need for user control adjustments. *Id.*

Turning to the claim language, Petitioner asserts that the "information of object" is shown in the HDI 3000 Manual where the machine asks for the user to input the clinical option or specific tissue being investigated, listing options for investigations of various body parts: renal, aorta, thyroid,

9

IPR2022-01577
Patent 6,901,157 B2

testicle, and breast. *Id.* at 20–22 (citing, e.g., Ex. 1003, Fig. 2–7, 195).

Patent Owner challenges this assertion by arguing that "these are categories

based on the FDA Guidelines that listed these categories as other than

cardiac or peripheral vascular." Prelim. Resp. 26. This argument is

unavailing in view of the disclosure of a list of parts of the body to be

selected when using the machine. Patent Owner also argues that Petitioner's

position here is "inconsistent and attempts to use the same feature of the

HDI 3000 for multiple, distinct claim elements," but we fail to see on this

record the deficiency in Petitioner's position. *Id.* at 25; *see id.* at 24–27.

More specifically, for example, we do not see inconsistency in Petitioner

mapping the HDI 3000 Manual's tissue-specific presets to elements recited

in independent claim 1 and independent claim 6.

Petitioner next asserts that the HDI 3000 Manual discloses a memory

storage to provide image processing parameters to be used by the imaging

device. Pet. 22–25; *see also id.* at 25–27 (similar). In particular, Petitioner

notes the HDI 3000 Manual provides "tissue specific presets . . . set up . . .

for specific tissue imaging and . . . intended to reduce the need for control

adjustments." *Id.* at 22 (quoting Ex. 1003, 33); *see also* Ex. 1003, 27, 195

("Setups are system parameters."). Patent Owner argues that the HDI 3000

Manual does not disclose what parameters are included in the presets.

Prelim. Resp. 28–32. But the HDI 3000 Manual explicitly says

"parameters." *See, e.g.*, Ex. 1003, 27. We see no basis on this record to

require more; the '157 patent provides generic example parameters of "A, B

and C" or possibly "X, Y and Z." Ex. 1001, 7:41–46.

10

IPR2022-01577
Patent 6,901,157 B2

Reviewing the Petition, Preliminary Response, and the evidence cited therein, we determine that Petitioner has sufficiently shown how the HDI 3000 Manual shows each limitation of claim 1.

Patent Owner also argues that the HDI 3000 Manual is not prior art, Prelim. Resp. 15–24, but Petitioner's showing is sufficient for purposes of institution under our precedent, for the reasons that follow. In *Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-01039, Paper 29 at 13 (PTAB Dec. 20, 2019) (precedential), the Board determined that, at the institution determination stage, a petitioner must establish a reasonable likelihood that a reference is a printed publication. A document is a printed publication if, for example, it "has been disseminated." *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1194 (Fed. Cir. 2008). Petitioner offers two declarants testifying to personal knowledge of the HDI 3000 Manual's actual dissemination prior to the relevant date. Pet. 11–12; Ex. 1010 (declaration of Dr. Flemming Forsberg, user of the HDI 3000 system); Ex. 1011 (declaration of David Rust, an engineer who worked on the HDI 3000 system and was involved in preparation and dissemination of documentation).

We have reviewed Patent Owner's arguments but do not find them persuasive at this stage of the proceeding on the present standard of review. Patent Owner's contention that Petitioner did not provide enough detail in its Petition (Prelim. Resp. 16–17) falls flat because the cited evidence is so short and clearly on point that there is little further explanation that would provide additional value. Patent Owner's arguments that the Manual was not publicly accessible appear to hinge on a statement in the Manual that the customer "shall keep confidential all proprietary information" provided to

11

IPR2022-01577
Patent 6,901,157 B2

the customer and that "[a]ll rights [are] reserved," as noted beneath the copyright information. *Id.* at 18 (quoting Ex. 1003, 6, 153, 577). Patent Owner fails to explain how this prevents public disclosure of the *document*. The language cited does not require the document to be kept confidential. Patent Owner lastly argues that provision of the Manual does not explain "how a member of the public interested in the subject and of ordinary skill . . . could have located and obtained a copy of the HDI 3000 manual." *Id.* at 19. But this reads too narrowly the standard of "printed publication," which *can* be satisfied by search accessibility, but the standard is not so limited. *SRI*, 511 F.3d at 1194. Here, Petitioner has offered evidence of actual dissemination, and Patent Owner offers no credible arguments against that. On this record, we determine that Petitioner has established a reasonable likelihood that the HDI 3000 Manual is a printed publication.

Reviewing the Petition, Preliminary Response, and the evidence cited therein, we determine that Petitioner has established a reasonable likelihood that claim 1 is anticipated by the HDI 3000 Manual. We determine that Petitioner has met the standard to institute *inter partes* review. Notwithstanding, we provide additional comments as to some of the remaining challenges.

E.  *Asserted Obviousness in View of the HDI 3000 Manual and Jackson*

In this alternative ground, Petitioner asserts that claims 1–4 and 6–10 would have been obvious in view of the HDI 3000 Manual and Jackson. Pet. 47–52. Petitioner offers Jackson to provide further details as to storing specific parameters. *See id.* For example, Jackson describes an improvement to prior art systems that simply "use pre-stored parameter-setting packages based on an intended clinical application." Ex. 1004, 1:39–

12

IPR2022-01577
Patent 6,901,157 B2

44.   Jackson notes that some parameters cannot be specifically stored easily because parameters like "gain" vary throughout an ultrasound procedure, or the imaging environment may be different.  *Id.* at 1:44–49, 4:64–66. Jackson purports to solve this problem using a method to reduce variability in the parameters.  *Id.* at 2:10–25.

Petitioner points out that Jackson stores many different parameters, and asserts that a person of ordinary skill in the art would have had a reason to incorporate Jackson's parameter storage as part of the HDI 3000 Manual's presets, and identifies several specific parameters to store.  Pet. 49–52. Petitioner asserts that parameters, such as postprocessing parameters, "were well known to be useful in achieving an optimal level of detail."  *Id.* at 51.

Patent Owner argues that Jackson does not identify "information of object," Prelim. Resp. 32, but we determined above that the Manual already disclosed this limitation.

### F.   Asserted Anticipation by Kinicki

In this ground, Petitioner asserts that claims 1–3 and 6–10 are anticipated by Kinicki.  Pet. 53–70.  Kinicki recognizes that "[d]ifferent organs and regions of the human body may require very different imaging parameters due to the different depths, sizes and tissue types of the structures being imaged."  Ex. 1005, 1:28–31.  Kinicki notes that this problem is, in general, solved by "providing predetermined operating modes," but seeks to improve on this by including more parameters.  *Id.* at 1:51–53, 3:25–41. Petitioner specifically identifies how Kinicki allows selection of body parts such as "cardiac, vascular and obstetric exam types."  Pet. 57 (citing Ex. 1005, 5:38–41).

13

IPR2022-01577
Patent 6,901,157 B2

Patent Owner argues that "Kinicki clearly does not disclose 'inputting information that represents one body part to be scanned,'" Prelim. Resp. 34 (emphasis omitted), but we fail to see how, e.g., "cardiac" would not represent a body part (i.e., the heart). In any event, Patent Owner's argument is premised on a claim construction that appears unduly narrow and unsupported by the '157 patent on this record (as we discussed in the claim construction section above).

### G. Asserted Obviousness Over Kinicki and Short or Clark

In these grounds, Petitioner asserts that claims 1–3 and 6–9 would have been obvious in view of Kinicki and Short (Pet. 71–82), and that claims 4 and 10 would have been obvious in view of Kinicki and Clark (*id.* at 82–88) or in view of Kinicki, Short, and Clark (*id.*). Petitioner asserts that Short (whose disclosure Petitioner asserts is related, and similar, to Kinicki) provides additional details on storing and using image processing condition parameters as part of a preset. *Id.* at 71–82. Petitioner asserts that Clark teaches the limitations requiring the ultrasound machine to be three-dimensional. *Id.* at 82–88. Patent Owner does not separately argue Short or Clark at this time. Prelim. Resp. 35.

### III. CONCLUSION

As explained above, we find that Petitioner has established a reasonable likelihood of success in showing that claim 1 is unpatentable over the HDI 3000 Manual. We institute an *inter partes* review of all challenged claims on all asserted grounds. 37 C.F.R. § 42.108(a); *see SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018).

14

IPR2022-01577
Patent 6,901,157 B2

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that an *inter partes* review of claims 1–4 and 6–10 of the '157 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '157 patent is hereby instituted commencing on the entry date of this Decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

IPR2022-01577
Patent 6,901,157 B2

FOR PETITIONER:

Charles Rash
Ruben Munoz
AKIN GUMP STRAUSS HAUER & FELD LLP
brandon.rash@akingump.com
rmunoz@akingump.com


FOR PATENT OWNER:

Eliot Williams
Robert Maier
Jennifer Tempesta
Derek Langdon
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
robert.maier@bakerbotts.com
jennifer.tempesta@bakerbotts.com
derek.langdon@bakerbotts.com

16

# EXHIBIT 7

Trials@uspto.gov
571-272-7822

Paper 8
Date: April 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BUTTERFLY NETWORK, INC.,
Petitioner,

v.

FUJIFILM SONOSITE, INC.,
Patent Owner.

_____

IPR2022-01576
Patent 9,538,985 B2

_____

Before WILLIAM V. SAINDON, BARBARA A. BENOIT, and
FRANCES L. IPPOLITO, *Administrative Patent Judges*.

SAINDON, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2022-01576
Patent 9,538,985 B2

## I.    INTRODUCTION

### A.    *Background and Summary*

Butterfly Network, Inc. ("Petitioner") filed a Petition (Paper 1, "Pet.") requesting *inter partes* review of claims 1–3 ("the challenged claims") of U.S. Patent 9,538,985 B2 (Ex. 1001, "the '985 patent").  FUJIFILM Sonosite, Inc. ("Patent Owner") filed a Preliminary Response (Paper 7, "Prelim. Resp.").

We have authority to determine whether to institute an *inter partes* review under 35 U.S.C. § 314(b) and 37 C.F.R. § 42.4(a) (2020).  The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides that an *inter partes* review may not be instituted unless "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."

For the reasons provided below, we determine Petitioner has satisfied the threshold requirement set forth in 35 U.S.C. § 314(a).  Because Petitioner has demonstrated a reasonable likelihood that at least one claim of the '985 patent is unpatentable, we institute an *inter partes* review of all challenged claims based on all grounds raised in the Petition.  37 C.F.R. § 42.08(a).

Our findings of fact, conclusions of law, and reasoning discussed below are based on the evidentiary record developed thus far, and made for the sole purpose of determining whether the Petition meets the threshold for initiating review.  This decision to institute trial is not a final decision as to the patentability of any challenged claim or the construction of any claim limitation.  Any final decision will be based on the full record developed during trial.

IPR2022-01576
Patent 9,538,985 B2

### B.  Real Parties in Interest

Petitioner asserts that Butterfly Network, Inc. and BFLY Operations, Inc. are real parties in interest.  Paper 6, 1 (Petitioner's Updated Mandatory Notices).  Patent Owner asserts that it is its sole real party in interest.  Paper 3, 2 (Patent Owner's Mandatory Notices).

### C.  Related Matters

Patent Owner states that it has asserted the '985 patent against Petitioner in the Federal District Court of Delaware in *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, 1:22-cv-00309-JPM.  Paper 3, 2; *accord* Pet. 2.

### D.  Prior Art and Asserted Grounds

Petitioner's grounds rely on the following prior art references:

| Name | Reference | Exhibit(s) |
|---|---|---|
| Grunwald | US PG Pub. 2006/0116578 A1, pub. June 1, 2006 | 1004 |
| Pelissier | US PG Pub. 2009/0198132 A1, pub. Aug. 6, 2009 | 1005 |
| Hyun | US PG Pub. 2010/0145195 A1, pub. June 10, 2010 | 1006 |
| Petruzzelli | US PG Pub. 2013/0324850 A1, pub. Dec. 5, 2013 | 1003 |

Petitioner asserts that claims 1–3 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1 | 102 | Petruzzelli |

---

[1]  The '985 patent was filed on April 18, 2014.  Ex. 1001, code (22).  We apply the versions of 35 U.S.C. §§ 102 and 103 that were in force after they

3

IPR2022-01576
Patent 9,538,985 B2

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1 | 103 | Petruzzelli |
| 1 | 103 | Petruzzelli, Pelissier |
| 1–3 | 102 | Grunwald |
| 1–3 | 103 | Grunwald |
| 1–3 | 103 | Grunwald, Hyun |

### E. Overview of the '985 Patent

The '985 patent is related to a portable ultrasound device having a compact form factor and a user interface that facilitates hand-held operation. Ex. 1001, 1:9–12. Figure 1B of the '985 patent is reproduced below:



**Fig. 1B**

Figure 1B depicts a user carrying the portable ultrasound device, with transducer wand 102 in the user's right hand and base unit 110 held in the user's left hand. *Id.* at 2:57–3:2.

---

were amended by the Leahy-Smith America Invents Act, Pub. L. No. 112–29, 125 Stat. 284 (2011).

IPR2022-01576
Patent 9,538,985 B2

The '985 patent describes how a user will slide a finger on the touchscreen of base unit 110 to expand/contract control areas. *Id.* at 3:65–4:2. One control area can present various graphical tools, e.g., markers, labels, calipers, etc., that a user can position or overlay onto the active image area. *Id.* at 4:2–5. Once a graphical tool is selected, another control area shows further controls, such as a thumbwheel for selecting a labeling icon. *Id.* at 4:27–41. The icon can then be dragged with their finger onto the active image area. *Id.* at 5:16–20. Figure 3C of the '985 patent depicts this operation, and is reproduced below:



Fig. 3C

Figure 3C depicts active image area 352 depicting the ultrasound image. Control area 355c near the bottom edge shows selection of a "PICTO" tool. Control area 355a shows thumbwheel 357 having selected a torso icon, and then a finger is depicted as dragging the icon onto active image area 352.

### F. Challenged Claims

Claim 1 of the '985 patent is reproduced below.

> 1. A portable ultrasound system, comprising a hand-held base unit that includes:

5

IPR2022-01576
Patent 9,538,985 B2

a touchscreen display; and:

a programmable processor configured to execute instructions that cause the processor to produce a display on the touchscreen display, including—

a first control area having a number of graphical tools that can each be selectively activated by a user,

a second control area that is accessible by a hand of the user that is holding the portable ultrasound system, wherein the second control area includes a plurality of controls that can be selectively activated by a thumb of the user to select an attribute of a selected graphical tool, and

an active image area in which an image of a patient obtained from an ultrasound scan is displayed and at which the selected one of the graphical tools can be overlaid onto the image with the user-selected tool attribute.

## II.  ANALYSIS

### A.  Legal Standards Used in the Merits Analysis

"In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in *inter partes* review).

To establish anticipation, every element and limitation of the claimed invention must be found in a single prior art reference, arranged as in the claim. *Karsten Mfg. Corp. v. Cleveland Golf Co.*, 242 F.3d 1376, 1383 (Fed. Cir. 2001).

6

IPR2022-01576
Patent 9,538,985 B2

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious . . . to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) when in evidence, objective evidence of nonobviousness, i.e., secondary considerations. *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

### B. Level of Ordinary Skill in the Art

Petitioner asserts that a person of ordinary skill in the art:

> would have a degree in electrical engineering, computer science, or a related discipline, along with relevant experience (at least 1–2 years for a Ph.D., 2–3 years for a Master's, and 3+ years for a Bachelor's) researching or developing graphical user interfaces (GUIs) for ultrasound systems or other medical imaging devices. EX1007, ¶¶14–19. The person would have general knowledge of GUIs for ultrasound systems or other medical imaging devices as of April 18, 2014. *Id.*

Pet. 14–15.

Patent Owner applies Petitioner's definition for purposes of its Preliminary Response. Prelim. Resp. 10.

We adopt the parties' accepted definition for purposes of this Decision. We note that the '985 patent and the prior art give little to no explanation for how to implement the user interfaces or how to go about the various modifications described therein. Accordingly, the present record establishes that modification and creation of graphical user interfaces is

7

IPR2022-01576
Patent 9,538,985 B2

relatively straightforward and predictable in this art. *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) ("a patent need not teach, and preferably omits, what is well known in the art") (citing *Lindemann Maschinenfabrik GMBH v. Am. Hoist & Derrick*, 730 F.2d 1452, 1463 (Fed. Cir. 1984)).

### C. Claim Construction

Petitioner asserts that no claim terms require construction at this stage. Pet. 15. Patent Owner does not offer any claim constructions, but does challenge Petitioner's choice not to offer any claim constructions, and suggests that we should deny the Petition on that basis. Prelim. Resp. 75–77. We find Patent Owner's arguments unavailing. First, we note that the parties have not offered competing claim constructions, such that there is no specific claim construction issue between the parties at this time. Second, we note that we consider Petitioner's interpretation of the claims sufficiently clear based on their application of the claims on the art. Thus, we are able to proceed without explicitly construing any claim terms, and we are not persuaded to deny on that basis.

In view of the above, we do not construe any claim terms. *Realtime Data, LLC v. Iancu*, 912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe 'only those terms . . . that are in controversy, and only to the extent necessary to resolve the controversy.'") (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### D. Asserted Anticipation or Obviousness over Petruzzelli

Petitioner asserts that Petruzzelli's hand-held touchscreen MRI display system anticipates or renders obvious claim 1. Pet. 31–53. At a high level, claim 1 requires (1) a hand-held touchscreen display, (2) a first control

8

IPR2022-01576
Patent 9,538,985 B2

area having graphical tools, (3) a second control area accessible by the thumb of the hand holding the display, to select an attribute of the graphical tool, and (4) an active image area. Petitioner walks through each of these limitations in its ground.

### 1. Hand-Held Touchscreen Display

Petitioner points out that Petruzzelli describes itself as using "an iPad or other suitable tablet computing device" that "incorporat[es] a touch screen." Pet 31 (quoting Ex. 1003 ¶ 27). Figure 2 of Petruzzelli, reproduced below, shows an example of what can be displayed:



Figure 2

Figure 2 of Petruzzelli shows an exemplary interface for an ultrasound imaging system, with a variety of menus, submenus, and an active image display area. Ex. 1003 ¶¶ 50–56.

Patent Owner argues that Petruzzelli is not "hand-held," despite acknowledging that it is an iPad or similar tablet computing device, on a

9

IPR2022-01576
Patent 9,538,985 B2

theory that Petruzzelli does not "sugges[t] . . . the manner in which the iPad or tablet is to be utilized." Prelim. Resp. 15. Patent Owner suggests instead that the iPad or tablet "should instead be mounted or fixed stably on a structure." *Id.* at 18.

Patent Owner's argument is unavailing. Claim 1 is directed to a hand-held device; not a method of holding a device by a hand. *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed. Cir. 1990) ("apparatus claims cover what a device *is*"). iPads and tablets are plainly hand-held devices, and Patent Owner offers no support for its speculative assertion that Petruzzelli's iPad or tablet is mounted in a fixed structure.

### 2. *A First Control Area Having Graphical Tools*

Petitioner asserts that the bottom-left area of the tablet in Petruzzelli has a menu 122 (depicted in Figure 2, reproduced earlier) to select different graphical tools. Pet. 34–41. In particular, Petitioner asserts that a graphical tool is something positionable or overlaid on the ultrasound image and useful to "identify, label, measure, or otherwise help a user evaluate an ultrasound image." *Id.* at 35 (quoting Ex. 1001, 4:2–19). Petitioner directs our attention to one such graphical tool in Figure 2 of Petruzzelli, which depicts an "Annotate" tool used to add labels. *Id.* at 36–38. Petitioner also points out the "Measure" tool to measure areas of interest. *Id.* at 38–41.

Patent Owner does not offer arguments as to this limitation at this time.

10

IPR2022-01576
Patent 9,538,985 B2

### 3. *A Second Control Area, Accessible by the Thumb of the Hand Holding the Display, to Select an Attribute of the Graphical Tool*

Petitioner asserts that the second control area in Petruzzelli is the sub-menu that appears when the user selects a graphical tool in menu 122 (depicted in Figure 2, reproduced earlier). Pet. 42–47. In particular, Petitioner asserts that the location of the sub-menu, along the edge of the tablet, permits it to be accessible by a thumb holding the device. *Id.* at 43–44. Petitioner also asserts that, e.g., Petruzzelli's Figure 7 (reproduced below) depicts the user's thumb in a position where it could press a button on the device while using the measuring graphical tool.



Figure 7

Figure 7 of Petruzzelli depicts an interface for defining a region of interest by touching area 104 with two points of contact (depicted as finger and thumb). Ex. 1003 ¶ 64.

Petitioner also asserts, in the alternative, that it would have been obvious to "size the tablet and arrange sub-level function menus" to be

11

IPR2022-01576
Patent 9,538,985 B2

operable by a thumb of a hand holding the tablet. Pet. 47–48. Petitioner asserts that graphical user interfaces were known to be predictable to change, easy to modify, and flexible in design. *Id.* at 48–51.

Similar to its earlier argument, Patent Owner asserts that Petruzzelli does not actually describe the control areas being accessed by a thumb in the manner claimed. Prelim. Resp. 19–31. As before, however, we note that the claim is an apparatus claim; Petruzzelli must disclose a device meeting all limitations but need not disclose the device being used in any particular way.[2] Further, Patent Owner's argument appears to presume the claim requires that each button of each sub-menu must be accessible by a thumb, or only a thumb. This is not the case, as the claim only requires a plurality of buttons need to be accessible by the thumb. Similarly, nothing in the claim language prevents some controls being used by a different or more than one finger. The '985 patent in several places describes use of another finger to operate the device. *See, e.g.*, Ex. 1001, 5:16–20 (describing simultaneous use of a thumb and finger to drag a pictograph), 5:54–58 (similar), 6:30–38 (describing use of index finger).

Given the iPad/tablet form factor, we again determine on this preliminary record that Petitioner has shown sufficiently that more than one button in the sub-menu of Petruzzelli is accessible by a thumb holding the tablet. The columns of buttons in the "Measure" menu in Figure 7, for example, are at the bottom left of a tablet. We acknowledge Patent Owner's

---

[2] To be sure, if Petruzzelli explicitly disclosed one or more buttons on its annotation sub-menu being used by a thumb of the hand holding the tablet (for example), the question at hand would be easier to ascertain. But the absence of a description of such *use of the device* is not dispositive of *what is the device*.

IPR2022-01576
Patent 9,538,985 B2

arguments that take literal measurements of the hand illustrated in Petruzzelli's figures (Prelim. Resp. 25–26), but find them unavailing on this preliminary record because they do not change the form factor of Petruzzelli or otherwise constrain its disclosure.

Petitioner's alternative ground, that it would have been obvious to resize the buttons in the sub-menu to make them reachable by a thumb (to the extent they are not already), is also sufficient on this record. The record at this stage of the proceeding supports a conclusion that it was a known desire in the art to have hand-held devices where the thumb could access a menu of controls. *See, e.g.*, Ex. 1005, Fig. 5B (depicting a thumb manipulating a touch screen); Ex. 1006, Figs. 7–11 (depicting a series of figures of thumb placement and thumb-accessible menus).[3] The record at this stage of the proceeding also supports a conclusion that graphical user interfaces were easily created and modified.[4] Thus, Patent Owner's

---

[3] *See also KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 417 (2007) ("if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill"); *Western Union Co. v. MoneyGram Payment Systems*, 626 F.3d 1361, 1370 (Fed. Cir. 2010) (reviewing precedent and concluding that "applying computer and internet technology to replace older electronics has been commonplace in recent years"); *Leapfrog Enterprises, Inc. v. Fisher Price, Inc.*, 485 F.3d 1157, 1161 (Fed. Cir. 2007) (updating "to modern electronics would have been reasonably obvious to one of ordinary skill").

[4] For example, we are not aware of the references of record, or the '985 patent, going into any detail of how to create or modify the interfaces, despite statements encouraging customization and modification. *See, e.g.*, Ex. 1003 ¶ 49 ("interface 100 layouts, architectures, and functionalities may be arranged and/or configured in any suitable manner"); Ex. 1007 ¶ 101

IPR2022-01576
Patent 9,538,985 B2

assertions to the contrary (Prelim. Resp. 31–36) are unpersuasive at this time.

### 4. *An Active Image Area*

Petitioner notes that the top portion of the tablet in Petruzzelli (visible as the annular arc segment in Figures 2 and 7, previously reproduced) is the active image area. Pet. 51–53. Patent Owner does not challenge this assertion at this time.

### 5. *Conclusion for Petruzzelli*

Having reviewed the Petition, Preliminary Response, and evidence cited therein, we determine that Petitioner has established a reasonable likelihood that claim 1 of the '985 patent is anticipated or obvious in view of Petruzzelli. This showing is sufficient to institute an *inter partes* review on all challenged claims on all asserted grounds. *SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018). Notwithstanding, we provide additional commentary as to some of the remaining grounds.

### E. *Asserted Obviousness in View of Petruzzelli and Pelissier*

In the alternative, Petitioner asserts that claim 1 would have been obvious over Petruzzelli and Pelissier. Pet. 53–62. In particular, Petitioner asserts that it would have been obvious to implement Petruzzelli's user interface on a device that is explicitly shown to be operated by one hand and one thumb, such as shown in Pelissier. *Id.* at 57. Figure 5B of Pelissier is reproduced below:

---

(Petitioner's expert noting the absence of implementation details in the '985 patent).

14

IPR2022-01576
Patent 9,538,985 B2



FIG.5B

Figure 5B of Pelissier shows a "one-handed operation" mode where
"controls are located where they can be reached with the thumb or fingers of
the same hand that the operator is using to grasp [the device]." Ex. 1005
¶ 33.

Accordingly, to the extent Petruzzelli's iPad/tablet interface is not
already one-handed, Petitioner asserts that it would have been obvious to use
Petruzzelli's interface on a hand-held device as shown in Pelissier, for
"convenient left- or right-handed operation." Pet. 59–60 (quoting Ex. 1005,
code (57)).

Patent Owner argues that Pelissier's hand-held device is much smaller
than Petruzzelli's tablet, such that putting all of those features into the small
screen space would not work. Prelim. Resp. 40–43. But there is no need for
Petitioner to import every feature of Petruzzelli's interface into Pelissier. *In
re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not
whether the features of a secondary reference may be bodily incorporated
into the structure of the primary reference"); *In re Nievelt*, 482 F.2d 965, 968
(CCPA 1973) ("Combining the teachings of references does not involve an
ability to combine their specific structures."). Pelissier teaches that the use
of one hand or thumb to interact with a menu while grasping a device is

15

IPR2022-01576
Patent 9,538,985 B2

convenient.  Ex. 1005, code (57).  As above, we see no requirement in the claim that every feature must be usable by the thumb, nor do we see a requirement that Petitioner must explain in any further detail how to bodily incorporate the entirety of Petruzzelli into Pelissier on the facts of this case. Instead, we understand the ground to be proposing to incorporate the relevant features of Petruzzelli (menu/sub-menus for graphical tools and options) into a form factor that permits one-hand, one-finger operation, which is taught in Pelissier.

### F.  Asserted Obviousness or Anticipation by Grunwald

Petitioner asserts that claims 1–3 are anticipated by, or obvious in view of, Grunwald.  Pet. 62–88.  We address each of the major features of claim 1, along with any applicable arguments from Patent Owner.

### 1.  Hand-Held Touchscreen Display

Petitioner asserts that Grunwald uses a touchscreen display on a mobile phone, personal data assistant, or portable computer.  Pet. 63 (citing,

16

IPR2022-01576
Patent 9,538,985 B2

*inter alia*, Ex. 1004 ¶¶ 69, 216).  Figure 20 of Grunwald is reproduced

below.



FIG. 20

Figure 20 of Grunwald depicts a two-handed ultrasound system, where the

right hand holds imaging unit 2004 and the left hand holds a controller with

buttons 2016 and display and control unit 2006.  Ex. 1004 ¶¶ 214–215.  The

screen has touch-sensitive control areas.  *Id.* ¶ 216.

17

IPR2022-01576
Patent 9,538,985 B2

### 2. A First Control Area Having Graphical Tools

Petitioner asserts that the interface in Grunwald has first control area 2306 in the upper-left corner of the display, to allow selection of tools such as imaging tab 2310 and tools tab 2316.  Pet. 65–70.  Figure 23 of Grunwald, reproduced below, depicts this interface.



FIG. 23

Figure 23 of Grunwald depicts the interface to be displayed on the display, including the aforementioned tabs.

Patent Owner argues that the tabs in Grunwald are "top-level menu structures . . . and not any particular 'graphical tools.'"  Prelim. Resp. 50; *see also id.* at 49–55 (similar).  Put another way, Patent Owner argues that the actual tools are two levels down, directing our attention to Figure 22 of Grunwald, which depicts schematically the menu structure of Grunwald's

18

IPR2022-01576
Patent 9,538,985 B2

interface. *See, e.g., id.* at 51. Below is a truncated, annotated copy of Figure 22 of Grunwald provided by Patent Owner.



(Ex[1004] Fig. 22 (truncated and annotated).)

Prelim. Resp. 51. Figure 22 of Grunwald, as reproduced in modified version above, shows a menu structure for image menu 2220, with a first sub-menu, color flow menu 2232, having items such as gain, region of interest size, region of interest position, etc. A second sub-menu, power doppler menu 2234, has the same list of items.

Patent Owner's position would be bolstered here if it were to provide a claim construction analysis; namely, how to construe "graphical tool" and "attribute of a selected graphical tool" in a manner that precludes Petitioner's application of the claim on the art. In general, Petitioner shows how Grunwald allows selection and creation of what appear to be the same graphical tools that are described in the '985 patent—identifications, labels, and measurements. For example, Petitioner identifies that the "imaging mode" allows identification of a region of interest (Pet. 67; Ex. 1004, Fig. 25), which appears analogous to the window tool depicted in Figure 3F of the '985 patent. Patient information tab allows entry of a name (Pet. 67–68; Ex. 1004, Fig. 34), which appears analogous to the marker tool in Figure 3E

19

IPR2022-01576
Patent 9,538,985 B2

of the '985 patent.  And so on.  On this record, Petitioner has shown

sufficiently that Grunwald has a control area with graphical tools.

### 3.  A Second Control Area, Accessible by the Thumb of the Hand Holding the Display, to Select an Attribute of the Graphical Tool

Petitioner asserts that each of the graphical tools, once selected,

causes a second set of icons to be displayed relating to the selected tool.  *See*

Pet. 70–76.  For example, selection of imaging mode tab 2310 allows

selection of the region of interest position (2506) or size (2508).  *Id.* at 72–

73; Ex. 1004, Fig. 25.  Tools tab 2316 allows selection of caliper measuring

device 3106.  Pet. 74–75; Ex. 1004, Fig. 31B.  Petitioner asserts that because

Grunwald's display may be a touch screen on a personal data assistant, these

buttons, which are all on the left edge of the screen, can be accessed by a

thumb as claimed.  Pet. 71–72.  As a backup position, Petitioner also asserts

that it would have been obvious to customize or modify the touchscreen

interface to optimize it for one-hand, one-thumb use.  *Id.* at 77–80.

Patent Owner argues that a person using Grunwald will not be able to

use the touchscreen effectively with their thumb, e.g., because the display in

Grunwald is too small or because Grunwald does not explain how.  Prelim.

Resp. 55–64.

The embodiment of Grunwald shown in Figure 22 (reproduced

earlier) does show a fairly small screen, yet the menu structures depicted as

being displayed on that screen (e.g., Fig. 23, reproduced earlier) are rather

detailed.  Patent Owner's position presumes these are irreconcilable and

therefore concludes that Grunwald is not enabled.  Prelim. Resp. 63.

However, even assuming the scale of Figure 22 is accurate, Grunwald is not

limited to the Figure 22 embodiment, and states the display may be another

device form factor, such as a portable computer.  Ex. 1004 ¶ 69.  In addition,

20

IPR2022-01576
Patent 9,538,985 B2

the Figure 22 embodiment makes clear that the interface "may give the user the option to retile or rearrange the windows . . . in any fashion desired." *Id.* ¶ 216. Together, on this record, these passages indicate that a person of ordinary skill in the art had expansive understanding of the flexibility in screen size and/or interface layout to arrange things in a usable manner.[5] As we explained in the Petruzzelli ground, it was known in the art to set up touchscreen displays to enable one-hand, one-thumb operation. *See, e.g.*, Ex. 1005, Fig. 5B (depicting a thumb manipulating a touch screen); Ex. 1006, Figs. 7–11 (depicting a series of figures of thumb placement and thumb-accessible menus).

### 4.   An Active Image Area

Petitioner asserts that image area 2302 corresponds to the active image area. Pet. 80–81. Patent Owner does not offer arguments against this assertion at this time.

### 5.   Dependent Claims 2 and 3

Claims 2 and 3 each depend from claim 1. Claim 2 requires a pictograph and claim 3 requires display of a graphical tool in the first or second areas then detecting movement of a finger from the tool to the active image area. Petitioner asserts that the feature in Grunwald allowing a user to drag and drop icons, such as body part marker icons, satisfies these limitations. Pet. 82–88. Patent Owner does not offer arguments against these assertions at this time.

---

[5] Indeed, Petitioner calls out these customization features in its obviousness analysis. Pet. 77–80 (citing, e.g., Ex. 1004 ¶¶ 282–283, Fig. 31A).

IPR2022-01576
Patent 9,538,985 B2

### 6.  Asserted Obviousness in View of Grunwald and Hyun

In this alternative ground, Petitioner cites to Hyun to bolster its position with respect to Grunwald's implementation on a hand-held touchscreen.  Pet. 88–96.  Hyun discloses a hand-held touchscreen ultrasound system, where the menu buttons are placed in the locations a user would touch (i.e., where they could reach while holding the device).  Ex. 1006 ¶¶ 6–7.  Figure 7 of Hyun is reproduced below.

FIG. 7



Figure 7 of Hyun depicts a user holding a touchscreen tablet in their left hand, where the left thumb can access the upper left corner of the touchscreen.  *See also id.* at Figs. 6A–C (depicting thumb movement ranges), Fig. 8 (showing a portrait orientation), Figs. 9–11 (depicting various menus located near the thumb).

Petitioner asserts it would have been obvious to implement Grunwald's interface on Hyun's portable device.  Pet. 93.  Petitioner notes that Grunwald suggests to apply its teaching to tablet-like systems (mobile phone, personal data assistant) and also suggests a need for easy-to-use systems usable by a single hand, both of which are provided by Hyun.  *Id.* at 94 (citing Ex. 1004 ¶¶ 69, 216; Ex. 1006 ¶¶ 6–7, 21; *see also* Pet. 95–96 (further explanation)).

22

IPR2022-01576
Patent 9,538,985 B2

Patent Owner argues that the combination is inoperable. Prelim. Resp. 71–74. However, this argument makes at least two assumptions that undermine its persuasive value. First, Patent Owner presumes that the interface must only be used by the thumb; something that the references, claims, and '985 patent do not contemplate. Second, Patent Owner presumes that the interface of Grunwald must be bodily incorporated into Hyun. As we discussed in the Petruzzelli grounds, no such requirement exists.

Patent Owner also argues that Petitioner's rationale for combination is insufficient. Prelim. Resp. 69–71. Again, Patent Owner is unduly focusing on bodily incorporating one reference into another. Petitioner's combination is to implement Grunwald's teachings on a touchscreen device like in Hyun (*see, e.g.*, Pet. 93) in order to gain the one-handed benefits provided by Hyun's form factor (*see, e.g.*, *id.* at 94). Petitioner's proposed combination appears sufficient on the record at this stage of the proceeding.

## III. CONCLUSION

As explained above, we find that Petitioner has established a reasonable likelihood of success in showing that claim 1 is unpatentable over Petruzzelli. We institute an *inter partes* review of all challenged claims on all asserted grounds. 37 C.F.R. § 42.108(a); *see SAS Inst. v. Iancu*, 138 S. Ct. 1348, 1359–60 (2018).

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that an *inter partes* review of claims 1–3 of the '985 patent is instituted with respect to all grounds set forth in the Petition; and

23

IPR2022-01576
Patent 9,538,985 B2

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '985 patent is hereby instituted commencing on the entry date of this Decision, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

IPR2022-01576
Patent 9,538,985 B2

FOR PETITIONER:

Charles Rash
Brooks Kenyon
AKIN GUMP STRAUSS HAUER & FELD LLP
brandon.rash@akingump.com
bkenyon@akingump.com


FOR PATENT OWNER:

Eliot Williams
Robert Maier
Jennifer Tempesta
Derek Langdon
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
robert.maier@bakerbotts.com
jennifer.tempesta@bakerbotts.com
derek.langdon@bakerbotts.com

25

# EXHIBIT 8

Trials@uspto.gov                                              Paper 7
571.272.7822                                         Date: April 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

BUTTERFLY NETWORK, INC.,
Petitioner,

v.

FUJIFILM SONOSITE, INC.,
Patent Owner.

_____

IPR2022-01575
Patent 7,867,168 B2

_____

Before WILLIAM V. SAINDON, BARBARA A. BENOIT, and
FRANCES L. IPPOLITO, *Administrative Patent Judges*.

IPPOLITO, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314(a)*

IPR2022-01575
Patent 7,867,168 B2

## I.     INTRODUCTION

Butterfly Network, Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–6, 12, 13, and 15 of U.S. Patent No. 7,867,168 B2 (Ex. 1001, "the '168 patent").  Paper 1 ("Pet.").  FUJIFILM Sonosite, Inc. ("Patent Owner") has not filed a Preliminary Response to the Petition.

Under 35 U.S.C. § 314(a), an *inter partes* review may not be instituted unless the information presented in the Petition and any response thereto shows "there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  Considering the arguments presented in the parties' briefs, we conclude that the information presented in the Petition establishes that there is a reasonable likelihood that Petitioner would prevail in challenging at least 1 of the claims 1–6, 12, 13, and 15 of the '168 patent as unpatentable under the grounds presented in the Petition.  Pursuant to § 314, we hereby institute an *inter partes* review.

### A.     *Related Matters*

The Parties indicate the '168 patent (together with U.S. Patent Nos. 9,538,985 B2 and 6,901,157 B2) has been asserted in: *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, No. 1:22-cv-00309-JPM (D. Del.).  Pet. 2; Paper 3, 2; Paper 6, 1.

Petitioner also indicates that it has filed petitions requesting *inter partes* review of U.S. Patent No. 9,538,985 B2 (IPR2022-01576) and U.S. Patent No. 6,901,157 B2 (IPR2022-01577).  Paper 6, 1.

2

IPR2022-01575
Patent 7,867,168 B2

### B.    The '168 Patent

The '168 patent is titled "Ultrasonic Transducer Having Distributed Weight Properties," and "relates to ultrasound devices and more particularly to such devices having a thin wire interface." Ex. 1001, codes (54), (57), 1:26–28. The '168 patent describes ultrasound medical devices including ultrasound systems in which signal processing functionality is partitioned such that "a portion of the ultrasound signal processing is contained within the transducer assembly of an ultrasound system, thereby reducing the need for a multiplicity of high performance conductors, or other relatively high bandwidth, high fidelity bandwidth running between the transducer and the main body of the ultrasound system." *Id.* at 1:37, 2:20–25. Moreover, a distributed power source configuration may be utilized such that a portion of the power source is disposed in the ultrasound device main processing unit and another portion of the power source is disposed in the ultrasound device transducer assembly. *Id.* at 3:1–5.

The '168 patent explains that the redistribution of signal processing functionality in the ultrasound device enables a distribution of weight between a transducer assembly and a corresponding main processing unit, whereby the "transducer assembly may be provided with a desired amount of mass, such as for an improved user experience, improved interfacing with scanned objects, [and] a more traditional weight." *Id.* at 2:59–63. The '168 patent also explains that the main processing unit in the ultrasound device may have reduced mass "to provide a more portable unit, [and] a better balance of weight between the main processing unit and transducer assembly." *Id.* at 2:65–67, 3:9–11.

3

IPR2022-01575
Patent 7,867,168 B2

Fig. 2 of the '168 patent, reproduced below, illustrates an ultrasound system partitioned to allow for digital signaling between the transducer and the main processor. *Id.* at 3:41–44.



Fig. 2 illustrates an ultrasound system 20 in which signal processing functionality is partitioned such that a portion of the ultrasound signal processing is contained within the transducer assembly of an ultrasound system. *Id.* at 3:41–44, 4:9–13.

Ultrasound system 20 illustrated in Figure 2 includes processing unit 21 and transducer assembly 24, connected via digital cable 25. *Id.* As shown, both processing unit 21 and transducer assembly 24 contain batteries, e.g., 27-1, 27-2. *Id.* Transducer assembly 24 further includes transducer array 17; amplifiers 23-1T, 23-1R to 23-NT, 23-RT, which are used for driving transducer array 17, beam transformer 23, transmit/receive (Tx/Rx) circuitry 26 composed of pulser circuits, and control logic integrated in an ASIC of a digital beam former (DBF) 23. *Id.* at 3:58–61,

4

IPR2022-01575
Patent 7,867,168 B2

4:9–24, 4:31–35, Fig. 2.  Processing unit 21 includes digital signal processor (DSP) 13, back end processors 14, and display 15.  *Id.* at Fig. 2.

Digital cable 25 may include a pair of Low Voltage Differential Signal (LVDS) lines to transmit digital data back and forth.  *Id.* at 5:54–56. The '168 patent explains that digital cable 25 "can be a much smaller cable [(as compared to analog cables used in prior art ultrasound systems to couple the transducer array to individual receiving and transmitting channels, and to the digital beam former)] since only a small number of conductors are needed to provide necessary control and/or signals."  *Id.* at 3:51–54, 4:1–8, 4:38–40.

The '168 patent explains that the signal processing circuitry and/or other circuitry may be disposed in the transducer assembly 24, rather than in the processing unit assembly 21, in order to provide a transducer assembly having a desired weight or a weight more typical of historical transducer assemblies—while eliminating weight from the processing unit assembly (thereby resulting in a lighter and more portable processing unit).  *Id.* at 5:1–7.  Further, the '168 patent provides that components such as signal processing circuitry and power sources may be distributed or redistributed between transducer assembly 24 and main processing unit 21 to provide a desired weight balance.  *Id.* at 5:8–11.

### C.   Challenged Claims

Petitioner challenges claims 1–6, 12, 13, and 15.  Claims 1 and 12 are independent.  Claim 1 is illustrative and reproduced below:

> 1. [1a] A system comprising:
>
> an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said

5

IPR2022-01575
Patent 7,867,168 B2

transducer array and provide digital information there from;

[1b] a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly; and

[1c] a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between;

[1d] wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit.

Ex. 1001, 7:11–27 (bracketed designations added by Petitioner (*see* Pet. 23–30)).

### D.    *Alleged Grounds of Unpatentability*

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–6, 12, 13, 15 | 102 | Halmann[1] |
| 1–6, 12, 13, 15 | 103 | Halmann |
| 1-6, 12, 13, 15 | 103 | Halmann, Honda[2] |
| 2, 3, 5, 12, 13, 15 | 103 | Halmann, Walston[3] |
| 2, 3, 5, 12, 13, 15 | 103 | Halmann, Honda, Walston |
| 6 | 103 | Halmann, Smith[4] |

---

[1] Halmann et al., US 2003/0097071 A1, published May 22, 2003 ("Halmann," Ex. 1003).

[2] Japanese Unexamined Patent Application Publication No. JP 2003-33350A, published February 4, 2003 ("Honda," Ex. 1005 (including a certified English translation submitted by Petitioner) and Ex. 1056).

[3] Walston et al., US 2003/0139671 A1, published July 24, 2003 ("Walston," Ex. 1006).

[4] Smith et al., US 2004/0179332 A1, published September 16, 2004 ("Smith," Ex. 1007).

IPR2022-01575
Patent 7,867,168 B2

| 6 | 103 | Halmann, Honda, Smith |
|---|---|---|
| 1–4, 6, 12, 13, 15 | 102 | Barnes[5] |
| 1–6, 12, 13, 15 | 103 | Barnes |
| 2, 3, 5, 12, 13, 15 | 103 | Barnes, Walston |
| 6 | 103 | Barnes, Smith |

Pet. 3.  In addition to the references listed above, Petitioner relies on the Declaration of Christopher Daft, Ph.D.  Ex. 1008.

## II.    ANALYSIS

### A.    *Level of Ordinary Skill in the Art*

In determining the level of skill in the art, we consider the type of problems encountered in the art, the prior art solutions to those problems, the rapidity with which innovations are made, the sophistication of the technology, and the educational level of active workers in the field.  *Custom Accessories, Inc. v. Jeffrey-Allan Indus. Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986); *Orthopedic Equip. Co. v. United States*, 702 F.2d 1005, 1011 (Fed. Cir. 1983).

Petitioner contends that

> A person of ordinary skill in the art ("POSA") at the time of November 14, 2006, would have a degree in electrical engineering, physics, or a related discipline, along with relevant experience (at least 2-3 years for a Ph.D., 3-5 years for a Master's, and 5+ years for a Bachelor's) researching or developing ultrasound systems or other medical imaging devices. EX1008, ¶¶19-26. A POSA would have general knowledge of ultrasound systems and related technologies as of November 14, 2006. *Id.*
>
> If the '168 Patent were entitled to an August 24, 2004 priority date, the POSA would have had the degrees, experience,

---

[5] Barnes et al., US 2003/0013966 A1, published January 16, 2003 ("Barnes," Ex. 1004).

7

IPR2022-01575
Patent 7,867,168 B2

and knowledge described above as of August 24, 2004, and the challenged claims would be unpatentable for the same reasons herein. *Id.*

Pet. 9–10.

At this stage, Patent Owner has not addressed the level of ordinary skill in the art.

For purposes of this Decision, we adopt Petitioner's proposal as reasonable and consistent with the prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (the prior art may reflect an appropriate level of skill in the art).

### B.    Principles of Law

"Anticipation requires that every limitation of the claim in issue be disclosed, either expressly or under principles of inherency, in a single prior art reference," *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1255–56 (Fed. Cir. 1989), and that the claim limitations be "arranged or combined in the same way as recited in the claim[]," *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1371 (Fed. Cir. 2008). However, "the reference need not satisfy an *ipsissimis verbis* test." *In re Gleave*, 560 F.3d 1331, 1334 (Fed. Cir. 2009).

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set out a framework for assessing obviousness under § 103 that requires consideration of four factors: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *Id.* at 17–18. "While the sequence of these questions might be reordered in any particular

8

IPR2022-01575
Patent 7,867,168 B2

case," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007), the Federal Circuit has "repeatedly emphasized that an obviousness inquiry requires examination of all four *Graham* factors and that an obviousness determination can be made only after consideration of each factor." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1335 (Fed. Cir. 2016).

We note that, with respect to the fourth *Graham* factor, the current record in this proceeding does not include any argument or evidence directed to secondary considerations of nonobviousness. The analysis below addresses the first three *Graham* factors.

### C.     *Claim Construction*

In an *inter partes* review, we construe each claim "in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b). Accordingly, our claim construction standard is the same as that of a district court. *See id.* Under the standard applied by district courts, claim terms are generally given their plain and ordinary meaning as would have been understood by a person of ordinary skill in the art at the time of the invention and in the context of the entire patent disclosure. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

Petitioner "does not believe any terms require construction at this stage." Pet. 10.

At this stage of the proceeding, Patent Owner has not yet filed a response.

For purposes of this decision, we do not expressly construe any terms. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d

9

IPR2022-01575
Patent 7,867,168 B2

1013, 1017 (Fed. Cir. 2017)), cert. denied, 138 S. Ct. 1695 (April 30, 2018)

(noting that "we need only construe terms 'that are in controversy, and only

to the extent necessary to resolve the controversy'") (citing *Vivid Techs.,*

*Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999)).

### D.    Overview of the Prior Art

### 1.  Summary of Halmann (Ex. 1003)

Halmann is titled "Method and System for PDA-Based Ultrasound

System."  Ex. 1003, code (54).  Halmann describes a method and system for

configuring a personal digital assistant (PDA) device as an integral part of a

portable, hand-held ultrasound system.  *Id.* ¶ 2.  Figure 1 of Halmann,

reproduced below, illustrates a portable diagnostic ultrasound system in

which digital beamforming is performed within a hand-held probe assembly,

and Figure 1B, reproduced below, shows the portable diagnostic ultrasound

system of Fig. 1.  *Id.* ¶¶ 11–12.



FIG. 1

10

IPR2022-01575
Patent 7,867,168 B2

Fig. 1 illustrates a portable diagnostic ultrasound system in which digital beamforming is performed within a hand-held probe assembly. *Id.* ¶ 11.



Fig. 1B shows a realistic illustration of the portable diagnostic ultrasound system of Fig. 1. *Id.* ¶ 12.

As shown in Figure 1, portable diagnostic ultrasound system 5 includes detachable transducer module 10 with transducer array 20 connected to multiplexer 30. Beamforming module 40 includes pulser 60, TX/RX switching module 35, folder module 50, voltage controlled amplifier (VCA) 70, analog-to-digital converter (ADC) 80, beamforming ASIC 90, and PDA interface controller 100. *Id.* ¶¶ 18–20.

Halmann also teaches PDA device 120 with touch-screen display 125 where PDA 120 is modified to include ultrasound data processing and application software to support a plurality of ultrasound imaging modes; and (optionally) external battery/power source 110. *Id.* ¶ 18–20. PDA 120 includes an internal battery to power the PDA and hand-held probe assembly 2, with a battery power interface 140 connecting PDA 120 and hand-held probe assembly 2. *Id.* ¶ 18. Optionally, an external battery/power source 110 connects to beamforming module 40. *Id.* ¶ 21.

In operation, PDA-based ultrasound scanner 5 transmits ultrasound energy into a subject to be imaged, and receives and processes backscattered

11

IPR2022-01575
Patent 7,867,168 B2

ultrasound signals from the subject to create and display an image on display 125 of PDA device 120. *Id.* ¶ 24. For example, a user may select transducer head 10 (shown in Fig. 1B) to connect to beamforming module 40 to form hand-held probe assembly 2 to be used for a particular scanning application. *Id.* An imaging mode is selected from a menu on display 125 of PDA device 120 using a touch-screen stylus. *Id.*

> Halmann explains that

> The various elements of the portable ultrasound system 5 may be combined or separated according to various embodiments of the present invention. For example, the folder 50 and VCA 70 may be combined into a single processing element. Also, the external battery 110 may be integrated into the beamforming module 40, becoming an internal battery.
> . . .
> As an alternative, the function of the beamforming ASIC 90 may be performed by software in the PDA device 120. . . . Instead of the transducer head attaching to a beamforming module 40, it attaches to a signal processing module 45 that does not include the beamforming ASIC 90. The data out of the ADC 80 is sent to the PDA interface controller 100 and the pre-beamformed data is sent to the PDA 120. Digital beamforming is performed by software within the PDA 120 along with the other subsequent data processing functions.
>  As a further alternative, the hand-held-probe assembly may include an internal battery to provide power. A docking station may also be provided for the hand-held probe assembly to provide the function of battery recharging.

*Id.* ¶¶ 23, 33–34.

> 2. *Summary of Barnes (Ex. 1004)*

Barnes is titled "Balance Body Ultrasound System" and "relates to handheld ultrasound instruments having various diagnostic modes and transducer assemblies incorporating a balance body design, or other form

12

IPR2022-01575
Patent 7,867,168 B2

factor to reduce strain of use during scanning procedures." Ex. 1004, code (54), ¶ 3. Barnes describes a medical hand-held ultrasound system having a balance body, a transducer assembly connected to the balance body via a communication means (such as a cable) and a plurality of control elements arranged in an ergonomic fashion on the balance body, such that a user may hold the system and operate at least one of the control elements with the same hand. *Id.* at code (57). A user interface of the ultrasound system includes a D-controller and a touch screen. *Id.* The D-Controller is a control device allowing a user to "point and click" in order to navigate an on-screen menu or displayed graphics. *Id.* ¶ 21. For example, the D-controller may be a digital directional controller (such as a four or eight directional controller), or an analog "joy stick." *Id.*

Barnes' medical ultrasound system may be lightweight, and include: (i) a first body having system electronics, a first transmit and receive element, and a first power supply, the first body weighing less than two pounds; (ii) a second body housing a transducer assembly that has a digital beam former, an A/D circuit, a transducer array, a second power supply, a second transmit and receive element, and at least one control element, the second body weighing less than one pound; and (iii) a head set including a visual display, a receive element, and a third power supply, such that the first body, second body, and head set are all in real time communication with each other. *Id.* ¶¶ 13, 36. The user can control the ultrasound system through the second body or first body while visualizing an ultrasound scan though the head set. *Id.* ¶ 36. Fig. 20 of Barnes, reproduced below, illustrates a medical ultrasound system being used by a medical practitioner. *Id.* ¶ 18.

13

IPR2022-01575
Patent 7,867,168 B2



Fig. 20 illustrates a medical ultrasound system being used by a
medical practitioner.  *Id.* ¶ 18.

### 3.  *Summary of Honda (Exs. 1005 and 1056)*

Honda is titled "Medical Diagnostic Adapter, Portable Medical
Diagnostic Device, and Curved Ultrasonic Diagnostic Device."  Ex. 1005,
code (54).[6]  Honda's portable ultrasonic diagnostic device includes a
medical diagnostic adapter and a Personal Digital Assistant (PDA), shown as
elements 301 and 10, respectively, in Figure 6 of Honda, reproduced below.
*Id.* at code (57), Fig. 6.

---

[6] We cite to the certified English translation of Honda submitted by
Petitioner.

14

IPR2022-01575
Patent 7,867,168 B2

[FIG. 6]



Fig. 6 is a block diagram illustrating a portable ultrasonic diagnostic device 300.  *Id.* ¶ 23.

Portable ultrasonic diagnostic device 300 illustrated in Fig. 6 includes PDA 10 and medical diagnostic adapter 301, with adapter 301 including an expansion module 302 that drives ultrasonic probe 20, which transmits ultrasonic waves into a subject body, receives ultrasonic echoes from the subject body, collects medical information, and sends the collected information to PDA 10.  *Id.* ¶¶ 20, 23.  Expansion module 302 includes ultrasonic probe 20; ultrasonic scanning controller 4 that drives ultrasonic probe 20 to scan the subject body and obtain a reception signal; battery 5 for supplying operating power to ultrasonic scanning controller 4; charger 6 for charging battery 5; and interface 3 that is detachable from external expansion terminal 11 of PDA 10 and sends the reception signal to PDA 10.  *Id.* ¶ 23.  Portable ultrasonic diagnostic device 300 may be used while battery 5 is charging from, e.g., an automobile power source.  *Id.* ¶ 24.

15

IPR2022-01575
Patent 7,867,168 B2

Fig. 5 of Honda, reproduced below, illustrates additional aspects of ultrasonic diagnostic device 300.  *Id.* ¶¶ 20, 26.

[FIG. 5]



Fig. 5 illustrates additional aspects of ultrasonic diagnostic device 300.
*Id.* ¶¶ 20, 26.

Expansion module 302 of ultrasonic diagnostic device 300 is provided with an automobile power plug 306 (such as an AC plug) for charging the built-in battery.  *Id.* ¶ 21.  Expansion module 302 is detachable from external expansion terminal 11 of PDA 10, and is integrated with PDA 10 when attached.  *Id.*  Grasping a grip 305 simplifies the scanning operation of the subject body.  *Id.*  An ultrasonic image G is displayed on the screen of PDA 10.  *Id.* ¶ 22.

    *4.  Summary of Walston (Ex. 1006)*

Walston is titled "Immersive Portable Ultrasound System and Method" and "relates to portable diagnostic ultrasound systems."  Ex. 1006, code (54), ¶ 2.  Walston's portable ultrasound system provides immersive

16

IPR2022-01575
Patent 7,867,168 B2

viewing of images. *Id.* at code (57). According to Walston, the portable ultrasound system is a small, lightweight scope that includes a transducer and a display adapted for viewing ultrasound images close to the eye of the user, such as within five inches or a couple feet of the eye. *Id.*

### 5. *Summary of Smith (Ex. 1007)*

Smith is titled "Portable Ultrasound Unit and Docking Station" and "relates to ultrasound equipment, and more particularly, to portable ultrasound units and docking stations for such units." Ex. 1007, code (54), ¶ 1. According to Smith, when the portable ultrasound unit is mounted to a docking cart, the docking cart transforms the portable ultrasound unit into a cart-based system with enhanced features and functionality, such as improved ergonomics, ease of use, a larger display format, external communications connectivity, multiple transducer connections, and increased data processing capabilities. *Id.* at code (57).

### E.    *Anticipation and Obviousness based on Halmann*

Petitioner asserts that claims 1–6, 12, 13, and 15 would have been anticipated by, and rendered obvious by, the teachings of Halmann. Pet. 3, 23–44 (Petitioner's Grounds 1 and 2). We have reviewed the preliminary record, and we conclude Petitioner has demonstrated a reasonable likelihood of prevailing on its assertions as to at least claim 1. We address independent claim 1 below.

### 1.    *Independent claim 1*

The Petition outlines how Halmann discloses, teaches, or suggests the features of independent claim 1. Pet. 23–34.

Patent Owner has not filed a preliminary response and has not offered arguments at this stage of the proceeding.

17

IPR2022-01575
Patent 7,867,168 B2

Below, we analyze Petitioner's contentions as applied to the required elements of claim 1.

> [1a] "A system comprising: an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from"

Referring to Halmann's Figures 1 and 1B, Petitioner contends probe assembly 2 discloses an ultrasound transducer array (i.e., array 20) coupled to signal processing circuitry (i.e., multiplexer 30 and circuitry in module 40). Pet. 24. Petitioner further provides an annotated version of Figure 1, provided below:



Petitioner's annotated Figure 1 depicts a portable diagnostic ultrasound system in which digital beamforming is performed within a hand-held probe assembly. Pet. 24.

18

IPR2022-01575
Patent 7,867,168 B2

Petitioner has annotated the original figure with a red box around transducer 64 and a blue box around multiplexer 30, TX/RX SW 35, Folder 50, VCA 70, ADC 80, Beamforming ASIC 90, and USB Interface Control 100. Pet. 24. Petitioner asserts that the circuitry in the blue box processes analog signals from the array (marked by the red box). *Id.* at 25. Petitioner contends that

> Halmann explained,

> It is more desirable to perform beamforming in the digital domain by first converting ultrasound data from the analog domain to the digital domain." EX1003, ¶¶6, 8-9, 38. The ADC connects to a beamforming application-specific integrated circuit ("ASIC") (e.g., ASIC 90), which connects to an interface controller (e.g., USB controller 100). EX1003, ¶¶9, 21-22, 29, claim 16 ("interface controller"). USB controller 100 provides digital information to a PDA through a standard digital interface (e.g., interface 150). *Id.*

*Id.* at 25.

We have reviewed Petitioner's evidence and argument, and find that Petitioner has sufficiently shown that Halmann discloses this limitation of claim 1 for the purposes of institution.

> *[1b] "a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly"*

Petitioner contends Halmann discloses this limitation because Halmann discloses PDA 120 (e.g., main processing unit "modified to include ultrasound data processing and application software") and is separated from the transducer assembly (e.g., probe assembly 2) by a standard digital interface (e.g., a USB cable). Pet. 25–26 (citing Ex. 1003, Abstract, ¶¶ 2, 8–10, 19, 22; Ex. 1008 ¶ 110). Petitioner further directs us to

19

IPR2022-01575
Patent 7,867,168 B2

Halmann's claim 17, which provides that the PDA includes software to perform ultrasound data processing functions demodulation; parameter estimation; scan conversion; and display processing. *Id.* at 26 (citing Ex. 1003, claim 17).

We have reviewed Petitioner's evidence and argument, and find that Petitioner has sufficiently shown that Halmann discloses this limitation of claim 1 for the purposes of institution.

> [1c] *"a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between"*

Petitioner contends Halmann discloses, or at least renders obvious, this limitation of claim 1. Pet. 27–30. More specifically, Petitioner argues that Halmann disclosed a digital data cable (e.g., USB cable) as distinguished from a "wireless interface." Pet. 28 (citing Ex. 1003 ¶ 22; Fig. 1B.

Separately, Petitioner argues that it would have been obvious to use a USB cable as digital interface 150, according to known methods to yield predictable results because a POSITA would have known that such cables were inexpensive, lightweight, flexible, widely available, and based on the well-known USB standard. *Id.* at 29–30 (citing Ex. 1008 ¶¶ 73–75, 113–115).

We have reviewed Petitioner's evidence and argument, and find that Petitioner has sufficiently shown that Halmann discloses this limitation of claim 1 for the purposes of institution.

20

IPR2022-01575
Patent 7,867,168 B2

> *[1d] "wherein said system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit"*

For these limitations, Petitioner argues that Halmann discloses

[a] "digital data cable" in paragraph 22, and immediately follows in paragraph 23 that this same embodiment may include an external or internal battery for the transducer assembly in addition to the battery in the PDA. EX1003, ¶¶18-23; EX1008, ¶¶118-19. Halmann further illustrates a digital data cable and distributed power source in the same block diagram, as shown in Figures 1 and 5 and further in the "realistic illustration" of Figure 1B. EX1003, Figs. 1, 1B, 5.

Pet. 31. Alternatively, Petitioner argues that

Coupling a transducer assembly to a battery-powered PDA using a standard USB cable was also known. Supra §§ VII.A.2, VIII.A.3; EX1008, ¶¶73-75, 122. A POSA would have been motivated to distribute a portion of the battery power source to the assembly in such a system based on known advantages of (1) increasing the battery power source capacity in the system, which allows for longer use times between having to recharge or replace batteries; (2) reducing the drain on the PDA battery from the assembly's electronics; and (3) allowing a manufacturer to design a transducer assembly with a sufficient, reliable, and efficient power supply, without being limited by or dependent on the power capabilities of the main processing unit (e.g., PDA) that a user may connect to the assembly. Supra §§ VII.A.3, VII.D, VII.F; EX1008, ¶¶76-80, 123-25.

Pet. 33–34.

On this preliminary record, we agree with Petitioner's contentions that Halmann teaches or suggests these limitations of claim 1 for the purposes of institution.

21

IPR2022-01575
Patent 7,867,168 B2

*Conclusion*

Accordingly, we determine that Petitioner has established a reasonable likelihood of prevailing on its assertions that claim 1 would have been anticipated and/or rendered obvious by Halmann.

> 2.    *Independent claim 12 and dependent claims 2–6, 13, and 15*

The Petition outlines how Halmann teaches or suggests the features of independent claim 12, each one of claims 2–6 (which depend from independent claim 1), claims 13 and 15 (which depend from independent claim 12).  Pet. 35–44.

Patent Owner does not offer arguments at this stage of the proceeding.

"When instituting *inter partes* review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim." 37 C.F.R. § 42.108(a). We must "either (1) institute as to all claims challenged in the petition and on all grounds in the petition, or (2) institute on no claims and deny institution." Patent Trial and Appeal Board Consolidated Trial Practice Guide (Nov. 2019) ("CTPG")[7], 5–6, 64. We "will not institute on fewer than all claims or all challenges in a petition." *Id.* at 5, 64; *see also PGS Geophysical AS v. Iancu*, 891 F.3d 1354, 1359–60 (Fed. Cir. 2018) (stating a decision to institute is "a simple yes-or-no institution choice respecting a petition, embracing all challenges included in the petition"). Thus, because we have decided to grant institution on Grounds 1 and 2 against claim 1, we must do the same for independent claim 12 and dependent claims 2–6, 13, and 15.

---

[7] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

22

IPR2022-01575
Patent 7,867,168 B2

### F.    Remaining Challenges

Combining with the teachings of Halmann, Petitioner asserts that (i) claims 1–6, 12, 13, and 15 would have been obvious based on the teachings of Halmann and Honda (Petitioner's *Ground 3*), (ii) claims 2, 3, 5, 12, 13, and 15 would have been obvious based on the teachings of Halmann and Walston (Petitioner's *Ground 4*), (iii) claims 2, 3, 5, 12, 13, and 15 would have been obvious based on the teachings of Halmann, Honda, and Walston (Petitioner's *Ground 5*), (iv) claim 6 would have been obvious based on the teachings of Halmann and Smith (Petitioner's *Ground 6*), and (v) claim 6 would have been obvious based on the teachings of Halmann, Honda, and Smith (Petitioner's *Ground 7*).  Pet. 3, 44–59.

Additionally, Petitioner asserts that claims 1–4, 6, 12, 13, and 15 would have been anticipated by Barnes (Pet. 3, 59–74, Petitioner's *Ground 8*) and claims 1–6, 12, 13, and 15 would have been rendered obvious by Barnes (Pet 3, 59–74, Petitioner's *Ground 9*).

Patent Owner does not offer arguments at this stage of the proceeding.

As we conclude that Petitioner demonstrates a reasonable likelihood of prevailing with respect to its anticipation and obviousness challenges (based on Halmann, i.e., Grounds 1 and 2) to independent claim 1, we institute review on all challenged claims on all grounds set forth in the Petition.  *See SAS Institute Inc. v. Iancu*, 138 S. Ct. 1348, 1354 (2018); *PGS Geophysical AS*, 891 F.3d at 1360.

### III.    CONCLUSION

After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that at least one claim of the '168 patent is

23

IPR2022-01575
Patent 7,867,168 B2

unpatentable.  Accordingly, an *inter partes* review of claims 1–6, 12, 13, and 15 and all of the grounds presented in the Petition is hereby instituted.  *See also PGS Geophysical AS*, 891 F.3d at 1360 (indicating that a decision whether to institute an *inter partes* review "requires a simple yes-or-no institution choice respecting a petition, embracing all challenges included in the petition").

At this stage of the proceeding, the Board has not made a final determination as to the patentability of any challenged claim or any underlying factual or legal issues.

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–6, 12, 13, and 15 of the '168 patent is instituted with respect to all grounds set forth in the Petition;

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '168 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

24

IPR2022-01575
Patent 7,867,168 B2

FOR PETITIONER:

Charles Rash
Brooks Kenyon
AKIN GUMP STRAUSS HAUER & FELD LLP
brandon.rash@akingump.com
bkenyon@akingump.com


FOR PATENT OWNER:

Eliot Williams
Robert Maier
Jennifer Tempesta
Boyang Zhang
BAKER BOTTS L.L.P.
eliot.williams@bakerbotts.com
robert.maier@bakerbotts.com
jennifer.tempesta@bakerbotts.com
boyang.zhang@bakerbotts.com

25

# EXHIBIT 9

## Kenyon, Brooks

| | |
|---|---|
| **From:** | Kenyon, Brooks |
| **Sent:** | Thursday, April 20, 2023 12:49 PM |
| **To:** | Natsume, Thomas; Tempesta, Jennifer (External); DL BBFFSS v Butterfly; Tigan, Jeremy A. |
| **Cc:** | Michael J. Farnan; Farnan, Brian E. (External); BFLY-Fuji |
| **Subject:** | RE: Fujifilm Sonosite, Inc. v. Butterfly Network, Inc., No. 22-cv-309-JPM (D. Del.) |

Thomas:

Butterfly intends to seek a full stay of the case but is willing to discuss a partial stay in the interest of a potential compromise.  Please let us know this week if Fujifilm is amenable to either type of stay.  If Fujifilm cannot meet and confer this week, we can be available to meet and confer on Monday, April 24, between 1-3pm ET.

Regards,
Brooks

**Brooks J. Kenyon**
**Akin**
Direct: +1 212.872.8122 | Internal: 38122

**From:** Natsume, Thomas <thomas.natsume@bakerbotts.com>
**Sent:** Wednesday, April 19, 2023 12:29 PM
**To:** Kenyon, Brooks <bkenyon@akingump.com>; Tempesta, Jennifer (External) <jennifer.tempesta@bakerbotts.com>; DL BBFFSS v Butterfly <DLBBFFSSvButterfly@BakerBotts.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>
**Cc:** Michael J. Farnan <mfarnan@farnanlaw.com>; Farnan, Brian E. (External) <bfarnan@farnanlaw.com>; BFLY-Fuji <BFLY-Fuji@akingump.com>
**Subject:** RE: Fujifilm Sonosite, Inc. v. Butterfly Network, Inc., No. 22-cv-309-JPM (D. Del.)

**\*\*EXTERNAL Email\*\***

Brooks,

Below you indicate Butterfly intends to seek a stay "at least" of those three patents. Please advise as to specifically what it is Butterfly intends to seek — either a partial stay of the case, or a complete stay.

We are unavailable to discuss this week, but, once you provide Butterfly's position, we will consult with our client and can be available to confer next week.

Thanks,
Thomas

**Thomas K. Natsume**
Associate (New York-Qualified) | Baker Botts L.L.P.
T +44.20.7726.3495 | M +44.77.3437.4712

**From:** Kenyon, Brooks <bkenyon@akingump.com>
**Sent:** Tuesday, April 18, 2023 8:35 PM
**To:** Tempesta, Jennifer C. <jennifer.tempesta@bakerbotts.com>; DL BBFFSS v Butterfly <DLBBFFSSvButterfly@BakerBotts.com>; Tigan, Jeremy A. <JTigan@morrisnichols.com>
**Cc:** Michael J. Farnan <mfarnan@farnanlaw.com>; Farnan, Brian E. (External) <bfarnan@farnanlaw.com>; BFLY-Fuji <BFLY-Fuji@akingump.com>
**Subject:** Fujifilm Sonosite, Inc. v. Butterfly Network, Inc., No. 22-cv-309-JPM (D. Del.)

**[EXTERNAL EMAIL]**

Counsel:

Based on the institution of *inter partes* review ("IPR") proceedings for U.S. Patent Nos. 7,867,168, 9,538,985, and 6,901,157, Butterfly intends to file a motion to stay *at least* Fujifilm's claims directed to these patents pending resolution of the IPRs and any appeals. Please let us know if Fujifilm is amenable to a partial or full stay of the case and, if not, provide your availability tomorrow or on Thursday to meet and confer.

Regards,
Brooks

**Brooks J. Kenyon**
**Akin**

One Bryant Park | New York, NY 10036-6745 | USA | Direct: +1 212.872.8122 | Internal: 38122
Fax: +1 212.872.1002 | bkenyon@akingump.com | akingump.com | Bio
Pronouns: he/him/his (What's this?)

The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

**Confidentiality Notice:**

The information contained in this email and any attachments is intended only for the recipient[s] listed above and may be privileged and confidential. Any dissemination, copying, or use of or reliance upon such information by or to anyone other than the recipient[s] listed above is prohibited. If you have received this message in error, please notify the sender immediately at the email address above and destroy any and all copies of this message.

Baker Botts (UK) LLP is a limited liability partnership registered in England and Wales (registered number OC333302) with its registered office at Level 30, 20 Fenchurch Street, London EC3M 3BY and is authorised and regulated by the Solicitors Regulation Authority. The term partner is used to refer to a member of Baker Botts (UK) LLP. A list of members is at https://www.bakerbotts.com/thought-leadership/publications/2022/unspecified-month/publication .

# EXHIBIT 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FUJIFILM SONOSITE, INC., | |
| Plaintiff, | |
| | Civil Action No. 22-309-JPM |
| v. | |
| BUTTERFLY NETWORK, INC. | |
| Defendant. | |

## PLAINTIFF'S SECOND SUPPLEMENTAL OBJECTIONS AND RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES (NOS. 1-9)

Plaintiff Fujifilm Sonosite, Inc. ("Plaintiff" or "Fujifilm") serves these supplemental objections and responses to Defendant Butterfly Network, Inc.'s ("Defendant" or "Butterfly") First Set of Interrogatories (Nos. 1-9).  These responses are based upon information presently available to, and located by, Fujifilm.  As discovery proceeds, facts, information, evidence, documents, and things may be discovered which are not set forth in these responses and which may be responsive to these Interrogatories.  Fujifilm's responses are given without prejudice to Fujifilm's right to revise and/or supplement these responses.  Accordingly, Fujifilm's responses shall not be deemed to constitute admissions or representations that any statement or characterization is complete.

Fujifilm accordingly responds and objects as follows:

## GENERAL OBJECTIONS

Fujifilm incorporates the following General Objections into its response to each of Butterfly's Interrogatories, whether or not one or more General Objections are expressly referred to in a specific response:

1.      Fujifilm objects to each Interrogatory to the extent that it imposes obligations that

exceed the permissible scope of discovery under the Federal Rules of Civil Procedure, the Local Rules of this Court, any applicable orders of this Court, or any stipulations of the parties.

2.      Fujifilm objects to each Interrogatory to the extent that it is overly broad, unduly burdensome, internally duplicative, unreasonably cumulative of other discovery, vague, or ambiguous so as not to be subject to a reasonable interpretation or response and would require Fujifilm to speculate and decide to what extent it must search through information and subjectively determine what may, or may not, be responsive.

3.      Fujifilm objects to each Interrogatory to the extent that it calls for information protected from discovery by any evidentiary privilege, including without limitation, the attorney-client privilege, the work product doctrine, the common interest privilege, or other applicable privileges or immunities recognized by law.  Inadvertent disclosure of any such information shall not be deemed a waiver of any privilege or immunity.

4.      Fujifilm objects to Butterfly's Instructions and Definitions to the extent that they seek to impose on Fujifilm obligations greater than or different from those imposed under the Federal Rules of Civil Procedure, the Local Rules of this Court, any applicable orders of this Court, or any stipulations or agreements of the parties.

5.      Fujifilm objects to each Interrogatory to the extent that it requests Fujifilm to produce or otherwise analyze any document or other information that is not within the possession, custody, or control of Fujifilm; that can be obtained from some other source that is more convenient, less burdensome, and less expensive; or that is available from a public source such that the burden of obtaining the information is substantially the same for Butterfly as it would be for Fujifilm.

6.      Fujifilm objects to each Interrogatory to the extent that it seeks information that is

2

neither relevant to a claim or defense of any party, nor proportional to the needs of the case.

7.     Fujifilm objects to each Interrogatory to the extent that it seeks information that is confidential information of third parties, and which Fujifilm is obligated to maintain as confidential information.  Fujifilm will provide such information only subject to the approval of those third parties or as ordered by the Court.

8.     Fujifilm objects to each Interrogatory and/or Instruction to the extent that it seeks or purports to require the identification of "any," "each," or "all," document, product, person, circumstance, company, entity, fact, or other thing regarding or relating to a particular subject, as unduly burdensome, overbroad, and seeking information or documents that are not relevant to a claim or defense of any party and proportional to the needs of the case.

9.     Fujifilm objects to each Interrogatory to the extent that it contains purported factual assertions, assumptions, or characterizations that are in dispute or as to which Butterfly will have the burden of proof at trial.

10.     Fujifilm objects to each Interrogatory to the extent that it asks for a legal conclusion.

11.     Fujifilm's responses to these Interrogatories are hereby made without waiving or intending to waive, but rather, to the contrary, by preserving and intending to preserve:

     a.     all questions as to the competence, relevance, materiality, and admissibility as evidence for any purpose of the information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

     b.     the right to object on any ground to the use of any such information or documents, or the subject matter thereof, in any aspect of this action or any other court action or judicial or administrative proceeding or investigation;

3

c.    the right to object at any time in connection with any further response to this or any other request for information or production of documents; and

d.    the right at any time to supplement its responses.

12.    In offering to produce various types of documents, information, or things, Fujifilm makes no representation that any such documents, information, or things exist or are actually known (or not known) to exist.

13.    Fujifilm anticipates that future discovery, independent investigation, or analysis will supply additional facts and add meaning to known facts, as well as establish new factual conclusions and legal contentions, all of which may lead to additions to, changes in, and variations from the responses set forth herein.  Fujifilm reserves the right to modify, supplement, withdraw, or otherwise alter its responses to these Interrogatories in accordance with the Federal Rules of Civil Procedure and the Local Rules of this Court, and the provisions of any applicable Protective Order.

14.    Fujifilm objects to the Instructions, Definitions, and Interrogatories to the extent they purport to impose discovery obligations on entities that are not parties to this lawsuit and over which Fujifilm does not exercise control.

15.    By identifying or producing any information, documents or things in response to any interrogatory, Fujifilm does not stipulate, and expressly reserves all objections, to the authenticity, relevance, materiality, and admissibility of any such documents and things.  Nor does it impliedly or expressly imply that Fujifilm agrees with the alleged meaning of any word or phrase set forth in the interrogatory itself, its definitions, or its instructions.

16.    Fujifilm objects to the definition of "Fuji," "You," "Your," "Fuji witness," or "Plaintiff" as overbroad, unduly burdensome, vague, and ambiguous to the extent it is intended to

4

refer to " other organizational or operating units, including without limitation Fuji Photo Film Co., Ltd., Fujifilm Holdings Corp., Fujifilm Corp., and past or present officers, directors, employees, agents, representatives, consultants, attorneys, and others acting or purporting to act on its behalf. In responding to these Requests, Fujifilm will interpret this term to refer to Plaintiff FUJIFILM Sonosite, Inc. and any predecessor company, including SonoSite, Inc.

## INTERROGATORIES

### INTERROGATORY NO. 1.

For each Asserted Claim of each Asserted Patent, identify the priority date, and describe in detail the complete chronological development of the subject matter claimed.

### RESPONSE:

Fujifilm objects to this Interrogatory based on its General Objections. Fujifilm objects to this Interrogatory as premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order. Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion. Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection. Fujifilm further objects that "the complete chronological development of the subject matter claimed" would be better sought through deposition testimony.

Subject to and without waiving Fujifilm's General and Specific Objections to this Interrogatory, Fujifilm responds as follows:

- The priority date of the '157 Patent is 1/15/2001.

- The priority date of the '108 Patent is 2/1/2002.

- The priority date of the '168 Patent is 8/24/2004.

- The priority date of the '050 Patent is 2/8/2011.

- The priority date of the '981 Patent is 8/22/2008.

- The priority date of the '822 Patent is 4/7/2010.

- The priority date of the '985 Patent is 4/18/2014.

6

Fujifilm further identifies the following produced documents as responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d):

- '157 Patent: FFSS_BFLY_0000001-202 ('157 Patent file history); FFSS_BFLY_0007445-7553 (Foreign Priority Application JP 2001-005994); FFSS_BFLY_0007554-7645 (Foreign Priority Application JP 2001-005995)

- '108 Patent: FFSS_BFLY_0000203-477 ('108 Patent file history);

- '168 Patent: FFSS_BFLY_0000478-775 ('168 Patent file history); FFSS_BFLY_0006999-7376 (file history of U.S. Application No. 10/925,114).

- '050 Patent: FFSS_BFLY_0000776-873 ('050 Patent file history);

- '981 Patent: FFSS_BFLY_0000874–1121 ('981 Patent file history);

- '822 Patent: FFSS_BFLY_0001122–1634 ('822 Patent file history);

- '985 Patent: FFSS_BFLY_0001635–1802 ('985 Patent file history).

Fujifilm additionally will produce and identify other non-privileged documents in its possession responsive to this Interrogatory that are located after a reasonable search.

**INTERROGATORY NO. 2.**

Describe in detail, on a claim-by-claim basis for each Asserted Claim of each Asserted Patent, all factual and legal bases concerning any secondary considerations that You contend should be considered in determining whether that claim is non-obvious under 35 U.S.C. § 103, and identify three persons most knowledgeable of such evidence.

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections. Fujifilm objects to this Interrogatory as premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order. Fujifilm

7

objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection. Fujifilm also objects to this Interrogatory to the extent that it seeks to shift the burden of proving validity to Fujifilm; the burden is upon Butterfly to prove invalidity.

Subject to and without waiving Fujifilm's General and Specific Objections to this Interrogatory, Fujifilm responds as follows:

The Asserted Claims are presumed valid. Butterfly has not come forward with any evidence to overcome the presumption of validity. Further, Fujifilm states that there exist secondary considerations of non-obviousness for the Asserted Claims, which may be attested to by individuals, including any one of the inventors of the Asserted Patents. Fujifilm will respond further to this Interrogatory at an appropriate time in accordance with the scheduling order in this case. Additionally, Fujifilm reserves the right to rely on expert testimony in connection with issues pertinent to this Interrogatory and, accordingly, reserves the right to rely on any additional evidence, arguments, or other support as part of the reports of its experts.

**FIRST SUPPLEMENTAL RESPONSE:**

Subject to and without waiver of the foregoing general and specific objections, Fujifilm supplements the above response as follows:

Fujifilm states that there exist secondary considerations of nonobviousness for the Asserted Claims, including commercial success, long-felt need, failure of others, and unexpected results.

As illustrated by the claim charts in exhibits A-N of the First Amended Complaint in this proceeding, all Accused Products embody the features of at least one claim of each Asserted Patent. Butterfly's continuous infringement, including making, selling, and/or using the Accused

8

Products provides exemplary evidence showing at least commercial success of the Asserted Claims.

In addition, Fujifilm's Enhanced Needle Visualization embodies the feature of at least one claim of the '822 Patent. Fujifilm's development of Enhanced Needle Visualization contributed to the commercial success of its products. The launch of the Enhanced Needle Visualization contributed to increased earnings and revenues. This positive market response to the introduction of the Enhanced Needle Visualization prompted Fujifilm to further promote enhanced needle visualization throughout the year. *See e.g.*, FFSS_BFLY_0006398.

The inventions of the Asserted Claims also solved a long-felt need in the industry. Prior to the successful development of Enhanced Needle Visualization by Fujifilm, users could lose track of a needle while scanning a patient using an ultrasound device. Feedback on this feature include quotes such as "we'll never lose another deal in anesthesia" and "[y]our company has just made millions of pounds of research into echogenic needles obsolete in a single blow." *See e.g.*, FFSS_BFLY_0006397.

Fujifilm succeeded in developing its Enhanced Needle Visualization where others had failed. For example, although echogenic needles had been proposed as an alternative solution to achieve higher needle visibility in an ultrasound image, they were not widely implemented in practice. *Id.*

Fujifilm further identifies the following produced documents as responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d):

FFSS_BFLY_0006378 (Correspondence titled Enhanced Needle Visualization update);

FFSS_BFLY_0006397 (Correspondence titled R&D News);

FFSS_BFLY_0006398 (Correspondence titled Congratulations on Q2 at SonoSite);

9

FFSS_BFLY_0007962-7969 (Blog Post of a Japanese Medical Professional, https://eanesth.exblog.jp/10889272);

FFSS_BFLY_0007970-7971 (Design Award by Industrial Designers Society of America, https://www.idsa.org/awards/idea/medical-scientific-products/sonosite-sii).

Fujifilm additionally will produce and identify other non-privileged documents in its possession responsive to this Interrogatory that are located after a reasonable search.

**INTERROGATORY NO. 3.**

To the extent Fujifilm contends that any Fujifilm Product practices, has practiced, and/or embodies any Asserted Claims, describe on a limitation-by-limitation basis in a claim chart format, through prose and citation to evidence, how each Fujifilm product practices, was used to practice, and/or embodies each claim limitation.

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections. Fujifilm further objects to this Interrogatory because it contains multiple discrete subparts. Fujifilm further objects to this Interrogatory as overbroad, unduly burdensome, and to the extent it seeks information or documents that are not relevant to a claim or defense of any party and proportional to the needs of the case. Fujifilm objects to this Interrogatory as being premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order. Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion. Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

10

Subject to and without waiver of the foregoing general and specific objections, Fujifilm is willing to meet and confer with counsel for Butterfly regarding this Interrogatory.

**MARCH 27, 2023 SUPPLEMENTAL RESPONSE:**

Subject to and without waiver of the foregoing general and specific objections, and without the benefit of expert discovery, for which the subject matter of this interrogatory is more appropriate, if at all, and subject to further supplementing or revision during the course of additional fact and expert discovery, as appropriate, Fujifilm provides herewith as Exhibits A-C exemplary claim charts describing how, to Fujifilm's best current understanding, the SonoSite M-Turbo and SonoSite S-II practice the '822 Patent and how SonoSite iViz practices the '985 Patent.

**INTERROGATORY NO. 4.**

For each Asserted Patent, set forth in detail the bases of Your contention that Fujifilm is in compliance with 35 U.S.C. § 287(a), including without limitation by describing in detail all facts supporting Your reliance, if any, on marking pursuant to 35 U.S.C. § 287(a) to collect pre-suit damages.

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections.  Fujifilm objects to this Interrogatory as being premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order.  Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion.  Fujifilm further objects to this Interrogatory because it contains multiple discrete subparts.  Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Subject to and without waiver of the foregoing general and specific objections, Fujifilm identifies the following produced documents as responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d):

FFSS_BFLY_0004476 – 4753 (SonoSite M-Turbo Ultrasound System User Guide);

FFSS_BFLY_0004754 – 5027 (SonoSite M-Turbo Ultrasound System User Guide);

FFSS_BFLY_0005028 – 5215 (SonoSite SII User Guide);

FFSS_BFLY_0005216 – 5431 (SonoSite SII User Guide);

FFSS_BFLY_0005432 – 5647 (SonoSite SII User Guide);

FFSS_BFLY_0005648 – 5925 (SonoSite SII User Guide);

FFSS_BFLY_0005926 – 6135 (SonoSite iViz User Guide);

FFSS_BFLY_0006136 – 6341 (SonoSite iViz User Guide);

FFSS_BFLY_0007800 – 7802 (Screenshots of Sonosite products).

Fujifilm additionally will produce and identify other non-privileged documents in its possession responsive to this Interrogatory that are located after a reasonable search.

**FIRST SUPPLEMENTAL RESPONSE:**

Subject to and without waiver of the foregoing general and specific objections, Fujifilm supplements the above response as follows:

**'822 Patent**

Fujifilm identifies the following produced documents as responsive to this Interrogatory for the '822 Patent pursuant to Fed. R. Civ. P. 33(d):

FFSS_BFLY_0004476 – 4753 (SonoSite M-Turbo Ultrasound System User Guide);

FFSS_BFLY_0004754 – 5027 (SonoSite M-Turbo Ultrasound System User Guide);

FFSS_BFLY_0005028 – 5215 (SonoSite SII User Guide);

12

FFSS_BFLY_0005216 – 5431 (SonoSite SII User Guide);

FFSS_BFLY_0005432 – 5647 (SonoSite SII User Guide);

FFSS_BFLY_0005648 – 5925 (SonoSite SII User Guide);

FFSS_BFLY_0007800 – 7802 (Screenshots of Sonosite products).

Fujifilm additionally will produce and identify other non-privileged documents in its possession responsive to this Interrogatory that are located after a reasonable search.

### '985 Patent

Fujifilm identifies the following produced documents as responsive to this Interrogatory for the '985 Patent pursuant to Fed. R. Civ. P. 33(d):

FFSS_BFLY_0005926 – 6135 (SonoSite iViz User Guide);

FFSS_BFLY_0006136 – 6341 (SonoSite iViz User Guide);

FFSS_BFLY_0007800 – 7802 (Screenshots of Sonosite products).

Fujifilm additionally will produce and identify other non-privileged documents in its possession responsive to this Interrogatory that are located after a reasonable search.

**INTERROGATORY NO. 5.**

Set forth in detail the bases for Your contention that Fujifilm is the owner of all substantial rights, title, and interest in each Asserted Patent (including the right to collect past damages for the entire period for which You are seeking damages in this Action), including without limitation by describing in detail all facts concerning any consideration paid or received for any rights, title, and interest in each Asserted Patent, and all facts that support, refute, or contradict Your contentions.

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections.  Fujifilm objects to this Interrogatory as being premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions

13

before such information is required to be provided pursuant to the scheduling order. Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion. Fujifilm further objects to this Interrogatory because it contains multiple discrete subparts. Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Subject to and without waiver of the foregoing general and specific objections, Fujifilm identifies the following produced documents as responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d):

- '168 Patent: FFSS_BFLY_0002179-82 (assignment record—change of name); FFSS_BFLY_0002183-88 (assignment record); FFSS_BFLY_0002234-35 (Blake Little assignment record); FFSS_BFLY_0002236 (Blake Little, Lee Dunbar assignment record); FFSS_BFLY_0002237-43 (Declaration); FFSS_BFLY_0002244 (Blake Little assignment record); FFSS_BFLY_0002308 (assignment record); FFSS_BFLY_0002335_38 (assignment record—change of name); FFSS_BFLY_0002308 (assignment record); FFSS_BFLY_0006995-98 (Patent Assignment Agreement).

- '050 Patent: FFSS_BFLY_0002189-92 (assignment record); FFSS_BFLY_0002193-96 (assignment record—change of name); FFSS_BFLY_0002248-50 (assignment record—SonoSite to FUJIFILM SonoSite); FFSS_BFLY_0002251-54 (Bradley Sliger assignment record); FFSS_BFLY_0002255-57 (inventor declaration); FFSS_BFLY_0002258 (Bradley Sliger assignment record); FFSS_BFLY_0002315 (assignment record); FFSS_BFLY_0002316-19 (assignment record—change of name); FFSS_BFLY_0002339-42 (assignment record); FFSS_BFLY_0006995-98 (Patent Assignment Agreement).

14

- '108 Patent:    FFSS_BFLY_0002233 (PTO/SB/96); FFSS_BFLY_0002304(Patent Assignment Abstract of Title); FFSS_BFLY_0002305-07 (Assignment Record); FFSS_BFLY_000230914 (Assignment Record); FFSS_BFLY_0002176–78 (Assignment Record); FFSS_BFLY_0002179-82 (assignment record—change of name);

- '157 Patent: FFSS_BFLY_0002302-03 (Patent Assignment Abstract of Title); FFSS_BFLY_0002333–34 (PTO 1595); FFSS_BFLY_0002343–2710 (Assignment Record); FFSS_BFLY_0001803–04 (Assignment Record); FFSS_BFLY_0001805–0002172 (Assignment Record); FFSS_BFLY_0002173 – 2175 (Assignment Record); FFSS_BFLY_0006995-98 (Patent Assignment Agreement).

- '822 Patent: FFSS_BFLY_0002323-24 (Assignment Record); FFSS_BFLY_0002199–208 (Assignment Record); FFSS_BFLY_0002209–212 (assignment record—change of name);

- '981 Patent:    FFSS_BFLY_0002320 (Patent Assignment Abstract of Title); FFSS_BFLY_0002321–22    (Assignment    Record);    FFSS_BFLY_0002197–98 (Assignment Record); FFSS_BFLY_0002173–175 (Assignment Record);

- '985 Patent: FFSS_BFLY_0002262–63 (PTO/AIA/96); FFSS_BFLY_0002264–66 (PTO/AIA/96); FFSS_BFLY_0002325–31 (Assignment Record); FFSS_BFLY_0002332 (Patent Assignment Abstract of Title); FFSS_BFLY_0002213–19 (Assignment Record).

Fujifilm additionally will produce and identify other non-privileged documents in its possession responsive to this Interrogatory that are located after a reasonable search.

**INTERROGATORY NO. 6.**

Describe all factual and legal bases for Your request for monetary relief in this case, including without limitation by identifying and describing all facts and circumstances supporting Your request for a reasonable royalty, lost profits, price erosion damages, ongoing royalty, or damages under any other theory; identifying documents that support or contradict Your

15

contentions; and identify three Fujifilm witnesses most knowledgeable about the information requested in this Interrogatory.

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections. Fujifilm objects to this Interrogatory as being premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order. Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion. Fujifilm further objects to this Interrogatory because it contains multiple discrete subparts. Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Subject to and without waiving Fujifilm's General and Specific Objections to this Interrogatory, Fujifilm responds as follows:

Fujifilm will respond further to this Interrogatory at an appropriate time in accordance with the scheduling order in this case and will produce and identify documents responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d). Additionally, Fujifilm reserves the right to rely on expert testimony in connection with issues pertinent to this Interrogatory and, accordingly, reserves the right to rely on any additional evidence, arguments, or other support as part of the reports of its experts.

**INTERROGATORY NO. 7.**

To the extent Fujifilm contends that it is entitled to a preliminary and/or permanent injunction against Butterfly's alleged infringement of the Asserted Patents, describe all factual and legal bases for Your contention, including without limitation with respect to any of the factors set forth in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), and identify three Fujifilm witnesses most knowledgeable about the information requested in this Interrogatory.

16

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections.  Fujifilm objects to this Interrogatory as being premature (1) to the extent it seeks Fujifilm's contentions without the benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order.  Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion.  Fujifilm further objects to this Interrogatory because it contains multiple discrete subparts.  Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Subject to and without waiving Fujifilm's General and Specific Objections to this Interrogatory, Fujifilm responds as follows:

Fujifilm will respond further to this Interrogatory at an appropriate time in accordance with the scheduling order in this case and will produce and identify documents responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d).  Additionally, Fujifilm reserves the right to rely on expert testimony in connection with issues pertinent to this Interrogatory and, accordingly, reserves the right to rely on any additional evidence, arguments, or other support as part of the reports of its experts.

**INTERROGATORY NO. 8.**

Identify all Prior Art of which You are aware concerning the alleged invention(s) of the Asserted Claims of each Asserted Patent.

**RESPONSE:**

Fujifilm objects to this Interrogatory based on its General Objections.  Fujifilm objects to this Interrogatory as being premature (1) to the extent it seeks Fujifilm's contentions without the

17

benefit of full fact discovery, (2) to the extent it seeks Fujifilm's expert contentions and/or opinions without the benefit of full fact and expert discovery; and (3) to the extent it seeks such contentions before such information is required to be provided pursuant to the scheduling order. Fujifilm objects to this Interrogatory to the extent that it calls for a legal conclusion. Fujifilm further objects to this Interrogatory because it contains multiple discrete subparts. Fujifilm also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Subject to and without waiver of the foregoing general and specific objections, Fujifilm identifies the Prior Art cited in connection with patent prosecution of each of the Asserted Patents.

**FIRST SUPPLEMENTAL RESPONSE:**

Subject to and without waiver of the foregoing general and specific objections, Fujifilm supplements the above response and identifies the alleged Prior Art cited in connection with Butterfly's Invalidity Contentions. Fujifilm additionally will produce and identify other Prior Art documents in its possession responsive to this Interrogatory that are located after a reasonable search.

**INTERROGATORY NO. 9.**

For each claim of each Asserted Patent, describe in detail its first disclosure and commercialization by separately identifying the date of the first offer for sale, first sale, first public use, and first public disclosure of any product or process that satisfies each limitation of that claim, setting forth the circumstances leading to and surrounding each such offer for sale, sale, public use or public disclosure, and identify three persons most knowledgeable of such offer for sale, sale, public use or public disclosure and all documents relating thereto.

**RESPONSE:**

Plaintiff objects to this Interrogatory based on its General Objections. Plaintiff further objects to this Interrogatory because it contains multiple discrete subparts. Plaintiff further objects to this Interrogatory as overbroad, unduly burdensome, and to the extent it seeks information or

18

documents that are not relevant to a claim or defense of any party and proportional to the needs of the case. Plaintiff also objects to this Interrogatory to the extent it calls for information protected from discovery by the attorney-client privilege, work-product doctrine, and/or any other applicable privilege or protection.

Subject to and without waiver of the foregoing general and specific objections, Fujifilm has produced or will produce non-privileged documents responsive to this Interrogatory pursuant to Fed. R. Civ. P. 33(d) that are located after a reasonable search.

Dated:  March 27, 2023

Respectfully submitted,

/s/ *Jennifer C. Tempesta*
Robert L. Maier
New York Bar No. 4123246
Jennifer C. Tempesta
New York Bar No. 4397089
**BAKER BOTTS L.L.P.**
30 Rockefeller Plaza
New York, NY 10112-4498
Telephone: (212) 408-2500
Facsimile: (212) 408-2501
robert.maier@bakerbotts.com
jennifer.tempesta@bakerbotts.com

Jeremy A. Tigan
Delaware Bar No.
**Morris, Nichols, Arsht & Tunnell LLP**
1201 North Market Street
Wilmington, DE 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
jtigan@morrisnichols.com

*ATTORNEYS FOR PLAINTIFF*
 *FUJIFILM SONOSITE, INC.*

20

**CERTIFICATE OF SERVICE**

I, Jennifer C. Tempesta, hereby certify that on March 27, 2023, all counsel of record were

served with the foregoing document via electronic service.

Brian E. Farnan
Michael J. Farnan
Farnan LLP
919 N. Market St., 12th Floor
Wilmington, DE 19801
mfarnan@farnanlaw.com

Steven D. Maslowski
Jason Weil
Akin Gump Strauss Hauer & Feld LLP
1735 Market St., 12th Floor
Philadelphia, PA 19103

Paul D. Tripodi II
Clark Gordon
Akin Gump Strauss Hauer & Feld LLP
4 Park Plaza, Suite 1900
Irvine, CA 92614

C. Brandon Rash
Akin Gump Strauss Hauer & Feld LLP
2001 K Street, N.W.
Washington, D.C. 20006
BFLY-Fujifilm@akingump.com

*Attorneys for Plaintiff, FUJIFILM Sonosite, Inc.*

By:  /s/ *Jennifer C. Tempesta*
     *Jennifer C. Tempesta (*4397089)

21

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| FUJIFILM SONOSITE, INC.<br><br>　　　Plaintiff,<br><br>　v.<br><br>BUTTERFLY NETWORK, INC.<br><br>　　　Defendant. | Case No. 1:22-cv-00309-MN |

## **PLAINTIFF'S FIRST SUPPLEMENTAL INITIAL DISCLOSURES**

Pursuant to Federal Rule of Civil Procedure 26(a)(1), Plaintiff FUJIFILM Sonosite, Inc. ("FUJIFILM" or "Plaintiff") makes the following Initial Disclosures in connection with the above-referenced action in which infringement claims for the following patents are asserted against Butterfly Network, Inc. ("Butterfly" or "Defendant"): U.S. Patent No. 6,901,157 (the "'157 Patent"), U.S. Patent No. 9,538,985 (the "'985 Patent"), U.S. Patent No. 7,867,168 (the "'168 Patent"), U.S. Patent No. 7,169,108 (the "'108 Patent"), U.S. Patent No. 8,861,822 (the "'822 Patent"), U.S. Patent No. 8,360,981 (the "'981 Patent"), and U.S. Patent No. 8,128,050 (the "'050 Patent") (collectively, "the patents-in-suit").

The following disclosures are made based on information reasonably available to FUJIFILM to date. By making these disclosures, FUJIFILM does not represent that it is identifying every document, tangible thing, or witness possibly relevant to this lawsuit. These disclosures do not limit FUJIFILM's discovery in this case or waive FUJIFILM's right to object to any testimony, document, or tangible thing disclosed herein on the basis of privilege, the work product doctrine, relevance, materiality, undue burden, or any other valid objection to its discoverability or use. FUJIFILM makes these disclosures with the expectation that a protective order will be entered by

the Court at an appropriate time. The case is in the preliminary stages of discovery, and FUJIFILM

has not to date received discovery from Defendant.  FUJIFILM reserves the right to supplement,

correct, or amend these disclosures pursuant to Federal Rule of Civil Procedure 26(e). FUJIFILM

also reserves the right to rely on any document that Defendant identifies or produces.

## RULE 26 DISCLOSURES

**I.      Rule 26(a)(1)(A)(i): the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Based upon information reasonably available at this time, FUJIFILM identifies the

following as individuals likely to have discoverable information that FUJIFILM may use to

support its claims or defenses. Discovery in this case is ongoing and in its preliminary stages, and

FUJIFILM anticipates that other individuals may also have discoverable information upon which

FUJIFILM may rely and specifically reserves the right to identify additional witnesses as discovery

proceeds.

In making these disclosures, FUJIFILM does not waive its rights to object, pursuant to

applicable Local and Federal Rules, to discovery of information by deposition or otherwise from

any of the individuals listed below, including without limitation based on the attorney-client

privilege and/or work product immunity.

FUJIFILM does not consent or authorize any other party to communicate with employees

or former employees of FUJIFILM, or other individuals with privileged information, and does not

consent to or authorize any communications prohibited by any applicable rule of professional

conduct.

By indicating the general subject matter of information these individuals may possess,

FUJIFILM is in no way limiting its right to call an individual to testify regarding other subjects.

2

| Name | Subject Matter |
|---|---|
| Yukiya Miyachi<br>To be contacted through Baker Botts LLP | • Named inventor on the '981 Patent.<br>• Information regarding the subject matter of the '981 Patent. |
| Nikolaos Pagoulatos<br>To be contacted through Baker Botts LLP | • Named inventor on the '822 Patent.<br>• Information regarding the subject matter of the '822 Patent. |
| Qinglin Ma | • Named inventor on the '822 Patent.<br>• Information regarding the subject matter of the '822 Patent. |
| Andrew K. Lundberg<br>Director of Hardware Engineering, FUJIFILM Sonosite, Inc.<br>To be contacted through Baker Botts LLP | • Named inventor on the '822 Patent.<br>• Information regarding the subject matter of the '822 Patent. |
| Richard Hippe<br>To be contacted through Baker Botts LLP | • Named inventor on the '822 Patent.<br>• Information regarding the subject matter of the '822 Patent. |
| Clinton T. Siedenburg<br>To be contacted through Baker Botts LLP | • Named inventor on the '822 Patent.<br>• Information regarding the subject matter of the '822 Patent. |
| Eiji Ogawa<br>To be contacted through Baker Botts LLP | • Named inventor on the '157 Patent.<br>• Information regarding the subject matter of the '157 Patent. |
| Bradley J. Sliger<br>To be contacted through Baker Botts LLP | • Named inventor on the '050 Patent.<br>• Information regarding the subject matter of the '050 Patent. |
| Blake Little<br>To be contacted through Baker Botts LLP | • Named inventor on the '108 and '168 Patents.<br>• Information regarding the subject matter of the '108 and '168 Patents. |
| Hung Nguyen | • Named inventor on the '108 Patent.<br>• Information regarding the subject matter of the '108 Patent. |
| Amanda Mander<br>To be contacted through Baker Botts LLP | • Named inventor on the '985 Patent.<br>• Information regarding the subject matter of the '985 Patent. |

| Name | Subject Matter |
|---|---|
| Craig Chamberlain Director of Experience Design, FUJIFILM Sonosite, Inc. To be contacted through Baker Botts LLP | • Named inventor on the '985 Patent. <br> • Information regarding the subject matter of the '985 Patent. |
| Evan McCormack To be contacted through Baker Botts LLP | • Named inventor on the '985 Patent. <br> • Information regarding the subject matter of the '985 Patent. |
| Lee Dunbar To be contacted through Baker Botts LLP | • Named inventor on the '168 Patent. <br> • Information regarding the subject matter of the '168 Patent. |
| Ryan Hebbler Director of Strategic Accounts for Clinical Solutions, FUJIFILM Sonosite, Inc. To be contacted through Baker Botts LLP | • Knowledge of FUJIFILM Sonosite's analysis, investigation, knowledge, and/or discussion of products made by ultrasound industry participants, including Butterfly |

In addition to the persons identified above, the following classes of persons may have discoverable information that FUJIFILM may use to support its claims or defenses:

1. persons with knowledge of Defendant's accused products, including but not limited to Defendant and customers of Defendant who may use Defendants' accused products;

2. each of the authors of Ultrasound-on-chip platform for medical imaging, PNAS 118(27) 2021 e2019339118;

3. other persons who will be deposed during this lawsuit and persons identified during such depositions;

4. any custodians of records or other persons who may be required to establish the authenticity of documents or things;

5. all individuals identified by Defendant in its Rule 26(a) initial disclosures and any amendments thereto;

6. all individuals identified by Defendant in its discovery responses;

7. all individuals identified by FUJIFILM in its discovery responses;

8. all individuals identified through discovery, deposition, declaration or other means, including those individuals whose names appear on documents cited in FUJIFILM claim charts attached to the complaint or infringement contentions.

Moreover, while FUJIFILM may decide to retain one or more expert witnesses to testify on its behalf at any trial in this matter, at this juncture, FUJIFILM has not yet made a decision regarding testifying expert witnesses. FUJIFILM will disclose the identity of any testifying expert witnesses in accordance with the schedule entered by this Court.

FUJIFILM reserves the right to subpoena documents and testimony from any person identified by any party in this action as having knowledge of relevant facts. FUJIFILM also reserves the right to supplement the above disclosure of persons who may have relevant knowledge as this case progresses.

**II.     Rule 26(a)(1)(A)(ii): a copy—or description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses unless the use would be solely for impeachment.**

This case is in the preliminary stages of discovery and FUJIFILM has not yet received discovery from Defendant. Therefore, FUJIFILM reserves its right to assert additional legal theories and facts in this lawsuit. FUJIFILM reserves all claims under the Federal Rules of Civil Procedure, the Patent Laws of the United States, and any other claims, at law or equity, that may now or in the future be available to FUJIFILM.

Documents will be produced in accordance with the discovery schedule set by the Court. FUJIFILM reserves the right to supplement these categories as investigation and discovery in this lawsuit progresses.  FUJIFILM identifies, without limitation, at least the following documents in its possession, custody, or control that it may use to support its claims or defenses:

- Documents regarding the patents-in-suit.

- Documents relating to sales of FUJIFILM products relevant to damages issues.

The above documents are located at either FUJIFILM, 22011 30th Dr SE, Bothell, WA 98021; and/or Baker Botts, L.L.P., 30 Rockefeller Plaza, New York, NY 10112.

FUJIFILM reserves its rights to amend, modify, or supplement this disclosure should additional responsive information regarding FUJIFILM's claims and defenses come to light through discovery or otherwise.

**III.    Rule 26(a)(1)(A)(iii): a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

FUJIFILM seeks damages for infringement of the patents-in-suit, based on a theory of lost profits and/or a reasonable royalty.  That computation will be prepared in connection with fact and

6

expert discovery.  FUJIFILM also seeks an award of attorney fees, expenses, and costs pursuant to 35 U.S.C. § 285, and treble damages resulting from Defendant's willful infringement. As the attorney fees, expenses, and costs are currently accruing, no computation of these damages is possible at the present time. FUJIFILM reserves the right to rebut any computation of alleged damages provided by Defendant.

**IV.    Rule 26(a)(1)(A)(iv): for inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

FUJIFILM is not presently aware of any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in this action or to indemnify or reimburse for payments made to satisfy the judgment.  FUJIFILM's investigation into this issue is continuing.

7

Dated: March 10, 2023

Respectfully submitted,

*/s/ Jennifer C. Tempesta*

Jeremy A. Tigan
MORRIS, NICHOLS, ARSHT &
TUNNELL LLP
1201 North Market Street
P.O. Box. 1347
Wilmington, DE 19899-1347
Phone: (302) 351-9106
jtigan@morrisnichols.com

OF COUNSEL:

Robert L. Maier
Jennifer C. Tempesta
Eric J. Faragi
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY 10112
Telephone: (212) 408-2500
Fax: (212) 408-2501

Attorneys for Plaintiff FUJIFILM Sonosite, Inc.

8

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 10, 2023 all counsel of record were served with a copy of this document via electronic mail.

*/s/ Jennifer C. Tempesta*
Jennifer C. Tempesta

# EXHIBIT 12

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

FUJIFILM SONOSITE, INC.,

                    Plaintiff,

    v.

BUTTERFLY NETWORK, INC.,

                 Defendant.

C.A. No. 22-309-JPM

**DEFENDANT BUTTERFLY NETWORK INC.'S
INITIAL INVALIDITY AND UNENFORCEABILITY CONTENTIONS**

Pursuant to the Court's Scheduling Order (D.I. 26) and Local Patent Rules 3.5 and 3.6 of the Western District of Tennessee ("W.D. Tenn. LPR"), Defendant Butterfly Network, Inc. ("Butterfly") hereby provides its Invalidity and Unenforceability Contentions concerning Plaintiff FUJIFILM Sonosite, Inc.'s ("Fujifilm") patent claims and accompanying document production. These Invalidity and Unenforceability Contentions are based on information currently available to Butterfly. As discovery is still in its early stages, Butterfly reserves the right to amend and/or supplement these Invalidity and Unenforceability Contentions as discovery progresses and to the extent any additional information provided to Butterfly alters, supplants, or clarifies the information currently available to Butterfly.

As a threshold matter, Butterfly and Fujifilm met and conferred via telephone on December 12, 2022, to discuss identifying and narrowing the issues presented in this case, as contemplated by W.D. Tenn. LPR 3.5. No agreement on narrowing the issues could be made.

**I.    PRELIMINARY STATEMENT AND RESERVATION OF RIGHTS**

These Invalidity and Unenforceability Contentions, including the attached exhibits, are based on Butterfly's current knowledge, understanding, and belief as to the facts and information available as of the date of these Invalidity and Unenforceability Contentions. As discussed below,

1

Butterfly's information as of the date of these Invalidity and Unenforceability Contentions is incomplete because Fujifilm's infringement allegations are vague, conclusory, and incomplete; the pleadings stage of this case is ongoing and not yet complete; the Court has not yet construed the claims in this case; fact discovery is ongoing and still in its early stages; and expert discovery is yet to commence. Accordingly, Butterfly reserves the right to amend, modify, and supplement, without prejudice, these Invalidity and Unenforceability Contentions as additional information is discovered, identified, understood, or appreciated, including Orders from the Court (e.g., concerning claim construction), information from Fujifilm (e.g., through discovery or any supplemental Infringement Contentions), and information from third parties.

### A.    Fujifilm's Infringement Contentions

### 1.    Asserted Claims and Priority Dates

Fujifilm was required to provide in its Infringement Contentions: "[e]ach claim of each patent in suit[1] that is allegedly infringed by each opposing party" and "[f]or any patent that claims priority to an earlier application, the priority date to which each asserted claim allegedly is entitled." W.D. Tenn. LPR 3.1(a), 3.1(f). Fujifilm has asserted the following priority dates and claims ("Asserted Claims") against Butterfly:[2]

| Patent | Asserted Claims | Fujifilm's Asserted Priority Date |
|---|---|---|
| 6,901,157 | 1-4, 6-10, 12-15, 17-21, 23-26 | January 15, 2001 |
| 7,169,108 | 1-4 | February 1, 2002 |
| 7,867,168 | 1-5, 12-13, 15 | August 24, 2004 |
| 8,128,050 | 1, 5, 7, 9, 10, 12 | February 8, 2011 |
| 8,360,981 | 1-5, 7-9, 11 | August 22, 2008 |

---

[1] The "Patents in Suit" or "Asserted Patents" are U.S. Patent Nos. 6,901,157 ("the '157 Patent"); 7,169,108 ("the '108 Patent"); 7,867,168 ("the '168 Patent"); 8,128,050 ("the '050 Patent"); 8,360,981 ("the '981 Patent"); 8,861,822 ("the '822 Patent"); 9,538,985 ("the '985 Patent"). Fujifilm's Initial Infringement Contentions at 1.

[2] *See* Fujifilm's Initial Infringement Contentions at 1, 6.

| 8,861,822 | 1-10 | April 7, 2010 |
|---|---|---|
| 9,538,985 | 1-3 | April 18, 2014 |

With its Infringement Contentions, Fujifilm was also required to search for and produce "[a]ll documents evidencing the conception and first reduction to practice of each claimed invention created on or before the date of application for the patent in suit or the priority date identified pursuant to LPR 3.1(f), whichever is earlier." W.D. Tenn. LPR 3.2(b). Fujifilm has not identified or otherwise relied on any documents to support the asserted priority dates, above, or any other priority date. And Fujifilm has not produced any "conception and [] reduction to practice" documents for at least five out of the seven Asserted Patents, other than the patent file histories themselves and their related priority documents. Indeed, on October 25, 2022, Butterfly served its Interrogatory No. 1, seeking Fujifilm to identify the priority date of each Asserted Claim and describe in detail the complete chronological development of the subject matter claimed, including without limitation "an identification and detailed description of the dates and circumstances of the conception, diligence, and reduction to practice of any alleged inventions." Butterfly's First Set of Interrogs. at 9. After requesting a two-week extension, Fujifilm served its response on December 9, 2022, repeating the same priority dates above and identifying the patent file histories themselves and their related priority documents. *See* Fujifilm's Resp. to Butterfly's First Set of Interrogs. at 6-7. Fujifilm, however, failed to identify or describe "the dates and circumstances of the conception, diligence, and reduction to practice of any alleged inventions." *See id.*

### 2.    Fujifilm's Infringement Contentions

Fujifilm's Infringement Contentions do not specify, and thus are unclear as to, which specific products allegedly infringe each claim, how Fujifilm understands the language of the Asserted Claims, and how the language applies to each specific product. Butterfly provides these

3

"each curve has a radius of at least approximately 0.25 inch" (claim 1) – This term is invalid for lack of written description and enablement. With respect to the size of the claimed "curves," the specification states that "[i]n some embodiments, for example, the curves 111 can have a radius of curvature of about 0.25 inch, 0.5 inch, 0.75 inch, or 1.0 inch" and "[i]n other embodiments, the curves 111 can have other suitable values of radii." '050 Patent at 3:7-11. The specification does not contemplate a range of 0.25 inches up to infinity, as claimed. Nor does the specification enable the full scope of such a range, which at some point will reach a practical and theoretical impossibility.

"the opening" (claim 5) – This term is indefinite based on a lack of antecedent basis because it is unclear as to what element this term is making reference.

## IV.    UNENFORCEABILITY DUE TO INEQUITABLE CONDUCT (W.D. Tenn. LPR 3.5(e))

Some or all of the Asserted Claims are unenforceable due to inequitable conduct. Below, Butterfly provides the information that Fujifilm withheld, misstated, or otherwise misrepresented to the Patent Office; the basis for claiming such information was material to patentability; and the basis for claiming that Fujifilm withheld, misstated, or misrepresented such information with the requisite intent. Butterfly's positions, however, are necessarily preliminary because Butterfly's investigation, discovery, and analysis are ongoing and the pleadings stage is not yet completed. Additional fact and expert discovery may shed new light on the degree of Fujifilm's inequitable conduct. Accordingly, Butterfly reserves the right to amend or further revise these Invalidity and Unenforceability Contentions based on further developments in this case.

### A.    Applicable Law

"Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [U.S. Patent and Trademark Office ("PTO")],

101

which includes a duty to disclose to the [PTO] all information known to that individual to be material to patentability." 37 C.F.R. § 1.56. Inequitable conduct occurs when an individual associated with the filing and prosecution of a patent application failed to disclose material information (e.g., a prior art reference) with the intent to deceive the PTO. *See Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). Inequitable conduct renders the asserted patent unenforceable. *Id.*

A prior art reference may constitute material information, even when the reference is not sufficient to invalidate the claim, if the disclosure of the reference would have blocked the issuance of the patent. *Belcher Pharm., LLC v. Hospira, Inc.*, 11 F.4th 1345, 1352 (Fed. Cir. 2021). The reference constitutes but-for material information if the PTO would not have allowed a claim had the Examiner been aware of the undisclosed reference. *Id.* at 1352-53 (citing *Therasense*, 649 F.3d at 1291). Establishing but-for materiality requires only a preponderance of the evidence, giving claims their broadest reasonable construction. *Id.* On other hand, for the intent requirement, the accused infringer must prove by clear and convincing evidence that the individual "knew of the reference," "knew that it was material," and "made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1285.

### B.    U.S. Patent No. 7,867,168

The claims of the '168 Patent are unenforceable due to inequitable conduct. Individuals substantively involved with the filing and prosecution of the application that led to the '168 Patent—and, therefore, those individuals with a duty of candor to the PTO—intentionally withheld information that was material to patentability, and did so with the specific intent to deceive the PTO. These individuals include R. Ross Viguet, the prosecuting attorney of the application that led to the '168 Patent and many other Fujifilm patent applications; Blake W. Little, a named inventor of the '168 Patent; and possibly others.

102

In particular, Mr. Viguet and Mr. Little knowingly withheld material prior art—Fujifilm's own U.S. Patent Publication No. 2003/0013966 ("Barnes")—from the PTO. Such information was highly material to patentability. Barnes disclosed every claim limitation of at least independent claim 1 of the '168 Patent, including the claim limitations that the Examiner expressly determined were not disclosed in the considered prior art. Barnes, alone or in combination with other references considered during prosecution, disclosed or suggested each and every limitation of the claims of the '168 Patent and, therefore, anticipates those claims or renders them obvious. In other words, had Mr. Viguet or Mr. Little disclosed Barnes to the Examiner, the claims of the '168 Patent would not have issued.

Mr. Viguet and Mr. Little also knew of Barnes, knew that it was material, and made a deliberate decision to withhold it. On information and belief, Mr. Viguet was intimately familiar with the disclosure of Barnes because he represented Fujifilm during the prosecution of that application. On information and belief, Mr. Little was also intimately familiar with the disclosure of Barnes because he is a named inventor on that application. Even more, Mr. Viguet identified Barnes during the contemporaneous prosecution of other Fujifilm patent applications that listed Mr. Little as a named inventor and were prosecuted by Mr. Viguet. For example, Mr. Viguet filed Information Disclosure Statements ("IDS") for at least U.S. Patent Application Nos. 10/356,401, 11/121,311, 10/356,335, 11/852,196, and 12/467,899, which identify Barnes (or a related application with a substantively similar disclosure) to the PTO. Mr. Viguet and Mr. Little, and possibly others, deliberately withheld Barnes during the filing and prosecution of the application that led to the '168 Patent with the intent to deceive the PTO.

### 1.    The Prosecution History of the '168 Patent

The '168 Patent is titled, "Ultrasonic Transducer Having Distributed Weight Properties." '168 Patent at (54). It issued on January 11, 2011 from U.S. Patent Application No. 11/599,120

("the '120 Application"), which is a continuation-in-part of U.S. Patent Application No. 10/925,114 ("the '114 Application). '168 Patent at (21), (45), (63).

### a.    The '114 Application

On August 24, 2004, Mr. David Tannenbaum of Fulbright & Jaworski LLP filed the '114 Application, on behalf of SonoSite, Inc. (predecessor of Fujifilm) (collectively, "Fujifilm") and named inventor Mr. Little. '114 Application File History (BFLY_FUJI_0008022) at 1, 20-21. On information and belief, Mr. Viguet of Fulbright & Jaworski LLP took over prosecuting responsibilities from Mr. Tannenbaum. For example, Mr. Viguet signed almost all documents subsequently filed. *See, e.g.*, '114 Application File History (BFLY_FUJI_0008022) at 197 (signing applicants' response to office action).

Applicants filed the '114 Application with independent claims directed to a transducer connected to a separate processor via a digital cable. '114 Application File History (BFLY_FUJI_0008022) at 1, 11-15. For example, original claim 1 recited:

> 1. An ultrasound system comprising
> a transducer for sending ultrasound energy into a body and for receiving from said body energy reflections of sent ones of said signals:
> a processor separated form [sic] said transducer, said processor operable for processing said signals into a video display according to certain protocols;
> and wherein said transducer comprises: at least one scanhead; a digital beam former; a plurality of amplifiers for allowing signal energy to pass between said scanhead and said digital beam former; and
> a digital cable for connection to said processor, said digital cable operable for communicating digitally between said beam former and said processor.

'114 Application File History (BFLY_FUJI_0008022) at 11. The Examiner James Kish made rejections based on U.S. Patent Nos. 5,971,923 ("Finger"), 6,491,634 ("Leavitt"), 5,839,442 ("Chiang"), and 6,530,887 ("Gilbert"), and U.S. Patent Pub. No 2003/0139664 ("Hunt") because, for example, they disclosed and rendered obvious a transducer comprising a digital beamformer

104

coupled to a separate processor via a digital cable. '114 Application File History (BFLY_FUJI_0008022) at 178-79, 203-06, 311-13, 365-71. Applicants abandoned the application and the recited claims. '114 Application File History (BFLY_FUJI_0008022) at 378.

### b.      The '120 Application

On November 14, 2006, Mr. Viguet filed the '120 Application as a continuation-in-part, on behalf of Fujifilm, named inventor Mr. Little, and newly added named inventor Lee Dunbar. '120 Application File History (BFLY_FUJI_0007741) at 1, 23-25. The '120 Application added new disclosure in the figures and written description regarding the distribution of power source configuration between a transducer assembly and main processing unit. *Compare* '120 Application File History (BFLY_FUJI_0007741) at 4-22, *with* '114 Application File History (BFLY_FUJI_0008022) at 4-19; BFLY_FUJI_0008647 (redline comparison). Mr. Little concurrently submitted a declaration, signed October 31, 2006, stating that he "reviewed and understand[s] the contents of the above-identified application, including the claims," and acknowledging his "duty to disclose to the [PTO] all information known to [him] to be material to patentability as defined in 37 CFR 1.56." '120 Application File History (BFLY_FUJI_0007741) at 23.

Applicants filed the '120 Application with independent claims directed to a transducer assembly connected to a separate processing unit—but, this time, without a digital cable. '120 Application File History (BFLY_FUJI_0007741) at 15-18. For example, original claim 1 recited:

> 1. A system comprising:
> an ultrasound transducer assembly including an ultrasound transducer array
>       and signal processing circuitry coupled to said transducer array operable
>       to process analog signals from said transducer array and provide digital
>       information there from; and
> a main processing unit separate from said ultrasound transducer assembly
>       and in communication therewith operable to receive said digital
>       information from said ultrasound transducer assembly.

105

'120 Application File History (BFLY_FUJI_0007741) at 15. On October 23, 2009, and before any office action, Mr. Viguet filed a preliminary amendment to add, among other things, a limitation to original claim 1:

> 1. (Currently Amended) A system comprising:
> an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from; and
> a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly;
> wherein said ultrasound transducer assembly and said main processing unit are each powered by a same battery power source, wherein portions of the battery power source are distributed between the transducer and the main processing unit.

'120 Application File History (BFLY_FUJI_0007741) at 176. Applicants stated that support for this amendment could be "found throughout the specification and original claims, as filed, see *e.g.* paragraphs [0021-0023]." '120 Application File History (BFLY_FUJI_0007741) at 180.

On June 8, 2010, the Examiner James Kish rejected the claims, including claim 1 above, as obvious based on U.S. Patent Nos. 6,416,475 ("Hwang," which is assigned to Fujifilm) and 5,640,960 ("Jones") because Hwang disclosed all claim elements except "portions of the battery power source are distributed between the transducer and the main processing unit," which Jones taught. '120 Application File History (BFLY_FUJI_0007741) at 197-201. In particular, the Examiner stated "Jones [taught] a hand-held, battery operated ultrasound device with a cordless probe," where both "the probe and the base unit are battery operated." '120 Application File History (BFLY_FUJI_0007741) at 198. The Examiner further stated, "[i]t would have been obvious to one of ordinary skill in the art at the time the invention was made incorporate the specific transducer assembly and processing unit configurations of Hwang into a wireless device, as taught by Jones." '120 Application File History (BFLY_FUJI_0007741) at 198.

106

On September 8, 2010, Mr. Viguet filed an amendment in response. Applicants amended, among other things, claim 1 to include "a digital data cable" to overcome the "hand-held, battery operated ultrasound device with a cordless probe" taught by Jones:

> 1. (Currently Amended) A system comprising:
> an ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from; ~~and~~
> a main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly; and
> a digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between
> wherein said ultrasound transducer assembly and said main processing unit are each powered by a ~~same~~ battery power source, wherein portions of the battery power source are distributed between the transducer and the main processing unit.

'120 Application File History (BFLY_FUJI_0007741) at 221. Applicants stated that "[i]n light of the [] amendments, Applicant submits that the rejections are now moot. Therefore, Applicant respectfully requests that the rejections be withdrawn." '120 Application File History (BFLY_FUJI_0007741) at 225.

On October 13, 2010, Examiner James Kish allowed the claims and expressly provided a "statement of reasons for allowance": "The prior art fails to teach an ultrasound system as claimed. Specifically, *the prior art fails to teach a system in which a cable connects a main processing unit to an ultrasound transducer assembly wherein portions of the necessary battery power is distributed between these two units*. . . Prior art teaches that the power source is located in one or the other and necessary power is supplied to the other via the cable." '120 Application File History (BFLY_FUJI_0007741) at 234-35 (emphasis added). Because the Examiner allowed all claims that recited (expressly or by dependence) a configuration in which a digital cable connects a

107

transducer assembly and main processing unit wherein portions of the battery power source are distributed between those units (i.e., the combination of a "digital data cable" and "distributed" battery power source), the presence or absence of such a combination in the prior art is material to patentability.

On December 2, 2010, Mr. Viguet filed a supplemental communication after allowance. Instead of disclosing Barnes to the Examiner, Mr. Viguet noted a mistake in the title and otherwise stated, "Applicant notes with appreciation that the present case stands allowed." '120 Application File History (BFLY_FUJI_0007741) at 242.

### 2.    Fujifilm Was Well Aware of Prior Art Disclosing Such a Combination

On March 15, 2002—more than four years before the filing of the '120 Application—Mr. James M. Heslin of Townsend and Townsend and Crew LLP filed U.S. Patent Application No. 10/099,474 ("the '474 Application"), on behalf of Fujifilm, named inventor Mr. Little, and other named inventors.[3] '474 Application File History (BFLY_FUJI_0010893) at 1. Mr. Little submitted a declaration, signed May 9, 2002, stating that he "reviewed and understand[s] the contents of the above-identified application, including the claims." '474 Application File History (BFLY_FUJI_0010893) at 130. On January 16, 2003, before any office action, the '474 Application published as Barnes. Barnes at (43). On January 8, 2004, Mr. Viguet of Fulbright & Jaworski LLP filed a revocation of power of attorney and appointment of new power of attorney, on behalf of Fujifilm. '474 Application File History (BFLY_FUJI_0010893) at 203. On information and belief, Mr. Viguet was thereafter intimately involved in and led the prosecution of the '474 Application, which spanned roughly the same time period as the '114 and '120

---

[3] Other named inventors of the '474 Application include Stephanie A. Barnes, Steven M. Bunce, Bryan S. Cabatic, Bill Purdue, John D. Schultz, and Kari L. Rice. '474 Application File History (BFLY_FUJI_0010893) at 7.

Applications but was examined by a different examiner at the PTO (Examiner Long V. Le). The '474 Application issued as U.S. Patent No. 7,819,807 ("the '807 Patent") on October 26, 2010—just *thirteen days* after the claims of the '168 Patent were allowed.

Barnes disclosed and rendered obvious each limitation of at least claim 1 of the '168 Patent, including the combination of a "digital data cable" and "distributed" battery power source. *See* Ex. C2 (Invalidity Claim Chart for the '168 Patent – Barnes) at claim 1; *Butterfly Network, Inc. v. FUJIFILM Sonosite, Inc.*, IPR2022-01575, Paper 1 (PTAB Oct. 3, 2022) at 59-69. For example, like the '168 Patent, Barnes disclosed a portable ultrasound system including a main processing unit (e.g., a "first body") having system electronics and a battery power supply coupled to a transducer assembly (e.g., a "second body"). Barnes ¶¶ 13, 36, claim 39. "The transducer assembly has a digital beam former, an A/D circuit, a transducer array, [and battery] power supply." Barnes ¶ 36. The first and second bodies each have a "transmit/receive element," which may be wired or wireless, to carry digital information between the bodies. Barnes ¶¶ 13, 36, claims 39, 42 ("transmit/receive elements … are wires"); '474 Application File History (BFLY_FUJI_0010893) at 203 (stating, in a January 9, 2004 office action response filed by Mr. Viguet, "claim 42 … expressly recites the first and second transmit/receive elements comprise wires (e.g., a cable connection)"), 679 (changing "wires" in claim 42 to "wired"), 682 ("Claim 42 has been amended to correct a minor typographical error.… No new matter has been added by these amendments.").

109



Barnes at Fig. 20 (annotated). As shown above, Figure 20 illustrated these "transmit/receive elements" as a wired cable connecting the first body to the second body. Barnes ¶¶ 13, 32, 36, claims 39, 42, Fig. 20.

Barnes further explained:

> ***The wire connecting the body and transducer assembly provides*** power to the transducer assembly, and ***a signal path for the body and transducer assembly to communicate using digital data***. In this manner the need for an analog cable, having many data paths for analog signals, is eliminated, and spares additional weight. The signal from the transducer array returns through the digital beam former incorporated into the transducer assembly so ***only digital information goes between the body and the transducer assembly***.

Barnes ¶ 32.

Although the specification of the Barnes publication does not expressly identify which embodiment corresponds to Figure 20, a person of ordinary skill in the art would have understood that Figure 20 illustrates the same "headset" embodiment described in paragraphs 13 and 36, and

110

recited in claim 39. Consistent with this understanding, on May 23, 2005, Mr. Viguet filed an

amendment during prosecution of the '474 Application that amended paragraph 36 (which

corresponds to paragraph 34 in the Barnes publication) as follows:

> In a fourth embodiment, the invention comprises of a first body having system electronics (Figure 20 at 2000), a first transmit and receive element (Figure 20 at 2001), and a first power supply. The first body ~~weighing~~ weighs less than two pounds. A second body houses the transducer assembly. The transducer assembly has a digital beam former, an A/D circuit, a transducer array, a second power supply, a second transmit and receive element and at least one control element. The second body ~~weighing~~ weighs less than one pound. A head set (Figure 20 at 2002) is provided comprising a visual display (Figure 20 at 2003), a receive element and a third power supply such that the first body, second body and head set are all in real time communication with each other.

'474 Application File History (BFLY_FUJI_0010893) at 288, 298 ("Paragraphs 25, 27, 28, 34, 36,

and 37 have been amended to include references to Figures 2-20, to include citations to

incorporated references that provide additional detail, and to fix typographic errors. No new matter

has been added."). Applicants also filed a cleaner version of Figure 20:

111



FIG. 20

'474 Application File History (BFLY_FUJI_0010893) at 298, 322.

Accordingly, Barnes disclosed each limitation of at least claim 1 of the '168 Patent, as arranged in the claim, because Barnes disclosed an embodiment that includes the claimed "transducer assembly" and "main processing unit," each having an internal battery and being coupled together via a digital data cable configured to convey digital information between the transducer assembly and main processing unit. Barnes ¶¶ 11, 13, 32, 36, claims 39, 42. Indeed, claim 42 in Barnes recites each limitation of claim 1 in the '168 Patent, as illustrated in the comparison below, including the combination of a "digital data cable" and "distributed" battery power source—the only limitations the Examiner found missing from the prior art. *Compare* Barnes at claims 39, 42, *with* '168 Patent at claim 1.

112

| Claims 39 and 42 of Barnes | Claim 1 of the '168 Patent |
|---|---|
| **39**. A lightweight medical ultrasound system comprising:<br><br>a **first body having system electronics**, **a first transmit/receive element** and a **first power supply**, said first body weighing less than two pounds;<br><br>a **second body having a digital beam former, an A/D converter circuit, a transducer array**, a **second power supply**, **a second transmit/receive element** and at least one control element, said second body weighing less than one pound; and<br><br>a headset comprising a visual display, a receive element and a third power supply such that **the first body, second body** and head set **are in communication with each other through the first and second transmit/receive element** and the receive element so that a user may control the system through the at least one control element of the second body, while the **first body performs the diagnostic operations through said system electronics**, and the user may see the operations through the visual display of the head set.<br><br>**42**. The lightweight medical ultrasound system as described in claim 39, wherein **the first and second transmit/receive elements** and the receive element of the headset **are wires**. | **1**. A system comprising:<br><br>an **ultrasound transducer assembly including an ultrasound transducer array and signal processing circuitry coupled to said transducer array operable to process analog signals from said transducer array and provide digital information there from**;<br><br>a **main processing unit separate from said ultrasound transducer assembly and in communication therewith operable to receive said digital information from said ultrasound transducer assembly**; and<br><br>a **digital data cable coupled between said ultrasound transducer assembly and said main processing unit carrying said digital information there between**;<br><br>wherein said **system is powered by a battery power source, wherein portions of the battery power source are distributed between the ultrasound transducer assembly and the main processing unit**. |

On October 3, 2022, Butterfly filed a Petition for *inter partes* review of the '168 Patent.

*See Butterfly Network, Inc. v. FUJIFILM Sonosite, Inc.*, IPR2022-01575, Paper 1 (PTAB Oct. 3, 2022). In that Petition, Butterfly similarly showed that Barnes disclosed each limitation of at least claim 1, including the combination of a "digital data cable" and "distributed" battery power

source—the only limitations the Examiner found missing from the prior art. *Id.* at 16-17, 63-69; *see also id.* at 59-74.

### 3.      Fujifilm Avoided Disclosing Barnes During the Prosecution of the '114 and '120 Applications but Disclosed It Elsewhere

Before, during, and after the prosecution of the '120 Application (i.e., the application that led to the '168 Patent), Fujifilm filed six serial applications with a substantively similar disclosure of Barnes. For example, on August 21, 2002, Fujifilm filed U.S. Patent Application No. 10/227,160 ("the '160 Application"), on behalf of named inventor Mr. Little and others. The '160 Application, which is a continuation-in-part of the '474 Application, issued as U.S. Patent No. 6,575,908 ("the '908 Patent") on June 10, 2003. Like Barnes, it disclosed the combination of a "digital data cable" and "distributed" battery power source. *E.g.*, '908 Patent at 3:6-22, 7:5-23. As another example, on April 30, 2010—less than six months before the claims of the '168 Patent were allowed, Mr. Viguet filed U.S. Patent Application No. 12/771,982 ("the '982 Application"), on behalf of Fujifilm, named inventor Mr. Little, and others. The '982 Application, which is a continuation of the '474 Application, was published on October 28, 2010—just fifteen days after the claims of the '168 Patent were allowed—and issued as U.S. Patent No. 8,052,606 ("the '606 Patent") on November 8, 2011. Like Barnes, it disclosed the combination of a "digital data cable" and "distributed" battery power source. *E.g.*, '606 Patent at 3:1-18, 6:45-57, Fig. 20.

Among the Information Disclosure Statements ("IDS") filed during the prosecution of the '114 and '120 Applications, Fujifilm failed to disclose Barnes or any of the six serially filed applications to the PTO. Instead, Fujifilm disclosed other Fujifilm patents and patent applications, including patents and applications that listed Mr. Little as a named inventor. For example, on September 30, 2008, Mr. Viguet filed an IDS during the prosecution of the '120 Application that

114

identified at least two patents or patent applications assigned to Fujifilm and listing Mr. Little as a named inventor. '120 Application File History (BFLY_FUJI_0007741) at 153.

On the other hand, Fujifilm disclosed Barnes, or one of the six serial applications, to the PTO during prosecution of *other* Fujifilm patent applications. Below are a few examples:

- On October 19, 2004, Mr. Viguet filed an IDS on behalf of Fujifilm and named inventor Mr. Little during the prosecution of U.S. Patent Application No. 10/356,401 ("the '401 Application"), which identified Barnes. '401 Application File History (BFLY_FUJI_0030126) at 47-50.

- On July 27, 2005—just over a year before the '120 Application was filed and during the prosecution of the '114 Application, Mr. Viguet filed an IDS on behalf of Fujifilm and named inventor Mr. Little during the prosecution of U.S. Patent Application No. 11/121,311 ("the '311 Application"), which identified the '908 Patent. '311 Application File History (BFLY_FUJI_0030642) at 49-57.

- On September 5, 2007—just two months before a supplemental IDS was filed for the '120 Application, Mr. Viguet filed an IDS on behalf of Fujifilm and named inventor Mr. Little during the prosecution of U.S. Patent Application No. 10/356,335 ("the '335 Application"), which identified the '908 Patent. '335 Application File History (BFLY_FUJI_0030821) at 350-53.

- On May 18, 2009—just one month before a supplemental IDS was filed for the '120 Application, Fujifilm filed an IDS on behalf of named inventor Mr. Little during the prosecution of U.S. Patent Application No. 12/467,899 ("the '899 Application"), which identified the '908 Patent. '899 Application File History (BFLY_FUJI_0031386) at 37-43.

115

- On March 30, 2010 and September 9, 2010, in two separate office actions, an Examiner rejected claims of U.S. Application No. 11/852,196 ("the '196 Application") as obvious based on Jones and a child application of Barnes (U.S. Patent Pub. No. 2003/0195418). '196 Application File History (BFLY_FUJI_0036078) at 73-89, 119-33. Mr. Viguet filed responses to those office actions on June 28, 2010 and November 9, 2010, respectively (*id.* at 103-14, 145-61)—in between which, on September 8, 2010, Mr. Viguet filed an amendment to claim 1 of the '168 Patent to include a "digital data cable" ('120 Application File History (BFLY_FUJI_0007741) at 219-225).

Butterfly believes that discovery in this case will further confirm that Mr. Viguet and Mr. Little, and possibly others at Fujifilm, were fully aware during the filing and prosecution of the '120 Application that Barnes disclosed the combination of a "digital data cable" and "distributed" battery power source. Butterfly also believes that discovery will further confirm that Mr. Viguet and Mr. Little, and possibly others at Fujifilm, deliberately withheld Barnes during the filing and prosecution of the '120 Application with the intent to deceive the PTO while, at the same time, intending to capitalize on its purported rights in these patents. For example, User Guide Supplement P13895-03 for Fujifilm's M-Turbo Ultrasound System and S Series Ultrasound System lists the '168 Patent, '807 Patent (which issued from Barnes), and '908 Patent (which issued from a child application of Barnes):

> ***The SonoSite ultrasound system(s) referenced in this document may be covered by one or more of the following U.S. patents***:
> 5722412, 5817024, 5893363, 6135961, 6203498, 6364839, 6371918, 6383139, 6416475, 6447451, 6471651, 6569101, 6648826, ***6575908***, 6604630, 6817982, 6835177, 6962566, 7169108, 7449640, 7534211, 7549961, 7588541, 7591786, 7604596, 7643040, 7686766, 7694814, 7727153, 7740586,

116

7804970, 7809400, *7819807*, 7841575, 7849250, *7867168*, 7883276 . . .

BFLY_FUJI_0026351 at 356 (emphasis added).

Mr. Viguet, as the attorney representing Fujifilm during the prosecution of the '120 Application and the prosecution of Barnes, owed a duty of candor to the PTO. Mr. Little, as the named inventor on the '168 Patent and Barnes, also owed a duty of candor. As mentioned above, Mr. Little submitted a declaration, stating that he "reviewed and understand[s] the contents of the ['120] application, including the claims," and acknowledging his "duty to disclose to the [PTO] all information known to [him] to be material to patentability as defined in 37 CFR 1.56." '120 Application File History (BFLY_FUJI_0007741) at 23. With the above-described material information, neither Mr. Viguet nor Mr. Little, nor anyone else at Fujifilm, identified Barnes (or any of the six serially filed applications) to the Examiner, despite unquestionably being aware of such a disclosure.

The single most reasonable inference to be drawn from the foregoing facts is that Mr. Viguet and Mr. Little, and possibly others, knowingly and deliberately withheld highly material information from the PTO during the prosecution of the '120 Application with a specific intent to deceive the PTO. Mr. Viguet's failure to disclose Barnes violated his duty of candor to the PTO. And Mr. Little's failure to disclose Barnes violated his duty of candor and the representation in his declaration to the PTO that he would disclose information which is material to patentability.

Had the PTO been aware of Barnes, the claims of the '168 Patent would not have issued. As described above, the Examiner's express reason for allowance was not finding the combination of a "digital data cable" and "distributed" battery power source in the prior art. Fujifilm's intentional omission of Barnes, which disclosed such combination, resulted in a material misunderstanding by the Examiner. Pursuant to the Federal Declaratory Judgement Act, 28 U.S.C.

117

§ 2201, *et seq.*, Butterfly intends to request a declaration that at least the '168 Patent is unenforceable due to inequitable conduct.

**V.      DOCUMENT PRODUCTION ACCOMPANYING INVALIDITY AND UNENFORCEABILITY CONTENTIONS (W.D. Tenn. LPR 3.6)**

As explained above, Butterfly's investigation, discovery, and analysis are ongoing. Butterfly's production and identification of documents that are responsive to the categories set forth in W.D. Tenn. LPR 3.6 are based on information and documents presently known and available to Butterfly after a reasonable investigation. Discovery in this case is at an early stage and, consistent with the Scheduling Order, the Local Rules of the District of Delaware, and the Federal Rules of Civil Procedure, Butterfly reserves the right to amend, modify, or supplement its production and this disclosure in the event further information is disclosed or discovered, or in response to claim constructions, positions taken by Fuji, or other discovery in this case. This disclosure is given without prejudice to Butterfly's right to use or rely on, at any time including trial, any subsequently discovered information, or any information omitted from this disclosure by inadvertence, mistake, or otherwise. Accordingly, Butterfly disclosure as required by W.D. Tenn. LPR 3.6 shall not be deemed to constitute an admission or representation that any statement or characterization is complete. Moreover, this disclosure does not constitute a waiver by Butterfly of the right to object on any basis to any discovery request or proceeding involving or relating to the subject matter of these documents.

Based upon information presently available and subject to the reservations set forth above, Butterfly will serve concurrently with its Invalidity and Unenforceability Contentions a production of documents that is responsive to the categories set forth in W.D. Tenn. LPR 3.6. Butterfly also incorporates thereto any documents cited in Exhibits A1-A6, B1-B3, C1-C3, D1-D2, E1-E2, F1-F3, G1-G3 to Butterfly's Invalidity and Unenforceability Contentions. Butterfly reserves the right

# EXHIBIT 13

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006

T  +1 202.887.4000
F  +1 202.887.4288
akingump.com



**C. Brandon Rash**
+1 202.887.4380/fax: +1 202.887.4288
brandon.rash@akingump.com

March 28, 2023

VIA E-MAIL

Jennifer C. Tempesta
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112

      Re:    *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, C.A. No. 22-309-JPM (D. Del.) –
                 Subpoenas to Plaintiff's Parent Companies

Jennifer:

Thank you for your March 16, 2023 letter regarding Butterfly Network, Inc.'s ("Butterfly") subpoenas to certain parent companies of FUJIFILM Sonosite, Inc. ("Plaintiff" or "Fujifilm"). Based on your letter, it is unclear to Butterfly why FUJIFILM Holdings America Corp., FUJIFILM Corp., and FUJIFILM Holdings Corp. ("Plaintiff's parent companies") will not participate in discovery when, as you are aware, these companies have an interest in this case, are involved in this case, and/or were previous owners of one or more asserted patents. ███████████████████████████████████ ████████████████████████████████████████████████████████████████████████ We would appreciate more information that addresses the points below.

First, your letter states you "do not understand why Butterfly believes [Plaintiff's parent companies] would have information responsive to all of the requests/topics." But it seems clear why they would:

(1) FUJIFILM Holdings Corp. and FUJIFILM Corp. owned at least U.S. Patent Nos. 6,901,157 ("the '157 Patent") and 8,360,981 ("the '981 Patent") during their prosecution and for over ten years before these patents were assigned to Plaintiff just three weeks before the original Complaint (D.I. 1) was filed in this action; and

(2) At least FUJIFILM Holdings America Corp. and FUJIFILM Corp. have been involved in and/or have an interest in this action.



Jennifer C. Tempesta
Baker Botts LLP
March 28, 2023
Page 2

      a.  For example, ███████████████████████████████████████ █████████████████████████████████████ between the parties regarding this action.[1]

      b.  As another example, it is our understanding that at least FUJIFILM Corp. holds a financial interest in this action with respect to at least the '157 and '981 Patents.

And, if it is your position that Plaintiff's parent companies do not have information responsive to certain requests or topics identified in Butterfly's subpoenas, each company can simply respond that it has no information.

Second, your letter states you "do not understand . . . how Butterfly could contend that information within the custody or control of [Plaintiff's parent companies] would not be duplicative of other information already produced, or which will be produced, by the [Plaintiff] in this case during the ordinary course of party discovery." Based on our understanding of the relationship between entities, separate ownership/inventive activities, and separate interests in the litigation, and separate inventors, licensing agreements and operations, along with your suggestions that each company acts independently, we fully expect these companies to have unique information. And, so far, Plaintiff has delayed any substantive production of documents in this action, having produced ***fewer than fifty non-public documents*** on or after serving its written responses to Butterfly's discovery requests nearly four months ago. Butterfly has tailored its subpoenas in good faith based on Plaintiff's production of information as of March 7, 2023 (i.e., when we sent Butterfly's subpoenas to Baker Botts to accept service).

Finally, your letter proposes a "compromise" that requires Butterfly to forgo seeking all discovery from "any FUJIFILM company" in exchange for the following:

> FUJIFILM Corporation will make Yukiya Miyachi and Eiji Ogawa available for virtual deposition [and] . . . will also agree to conduct a reasonable search in the files of these two individuals for documents potentially relevant to the patents asserted in the above-captioned action on which they are named inventors, and produce any non-privileged documents located as a result of that reasonable search.

It is unclear how such "compromise" provides anything more than what Plaintiff is already required to provide in this action. For example, Yukiya Miyachi and Eiji Ogawa are the sole named inventors for their respective patents, and Plaintiff identified them on its Rule 26(a)(1) Initial Disclosures as individuals "likely to have discoverable information" and that should "be contacted through Baker Botts LLP." Unless Plaintiff

---

[1] Here, we note that the parties agreed that communications and documents exchanged during these meetings were subject to FRE 408 and would not be used for any purpose in the litigation. The fact that early settlement meetings took place between the parties has already been disclosed to the Court by Fujifilm. D.I. 24 at 2.



Jennifer C. Tempesta
Baker Botts LLP
March 28, 2023
Page 3

does not intend to bring these individuals to trial or plans to drop the '157 and '981 Patents, Butterfly should be entitled to documents and depositions of Yukiya Miyachi and Eiji Ogawa regardless of any "compromise."

FUJIFILM Corp. also should have already conducted a reasonable search in the files of Yukiya Miyachi and Eiji Ogawa for documents potentially relevant to the '157 and '981 Patents and provided those documents to Plaintiff for production. █████████████████████████████████████████ Plaintiff was then already required by the Court to produce such documents by October 26, 2022. *See* D.I. 26 at 3; W.D. Tenn. LPR 3.2 (requiring Plaintiff to produce, *inter alia*, "[a]ll documents evidencing the conception and first reduction to practice of each claimed invention" and "[a]ll documents evidencing ownership"). The fact that Plaintiff has produced ***zero documents for these patents***, except publicly available prosecution documents and assignment agreements, makes clear that Plaintiff is stonewalling Butterfly's discovery requests and that these subpoenas are warranted.

**\* \* \***

Please confirm by Friday, March 31, 2023, that Baker Botts will accept service of the subpoenas sent on March 7, 2023, on behalf of FUJIFILM Holdings America Corp., FUJIFILM Corp., and FUJIFILM Holdings Corp.

Sincerely,

*/s/ C. Brandon Rash*

C. Brandon Rash

# EXHIBIT 14

# PATENT ASSIGNMENT COVER SHEET

Electronic Version v1.1                                    EPAS ID: PAT7193912
Stylesheet Version v1.2

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNMENT |

**CONVEYING PARTY DATA**

| Name | Execution Date |
|---|---|
| FUJIFILM CORPORATION | 02/22/2022 |

**RECEIVING PARTY DATA**

| | |
|---|---|
| Name: | FUJIFILM SONOSITE, INC. |
| Street Address: | 21919 30TH DRIVE SE |
| City: | BOTHELL |
| State/Country: | WASHINGTON |
| Postal Code: | 98021 |

**PROPERTY NUMBERS Total: 2**

| Property Type | Number |
|---|---|
| Patent Number: | 8360981 |
| Patent Number: | 6901157 |

**CORRESPONDENCE DATA**

Fax Number:          (408)720-8383

*Correspondence will be sent to the e-mail address first; if that is unsuccessful, it will be sent using a fax number, if provided; if that is unsuccessful, it will be sent via US Mail.*

Phone:               4083413000
Email:               angela.quinn@wbd-us.com, ipdocketing@wbd-us.com
Correspondent Name:  MICHAEL J. MALLIE
Address Line 1:      1841 PAGE MILL ROAD
Address Line 2:      SUITE 200
Address Line 4:      PALO ALTO, CALIFORNIA 94304

| ATTORNEY DOCKET NUMBER: | 105767G000 |
|---|---|
| NAME OF SUBMITTER: | MICHAEL J. MALLIE, 36,591 |
| SIGNATURE: | /Michael J. Mallie/ |
| DATE SIGNED: | 02/24/2022 |

**Total Attachments: 2**
source=105767G000_FFSS_AssignmentFiled_02242022#page1.tif
source=105767G000_FFSS_AssignmentFiled_02242022#page2.tif

PATENT
507147068                                    REEL: 059095 FRAME: 0054

FFSS_BFLY_0002173

<u>ASSIGNMENT OF U.S. PATENT RIGHTS</u>

For good and valuable consideration, the receipt of which is hereby acknowledged, FUJIFILM CORPORATION, a corporation of Japan, (the "Assignor") having a place of business at 26-30, Nishiazabu 2-Chome, Minato-Ku, Toyko, Japan, hereby sells, assigns, and transfers to FUJIFILM SONOSITE, INC., a corporation of Delaware, (the "Assignee") having a place of business at 21919 30TH Drive SE, WA 98021, its successors and assigns, and Assignee hereby accepts, all of Assignor's right, title, and interest (i) in and to the Assigned Patents that are listed on Schedule A attached hereto, the same to be held and enjoyed by said Assignee for its own use, and for the use of its successors, assigns, or other legal representatives to the end of the term or terms for which said Assigned Patents may be granted as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made; (ii) in and to causes of action and enforcement rights for the Assigned Patents including all rights to pursue damages, injunctive relief and other remedies for past and future infringement of the Assigned Patents; and (iii) to apply in any and all countries for the world for patents; certificates of invention or other governmental grants for the Assigned Patents.

Assignor also hereby authorizes and requests the Commissioner for Patents and Trademarks to issue to issue any and all patents or certificates of invention which may be granted upon any of the Assigned Patents in the name of Assignee, as the assignee to the entire interest therein.

This Assignment shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

Executed this 22 day of February, 2022

FUJIFILM CORPORATION
A corporation of Japan


By: _____
Name:  Mitsuru Yamamoto
Title:    General Manager, IP Technology Division, Intellectual
             Property HQ, FUJIFILM Corporation

<u>Assignment Document Return Address:</u>
Att:  IP Docketing
P.O. BOX 7037
Atlanta, GA  30357-0037
Phone (408) 341-3000
Fax (408) 341-3098

1

**PATENT
REEL: 059095 FRAME: 0055**

FFSS_BFLY_0002174

## SCHEDULE A

### ASSIGNED PATENTS

| Title | Country | Patent No. |
|-------|---------|-----------|
| ULTRASONIC DIAGNOSTIC APPARATUS | US | 8,360,981 |
| ULTRASONIC DIAGNOSTIC APPARATUS | US | 6,901,157 |

1

**PATENT**
**RECORDED: 02/24/2022**                **REEL: 059095 FRAME: 0056**

FFSS_BFLY_0002175

# EXHIBIT 15

4/24/23, 1:06 AM                    Case 1:22-cv-00309-JPM     Document 85-1  Filed 05/02/23  Page 823 of 861 PageID #:
CM/ECF LIVE - U.S. District Court:ded
6232

Query    Reports ▾    Utilities ▾    Help    Log Out

CLOSED,DISCOVERY-CJB,LEAD,Multi-Media Docs,PATENT

**U.S. District Court**
**District of Delaware (Wilmington)**
**CIVIL DOCKET FOR CASE #: 1:16-cv-01163-CFC-CJB**

Boston Scientific Corp. et al v. Nevro Corp.                          Date Filed: 12/09/2016
Assigned to: Judge Colm F. Connolly                                  Date Terminated: 08/08/2022
Referred to: Judge Christopher J. Burke                              Jury Demand: Plaintiff
Related Cases:  1:18-cv-00644-CFC-CJB                                 Nature of Suit: 830 Patent
                1:21-cv-00258-CFC-CJB                                 Jurisdiction: Federal Question
                1:19-cv-00325-CFC
                1:20-cv-00291-CFC-JLH
Cause: 35:271 Patent Infringement

**Plaintiff**

**Boston Scientific Corp.**                          represented by  **Amy DeWitt**
                                                                     Email: amy.dewitt@arnoldporter.com
                                                                     *TERMINATED: 12/16/2021*
                                                                     *PRO HAC VICE*

                                                                     **Andrew Schreiber**
                                                                     UNDELIVERABLE EMAIL 9/10/2021
                                                                     *TERMINATED: 12/06/2021*
                                                                     *PRO HAC VICE*

                                                                     **Anthony T. Pierce**
                                                                     Email: apierce@akingump.com
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Brian E. Farnan**
                                                                     Farnan LLP
                                                                     919 North Market Street
                                                                     12th Floor
                                                                     Wilmington, DE 19801
                                                                     (302) 777-0300
                                                                     Fax: (302) 777-0301
                                                                     Email: bfarnan@farnanlaw.com
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Brooks J. Kenyon**
                                                                     Email: bkenyon@akingump.com
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **C. Brandon Rash**
                                                                     Email: brandon.rash@akingump.com
                                                                     *PRO HAC VICE*
                                                                     *ATTORNEY TO BE NOTICED*

                                                                     **Caitlin E. Olwell**
                                                                     Email: colwell@akingump.com

| | | |
|---|---|---|
| | | information to chambers. Ordered by Judge Colm F. Connolly on 5/10/2021. (nmf) (Entered: 05/10/2021) |
| 05/10/2021 | 629 | NOTICE OF SERVICE of (i) Supplemental Rebuttal Expert Report of Dr. Ronald Berger Regarding Validity of U.S. Patent Nos. 7,437,193 and 8,644,933; (ii) Expert Report of Dr. Stuart F. Cogan Regarding the Validity of U.S. Patent Nos. 7,891,085, 8,019,439, 8,646,172, and 8,650,747; (iii) Rebuttal Expert Report of Elgin Lee; (iv) Supplemental Expert Report of Dr. Robert H. Sturges, Jr. Regarding Copying of BSC's Lead Production Processes; (v) Supplemental Rebuttal Expert Report of Dr. Darrin Young; (vi) Rebuttal Expert Report of John R. Bone, CPA, CFF; (vii) Rebuttal Expert Report of Richard T. Mihran, Ph.D. Regarding U.S. Patent Nos. 9,002,460; 9,002,461; 10,076,665; 10,149,978; 10,420,935 filed by Boston Scientific Corp., Boston Scientific Neuromodulation Corp..(Farnan, Brian) (Entered: 05/10/2021) |
| 05/10/2021 | 630 | NOTICE OF SERVICE of (1) Rebuttal Expert Report of John F. Ashley; (2) Rebuttal Expert Report of George Ligler, D. Phil., Regarding U.S. Patent Nos. 10,420,935 and 9,002,461; (3) Rebuttal Expert Report of George Ligler, D. Phil., Regarding Non-Infringement; (4) Expert Report of Ben Pless Regarding Validity of Nevros U.S. Patent Nos. 10,149,978, 10,076,665, 9,002,460, and 9,002,461; (5) Rebuttal Expert Report of Michael Plishka Concerning Non-Infringement of U.S. Patent Nos. 7,891,085; 8,019,439; 8,646,172; and 8,650,747; (6) Rebuttal Expert Report of Christopher Poletto, Ph.D., Regarding Trade Secrets; (7) Rebuttal Expert Report of Christopher Poletto, Ph.D., Regarding Non-Infringement; (8) Rebuttal Expert Report of William S. Rosenberg, M.D., Faans; (9) Expert Report of Sousan S. Sheldon, Mt-(Ascp), Ph.D.; (10) Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. Regarding Patents; and (11) Rebuttal Expert Report of Christopher A. Vellturo, Ph.D. Regarding Trade Secrets - filed by Nevro Corp..(Smith, Rodger) (Entered: 05/10/2021) |
| 05/17/2021 | 631 | ORAL ORDER: The Court, having reviewed the parties' joint motion regarding discovery disputes, (D.I. 615 ), as well as the briefing related to Defendant Nevro Corp.'s ("Nevro") requests for relief, (D.I. 602; D.I. 610; D.I. 616), hereby ORDERS as follows as to those requests: (1) With regard to Nevro's request that Plaintiffs Boston Scientific Corp. and Boston Scientific Neuromodulation Corp. (BSC) be compelled to produce the source code for the Contour Tool used with its Bionic Navigator 3D v2.1 product, (D.I. 602 at 1), it is GRANTED. Nevro has sufficiently explained why source code relating at least to the "Contour Algorithm" (which it says BSC also refers to as the "Contour Tool") is relevant to its infringement contentions. (D.I. 602, ex. A at 24; see also D.I. 616 at 1) BSC, understanding the dispute, responds that it "already produced the code for the Contour algorithm as part of Bionic Navigator 3D v.2.2." (D.I. 610 at 1) The Court reads that as an admission by BSC that the functionality of v2.1 is the same as v2.2. But if BSC does not formally stipulate that this is so, it must produce the source code for v2.2 in a timely fashion. (D.I. 616 at 1); (2) With regard to Nevro's request that BSC be compelled to provide a witness to testify on Nevro's Rule 30(b)(6) topics 19, 20 and 32 with respect to the MultiWave tool, the Contour Tool and the algorithm and MATLAB-generated source code, (D.I. 602 at 1-3), it is GRANTED-IN-PART. The Court agrees with Nevro that for the reasons it lists, (id.; D.I. 616 at 1-2), the questions at issue seem relevant, the Topics are not objectionable, and that, at least with regard to Topics 19 and 20, there were some questions that the only witness proffered (Mr. Zottola) could not answer. That said, there weren't many such questions. And as to those, it isn't clear if there are good answers to at least some of them. So Nevro is due some further process, which might be a very short additional deposition (i.e., one hour) or some additional way to get binding answers from BSC. The parties can meet and confer to try to come to agreement on what that process looks like.; and (3) With regard to Nevro's request that the Court permit a carve out to the stay of discovery as to the '280 patent so as to allow for deposition questioning to Carla Mann Woods about that patent, (D.I. 602 at 3), it is DENIED in light of the stay. From what BSC represents, if a future deposition is needed regarding the '280 patent, all indications are that Ms. Woods will sit for it. (D.I. 602, ex. L at 1; id., ex. M at 1) That said, if in the future, Nevro seeks such a deposition and Ms. Woods refuses, Nevro can (and should) seek appropriate relief from the Court.Ordered by Judge Christopher J. Burke on 5/17/2021. (mlc) (Entered: 05/17/2021) |
| 05/19/2021 | | Minute Entry for proceedings held before Judge Colm F. Connolly - Oral Argument held on 5/19/2021 re 586 MOTION to Stay *Nevro's Infringement Counterclaims Pending Inter Partes Review* filed by Boston Scientific Neuromodulation Corp., Boston Scientific Corp. (Court Reporter V. Gunning.) (nmf) (Entered: 05/19/2021) |
| 05/19/2021 | | ORAL ORDER: For the reasons stated during the telephone argument held on May 18, 2021, Plaintiffs' motion to stay Nevro's infringement counterclaims pending inter partes review and any appeal (D.I. 586 ) thereto is GRANTED. Ordered by Judge Colm F. Connolly on 5/19/2021. (nmf) (Entered: 05/19/2021) |
| 05/19/2021 | | ORAL ORDER denying D.I. 518 MOTION to Dismiss for Failure to State a Claim *BSC's Counterclaim for Inequitable Conduct* without prejudice to renew once the stay is lifted. Ordered by Judge Colm F. Connolly on 5/19/2021. (nmf) (Entered: 05/19/2021) |
| 05/19/2021 | 632 | ORAL ORDER: In light of the stay of Defendant Nevro Corp.'s ("Nevro") infringement counterclaims pending inter partes review and any appeal, Nevro's pending motion to amend its infringement contentions, (D.I. 515 ), which entirely relates to a now-stayed portion of the case, is denied without prejudice to renew, if necessary, if/when the stay is lifted in the future. (To the extent any such motion is later re-filed, if the parties feel it would be most efficient for the Court to rely on some or all of the briefing relating to the currently-filed motion, the parties can advise the Court of this at the relevant time and the Court will do so.). Ordered by Judge Christopher J. Burke on 5/19/2021. (mlc) (Entered: 05/19/2021) |
| 05/19/2021 | 633 | REDACTION NOTICE: In accordance with section G of the Administrative Procedures Governing Filing and Service by Electronic Means, redacted versions of sealed documents shall be filed electronically within 7 days of the filing of the sealed document. The records of this case do not reflect the filing of a redacted version of D.I. 607. (mlc) (Entered: 05/19/2021) |
| 05/19/2021 | 634 | REDACTED VERSION of 607 Letter by Nevro Corp.. (Attachments: # 1 Exs. A-D)(Smith, Rodger) (Entered: 05/19/2021) |
| 05/19/2021 | 635 | MEMORANDUM ORDER regarding D.I. 615 MOTION for Hearing *(Teleconference to Resolve Discovery Dispute)* filed by Nevro Corp.. Signed by Judge Christopher J. Burke on 5/19/2021.This order has been emailed to local counsel. (mlc) Document Unsealed on 5/25/2021 (dlb). (Entered: 05/19/2021) |
| 05/25/2021 | | Document Unsealed - D.I. 635 Memorandum Order, unsealed. (dlb) (Entered: 05/25/2021) |
| 05/27/2021 | 636 | NOTICE OF SERVICE of (i) Reply Expert Report of James M. North, M.D.; (ii) Reply Expert Report of Alan P. Schwartz; (iii) Reply Expert Report of Elgin Lee; (iv) Reply Expert Report of Dr. Darrin Young Regarding Infringement of U.S. Patent Nos. 7,437,193 and 8,644,933; (v) Reply Expert Report of Eric B. Cole, Ph.D.; (vi) Reply Expert Report of John R. Bone, CPA, CFF (Patent Report); (vii) Reply Expert Report of Dr. Robert H. Sturges, Jr. Regarding Infringement of U.S. Patent Nos. 7,891,085, 8,019,439, 8,646,172, and 8,650,747; and (viii) Reply Expert Report of John R. Bone, CPA, CFF (Trade Secret Report) filed by Boston Scientific Corp., Boston Scientific Neuromodulation Corp..(Farnan, Brian) (Entered: 05/27/2021) |
| 05/27/2021 | 637 | NOTICE OF SERVICE of (1) Reply Expert Report of Christopher Poletto, Ph.D., Regarding Invalidity; and (2) Reply Expert Report of Michael Plishka Concerning Invalidity of U.S. Patent Nos. 7,891,085; 8,019,439; 8,646,172; and 8,650,747 - filed by Nevro Corp..(Smith, Rodger) (Entered: 05/27/2021) |
| 06/01/2021 | 638 | NOTICE to Take Deposition of Michael Plishka on 6/4/2021 filed by Boston Scientific Corp., Boston Scientific Neuromodulation Corp..(Farnan, Brian) (Entered: 06/01/2021) |

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

BOSTON SCIENTIFIC CORP. and  :  CIVIL ACTION
BOSTON SCIENTIFIC            :
NEUROMODULATION CORP.,       :
                             :
          Plaintiffs,        :
                             :
     vs.                     :
                             :
NEVRO CORP.,                 :
                             :
          Defendant.    :    NO 16-1163-CFC-CJB

- - -

Wilmington, Delaware
Tuesday, May 18, 2021
3:00 o'clock, p.m.
Telephone conference

- - -

BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

- - -

APPEARANCES:

FARNAN LLP
BY:  MICHAEL J. FARNAN, ESQ.

-and-

Valerie J. Gunning
Official Court Reporter

---

APPEARANCES (Continued):

AKIN GUMP STRAUSS HAUER & FELD LLP
BY:  MICHAEL P. KAHN, ESQ.
     (New York, New York)

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
BY:  RACHEL J. ELSBY, ESQ.
     (Washington, D.C.)

-and-

AKIN GUMP STRAUSS HAUER & FELD LLP
BY:  STEVEN D. MASLOWSKI, ESQ.
     (Philadelphia, Pennsylvania)

-and-

ARNOLD & PORTER KAYE SCHOLER
BY:  MATTHEW M. WOLF, ESQ.
     (Washington, D.C.)

Counsel for Plaintiffs

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
BY:  RODGER D. SMITH II, ESQ.

-and-

---

APPEARANCES (Continued):

SIDLEY AUSTIN LLP
     BY:  BRADFORD J. BADKE, ESQ.,
          CHING-LEE FUKUDA, ESQ.,
          SHARON LEE, ESQ. and
          SONA DE, ESQ.
          THOMAS A. BROUGHAN III, ESQ.

     Counsel for Defendants

- - -

---

P R O C E E D I N G S

(The following telephone conference was held beginning at 3:00 p.m.)

THE COURT:  All right.  Good afternoon.  Could we have a roll call?  Let's start with the plaintiffs, please.

MR. FARNAN:  Good morning.  Michael Farnan for the plaintiff.

With me on the line are Michael Kahn, Steven Maslowski, Rachel Elsby and Mike Petegorsky from Akin Gump, and also Matthew Wolf from Arnold & Porter, and Mr. Kahn will be making the presentations.

THE COURT:  All right.  Thank you.  And then for the defendant?

MR. SMITH:  Good afternoon, Your Honor.  Rodger Smith from Morris Nichols on behalf defendant Nevro.  I'm joined by my counsel from Sidley Austin, Jim Badke, Ching-Lee Fukuda, Thomas Broughan, Sharon Lee and Erik Fountain, and Mr. Badke will be responsible for arguing on the motion today.

THE COURT:  All right.  Great.  All right.  So let's hear from Boston Scientific.

MR. KAHN:  Thank you, Your Honor.  This is

Michael Kahn.

This is the third motion to stay in favor of IPRs before the Court in these consolidated cases. The first two motions were filed by Nevro. Nevro moved to stay Boston Scientific's 2016 patent claims about four months before trial based on IPRs filed against two of the eight asserted patents and the Court granted that motion. Three years later and almost five years into the case, Boston Scientific's earliest brought claims still await trial.

Nevro then moved to stay Boston Scientific's 2018 patent claims, again, based on IPRs filed against only a subset of the asserted claims. The Court granted Nevro's second motion and those claims remained stayed.

Now the parties' roles are reverse and Nevro's 2020 counterclaims are the subject of the same motion from which Nevro has twice benefited.

In opposing the stay, Nevro completely ignores the history of the case and its own significant competitive and legal benefits over the last five years. Nevro abandoned its prior arguments, criticizes the very cases that it cited to Your Honor in support of its own motions, and flips virtually every argument and representation it made to support those earlier motions. But Nevro can't change the relevant history. Here, fundamental fairness, party accountability, and the significant case history warrants a stay of Nevro's counterclaims. But even setting that history aside, Your Honor, a stay here makes good sense from a case management perspective for at least three reasons.

First, it will greatly simplify the currently scheduled October trial and the remaining work to be done by the Court and the parties to get there. This is a point that even Nevro doesn't dispute.

As things stand currently, trial is set to include Boston Scientific's trade secret claims, Boston Scientific's longstanding 2016 patent claims, and Nevro's 2020 counterclaims that were brought originally in a separate case.

While Boston Scientific's patent and trade secret claims relate to the similar Nevro products and overlapping technology, Nevro's counterclaims stand alone in the upcoming trial. So the jury without a stay would be forced to learn about a completely different set of products, patents, prior art, new technical issues and hear from different and new technical witnesses and, of course, a stay now would avoid considerable remaining work by the Court and by the parties through remaining fact discovery, expert discovery, summary judgment, Daubert, pretrial and trial, all for claims that might be either narrowed or canceled. So for the first factor, which in this district is given more weight than the others, simplification, there's really no dispute that a stay would result in simplification of the upcoming trial.

Second, a stay would avoid multiple trials on the same Nevro technology and the same accused product. Nevro filed these counterclaims in response to Boston Scientific's 2018 patents because they relate to similar aspects of the technology. If some or all of Nevro's counterclaims proceed to trial this year without Boston Scientific's 2018 patents, it would ensure that two, possibly three trials over the same products, the same prior art and the same technology take place.

As just one example, Your Honor, Boston Scientific has prior use and prior sales offenses to most of Nevro's counterclaims, the same Boston Scientific prior art that is therefore relevant to all of those counterclaim. And as Your Honor may be aware, in February, Nevro just filed another case asserting five more patents related to virtually identical technology as that at issue in Nevro's counterclaims. So without a stay, it might actually be three separate juries learning the same technology, assessing the same prior art, and deciding the same related issues.

And, third and finally, a stay will avoid significant potential disruption of the case schedule due to Nevro's motion to amend all of its infringement contentions.

During hearings before Your Honor on January 6th and 13th, we discussed Nevro's at the time threat of serving amended infringements contentions for all of its counterclaim patents and the impact that would have on timing for Nevro's counterclaims. Your Honor highlighted the risks to Nevro that would be introduced specifically with respect to Nevro's trial schedule, but Nevro did not heed the Court's warning and went ahead anyway, and Nevro filed a motion for leave to amend all of its infringement contentions and that motion remains pending before Magistrate Judge Burke.

To the extent Magistrate Judge Burke granted any part of that motion, the parties will have to take a number of steps back in the case schedule, address your responsive contentions, new fact discovery, new claim construction and new expert discovery and a stay here would remove that risk of case disruption and the considerable prejudice to Boston Scientific of Nevro's attempted re-do.

So, Your Honor, with that, you know, we addressed the operative factors in more detail in the briefing, but I would be happy to answer any further questions from Your Honor.

THE COURT: No. Thank you very much. All

right. Let's hear from Nevro.

MR. BADKE: Good afternoon, Your Honor. This is Jim Badke.

The reason we're considering this five months before trial is because Boston didn't file their IPRs. They delayed for nine to twelve months, and what this motion is about is not efficiency. It has nothing to do with efficiency and everything to do with creating a tactical advantage. It has been their aim to knock out the counterclaims as of the October trial for quite awhile now, and if you want to think about efficiency, they have six asserted patents that they are planning to go with in October. They have a trade secret claim and now they're trying to amend their trade secret claim to bring in even more trade secret allegations, so their behavior is actually the opposite of efficiency.

So in terms of greatly simplifying the case, eliminating two patents that have been instituted, two of Nevro's patents that have been instituted out of the five that are in suit does not greatly simplify the case, especially compared to the amount of information that Boston plans to assert at trial.

We're at a very late stage of the litigation. The IPRs will not be decided for some five months after the trial date.

Your Honor, you may recall at the January 6th hearing we discussed quite a bit the prejudice to Nevro in allowing Boston to bring in two claims from the '280 patent that it had not previously asserted, and I said to Your Honor that one thing that we weren't able to do, one of our prejudices was that we weren't able to bring IPRs, and Your Honor said, well, you know, you can challenge the validity in your Court, and I will repeat that here, that the trial in your Court comes up before any institution of IPRs by the PTAB, and this Court doesn't take a back seat certainly to the PTAB in judging validity. So given this late stage of the litigation, a stay just doesn't make sense.

With respect to the prior stays, they were at a different time, circumstance and a different judge. We are in the here and now and we need to adjudge the merits as they stand today. But, in any event, I will point out that the Nevro patents that have not been involved in the PTAB, and specifically the '978 patent, are the bulk of the damages that we request and the instituted patents are less than 20 percent of Nevro's total damages, and so what that means as a practical matter is the most important patents that Nevro is asserting are not part of the IPR process and have not been instituted.

Again, this is highly prejudicial, especially at

this point in the case to Nevro. Boston and Nevro are just two of four competitors in the spinal cord simulation field. This case was out there, and, Your Honor, I'm sure you're aware that delay is prejudicial to a direct competitor in getting its claims to trial. And basically, tactically, what Boston is trying to do is to set up a trial schedule so that they essentially have two trials on their patents and their trade secrets before Nevro is able to try this case. That is just quite unfair and tactically prejudicial.

Your Honor, I will address one thing that Mr. Kahn did bring up and that is our motion to amend contentions and I know you don't want to hear what is before Judge Burke, but since it was raised, I will respond to it.

They are basically looking to take as an advantage their behavior in withholding discovery from us, but, in any event, we shouldn't be in this situation. So in late November, Boston produced some 20,000 pages of documents out of 30,000 that they had total documents produced at the time, so they withheld documents.

We didn't -- we weren't able to take adequate discovery on the source code, which we got in December. By January 5th, we had amended our contentions and served it on them. Fact discovery ended in March, March 11th, so there was ample time for them to respond to the contentions, but,

in any event, the date of the contentions was driven by their late production of discovery and we were before Magistrate Judge Burke on those issues.

So it's not -- it's not fair that they should try to use their lack of diligence in discovery as a basis for seeking a stay. That was of their own doing.

So unless Your Honor has any questions, I will stop there.

THE COURT: All right. Well, thank you. Anything Boston Scientific cares to respond to?

MR. KAHN: Yes. A few points, Your Honor. I will start with the last point first on the motion to leave.

Some of those similar arguments have been presented before and I think in the latter half of our reply brief we presented what the facts actually are, and so the story as it's being told there is not quite reflected in the record, but I will leave is that there for now.

Nevro's comment about a tactical advantage and having our claims tried without their counterclaims, there's nothing unfair about that. The 2016 claims that are currently scheduled for trial this October, two of Nevro's five counterclaim patents had issued when we brought those claims. Nevro didn't file any counterclaims.

Two other patents issued in 2018. Nevro didn't bring those right away. Nevro waited until February 2020

before bringing its counterclaims for the first time. That is what's driving the timing here, and the tactical positioning is exactly how the parties originally brought these cases.

Boston Scientific brought its 2016 patent claims. There were no counterclaims. What Nevro is trying to do now is jump the line, avoid the same tactics that it used to stay all of our claims and push them to the sidelines and jump to the front. So from a tactical perspective, this is restoring what Nevro had envisioned from the start, having to respond to our patent without any counterclaims.

Second, with respect to timing, and I already touched on it briefly, Your Honor, we brought our case in 2018. Nevro did not respond with its counterclaims. Nevro waited until late 2019 and early 2020 to bring its counterclaims for the first time, so while Nevro paints us as the party creating the squeeze on the schedule, it is due entirely to when Nevro brought its counterclaims.

With the operative complaint in February -- with the operative counterclaims filed in February 2020, within roughly six months we had our IPR petitions on file. That is far faster than what Nevro did to support its motion before Your Honor.

Nevro waited until the last week of the one-year timeline before it moved. So how Nevro can sit here with that history and accuse us of delay and tactical delay is simply not supported.

And then a point about Nevro's '978 patent. You know, prior to our filing the motion to stay, Your Honor, that patent was presented to the Court in the operative pleading, in the Markman papers and in all discussions as one of five, and, in fact, the IPR statistics for our case were that more than 50 percent of the claims that were alleged by Nevro, that were asserted by Nevro were embroiled in IPR petitions.

After we filed our motion to stay, Nevro dropped 18 claims from the patents that were IPR'd to make the '978 look like it's more important. And one more point on that, Your Honor. The '978 patent addresses paresthesia-free SCS therapy delivered at a 1.2 K frequency. Nevro does not have marketing approval for that frequency. So the idea that that patent has a -- has an outside competitive benefit for Nevro is entirely inconsistent with the commercial realities, setting aside the fact that in California Nevro told the Court that its core important technologies were something entirely different.

So the last point, Your Honor. Nevro made the argument that delay is prejudicial by itself. You know, that's an argument that if we go back to the two Delaware cases that Nevro relies on for its motion to stay before Your Honor back in 2019, the IO Engine case and the British Telecomm case both authored by Bryson, he stated clearly, delay by itself is not prejudicial, but as with virtually every one of its other arguments, Nevro disregards those two prior cases that it used to its benefit and doesn't respond on those issues as raised in our motion.

Unless you have further questions, nothing more from Your Honor.

THE COURT: All right. Thank you.

MR. BADKE: Your Honor, may I have just a minute?

THE COURT: One minute, yes.

MR. BADKE: Okay. Thank you, Your Honor.

I just want to point out, the '978 patent, the Nevro patent is about 72 percent of our damages. I just want to point that out.

You probably don't want to go back and relitigate the prior stay, but I do want to point out, as I said, those were at different timed circumstances and, for example, the Delaware I patents were stayed because, at least in part because of Judge Sleet's scheduling issues and retirement. The Delaware II Boston patents were stayed because Boston agreed to the stay. And, you know, we could retread old ground, but I suspect Your Honor doesn't want to hear it, so I will stop there.

THE COURT: All right. This litigation has been going on I think what, for five years? It has been stayed or partially stayed twice. Boston Scientific has filed separate complaints in 2016 and 2018. Nevro filed IPR petitions against the patents asserted by Boston Scientific in both of those complaints. Both times the Court granted the motion to stay.

In both cases the Court stayed all asserted patents, including patents against which no IPR had been instituted. Boston Scientific did not argue against the stay of the 2018 patents, or I should say did not argue against the stay of the case with respect to the 2018 asserted patents.

Boston Scientific's 2016 patent claims and the 2018 trade secret claims are currently set for trial in October of this year. The case continued to be stayed though with respect to the Boston's 2018 patent claim.

Nevro recently filed a new related lawsuit against Boston Scientific. Nevro has asserted five patents and counterclaims, and on March 16th of this year, the PTAB instituted IPR proceedings on all claims of two of those patents, the '655 patent and the '460 patent.

Nevro has also petitioned for an IPR of the '461 patent and I guess we're still waiting on institution of

that. Is that correct?

MR. BADKE: Yes, Your Honor.

THE COURT: All right. Boston Scientific is not pursuing IPRs against the remaining two patents asserted by Nevro.

As both counsel have noted, whether or not to stay litigation is a matter left to the Court's discretion and the Court in exercising that discretion needs to weigh the competing interests of the parties and attempt to maintain an even balance. It's hard to do that in these patent cases between the competitors, but, you know, I'm going to try my best and I have tried my best.

As the parties recognize in this district, Courts consider three factors. The first factor is whether a stay will simplify the issues and trial of the case. I heard counsel, one counsel say that that is the priority in this district. I'm not so sure that is the case. Certainly, I'm not bound to give it overall priority, but it's an important factor.

The second factor is whether discovery is complete and the trial date has been set.

And the third factor is whether a stay would unduly prejudice or present a clear tactical disadvantage to the non-moving party.

I'm convinced that all three factors favor a stay of Nevro's counterclaims. The case was p.he same general reasoning in support of those stays supports Boston Scientific's request for a stay right now.

As Nevro stated in one of its prior motions, "Courts uniformly recognize that staying cases pending resolution of instituted IPRs is appropriate despite the concomitant delay." That is at DI 67, page 19.

And we are, you could argue, fairly in the advanced stage, but Courts have stayed counterclaims and claims at similar stages of litigation. And, in particular, I was persuaded by Judge Stark's decision in the Ethicon LLC against Intuitive Surgical case found at 2019 Westlaw, 1276029, and there are other cases where the Court has done that as well.

I agree that IPR proceedings are very likely to simplify the issues for trial. The IPRs will either totally resolve some of Nevro's counterclaims or, alternatively, they'll help clarify and reduce the issues that would remain to be litigated.

I'm also persuaded that Nevro will not be unfairly prejudiced by a stay. Nevro has already sought and obtained multiple stays in this case, previously volunteered to stay its counterclaims, and, finally, significant work remains in granting a stay, will conserve party and judicial resources. So all of those factors, it seems to me, counsel for a stay. When this case was first stayed in 2016, the case was even closer to trial than it is currently.

So in sum, the totality of the factors persuades me to exercise my discretion to formulate a proper case-specific resolution and grant the motion to stay. So I'm going to therefore grant DI 586, Boston Scientific's motion to stay, and stay the counterclaims pending the completion of inter parties review and any appeal, any appeal thereto.

Any questions from the --

MR. BADKE: Your Honor, sorry.

THE COURT: Go ahead.

MR. BADKE: Your Honor, this is Jim Badke for Nevro.

As I said, the '978 is really the biggest part of our case. We would be willing to drop the IPR patent in order to go forward with the October trial.

THE COURT: Yes. Well, you didn't raise that in your briefing, did you?

MR. BADKE: No, because -- no. I mean, there are multiple options.

THE COURT: I know, but the problem is you didn't raise it in your briefing and I spent a lot of time, you know, preparing for this, and that would have been a suggestion that, you know, should have been thought about being made long before this was teed up, so we're past that juncture and, you know, maybe you should have thought about raising that from the get-go. Maybe Boston Scientific's response would have been different, but that's not the way you positioned it.

Anything further?

MR. KAHN: Not from Boston Scientific, Your Honor.

THE COURT: Anything from Nevro?

MR. BADKE: No, Your Honor.

THE COURT: Okay. Everybody have a good day. Thank you.

(Telephone conference concluded at 3:25 p.m.)

- - -

**'**

**'280** [1] - 10:3
**'460** [1] - 16:23
**'461** [1] - 16:24
**'655** [1] - 16:23
**'978** [6] - 10:19, 14:4, 14:14, 14:15, 15:15, 19:15

**1**

**1.2** [1] - 14:16
**11th** [1] - 11:24
**1276029** [1] - 18:13
**13th** [1] - 8:4
**16-1163-CFC-CJB** [1] - 1:9
**16th** [1] - 16:21
**18** [2] - 1:13, 14:13
**19** [1] - 18:7

**2**

**20** [1] - 10:21
**20,000** [1] - 11:18
**2016** [7] - 5:5, 6:11, 12:20, 13:5, 16:5, 16:15, 19:1
**2018** [10] - 5:11, 7:7, 7:10, 12:24, 13:15, 16:5, 16:12, 16:13, 16:16, 16:18
**2019** [3] - 13:16, 15:2, 18:12
**2020** [5] - 5:15, 6:12, 12:25, 13:16, 13:21
**2021** [1] - 1:13

**3**

**30,000** [1] - 11:19
**3:00** [2] - 1:13, 4:4
**3:25** [1] - 20:13

**5**

**50** [1] - 14:9
**586** [1] - 19:6
**5th** [1] - 11:23

**6**

**67** [1] - 18:7
**6th** [2] - 8:3, 10:1

**7**

**72** [1] - 15:16

**A**

**abandoned** [1] - 5:20
**able** [4] - 10:5, 10:6, 11:8, 11:21
**accountability** [1] - 5:25
**accuse** [1] - 14:2
**accused** [1] - 7:5
**ACTION** [1] - 1:4
**address** [2] - 8:16, 11:10
**addressed** [1] - 8:22
**addresses** [1] - 14:15
**adequate** [1] - 11:21
**adjudge** [1] - 10:16
**advanced** [1] - 18:9
**advantage** [3] - 9:9, 11:16, 12:18
**afternoon** [3] - 4:6, 4:17, 9:2
**agree** [1] - 18:15
**agreed** [1] - 15:24
**ahead** [2] - 8:10, 19:12
**aim** [1] - 9:9
**AKIN** [3] - 2:2, 2:6, 2:10
**Akin** [1] - 4:12
**allegations** [1] - 9:15
**alleged** [1] - 14:10
**allowing** [1] - 10:3
**almost** [1] - 5:8
**alone** [1] - 6:16
**alternatively** [1] - 18:17
**amend** [4] - 8:1, 8:11, 9:14, 11:11
**amended** [2] - 8:5, 11:23
**amount** [1] - 9:21
**ample** [1] - 11:25
**AND** [1] - 1:2
**answer** [1] - 8:23
**anyway** [1] - 8:10
**appeal** [2] - 19:8, 19:9
**APPEARANCES** [3] - 1:19, 2:1, 3:1
**appropriate** [1] - 18:6
**approval** [1] - 14:17
**argue** [3] - 16:11, 16:12, 18:8
**arguing** [1] - 4:21
**argument** [3] - 5:22, 14:24, 14:25
**arguments** [3] - 5:20, 12:13, 15:5
**ARNOLD** [1] - 2:14
**Arnold** [1] - 4:13
**ARSHT** [1] - 2:19

**art** [4] - 6:19, 7:12, 7:15, 7:22
**aside** [2] - 6:2, 14:20
**aspects** [1] - 7:8
**assert** [1] - 9:22
**asserted** [10] - 5:7, 5:12, 9:12, 10:4, 14:10, 16:6, 16:9, 16:14, 16:20, 17:4
**asserting** [2] - 7:18, 10:23
**assessing** [1] - 7:22
**attempt** [1] - 17:9
**attempted** [1] - 8:20
**AUSTIN** [1] - 3:3
**Austin** [1] - 4:19
**authored** [1] - 15:3
**avoid** [4] - 6:21, 7:4, 7:24, 13:7
**await** [1] - 5:9
**aware** [2] - 7:17, 11:4
**awhile** [1] - 9:10

**B**

**BADKE** [9] - 3:3, 9:2, 15:11, 15:14, 17:2, 19:11, 19:13, 19:20, 20:10
**Badke** [4] - 4:19, 4:21, 9:3, 19:13
**balance** [1] - 17:10
**based** [2] - 5:6, 5:11
**basis** [1] - 12:5
**BEFORE** [1] - 1:16
**beginning** [1] - 4:4
**behalf** [1] - 4:18
**behavior** [2] - 9:15, 11:16
**benefit** [2] - 14:19, 15:6
**benefited** [1] - 5:16
**benefits** [1] - 5:19
**best** [2] - 17:12
**between** [1] - 17:11
**biggest** [1] - 19:15
**bit** [1] - 10:2
**Boston** [32] - 4:24, 5:5, 5:8, 5:10, 6:10, 6:14, 7:6, 7:9, 7:13, 7:15, 8:19, 9:5, 9:21, 10:3, 11:1, 11:6, 11:18, 12:10, 13:5, 15:23, 15:24, 16:4, 16:6, 16:11, 16:15, 16:20, 17:3, 18:2, 19:6, 20:3, 20:7
**BOSTON** [2] - 1:4, 1:5
**Boston's** [1] - 16:18
**bound** [1] - 17:18

**BRADFORD** [1] - 3:3
**brief** [1] - 12:15
**briefing** [3] - 8:23, 19:19, 19:23
**briefly** [1] - 13:14
**bring** [6] - 9:14, 10:3, 10:6, 11:11, 12:25, 13:16
**bringing** [1] - 13:1
**British** [1] - 15:2
**BROUGHAN** [1] - 3:5
**Broughan** [1] - 4:20
**brought** [7] - 5:9, 6:12, 12:22, 13:3, 13:5, 13:14, 13:19
**Bryson** [1] - 15:3
**bulk** [1] - 10:19
**Burke** [4] - 8:13, 8:14, 11:13, 12:3
**BY** [6] - 1:21, 2:3, 2:11, 2:15, 2:19, 3:3

**C**

**California** [1] - 14:21
**canceled** [1] - 6:25
**cares** [1] - 12:10
**case** [29] - 5:8, 5:18, 5:25, 6:3, 6:13, 7:18, 7:25, 8:16, 8:19, 9:17, 9:20, 11:1, 11:3, 11:8, 13:14, 14:8, 15:2, 15:3, 16:13, 16:17, 17:15, 17:17, 18:1, 18:12, 18:22, 19:1, 19:2, 19:5, 19:16
**case-specific** [1] - 19:5
**cases** [9] - 5:3, 5:20, 13:4, 15:1, 15:6, 16:9, 17:11, 18:5, 18:13
**certainly** [2] - 10:11, 17:18
**challenge** [1] - 10:7
**change** [1] - 5:24
**CHING** [1] - 3:4
**Ching** [1] - 4:20
**CHING-LEE** [1] - 3:4
**Ching-Lee** [1] - 4:20
**circumstance** [1] - 10:15
**circumstances** [1] - 15:20
**cited** [1] - 5:21
**CIVIL** [1] - 1:4
**claim** [4] - 8:17, 9:13, 9:14, 16:18
**claims** [22] - 5:5, 5:9,

5:11, 5:12, 5:13, 6:10, 6:11, 6:15, 6:24, 10:3, 11:5, 12:19, 12:20, 12:23, 13:6, 13:8, 14:9, 14:13, 16:15, 16:16, 16:22, 18:10
**clarify** [1] - 18:18
**clear** [1] - 17:23
**clearly** [1] - 15:3
**closer** [1] - 19:2
**code** [1] - 11:22
**COLM** [1] - 1:16
**comment** [1] - 12:18
**commercial** [1] - 14:20
**compared** [1] - 9:21
**competing** [1] - 17:9
**competitive** [2] - 5:18, 14:19
**competitor** [1] - 11:4
**competitors** [2] - 11:2, 17:11
**complaint** [1] - 13:20
**complaints** [2] - 16:5, 16:7
**complete** [1] - 17:21
**completely** [2] - 5:17, 6:18
**completion** [1] - 19:8
**concluded** [1] - 20:13
**concomitant** [1] - 18:7
**conference** [3] - 1:14, 4:3, 20:13
**CONNOLLY** [1] - 1:16
**conserve** [1] - 18:24
**consider** [1] - 17:14
**considerable** [2] - 6:21, 8:19
**considering** [1] - 9:4
**consolidated** [1] - 5:3
**construction** [1] - 8:17
**contentions** [8] - 8:2, 8:5, 8:12, 8:17, 11:12, 11:23, 11:25, 12:1
**continued** [1] - 16:17
**Continued** [2] - 2:1, 3:1
**convinced** [1] - 17:25
**cord** [1] - 11:2
**core** [1] - 14:21
**CORP** [3] - 1:4, 1:5, 1:8
**correct** [1] - 17:1
**counsel** [5] - 4:19, 17:6, 17:16, 18:25
**Counsel** [2] - 2:17, 3:7
**counterclaim** [3] -

7:16, 8:6, 12:22
**counterclaims** [25] - 5:15, 6:1, 6:12, 6:16, 7:6, 7:9, 7:15, 7:20, 8:7, 9:10, 12:19, 12:23, 13:1, 13:6, 13:12, 13:15, 13:17, 13:19, 13:21, 16:21, 18:1, 18:9, 18:17, 18:23, 19:7
**course** [1] - 6:20
**COURT** [15] - 1:1, 4:6, 4:15, 4:23, 8:25, 12:9, 15:10, 15:13, 16:2, 17:3, 19:12, 19:18, 19:22, 20:9, 20:11
**Court** [15] - 1:24, 5:3, 5:7, 5:12, 6:7, 6:22, 10:8, 10:9, 10:10, 14:6, 14:21, 16:7, 16:9, 17:8, 18:13
**Court's** [2] - 8:10, 17:7
**Courts** [3] - 17:14, 18:5, 18:9
**creating** [2] - 9:8, 13:18
**criticizes** [1] - 5:20

### D

**D.C** [2] - 2:7, 2:15
**damages** [3] - 10:20, 10:21, 15:16
**date** [3] - 9:25, 12:1, 17:21
**Daubert** [1] - 6:23
**DE** [1] - 3:5
**December** [1] - 11:22
**decided** [1] - 9:24
**deciding** [1] - 7:22
**decision** [1] - 18:11
**defendant** [2] - 4:16, 4:18
**Defendant** [1] - 1:9
**Defendants** [1] - 3:7
**DELAWARE** [1] - 1:2
**Delaware** [4] - 1:12, 14:25, 15:21, 15:23
**delay** [6] - 11:4, 14:2, 14:24, 15:4, 18:7
**delayed** [1] - 9:6
**delivered** [1] - 14:16
**despite** [1] - 18:6
**detail** [1] - 8:22
**DI** [2] - 18:7, 19:6
**different** [7] - 6:18, 6:20, 10:15, 14:22, 15:20, 20:4
**diligence** [1] - 12:5

**direct** [1] - 11:4
**disadvantage** [1] - 17:23
**discovery** [10] - 6:22, 6:23, 8:17, 8:18, 11:16, 11:22, 11:24, 12:2, 12:5, 17:20
**discretion** [3] - 17:7, 17:8, 19:4
**discussed** [2] - 8:4, 10:2
**discussions** [1] - 14:7
**dispute** [2] - 6:8, 7:2
**disregards** [1] - 15:5
**disruption** [2] - 7:25, 8:19
**DISTRICT** [2] - 1:1, 1:2
**district** [3] - 6:25, 17:13, 17:17
**documents** [3] - 11:19, 11:20
**done** [2] - 6:6, 18:13
**driven** [1] - 12:1
**driving** [1] - 13:2
**drop** [1] - 19:16
**dropped** [1] - 14:12
**due** [2] - 7:25, 13:18
**during** [1] - 8:3

### E

**earliest** [1] - 5:9
**early** [1] - 13:16
**efficiency** [4] - 9:7, 9:8, 9:11, 9:16
**eight** [1] - 5:6
**either** [2] - 6:24, 18:16
**eliminating** [1] - 9:18
**ELSBY** [1] - 2:7
**Elsby** [1] - 4:12
**embroiled** [1] - 14:10
**ended** [1] - 11:24
**Engine** [1] - 15:2
**ensure** [1] - 7:10
**entirely** [3] - 13:19, 14:19, 14:22
**envisioned** [1] - 13:10
**Erik** [1] - 4:20
**especially** [2] - 9:21, 10:25
**ESQ** [11] - 1:21, 2:3, 2:7, 2:11, 2:15, 2:19, 3:3, 3:4, 3:4, 3:5, 3:5
**essentially** [1] - 11:7
**Ethicon** [1] - 18:11
**event** [3] - 10:17, 11:17, 12:1
**exactly** [1] - 13:3
**example** [2] - 7:13, 15:21

**exercise** [1] - 19:4
**exercising** [1] - 17:8
**expert** [2] - 6:23, 8:18
**extent** [1] - 8:14

### F

**fact** [5] - 6:22, 8:17, 11:24, 14:8, 14:20
**factor** [5] - 6:25, 17:14, 17:19, 17:20, 17:22
**factors** [5] - 8:22, 17:14, 17:25, 18:25, 19:3
**facts** [1] - 12:15
**fair** [1] - 12:4
**fairly** [1] - 18:8
**fairness** [1] - 5:24
**far** [1] - 13:23
**FARNAN** [3] - 1:20, 1:21, 4:9
**Farnan** [1] - 4:9
**faster** [1] - 13:23
**favor** [2] - 5:2, 17:25
**February** [4] - 7:17, 12:25, 13:20, 13:21
**FELD** [3] - 2:2, 2:6, 2:10
**few** [1] - 12:11
**field** [1] - 11:2
**file** [3] - 9:5, 12:23, 13:22
**filed** [11] - 5:4, 5:6, 5:11, 7:6, 7:18, 8:11, 13:21, 14:12, 16:4, 16:5, 16:19
**filing** [1] - 14:5
**finally** [2] - 7:24, 18:23
**first** [8] - 5:4, 6:5, 6:25, 12:12, 13:1, 13:17, 17:14, 19:1
**five** [10] - 5:8, 5:19, 7:18, 9:4, 9:19, 9:24, 12:22, 14:8, 16:3, 16:20
**flips** [1] - 5:22
**flows** [1] - 13:9
**following** [1] - 4:3
**FOR** [1] - 1:2
**forced** [1] - 6:18
**formulate** [1] - 19:4
**forward** [1] - 19:17
**Fountain** [1] - 4:21
**four** [2] - 5:5, 11:2
**free** [1] - 14:16
**frequency** [2] - 14:16, 14:17
**front** [1] - 13:9
**FUKUDA** [1] - 3:4
**Fukuda** [1] - 4:20

**fundamental** [1] - 5:24

### G

**general** [1] - 18:2
**get-go** [1] - 20:3
**given** [2] - 7:1, 10:11
**grant** [2] - 19:5, 19:6
**granted** [4] - 5:7, 5:12, 8:14, 16:7
**granting** [1] - 18:24
**great** [1] - 4:23
**greatly** [3] - 6:5, 9:17, 9:20
**ground** [1] - 15:25
**guess** [1] - 16:25
**GUMP** [3] - 2:2, 2:6, 2:10
**Gump** [1] - 4:12
**Gunning** [1] - 1:24

### H

**half** [1] - 12:14
**happy** [1] - 8:23
**hard** [1] - 17:10
**HAUER** [3] - 2:2, 2:6, 2:10
**hear** [5] - 4:24, 6:19, 9:1, 11:12, 16:1
**heard** [1] - 17:16
**hearing** [1] - 10:2
**hearings** [1] - 8:3
**heed** [1] - 8:10
**held** [1] - 4:3
**help** [1] - 18:18
**highlighted** [1] - 8:7
**highly** [1] - 10:25
**history** [5] - 5:18, 5:24, 5:25, 6:2, 14:2
**Honor** [33] - 4:17, 4:25, 5:21, 6:2, 7:13, 7:17, 8:3, 8:7, 8:21, 8:24, 9:2, 10:1, 10:5, 10:7, 11:3, 11:10, 12:7, 12:11, 13:14, 13:24, 14:5, 14:15, 14:23, 15:2, 15:9, 15:11, 15:14, 15:25, 17:2, 19:11, 19:13, 20:8, 20:10
**HONORABLE** [1] - 1:16

### I

**idea** [1] - 14:18
**identical** [1] - 7:19
**ignores** [1] - 5:17
**II** [2] - 2:19, 15:23

**III** [1] - 3:5
**impact** [1] - 8:6
**important** [4] - 10:22, 14:14, 14:21, 17:19
**IN** [2] - 1:1, 1:2
**include** [1] - 6:10
**including** [1] - 16:10
**inconsistent** [1] - 14:19
**information** [1] - 9:21
**infringement** [2] - 8:1, 8:11
**infringements** [1] - 8:5
**instituted** [7] - 9:18, 9:19, 10:20, 10:24, 16:11, 16:22, 18:6
**institution** [2] - 10:9, 16:25
**inter** [1] - 19:8
**interests** [1] - 17:9
**introduced** [1] - 8:8
**Intuitive** [1] - 18:12
**involved** [1] - 10:18
**IO** [1] - 15:2
**IPR** [10] - 10:23, 13:22, 14:8, 14:11, 16:5, 16:10, 16:22, 16:24, 18:15, 19:16
**IPR'd** [1] - 14:13
**IPRs** [10] - 5:3, 5:6, 5:11, 9:5, 9:24, 10:6, 10:10, 17:4, 18:6, 18:16
**issue** [1] - 7:19
**issued** [2] - 12:22, 12:24
**issues** [8] - 6:19, 7:23, 12:3, 15:7, 15:22, 17:15, 18:16, 18:18
**itself** [2] - 14:24, 15:4

### J

**January** [3] - 8:3, 10:1, 11:23
**Jim** [3] - 4:19, 9:3, 19:13
**joined** [1] - 4:19
**judge** [1] - 10:15
**Judge** [6] - 8:13, 8:14, 11:13, 12:3, 15:22, 18:11
**judging** [1] - 10:11
**judgment** [1] - 6:23
**judicial** [1] - 18:24
**jump** [2] - 13:7, 13:9
**juncture** [1] - 20:2
**juries** [1] - 7:21
**jury** [1] - 6:17

## K

**KAHN** [4] - 2:3, 4:25, 12:11, 20:7
**Kahn** [4] - 4:11, 4:13, 5:1, 11:11
**KAYE** [1] - 2:14
**knock** [1] - 9:9

## L

**lack** [1] - 12:5
**last** [4] - 5:19, 12:12, 13:25, 14:23
**late** [5] - 9:23, 10:12, 11:18, 12:2, 13:16
**latter** [1] - 12:14
**lawsuit** [1] - 16:19
**learn** [1] - 6:18
**learning** [1] - 7:21
**least** [2] - 6:3, 15:22
**leave** [3] - 8:11, 12:12, 12:17
**Lee** [2] - 4:20
**LEE** [2] - 3:4, 3:4
**left** [1] - 17:7
**legal** [1] - 5:19
**less** [1] - 10:20
**likely** [1] - 18:15
**line** [2] - 4:11, 13:7
**litigated** [1] - 18:19
**litigation** [5] - 9:23, 10:12, 16:2, 17:7, 18:10
**LLC** [1] - 18:11
**LLP** [6] - 1:20, 2:2, 2:6, 2:10, 2:19, 3:3
**longstanding** [1] - 6:11
**look** [1] - 14:14
**looking** [1] - 11:15

## M

**Magistrate** [3] - 8:13, 8:14, 12:3
**maintain** [1] - 17:10
**management** [1] - 6:3
**March** [3] - 11:24, 16:21
**marketing** [1] - 14:17
**Markman** [1] - 14:7
**Maslowski** [1] - 4:12
**MASLOWSKI** [1] - 2:11
**matter** [2] - 10:22, 17:7
**MATTHEW** [1] - 2:15
**Matthew** [1] - 4:13
**mean** [1] - 19:20

**means** [1] - 10:22
**merits** [1] - 10:16
**MICHAEL** [2] - 1:21, 2:3
**Michael** [3] - 4:9, 4:11, 5:1
**might** [2] - 6:24, 7:20
**Mike** [1] - 4:12
**minute** [2] - 15:12, 15:13
**months** [5] - 5:5, 9:4, 9:6, 9:24, 13:22
**morning** [1] - 4:9
**MORRIS** [1] - 2:19
**Morris** [1] - 4:18
**most** [2] - 7:14, 10:22
**motion** [20] - 4:22, 5:2, 5:7, 5:13, 5:15, 8:1, 8:11, 8:12, 8:15, 9:6, 11:11, 12:12, 13:23, 14:5, 14:12, 15:1, 15:7, 16:8, 19:5, 19:7
**motions** [4] - 5:4, 5:21, 5:23, 18:4
**moved** [3] - 5:4, 5:10, 14:1
**moving** [1] - 17:24
**MR** [13] - 4:9, 4:17, 4:25, 9:2, 12:11, 15:11, 15:14, 17:2, 19:11, 19:13, 19:20, 20:7, 20:10
**multiple** [3] - 7:4, 18:22, 19:21

## N

**narrowed** [1] - 6:24
**need** [1] - 10:16
**needs** [1] - 17:8
**NEUROMODULATIO N** [1] - 1:5
**Nevro** [55] - 4:18, 5:4, 5:10, 5:16, 5:17, 5:19, 5:23, 6:8, 6:15, 7:5, 7:6, 7:17, 8:8, 8:9, 8:10, 9:1, 10:2, 10:18, 10:23, 11:1, 11:8, 12:23, 12:24, 12:25, 13:6, 13:10, 13:15, 13:17, 13:19, 13:23, 13:25, 14:1, 14:10, 14:12, 14:17, 14:19, 14:21, 14:23, 15:1, 15:5, 15:16, 16:5, 16:19, 16:20, 16:24, 17:5, 18:4, 18:20, 18:21, 19:14, 20:9

**NEVRO** [1] - 1:8
**Nevro's** [20] - 5:12, 5:14, 6:1, 6:11, 6:16, 7:8, 7:15, 7:19, 8:1, 8:4, 8:7, 8:9, 8:20, 9:19, 10:21, 12:18, 12:21, 14:4, 18:1, 18:17
**new** [6] - 6:19, 6:20, 8:17, 8:18, 16:19
**New** [2] - 2:3
**NICHOLS** [1] - 2:19
**Nichols** [1] - 4:18
**nine** [1] - 9:6
**NO** [1] - 1:9
**non** [1] - 17:24
**non-moving** [1] - 17:24
**noted** [1] - 17:6
**nothing** [3] - 9:7, 12:20, 15:8
**November** [1] - 11:18
**number** [1] - 8:15

## O

**o'clock** [1] - 1:13
**obtained** [1] - 18:22
**October** [6] - 6:6, 9:10, 9:13, 12:21, 16:17, 19:17
**OF** [1] - 1:2
**offenses** [1] - 7:14
**Official** [1] - 1:24
**old** [1] - 15:25
**one** [11] - 7:13, 10:5, 11:10, 13:25, 14:8, 14:14, 15:5, 15:13, 17:16, 18:4
**one-year** [1] - 13:25
**operative** [4] - 8:22, 13:20, 13:21, 14:6
**opposing** [1] - 5:17
**opposite** [1] - 9:16
**options** [1] - 19:21
**order** [1] - 19:17
**originally** [2] - 6:12, 13:3
**outside** [1] - 14:18
**overall** [1] - 17:18
**overlapping** [1] - 6:16
**own** [3] - 5:18, 5:21, 12:6

## P

**p.he** [1] - 18:1
**p.m** [3] - 1:13, 4:4, 20:13
**page** [1] - 18:7

**pages** [1] - 11:18
**paints** [1] - 13:17
**papers** [1] - 14:7
**paresthesia** [1] - 14:16
**paresthesia -free** [1] - 14:16
**part** [4] - 8:15, 10:23, 15:22, 19:15
**partially** [1] - 16:4
**particular** [1] - 18:10
**parties** [7] - 6:7, 6:22, 8:15, 13:3, 17:9, 17:13, 19:8
**parties'** [1] - 5:14
**party** [4] - 5:25, 13:18, 17:24, 18:24
**past** [1] - 20:1
**patent** [21] - 5:5, 5:11, 6:11, 6:14, 10:3, 10:19, 13:5, 13:11, 14:4, 14:6, 14:15, 14:18, 15:15, 15:16, 16:15, 16:18, 16:23, 16:25, 17:11, 19:16
**patents** [26] - 5:7, 6:19, 7:7, 7:10, 7:18, 8:6, 9:12, 9:18, 9:19, 10:18, 10:20, 10:22, 11:7, 12:22, 12:24, 14:13, 15:21, 15:23, 16:6, 16:10, 16:12, 16:14, 16:20, 16:23, 17:4
**pending** [3] - 8:12, 18:5, 19:7
**Pennsylvania** [1] - 2:11
**percent** [3] - 10:21, 14:9, 15:16
**perspective** [2] - 6:3, 13:10
**persuaded** [2] - 18:11, 18:20
**persuades** [1] - 19:3
**Petegorsky** [1] - 4:12
**petitioned** [1] - 16:24
**petitions** [3] - 13:22, 14:11, 16:6
**Philadelphia** [1] - 2:11
**place** [1] - 7:12
**plaintiff** [1] - 4:10
**Plaintiffs** [2] - 1:6, 2:17
**plaintiffs** [1] - 4:7
**planning** [1] - 9:12
**plans** [1] - 9:22
**pleading** [1] - 14:7
**point** [10] - 6:7, 10:17, 11:1, 12:12, 14:4,

14:14, 14:23, 15:15, 15:17, 15:19
**points** [1] - 12:11
**PORTER** [1] - 2:14
**Porter** [1] - 4:13
**positioned** [1] - 20:5
**positioning** [1] - 13:3
**possibly** [1] - 7:11
**potential** [1] - 7:25
**practical** [1] - 10:22
**prejudice** [3] - 8:19, 10:2, 17:23
**prejudiced** [1] - 18:21
**prejudices** [1] - 10:6
**prejudicial** [5] - 10:25, 11:4, 11:9, 14:24, 15:4
**preparing** [1] - 19:24
**present** [1] - 17:23
**presentations** [1] - 4:14
**presented** [3] - 12:14, 12:15, 14:6
**pretrial** [1] - 6:23
**previously** [2] - 10:4, 18:22
**priority** [2] - 17:16, 17:18
**problem** [1] - 19:22
**proceed** [1] - 7:9
**proceedings** [2] - 16:22, 18:15
**process** [1] - 10:23
**produced** [2] - 11:18, 11:20
**product** [1] - 7:5
**production** [1] - 12:2
**products** [3] - 6:15, 6:19, 7:11
**proper** [1] - 19:4
**PTAB** [4] - 10:10, 10:11, 10:18, 16:21
**pursuing** [1] - 17:4
**push** [1] - 13:8

## Q

**questions** [4] - 8:24, 12:7, 15:8, 19:10
**quite** [4] - 9:10, 10:2, 11:9, 12:16

## R

**RACHEL** [1] - 2:7
**Rachel** [1] - 4:12
**raise** [2] - 19:18, 19:23
**raised** [2] - 11:13, 15:7
**raising** [1] - 20:3

**re** [1] - 8:20
**re-do** [1] - 8:20
**realities** [1] - 14:20
**really** [2] - 7:2, 19:15
**reason** [1] - 9:4
**reasoning** [1] - 18:2
**reasons** [1] - 6:4
**recently** [1] - 16:19
**recognize** [2] - 17:13, 18:5
**record** [1] - 12:17
**reduce** [1] - 18:18
**reflected** [1] - 12:16
**relate** [2] - 6:15, 7:7
**related** [3] - 7:18, 7:22, 16:19
**relevant** [2] - 5:24, 7:16
**relies** [1] - 15:1
**relitigate** [1] - 15:19
**remain** [1] - 18:18
**remained** [1] - 5:13
**remaining** [4] - 6:6, 6:21, 6:22, 17:4
**remains** [2] - 8:12, 18:24
**remove** [1] - 8:18
**repeat** [1] - 10:8
**reply** [1] - 12:14
**Reporter** [1] - 1:24
**representation** [1] - 5:22
**request** [2] - 10:20, 18:3
**resolution** [2] - 18:6, 19:5
**resolve** [1] - 18:17
**resources** [1] - 18:25
**respect** [5] - 8:9, 10:14, 13:13, 16:13, 16:18
**respond** [6] - 11:14, 11:25, 12:10, 13:11, 13:15, 15:6
**response** [2] - 7:6, 20:4
**responsible** [1] - 4:21
**responsive** [1] - 8:16
**restoring** [1] - 13:10
**result** [1] - 7:2
**retirement** [1] - 15:23
**retread** [1] - 15:25
**reverse** [1] - 5:14
**review** [1] - 19:8
**risk** [1] - 8:18
**risks** [1] - 8:8
**RODGER** [1] - 2:19
**Rodger** [1] - 4:17
**roles** [1] - 5:14

**roll** [1] - 4:7
**roughly** [1] - 13:22

**S**

**sales** [1] - 7:14
**schedule** [5] - 7:25, 8:9, 8:16, 11:6, 13:18
**scheduled** [2] - 6:6, 12:21
**scheduling** [1] - 15:22
**SCHOLER** [1] - 2:14
**Scientific** [12] - 4:24, 7:14, 7:15, 8:20, 12:10, 13:5, 16:4, 16:6, 16:11, 16:20, 17:3, 20:7
**SCIENTIFIC** [2] - 1:4, 1:5
**Scientific 's** [12] - 5:5, 5:9, 5:10, 6:10, 6:11, 6:14, 7:7, 7:10, 16:15, 18:3, 19:6, 20:3
**SCS** [1] - 14:16
**seat** [1] - 10:10
**second** [4] - 5:13, 7:4, 13:13, 17:20
**secret** [6] - 6:10, 6:15, 9:13, 9:14, 9:15, 16:16
**secrets** [1] - 11:8
**seeking** [1] - 12:6
**sense** [2] - 6:2, 10:13
**separate** [3] - 6:13, 7:21, 16:5
**served** [1] - 11:23
**serving** [1] - 8:4
**set** [5] - 6:9, 6:18, 11:6, 16:16, 17:21
**setting** [2] - 6:1, 14:20
**SHARON** [1] - 3:4
**Sharon** [1] - 4:20
**sidelines** [1] - 13:9
**SIDLEY** [1] - 3:3
**Sidley** [1] - 4:19
**significant** [4] - 5:18, 5:25, 7:25, 18:23
**similar** [4] - 6:15, 7:7, 12:13, 18:10
**simplification** [2] - 7:1, 7:3
**simplify** [4] - 6:5, 9:20, 17:15, 18:16
**simplifying** [1] - 9:17
**simply** [1] - 14:3
**simulation** [1] - 11:2
**sit** [1] - 14:1
**situation** [1] - 11:17

**six** [2] - 9:11, 13:22
**Sleet's** [1] - 15:22
**SMITH** [2] - 2:19, 4:17
**Smith** [1] - 4:18
**SONA** [1] - 3:5
**sorry** [1] - 19:11
**sought** [1] - 18:21
**source** [1] - 11:22
**specific** [1] - 19:5
**specifically** [2] - 8:8, 10:19
**spent** [1] - 19:23
**spinal** [1] - 11:2
**squeeze** [1] - 13:18
**stage** [3] - 9:23, 10:12, 18:9
**stages** [1] - 18:10
**stand** [3] - 6:9, 6:16, 10:17
**Stark's** [1] - 18:11
**start** [3] - 4:7, 12:12, 13:11
**STATES** [1] - 1:1
**statistics** [1] - 14:8
**stay** [36] - 5:2, 5:4, 5:10, 5:17, 6:1, 6:2, 6:17, 6:21, 7:2, 7:4, 7:20, 7:24, 8:18, 10:12, 12:6, 13:8, 14:5, 14:12, 15:1, 15:19, 15:24, 16:8, 16:12, 16:13, 17:7, 17:15, 17:22, 18:1, 18:3, 18:21, 18:23, 18:24, 19:1, 19:5, 19:7
**stayed** [9] - 5:13, 15:21, 15:23, 16:3, 16:4, 16:9, 16:17, 18:9, 19:1
**staying** [1] - 18:5
**stays** [3] - 10:14, 18:2, 18:22
**steps** [1] - 8:16
**STEVEN** [1] - 2:11
**Steven** [1] - 4:11
**still** [2] - 5:9, 16:25
**stop** [2] - 12:8, 16:1
**story** [1] - 12:16
**STRAUSS** [3] - 2:2, 2:6, 2:10
**subject** [1] - 5:15
**subset** [1] - 5:12
**suggestion** [1] - 19:25
**suit** [1] - 9:20
**sum** [1] - 19:3
**summary** [1] - 6:23
**support** [4] - 5:21, 5:23, 13:23, 18:2
**supported** [1] - 14:3

**supports** [1] - 18:2
**Surgical** [1] - 18:12
**suspect** [1] - 15:25

**T**

**tactical** [6] - 9:8, 12:18, 13:2, 13:9, 14:2, 17:23
**tactically** [2] - 11:5, 11:9
**tactics** [1] - 13:7
**technical** [2] - 6:19, 6:20
**technologies** [1] - 14:22
**technology** [6] - 6:16, 7:5, 7:8, 7:12, 7:19, 7:21
**teed** [1] - 20:1
**Telecomm** [1] - 15:3
**Telephone** [1] - 1:14
**telephone** [2] - 4:3, 20:13
**terms** [1] - 9:17
**THE** [16] - 1:1, 1:2, 4:6, 4:15, 4:23, 8:25, 12:9, 15:10, 15:13, 16:2, 17:3, 19:12, 19:18, 19:22, 20:9, 20:11
**therapy** [1] - 14:16
**therefore** [2] - 7:16, 19:6
**thereto** [1] - 19:9
**third** [3] - 5:2, 7:24, 17:22
**THOMAS** [1] - 3:5
**Thomas** [1] - 4:20
**threat** [1] - 8:4
**three** [6] - 5:7, 6:3, 7:11, 7:21, 17:14, 17:25
**timed** [1] - 15:20
**timeline** [1] - 14:1
**timing** [3] - 8:7, 13:2, 13:13
**today** [2] - 4:22, 10:17
**total** [2] - 10:21, 11:19
**totality** [1] - 19:3
**totally** [1] - 18:16
**touched** [1] - 13:14
**trade** [7] - 6:10, 6:14, 9:13, 9:14, 9:15, 11:8, 16:16
**trial** [23] - 5:6, 5:9, 6:6, 6:9, 6:17, 6:24, 7:3, 7:9, 8:9, 9:5, 9:10, 9:22, 9:25, 10:9, 11:5, 11:6, 12:21,

16:16, 17:15, 17:21, 18:16, 19:2, 19:17
**trials** [3] - 7:4, 7:11, 11:7
**tried** [2] - 12:19, 17:12
**try** [3] - 11:8, 12:5, 17:12
**trying** [3] - 9:14, 11:6, 13:6
**Tuesday** [1] - 1:13
**TUNNELL** [1] - 2:19
**twelve** [1] - 9:6
**twice** [2] - 5:16, 16:4
**two** [14] - 5:4, 5:6, 7:10, 9:18, 10:3, 11:2, 11:7, 12:21, 12:24, 14:25, 15:5, 16:22, 17:4

**U**

**U.S.D.C.J** [1] - 1:16
**unduly** [1] - 17:23
**unfair** [2] - 11:9, 12:20
**unfairly** [1] - 18:21
**uniformly** [1] - 18:5
**UNITED** [1] - 1:1
**unless** [2] - 12:7, 15:8
**up** [4] - 10:9, 11:6, 11:11, 20:1
**upcoming** [2] - 6:17, 7:3

**V**

**Valerie** [1] - 1:24
**validity** [2] - 10:8, 10:11
**virtually** [3] - 5:22, 7:19, 15:4
**volunteered** [1] - 18:22
**vs** [1] - 1:7

**W**

**waited** [3] - 12:25, 13:16, 13:25
**waiting** [1] - 16:25
**warning** [1] - 8:10
**warrants** [1] - 6:1
**washington** [2] - 2:7, 2:15
**week** [1] - 13:25
**weigh** [1] - 17:8
**weight** [1] - 7:1
**Westlaw** [1] - 18:12
**willing** [1] - 19:16
**Wilmington** [1] - 1:12
**withheld** [1] - 11:20

**withholding** [1] - 11:16
**witnesses** [1] - 6:20
**WOLF** [1] - 2:15
**Wolf** [1] - 4:13

## Y

**year** [4] - 7:9, 13:25, 16:17, 16:21
**years** [4] - 5:8, 5:19, 16:3
**York** [2] - 2:3

# EXHIBIT 17

**FUJIFILM**
Value from Innovation

**SONOSITE**

**FUJIFILM Sonosite, Inc.**
21919 30th Dr. SE
Bothell, WA
98021-3904
USA

**Tel:** 1.425.951.1200
**Fax:** 1.425.951.1201
www.sonosite.com

September 2020

**End of Sale Notice – Sonosite iViz**

Dear Valued Customer,

It is our goal, and responsibility, to ensure that you receive timely updates about Fujifilm Sonosite products.

Developed for physicians on-the-go, Sonosite iViz is a built-from-the-ground-up, lightweight, miniaturized ultrasound system that can be taken anywhere. After 5 years in the hospital, office and field environments, we wish to inform our customers of the retirement of the Sonosite iViz ultrasound system, transducers and accessories.

Orders for Sonosite iViz, and associated transducers, accessories and service agreements will be accepted until the dates listed below, while inventory remains:

| | |
|---|---|
| New Systems | February 28, 2021 |
| New Transducers | August 31, 2022 |
| New Accessories | August 31, 2022 |
| SonoProtect Service Agreements - Systems | February 28, 2021 |
| SonoProtect Service Agreements - Transducers | February 28, 2021 |

Service support for this system and associated transducers will continue to be provided until the dates listed below:

| | |
|---|---|
| Sonosite iViz Systems | August 31, 2027 |
| Sonosite iViz Transducers | August 31, 2027 |
| Sonosite iViz Accessories | August 31, 2024 |

Due to the limited supply of spare parts available now that we are retiring the Sonosite iViz, the purchase of spare parts, including batteries and power supplies is limited to individual service events, and stocking orders for parts can no longer be accepted.

**Any patient. Anywhere. Anytime.**

End of Sale Notice – Sonosite iViz
MKT03507 10/2020

BFLY_FUJI_0024187

If you have any questions regarding these limitations, or about service support for Sonosite iViz, please contact your local Technical Support Team at 877-657-8118 or ffss-service@fujifilm.com.

Sonosite's product family has expanded significantly over the years to include a wide range of powerful point-of-care ultrasound solutions enhancing quality of care, patient safety, cost reduction, efficiency, and patient satisfaction. Sonosite has a solution to fit every ultrasound need in any point-of-care clinical environment. To find out more about Sonosite products and/or product retirement information, please contact your local FUJIFILM Sonosite Representative or visit us at www.sonosite.com.

We sincerely thank you for your continued support and look forward to serving you in the years to come.


Sincerely,


Richard Mander
Director of Product Management
FUJIFILM Sonosite, Inc.

FUJIFILM SonoSite, Inc. the SonoSite logo and other trademarks not owned by third parties are registered and unregistered trademarks of FUJIFILM SonoSite Inc. in various jurisdictions. All other trademarks are the property of their respective owners. ©2020 FUJIFILM SonoSite, Inc. All rights reserved.

# EXHIBIT 18

Current Emergency and Hospital Medicine Reports (2021) 9:73–81
https://doi.org/10.1007/s40138-021-00229-6

TECHNOLOGY IN MEDICINE (J PAXTON, SECTION EDITOR)



# The Use of Handheld Ultrasound Devices in Emergency Medicine

Adrienne N. Malik[1] · Jonathan Rowland[2] · Brian D. Haber[3] · Stephanie Thom[1] · Bradley Jackson[1] · Bryce Volk[1] · Robert R. Ehrman[3]

Accepted: 21 April 2021 / Published online: 11 May 2021
© The Author(s), under exclusive licence to Springer Science+Business Media, LLC, part of Springer Nature 2021, corrected publication 2021

## Abstract

**Purpose of Review** Ultraportable handheld ultrasound (HHU) devices are being rapidly adopted by emergency medicine (EM) physicians. Though knowledge of the breadth of their utility and functionality is still limited compared to cart-based systems, these machines are becoming more common due to ease-of-use, extreme affordability, and improving technology.
**Recent Findings** Images obtained with HHU are comparable to those obtained with traditional machines but create unique issues regarding billing and data management. HHU devices are increasingly used successfully to augment the education of practitioners-in-training, by emergency physicians in austere environments, and in the burgeoning fields of "tele-ultrasound" and augmented reality scanning.
**Summary** This review seeks to describe the current state of use of HHU devices in the emergency department (ED) including device overview, institutional concerns, unique areas of use, recent literature since their adoption into clinical EM, and their future potential.

**Keywords** Handheld ultrasound · Emergency ultrasound · POCUS · Pocket ultrasound · Portable ultrasound · Emergency medicine

## Introduction

Point-of-care ultrasound (POCUS) is ubiquitous in emergency departments (EDs) and recognized as standard of care in the workup of multiple disease processes encountered by the emergency physician (EP). In addition to its recognition as a workhorse for diagnosis and procedural guidance, POCUS is increasingly used by other medical specialties, ancillary staff, and first responders. POCUS is increasingly used outside the clinical setting as a tool for teaching practitioners-in-training with ultrasound instruction integrated into medical school curricula.

Technological advances have led to the introduction of truly handheld ultrasound (HHU) into the POCUS market [1•]. With smaller footprints, user friendly interfaces, and lower price points, the broad appeal of these devices is clear. However, as with most emerging technology in healthcare, the advent of HHU devices brings a host of clinical and academic potential as well as new challenges and complex questions about the handling of patient data.

While numerous HHU devices are available, and large, robust data to support their interchangeable use with the traditional machines is lacking [2, 3••], the American College of Emergency Physicians (ACEP) released a consensus statement recognizing HHU-generated images as "comparable" to those of traditional machines [1•, 2–4]. In order to better navigate the myriad handheld devices, this paper will serve as an overview of what is currently known about HHU devices: the mechanics of how they work, nuances of their use in practice, how they compare to traditional machines, and what this technology portends for the future of POCUS in the ED and beyond.

---

This article is part of the Topical collection on *Technology in Medicine*

✉ Robert R. Ehrman
rehrman@med.wayne.edu

[1] Department of Emergency Medicine, University of Kansas School of Medicine, 3901 Rainbow Blvd, Kansas City, KS 66045, USA

[2] Department of Emergency Medicine, University of California-Irvine, 1001 Health Sciences Rd, Irvine, CA 92617, USA

[3] Department of Emergency Medicine, Wayne State University School of Medicine, 4201 St. Antoine, Suite 6G, Detroit, MI, USA

🙂 Springer

BFLY_FUJI_0027169

## Devices

Several HHU devices are currently available. A comparison of specifications between several devices can be found in Fig. 1. The image-generating technology between handhelds and traditional machines is similar with one exception. To create ultrasound images, traditional cart-based ultrasound systems and most handhelds use piezoelectric crystal technology. The product from Butterfly Network Inc., however, utilizes capacitive micromachined ultrasound transducers on complementary metal oxide semiconductors, or CMUT-on-CMOS technology. CMUTs replace the traditional vibrating piezoelectric crystals with oscillating drums embedded in a single silicon chip, serving the same function of converting electricity into sound waves [4, 5]. In addition to decreasing the cost of production, this technology allows a single device to operate at a wider range of frequencies, negating the need for multiple probes [5].

Handheld products come as single or multiple probe devices. SonoQue and GE offer two separate heads on a single probe, increasing the range of studies that can be performed by simply rotating the probe (Fig. 1) [3••]. While some products

have the ability to display generated images on personal smart devices, others utilize proprietary displays sold with the product, which may hold much of the processing power of the system [3••]. Connectivity between the probe and the display varies between products. Some HHU probes connect through a traditional cable system, while some products offer wireless communication. The Clarius and Vave devices can stream their images live to multiple displays simultaneously.

Some HHU devices feature artificial intelligence (AI) packages that perform calculations such as ejection fraction and bladder volume measurement [5]. Image recognition software allows auto-identification and labeling of structures and gives real-time feedback on the quality of the images obtained. The Kosmos product can also perform digital cardiac auscultation with image acquisition and comes with telemetry leads which can be attached to the patient, thus integrating electrocardiograph findings and rhythm interpretation into the ultrasound study.

Understanding the benefits and limitations of HHU is critical to its proper use in the clinical arena. In the same way a POCUS examination is not a comprehensive evaluation, HHU excels when used to evaluate well-defined clinical questions

| Name | Probes | Wireless | Display | Storage | Cost |
|---|---|---|---|---|---|
| Clarius | Linear, curvilinear, microconvex, & endocavitary | Yes | Personal iOS or Android smart device | Cloud-based; DICOM capable | $4,900–$6,900; no subscription |
| SonoQue | Linear & curvilinear; also dual-head probes | Yes | Personal iOS smart device | On smart device | $999–$4,400; no subscription |
| Philips Lumify | Linear, curvilinear, & phased array | No | Personal Android smart device; iOS device with adapter | On device; DICOM capable | $6,000; no subscription |
| EchoNous Kosmos | Phased array | No | Proprietary tablet or select Samsung devices | On device; DICOM capable | $5,000–$8,500; no subscription |
| Vave | Phased array | Yes | Personal iOS or Android smart device | On device or cloud; DICOM capable | $99/month (billed annually) |
| GE Vscan | Sector, dual-head linear/sector, dual-head linear/curvilinear | No (Vscan Extend) Yes (Vscan Air) | Extend: Proprietary tablet  Air: Personal iOS or Android smart device | On device or cloud; DICOM capable | $2,995–$4,995; no subscription |
| Butterfly iQ+ | CMUT probe | No | Personal iOS or Android smart device | Cloud-based; DICOM capable | $1,999 with $420 annual subscription; $2,999 with lifetime subscription |
| SonoSite iViz | Linear, curvilinear, & phased array | No | Proprietary tablet | DICOM & cloud capable | >$10,000; no subscription |

**Fig. 1**  Comparison of specifications between several devices

 Springer



**Fig. 2** Side by side comparison of a parasternal long axis (PLAX) cardiac view obtained on the same patient using a SonoSite X-Porte (Fujifilm, SonoSite INC. Bothell, WA) on the left and the Butterfly iQ HHU (Butterfly Network INC, Guilford, CT) on the right. Both images were obtained using the cardiac preset function on each machine

in a manner that respects the limitations of this new technology [3••, 5].

A primary benefit to HHU is that it is readily available to the clinician for *every* patient encounter. Starting as low as $2000, these devices are the cheapest available ultrasound (US) systems, opening the door for widespread use in medical education, resource-limited settings, or to any clinician who performs POCUS examinations [2, 3••, 6, 7].

Most HHU devices offer a battery life that is capable of intermittent scanning for the duration of a clinical shift without being tethered to an electrical outlet [5, 8, 9]. However, this benefit is tempered by the tendency of some devices to overheat after a relatively short period of use [5, 8]. Image quality of HHU has a foundation of published literature establishing its non-inferiority to cart-based machines for POCUS applications[1], though anecdotally HHU-generated images are subjectively of lesser quality (Fig. 2) [2, 4, 5, 8–10••]. A notable exception is that CMUT-on-CMOS (i.e., Butterfly iQ) technology has minimal published comparisons against traditional machines. Advanced echocardiographic applications are also lacking in the HHU world. Focused cardiac US can still be qualitatively performed with HHU, but few current devices offer spectral Doppler capabilities, thus precluding their use for quantitative applications [5, 8, 11, 12•, 13].

Most HHU models leverage app-based smartphone technology, generally Android or iOS [2] making boot times negligible and reducing complicated knobology to familiar finger swipes and taps [14], thereby reducing the barrier to entry for the novice users. Many HHU models offer HIPAA-compliant cloud-based storage with a user interface that promotes collaboration and immediate feedback from remote reviewers without the need for a middleware solution [3••, 5, 15]. Cloud-based storage is often proprietary and may be incapable of agnostic integration with existing US and/or hospital Picture Archiving and Communication System (PACS) systems, but most HHU systems can be configured for DICOM PACS [2]. HIPAA compliance is also contingent upon the device/smartphone with which the HHU is paired. The use of powerful smart devices opens opportunities for tele-ultrasound and remote guidance directly from the device itself without the need for additional equipment [16].

## Institutional Concerns

### Image Storing and Sharing

Archiving images and clips for all POCUS exams is best practice and required for billing. HHU devices offer novel solutions to image archiving [5, 8]. When deciding between local PACS vs. cloud-based storage, most of the handheld devices

---

[1] Of note, two systematic reviews on handheld ultrasound diagnostic performance are heavily dominated by studies that utilized GE's Vscan device. Ninety-four percent of studies included by Rykkje et al. [3••] and 88% by Galusko et al. [10••] were on the Philips Healthcare Vscan.

BFLY_FUJI_0027171

Curr Emerg Hosp Med Rep (2021) 9:73–81

allow either option [2]. Choosing the local storage option most closely mirrors existing workflows with cart-based machines and likely allows more seamless integration with existing PACS systems. Cloud-based image archiving on the other hand prompts important questions about ownership of images, HIPAA compliance, and security of images.

While image ownership is a complex legal question, the precedent is that it is owned by the creator of the information, i.e., the clinician. Butterfly IQ follows this precedent in their Patient Privacy Notice, identifying themselves as "data processor" and clinicians as "data controller" [17, 18]. This same terminology is used by another major cloud storage solution, Trice Imaging [19]. The term "data controller" originates from the European Union's General Data Protection Regulation and indicates a party who decides what to do with data and when to delete it. Physician ownership of imaging studies is further substantiated in that patient requests to modify or remove data sent to Butterfly will be referred back to the clinician who obtained the image [20]. Likewise, Trice Imaging provides tools for clinicians to modify or delete studies but will not do so themselves [19]. Another important ethical consideration with image ownership is that some cloud-based services use de-identified ultrasound studies from users to improve proprietary AI algorithms, which will then be sold back to the same users.

A hospital-owned PACS server is the traditional workflow solution for image archiving, but significant and common security issues have been identified [2, 21, 22]. Cloud-based storage brings its own set of security concerns, in part due to the increased visibility [17]. Despite these concerns, cloud storage offers security advantages over local storage as IT resources are pooled, making it easier to stay up-to-date with threats [23]. Security of ultrasound images is an important and complex topic which requires further investigation.

Other factors that ultimately influence a hospital's decision between local or cloud storage include internet connectivity, bandwidth availability, and redundancy of image availability during "downtime." All of these factors require careful consideration at the hospital level and are best undertaken prior to implementation of the new technology [1•].

## Billing

Per ACEP guidelines, "ultrasound is a separate entity from the physical examination that adds anatomic, functional and physiologic information to the care of the acutely-ill patient" [24]. Comparisons to stethoscopes are inaccurate, as ultrasound presents a new set of data separate from the physical examination that requires archiving and quality assurance [25]. Similar to other procedures, appropriate performance and interpretation of ultrasound requires training, skill development, feedback, credentialing, and time to complete the study. Therefore, imaging studies completed with handheld devices

should continue to be billed as independent procedures and not regarded as an extended physical examination [1, 24].

Ownership of the device impacts the type of billing allowed. Hospital device ownership is preferable, allowing billing for both facility and professional fees [2]. It is unlikely that the facility fee can be billed for devices owned by individuals or physician groups. Facility fees are needed to support overhead costs of machine purchases, EMR integration, maintenance, and workflow solutions. This also has the potential to create confusion for coding and billing companies, as device ownership may not be readily apparent [2]. Without approval from hospital administration, IT, security, and legal departments, ACEP's stance is that personally owned devices should not be used clinically [1•]. Overall, it is recommended that the hospital purchase *both* the HHU transducer and the device with which it will be used—this will allow for both the professional and technical fees to be charged without changes to extant billing structures [2].

## Theft/Misplacement

The portability offered by handheld devices is a double-edged sword, as they are more prone to misplacement or theft [5]. Though data is ultimately uploaded, some protected health information (PHI) is maintained on the portable device. To safeguard health information and comply with HIPAA, devices should ideally be hospital-owned and password-protected. They should also be loaded with mobile device management software allowing tracking, locking, and erasure of PHI. If enough devices can be purchased, assigning devices to individual providers may allow greater personal responsibility over their safekeeping. Radio frequency identification tagging is another option commonly implemented in hospitals to track device location and provide alerts if a device leaves the premises.

## Disinfecting Procedures and Concerns

Proper cleaning of HHU devices is necessary to prevent iatrogenic infection transmission. Cleaning processes for handheld devices are similar to cart-based machines with a few notable exceptions. Only one HHU device is currently approved for endocavitary use (Clarius EC7 HD); the majority of HHUs are only intended for external scanning or procedural guidance. External scanning over intact skin is considered low risk for infection transmission, so cleaning the probe and cable with a low-level disinfectant is sufficient [26, 27]. US-guided procedures are considered high risk and require a barrier (Tegaderm, probe cover) plus low-level disinfection.

One notable difficulty that has arisen during the SARS-CoV-2 pandemic is machine disinfection between suspected or confirmed cases. Given documented persistence of SARS-CoV-2 on surfaces up to 3 days, current recommendations are


Springer

BFLY_FUJI_0027172

Curr Emerg Hosp Med Rep (2021) 9:73–81

to drape cart-based machines with disposable plastic drapes. This process is time-consuming and resource-intensive. HHU devices present a solution for POCUS infection control as there is no cart-based system in existence that is as easily cleaned or covered [11, 16, 28, 29]. HHU devices can be quickly and completely cleaned with a single disinfectant wipe. Another simple alternative is to place the entire US device and tablet/phone within a sterile probe cover and close the end [30]. After the exam is complete, the probe cover is discarded and the device wiped down. Additionally, the remote viewing capabilities offered by HHU technologies may be beneficial for infection control as they allow one user to obtain images that can be virtually viewed by other clinicians outside the patient room [5].

## Current Use of HHUs in the ED

POCUS applications in the ED using traditional cart-style machines are well established as standard of care for the management of certain disease processes [24]. Use of HHU devices in the ED is currently informed by mostly small, single-center studies with few randomized control trials (RCTs) available at this time. Nonetheless, the limited data from these studies is promising [3, 8, 31–35]. A retrospective study evaluating POCUS lung scores obtained from ED COVID-19 patients using a Butterfly iQ HHU and traditional GE Venue machine reported a high degree of correlation between images [31]. Two other studies using HHU to differentiate the cause of acute dyspnea in the ED found HHU use feasible for this purpose and demonstrated reliable discrimination between cardiac and non-cardiac causes of dyspnea [33, 34]. Pujol et al. determined that it is feasible to diagnose proximal deep vein thrombosis by performing venous compression studies with a HHU device [32]. Another small RCT found no difference between HHU and traditional machines when used to guide EPs placing IJ central lines on training models [35]. Similarly, a small retrospective study found HHU devices feasible to use for ultrasound-guided paracentesis [36].

Though evidence on HHU use for traditional POCUS applications in the ED is sparse, handhelds already demonstrate great potential to change specific areas of EM practice. One such area is within the scope of ED patient resuscitation. Though no large studies have been performed assessing the non-inferiority of HHU for rapid evaluation ED patients in this context, it stands to reason that smaller, portable equipment would be beneficial in these circumstances. Some data exists that hints HHU would perform adequately as a stand-alone device if used during resuscitation efforts. Previous comparison studies between HHU and standard machines reported general agreement for evaluation of left ventricular ejection fraction, pericardial effusions, and inferior vena cava collapsibility, three clinical questions frequently evaluated by

EPs attending critically ill patients [37]. Another study found the results of focused assessment with sonography in trauma (FAST) assessments of trauma patients performed by EPs using HHU devices correlated well with findings from radiologist performed abdominal ultrasounds that immediately followed, suggesting that HHU performs as well as standard machines for this application [38].

HHU also exhibits value in areas of patient care previously prohibitive to widespread use of ultrasound due to constraints inherent in traditional machines. In some EDs, trained ancillary staff perform POCUS peripheral IV (PIV) placement. Until recently this has been executed using standard machines, leading to workflow issues when a machine needed for a POCUS study by an EP is in use by another ED team member placing IVs. HHU devices offer a solution to this problem, easily replacing larger ultrasound machines as the workhorses for ultrasound PIV placement, thus freeing the main machines for more complex POCUS studies. A retrospective study of PIVs placed in difficult to access ED patients using the Philips Lumify HHU system found 92% success with HHU devices, compared to the 97% success rate using traditional ultrasound machines; first-attempt success was similar as well [39•].

One of the most robust areas of application for HHU devices outside the ED is medical education. HHU, like its larger predecessors, can be utilized in undergraduate and graduate medical education to teach safer approaches to invasive procedures, improve physical examinations, and enhance understanding of anatomy [5]. Some evidence suggests that physicians are less inclined to utilize physical examination skills and that the quality and proficiency of these skills is lacking and prone to error [40, 41]. POCUS is proven, to improve bedside physical exams by medical students and residents to the point that one author recommends "insonation" as a component of the physical exam [4, 40, 42]. Recent studies demonstrate that incorporating HHU devices into undergraduate medical education was well received by students, improved conceptual understanding of anatomy, and improved student confidence and diagnostic accuracy when performing physical examinations [42–44, 45••, 46].

POCUS use is widespread in the clinical setting, utilized by practitioners spanning multiple specialties. In order for learners to keep up-to-date with the myriad clinical ultrasound applications, medical schools are integrating concepts of ultrasonography—such as teaching bedside image acquisition and image interpretation—into their core medical school curricula [44, 47]. In a survey of ultrasound medical education directors, respondents noted that lack of funding was a huge barrier to implementing ultrasound curricula for medical students [44]. With the price of some HHU devices around $2000 (compared to $50,000 or greater for a cart-based system), they represent a low-cost solution to providing the benefits of early ultrasound education to medical students. The feasibility of this is demonstrated by the medical school at the

🙋 Springer

BFLY_FUJI_0027173

University of California Irvine which provided Butterfly iQ devices to their entire 2023 medical student class [6].

HHU has great potential for use outside of traditional hospital and academic settings [3, 48]. The use of POCUS to augment the work of paramedics and first responders has been previously explored, but the size, cost, and necessity for multiple probes inherent to standard machines significantly limited the ability to undertake large scale prehospital studies [48]. With the advent of HHU devices, research on prehospital POCUS and its effect on patient outcomes is now feasible [49]. The cost and portability of HHU devices make them ideal diagnostic tools for first responders as well as EPs who staff large-scale events, sometimes in areas with few existing medical resources [4]. Large gatherings can generate disease states warranting POCUS imaging such as trauma, dehydration, and undifferentiated dyspnea [50]. Prager et al. prospectively evaluated the use of HHU by EPs at a large music festival and reported that HHU findings altered the management decision in 39% of cases. Prager notes that, "As POCUS machines continue to become more portable and less expensive, this modality could prove to be an important measure to reduce downstream health care costs in patients presenting [for evaluation] at mass gatherings" [50]. There are also documented cases of HHU assisting in triage during disaster/mass-casualty scenarios [48]. Their high portability and ability to provide real-time diagnostics make these devices ideal for such circumstances [4]. Similarly, HHU is proving invaluable to practitioners in austere environments that otherwise have no reliable imaging source [3, 4, 15, 49]. Burleson et al. retrospectively reported the experience of ultrasound-trained physicians using the Butterfly iQ HHU in an austere East African ED [8]. They found that while there were some disadvantages to the device, such as frequent overheating and poorer quality of cardiac POCUS, the Butterfly iQ met the needs of their high-acuity ED [8]. The authors note that "…advantages over cart-based machines are magnified where financial resources, floor space, and reliable power may be scarce" [8].

While evidence for the use of HHU within the scope of EM practice is in its infancy, more rigorous data on the subject exists in literature outside of this specialty [3, 4, 32, 37, 51, 52]. Findings from some of these studies are undeniably applicable to HHU use in the ED. A prospective blinded study comparing HHU devices to traditional machines for grading hydronephrosis found excellent agreement between the two devices [51]. A systematic review comparing HHU devices to standard machines reported that "Strong correlations [between devices] were found when evaluating ascites, hydronephrosis, pleural cavities, in detection of abdominal aortic aneurysms and for use with obstetric and gynecological patients" [3••]. Overall, there remains a paucity of data generated from large RCTs directly comparing handheld devices to cart-style machines in the context of ED use. Data from such studies are necessary before broad adoption of HHU as the primary POCUS tool in the ED is possible, but the potential of these devices is already apparent.

## Future of Handhelds in the ED

Remotely guided US, or "tele-ultrasound," improves image quality and scanning confidence among novice users and will be critical for improving safety as HHU becomes more widespread [5, 15, 53, 54]. AI algorithms have been developed that automatically show users the movements necessary to obtain high quality images [5, 55]. Use of neural networks in computer science also has significant implications for POCUS [56]. Many HHU devices already possess AI functions such as automated calculation of ejection fraction and bladder volume [57, 58]. Zhang et al. created a fully automated echocardiography interpretation algorithm which functions with B-mode images obtained by HHU [59]. Thus, practitioners using machines lacking advanced echocardiography functionality or high-end image quality may still use HHU devices to answer cardiac-related clinical questions due to these advances in AI and smart device processing power. The combination of widespread HHU availability, evolving tele-ultrasound capabilities and machine learning algorithms paints a promising picture for patient care with earlier, more accurate disease detection from even novice users, in any geographic location [3••].

Concordant with advances in tele-ultrasound, virtual POCUS education has recently become feasible. Technologies inherent in some HHU devices allow for remote image viewing and thus remote peer-review and QA [5]. HHU devices saw increased use as adjuncts to resident education during the COVID-19 pandemic due to their compatibility with virtual platforms [60]. Research on efficacy of this emerging facet of medical education is currently extremely limited but likely to expand in the face of restrictions on in-person learning during the current COVID-19 pandemic.

HHU will likely see increased future use by ED consultants, including specialties that are not traditional users of POCUS (e.g., nephrology, internal medicine) [61]. The likelihood that HHU devices will become ubiquitous outside the ED relatively soon has led some to suggest that US should become a routine part of the physical examination [3••, 40, 62]. As US education is increasingly incorporated into medical school curricula, it is likely to make specialty-specific training and implementation at the graduate level easier and more widespread [5, 63–65].

Use of HHU devices by consultants offers many potential benefits for patient care. In an office-based setting, it could be used to identify conditions requiring urgent ED referral (e.g., large pericardial effusion) versus those appropriately treated in the outpatient setting (e.g., cellulitis without abscess). In the inpatient setting, HHU could be used to track serial changes in a patient's condition, such as pulmonary edema, from arrival in the ED until discharge from the floor. Alternatively, consultants could use HHU devices to perform focused examinations to answer limited questions—has left ventricular ejection fraction decreased or does the patient with known


Springer

cholelithiasis now have findings suggestive of acute cholecystitis? Rapid answers to these direct questions, particularly with consultants at the bedside, could facilitate treatment and disposition decisions while reducing the burden on sonographers and interpreting physicians [3••].

While it is highly plausible that HHU use can improve patient care, demonstration of such benefit with formal research studies will strengthen the argument for widespread implementation and direct its use to the areas with greatest potential impact. Several preliminary studies suggest benefits of HHU use. These include reduced need for follow-up testing when used in the outpatient setting, with a low incidence of false negatives (5%), and faster time to diagnosis and reduced time to first intervention when HHUs were used by rapid response teams [66, 67]. While image interpretability appears similar between HHUs and cart-based systems, a critical concept for future studies is not to conflate image quality and the setting of use with operator training and skills [68]. Maintenance of rigorous educational programs and adequate quality assurance are crucial as device availability increases.

## Conclusion

The potential benefits of a handheld advanced imaging system are undeniable. With further technologic developments, the gap in functionality between handheld and cart-based systems will continue to decline.

Though there are obstacles surrounding HHU device operation and image management, many of these can be overcome through administrative hospital support and the fiscal advantages these devices provide. Medical education continues to be a driving force for HHU innovation and adoption. Training a new generation of physicians in anatomy and diagnostics using these platforms will foster familiarity and comfort that is likely continue into regular practice.

As we look toward the future of ultrasound, the growing body of research to improve and validate use of handheld ultrasound devices will be key to improving patient outcomes and expanding its use to novel settings. Implementation of machine learning and tele-ultrasound applications is likely to alter the POCUS landscape, and physicians should continue to study and embrace these technologies for the improvement of patient care.

## Declarations

**Conflict of Interest**   The authors declare no competing interests.

**Human and Animal Rights and Informed Consent**   This article does not contain any studies with human or animal subjects performed by any of the authors.

## References

Papers of particular interest, published recently, have been highlighted as:
• Of importance
•• Of major importance

1.• American College of Emergency Physicians. Appropriate use criteria for handheld pocket ultrasound devices: ACEP Policy Statement. https://www.acep.org/globalassets/new-pdfs/policy-statements/appropriate-use-criteria-for-handheld-pocket-ultrasound-devices.pdf. Published July 2018. Approved June 2018. Accessed December 2020. **ACEP Statement describing handheld ultrasound images as "comparable" to cart-based machines.**

2. Liu R. What's the deal with pocket ultrasound?. ACEP Now, [online] 2020;38(7). Available at: <https://www.acepnow.com/article/whats-the-deal-with-pocket-ultrasound/>. Accessed 12 December 2020.

3.•• Rykkje A, Carlsen JF, Nielsen MB. Hand-held ultrasound devices compared with high-end ultrasound systems: a systematic review. Diagnostics (Basel). 2019;9(2):61. https://doi.org/10.3390/diagnostics9020061. **Systematic review of 16 publications comparing HHU to cart-based machines for abdominal and lung applications. The review found good agreement between device types for several specific examinations but noted that research is needed.**

4. European Society of Radiology (ESR). ESR statement on portable ultrasound devices. Insights Imaging. 2019 Sep 16;10(1):89. https://doi.org/10.1186/s13244-019-0775-x.

5. Baribeau Y, Sharkey A, Chaudhary O, Krumm S, Fatima H, Mahmood F, et al. Handheld point-of-care ultrasound probes: the new generation of POCUS. J Cardiothorac Vasc Anesth. 2020 Nov;34(11):3139–45. https://doi.org/10.1053/j.jvca.2020.07.004.

6. Butterfly Network. Tonight, @UCIrvine introduced the medical professionals of the future! Every incoming UC Irvine med school student was presented with their very own #ButterflyiQ. https://t.co/TzrJvxU21h [Internet]. @ButterflyNetInc. 2019 [cited 2021 Feb 20]. Available from: https://www.twitter.com/ButterflyNetInc/status/1160024249211314176.

7. Kodaira Y, Pisani L, Boyle S, Olumide S, Orsi M, Adeniji AO, et al. Reliability of ultrasound findings acquired with handheld apparatuses to inform urgent obstetric diagnosis in a high-volume resource-limited setting. Int J Gynecol Obstet. 2020. https://doi.org/10.1002/ijgo.13475.

8. Burleson SL, Swanson JF, Shufflebarger EF, Wallace DW, Heimann MA, Crosby JC, et al. Evaluation of a novel handheld point-of-care ultrasound device in an African emergency department. Ultrasound J. 2020 Dec 7;12(1):53. https://doi.org/10.1186/s13089-020-00200-8.

9. Zardi EM, Franceschetti E, Giorgi C, Palumbo A, Franceschi F. Accuracy and performance of a new handheld ultrasound machine with wireless system. Sci Rep. 2019 Oct 10;9(1):14599. https://doi.org/10.1038/s41598-019-51160-6.

10.•• Galusko V, Bodger O, Ionescu A. A systematic review of pocket-sized imaging devices: small and mighty? Echo Res Pract. 2018 Dec:113–38. **A systematic review of HHU use for cardiac applications by users with various levels of ultrasound training. Found HHU was feasibly used by all training groups though with some noted decreased diagnostic accuracy. States that HHU may serve well as a screening exam for pathology prior to formal echo studies. Noted a need for further studies in this area due to the heterogeneity of those currently available.**

BFLY_FUJI_0027175

11. Thavanathan RS, Woo MY, Hall G. The future is in your hands - Handheld ultrasound in the emergency department. CJEM. 2020 Aug;12:1–3. https://doi.org/10.1017/cem.2020.449.

12.• Mancusi C, Carlino MV, Sforza A. Point-of-care ultrasound with pocket-size devices in emergency department. Echocardiography. 2019;36(9):1755–64. https://doi.org/10.1111/echo.14451. **Review article describing the use of handheld POCUS in the ED and its feasibility for use in acute dyspnea, shock and chest pain patients.**

13. Butterfly Network. Tonight, @UCIrvine introduced the medical professionals of the future! Every incoming UC Irvine med school student was presented with their very own #ButterflyiQ. https://t.co/TzrJvxU21h [Internet]. @ButterflyNetInc. 2019 [cited 2021 Feb 20]. Available from: https://twitter.com/ButterflyNetInc/status/1160024249211314176.

14. Wilkinson J, Saxhaug L. Handheld ultrasound in training – The future is getting smaller!. J Intensive Care Soc, [online]; 2020;175114372091421. Available at: https://journals.sagepub.com/doi/full/10.1177/1751143720914216. Accessed 12 December 2020.

15. Salerno A, Tupchong K, Verceles AC, McCurdy MT. Point-of-care Teleultrasound: a systematic review. Telemed J E Health. 2020 Nov;26(11):1314–21. https://doi.org/10.1089/tmj.2019.0177.

16. TeleGuidance - Butterfly Network [Internet]. [cited 2021 Feb 20]. Available from: https://www.butterflynetwork.com/teleguidance.

17. Shini SG, Thomas T, Chithraranjan K. Cloud based medical image exchange-security challenges. Procedia Eng. 2012;38:3454–61.

18. Butterfly IQ Patient Privacy Notice. https://www.butterflynetwork.com/patient-privacy. Accessed February 14, 2021.

19. Trice Data Protection Policy. https://triceimaging.com/data/. Accessed February 14, 2021.

20. Butterfly Network Global Privacy. FAQs https://www.butterflynetwork.com/global-privacy. Accessed February 14, 2021.

21. Stites M, Pianykh O. How secure is your radiology department? mapping digital radiology adoption and security worldwide. Am J Rad. 2016;206:797–804.

22. "Millions of Americans' medical images and data are available on the internet. Anyone can take a peek." https://www.propublica.org/article/millions-of-americans-medical-images-and-data-are-available-on-the-internet

23. Can cloud-based archiving cure your security headaches?: Your medical imaging cloud. Ambra Health. https://ambrahealth.com/hospitals-health-systems/can-cloud-based-archiving-cure-security-headaches/. Published August 22, 2017. Accessed February 14, 2021.

24. American College of Emergency Physicians. ACEP Ultrasound Guidelines: Emergency, point-of-care and clinical ultrasound guidelines in medicine: ACEP Policy Statement. https://www.acep.org/patient-care/policy-statements/ultrasound-guidelines-emergency-point-of%2D%2Dcare-and-clinical-ultrasound-guidelines-in-medicine/. Published October 2008, revised June 2016. Accessed January 2021

25. Geria RN, Raio CC, Tayal V. Point-of-care ultrasound: not a stethoscope-a separate clinical entity. J Ultrasound Med. 2015;34:172–3.

26. Reprocessing Requirements for Ultrasound Probes (College of Physicians and Surgeons of British Columbia). https://www.cpsbc.ca/files/pdf/Reprocessing-Requirements-Ultrasound-Probes.pdf.

27. American College of Emergency Physicians. ACEP guideline for ultrasound transducer cleaning and disinfection. https://www.acep.org/patient-care/policy-statements/guideline-for-ultrasound-transducer-cleaning-and-disinfection/. Published June 2018. Accessed January 2021.

28. Kirkpatrick AW, McKee JL, Volpicelli G, Ma IWY. The potential for remotely mentored patient-performed home self-monitoring for new onset alveolar-interstitial lung disease. Telemed J E Health. 2020 Oct;26(10):1304–7. https://doi.org/10.1089/tmj.2020.0078.

29. Khanji MY, Ricci F, Patel RS, Chahal AA, Bhattacharyya S, Galusko V, et al. Special Article - The role of hand-held ultrasound for cardiopulmonary assessment during a pandemic. Prog Cardiovasc Dis. 2020 Sep-Oct;63(5):690–5. https://doi.org/10.1016/j.pcad.2020.07.003.

30. Gibson LE, Bittner EA, Chang MG. Handheld ultrasound devices: An emerging technology to reduce viral spread during the Covid-19 pandemic. Am J Infect Control. 2020;48(8):968–9. https://doi.org/10.1016/j.ajic.2020.05.041.

31. Bennett D, De Vita E, Mezzasalma F, Lanzarone N, Cameli P, Bianchi F, et al. Portable pocket-sized ultrasound scanner for the evaluation of lung involvement in coronavirus disease 2019 patients. Ultrasound Med Biol. 2021 Jan;47(1):19–24. https://doi.org/10.1016/j.ultrasmedbio.2020.09.014.

32. Pujol S, Laurent J, Markarian T, Claret PG, Lefrant JY, Roger C, et al. Compression with a pocket-sized ultrasound device to diagnose proximal deep vein thrombosis. Am J Emerg Med. 2018 Jul;36(7):1262–4. https://doi.org/10.1016/j.ajem.2018.03.076.

33. Kirkpatrick AW, McKee I, McKee JL, Ma I, McBeth PB, Roberts DJ, et al. Remote just-in-time telementored trauma ultrasound: a double-factorial randomized controlled trial examining fluid detection and remote knobology control through an ultrasound graphic user interface display. Am J Surg. 2016 May;211(5):894–902.e1. https://doi.org/10.1016/j.amjsurg.2016.01.018.

34. Sforza A, Mancusi C, Carlino MV, Buonauro A, Barozzi M, Romano G, et al. Diagnostic performance of multi-organ ultrasound with pocket-sized device in the management of acute dyspnea. Cardiovasc Ultrasound. 2017 Jun 19;15(1):16. https://doi.org/10.1186/s12947-017-0105-8.

35. Chetioui A, Masia T, Claret PG, Markarian T, Muller L, Lefrant JY, et al. Pocket-sized ultrasound device for internal jugular puncture: A randomized study of performance on a simulation model. J Vasc Access. 2019 Jul;20(4):404–8. https://doi.org/10.1177/1129729818812733.

36. Keil-Rios D, Terrazas-Solis H, González-Garay A, Sánchez-Ávila JF, García-Juárez I. Pocket ultrasound device as a complement to physical examination for ascites evaluation and guided paracentesis. Intern Emerg Med. 2016 Apr;11(3):461–6. https://doi.org/10.1007/s11739-016-1406-x.

37. Platz E, Pivetta E, Merz AA, Peck J, Rivero J, Cheng S. Impact of device selection and clip duration on lung ultrasound assessment in patients with heart failure. Am J Emerg Med. 2015;33(11):1552–6. https://doi.org/10.1016/j.ajem.2015.06.002.

38. Coşkun F, Akıncı E, Ceyhan MA, Sahin KH. Our new stethoscope in the emergency department: handheld ultrasound. Ulus Travma Acil Cerrahi Derg. 2011 Nov;17(6):488–92. https://doi.org/10.5505/tjtes.2011.89914.

39.• Acuña J, Sorenson J, Gades A, Wyatt R, Stea N, Drachman M, et al. Handheld ultrasound: overcoming the challenge of difficult peripheral intravenous access in the emergency department. J Ultrasound Med. 2020;39(10):1985–91. https://doi.org/10.1002/jum.15303. **Retrospective review that found a specific HHU device reliable for PIV placement in patients with difficult IV access.**

40. Narula J, Chandrashekhar Y, Braunwald E. Time to add a fifth pillar to bedside physical examination: inspection, palpation, percussion, auscultation, and insonation. JAMA Cardiol. 2018 Apr 1;3(4):346–50. https://doi.org/10.1001/jamacardio.2018.0001.

41. Oliver CM, Hunter SA, Ikeda T, Galletly DC. Junior doctor skill in the art of physical examination: a retrospective study of the medical admission note over four decades. BMJ Open. 2013;3(4):e002257.

42. Wong CK, Hai J, Chan KYE, et al. Point-of-care ultrasound augments physical examination learning by undergraduate medical students. Postgrad Med J. 2021;97:10–5.

Springer

BFLY_FUJI_0027176

Curr Emerg Hosp Med Rep (2021) 9:73–81                                                                                81

43. Ireson M, Warring S, Medina-Inojosa JR, O'Malley MT, Pawlina W, Lachman N, et al. First year medical students, personal handheld ultrasound devices, and introduction of insonation in medical education. Ann Glob Health. 2019 Oct 15;85(1):123. https://doi.org/10.5334/aogh.2565.

44. Dinh VA, Fu JY, Lu S, Chiem A, Fox JC, Blaivas M. Integration of Ultrasound in Medical Education at United States Medical Schools. J Ultrasound Med. 2016;35:413–9. https://doi.org/10.7863/ultra.15.05073.

45. •• Tarique U, Tang B, Singh M, Kulasegaram KM, Ailon J. Ultrasound curricula in undergraduate medical education: a scoping review. J Ultrasound Med. 2018;37:69–82 https://doi-org.proxy.kumc.edu/10.1002/jum.14333. **An review article on the benefits of ultrasound integration into undergraduate medical education noting that POCUS in the curriculum improves medical student physical examination and procedural skills as well as improves clinical knowledge. Specifically notes that handheld ultrasound improved detection of rheumatic heart disease by trainees when compared to history and physical exam alone.**

46. Cawthorn TR, Nickel C, O'Reilly M, Kafka H, Tam JW, Jackson LC, et al. Development and evaluation of methodologies for teaching focused cardiac ultrasound skills to medical students. J Am Soc Echocardiogr. 2014 Mar;27(3):302–9. https://doi.org/10.1016/j.echo.2013.12.006.

47. Bahner DP, Goldman E, Way D, Royall NA, Liu YT. The state of ultrasound education in U.S. Medical Schools. Acad Med. December 2014;89(12):1681–6. https://doi.org/10.1097/ACM.0000000000000414.

48. Ma OJ, Norvell JG, Subramanian S. Ultrasound applications in mass casualties and extreme environments. Crit Care Med. 2007 May;35(5 Suppl):S275–9.

49. Amaral CB, Ralston DC, Becker TK. Prehospital point-of-care ultrasound: A transformative technology. SAGE Open Med. 2020 Jul 26;8:2050312120932706. https://doi.org/10.1177/2050312120932706.

50. Prager R, Sedgwick C, Lund A, Kim D, Ho B, Stachura M, et al. Prospective evaluation of point-of-care ultrasound at a remote, multi-day music festival. Prehosp Disaster Med. 2018 Oct;33(5):484–9. https://doi.org/10.1017/S1049023X18000821.

51. Kameda T, Uebayashi K, Wagai K, Kawai F, Taniguchi N. Assessment of the renal collecting system using a pocket-sized ultrasound device. J Med Ultrason (2001). 2018 Oct;45(4):577–81. https://doi.org/10.1007/s10396-018-0881-2.

52. Mantella LE, Colledanchise K, Bullen M, Hétu MF, Day AG, McLellan CS, et al. Handheld versus conventional vascular ultrasound for assessing carotid artery plaque. Int J Cardiol. 2019 Mar 1;278:295–9. https://doi.org/10.1016/j.ijcard.2018.12.014.

53. Kirkpatrick AW, McKee I, McKee JL, Ma I, McBeth PB, Roberts DJ, et al. Remote just-in-time telementored trauma ultrasound: a double-factorial randomized controlled trial examining fluid detection and remote knobology control through an ultrasound graphic user interface display. Am J Surg. 2016 May;211(5):894–902.e1. https://doi.org/10.1016/j.amjsurg.2016.01.018.

54. Jensen SH, Weile J, Aagaard R, Hansen KM, Jensen TB, Petersen MC, et al. Remote real-time supervision via tele-ultrasound in focused cardiac ultrasound: A single-blinded cluster randomized controlled trial. Acta Anaesthesiol Scand. 2019 Mar;63(3):403–9. https://doi.org/10.1111/aas.13276.

55. Commissioner O of the FDA Authorizes Marketing of First Cardiac Ultrasound Software That Uses Artificial Intelligence to Guide User [Internet]. FDA. FDA; 2020 [cited 2021 Feb 20]. Available from: https://www.fda.gov/news-events/press-announcements/fda-authorizes-marketing-first-cardiac-ultrasound-software-uses-artificial-intelligence-guide-user.

56. Shokoohi H, LeSaux MA, Roohani YH, Liteplo A, Huang C, Blaivas M. Enhanced point-of-care ultrasound applications by integrating automated feature-learning systems using deep learning. J Ultrasound Med. 2019 Jul;38(7):1887–97.

57. The Latest in Cardiovascular Hand-Held Point-of-Care Ultrasound: The Power of Echocardiography Anytime, Anywhere - American College of Cardiology [Internet]. [cited 2021 Feb 20]. Available from: https://www.acc.org/latest-in-cardiology/articles/2019/08/12/08/11/the-latest-in-cardiovascular-hand-held-point-of-care-ultrasound.

58. Automatically Estimate Bladder Volume [Internet]. Butterfly Network. [cited 2021 Feb 20]. Available from: https://support.butterflynetwork.com/hc/en-us/articles/360042212671-Automatically-Estimate-Bladder-Volume

59. Jeffrey Z, Sravani G, Pulkit A, Tison GH, Hallock LA, Lauren B-N, et al. Fully automated echocardiogram interpretation in clinical practice. Circulation. 2018 Oct 16;138(16):1623–35.

60. Lin SD. A virtual point-of-care ultrasound course during the COVID-19 pandemic. AEM Educ Train. 2020 Nov 9. https://doi.org/10.1002/aet2.10545.

61. Soomro QH, Amerling R. Point-of-care ultrasound in nephrology. Curr Opin Nephrol Hypertens. 2021 Mar 1;30(2):176–83. https://doi.org/10.1097/MNH.0000000000000681.

62. Koratala A. Focus on POCUS: it is time for the kidney doctors to upgrade their physical examination. Clin Exp Nephrol. 2019 Jul;23(7):982–4. https://doi.org/10.1007/s10157-019-01707-8.

63. Liu RB, Suwondo DN, Donroe JH, Encandela JA, Weisenthal KS, Moore CL. Point-of-care ultrasound: does it affect scores on standardized assessment tests used within the preclinical curriculum? J Ultrasound Med. 2019 Feb;38(2):433–40. https://doi.org/10.1002/jum.14709.

64. Johri AM, Durbin J, Newbigging J, Tanzola R, Chow R, De S, et al. Cardiac point-of-care ultrasound: state-of-the-art in medical school education. J Am Soc Echocardiogr. 2018 Jul;31(7):749–60. https://doi.org/10.1016/j.echo.2018.01.014.

65. Ma IWY, Steinmetz P, Weerdenburg K, Woo MY, Olszynski P, Heslop CL, et al. The canadian medical student ultrasound curriculum: a statement from the canadian ultrasound consensus for undergraduate medical education group. J Ultrasound Med. 2020 Jul;39(7):1279–87. https://doi.org/10.1002/jum.15218.

66. Colli A, Prati D, Fraquelli M, Segato S, Vescovi PP, Colombo F, et al. The use of a pocket-sized ultrasound device improves physical examination: results of an in- and outpatient cohort study. PLoS One. 2015 Mar 20;10(3):e0122181. https://doi.org/10.1371/journal.pone.0122181.

67. Zieleskiewicz L, Lopez A, Hraiech S, Baumstarck K, Pastene B, Di Bisceglie M, et al. Bedside POCUS during ward emergencies is associated with improved diagnosis and outcome: an observational, prospective, controlled study. Crit Care. 2021 Jan 22;25(1):34. https://doi.org/10.1186/s13054-021-03466-z.

68. Dewar ZE, Wu J, Hughes H, Adnani A, Christiansen G, Ovedovitz L, et al. A comparison of handheld ultrasound versus traditional ultrasound for acquisition of RUSH views in healthy volunteers. J Am Coll Emerg Physicians Open. 2020 Nov 21;1(6):1320–5. https://doi.org/10.1002/emp2.12322.

**Publisher's Note** Springer Nature remains neutral with regard to jurisdictional claims in published maps and institutional affiliations.

🌱 Springer

BFLY_FUJI_0027177

# EXHIBIT 19

Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, DC 20006

T    +1 202.887.4000
F    +1 202.887.4288
akingump.com



**C. Brandon Rash**
+1 202.887.4380/fax: +1 202.887.4288
brandon.rash@akingump.com

April 18, 2023

VIA E-MAIL

Jennifer C. Tempesta
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112

Re:    *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, C.A. No. 22-309-JPM (D. Del.) –
Plaintiff's Response to Interrogatory No. 3 – Covered Products

Jennifer:

We write regarding FUJIFILM Sonosite, Inc.'s ("Fujifilm") March 27, 2023 response to Butterfly Network, Inc.'s ("Butterfly") Interrogatory No. 3 directed to covered products. A timeline of events related to this issue is attached as **Appendix A**. Butterfly provides a non-exhaustive list of deficiencies below with respect to Fujifilm's response and reserves all rights to address other deficiencies as discovery progresses.

**First**, the claim charts that Fujifilm provided appear to be based solely on public information, but Fujifilm has designated the claim charts as "Restricted – Outside Attorney's Eyes Only" under the Protective Order—a designation that is limited to a party's most sensitive competitive information and intended to be used "to facilitate the production of third party confidential information that requires such a designation."[1] (D.I. 30 at 6.)

- **Please promptly** confirm that Fujifilm will withdraw this designation and re-serve the relevant exhibits with no designation. Alternatively, please promptly serve a redacted version of the exhibits that we may share with Butterfly or identify specifically which portions Fujifilm contends are confidential so that we may prepare a redacted version to share with Butterfly.

**Second**, even though Fujifilm agreed "to supplement its response to Interrogatory No. 3 as requested" (App. A ¶ 14), Fujifilm repeatedly qualifies, and even appears to limit, its response because the information sought is "more properly the subject of expert discovery rather than fact discovery" (*e.g.*, 03/27/2023 Response to Interrog. 3, Exs. A-C at 1). But Fujifilm asserted in its First Amended Complaint (D.I. 21) that certain products practice the '822 and '985 Patents and did so without reliance on expert discovery. Moreover, all relevant information to Fujifilm's contentions is solely under its control and should have been included in the response.

---

[1] For now, this letter includes the same confidentiality designation as Fujifilm's claim charts even though those charts do not appear to qualify for "Restricted – Outside Attorneys' Eyes Only."

**Akin**

Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 2

- **Please promptly** supplement Fujifilm's response to identify any information that is lacking or provide us with a particularized basis for Fujifilm's inability to provide a full and complete response at this time regarding its own products. Absent supplementation, Butterfly will seek to bar presentation of any new or different contentions that Fujifilm raises.

**Third**, Interrogatory No. 3 asks for *any* product that Fujifilm contends "practices, has practiced, and/or embodies any Asserted Claims." Fujifilm has identified only the "**SonoSite M-Turbo**," "**SonoSite S-II**," and "**SonoSite iViz**" in its response and charted only **one claim** for each of the '822 and '985 Patents.

- **Butterfly has and will rely on Fujifilm's identification of products and relevant patent claims. Please promptly** supplement Fujifilm's response to include any additional information if the current response is not a full and complete statement of all products that Fujifilm contends practice, have practiced, and/or embody the asserted claims and of all claims that Fujifilm contends are practiced, have been practiced, and/or embodied by any product. Absent prompt supplementation, Butterfly will seek to bar presentation of any new or different contentions that Fujifilm raises.

**Fourth**, Fujifilm's response only identifies claim charts but does not provide any of the remaining information sought by Interrogatory No. 3. In particular, Interrogatory No. 3 further seeks "*the date(s) on which any such uses occurred, any guidance provided by Fuji regarding such uses, any instructions or other documentation concerning such uses, the number of times each product(s), service(s), or method(s) has been used to practice any Asserted Claim; and the identity of the three Fuji witnesses most knowledgeable about the information requested in this Interrogatory.*"

- **Please promptly** supplement Fujifilm's response to include all requested information.

**Fifth**, Fujifilm's response is deficient with respect to its doctrine of equivalents allegations. For all three claim charts, Fujifilm include the same generic allegation: "To the extent that any claim element is found to not be literally met with respect to the Product, FUJIFILM Sonosite contends that the element is met under the doctrine of equivalents because there are no substantial differences between the element and the Product, and the element and the Product perform substantially the same function, in substantially the same way, to achieve substantially the same result." (Ex. A at 1; Ex. B at 1; Ex. C at 1.)

- **Please promptly** supplement Fujifilm's response to include the requisite specificity, on a limitation-by-limitation basis, to maintain theories based on doctrine of equivalents. (*See, e.g.*, *B.E. Tech., LLC v. Samsung Elecs. Am., Inc.*, No. 12-cv-2825, D.I. 63 (W.D. Tenn. Oct. 4, 2013) (McCalla, J.) at 23-27.) Absent supplementation, Butterfly will seek to bar any presentation of doctrine-of-equivalents claims that Fujifilm raises.

**Finally**, Fujifilm's claim charts are deficient. For many limitations, Fujifilm has failed to simply state its position, much less provide the description that Butterfly requested in its interrogatory, and the



Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 3

███████████████████████████████

"detailed claim charts" that Fujifilm stated that it would provide. (*See* 03/06/2023 Email from J. Tempesta to B. Kenyon.) These are Fujifilm's products, and thus, Fujifilm has had complete information on the structure and operation of these products since before the case even started. Fujifilm, however, appears to rely on general public information to make vague allegations.

- **Please promptly** supplement Fujifilm's response to state its positions with clarity—i.e., the structure in the covered product that Fujifilm contends satisfies each claim limitation. Similarly, to the extent Fujifilm intends to rely on any additional evidence, such as confidential documents or source code, this information is solely under Fujifilm's control and should be included in its response. To the extent the current response is not a full and complete statement of Fujifilm's contentions, please promptly supplement Fujifilm's response to include any additional information. Absent prompt supplementation, Butterfly will seek to bar presentation of any new or different contentions that Fujifilm raises.

**In closing**, we provide below a non-exhaustive list of specific deficiencies on an exhibit-by-exhibit basis. Please promptly supplement to include the information. Once again, absent supplementation, Butterfly will seek to bar presentation of any new or different contentions that Fujifilm raises.

### 1. Exhibit A – '822 Claim Chart – M-Turbo Ultrasound System ("M-Turbo System")

Regarding the "*establishing a first ultrasound imaging signature*" and "*establishing a second ultrasound imaging signature*" limitations, Fujifilm just repeats claim language and includes unexplained tables from a publicly available user guide. (Ex. A at 6-14.) Fujifilm does not state what in the M-Turbo System it contends performs each of these limitations. Fujifilm also does not state what in the M-Turbo System corresponds to "*one or more imaging parameters including a transmit waveform, ratio of transmit to receive beamformed lines, imaging steering angle, receive line density, number of focal zones, quadrature bypass filter type and coefficients, compression curve and speckle reduction parameters*" for each of these limitations. In addition, Fujifilm does not state how it contends any parameters are "*selected to produce a high quality image of tissue*" or "*selected to produce a high quality image of an instrument*."

Regarding the "*generating a first frame*" and "*generating a second frame*" limitations, Fujifilm just repeats the claim language and includes the same unexplained figures for both limitations from a publicly available user guide. (Ex. A at 14-18.) Fujifilm does not state what in the M-Turbo System it contends performs each of these limitations. Fujifilm also does not state what in the M-Turbo System it contends is "*a first frame*" and "*a second frame*." The unexplained figures that Fujifilm includes for these limitations are the same unexplained figures that Fujifilm uses for each of the remaining limitations, including the "*producing a graphic indication on the blended final ultrasound image*" limitation.

Regarding the "*detecting pixels in the second frame*" limitation, Fujifilm just repeats the claim language, states that "[p]ixels corresponding to an interventional instrument (e.g., a needle) is displayed in the final images," and includes the same unexplained figures and an unexplained table. (Ex. A at 18-20.)



Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 4

As stated above, Fujifilm does not even state what it contends is "*a second frame*," much less what in the M-Turbo System it contends performs the function of "*detecting pixels in the second frame*."

Regarding the "*automatically determining a mask of pixels*" limitation, Fujifilm just repeats the claim language and includes the same unexplained figures that were included for the "*generating a first frame*," "*generating a second frame*," and "*detecting pixels*" limitations. Fujifilm does not state what in the M-Turbo System it contends performs this limitation. Fujifilm also does not state what it contends is "*a mask of pixels that correspond to the location of the interventional instrument*." Fujifilm does not cite any evidence or offer any explanation whatsoever to suggest that this "*automatically determining*" step is performed by the M-Turbo System.

Regarding the "*blending pixels*" limitation, Fujifilm just repeats the claim language, states in conclusory fashion that "the final image comprises pixels blended from the first frame and the second frame and pixels from the first frame [sic]," and includes the same unexplained figures from the prior limitations. Yet again, Fujifilm does not cite any evidence or offer any explanation whatsoever to suggest that this "*blending pixels*" function is performed by the M-Turbo System. As explained, Fujifilm does not explain what it contends is "*a first frame*," "*a second frame*," and "*a mask*," much less what it contends is "*blending pixels from the first frame and the second frame in a region that is inside the mask*" in that M-Turbo System.

Regarding the "*producing a graphic indication*" limitation, Fujifilm just repeats claim language and includes the same unexplained figures and tables. (Ex. A at 23-26.) Fujifilm does not state what it contends is "*a graphic indication*" and "*the boundaries of a coverage area … where one or more of the imaging parameters of the second ultrasound imaging signature is selected to produce a high quality image of the interventional instrument*." Fujifilm also does not state what in the M-Turbo System is "*producing a graphic indication on the blended final ultrasound image*."

Instead of simply identifying where each limitation is found in the covered product, Fujifilm generally repeats the claim language and relies on the same figures from a publicly available user guide showing the alleged "blended final ultrasound image." As best as Butterfly can understand, Fujifilm is contending that any needle visualization enhancement that includes the claimed "*graphic indication*" is inherently covered by claim 1. Fujifilm, however, cannot apply such a <u>broad</u> reading of the claims for purposes of showing that Butterfly's products infringe and its own products practice the claims and, at the same time, apply a <u>narrow</u> reading of the claims to avoid invalidity.

Fujifilm alleges each of the above functions are performed in software but never identifies where in the software each is performed. This information is solely under Fujifilm's control and available to it.

### 2. Exhibit B – '822 Claim Chart – SII Ultrasound System ("SII System")

The allegations in Exhibit B are deficient for the same reasons as the allegations in Exhibit A because Fujifilm makes substantially the same allegations (i.e., repeating claim language) and includes



Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 5

substantially the same unexplained figures and tables for each limitation that are found in the publicly available user guide for the SII System. (*See* Ex. B at 2-26.) Just like for the limitations in Exhibit A discussed above, Fujifilm has provided no evidence and no explanation whatsoever for how certain limitations are practiced by the SII System.

Accordingly, Fujifilm should promptly supplement its response to Interrogatory No. 3 to identify what it contends in the software of the SII System corresponds to each claimed function.

**3. Exhibit C – '985 Claim Chart – iViz Ultrasound System ("iViz System")**

Regarding the "*first control area*" limitation, Fujifilm just repeats the claim language; states "for example, an area within the left-hand region of the touch screen as shown below"; and includes an unexplained, unannotated screenshot from a video. (Ex. C at 8-9.) By only vaguely referring to "an area within the left-hand region," Fujifilm does not state what it contends is "*a first control area*." Claim 1 also requires "*a first control area having a number of graphical tools*," but Fujifilm does not state what it contends are the claimed "*graphical tools*."

Regarding the "*second control area*" limitation, Fujifilm just repeats the claim language; states "for example, a second area within the left-hand region of the touch screen as shown below"; and includes unexplained, unannotated screenshots from the same video. (Ex. C at 9-12.) Again, by only vaguely referring to "a second area within the left-hand region," Fujifilm does not state what it contends is "*a second control area*." Indeed, Fujifilm describes the "*first control area*" and the "*second control area*" in the same way—i.e., "*within the left-hand region of the touch screen*." (Ex. C at 8-9.) Fujifilm also does not state what it contends is "*a selected graphical tool*," "*an attribute*," and "*a plurality of controls that can be selectively activated … to select an attribute of a selected graphical tools*."

\* \* \* \*

The information sought by Interrogatory No. 3 is available to and solely under Fujifilm's control. We have provided detailed analysis and comments in this letter so that Fujifilm can promptly address the deficiencies identified above and provide any other arguments or evidence on which Fujifilm intends to rely in support of its covered product contentions in this case.

Sincerely,

*/s/ C. Brandon Rash*

C. Brandon Rash



Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 6

██████████████████████████

### APPENDIX A: TIMELINE OF EVENTS

Below is a timeline concerning Interrogatory No. 3 and Fujifilm's covered products contentions.

1. **March 9, 2022** – Fujifilm filed its Complaint, which included only vague allegations about covered products. (*See, e.g.*, D.I. 1 ¶ 13 ("Defendant copied aspects of Plaintiff's patented technologies by studying Plaintiff's patented products"; "user manuals for Plaintiff's patent products, including the user manual for the FUJIFILM Sonosite M-Turbo model product," which "includes reference to at least the '108 Patent and the '822 Patent").)

2. **August 8, 2022** – Butterfly filed a motion to dismiss, *inter alia*, Fujifilm's claims for pre-suit damages because, in part, the complaint fails to plead facts plausibly showing that Fujifilm marked its "patented products" in compliance with 35 U.S.C. § 287(a). (*See* D.I. 12 at 1.)

3. **September 7, 2022** – To overcome Butterfly's motion, Fujifilm filed its First Amended Complaint, alleging that Fujifilm product iViz practices the '985 patent (D.I. 21 ¶¶ 96, 111) and that Fujifilm products SII and M-Turbo each practice the '822 patent (D.I. 21 ¶ 188).

4. **October 25, 2022** – Butterfly served Interrogatory No. 3, asking Fujifilm, with respect to any Fujifilm product that Fujifilm contends practices or has practiced any asserted claim, to "describe on a limitation-by-limitation basis in a claim chart format, through prose and citation to evidence, how each Fujifilm product practices, was used to practice, and/or embodies each claim limitation." (Butterfly's First Set of Interrogatories (Nos. 1-9) at 9-10.) Butterfly also requested that Fujifilm describe certain details of such uses and identify Fujifilm witnesses most knowledgeable about the information requested in this interrogatory. (*Id.* at 10 n.3.)

5. **December 9, 2022** – Fujifilm served a response to Interrogatory No. 3, stating only that "Fujifilm is willing to meet and confer." (Plaintiff's Objections and Responses to Defendant's First Set of Interrogatories (Nos. 1-9) at 9.)

6. **December 14, 2022** – The parties met and conferred on, *inter alia*, Interrogatory No. 3. Butterfly explained that, to the extent Fujifilm intends to rely on any Fujifilm product practicing one or more claims of any patent-in-suit, it was obligated to provide the requested claim chart for each such product. (*See* 12/16/2022 Email from B. Kenyon to J. Tempesta.)

7. **December 17, 2022** – In response, Fujifilm demanded that Butterfly provide authority supporting the proposition that covered products contentions are "properly the subject of fact discovery, and that, if so, the burden is on Fujifilm to provide Butterfly with this information." (12/17/2022 Email from J. Tempesta to B. Kenyon.)



Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 7

8. **December 21, 2022** – Butterfly explained how the information sought is discoverable, uniquely within Fujifilm's control, and "directly relevant to multiple issues that Fujifilm has put at issue in the case, on which Fujifilm bears the burden, including at least marking/pre-suit damages, secondary considerations, lost profits, reasonable royalty, and injunctive relief." (*See* 12/21/2022 Letter from C. Rash to J. Tempesta at 3.) Butterfly also identified exemplary authority based on the Federal Rules and three, on-point district court decisions. (*See id.*)

9. **December 27, 2022** – In response, Fujifilm complained that "Butterfly does not articulate how, if at all, its cases support Butterfly's position." (12/27/2022 Letter from J. Tempesta to B. Rash at 2.)

10. **January 18, 2023** – Butterfly further explained the case law for Fujifilm, showing where courts have compelled plaintiffs in the same position as Fujifilm to provide "a full substantive response." (01/18/2023 Letter from B. Rash to J. Tempesta at 6-7.)

11. **February 2, 2023** – In response, Fujifilm objected for the first time that "this Interrogatory is premature" because "[Fujifilm] is still the process of exploring whether it will contend that any [Fujifilm] product practices a claim of any patent-in-suit." (02/02/2023 Letter from J. Tempesta to B. Rash at 3.)

12. **February 7, 2023** – Butterfly noted that Fujifilm's new position in its February 2 letter is inconsistent with the allegations that Fujifilm included in its First Amended Complaint—that certain products practice the '985 and '822 Patents—to overcome Butterfly's motion to dismiss. (02/07/2023 Letter from B. Rash to J. Tempesta at 1-2.) Butterfly requested once again that Fujifilm supplement its response to Interrogatory No. 3, explaining that Butterfly would otherwise be required to seek appropriate relief from the court.

13. **February 15, 2023** – The parties met and conferred on, *inter alia*, Interrogatory No. 3, and Butterfly reiterated the relevance of the information sought and noted that Fujifilm had not yet responded to the case law that Butterfly provided. (02/17/2023 Email from B. Kenyon to T. Natsume.) Fujifilm confirmed that it believes certain products practice at least the '822 and '985 Patents but indicated that covered product contentions are not relevant and that a request for such contentions was "unusual." (*Id.*) Butterfly requested case law in support of Fujifilm's position that plaintiffs can rely on covered products in support of its claims without providing its covered products contentions during fact discovery. (*See id.*) Fujifilm also argued for the first time that the burden was on Butterfly to identify "unmarked" products before Fujifilm has the burden of providing the information sought by Interrogatory No. 3. (*See id.*) Butterfly reminded Fujifilm, however, that Butterfly had in fact already identified such products in its original motion to dismiss filed in August 2022. (*See id.*; D.I. 12 at 3-4.)



Jennifer C. Tempesta
Baker Botts LLP
April 18, 2023
Page 8

14. **February 21, 2023** – Fujifilm finally agreed "to supplement its response to Interrogatory No. 3 as requested." (02/21/2023 Letter from J. Tempesta to B. Rash at 2.)

15. **February 23, 2023** – Butterfly requested Fujifilm to identify when it reasonably expects to serve the supplement to its response to Interrogatory No. 3, stating that Butterfly wants to make sure that Fujifilm has "sufficient time to prepare a thoughtful response." (02/23/2023 Email from B. Kenyon to J. Tempesta.)

16. **February 27, 2023** – In response, Fujifilm agreed to supplement "in one month." (02/27/2023 Email from J. Tempesta to B. Kenyon.)

17. **March 2, 2023** – Butterfly reminded Fujifilm that Fujifilm had made clear and unmistakable representations in its First Amended Complaint, filed in September 2022, that certain products practice at least one claim of the '822 and '985 Patents in order to overcome Butterfly's motion to dismiss. (03/02/2023 Letter from B. Rash to J. Tempesta at 1-2.) Butterfly expressed its concern that, on February 2, 2023, Fujifilm stated that it is "still in the process of exploring" this issue, and that it now needs "one month" to prepare and serve a response. (*Id.* at 1.) Butterfly requested an explanation for its inability to provide covered products contentions earlier, an explanation for a further one-month delay, and an affirmation that Fujifilm had conducted a fulsome analysis in connection with its covered products allegations in the First Amended Complaint. (*Id.* at 3.)

18. **March 6, 2023** – In response, Fujifilm stated that it "disagree[s] with the characterizations made in your [March 2] letter" and that "Fujifilm had no obligation to prepare the detailed claim charts of its own products that Butterfly is now requesting prior to filing the complaint." (03/06/2023 Email from J. Tempesta to B. Kenyon.)

19. **March 27, 2023** – Fujifilm served its supplemental response to Interrogatory No. 3, including three claim charts attached as Exhibits A ('822 Patent – M-Turbo System), B ('822 Patent – SII System), and C ('985 Patent – iViz System).

# EXHIBIT 20



**C. BRANDON RASH**
+1 202.887.4380/fax: +1 202.887.4288
brandon.rash@akingump.com

December 15, 2022

VIA E-MAIL

Jennifer C. Tempesta
Baker Botts LLP
30 Rockefeller Plaza
New York, NY 10112
Jennifer.Tempesta@bakerbotts.com

> Re:   *FUJIFILM Sonosite, Inc. v. Butterfly Network, Inc.*, C.A. No. 22-309-JPM (D. Del.) – Plaintiff's Court-Ordered Production Obligations

Dear Jennifer:

We write regarding significant concerns that we have with FUJIFILM Sonosite, Inc.'s ("Fujifilm") production of documents and its compliance with the requirements of Local Patent Rules of the Western District of Tennessee ("W.D. Tenn. LPR") applicable in this matter.

Specifically, under W.D. Tenn. LPR 3.2, Fujifilm was required to search for and produce, *inter alia*, "***[a]ll documents evidencing conception and [] reduction to practice***" and "***ownership***" of the patents-in-suit with its Initial Infringement Contentions on <u>October 26, 2022</u>. D.I. 26 at 2. Based on information we learned in the parties' meet and confer yesterday, it has become clear that Fujifilm possesses a "substantial" number of documents that should have already been searched and, if responsive under W.D. Tenn. LPR 3.2, produced to Butterfly Network, Inc. ("Butterfly").

For example, Fujifilm informed us that "custodial" documents associated with numerous named inventors are located on a "common" drive and indicated that it is only now beginning to search for "conception and [] reduction to practice" related documents on this drive.

To the extent documents identified in W.D. Tenn. LPR 3.2 exist and were not already produced, that failure has significantly prejudiced Butterfly both in preparation of its case and the expense associated with an incomplete record. Most troubling is the fact that Butterfly has had to prepare extensive Non-Infringement Contentions during that time and, at the moment, is busy preparing Invalidity and Unenforceability Contentions, due January 6, 2023.



Jennifer C. Tempesta
Baker Botts LLP
December 15, 2022
Page 2

We have provided below a timeline of relevant events:

- On September 29, 2022, Fujifilm served its initial disclosures and identified **all** named inventors of its seven asserted patents as "individuals likely to have discoverable information that FUJIFILM may use to support its claims or defenses." Fujifilm's Initial Disclosures at 2.

- On October 26, 2022, Fujifilm was required to produce, *inter alia*, "[a]ll documents evidencing conception and [] reduction to practice" and "ownership" with its Initial Infringement Contentions. W.D. Tenn. LPR 3.2.

- On November 10, 2022, Butterfly informed Fujifilm of its court-ordered production obligations and that, based on our review, Fujifilm failed to produce, *inter alia*, "conception and [] reduction to practice" documents for at least five out of the seven asserted patents. 11/10/2022 Letter from B. Kenyon to J. Tempesta at 2.

- On November 16, 2022, Fujifilm responded, stating that it had produced all documents evidencing conception and reduction to practice under W.D. Tenn. LPR 3.2(b) "located to-date" and that Fujifilm "will supplement its production to the extent additional documents are located." 11/16/22 Letter from J. Tempesta to B. Kenyon at 1. Fujifilm, however, provided no indication in this letter that there were a substantial number of additional inventor-related documents in Fujifilm's possession that existed and had not yet been searched by Fujifilm.

- On November 30, 2022, Fujifilm identified three named inventors, out of the possible fourteen named inventors across all asserted patents, as the individuals "most likely to have non-cumulative discoverable ESI." Fujifilm's Disclosure of Custodians Pursuant to Paragraph 2(c) of the Parties' Agreement and Order on E-Discovery (D.I. 44) ("ESI Order") at 1.

- On December 7, 2022, Butterfly responded to Fujifilm's proposed list of custodians and stated that it is unclear what discoverable ESI these inventors would have given that Fujifilm was already required under W.D. Tenn. LPR 3.2(b) to have produced all documents evidencing conception and reduction to practice with its Infringement Contentions on October 26, 2022. Butterfly's Modifications Pursuant to Paragraph 2(d) of the ESI Order at 2.



Jennifer C. Tempesta
Baker Botts LLP
December 15, 2022
Page 3

- In our December 12, 2022 meet and confer, Butterfly raised this issue again and then repeated it in a summary memorializing the parties' meet and confer. 12/13/2022 Email from B. Kenyon to J. Tempesta. In response, Fujifilm did not address this issue concerning its obligations under W.D. Tenn. LPR 3.2 but, instead, stated that "there are non-email files for other former employee named inventors within Fujifilm's possession that will be reviewed for production" and that "there are other sources likely to have discoverable information for several other former employee inventors, which sources are being reviewed for production." 12/13/2022 Email from J. Tempesta to B. Kenyon.

- In our December 14, 2022 meet and confer, Butterfly again raised this issue concerning Fujifilm's obligations under W.D. Tenn. LPR 3.2 and received no response. Butterfly further learned that Fujifilm in fact possesses a "substantial" number of documents for numerous named inventors of the asserted patents on a "common" drive. Separately, on the meet and confer, Butterfly raised the fact that, in a December 9, 2022 Response to discovery requests related to conception and reduction to practice that Butterfly served on October 25, 2022, Fujifilm stated only that it was willing to meet and confer. Fujifilm's Objections and Response to Defendant's First Set of Requests for Production of Documents and Things (Nos. 1-158) (Dec. 9, 2022). As part of this discussion, Fujifilm confirmed that is still searching for documents responsive to these requests related to conception and reduction to practice.

As you will recall, it was Fujifilm that insisted the parties proceed with contentions and discovery (including document production) before completion of the pleadings stage. *See, e.g.*, Joint Planning Report and Proposed Schedule (D.I. 24) at 2-3. Fujifilm has not met its court-ordered production obligations, and it is inappropriate to use the ESI process to circumvent that obligation.

Sincerely,

*/s/ C. Brandon Rash*

C. Brandon Rash