IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| FUJIFILM SONOSITE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-309 (JPM) |
| | ) | |
| BUTTERFLY NETWORK, INC., | ) | DEMAND FOR JURY TRIAL |
| | ) | |
| Defendant. | ) | |

## <u>PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF</u>

OF COUNSEL:

Robert L. Maier
Jennifer C. Tempesta
Margaret M. Welsh
Pallavi Mathur
Eric J. Faragi
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY  10112
(212) 408-2500

May 18, 2023

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff FUJIFILM Sonosite, Inc.*

**TABLE OF CONTENTS**

Page

I.  DISPUTED CLAIM TERMS ........................................................................................... 1

    A.  The '157 Patent .................................................................................................... 1

        1.  "information of object" ............................................................................... 1

        2.  "image analysis unit" is not a means plus function term ........................... 4

        3.  "normalization process" should be afforded its plain meaning ................. 6

        4.  "region setting unit" is not a means plus function term............................. 7

    B.  The '985 Patent .................................................................................................... 7

        1.  "accessible by a hand of the user that is holding the portable ultrasound system" means "accessible by the user's hand that is holding the base unit"........................................................................................................... 7

        2.  "controls that can be selectively activated by a thumb of the user to select" means "controls that a thumb of the user's hand holding the base unit can selectively activate to select" ...................................................... 9

    C.  The '050 Patent .................................................................................................. 10

    D.  The '108 Patent .................................................................................................. 11

        1.  "An ultrasound system application specific integrated circuit (US-ASIC)" is limiting in accord with its plain meaning............................................... 11

        2.  "one or more digital signal processor(s)" should be given its plain meaning.................................................................................................... 12

        3.  "input/output channels" is not a means plus function term ...................... 13

    E.  The '822 Patent .................................................................................................. 14

        1.  "determining a mask of pixels that correspond to the location of the interventional instrument" / "determine a mask of pixel coordinates that correspond to the location of the interventional instrument" should be given plain and ordinary meaning........................................................... 14

        2.  "blending pixels from the first frame and the second frame" / "combine a first set of pixels from the first frame and a second set of pixels from the second frame" should be given plain and ordinary meaning .................... 15

        3.  "producing a graphic indication on the blended final ultrasound image" / "producing a graphic on the blended final ultrasound image" should be given plain and ordinary meaning........................................................... 15

        4.  "processor" is not a means plus function term......................................... 17

    F.  The '981 Patent .................................................................................................. 19

        1.  "display of an impulse drive type" should be afforded its plain meaning 19

        2.  "one field period" should be given its plain and ordinary meaning ........ 21

3.    "adjustment circuit" is not a means plus function term ............................ 22

4.    "control unit" is not a means plus function term ..................................... 23

5.    "image display period control circuit" is not a means plus function term 24

6.    "second adjustment circuit" is not a means plus function term ................ 25

II.    CONCLUSION ......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Apex Inc. v. Raritan Computer, Inc.*,
    325 F.3d 1364 (Fed. Cir. 2003)......................................................................................22, 25

*Aortic Innovations LLC v. Edwards Lifesciences Corp.*,
    Case No. 1:21-cv-01377-JPM, D.I. 125, slip op. at 15 (D. Del. May 9, 2023) ........................3

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
    899 F.3d 1291 (Fed. Cir. 2018)........................................................................................5, 22

*Eon Corp. IP Holdings v. Silver Spring Networks*,
    815 F. 3d 1314 (Fed. Cir. 2016)..............................................................................................2

*GoDaddy.com, LLC v. RPost Commc'ns Ltd*,
    No. CV-14-00126-PHX-JAT, 2016 WL 212676 (D. Ariz. Jan. 19, 2016)..............................18

*Hytera Commc'ns Co. v. Motorola Sols., Inc.*,
    841 F. App'x 210 (Fed. Cir. 2021) ........................................................................................16

*Intel Corp. v. Qualcomm Inc.*,
    21 F.4th 801 (Fed. Cir. 2021) ..........................................................................................9, 10

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001)............................................................................................15

*INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*,
    951 F. Supp. 2d 604 (D. Del. 2013)......................................................................................11

*IPS Grp., Inc. v. CivicSmart, Inc.*,
    No. 17-CV-632-CAB-(MDD), 2018 WL 6567843 (S.D. Cal. Dec. 13, 2018).......................23

*Media Rights Techs., Inc. v. Capital One Financial Corp.*,
    800 F.3d 1366 (Fed. Cir. 2015)........................................................................................5, 22

*MTD Prod Inc. v. Iancu*,
    933 F.3d 1336 (Fed. Cir. 2019)........................................................................................22, 25

*Paice LLC v. Ford Motor Company*,
    685 Fed. Appx. 940 (Fed. Cir. 2017)....................................................................................15

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................................................20, 21

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013).........................................................................................11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   No. CV 04-1371-LPS, 2016 WL 1171496 (D. Del. Mar. 24, 2016) ......................................22

*Purdue Pharma L.P. v. Endo Pharm. Inc.*,
   438 F.3d 1123 (Fed. Cir. 2006).........................................................................................17

*SanDisk Corp. v. Memorex Prod., Inc.*,
   415 F.3d 1278 (Fed. Cir. 2005).....................................................................................14, 17

*Techno View IP, Inc. v. Facebook Techs., LLC*,
   No. CV 17-386-CFC-CJB, 2018 WL 6427874 (D. Del. Dec. 7, 2018).................................18

*Teleflex v. Ficosa America Corp.*,
   299 F.3d 1313 (Fed. Cir. 2002).....................................................................................11, 15

*Trivascular, Inc. v. Samuels*,
   812 F.3d 1056 (Fed. Cir. 2016)...........................................................................................4

*Velocity Pat. LLC v. FCA US LLC*,
   No. 13 C 8419, 2018 WL 4214161 (N.D. Ill. Sept. 4, 2018)...............................................18

*Velocity Pat. LLC v. Mercedes-Benz USA*,
   LLC, No. 13-cv-8413, 2016 WL 5234110 (N.D. Ill. Sept. 21, 2016) ...................................17

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)............................................................................................2

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015).....................................................................................17, 24

## TABLE OF EXHIBITS

| Exhibit No. | Description |
| :---: | :--- |
| Y | U.S. Pat. No. 8,088,071 |

Plaintiff FUJIFILM Sonosite, Inc. ("Sonosite") hereby submits its Responsive Claim Construction Brief. As confirmed below, Sonosite's constructions should be adopted.

## I.    DISPUTED CLAIM TERMS

### A.    The '157 Patent

#### 1.    "information of object"

The claims require "information of object," and that specific phrase is repeated almost 40 separate times throughout the specification.  Because this term appears nowhere in any cited document other than in the '157 Patent itself, its construction must be based on the intrinsic evidence, and more specifically the specification, since the file history is silent in this regard.  The closest definitional citation from the specification is as follows: "The ***information of object represents***, for example, ***one of the body parts such as liver, heart and so on of a human or a test phantom as the object to be inspected***." '157 Patent at 4:37-39 (emphases added; all emphasis herein added unless otherwise noted). And Sonosite's proposed construction, i.e., "information that represents one body part to be scanned, such as a particular organ" comes from that passage.

To challenge Sonosite's construction, Butterfly focuses on the phrase "for example" in that citation, to argue that this portion of the specification is not ascribing meaning, but is merely just one example of what "information of object" could mean.  Def. Br. at 3.  But Butterfly misinterprets the patent language—the "for example" language simply acknowledges that the body parts identified there are merely examples; in other words, "information of object" is not limited to being only a "liver" or a "heart"—those are just the stated examples, preceded by the "for example" terminology.  That does not change the definitional nature of this language.

Butterfly also disagrees that this term relates to an individual body part.  Butterfly argues that the phrase "respective body parts" in the sentence of the specification "[n]ext, examples of the settings of the parameters for the respective body parts of an object to be inspected will be

-1-

described" proves that "information object" refers to "more than one body part." Def. Br. at 3 (citing 10:33-67). Yet this sentence of the '157 specification confirms that Sonosite's construction is correct. It shows that the '157 Patent intended for parameters to be set in correspondence with a respective body part—or as the claim recites—"in correspondence with the information of object." Butterfly's attempt to frame Sonosite's construction as "limiting the claims to specific examples in the specification" thus misses the mark. Def. Br. at 4. As discussed above and further below, Sonosite's proposed construction is not directed to a specific example but rather "stays true to the claim language and most naturally aligns with the patent's description of the invention." *Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F. 3d 1314, 1321 (Fed. Cir. 2016).

The stated objects of the invention also confirm that Sonosite's proposed construction is correct. The '157 Patent, in discussing the present invention, states "[t]he first object of the present invention is to provide an ultrasonic diagnostic apparatus in which optimum transmission/reception conditions and the image processing conditions can be easily set for each individual body part of an object to be inspected" and "the second object of the present invention is to provide an ultrasonic diagnostic apparatus in which transmission/reception conditions and image processing conditions optimizing an image in a region of interest within a screen can be easily set for each individual body part of an object to be inspected." '157 Patent at 2:16-25. Both include setting transmission/reception conditions and image processing conditions for each individual body part of an object to be inspected. "When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007).

Further, in viewing the phrase "information of object" in the context of the claims, only Sonosite's construction is consistent with the stated goals of the invention. Claim 1 includes: "an

information input unit to be employed for inputting information of object concerned with the object to be inspected; a parameter memory unit for storing the image processing condition parameters to be used in the image processing unit, in correspondence with the information of object…" '157 Patent at 14:65-15:4. Throughout the specification, the invention is described as directed to setting image processing and transmission/reception conditions for a "particular" or "individual" body part. *E.g.*, *id.* at 2:55-58 ("[t]herefore, optimum transmission/reception conditions or image processing conditions ***for the particular body part*** can be easily set by inputting the information of object"); *id.* at 1:41-42 ("a gradation control process proper ***for each individual body part***"); *see also id.* 9:56-60 ("A region which is analyzed by the image analysis unit 65 is a predetermined one prescribed ***for every body part*** beforehand. The analytical region is set on the basis of the information of object input from the information input unit 3.").

Moreover, as this Court has found, "[i]f a specification consistently uses two terms interchangeably, this may also serve as a definition equating the two." *Aortic Innovations LLC v. Edwards Lifesciences Corp.*, Case No. 1:21-cv-01377-JPM, D.I. 125, slip op. at 15 (D. Del. May 9, 2023). Here in the '157 Patent specification, "body part of an object to be inspected" or "individual body part" are repeatedly used interchangeably with "information of object." *E.g.*, '157 Patent at 8:1-14 ("[i]n a case where the ***body part of an object to be inspected*** and diagnosed is near to the surface of the object … [o]n the other hand, in a case where ***the body part of an object be inspected*** and diagnosed is far from the surface … [s]ince the ***individual body parts of an object to be inspected*** differ in distances from the surface of the object"); 2:18-20 ("the image processing conditions can be easily set for each ***individual body part of an object to be inspected***").

The extrinsic evidence confirms that "information of object" has no meaning outside of the '157 patent, as all of Butterfly's dictionary citations are to "information" or "object," but not to

-3-

the special term at issue in the '157 patent. Def. Br. at 4.

Finally, Butterfly also cites a decision from the PTAB in support of its position. *Id.* at 4-5. However, that is merely a preliminary decision that triggers the PTAB's further review—with which Sonosite disagrees—and it is not based on a full evidentiary record, and should be disregarded by the Court for purposes of the analysis here. *See Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1068 (Fed. Cir. 2016) ("[T]he Board is not bound by any findings made in its Institution Decision. At that point, the Board is considering the matter preliminarily without the benefit of a full record. The Board is free to change its view of the merits after further development of the record, and should do so if convinced its initial inclinations were wrong."). Sonosite expects to offer a more fulsome evidentiary record at the PTAB, including *e.g.* expert testimony.

### 2.    "image analysis unit" is not a means plus function term

For this term, Butterfly neglects to mention the eight other terms that use the word "unit" in the '157 Patent. In the context of this intrinsic record, the plain and ordinary meaning of the word "unit" is a "processing unit," or more simply a "processor." Thus, the plain and ordinary meaning of "image analysis unit" is simply a "processor that can analyze image data."

The Court, in construing the term, need look no further than the figures and the specification of the '157 Patent.  Figures 1 and 6 are circuit block diagrams of the present invention that show an "image analysis unit 65" as one of many processing "units" within the ultrasonic diagnostic apparatus. *See* '157 Patent at Fig. 1; Fig. 6; 4:8-10; 11:1-5. The specification further describes that the "image analysis unit 65" is "interposed between the [analog/digital] A/D conversion circuit 63 and the [digital scan converter] DSC 68[.]" '157 Patent at 5:65-67.  Butterfly claims that "Figures 1 and 6 just show 'image analysis unit 65' as a black box function," but this argument fails to address that the circuit block diagram itself imparts structure to the image analysis unit. The mere fact that these elements are shown as part of a circuit block diagram further

-4-

supports that each of these "units" shown in Figures 1 and 6 is or includes a processor, that together perform the claimed functionality of the invention of the '157 Patent.

Butterfly's cited cases are distinguishable because, unlike here, those cases address situations where the term at issue failed to provide the structure recited. For example, in *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, the "cheque standby unit" was only depicted in a figure "as a vertical line indistinguishable from the main transfer path 106a." 899 F.3d 1291, 1298 (Fed. Cir. 2018). Butterfly's citation to *Media Rights Techs., Inc. v. Capital One Financial Corp.* suffers similar deficiencies where the term "compliance mechanism" was not depicted in the circuit block diagrams of the patent. *See* 800 F.3d 1366, 1372-73 (Fed. Cir. 2015).

Finally, Butterfly alleges that, if it is correct that this is a means plus function term—which it is not—and even if the patent includes sufficient structure, it still should be found indefinite because it lacks a specific algorithm. Def. Br. at 7. Butterfly here sets up its own strawman; it creates the problem with its proposed construction that would require "analyzing image data" to mean "detecting peaks and calculating maximum values, minimum values, and average value of an intensity, by histogram analysis." *See id*. But, the patent explains that "[t]he analysis in the image analysis unit 65 is made by *extracting certain frame data from among data being scanned*."'157 Patent at 6:58-60. Thus, even assuming this is means-plus-function—a presumption not overcome—the specification describes a structure with a specific algorithm.

Thus, "image analysis unit" is not means plus function, and its proper construction is "at least one processor programmed to analyze the image data by extracting certain frame data from among data being scanned," or, even more simply, "a processor that can analyze image data." Butterfly's proposal, which attempts to sneak in much more detailed requirements, such as "by a histogram analysis," should be rejected.

### 3.    "normalization process" should be afforded its plain meaning

"Normalization process" has a well understood meaning, *i.e.*, a "process" for "normalizing" image data. Butterfly's own extrinsic evidence supports this well-understood meaning—it defines "normalize" as "[t]o adjust a measured parameter to a value acceptable to an instrument or measured technique." Def. Br. at 9. This is consistent with the definition cited by Sonosite that "normalization" is "the process of decomposing and restructuring a more complex data structure in order to reduce the structure to a simpler, more stable form." Pl. Br. at 8. In both definitions, data is "adjusted," or "restructured," to a "value acceptable," or "more stable form." Anything narrower would be inconsistent with the plain meaning and unnecessarily limiting.

Yet Butterfly's proposed construction does just that—it improperly limits "normalization process" to one exemplary embodiment.  That is particularly problematic here, because the '157 Patent provides at least *two* concrete examples of a "normalization process": 1) "a linear transformation is made by way of example so that the region between the maximum value max1 and the minimum value min2 may become the full output range for the image data"; and 2) "that the region between the maximum value max2 and the minimum value min2 may become the full output range for the image data[.]" '157 Patent at 10:6-12. Butterfly's construction improperly limits to only the first embodiment.  Butterfly alleges "normalization" is "not just any transformation of the image data" and that "all sorts of unrelated image processing processes" would be implicated. Def. Br. at 9.  However, the claims also separately recite that "image processing condition parameters" are used, and Butterfly improperly conflates these concepts.

Accordingly, a "normalization process" is a process for normalizing image data, and, to the extent further construction is necessary—and Sonosite believes it is not—an appropriate further construction would be "a process of performing a transformation on image data using parameters calculated based on at least peaks detected in the data."

-6-

### 4.    "region setting unit" is not a means plus function term

Butterfly is wrong on this term for similar reasons as discussed above with respect to the claimed "image analysis unit." In short, there are eight other terms that use the word "unit" in the intrinsic record of the '157 Patent, and in this context, a "unit" is a "processing unit," or more simply a "processor." Thus, the term conveys sufficient structure, and should be given its plain and ordinary meaning (in other words, simply a "processor that can set a region of interest").

Figure 6 of the '157 Patent is a circuit block diagram that shows "region setting unit 4" as one of many processing "units" within the ultrasonic diagnostic apparatus. *See* '157 Patent at Fig. 6; 11:1-5. The patent also explains that the region setting unit "prescribes an image region in which image data are analyzed" and thus no specialized algorithm is required. *Id*. at 11:13-16; ("A desired *region of interest (ROI)* in a screen can be set by employing the *region setting unit 4*. The region of interest prescribes an image region in which image data are analyzed."); 11:22-26; 12:14-18 ("At step S16, the operator *sets a desired region of interest (ROI)* by the use of the *region setting unit 4* while watching the displayed image. The setting can be made by, for example, designating the center of the region or designating a closed region with a pointer or the like.").

Thus, "region setting unit" is not a means plus function term, and needs no construction. If it is further construed, its proper construction is "processor that can set a region of interest."

### B.    The '985 Patent

#### 1.    "accessible by a hand of the user that is holding the portable ultrasound system" means "accessible by the user's hand that is holding the base unit"

Butterfly is attempting to broaden the scope of the '985 Patent claims beyond what they recite, purely for invalidity purposes. By taking words out of context and viewing them in isolation, Butterfly argues that the plain meaning of "a hand … holding the portable ultrasound system" is "either hand." Def. Br. at 11. But, as Sonosite explained, this ignores the antecedent basis of the

term "portable ultrasound system" in the same claim—claim 1 recites only "[a] portable ultrasound system, comprising a hand-held base unit"; the hand holding *the* portable ultrasound system must hold at least the base unit. Pl. Br. at 12. Notably, claim 1 does not preclude access by the other hand—claim 1 simply says nothing about a transducer or a hand holding it. *See* '985 Patent at 8:2-21. Therefore, contrary to Butterfly's argument, Figure 1B's depiction of a two-handed system is not inconsistent with Sonosite's construction based on the claim language reciting only the base unit. *Id.* at Fig. 1B. Sonosite's construction does not import limitations from the specification, *contra* Def. Br. at 12 n.4, because Sonosite's construction is based on the claim language itself.

Nor does the specification support Butterfly's "either hand" construction. Under Butterfly's construction, a second control area *not* accessible to the hand holding the base unit would satisfy the claim element here, so long as the other hand can access it—but Butterfly offers no support for this construction. In fact, Butterfly's own citation to the specification also undermines such a construction. Butterfly points to control area 355a in Figure 3C (which corresponds to the "second control area" in the claim), as "accessible by *either* the user's left hand *or* ... the user's right hand" as support for Butterfly's "either hand" construction. Def. Br. at 11. But what Butterfly recites is simply the fact that the control area 355a is accessible to *both* hands of the user, which includes the hand holding the base unit. This actually supports Sonosite's construction, which requires that the second control area be accessible to *at least* the hand holding the base unit—a control area accessible to both hands would, of course, satisfy that requirement.

The specification makes clear that, "[i]n one aspect of *this* embodiment [depicted in Figure 1B]," '985 Patent at 2:65-66; *see also id.* at 2:57-65 (describing the same embodiment in Figure 1B)*,* "a user can use one hand (e.g., the right hand) to operate the transducer wand 102 and simultaneously use the other hand (e.g., the left hand) to *carry and operate* the base unit 110," *id.*

-8-

at 2:66-3:2. To enable this, the immediately following text in the patent discloses that, in the GUI shown in Figure 3C, "the touchscreen 114 can include a graphical thumb controller (not visible in FIG. 1B) configured to control the base unit 110." *Id.* at 3:3-5. This key aspect of the invention is illustrated, e.g., in Figs. 1B and 3C (annotated below), which depict a clinician holding the unit in the left hand, and then shows the interface of that screen, with left-handed thumb operation:



Fig. 1B                                                      Fig. 3C

Thus, the interface in Figure 3C, which Butterfly cites for disclosure of the "second control area" at issue, must enable the same hand to "carry ***and*** operate the base unit 110." *Id.* at 3:1-2. This necessarily requires that the second control area be accessible to at least the hand "carry[ing]"—i.e., holding—the base unit. Construing the term otherwise would render the limitation superfluous, and would be inconsistent with the antecedent basis in the claim and the specification. Pl. Br. at 12 n.5; *see also Intel Corp. v. Qualcomm Inc.*, 21 F.4th 801, 810 (Fed. Cir. 2021).

Hence, unlike the rejected constructions in *Columbia Ins.* and *Nike*, *see* Def. Br. at 11-12, Sonosite's construction accurately reflects the plain and ordinary meaning of the term read in the context of the claim and intrinsic evidence.

      **2.**      **"controls that can be selectively activated by a thumb of the user to select" means "controls that a thumb of the user's hand holding the base unit can selectively activate to select"**

Butterfly makes no substantive argument here. Instead, it makes conclusory assertions that the term requires no construction, even though, as with the term "second control area" above, here

Butterfly is advocating for an interpretation of the term "thumb" and construes it as either thumb. Def. Br. at 12. As Sonosite has explained, immediately after reciting a second control area accessible to the hand holding the base unit, the claim language recites controls in that control area being "activated by a thumb of the user"; hence, the thumb naturally refers to the thumb of the same hand. Pl. Br. at 13. Construing it otherwise is not only contrary to this plain-language reading, but also again renders the claim limitation—and the invention allowing for one-handed operation—meaningless. *Id.*; *see also Intel*, 21 F.4th at 810.

Butterfly's only other assertion here—that Sonosite's construction means accessing the "second control area" using only the hand holding the base unit and only the thumb of that hand, Def. Br. at 12—is incorrect and already addressed both above, *supra* Part II.B.1, and in Sonosite's opening brief, Pl. Br. at 13. Sonosite's construction does not prevent access by the user's other hand *in addition* to the thumb of the hand holding the base unit, but it requires that the controls can be activated at least by the thumb of the hand holding the base unit. Butterfly's construction is nonsensical when read in light of the surrounding claim language and the intrinsic evidence.

### C.    The '050 Patent

Butterfly asserts that the preamble is not limiting, yet fails to address the intrinsic and extrinsic evidence. Def. Br. at 35. Butterfly cites a string of case law without analysis and claims the preamble "merely describes a use or purpose," ignoring the repeated references in the '050 specification to the invention being support devices for ultrasound scanners. *Id.* Butterfly's analysis of the *Catalina* "guideposts" does not fare any better.  As Butterfly concedes, these "guideposts," such as whether the preamble serves as an antecedent basis for later terms, merely *may* indicate when a preamble is limiting. *Id.* And contrary to Butterfly's assertion, the preamble of Claim 1 informs one skilled in the art as to the subject matter encompassed by the claim. For example, the preamble "gives meaning and vitality" to the claim by reciting a structure that is

important to the invention—it indicates how the structures in the claim, *i.e.*, a body, a recess, and a peripheral channel, are interrelated. *See INVISTA N. Am. S.a.r.l. v. M & G USA Corp.*, 951 F. Supp. 2d 604, 612 (D. Del. 2013) (the term "composition" in the preamble was limiting because, without it, the claim merely listed a set of components, and the "composition" term supplied necessary structure). In other words, the preamble in Claim 1 is important to understand that the invention is directed to an ultrasound scanner support device rather than just a body, a recess, and a peripheral channel together without mention of ultrasound devices.  Moreover, as detailed in Sonosite's opening brief, Pl. Br. at 14-15, the entirety of the intrinsic evidence consistently and repeatedly recites to the support device being one for an ultrasound scanner, and it would make no sense on this record to ignore that limitation. Butterfly's construction should therefore be rejected.

### D.     The '108 Patent

#### 1.     "An ultrasound system application specific integrated circuit (US-ASIC)" is limiting in accord with its plain meaning

Butterfly has failed to overcome the "heavy presumption" of plain meaning. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1350 (Fed. Cir. 2013).  Butterfly's proposed construction deviates from the plain meaning by rewriting the claim to add additional limitations. Butterfly cites no evidence establishing that the plain meaning of US-ASIC includes "inputs echo signals from a transducer and outputs video signals based on the echo signals." Rather, Butterfly merely imports limitations from the written description into the claims, Def. Br. at 13-14, a practice routinely rejected by courts. *Teleflex v. Ficosa America Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002).

Butterfly argues that Sonosite's construction fails to identify "structure" in its proposed construction, but its reliance on *Enzo*, Def. Br. at 12-13, is misplaced; here, the term itself identifies an essential structure—an application specific integrated circuit, which clearly articulates that the structure should be an integrated circuit, and, in this context, one used in an ultrasound device.

-11-

### 2.    "one or more digital signal processor(s)" should be given its plain meaning

A "digital signal processor" has a customary meaning in the field. D.I. 73 Ex. J; Pl. Br. at 17-18. Butterfly presented no compelling reason to deviate from that meaning here. Butterfly incorrectly states that "[t]he parties agree that a 'digital signal processor' is not just any circuitry capable of processing digital signals; rather, it is at least a 'microprocessor.'" Def. Br. at 15. Sonosite's position is that the plain and ordinary meaning controls, and no further construction is necessary. Even if further construction is necessary, Sonosite did not agree to distinguish "any circuitry capable of processing digital signals" from a "microprocessor."

Butterfly's addition of "execution of program code" is unnecessary. Butterfly first alleged that "all microprocessors [execute program code]." *Id*. If Butterfly's statement were correct, addition would be unnecessary and superfluous, and would not affect the scope of the term at all. However, this is not the case, and is instead apparently Butterfly's attempt to embed a non-infringement position into the claim construction.  In fact, Butterfly presented no evidence that all microprocessors execute program code. Butterfly alleges that "[b]y definition, [microprocessors] all execute program code or software instructions," without any support. *Id*. Instead, the only intrinsic evidence Butterfly relies on are mentions of the word "program." *Id*. at 15-16. Similarly, the only extrinsic evidence Butterfly relies upon are unrelated sentences with the words "program" or "instruction" from various sections of three books. *Id*. These do not support adding "execution of program code" to the well-known term at issue.

Butterfly's proposed limitation "in real time" is also improper. As suggested in the *Handbook of Digital Signal Processing*, not all digital signal processors operate in real time. D.I. 73 Ex. J at 941. Both real-time and non-real-time processors can achieve the purpose of forming ultrasound images, and Butterfly presents no evidence establishing the '108 Patent excludes any

-12-

particular type of digital signal processor.

Nor is the limitation "mathematically intensive operations" justified. The extrinsic evidence Butterfly cites, at most, shows that *some* digital signal processors perform "mathematically intensive operations"—for example, Butterfly points to a Texas Instruments book and article, Def. Br. at 16 (citing D.I. 74 Ex. 26), both of which describe the same single family of digital signal processors manufactured by one particular company. Butterfly's extrinsic references do not establish that *all* digital signal processors require "mathematically intensive operations." *See id.* (citing Exhibits).

### 3.    "input/output channels" is not a means plus function term

This term recites sufficient structure so that §112, ¶6 is not applicable. Butterfly alleges that the term is described solely by how it functions. That is incorrect. As Sonosite explained, the term itself is well known in the art. Pl. Br. at 19-20. The only argument Butterfly presented is that all components in Figure 5 are black boxes and thus any component connecting them is "just another black box function." Def. Br. at 17. This is wrong. First, while Figure 5 depicts each component in block diagram form, the structures and functions of these components are described in detail in the specification. Second, Figure 5 depicts the most important structure of an I/O channel—which components it connects to. In other words, an I/O channel can simply be a structure linking other structures, such as a conducting wire.

Butterfly's alternative construction is improper at least based on its addition of "peripheral component." There is no justification for limiting the claimed channels to require communication with "peripheral" or "external" components. Def. Br. at 17-19. For example, while the specification suggests that components not conducive to inclusion on a single die, such as certain data libraries, memory buffers for large files, video data and video memory, may remain separate, '108 Patent at 4:4-9, the specification also does not require other memories, such as the memory

for FE ASIC 230 and 2D/3D image memory 242, to be separate. *Id.* at 4:4-9, Fig. 5. Indeed, Figure 5 clearly shows these memories within the boundary of an exemplary embodiment of the claimed ASIC. *Id.*, Fig. 5. Therefore, the specification does not support a read that an I/O channel can *only* connect to external components. Further, among the cited dictionaries, only one supports Butterfly's "peripheral component" read, while other cited sources, including those identified by Butterfly, are silent on whether a channel must connect external components. *See* D.I. 74 Ex. 36 at 3025; *but see* Ex. 35 at 3042-43; Ex. 34 at 3028; D.I. 73 Ex. K.

### E.     The '822 Patent

#### 1.     "determining a mask of pixels that correspond to the location of the interventional instrument" / "determine a mask of pixel coordinates that correspond to the location of the interventional instrument" should be given plain and ordinary meaning

As stated in Sonosite's opening brief, Butterfly seeks to import an *expressly deleted* element back into the claim. Pl. Br. at 22-23. For this reason alone, Butterfly's proposal is critically flawed and contrary to the intent and understanding during prosecution.  Butterfly also incorrectly argues that Sonosite's proposed construction contradicts the intrinsic record because it includes "masks that encompass every pixel in the second frame, or only pixels corresponding to the interventional instrument and no surrounding area." Def. Br. at 20. This is incorrect. First, Butterfly's own construction also includes masks that "encompass every pixel in the second frame." This is a result of parties' use of "include" in their constructions, Pl. Br. at 21-22, and it is axiomatic that the use of "include" does not exclude additional unrecited elements. *SanDisk Corp. v. Memorex Prod., Inc.*, 415 F.3d 1278, 1284 (Fed. Cir. 2005). Second, Sonosite's construction is consistent with the specification which suggests the mask is the result of the detection step. *See* '822 Patent at 9:39-47. Whether the surrounding area is included, therefore, depends on the selection of the algorithm and parameters. *See id*. at 9:26-38. While the preferred embodiment

-14-

includes the immediately surrounding pixels, a preferred embodiment, even if it is the only embodiment, should not be read into the claim. *See, e.g.*, *Teleflex*, 299 F.3d at 1324, 1328.

### 2.   "blending pixels from the first frame and the second frame" / "combine a first set of pixels from the first frame and a second set of pixels from the second frame" should be given plain and ordinary meaning

Butterfly again attempts to incorporate descriptions in the specification into the claim language. While one embodiment from the specification teaches calculating a weighted average of the two pixel values, the specification provides two additional embodiments that Butterfly improperly seeks to exclude. *See* Pl. Br. at 24.  That proposal should be rejected.

### 3.   "producing a graphic indication on the blended final ultrasound image" / "producing a graphic on the blended final ultrasound image" should be given plain and ordinary meaning

Butterfly also attempts to import a temporal requirement into the claim. However, the claim, specification, and file history do not require this.  The sequence of the claim elements does not limit the order of steps covered by the elements unless the steps "actually recite an order." *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001); *see also Paice LLC v. Ford Motor Co,*, 685 F. App'x 940, 944 (Fed. Cir. 2017) (rejecting a construction requiring two steps in a claim be performed at the same time). The claim here does not actually recite such an order. To be clear, Sonosite is not arguing that each element may be performed in any sequence, rather Sonosite's position is that the last element, i.e., the step of producing a graphic indication, is not necessarily performed after the blending step. It is true that some claim steps are inherently performed after others; for example, "generating a first frame using … the first ultrasound signature" is logically performed after "establishing a first ultrasound signature." '822 Patent at 12:30-37, 46-47. However, Butterfly cannot argue that all elements must be performed strictly following the sequence of steps. For example, while the claim uses first and second ultrasound imaging signatures, "establishing a first ultrasound imaging signature" (e.g., parameters

for producing an image of tissue) can be performed after "establishing a second ultrasound image signature" (e.g., parameters for producing an image of an instrument) as they are parallel steps. *See* '822 Patent, Fig. 5. This is also true regarding the "producing" step.

Butterfly relies on the word "final" and the article "the" to argue that the "producing" step is performed after the "blending" step. Def. Br. at 23. However, the phrase "final image" does not refer to an order of steps, but rather identifies where the graphic indication should be displayed—namely, the graphic indication should be displayed to the clinician on the final image, not some interim image. Pl. Br. at 25-26. To this end, Butterfly's reliance on *Hytera* is misplaced. Def. Br. at 22-23. There, each step could not be performed unless the preceding step was performed. *See Hytera Commc'ns Co. v. Motorola Sols., Inc.*, 841 F. App'x 210, 218-219 (Fed. Cir. 2021) (claim recited "preparing to transmit a particular payload type in a timeslot;" "determining whether the timeslot is a current desired timeslot," and "transmitting a burst in the timeslot," which could only be performed in sequence). However, the producing step here does not have such a requirement. While the blending step provides antecedent basis for "the final image" in the producing step, this merely indicates the effects of both steps are shown on the same final image.

The specification also supports that the producing step is not necessarily performed after the blending step because the producing step does not rely on results generated in the blending step. In one embodiment, the specification describes that the graphic indication is used to indicate a coverage area "where high quality visualization of the interventional instrument is enabled." '822 Patent, 11:42-47. The coverage area is controlled by parameters used to generate the second image. *Id*. The graphic indication does not depend on the pixel values of the combined final image resulting from the blending step. *See id*. at 11:37-55. The coverage area is thus ascertainable once the parameters are determined. Therefore, the graphic indication can logically be generated on the

first image, the second image, or a blank image to which the blended pixels values are later added. This position is further illustrated in the specification. *See id.*, Fig. 6.

Lastly, Butterfly misinterprets the file history. As explained in Sonosite's opening brief, Butterfly's quotes do not support its proposed construction. Pl. Br. at 25-26. The portions of the file history quoted by Butterfly generally relate to the Applicant's distinguishing of the Ouchi prior art reference, which displayed graphic indications on ***interim*** images.  To distinguish that prior art functionality—which would be useless to a clinician in this needle enhancement context—the Applicant made clear that the graphic indication is provided not on an interim image, but rather on the final image. *See id.* That history provides no limitation whatsoever regarding how or when that indication is added, so long as it is shown. *See id.*  Thus, Butterfly's characterization of the file history is incorrect, and certainly does not suggest the kind of "clear and unmistakable disavowal" required by the Federal Circuit to support Butterfly's position. *See Purdue Pharma L.P. v. Endo Pharm. Inc.*, 438 F.3d 1123, 1136 (Fed. Cir. 2006); *see also SanDisk Corp.*, 415 F.3d at 1287.

### 4.    "processor" is not a means plus function term

As explained in Sonosite's opening brief, courts have repeatedly found that "processor" is not a means-plus-function term.  Pl. Br. at 27-28.  Butterfly's argument misinterprets the law. While *Williamson* provides general guidance regarding means-plus-function, it does not directly answer whether a term "processor" in the claim recites sufficient structure. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351-52 (Fed. Cir. 2015).

Butterfly ignores cases finding "processor" not means-plus-function, and its reliance on *Velocity Patent LLC v. Mercedes-Benz USA*, LLC, No. 13-cv-8413, 2016 WL 5234110 (N.D. Ill. Sept. 21, 2016), is misplaced. That court later explained that the "processor" there was means-plus-function for a very particular reason—because it failed to provide information regarding input into the processor and how the input affects the output.  *Velocity Patent LLC v. FCA US LLC*, No.

13 C 8419, 2018 WL 4214161, at *8 n.16 (N.D. Ill. Sept. 4, 2018).  Contrary to Butterfly's argument, the '822 Patent provides sufficient structure. For example, the claim discusses the process the input pixel values of the first and second images, and Figure 5 also illustrates structural information as to inputs into and outputs from the processor. '822 Patent at 14:1-15, Fig. 5.

Butterfly also misinterprets *GoDaddy* when it states its holding is that "for functions that are not typical functions found in a general-purpose processor and require additional programming of the processor to implement, functions like 'associating' data or 'performing' certain steps, §112, ¶6 would apply." Def. Br. at 25. However, courts in Delaware have analyzed *GoDaddy* and reach a different result, finding that when the term "processor" is found to invoke Section 112, paragraph 6, "courts have explained that the claimed 'processor' failed to convey to the person of skill in the art anything about the internal components, structure, or specific operation of the processor." *Techno View IP, Inc. v. Facebook Techs., LLC*, No. CV 17-386-CFC-CJB, 2018 WL 6427874, at *6 (D. Del. Dec. 7, 2018) (quoting *GoDaddy.com, LLC v. RPost Commc'ns Ltd*, No. CV-14-00126-PHX-JAT, 2016 WL 212676, at *56-57 (D. Ariz. Jan. 19, 2016)). As explained below and in Sonosite's opening brief, the '822 Patent discloses internal components (e.g., Reduced Instruction Set Controller), structure (e.g., input and output of the processor), and specific operation (e.g., operating under control of an instruction set). Pl. Br. at 27-29.

Butterfly also completely ignores critical details incorporated into the '822 Patent.  For example, a co-pending application 12/467,899, now U.S. Pat. No. 8,088,071 ("the '071 Patent"), is incorporated by reference into the '822 Patent, provides additional "[d]etail with respect to imaging systems which may be adapted according to the concepts of the present invention," *see* '822 Patent at 4:46-51, including details regarding two types of processors, each of which, individually or combined, provide examples of the recited processors.  The '071 Patent discloses

that "[t]he graphics processor need not be incorporated into the core electronics system package, instead relying on a dedicated graphics processor card integrated into a docking module 40 of the modular system 60," and further articulates the preferred type of a central processor is "a RISC (reduced instruction set controller) processor." Ex. Y, '071 Patent at 5:34-38, 5:48-49. It further describes that "[t]he RISC processor is coupled to the front-end and digital signal processing ASICs to control and synchronize the processing and control functions for both the core module, and the modular system the core module may be linked into at the time." *Id*. at 5:49-53.

Finally, the dictionaries Butterfly cites do not show that "processor" lacks structure—to the contrary, they show that the term itself connotes sufficient structure. *See* Def. Br. at 25.

### F.    The '981 Patent

#### 1.    "display of an impulse drive type" should be afforded its plain meaning

Butterfly's arguments confirm that Sonosite's construction is correct. As Butterfly points out, in "an impulse drive type" display, the luminescent state "is limited in *a predetermined period* within one frame period." Def. Br. at 27 (quoting '981 Patent at 6:32-52). A "predetermined period" is not an "instant"—according to Butterfly, emitting light for an "instant" means that "the brightness level *immediately* begins to degrade" *Id.*[1] That is not what happens in the impulse drive type display here—Figure 4 clearly demonstrates that the light-emission does not immediately degrade, but lasts for a "period" within a field period. '981 Patent, Fig. 4. Butterfly further asserts that, in an impulse drive type display, "the luminescent state or brightness level for a pixel cannot be 'fixed' for *any period of time*" Def. Br. at 27. That is not correct—Figure 4 clearly shows that light emission of the pixel is fixed for a certain period of time even though that period is shorter

---

[1] While Butterfly cites the '981 Patent at 6:32-42 here, the citation is inapposite because it does not state that the brightness level immediately begins to degrade.

than a field period, which is accurately captured by Sonosite's construction. '981 Patent, Fig. 4.

Butterfly relies on extrinsic evidence to establish a purported "common[] underst[anding] in the art." Def. Br. at 27 (citing D.I. 74 Exs. 43-46). However, extrinsic evidence cannot be used "to contradict claim meaning that is unambiguous in light of the intrinsic evidence," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1324 (Fed. Cir. 2005), which is exactly what Butterfly attempts to do here—as explained above, the '981 Patent unambiguously discloses that light emission can be fixed for a certain time within a field period.

Moreover, the extrinsic evidence cited by Butterfly is inapposite in any event because it discusses "impulse drive" in the context of cathode ray tube ("CRT") displays—a different, older technology. *See* D.I. 74 Ex. 43 at 1:14-17 ("A liquid crystal display device has advantages such as small thickness … as compared to a display device using a ***cathode-ray tube (CRT)***."), 1:35-39 ("A ***display device such as a CRT***, in which display is performed by light emission that lasts only for an extremely short time in one frame period . . ."); D.I. 74 Ex. 44 ¶1 (stating that LCDs are "substitutes for CRT displays"), ¶6 ("impulse-type driving method which is used ***in CRT and the like*** . . . ."); D.I. 74 Ex. 45 at 1:32-33 ("The way that the ***CRT monitor*** displays the frames is called an impulse type. Each pixel only emits light at an instant …"). Therefore, Butterfly's references on "impulse drive type display" are inapplicable because the invention in the '981 Patent does not use CRT monitors or the like. *See generally* '981 Patent (no reference to CRT displays). In any event, to the extent that Butterfly's extrinsic evidence suggests that pixels in impulse drive type displays must emit light for only an "instant," that is contradicted by '981 Patent's specification, as discussed above, rendering such extrinsic evidence irrelevant. *Phillips*, 415 F.3d at 1324.

Lastly, Butterfly argues that claim 3's reference to "an organic EL (electro luminescence) display" is ***in addition to*** the "impulse drive type" display recited in claim 1, allegedly because, so

Butterfly argues, an organic EL display is not an impulse drive type display but a hold type display. Def. Br. at 28. This is contradicted by the specification. For example, Figure 3 shows a configuration of the impulse drive type display in display unit 30, and clearly includes an "organic EL element." '981 Patent at Fig. 3, 4:47, 5:18-20, 34-35. Figure 4 further shows a timing chart for operation of the display, which again shows the illumination of the "organic EL element." *Id.* Fig. 4, 5:63-64. Thus, there is no ambiguity that, in the '981 Patent, an organic EL display is an "impulse drive type" display. Butterfly points to no disclosure in the '981 Patent suggesting that an organic EL display is a "hold type" display—indeed, "hold type display" appears only once in the '981 Patent, to show a problem in legacy systems that the present invention overcomes using impulse drive type displays including an organic EL display. '981 Patent Fig. 5A, 6:32-42.

Butterfly's only extrinsic citation is a single patent document characterizing an EL display as a hold-type display, Def. Br. at 28, but that is far from sufficient to constitute an authoritative definition of common understanding in the industry, and Butterfly produces no dictionary definitions and no expert opinion. But in any event, extrinsic evidence cannot be used to contradict clear intrinsic evidence, *Phillips*, 415 F.3d at 1324. Thus, not only does Butterfly's construction introduce new ambiguity as to what an "instant" means, Pl. Br. at 30, but Butterfly's arguments are also contradicted by the specification. Therefore, Butterfly's construction should be rejected.

### 2. "one field period" should be given its plain and ordinary meaning

Butterfly's own arguments show that its construction is circular, because Butterfly's construction refers back to "one field period" for both non-interlace and interlace systems. As Butterfly has admitted, "the period of one frame" in the non-interlace system is equivalent to (hence in turn defined by) one field period, Def. Br. at 28, and one field period in interlace systems is the period of "one of the … fields" in a frame, *id.* at 29. This does nothing more than introduce the extraneous concepts "frame" and "frame period," without clarifying the meaning of "one field

-21-

period." Pl. Br. at 30-31. Sonosite submits that the term requires no construction because it is well understood in the art. *Id*. Sonosite's alternative construction, which memorializes the plain and ordinary meaning ("the period of time of one field of the display"), is taken directly from dictionary definitions that **Butterfly** produced, D.I. 73 Ex. G at 16, which Butterfly notably does not cite.

### 3. "adjustment circuit" is not a means plus function term

Courts construing terms containing the word "circuit" have overwhelmingly rejected accused infringers' arguments similar to those Butterfly makes here, and Butterfly cites no case law to overcome controlling Federal Circuit authority *MTD Prod Inc. v. Iancu,* 933 F.3d 1336 (Fed. Cir. 2019) and *Apex Inc. v. Raritan Computer, Inc*., 325 F.3d 1364 (Fed. Cir. 2003).[2] The Federal Circuit held that the term "circuit" itself connotes some structure, and certainly should not be construed as means-plus-function if further coupled "with an appropriate identifier such as 'interface,' 'programming' and 'logic'"; and, "in the absence of any more compelling evidence of the understanding of one of ordinary skill in the art, the presumption that §112, ¶6 does not apply is determinative." *Apex*, 325 F.3d at 1373; *see also MTD Prod.*, 933 F.3d at 1342. Butterfly produces no such evidence here, let alone "compelling evidence."[3]

Moreover, even assuming *arguendo* that §112, ¶6 did apply, the specification discloses sufficient structure by disclosing where and what the circuit is and how it operates. For example, the specification describes the "adjustment circuit" in detail:

> The blanking period adjustment circuit 310 outputs a signal, which

[2] Butterfly cites *Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1301 (Fed. Cir. 2018) and *Media Rights Techs., Inc. v. Capital One Financial Corp.*, 800 F.3d 1366, 1373 (Fed. Cir. 2015), but neither dealt with a term containing "circuit." *Diebold*, 899 F.3d at 1301 (construing "cheque standby unit"); *Media Rights*, 800 F.3d at 1373 (construing "compliance mechanism").

[3] While Butterfly accuses claim language following "circuit" as "black box functions," courts routinely reject attempts to construe terms with similar or identical structure as means-plus-function terms. *See, e.g., Power Integrations, Inc. v. Fairchild Semiconductor Int'l*, Inc., No. CV 04-1371-LPS, 2016 WL 1171496, at *5 (D. Del. Mar. 24, 2016).

specifies the ratio of the blanking period to the image display period, to the second gate wire drive circuit 303. The second gate wire drive circuit 303 generates control signals, which are activated into the high level in the image display periods of the respective rows and deactivated into the low level in the blanking periods, according to the signal output from the blanking period adjustment circuit 310, and supplies the control signals to the control signal supply wires XiC of the respective rows.

'981 Patent at 5:47-56. There are also contains numerous references detailing how the adjustment circuit is controlled by the control unit. *E.g. id.* at 7:5-17, 25-30, 35-37, 42-47. The specification thus discloses a structure, along with details on the location and operation of the adjustment unit. Accordingly, the term is not indefinite and should be given its plain and ordinary meaning.

### 4.    "control unit" is not a means plus function term

Butterfly's argument ignores the overwhelming weight of the case law holding that the term "control unit" is not a means-plus-function term. *See* Pl. Br. at 33. Butterfly sidesteps that case law by improperly splitting "control" and "unit." Def. Br. at 31. "Control unit" here is not any "unit" that "controls"—on the contrary, as both case law and dictionaries demonstrate, "control unit" is a term well understood in the art. Pl. Br. at 33-34. Therefore, Butterfly's argument based on "unit" being a nonce word is inapplicable. The only case Butterfly cites in support, *IPS Grp., Inc. v. CivicSmart, Inc.*, No. 17-CV-632-CAB-(MDD), 2018 WL 6567843, at *1 (S.D. Cal. Dec. 13, 2018) is both non-controlling and distinguishable. There, the "control unit" was a specialized unit "for controlling supply of power to the load primarily from the main battery and secondarily from the backup battery," *id.*, which deviated from the common understanding in the art of a "control unit" demonstrated in the definitions cited in Sonosite's opening brief. Pl. Br. at 33-34. Butterfly cites no support for its assertion that "[a] 'CPU' is not sufficient structure unless the

claimed functions can be performed by a general-purpose CPU without special programming"[4]—

neither *Williamson* nor *In re Katz* cited by Butterfly, Def. Br. at 31, dealt with the meaning of

"control unit."

The "control unit" here is clearly a structure, consistent with dictionary definitions. *See*

D.I. 73 Exs. S, T. For example, the specification describes the "control unit" as structure as follows:

> The control unit 42 controls the scan control unit 11, the memory 24, the B-mode image signal generating unit 25, the display unit 30, and so on according to an operation of an operator using the console 41. In the embodiment, the scan control unit 11, the transmission control unit 13, the reception control unit 23, the B-mode image signal generating unit 25, and the control unit 42 *are formed of a CPU and software (program)*, however, *they may be formed of digital circuits or analog circuits*.

'981 Patent at 4:52-60. The specification also describes the operation of the control unit, for

example: "the control unit 42 controls the blanking period adjustment circuit 310 to make the

blanking period longer when the part moving at a high speed is observed, and make the blanking

period shorter when the part relatively stationary is observed." *Id.* at 7:26-30.

In addition, based on such disclosures, even assuming *arguendo* that §112, ¶6 did apply,

the specification discloses sufficient structure by disclosing where and what the "control unit" is

and how it operates. Accordingly, the term is not indefinite.

**5.      "image display period control circuit" is not a means plus function term**

Butterfly's arguments here are identical to those with respect to "adjustment circuit."

*Compare* Def. Br. Part VI.E with *id.* Part VI.C. They fail for the same reasons as stated above.

*Supra* Part II.F.3. The word "circuit" connotes some structure and is certainly not a means-plus-

function term when coupled with an appropriate identifier—here, "image display period control."

---

[4] Butterfly also does not explain what constitutes "special" programming.

*Apex*, 325 F.3d at 1373; *see also MTD Prod.*, 933 F.3d at 1342. Butterfly again cites no evidence, much less "compelling evidence," to overcome the presumption that §112, ¶6 does not apply.

Even assuming §112, ¶6 did apply, the specification discloses sufficient structure by disclosing where and what the circuit is and how it operates. For example, the "image display period control circuit" here (e.g. the "second gate wire drive circuit") is described in detail:

> The second gate wire drive circuit 303 generates control signals, which are activated into the high level in the image display periods of the respective rows and deactivated into the low level in the blanking periods, according to the signal output from the blanking period adjustment circuit 310, and supplies the control signals to the control signal Supply wires XiC of the respective rows. The transistor T2 electrically connects the drain of the transistor T3 to the current supply wire YI according to the control signal generated by the second gate wire drive circuit 303.

'981 Patent at 5:50-59; *see also id.* at 6:28-31. The specification thus discloses structure, along with details about the location and operation of the circuit. Plain meaning should govern.

### 6. "second adjustment circuit" is not a means plus function term

Butterfly's arguments here are identical to those with respect to "adjustment circuit." *Compare* Def. Br. Part VI.F with *id* Part VI.C. They fail for all of the same reasons stated above. *Supra* Part II.F.3. And again, even assuming *arguendo* that §112, ¶6 did apply, the specification discloses sufficient structure by disclosing where and what the circuit is and how it operates. For example, the specification describes the "second adjustment circuit" here (e.g. the "luminance information adjustment circuit") in detail. *See, e.g.,* '981 Patent at 8:59-9:20. The specification thus discloses a structure, along with details on its structural location and operation of the adjustment unit. The term should be given its plain and ordinary meaning.

## II. CONCLUSION

The Court should adopt each of Sonosite's proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jeremy A. Tigan*

OF COUNSEL:

Robert L. Maier
Jennifer C. Tempesta
Margaret M. Welsh
Pallavi Mathur
Eric J. Faragi
BAKER BOTTS L.L.P.
30 Rockefeller Plaza
New York, NY  10112
(212) 408-2500

May 18, 2023

Jeremy A. Tigan (#5239)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com

*Attorneys for Plaintiff FUJIFILM Sonosite, Inc.*

-26-

## CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2023, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on May 18, 2023, upon the following in the manner indicated:

Brian E. Farnan, Esquire                              *VIA ELECTRONIC MAIL*
Michael J. Farnan, Esquire
FARNAN LLP
919 North Market Street, 12th Floor
Wilmington, DE  19801
*Attorneys for Defendant Butterfly Network, Inc.*

Steven D. Maslowski, Esquire                          *VIA ELECTRONIC MAIL*
Jason Weil, Esquire
AKIN GUMP STRAUSS HAUER & FELD LLP
1735 Market Street, 12th Floor
Philadelphia, PA 19103
*Attorneys for Defendant Butterfly Network, Inc.*

Paul D. Tripodi II, Esquire                           *VIA ELECTRONIC MAIL*
Clark Gordon, Esquire
AKIN GUMP STRAUSS HAUER & FELD LLP
4 Park Plaza, Suite 1900
Irvine, CA  92614
*Attorneys for Defendant Butterfly Network, Inc.*

C. Brandon Rash                                       *VIA ELECTRONIC MAIL*
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C.  20006
*Attorneys for Defendant Butterfly Network, Inc.*

Brooks J. Kenyon                                      *VIA ELECTRONIC MAIL*
Megan R. Mahoney
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
Bank of America Tower, 44th Floor
New York, NY  10036-6745
*Attorneys for Defendant Butterfly Network, Inc.*

*/s/ Jeremy A. Tigan*

Jeremy A. Tigan (#5239)